UNITED STATES DISTRICT COURT   *ORIGINAL*

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

| | | |
|---|---|---|
| JAMES FABIAN, individually and on behalf of All Others Similarly Situated, | ) ) ) ) | **Motion to Dismiss** |
| Plaintiff, | ) ) | |
| vs. | ) ) | NO. C 19-00054YGR |
| NANO f/k/a RAIBLOCKS f/k/a HIEUSYS, LLC, et al., | ) ) ) | Pages 1 - 39 |
| Defendants. | ) ) | Oakland, California Monday, June 25, 2019 |
| _____ | ) | |

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

APPEARANCES:

For Plaintiff:           Levi & Korsinsky, LLP
                         1101 30th St. NW, Suite 115
                         Washington, D.C.  20007
                    BY:  JOHN A. CARRIEL, ATTORNEY AT LAW


                         Silver Miller
                         11780 W. Sample Road
                         Coral Springs, Florida  33065
                    BY:  TODD R. FRIEDMAN, ATTORNEY AT LAW


           (Appearances continued next page)

Reported By:        Raynee H. Mercado, CSR No. 8258


    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

<u>**A P P E A R A N C E S (CONT'D.)**</u>

```
For Defendants:          Scoolidge Peters Russotti & Fox LLP
                         135 Madison Avenue, Fifth Floor
                         New York, New York  10016
                    BY:  PETER FOX,
                         PETER SCOOLIDGE, ATTORNEYS AT LAW


                         Cornerstone Law Group
                         351 California Street, Suite 600
                         San Francisco, California  94104
                    BY:  PAUL J. BYRNE, ATTORNEY AT LAW


                         --o0o--
```

```
 1    Tuesday, June 25, 2019                          2:56 p.m.

 2                         P R O C E E D I N G S

 3         THE CLERK:  Calling civil action 19-0054, Fabian

 4    versus Nano.

 5       Counsel, please come forward and state your appearances.

 6         MR. CARRIEL:  John Carriel on behalf of plaintiff

 7    Fabian.

 8         MR. FRIEDMAN:  And Todd Friedman also on behalf of

 9    the plaintiff.

10         THE COURT:  Okay.  Good afternoon.

11         MR. FRIEDMAN:  Good afternoon.

12         MR. SCOOLIDGE:  Good afternoon, Your Honor.  Peter

13    Scoolidge, and with me, my partner Peter Fox for the

14    defendants Hieusys, LLC; Colin Lemahieu, Troy Retzer and, Mica

15    Busch.  And with us also is our local counsel Paul Byrne from

16    Cornerstone Law for all these defendants and Zach Shapiro.

17         THE COURT:  Okay.  Who's arguing?

18         MR. CARRIEL:  I am, Your Honor.

19         MR. SCOOLIDGE:  My partner Mr. Fox and I are going to

20    split the arguments, Your Honor, if that's okay with the

21    court.

22         THE COURT:  That's fine.

23       So which arguments are you each taking?

24         MR. SCOOLIDGE:  So Mr. Fox is going to handle the

25    Howey test arguments and the state law arguments, and I'll be
```

```
1    handling everything else, Your Honor.

2            THE COURT:  All right.  Let's start with you.

3            MR. SCOOLIDGE:  So, Your Honor, this is a case about

4    a hack on --

5            THE COURT:  Hold on.  I didn't say you could proceed.

6            MR. SCOOLIDGE:  Apologies.

7            THE COURT:  All right.  Number of things to take care

8    of.  First with respect to the Section 15(a) and Section 12

9    claims, it seems to me that Section 15(a) rises and falls with

10   the analysis of Section 12(a)(1).

11       Would you all agree with that?

12           MR. CARRIEL:  Yes, Your Honor.

13           MR. SCOOLIDGE:  Yes, Your Honor.

14           THE COURT:  Okay.

15       So we'll start with you, Mr. Carriel, on that Section

16   12(a)(1) claim because the statute seems to be pretty explicit

17   that you have to bring those actions within one year after the

18   violation upon which it was based.

19       And while the Ninth Circuit hasn't ruled specifically on

20   whether equitable tolling is appropriate in this situation,

21   every circuit that has rendered an opinion on that topic has

22   said that it doesn't exist.  Right?

23       So the First, Second, Third, Fifth, Sixth and Eighth

24   Circuits say there is no equitable tolling.  So why would I,

25   as a district court, say something different from 18 other
```

```
 1        judges on the circuits about that topic?
 2           We'll start there.
 3              MR. CARRIEL:  Well, I think the Ninth Circuit is
 4        pretty progressive, and there's nothing --
 5              THE COURT:  So's the Second Circuit.
 6              MR. CARRIEL:  But there's nothing against going --
 7        nothing wrong with going against the trend, I would say.  But
 8        the facts in this case --
 9              THE COURT:  What law do you rely on which would
10        suggest that the Ninth Circuit would do something different
11        than six other circuits?
12              MR. CARRIEL:  I wouldn't rely on any law in
13        particular to suggest that.
14              THE COURT:  Well, I have to -- I can't pull it out of
15        thin air.  I can't pull it out of thin air, so what would I --
16        if I oppose six other circuits, what am I supposed to base it
17        on?  It's supposed to be a reasoned analysis.
18              MR. CARRIEL:  Hmm.  I believe that there is an
19        argument to be made that *American Pipe* can come into play and
20        that *China Agritech* is narrowed to cases in which class
21        certification was denied.
22           And the facts in this case are quite different in that the
23        first class action that was filed was settled on an individual
24        basis, and there are a slew of other factual items to lend
25        toward the idea that it would be equitable to toll this claim
```

1    in the fairest sense.

2          THE COURT:  So in the -- wasn't it in the *China*

3    *Agritech* case, the Supreme Court, where it said or observed

4    that allowing successive class actions based upon the *American*

5    *Pipe* rule would allow the statute of limitations to be

6    extended time and again.  As each class is denied

7    certification, a new named plaintiff could file a class

8    complaint that resuscitates the litigation.

9          MR. CARRIEL:  Yes, Your Honor.

10         THE COURT:  So doesn't that totally undercut your

11   argument?

12         MR. CARRIEL:  I don't believe so.  So the key

13   language in that passage is that each time a class is denied

14   class certification, that did not occur here.  There was no

15   motion for class certification ever filed.

16         THE COURT:  Wasn't it your law firms --

17         MR. CARRIEL:  No.

18         THE COURT:  -- that --

19         MR. CARRIEL:  I'm with Levi & Korsinsky.  It was my

20   co-counsel's law firm, Silver Miller.

21         THE COURT:  Yeah, so Silver & Miller represented the

22   plaintiff in the *Brola vs. Nano* case.

23         MR. CARRIEL:  Yes, Your Honor.  But the decision to

24   settle is the plaintiff's decision.  It's -- I wasn't there.

25   I can't speak to what happened, but it is the plaintiff's

1   decision.  It's --

2          THE COURT:  Yeah, but you're arguing prejudice based

3   upon your own actions; that is, the lawyer's actions.

4          MR. CARRIEL:  I believe that it --

5          THE COURT:  It's like -- it's like internally my

6   next-door neighbor has defrauded my client.  Well, it's the

7   same law firm.

8          MR. CARRIEL:  Again, I can't speak to how those

9   events went down.  But my understanding of how any settlement

10  would come out is that it is the client's decision at the end

11  of the day.  The law firm cannot force the client to keep the

12  class action open.

13      So if the defendant made a really great offer, and the

14  plaintiffs took the offer, that's -- it shouldn't prejudice

15  this class.

16         THE COURT:  Well, except that the plaintiff could

17  have substituted in a new plaintiff.  Right?

18         MR. CARRIEL:  Yeah.

19         THE COURT:  Knowing that the *American Pipe* rule

20  wouldn't allow any subsequent -- I mean, based upon six

21  circuits -- six different circuits' analysis wouldn't have

22  allowed a separate cause of action to proceed.

23         MR. CARRIEL:  Right.  Another client could have

24  stepped in.  But, again, I was not involved in that process

25  whatsoever.  My firm doesn't become involved until January of

```
 1   2019.
 2             THE COURT:  I had your firm -- Mr. Silver appeared in
 3   that case July 18th, 2018.
 4             MR. CARRIEL:  I'm from Levi & Korsinsky.
 5             THE COURT:  You're both representing this class or
 6   this --
 7             MR. CARRIEL:  Correct.
 8             THE COURT:  -- purported class, so it's -- so when I
 9   talk about "you" as lawyers, it's both of you.
10             MR. CARRIEL:  Right.  But we can't discuss the
11   specifics of the settlement of what happened internally,
12   because it was a confidential settlement, I have no idea what
13   the settlement was.
14             THE COURT:  I'm just telling you that one of the
15   lawyers for this class was the lawyer for the class that you
16   said harmed them and appeared in that case prior to the
17   settlement by almost four or five months.  It's not something
18   that I can ignore.
19             MR. CARRIEL:  I'd agree with you, Your Honor.  But
20   I -- I would say that if you decided to not toll the class
21   claims, the individual claims should survive for Section
22   12(a)(1) under *American Pipe* and *China Agritech*.
23             THE COURT:  And on what ground?
24             MR. CARRIEL:  That's what happened after *China
25   Agritech* was sent back down.
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    **THE COURT:**  Okay.  A response?

2    **MR. SCOOLIDGE:**  So, Your Honor, I think that the

3    significance of whether class cert was granted or denied is

4    not discussed in any of those cases.  Really, it's about

5    whether the plaintiff would have been on notice of the class

6    action and whether the plaintiff's rights were thought to be

7    protected by the class action.  The significance of class cert

8    being denied or not really is just the way that the case

9    ended, and the plaintiff then realized that they had to go

10   file their own case.

11   And I think that here, I mean, plaintiff's counsel hasn't

12   offered any kind of rationale for why class cert being granted

13   or denied has any significance in the analysis.

14   **THE COURT:**  He suggests that after *China Agritech*,

15   that the individual claims were not dismissed.

16   Is that true?

17   **MR. SCOOLIDGE:**  That's correct, Your Honor.  Under

18   *China Agritech*, somebody with an individual claim could still

19   bring it.  They just can't be a successive class plaintiff,

20   class --

21   **THE COURT:**  So what's your --

22   **MR. SCOOLIDGE:**  -- representative.

23   **THE COURT:**  So you would agree with him that I could

24   apply it -- apply the rule as to the class but not as to the

25   individual.

1      MR. SCOOLIDGE:  Well, the problem is that there's

2  always statutes of repose, Your Honor.  But I agree with that

3  statement that Your Honor made.

4      The statute of repose is a three-year statute of repose.

5  And actually in paragraph 1, sentence 1 of the complaint, the

6  plaintiff admits that the coin was available for trading in

7  October 24, 2015.

8      THE COURT:  Well, he says in paragraph 129 that he

9  purchased it on August 16th, 2017.

10      Isn't that when the statute begins?

11      MR. SCOOLIDGE:  The statute begins when it's first

12  bona fide offered to the public, so that would be the first

13  time that the public is able to get it.

14      THE COURT:  But he has no standing until he

15  purchases.  And if it is a rescissionary claim, then doesn't

16  the statute begin to run when he purchased it as a matter of

17  law?

18      MR. SCOOLIDGE:  Well, the statute of repose I think

19  just forecloses claims, period, against the set of defendants

20  who bona fide public-offered a security.  So assuming it's a

21  security, and we dispute that, the fact that the defendants

22  released it for distribution to the public in 2015 would be

23  what would trigger the statute of repose.

24      And, again, paragraph 1 of the complaint, they state that

25  it was available for trading -- XRB was available on BitGrail

1   October 20, 2015.

2              **THE COURT:**  Okay.  A response?

3              **MR. CARRIEL:**  Your Honor, it does come down to when

4   XRB was -- was a -- bona fide available for -- bona fide --

5              **MR. SCOOLIDGE:**  Bona fide offered to the public.

6              **MR. CARRIEL:**  Bona fide offer for the public, so the

7   definition of "bona fide offer to the public" is when -- when

8   was XRB available to purchase or sell.  And XRB was not

9   available to purchase or sell until 2017, not 2015.

10      2015 potentially is whether the Nano faucet began, but

11  that's an entirely separate issue.  The issue here is when was

12  it bona fide offered to the public.  And that's when it was

13  available to buy it or sell it, and that did not occur until

14  2017.

15      And so the statute of repose does not start ticking until

16  2017, and it would not run out until 2020, so this should be a

17  non-issue in our view.

18              **MR. SCOOLIDGE:**  So, Your Honor, for one thing,

19  there's not a purchase or sale test for when it's bona fide

20  offered to the public.  It's just when it's offered to the

21  public.

22      And for another thing -- I'm just going to read the

23  sentence I'm referring to.  It says that, this is a class

24  action on behalf of a class of investors consisting of all

25  individuals and entities --

1          **THE COURT:**  Well, he doesn't -- he doesn't dispute

2     that you might have been there, right, in --

3          Well, the reference in the complaint to October 24th,

4     2015, why do you have that date?

5          **MR. CARRIEL:**  I think that's a -- a carryover from

6     when we initially believed that XRB became publicly available.

7     But as we learned more about the case and, as is alleged

8     throughout the complaint, that that date is too early.

9          So the faucet did not begin until 2016, and it was not

10    publicly available to buy or sell or trade on exchanges until

11    2017.  And that is a consistent theme throughout the

12    complaint.

13          **THE COURT:**  So you --

14                    (Simultaneous colloquy.)

15          **MR. CARRIEL:**  -- narrow the class definition.

16          **THE COURT:**  Okay.

17          **MR. CARRIEL:**  But I was taught to always use the

18    biggest class definition you can and then --

19          **THE COURT:**  Well, until it gets in you trouble.

20          **MR. CARRIEL:**  I hope so.

21          **THE COURT:**  Okay.  If the case doesn't survive

22    because there is -- well, at least as to the class, it's time

23    barred, then I don't ever get to the *Howey* test, right?

24          **MR. SCOOLIDGE:**  Well, Your Honor, we would argue that

25    the court should actually reach that because this is the

 1    second case like this now, and we think that if the court

 2    doesn't rule on the securities issues that there may very well

 3    be another case like this after this one's dismissed by the

 4    same plaintiffs, so we would request that the court actually

 5    rule on it.

 6            THE COURT:  Why would I reach an issue I don't have

 7    to reach?

 8            MR. SCOOLIDGE:  To deter further lawsuits of this

 9    nature, Your Honor.

10            THE COURT:  Well, it's not clear to me, so we can go

11    through it, but --

12        Okay.  That test is four parts.  Investment of money, part

13    one?  They had to --

14            MR. FOX:  Your Honor --

15            THE COURT:  They had to invest money -- I mean, after

16    the faucet, right?

17            MR. FOX:  Well --

18            THE COURT:  The faucet was free.

19            MR. FOX:  Well, faucet was free, and -- and that was

20    it with respect, Your Honor.

21            THE COURT:  Well, 129 says differently.

22            THE CLERK:  Can you move the mic to you and not stand

23    in between.

24            MR. FOX:  Sure.  Certainly.

25        There's no allegations in the complaint that the

1    defendants raised any capital whatsoever.  The capital that

2    went into this project was their sweat equity and their money.

3        129 may have a conclusory assertion, but there's no -- oh,

4    okay.

5        Yeah, well, so 129 looks to be an allegation that Fabian

6    bought some bitcoin, which I think is unrelated transaction.

7        If you go down to paragraphs --

8            **THE COURT:**  Right.  And then he used the bitcoin --

9            **MR. FOX:**  -- 134 and 135, you've got allegations that

10   he purchased the Nano coin on an exchange from persons

11   unknown.  There's no allegation that his purchase was

12   connected to the release of the Nano coin.

13       And in fact, if you look at I believe it's paragraph 75

14   through 78, you'll see a description of how all the Nano coins

15   that exist in the world came to be released, and that was

16   through the free faucet.

17       The fact that after their release, because they proved

18   useful, because of the network effects that grew with -- with

19   their distribution, they took on value, is -- is frankly

20   irrelevant for the purposes of *Howey*.

21       The security law -- securities laws are concerned about --

22   with what happens when someone makes an investment, gives

23   something up to an enterprise in exchange for a promise to

24   share in the profits that the enterprise generates with that

25   investment.  That's -- that's missing here.

1          **THE COURT:**  Response.

2          **MR. CARRIEL:**  Well, not all of the Nano coins were

3     distributed.  It says right here in paragraph 79 that the

4     defendants kept 7 million XRB for themselves to fund the

5     further development of the Nano ecosystem.  The faucet is

6     irrelevant.

7          This really comes down to when were the XRB offered for

8     purchase or sale.  This has nothing to do with the faucet.

9     That was just background to explained -- explain what this

10    case is about.

11         **MR. FOX:**  It --

12         **MR. CARRIEL:**  Or the factual basis underlying it.

13         **MR. FOX:**  With respect to -- to opposing counsel, it

14    can't be background when you're talking about *Howey*, when

15    you're talking about a security.  The capital raised is --

16         **THE COURT:**  Well, what do you mean, it can't be --

17    what he just said was -- I get background in complaints all

18    the time.  I totally do not understand that statement.  Makes

19    no sense to me.

20         **MR. FOX:**  Well, it -- it could be background, but in

21    that case, there's nothing in the complaint to explain how any

22    capital was raised or how these -- these coins were

23    distributed to the public.  The allegations in paragraphs 134

24    and 135 about -- about the -- Mr. Fabian's purchases on

25    BitGrail do not contain anything to indicate that the

```
 1    counter-party was Nano or that the transactions involved any

 2    sort of capital raising.  This was a secondary market.  This

 3    was an exchange.

 4            THE COURT:  Okay.  So --

 5            MR. CARRIEL:  Your Honor, if I may?

 6            THE COURT:  -- can you get beyond the argument -- if

 7    I gave you leave to amend, could you allege a direct

 8    transaction with the defendants?

 9            MR. CARRIEL:  Yes, Your Honor.  The complaint

10    actually does include several paragraphs --

11            THE COURT:  Which?

12            MR. CARRIEL:  -- detailing --

13        Well, I wouldn't be able to pinpoint that to you at this

14    moment, but --

15            THE COURT:  Look at it.  That's why we're here?

16            MR. CARRIEL:  I'm sorry?

17            THE COURT:  Look at your complaint --

18            MR. CARRIEL:  Right.

19            THE COURT:  -- and tell me what you're relying on.

20                    (Pause in the proceedings.)

21            THE COURT:  I mean, this is a pretty fundamental

22    question.  The direct transaction between the defendants and

23    the plaintiff.

24                    (Pause in the proceedings.)

25            THE COURT:  So if you can't find it, tell me what you
```

1    would allege it to say.  I mean, sure you understand how the

2    transaction worked, right?

3         **MR. CARRIEL:**  Yes, Your Honor.

4       So what I'm referring to are specific sales of XRB that

5    the Nano defendants made where --

6         **THE COURT:**  But what I'm concerned about is what did

7    Mr. Fabian, who is the only plaintiff here -- what was his

8    transaction with the named defendants.

9       Is there a direct transaction, or did Mr. Fabian only

10   receive his Nano through the secondary market?

11        **MR. CARRIEL:**  Mr. Fabian received his Nano through

12   the secondary market; however, that secondary market was

13   created by the Nano defendants -- commissioned by them, and

14   for all intents and purposes, run by them.

15        **THE COURT:**  Okay.

16      And do you have any law for the proposition that that's

17   sufficient to satisfy the *Howey* test?

18        **MR. CARRIEL:**  Which element of the *Howey* test?  The

19   common enterprise or --

20        **THE COURT:**  Well, I think --

21                  (Simultaneous colloquy.)

22        **THE COURT:**  -- probably be -- in fact, I think it

23   probably cuts across all of them.

24      Do you have anything for me to look at?

25      I get securities cases all the time, right?  And these are

1    investors who are suing under the securities laws because they

2    purchased something directly from the defendant and something

3    happens and there're misrepresentations and the -- and the

4    stock price, you know, drops and so they sue.

5         **MR. CARRIEL:**  So our claims aren't about -- or our

6    securities claims aren't about misrepresentations.  They're

7    about the offer or sale of Nano, the security.  So if the --

8    if Nano is a security, then they're strictly liable.

9         So the question is, what is the investment or money?  He

10   invested bitcoin into a common enterprise.  The common

11   enterprise is the Nano development team and the Nano

12   development fund, the 7 million XRB that was sold to continue

13   funding the development of Nano.

14        Expectation or profit is that they were relying on the

15   abilities of the Nano team to develop XRP -- XRB and increase

16   its value by doing so.

17        **THE COURT:**  Do you want to respond?

18        **MR. FOX:**  I'm not sure that I have much new to add,

19   Your Honor.  *Howey* requires an investment with the promoters,

20   with the enterprise.  Buying something on a secondary market

21   that is not already a security doesn't make it a security.

22        It's not that Mr. Fabian would have needed to buy the

23   security directly -- buy the coin -- excuse me -- buy the coin

24   directly from our clients to make it a security.  It's that

25   someone would have needed to.  And that never happened.

1    There was only one release of the coin, and it's pled very

2    clearly in the complaint in paragraphs 70, 71, 72 and then

3    specifically 75 and 78, it was all released for free.

4    Your Honor, this -- this is a situation that in some ways

5    is analogous to, you know, if 130 years ago, our clients had

6    invented the telephone, it's useless unless other people are

7    using it.  And so they gave it away for free to create value

8    for the product that -- that they had developed.

9    It doesn't have to do with raising capital.  There was

10   capital that was used to develop the Nano coin.  It was -- it

11   was the hard work and the sweat of our clients.  And to the

12   extent that it required money, it was their own money.

13   Nobody, not Mr. Fabian or anyone else, was asked to give

14   anything up in connection with the release of these coins.

15   And, you know, if you look at the other ICO cases that

16   have been coming down, some of which have been cited in the

17   briefing, the distinction is very clear.  All of those cases

18   involve capital raising.  They're all -- they all involve an

19   exchange of a coin for a token or some sort of instrument

20   for -- for value, for money, usually fiat currency or

21   cryptocurrency.  That's -- that's simply missing here.

22        **THE COURT:**  Okay.  Any response?

23        **MR. CARRIEL:**  Your Honor, the Nano team did not

24   develop the telephone.  They're developing -- they're still

25   developing XRB.  It's a continuous project.  It wasn't

1    something that was created and then given away for free.  It's

2    continued to be -- it -- it's still being worked on.  And they

3    are funding their efforts through the sale of XRB, which only

4    has value through their work.

5          THE COURT:  Okay.  Let's move on unless you want --

6    anybody want to say anything more about the *Howey* test?

7          MR. CARRIEL:  Your Honor, I would ask that we would

8    be granted leave to amend to allege additional more specific

9    facts for that if you're inclined to deny it.

10         THE COURT:  You mean "grant"?

11         MR. CARRIEL:  Or grant it, yeah.

12         THE COURT:  And any comments on whether or not the

13   defendants are statutory sellers?

14         MR. CARRIEL:  So the test under *Pinter v. Dahl* is

15   there are two types of sellers.  There's either the direct

16   seller.  That is the individual or entity that transfers title

17   to the security at issue.  Or the statutory seller, which is a

18   person or entity who successfully slits -- solicits the

19   purchase of a security for their own financial benefit or

20   another person's financial benefit.

21       The Nano defendants developed XRB, commissioned the

22   creation of BitGrail, the exchange where XRB could be sold,

23   and then ushered and urged investors or the general public to

24   purchase XRB on BitGrail.

25       They solicited, and successfully so in the case of my

client Fabian and the putative class, those individuals to purchase XRB on Bitgrail for either their own personal financial benefit or for the financial benefit of other users on BitGrail or BitGrail itself, through commissions and any sort of arrangements that they might have with Nano.

THE COURT:  So I have the test as coming out of *Pinter*.

Is that wrong?

MR. SCOOLIDGE:  That's correct, Your Honor.  *Pinter vs. Dahl* as interpreted by subsequent cases.

THE COURT:  Okay.  So under that test, the statutory seller's standard by way of solicitation is one where liability would extend to a person who, one, successfully solicits a purchase; and, two, motivated in part at least by a desire to serve their own financial interests or those of the securities owner.

Now, I know you take issue with the fact that this is a security, but let's assume for purposes of argument that I find it is.  Sounds like you would meet the test.

MR. SCOOLIDGE:  Well, Your Honor, we -- we don't think that there would be statutory seller liability here.

So the test is that the defendant has to have successfully solicited the sale of the security.  And here, at most -- and this came out really in the opposition briefing -- the only statements they rely on are that there's four Twitter posts,

1   and three of them were made after Mr. Fabian bought his coins,

2   after December 12, 2017.  Only one of them actually predates

3   it.  And that statements reads something like "XRB now

4   available on BitGrail."

5       There's no allegation in the complaint that Mr. Fabian

6   read that specific statement.  And there's no allegation that

7   it successfully induced him to buy the coin.

8       And it's important to keep in mind that what *Pinter vs.*

9   *Dahl* did was it substituted something for actual passing of

10  title.  And so merely making a statement followed by a

11  purchase isn't enough.  There has to be something more

12  substantial than that.  And that something more substantial is

13  that it was successful in inducing the purchase.

14      And the case law following *Pinter* all involves defendants

15  who were directly in contact with the plaintiff inducing the

16  purchase in a substantia way, not just a director showing up

17  at a road show, not just making statements that the plaintiff

18  may or may not have heard.  The defendants must have

19  successfully solicited the sale, so we think that the

20  complaint fails here, Your Honor.

21          **THE COURT:**  All right.  A response?

22          **MR. CARRIEL:**  Your Honor, the Nano team created XRB.

23          **THE COURT:**  Is there any -- is there any pre-purchase

24  solicitation that you can point to that your client relied on?

25          **MR. CARRIEL:**  The complaint explicitly states that

```
1    our client followed and viewed all of the -- the Nano team's

2    social media posts, including --

3                   (Simultaneous colloquy.)

4         THE COURT:  -- agree with the defense counsel that

5    everything except for the one part that says it's available

6    happened after the purchase.  Do you have anything else?

7       You can't -- by definition, you can't rely on something

8    for your purchase if it happened after you purchased it.

9         MR. CARRIEL:  Correct, Your Honor.  However, the Nano

10   team created XRB, so anything that our client learned about

11   XRB, he had to have learned it from Nano.  Seems obvious.

12        THE COURT:  Why is that obvious?  People write about

13   things all the time.  Could have picked up Wired magazine.  He

14   could have -- well, I guess no one picks up a magazine

15   anymore, right?

16      He could have read some blog or some post or something by

17   someone else.  That's not at all obvious to me.

18        MR. CARRIEL:  In that case, Your Honor, the complaint

19   might not have those specific allegations in its current

20   state, but there are numerous that we could include.

21        THE COURT:  All right.

22        MR. SCOOLIDGE:  Your Honor, I think that they had a

23   pretty good chance to include this stuff.  This is the second

24   case they filed.

25        THE COURT:  It may be, but this is the first in front
```

```
1    of me.  And I can guarantee you that if I find in your favor

2    without leave to amend and it goes to the Ninth Circuit, the

3    Ninth Circuit is going to throw it right back at me about a

4    year and a half from now and I have to redo it.

5            MR. SCOOLIDGE:  Fair enough, Your Honor.

6            THE COURT:  The issue of ex-territorial application.

7    So any comments, or you going to rest on your papers?

8            MR. SCOOLIDGE:  Your Honor, for the defendants, think

9    we'll just rest on the papers.

10           MR. CARRIEL:  For the plaintiffs as well.  I think

11   it's pretty clear-cut, so --

12           THE COURT:  All right.  State law claims.

13       First, with respect to the breach of implied contract, I

14   would say I don't see that the complaint alleges any kind of

15   express or implied contract.  You have to identify what the

16   specific terms are of the contract, and you haven't done that.

17   Just -- what are they?

18       What does the contract say, implied or not?

19           MR. CARRIEL:  The contract in this case is that

20   depositors or users of the BitGrail exchange will deposit

21   their funds and purchase XRB, and their funds will not go

22   missing.  It is complied that an exchange will not lose their

23   funds.

24       The Nano team is a party to these contracts because they

25   commissioned the creation of BitGrail.  They controlled
```

1   BitGrail's actions with respect to XRB and XRB code that

2   allows for the transfer of one XRB to -- from one investor to

3   another investor.

4       And when there was an issue with that code -- I'm sorry.

5           THE COURT:  Let me ask you this.

6           MR. CARRIEL:  Hm-hmm.

7           THE COURT:  Just occurred to me as I was sitting

8   here.  In the Wild West, you deposited funds in a bank, and

9   someone came and robbed the bank.  Your funds went missing.

10      Is there an implied contract that they wouldn't go missing

11  when it was pretty common that banks got robbed all the time?

12          MR. CARRIEL:  Your Honor, the funds were not stolen

13  in that sense in this case.

14          THE COURT:  They weren't?  What happened to them.

15          MR. CARRIEL:  The funds went missing because there

16  was issue with the code that allows for the transfer of one

17  XRB -- of XRB from one person to another that resulted in a

18  double-spending or a double-depositing of that asset.  So

19  every time you'd deposited two XRB you would get four XRB out

20  of thin air, which really just meant that their money --

21  there'd be money going missing.

22      And that issue was caused due to a flaw in the coding

23  which was run by the Nano team.

24          THE COURT:  And -- and they didn't reengineer that

25  after the fact?

1         **MR. CARRIEL:**  No, Your Honor.

2      And the exchange owner issued a statement detailing how he

3   begged the Nano team to let him take off the -- take the

4   exchange off line because of this flaw.  And the Nano team

5   forced him to keep it open, which --

6         **THE COURT:**  Where is that in the complaint?

7              (Pause in the proceedings.)

8         **THE COURT:**  Is it there?

9         **MR. FOX:**  Yeah, it's at paragraph 100.

10        **THE COURT:**  All right.  Thank you.

11     Okay.  What else do you have on implied contract?

12        **MR. CARRIEL:**  I'm sorry, Your Honor?

13        **THE COURT:**  What else do you have with respect to

14   that topic of an implied contract?

15        **MR. CARRIEL:**  That's really about it, Your Honor.

16        **THE COURT:**  Okay.  Any response?

17        **MR. FOX:**  Yes, Your Honor.  If I may.

18     Even if the complaint adequately pled a contract between

19   Mr. Fabian and BitGrail, which it clearly doesn't and you can

20   refer to our papers for more on that, I'm not aware of any law

21   that would impose contractual obligations on a non-party to

22   the contract, at least in the absence of some sort of piercing

23   of the corporate veil or allegations of an assignment.

24     There may be some other exceptions that I'm thinking of,

25   but they're not -- they don't appear in the -- in the

```
 1    complaint.
 2              THE COURT:  Okay.
 3         I had you, while you were sitting there waiting through
 4    the other case, read the Cleveland vs. Johnson opinion.
 5    Neither of you cited that to me.  This is 209 Cal App. 4th
 6    1315, California Court of Appeal decision, which relates to
 7    the next set of topics on the claim for breach of fiduciary
 8    duty and, by extension, the one for aiding and abetting, and
 9    the one for constructive fraud.
10         That case seems to lay out a relatively broad standard by
11    which confidential relationships or fiduciary relationships
12    exist under California law.  And in particular, in the case
13    where you've got promoters as being fiduciaries.
14         So comments on the application of that case to this
15    matter.
16              MR. FOX:  Sure, Your Honor.
17         This is a case where there was a promoter.  This is a case
18    where there was -- I don't know -- I -- a bit of a slow
19    reader.  I didn't read all of the procedural posture.  I'm not
20    sure why there wasn't a 10(b)(5) case here, but it would
21    appear that there was a security.  There was an investment.
22              THE COURT:  Well, it's a California case.  It's not
23    a -- it's not a federal case.
24              MR. FOX:  Yeah, no, I -- I understand.  And I don't
25    know why the plaintiffs pled it the way that they did.
```

1      But my point is you had a contribution of capital here and

2   a promise to participate in an enterprise and share in its

3   returns.  That's not present here.

4      You know, indicative of that, in that case -- wouldn't

5   always have to be true, but where you're talking about a

6   closed corporation, often is -- you've got parties that know

7   each other, parties that are speaking to each other, parties

8   that are communicating with each other.  They're making

9   promises.  They're taking investments.

10      Our clients don't know Mr. Fabian from Adam.  And there's

11  no allegations in the complaint to the contrary.  Indeed,

12  there's no allegations not only that -- did they -- that -- no

13  allegations that they had any communications, there's no

14  allegations that any statements made by any of our defendants

15  were even read or relied upon by Mr. Fabian.

16      So in our view, the -- the case is easily distinguishable

17  on the facts.  There's just no investment here.  There's no

18  business relationship.  There are no promises going back and

19  forth.

20          **THE COURT:**  Okay.  Response?

21          **MR. CARRIEL:**  Your Honor, I disagree.

22      There are multiple statements that the Nano team made

23  assuring investors that their funds were safe on BitGrail,

24  promising them that -- promising investors and our client that

25  they could trust defendant Firano, the CEO of BitGrail, making

1  statements such as, I speak to -- or I speak to Firano every

2  day.  He's a great guy.  You can trust him.  The funds are

3  safe.

4              (Simultaneous colloquy.)

5        THE COURT:  But, you know, again, all of these -- and

6  in this regard, it bleeds over to the fraud claim, the

7  misrepresentation claims -- again, everything in the complaint

8  except for one post, which is pretty innocuous -- happened

9  after your client acquired -- I'm not even going to say

10  purchased, but your client acquired the Nano.

11        MR. CARRIEL:  Yes, Your Honor.

12        THE COURT:  Right?

13        MR. CARRIEL:  So the first claim --

14        THE COURT:  And so -- hold on.

15     Under the law, under California law, you must plead

16  reliance.  That goes to fraud, negligent misrepresentation.

17  By definition, you have nothing in this complaint that shows

18  any reliance, much less justifiable reliance, because you've

19  pled nothing prior to October --

20        MR. CARRIEL:  December 12th, 2017?

21        THE COURT:  Yes.

22        MR. CARRIEL:  So the first claim about the purchase

23  of the unregistered security, that's all about the

24  acquisition.  The rest of the claims are about what happened

25  after the acquisition, which is the Nano team became aware

1    that there was issue with the code, that this double-spend

2    problem was occurring, and they hid it from investors,

3    assuring them that they could leave their funds on the -- on

4    the exchange.  So the reliance is in trusting that their funds

5    were safe, not buying XRB, if there was a reliance

6    requirement.

7         The breach here is that they concealed the fact that --

8         **THE COURT:**  Well, there is a reliance requirement for

9    a number of these state law claims.

10        I mean, have you --

11        **MR. CARRIEL:**  The -- the reliance is in -- when

12   public information was coming out, that there was a problem

13   with the code, that money was going missing on the BitGrail

14   exchange.

15        The Nano team came out in support of BitGrail and told

16   them that they're handling it, we're working together,

17   everything's fine, your money's safe, when, in fact, they knew

18   that it was not safe, as alleged in paragraph 100 with the

19   CEO's statements from Bitgrail, who said he was forced to keep

20   the exchange, even though he warned the Nano team that there

21   was a problem with the funds.

22        So our client and the putative class, when they heard

23   about these issues and they heard that their money was going

24   missing, they relied on the assurances from the Nano team in

25   leaving their funds there instead of withdrawing.

1    **THE COURT:**  But you don't allege anywhere that the

2    damage is the fact that you left the funds there and did not

3    withdraw them before the problem or related to the problem.

4    You don't allege that anywhere.

5        I haven't analyzed whether or not that's a viable claim in

6    any event, but that's not alleged.  So I hear you saying you'd

7    like to allege that.

8        Does that suffice?  Defense?

9        **MR. FOX:**  Yeah, it suffices insofar as there's no

10   allegations of that.  And we -- we haven't analyzed whether

11   that would be a viable claim or not, but it -- it -- in the

12   big picture --

13       **THE COURT:**  So you haven't analyzed that.

14       **MR. FOX:**  Well, it -- it is difficult to understand

15   how any sort of duties could arise, be they fiduciary, be they

16   contractual, be they intentional as with respect to fraud --

17   how any duties could arise after the transaction.  That's --

18   that's my off-the-cuff analysis.

19       You have -- you have two transactions that are pled here.

20   They occur in September 2017 and December 12th, 2017.  All the

21   statements except for one occurred after that.  And you have

22   two parties that are remote from each other, that have no

23   business dealings with each other, that don't know each other.

24       I don't see how any of these duties could arise.

25       As for -- I mean -- and getting to the specifics, as for

1   fraud, thinking about could you plead reliance on, you know,

2   that you relied in your decision to hold, how would they --

3   how would they ever allege scienter?

4        How could the y -- you know, these types of claims --

5            **THE COURT:**  Well --

6                        (Simultaneous colloquy.)

7            **MR. FOX:**  -- need to be pled with particularity, Your

8   Honor.

9            **THE COURT:**  Right.  But stop for a moment.

10       Scienter isn't your -- well, scienter is a complicated

11   problem because rarely do plaintiffs have all the information

12   that they need even when there is scienter.  So they do what

13   they can, and, you know, I take a look at what it is that

14   they're prepared to allege.  But scienter is always a

15   challenging topic.

16       This isn't a 12(b)(5) case.  It's a common law fraud case

17   in terms of what the -- that particular claim is all about.

18           **MR. FOX:**  Fair --

19           **THE COURT:**  But certainly if -- if they've got

20   allegations -- and, again, I haven't analyzed it.  I'm not

21   exactly sure how you -- how this would all flow given that all

22   of these statements were made after the fact -- if you have

23   someone who is there and they've alleged that he is telling

24   the internal person not to -- not to fix the code which is

25   causing the damage, one could plausibly in- -- infer that they

1    are trying to defraud and trying to protect themselves by

2    that, so --

3        Anyway that -- that one concerns me a little bit less

4    given the proffer that's been made.

5            **MR. FOX:**  And just one thing, if I may add on that

6    point and it's not California law.  It's federal law.

7        But if I'm recalling correctly -- and I'm thinking on my

8    feet here because we didn't look at this issue -- the -- the

9    blue chip stock (sic) case -- and then I could -- construction

10   of -- of Rule 10(b)(5) which addresses whether there is an

11   implied right of action or not, I believe it deals with

12   questions as to whether to hold a security gives rise to a

13   right of action.  And -- and my recollection is the answer is

14   no.  It is only purchases and sales.

15       That's only -- that's a "Cf," Your Honor.

16           **THE COURT:**  Okay.

17       Unjust enrichment.  So in terms of unjust enrichment --

18   unjust enrichment is a theory.  It is a contractual theory

19   where someone unjustly confers a benefit through mistake or

20   fraud or coercion.

21       The key Ninth Circuit case, I think, to read on that

22   California claim is *Astiana*, A-s-i-t-a-n-a (sic), *vs. Hain*

23   *Celestrial Group*, H-a-i-n Celestrial Group, 783 F3d. at 753,

24   Ninth Circuit 2015.  It's written by Judge McKeown.

25       Here, it's not clear to me what the plaintiffs provided

1    the defendants with that gave them some kind of monetary

2    benefit.

3            **MR. CARRIEL:**  The monetary benefit here is the

4    increase in value to XRB which occurred because plaintiffs and

5    the putative class purchased XRB, and that increase --

6            **THE COURT:**  Except that --

7            **MR. CARRIEL:**  -- benefited the Nano team because they

8    held 7 million and sold some XRB for themselves.

9            **THE COURT:**  Well, you have to be more clear.  It's --

10    it's not clear to me what it is you're trying to do there.

11        Look, this is -- I'm going to give you a couple more

12    cites.  I think that some of these were already in the

13    briefing.

14        On the fiduciary duty issues, the *Gutierrez* case, which

15    was cited at page 25 of the defendants' opening memo, that has

16    your elements, as does the case *Cleveland* that I gave you.

17        In terms of fraud, look at *Lazar vs. Superior Court*, 12

18    Cal 4th 631, 1996 case.  It has that -- the elements and the

19    big issue on all of these fraud claims, including the one with

20    respect to negligent misrepresentation, is you have to have

21    reliance.  And that means you have to have something which

22    preceded whatever it was that you were claiming caused the

23    damage, and there has to be a link.

24        You can also take a look at *Charnay*, C-h-a-r-n-a-y, *vs.*

25    *Cobert*, 145, Cal. App. 4th 179, 2006 case.  Those will give

1    you elements.

2        And then the constructive fraud claim that's going to rise

3    and fall with a breach of fiduciary duty and aiding and

4    abetting because it requires a fiduciary or confidential

5    relationship.  And with respect to that one, you can take a

6    look at *Sacramento E.D.M., Inc. vs. Hynes Aviation*.  That's

7    H-y-n-e-s, 965 F. Supp. 2nd 1141, Eastern District case, 2013.

8        I'm going to grant the motion with leave to amend.

9        **MR. FOX:**  Your Honor, may we be heard very briefly on

10   that?

11       **THE COURT:**  You may.

12       **MR. FOX:**  They're not going -- they're not going to

13   be able to amend their Securities Act claim successfully.  The

14   statute of repose begins when a security's bona fide offered

15   to the public.

16       And for background on that, I would -- you know, I would

17   point to the case that we cite on page 7 of our opening brief,

18   *CalPERS vs. ANZ*.  It's 137 Supreme Court 2042.  They've pled

19   that it was available to the public in October 2917.

20       I know we're talking about a motion to dismiss here, but

21   that is, in fact, true.  They also have incorporated by

22   reference a website that demonstrates that fact.  So they --

23   they are barred by statute of -- by the statute of repose, and

24   giving them an opportunity to amend is not going to fix that

25   problem.

1      Second point, *Howey*, they're not going to be able to fix

2   that either.  What's at issue at *Howey* is the release of the

3   coins.  They've themselves replied in paragraph 70, 71, 75

4   through 79 how the coins are released and that they were

5   released for free.  That also is true.  They cannot plead in

6   good faith anything differently.

7      Third -- and this is, you know -- out there because the

8   first two take care of the third -- statutory seller, they're

9   not going to be able to plead that they either bought the

10   security from the defendants, from Nano, or that Nano made any

11   solicitation in connection with their purchases on the

12   exchange for the benefit of whoever it may have been who was

13   selling the coin on the exchange because Nano didn't sell any

14   coins on the exchange.  The exchange was not an underwriter.

15      If they put those -- put that in the allegation, it's

16   going to be false, and it won't be consistent with Rule 11.

17      So there's three reasons why it would be futile for them

18   to amend their complaint on the -- on the 12(a)(1) claim, Your

19   Honor, or on any Securities Act claim for that matter.

20          **THE COURT:**  A response?

21          **MR. CARRIEL:**  Your Honor, I disagree obviously.

22      So the issue here is what is "bona fide offered."  We

23   argue that "bona fide offered" is when XRB was first offered

24   for purchase or sale.  They argue that -- or defendants argue

25   that "bona fide offer" is when it was given out for free in

1    the beginning or whenever Nano was first founded.

2        So if we could get some clarification on that point on --

3    on the law here, then we can determine whether or not that

4    aspect of it can -- could be amended and further clarified in

5    support of our claims.

6        **MR. FOX:**  Your Honor, with respect, no clarification

7    of the law is needed.  The law is very clear about what

8    "bona fide offered" means, and you can look at the cases that

9    are cited in our case -- in our brief -- our opening brief on

10   that point.

11       **MR. CARRIEL:**  Your Honor, our opposition brief cites

12   opposing cases, so --

13       **MR. FOX:**  No --

14       **THE COURT:**  All right.  I will tell you what,

15   gentlemen.

16       **MR. CARRIEL:**  And then --

17       **THE COURT:**  I -- I'm talking.

18       **MR. CARRIEL:**  Sorry.

19       **THE COURT:**  I will try to address that issue in

20   writing.  In the meantime, I'm going to give you 30 days to

21   amend your complaint.  If in the interim you receive an order

22   from me that says that those particular claims are dismissed

23   without prejudice, don't include them.

24       Thirty days would be July 25th.

25       **MR. SCOOLIDGE:**  Your Honor, if I could just make one

```
 1      more point real quick about the individual defendants and the
 2      lack of allegations against them, would the court be willing
 3      to hear that?
 4               THE COURT:  Brief.
 5               MR. SCOOLIDGE:  So the complaint really has no
 6      allegations at all about what the specific individual
 7      defendants did aside from that they made various social media
 8      posts at various times.  And I think that leave to amend with
 9      regard to them probably would also be futile for the same
10      reasons that my colleague mentioned, so I think that we would
11      just ask that they be dismissed with prejudice now, Your
12      Honor.
13          That's all.
14               THE COURT:  Denied.
15          Okay.  How much time do you want to respond to the first
16      amended complaint?  Two weeks, three weeks?
17               MR. SCOOLIDGE:  Thirty days, Your Honor?
18               THE COURT:  Why would you need 30 days?  All your
19      work is done.  As far as you're concerned, they can't do
20      anything new.
21               MR. SCOOLIDGE:  Three weeks is fine, Your Honor.
22               THE COURT:  All right.  Three weeks from filing on 35
23      days' notice.  No extensions will be granted.  Do not ask for
24      them.
25          The law clerk that I have working on this will be leaving
```

1   me.  I'd like it done before that person leaves.

2          **MR. FOX:**  We would as well.

3          **THE COURT:**  Okay.

4      The rest is under submission.  Have a good summer.  Thank

5   you.

6          **MR. SCOOLIDGE:**  Thank you, Your Honor.

7          (Proceedings were concluded at 3:53 P.M.)

8                       --o0o--

9

10

11                 **CERTIFICATE OF REPORTER**

12

13          I certify that the foregoing is a correct transcript

14   from the record of proceedings in the above-entitled matter.

15   I further certify that I am neither counsel for, related to,

16   nor employed by any of the parties to the action in which this

17   hearing was taken, and further that I am not financially nor

18   otherwise interested in the outcome of the action.

19

20   _____

21      Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

22               Monday, July 15, 2019

23

24

25