# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

JAMES FABIAN,

        Plaintiff,

    vs.

COLIN LEMAHIEU, ET AL.,

        Defendants.

CASE NO. 19-cv-00054-YGR

ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

Re: Dkt. No. 60

Plaintiff James Fabian brings this putative class action against defendants Nano f/k/a/ RaiBlocks f/k/a Hieusys, LLC ("Nano"), Colin LeMahieu, Mica Busch, Zack Shapiro, and Troy Retzer (collectively, "Nano Defendants" or "Moving Defendants") as well B.G. Services SRL f/k/a BitGrail SRL f/k/a ebcoin Solutions ("BitGrail") and Francesco "The Bomber" Firano (collectively "BitGrail Defendants")[1] for securities fraud and related claims in connection with defendants' promotion of and statements regarding a cryptocurrency or digital asset referred to as NANO f/k/a RaiBlocks ("XRB" or "Nano Tokens"). (Dkt. No. 58 ("FAC") at 1.)

Now before the Court is Nano Defendants' motion to dismiss the FAC.[2] (Dkt. No. 60

---

[1] The Court notes that the BitGrail Defendants have not yet responded or otherwise appeared in the action.

[2] In addition to and in support of their motion to dismiss, Nano Defendants attach four exhibits. (*See* MTD, Exs. 1-4.) Two of the exhibits constitute translations (as certified by the Declaration of Monica Iacoviello, Dkt. No. 64-1) of the decisions of the Italian bankruptcy court overseeing the bankruptcies of BitGrail and its owner, Firano. (MTD, Exs. 1-2 ("Italian Court Documents").) The other two exhibits represent a post by defendant LeMahieu on "Bitcointalk" and a statement by LeMahieu in a Google Hangout chat, respectively. (*Id.*, Exs. 3-4.) During the September 24 hearing, the Moving Defendants requested, for the first time, that the Court take judicial notice of the Italian Court Documents on the grounds that plaintiff's FAC incorporated the documents by reference. In support thereof, Moving Defendants relied upon *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1160 (9th Cir. 2012) to argue that the Court should take judicial notice of these documents and assume that the facts contained therein are true. The Court agrees that the plaintiff has relied substantially upon the contents of the Italian Court Documents (*see* FAC ¶¶ 6, 22, 160-62, 171), such that he cannot contest the authenticity of these documents. *Doe*

("MTD").)  Having carefully considered the pleadings and the papers submitted, as well as arguments from counsel during the hearing on September 24, 2019, and for the reasons set forth more fully below, the Court **GRANTS IN PART** and **DENIES IN PART** the Nano Defendants' motion.

## I. BACKGROUND

### A. Factual Background

Plaintiff alleges as follows:

Nano is, according to its own published promotional materials, a "low-latency payment platform" that "utilizes a novel block-lattice architecture" on which "each account has [its] own blockchain as part of a larger directed acyclic graph."  (FAC ¶ 32.)  Said differently, "Nano purports to have created a faster, cheaper, and more easily scalable blockchain and cryptocurrency that improves upon earlier blockchains and cryptocurrencies such as the widely-popular bitcoin."  (*Id.*)  LeMahieu founded Nano in 2014 and serves as the company's Lead Developer.  (*Id.* ¶ 33.)  Busch served, at all relevant times, as a "Control System Developer" for Nano's "Residential" and "Enterprise" markets.  (*Id.* ¶ 34.)  Shapiro ran, at all relevant times, "Mobile, Wallets, and Product" for Nano and served as the company's head iOS Developer.  (*Id.* ¶ 35)  Retzer manages and directs Nano's marketing and community and public relations efforts.  (*Id.* ¶ 36.)

The Nano Defendants developed Nano Tokens, or XRB, which they each promoted, offered, traded, and sold to the public for their personal financial benefit.  (*Id.* ¶ 2.)  XRB has never been registered as a security with the Securities and Exchange Commission and is not exempt from registration.  (*Id.*)  The Nano Defendants worked with the BitGrail Defendants to create BitGrail's "RaiBlocks dedicated exchange" (the "BitGrail Exchange") in approximately December 2016.  (*Id.* ¶ 3.)  BitGrail was a cryptocurrency exchange operating in Italy that was primarily focused on creating and sustaining a market for Nano Tokens.  (*Id.* ¶ 37.)

*One v. CVS Pharm.*, 348 F.Supp.3d 967, 993 (N.D. Cal. 2018); *see also* Dkt. No. 64-1.  However, the Court does not agree that *Davis* provides authority for Nano Defendants' assertion that the Court should adopt the factual findings of Italian Court Documents as "true."  Accordingly, the Court **GRANTS** Nano Defendants' request for judicial notice of the Italian Court Documents, but affords them only their proper evidentiary weight.  *See Davis*, 691 F.3d at 1160.  To the extent that Nano Defendants intended their attachment of Exhibits 3 and 4 to their motion to dismiss to represent a request for judicial notice of those documents, the Court **DENIES** that request.

United States District Court
Northern District of California

Nano Defendants directed the investing public to purchase XRB through, and store XRB holdings at, the BitGrail Exchange by (i) commissioning, and contributing to the creation of the BitGrail Exchange; (ii) providing specific investment instructions and assurances that the BitGrail Exchange was secure and could be trusted to safeguard investment assets; and (iii) collaborating with the BitGrail Defendants in maintaining the BitGrail Exchange's XRB-related operations. (*Id.* ¶ 5.) On or about February 8, 2018, over 15 million XRB, bearing a market value of approximately $170 million and supposedly safely stored on BitGrail, were "lost," giving rise to the instant action. (*Id.* ¶ 10.)

Beginning in early 2016, the Nano Defendants opened a "faucet" for distributing XRB (the "Nano Faucet"), of which they had exclusive control and authority, including how much XRB it distributed. (*Id.* ¶¶ 86, 87.) The Nano Faucet allowed the Nano Defendants to distribute Nano Coins at no cost to those acquiring the coins. (*See id.* ¶¶ 82, 83.) The Nano Faucet operated for approximately one and a half years, before closing on or about October 15, 2017. (*Id.* ¶ 86.) By October 2017, individuals had claimed more than 120 million Nano Coins, or approximately 40 percent of the then-existing total supply of XRB. (*Id.* ¶ 90.)

The Nano Defendants repeatedly represented to the public that they sought to list XRB on as many exchanges as possible to promote the purchase and adoption of XRB. (*Id.* ¶ 93.) For example, on March 4, 2016, LeMahieu wrote on the Cryptocurrency subreddit – which had over 900,000 members – that XRB would be "getting listed" on two popular cryptocurrency exchanges in America and Russia (Bittrex and YoBit). (*Id.* ¶ 94.) In other words, LeMahieu implied that XRB had an international following and demand, and that XRB would soon appreciate in value and grow in adoption by virtue of its listing on online exchanges. (*Id.* ¶ 95; *see also id.* ¶ 98.)

After larger exchanges were unwilling to list XRB, the Nano Defendants decided to create a new exchange that would be built from the ground up and dedicated to XRB. (*Id.* ¶ 99.) "[I]n approximately December 2016, the Nano Defendants approached" Firano to create the BitGrail Exchange. (*Id.*) LeMahieu, in particular, worked with Firano to create and launch the BitGrail Exchange. (*Id.* ¶ 106.) The BitGrail Exchange launched in April 2017 and was "far-and-away XRB's largest marketplace" as a result of Nano Defendant's strategic positioning and widespread

3

marketing efforts.  (*Id.* ¶ 107.)

Throughout the Class Period, April 1, 2017 through March 31, 2018, each of the Nano Defendants remained substantially involved in the maintenance of the BitGrail Exchange's XRB-related operations and retained significant control over Firano's decision-making concerning the BitGrail Exchange.  (*Id.* ¶ 108.)  On January 2, 2018, the Nano Defendants posted that Busch and Firano were "[t]wo passionate & hard-working gents" that were "solving the operational challenges at @BitGrail in a high-pressure environment as a game-changing tech matures."  (*Id.* ¶ 109.)

The Nano Defendants promoted Nano Coins as having relative advantages over other cryptocurrencies, including that transactions in XRB are "purportedly instant, carry no fees, and have no limit to their scalability."  (*Id.* ¶ 110.)  The Nano Defendants focused on promoting and encouraging individuals to purchase, sell, and trade Nano Coins on online exchanges, and in particular, on the BitGrail Exchange.  This trading of Nano Coin on the BitGrail Exchange drove up the price of XRB.  (*Id.* ¶ 111.)  On April 20, 2017, the official Nano Twitter account announced that XRB was available for purchase on "their recently created BitGrail Exchange."  (*Id.* ¶ 112.)  The Nano Defendants also released an infographic on how to purchase XRB on the BitGrail Exchange.  (*Id.* ¶ 113.)  The Nano Defendants recommended BitGrail on XRB/Nano's Twitter feed, on Reddit, on Slack, on Telegram, on Medium, and on Nano's official website multiple times.[3]  (*Id.* ¶ 114.)

Prior to the February 2018 loss of 15 million XRB, the Nano Defendants expressly encouraged members of the public, including plaintiff and the class,[4] to purchase, trade, and hold Nano Coin on the BitGrail Exchange.  (*Id.* ¶ 115.)  Specifically, the Nano Defendants offered investment advice to XRB holders.  (*Id.* ¶ 116.)  On January 9, 2018, Shapiro advised one XRB

_____

[3]  The screenshots of Twitter incorporated in this paragraph of the FAC show dates of December 16, 2017 and April 20, 2017.  (*See* FAC ¶ 114.)

[4]  Plaintiff's FAC defines the putative class as: "All BitGrail investors and accountholders who are citizens of the United States and who, between April 1, 2017 and March 31, 2018, and who transferred bitcoins, alternative cryptocurrencies, or any other form of monies or currency to BitGrail to purchase, invest in, or stake XRB."  (FAC ¶ 41.)

holder on Twitter: "I recommend selling your xrb there and withdrawing btc even if it's at a loss. Thanks[.]" (*Id.*) On November 10, 2017, Shapiro touted: "the faster $xrb can get in blockfolio, the faster people can see their gains and losses and come to BitGrail to invest more in a coin getting more and more attention." (*Id.* ¶ 117.) On January 29, 2018, Shapiro promoted coverage of XRB on CNBC's Fast Money television show. (*Id.* ¶ 118.) Shapiro also created an application specifically designed to monitor the price of Nano Coins.[5] (*Id.* ¶ 119.)

The Nano Defendants also promoted Nano Coins by instructing members of the public, including plaintiff and the class, to tell their friends, family, and acquaintances to purchase and acquire XRB. (*Id.* ¶ 120.) On December 20, 2017, LeMahieu wrote: "I think the best thing an average fan could do is word of mouth and telling people about [XRB]. More people being aware of it means there's the possibility someone who's never heard of it before would be interested in contributing as a vendor, developer, exchange, etc. Good advertising or marketing will never be able to reach everyone as well as someone reaching out within their own network." (*Id.* ¶ 121.)

The Nano Defendants promoted XRB on various social-network platforms, including Reddit and Twitter. (*Id.* ¶ 123.) In September 2017, LeMahieu stated on Reddit's Cryptocurrency subreddit that XRB had "been organically growing and expanding since our launch two years ago and we want to open up discussion of the technology to a broader audience." (*Id.* ¶ 124.) The Nano Defendants also produced, participated in, and published videos online for members of the public, including plaintiff and the class, that were used to promote the purchase, acquisition, and appreciation of XRB's value. (*Id.* ¶ 125.)

By October 2017, XRB had significant trading volume on the BitGrail Exchange, and the Nano Defendants determined it was time to close the Nano Faucet and profit in the process. (*Id.* ¶ 130.) On October 15, 2017, the Nano Faucet was closed. Contemporaneously, the Nano Defendants: (i) withheld seven million Nano Coins for themselves for their work in conceiving, developing, promoting, and selling Nano Coin to the public; and (ii) "burned" (meaning, purportedly sent to three inaccessible digital wallets) the undistributed 60 percent of XRB that was

---

[5] The FAC does not include a date for this statement. (*See* FAC ¶ 119.)

1    not claimed during the Nano Faucet, therefore condensing the entire value of XRB supply into the

2    remaining 40 percent.  (*Id.* ¶ 131.)  Accordingly, the price of Nano Coins nearly doubled from

3    $0.09 per Nano Coin to nearly $0.17 per Nano Coin.  (*Id.* ¶ 132.)

4         The Nano Defendants "made various statements and representations that the Nano

5    Defendants owed various duties of care and loyalty" to plaintiff and the class.  (*Id.* ¶ 137.)  On

6    March 7, 2016, LeMahieu wrote "We're investigating creating an irrevocable legal trust to

7    document our commitment to the distribution."  (*Id.* ¶ 138.)  On September 18, 2017, LeMahieu

8    "expressly recognized that the Nano Defendants' behavior, actions, and conduct was informed by

9    their recognition of a correlation between listing XRB on larger exchanges and ensuing damages:

10   'For a long time we weren't actively seeking because we wanted to hammer out node performance

11   and usability issues.  Larger exchanges mean more visibility and damage if there had been

12   problems.'"  (*Id.* ¶ 139.)  In December 2017, LeMahieu responded to a question from a Reddit-

13   user as to whether any security audit to the source code was planned: "We don't have one

14   contracted though both internally and externally this is an important thing people want

15   completed."  (*Id.* ¶¶ 140, 141.)

16        In or about mid-January 2017, BitGrail Exchange proved itself unable to verify in a timely

17   fashion its new users.  (*Id.* ¶ 151.)  This left new users unable to engage in anything more than a

18   very meager volume of transactions – a frustrating circumstance that rendered the users' accounts

19   effectively useless with regard to the purpose for which the users had opened the accounts.  (*Id.*)

20   The Nano Defendants and BitGrail had a "public spat" over BitGrail's verification problem, and

21   some asserted that the problem stemmed from the Nano Defendants' failure to cooperate with

22   BitGrail's business model.  (*Id.* ¶ 152.)

23        In late 2017, many BitGrail Exchange users reportedly experienced problems with the

24   Nano Protocol and reliability and security of the BitGrail Exchange trading platform.  (*Id.* ¶ 146.)

25   For some users, account balances would inexplicably (and inaccurately) slip into negative figures.

26   (*Id.* ¶ 147.)  For some users, single account withdrawals were processed twice.  (*Id.* ¶ 148.)

27   BitGrail Exchange accountholders took to social media to decry the lack of reliability and

28   trustworthiness of BitGrail Exchange's operations or the reliability of the Nano Protocol itself.

(*Id.* ¶ 149.)  Despite the account glitches and functionality concerns that affected so many BitGrail Exchange users, the Nano Defendants did not distance themselves from the BitGrail Defendants. (*Id.* ¶ 150.)  Rather, according to Firano, the Nano Defendants "forced" him to keep XRB available on the BitGrail Exchange despite Firano's warnings.  (*Id.*)

In early February 2018, BitGrail announced that it had "lost" $170 million worth of Nano Coins from its exchange due to "unauthorized transactions."  (*Id.* ¶ 154.)  The "missing" XRB amounted to approximately eighty percent of the XRB that BitGrail Exchange customers held in their accounts and to nearly fifteen percent of all XRB in existence.  (*Id.*)  In the aftermath of the purported XRB theft, the Nano Defendants and the BitGrail Defendants engaged in another very public dispute over the cause of the problem and how it should be resolved.  (*Id.* ¶ 155.)  The Nano Defendants accused Firano of trying to cover-up the event and of asking Nano to engage in purportedly unethical behavior to solve the problem.  (*Id.* ¶ 156.)  BitGrail denied all allegations of wrongdoing and alleged that the Nano Defendants were unwilling to cooperate in formulating a solution.  (*Id.* ¶ 157.)  In the wake of these events, BitGrail made withdrawals from the BitGrail Exchange impossible by suspending all account activity.  (*Id.* ¶ 158.)  The Nano Defendants "ushered" XRB holders, including plaintiff and the class, to the BitGrail Exchange. (*Id.* ¶ 159.)  Those users relied on the Nano Defendants' representations in investing their assets on the BitGrail Exchange and "have now been burned" by the Nano Defendants and the BitGrail Defendants.  (*Id*.)

Less than 24 hours after investors learned that the entirety of their XRB holdings were "lost," the Nano Defendants released their "Official Statement Regarding BitGrail Insolvency" to their XRB investors, denying any responsibility and "pointing the finger" at BitGrail:

> BitGrail is an independent business and Nano is not responsible for the way Firano or BitGrail conduct their business.  We have no visibility into the BitGrail organization, nor do we have control over how they operate.

(*Id.* ¶ 11.)  Since that announcement, Nano Defendants have distanced themselves from BitGrail and attempted to erase the fact that both the Nano Defendants and BitGrail were substantially involved with BitGrail's operations related to XRB.  (*Id.* ¶ 12.)  On April 9, 2018, "a mere three [3] days" after Nano Defendants were named in a lawsuit filed in the Eastern District of New York

"the Nano Defendants announced that [Nano] was 'sponsoring' a 'legal fund' purportedly designed to 'provide all victims of the hack of the cryptocurrency exchange BitGrail with equal access to representation' and enable such investors to seek recourse against the exchange." (*Id.*)

Since plaintiff filed the initial complaint in this action, "numerous additional facts have been revealed by Tribunal of Florence in Italy through its issuance of the BitGrail Decision and the Firano Decision." (*Id.* ¶ 160.) These "additional facts" include the following:

- It was "undisputedly ascertained and shared between the parties that the shortfall took place during the exchange's normal operation";

- The court-appointed expert ascertained that the shortfall was caused by multiple withdrawals ("Double Transactions") that occurred in circumstances which are not clearly proven;

- Firano discovered the shortfall caused by Double Transactions in mid-July 2017 and described the problem in a Telegram group chat with Nano's development team; and

- The exchanges for cryptocurrency have always been invited to manage the transactions autonomously, precisely because blindly trusting the node implies a high risk, not only for possible double withdrawals; that is a risk that "in this Court's view should have been managed by the platform operator, which could and should have limited such risk while providing its services."

(*Id.* ¶ 160.)

Despite being aware of the Double Transactions as of July 2017, the Nano Defendants issued "countless statements falsely or negatively assuring" plaintiffs and the class that their funds were safe on the BitGrail Exchange. (*Id.* ¶ 164.) For example, on January 2, 2018, the Nano Twitter account tweeted "We are working closely with @BitGrail on a node issue discovered due to the scale that BitGrail is processing transactions. All funds are safe and we are working closely with them to resume deposits and withdrawals as soon as possible. Thanks for your patience $xrb[.]" (*Id.* ¶ 165.) On January 12, 2018, Shapiro tweeted twice from his personal account: "Funds are safe on BitGrail. It's an issue with the node which we are working hard to fix. Again.

funds are safe"; "I thought we were all cool a second ago. Funds are safe, we're testing upgrades. Everyone be excellent to each other. Cool?" (*Id.* ¶ 166 (quoted verbatim).)

"The Nano Defendants publicly promoted BitGrail as a safe and reliable place for XRB holders to stake and exchange their XRB, and XRB holders relied on that endorsement by the Nano Defendants in choosing the exchange that would house their valuable assets." (*Id.* ¶ 167.) For example, on January 12, 2018, when one XRB holder questioned the Nano Defendants about the "sagacity" of relying upon the otherwise unknown BitGrail Exchange and its founder and principal operator Firano, Shapiro "publicly represented on Twitter that he speaks with Mr. Firano every day and that both Mr. Firano and BitGrail can be trusted." (*Id.* ¶ 168.) Specifically, Shapiro replied "Yes you can. I talk to [Firano] every day and he's a good guy. We'll get it all sorted next week. Just hang in there." (*Id.*) On February 4, 2018, four days before the loss of $170 million worth of Nano Coins, Shapiro tweeted, "Hey Katherine, we're not ignoring it but there's only so much we [c]an do. We're hoping BitGrail starts rapid verifications as soon as possible and the presence of other exchanges gives people other options for trading. The BG issues are 100% on our radar[.]" (*Id.* ¶ 169.) Plaintiff's and the class' detrimental reliance on Nano Defendants' misstatements, misrepresentations, and omissions of material fact, includes but is not limited to, causing plaintiff to purchase, acquire, own, hold, and refrain from selling their respective XRB before suffering their losses on February 8, 2018. (*Id.* ¶ 170.)

Plaintiff first learned of Nano Coins/XRB in April or May 2017 through social media posts touting the asset, including but not limited to those published on Twitter. (*Id.* ¶ 183.) To learn more, plaintiff followed the Twitter feeds of LeMahieu, Shapiro, and others related to XRB. (*Id.* ¶ 184.) After months of following the representations published by those people, and relying on their truthfulness, plaintiff began investing in Nano Coins. (*Id.* ¶ 185.) On or about August 16, 2017, plaintiff purchased with a credit card on Coinbase's website 1.62457112 bitcoin for $7,104.20, with each bitcoin worth $4,308.83. (*Id.* ¶ 186.) On August 22, 2017, plaintiff transferred his entire bitcoin holding to a cryptocurrency exchange Bittrex. (*Id.* ¶ 187.)

In further reliance on the social media representations he had read from LeMahieu, Shapiro, and others related to XRB, including those regarding the safety and security of both the

Nano Protocol and the BitGrail Exchange, plaintiff selected the BitGrail Exchange to purchase and stake his Nano Coins. (*Id.* ¶ 188.) On August 31, 2017, plaintiff opened an account on BitGrail and then transferred .66971933 bitcoin, worth $3,220 at the time, from his Bittrex wallet to BitGrail. (*Id.* ¶ 189.) To open and manage his BitGrail account, plaintiff logged onto BitGrail's website from his home and followed the instructions provided. (*Id.* ¶ 190.) On September 1, 2017, the .66971933 bitcoin became available on BitGrail and plaintiff used that entire sum to purchase approximately 21,143 XRB. (*Id.* ¶ 191.) On December 12, 2017, plaintiff transferred $2,850 to BitGrail to purchase another 2,000 XRB. (*Id.* ¶ 192.) As of December 12, 2017, plaintiff purchased and held 23,143 XRB with a total purchase price of $6,070.00. (*Id.* ¶ 193.)

In deciding to invest in Nano Coins, open an account on the BitGrail Exchange, and stake his investment holdings in XRB there, plaintiff reviewed and relied upon the Nano Defendants' promotions on social media channels and statements made on the Nano Defendants' own website representing that the BitGrail Exchange is a safe and reliable exchange on which to purchase and stake XRB. (*Id.* ¶ 194.) Shortly before plaintiff lost control and possession of his 23,143 XRB on BitGrail, he transferred 110 XRB to a separate XRB wallet off of the BitGrail Exchange. Thus, as of February 8, 2018, plaintiff owned and held a total of 23,033 XRB in his BitGrail wallet, worth approximately $275,000. (*Id.* ¶¶ 195, 196.)

### B. Procedural Background

This is the second lawsuit against the Nano Defendants in connection with the XRB asset. The first action was filed on April 6, 2018 by one of the plaintiff's firms here, Silver Miller of Florida, in the Eastern District of New York. *See Brola v. Nano, et al*, Case No. 1:18-cv-02049-NG-RML (E.D.N.Y.) (the "*Brola* Action"). The complaint in the *Brola* Action articulated allegations filed on behalf of a class that included plaintiff in this action. *See id.* Dkt. No. 1. The *Brola* Action was dismissed pursuant to voluntary dismissal on September 28, 2018. *Id.* Dkt. No. 31. No substantive motion work occurred.

Plaintiff filed the initial complaint in this action on January 3, 2019. (Dkt. No. 1.) Nano Defendants filed a motion to dismiss that complaint on March 29, 2019. (Dkt No. 33.) Following a hearing on June 25, 2019 (*see* Dkt. Nos. 53, 57), the Court granted the motion with leave to

amend. (Dkt. No. 56.) During the June 25 hearing, the Court went through each of plaintiff's claims and explained why plaintiff's complaint failed to state a claim in each instance. (*See* Dkt. No. 57 ("Prior Hearing").)

## II.     LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed for failure to state a claim upon which relief may be granted. Dismissal for failure to state a claim under Rule 12(b)(6) is proper if there is a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)).

The complaint must plead "enough facts to state a claim [for] relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). If the facts alleged do not support a reasonable inference of liability, stronger than a mere possibility, the claim must be dismissed. *Id.* at 678-79; *see also In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (stating that a court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences").

A complaint that falls short of the Rule 8(a) standard may be dismissed if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to a nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).

If a court dismisses a complaint, it should give leave to amend unless "the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990); *see also* Fed. R. Civ. P. 15(a). In making this determination, a court must bear in mind "the underlying purpose of Rule 15 to facilitate decisions on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (alterations and internal quotation marks omitted).

## III.   ANALYSIS

Of the eleven causes of action articulated in in the FAC, plaintiff asserts ten against the Moving Defendants. (*See* FAC ¶¶ 197-256.) The Court addresses each.

### A.   Federal Securities Claims (Counts I and II)

Plaintiff brings claims for violations of Sections 12(a)(1) and 15(a) of the 1933 Act. (*See* FAC ¶¶ 197-206.) Section 12(a)(1) provides a private right of action to enforce the registration requirements of Section 5 of the 1933 Act by providing that a seller of an unregistered security will be liable to the buyer for rescission. *See* 15 U.S.C. § 77l(a)(1). Section 15(a) provides liability for persons who control any person or entity liable under other sections of the 1933 Act, including Section 12. *See* 15 U.S.C. § 77o(a). Accordingly, and as parties conceded during the September 24 hearing, plaintiff's Section 15 claim rises and falls with his Section 12 claim. Thus, the Court addresses only the sufficiency of the later.

Pursuant to the relevant statute of limitations, a Section 12(a)(1) claim cannot be maintained "unless brought within one year after the violation upon which it is based." 15 U.S.C. § 77m. As plaintiff concedes, this one-year period began to run on the date of plaintiff's last purchase of Nano Coins, or December 12, 2017. *See id.*; *see also* FAC ¶ 193; Dkt. No. 63 ("Opp.") at 7. Therefore, plaintiff's initial complaint, filed on January 3, 2019, exceeds the one-year statute of limitations.

The parties agree that, as a general rule, the statute of limitations for Section 12(a)(1) is not subject to equitable tolling. (MTD at 7; Opp. at 7.) However, plaintiff argues that courts have found that some circumstances exist where equitable tolling is warranted. (Opp. at 7 (citing *Argent Classic Convertible Arbitrage Fund, L.P. v. Amazon.com, Inc.*, No. C01-0640L, 2003 WL

26116562, at *4 (W.D. Wash. Jan. 6, 2003) (noting that an exception to the general rule "might [exist] where defendant takes extraordinary steps to convince the offeree that a registration statement has, in fact, been field or otherwise prevents the offeree from filing suit in a timely manner").) The Ninth Circuit has not addressed this issue, but the First, Second, Third, Fifth, Sixth, and Eight Circuits have. The weight of the authority supports finding that equitable tolling does not apply to Section 12(a)(1) claims, *regardless of the circumstances*.[6]

The Court finds the reasoning of these cases persuasive. *See Nolfi*, 675 F.3d at 553 (finding that "the fact that the statute plainly fails to include a discovery rule for § 12(a)(1)—when juxtaposed with a provision within the *same sentence* specifically allowing it for § 12(a)(2)— shows that Congress intended to negate equitable tolling in this context") (emphasis supplied); *see also In re Rexplore, Inc. Sec. Litig.*, 671 F.Supp. 679, 687 (N.D. Cal. 1987) (with respect to the same statutory language, finding that "[a] reasonable construction of this language is that Congress intended the one year limitation period of Section 12(1) to be absolute" and noting that "since the registration, or lack thereof, of securities is a public record and easily discovered, it is inappropriate to apply the equitable tolling doctrine to a claim brought for failure to register securities"). Moreover, and as the Court noted during the September 24 hearing, plaintiff has failed to provide any authority to suggest that the Ninth Circuit would depart from this reasoning. Thus, the Court determines that the statute of limitations for a Section 12(a)(1) claim is not subject

_____

[6] *Compare Cook v. Avien, Inc.*, 573 F.2d 685, 691 (1st Cir.1978) ("We hold that, under the explicit language of [the statute], the limitations period runs from the date of the violation irrespective of whether the plaintiff knew of the violation."); *Pell v. Weinstein*, 759 F.Supp. 1107, 1111 (M.D.Pa.1991), *aff'd without opinion*, 961 F.2d 1568 (3d Cir.1992); *Mason v. Marshall*, 412 F.Supp. 294, 299 (N.D.Tex.1974), *aff'd*, 531 F.2d 1274 (5th Cir.1976) (same); *Nolfi v. Ohio Kentucky Oil Corp.*, 675 F.3d 538, 553 (6th Cir. 2012) ("Because the statute permits claims under § 12(a)(2) to proceed if brought within one year of discovery of the violation but does not have a similar discovery rule for § 12(a)(1) claims, Congress's intent on this matter is clear and that the express language of the statute should be applied."); *Gridley v. Cunningham*, 550 F.2d 551, 552–53 (8th Cir.1977) (stating that a § 12(a)(1) claim must be brought within one year of the violation, finding that the statute of limitations period had passed, and not permitting the claim to proceed under Fed.R.Civ.P. 15(c) as an amendment relating back to an original contract claim); *with Katz v. Amos Treat & Co.*, 411 F.2d 1046, 1055 (2d Cir.1969) (allowing equitable tolling where a party said it was in the process of registering securities when, in fact, it was not); *Sanderson v. Roethenmund*, 682 F.Supp. 205, 208 (S.D.N.Y.1988) (same).

to equitable tolling and finds that plaintiff's Section 12(a)(1) claim, both on his own behalf and on behalf of the proposed class, are untimely.

Moreover, with respect to plaintiff's class claims, even if the Court found that equitable tolling of the Section 12(a)(1) statute of limitations was appropriate under the circumstances articulated in *Argent*, the circumstances at issue here do not rise to that level. *Argent Classic Convertible*, 2003 WL 26116562, at *4. In sum, plaintiff argues that because the *Brola* Action asserted his claims, and a reasonable class member would believe that those claims were being litigated on a class-wide basis, rendering the filing of additional claims unnecessary, the Court should apply equitable tolling under the *American Pipe* Rule. *See American Pipe & Construction Company v. Utah*, 414 U.S. 538 (1974) (holding that the timely filing of a class action tolls the statute of limitations for a subsequent individual action by a plaintiff-intervenor in the action); *see also Crown, Cork & Seal Co. Inc. v. Parker*, 462 U.S. 345 (1983) (extending the *American Pipe* rule to individual actions by absent class members). However, the Supreme Court has recently held that the *American Pipe* Rule does not apply to successive class actions, such as the *Brola* Action and the instant action. *See China Agritech, Inc. v. Resh, et al*, 138 S.Ct. 1800 (2018) (holding that upon denial of class certification, a putative class member, in lieu of promptly joining an existing suit or promptly filing an individual action, may not commence a class action anew beyond the time allowed by the applicable statute of limitations). Therein, the Court observed that allowing for successive class actions based upon the *American Pipe* Rule would "allow the statute of limitations to be extended time and again; as each class is denied certification, a new named plaintiff could file a class complaint that resuscitates the litigation." *Id.* at 1808. Although the *Brola* Action did not reach the class certification stage, the instant action represents an attempt by plaintiff's counsel to resuscitate the litigation. Having failed to bring a successful claim in the Eastern District of New York and settling that action on an individual basis, Silver Miller has found a new plaintiff and attempts to bring a successive class action claim here.[7]

---

[7] Moreover, the Court finds unpersuasive plaintiff's argument that the statute of limitations on his individual Section 12(a)(1) claim should be tolled pursuant to the *American Pipe*

Therefore, the Court finds that the one-year statute of limitations on plaintiff's Section 12(a)(1) claim is not subject to equitable tolling and thus expired prior to plaintiff's filing of an initial complaint.[8]  The Court has previously provided plaintiff an opportunity to amend his complaint to address this deficiency.  (*See* Prior Hearing.)  Accordingly, the Court **GRANTS** this portion of Nano Defendants' motion to dismiss the FAC and **DISMISSES WITH PREJUDICE** plaintiff's Section 12(a)(1) and Section 15(a) claims.  *See Foman v. Davis*, 371 U.S. 178, 182 (1962) (identifying factors that may justify denying leave to amend, including failure to cure deficiencies by amendments previously allowed and futility).

### B.  State Law Claims

In addition to the federal securities law claims addressed above, plaintiff asserts eight state-law causes of action against the Moving Defendants.[9]

#### 1.  Breach of Implied Contract Claim (Count IV)

To state a claim for breach of contract, express or implied, under California law, a plaintiff must allege: "(1) the contract, (2) the plaintiff's performance of the contract or excuse for nonperformance, (3) the defendant's breach, and (4) the resulting damage to the plaintiff."  *CDF*

---

Rule.  Plaintiff argues that he "timely filed this class action upon the settlement and dismissal of the previously class action to which [sic] [he] was a member."  (Opp. at 10.)  As plaintiff elsewhere concedes, "to benefit from equitable tolling, plaintiffs must demonstrate that they have been diligent in pursuit of their claims."  (*Id.* at 9 (citing *China Agritech*, 138 S.Ct. at 1808).)  Here, the parties in the relevant class action, the *Brola* Action, settled on September 28, 2018.  Plaintiff in this action did not file his complaint until January of 2019, more than three months later.  The Court finds that this delay does not reflect diligent pursuit of plaintiff's claims, especially in light of plaintiff's counsel, Silver Miller's, representation of the plaintiff in the *Brola* Action.  *C.f. American Pipe*, 414 U.S. at 561 (finding tolling of the statue of limitations period where subsequent motion was filed "only eight days" after the entry of the order denying class certification).

[8]  As the Court has resolved the timeliness of plaintiff's Section 12(a)(1) claim by application of the statute of limitations, the Court need not address Moving Defendants' argument regarding the statute of repose.  (*See* MTD at 8-9 (citing 15 U.S.C. § 77m).)

[9]  As defendants conceded during the September 24 hearing, the Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. §§ 1332(a), 1332(d)(2)(A), based on the allegations in plaintiff's complaint of class claims in which the matter in controversy exceeds $5,000,000 and in which some of the members of the class are citizens of a state different from defendants.  (*See generally*, FAC; *see also id.* ¶¶ 27, 217, 223, 226, 231, 237, 244, 250, 255.)

*Firefighters v. Maldonado*, 158 Cal.App.4th 1226, 1239 (2008); *see also Otworth v. Southern Pac. Transportation Co.*, 166 Cal.App.3d 452, 458 (1985). With respect to the first element, a contract, "the vital elements of a cause of action based on contract are mutual assent (usually accomplished through the medium of an offer and acceptance) and considerations. As to the basic elements, there is no difference between an express and implied contract." *Division of Labor Law Enforcement v. Transpacific Transportation Co.*, 69 Cal.App.3d 268, 275 (1977).

Here, plaintiff alleges that "[t]he Nano Defendants had a valid, binding and enforceable contract with Plaintiff and the Class that was not reduced to writing, but was implied based on the Nano Defendants' conduct." (FAC ¶ 213.) "[A]n implied in fact contract may be inferred from the conduct, situation or mutual relation of the parties, the very heart of this kind of agreement is an intent to promise[.]" *See Division of Labor*, 69 Cal.App.3d at 275.

Plaintiff asserts that the Nano Defendants made a number of implied promises to himself and the class related to the safety and security of the BitGrail Exchange. (*See* FAC ¶ 214.) Plaintiff identifies the following actions by Nano Defendants, as conduct giving rise to an implied contract – (i) "[c]laiming responsibility for creating" Nano Coins, "which stands in stark contrast to Bitcoin, whose creator(s) remain(s) anonymous[;]" (ii) "[d]eveloping the business and marketing scheme to distinguish XRB from the vast array of other cryptocurrencies and encourage the pubic to purchase it[;]" (iii) "[a]pproaching Defendant Firano for the purpose of creating a 'Raiblocks dedicated exchange'[;]" (iv) "[c]ollaborating with Defendant Firano to create and launch BitGrail, an XRB dedicated exchange[;]" (v) "[r]epresenting to the public that Defendant Busch was working hard on 'solving the operational challenges at @Bitgrail'[;]" and (vi) "[r]ecognizing [the] importance [of] and acknowledging responsibility for choosing the proper exchanges [to] list XRB, [including] conducting a security audit of XRB's code[.]" (Opp. at 16 (citing FAC ¶¶ 69, 71-72, 78, 96, 99, 105-07, 109, 139-41).)

The alleged actions merely represent the Nano Defendants' conduct relative to the BitGrail Exchange. None of this alleged conduct gives rise to an inference of *mutual assent* of any particular offer and acceptance between plaintiff and the Nano Defendants. *Mulder v. Mendo Wood Products, Inc.*, 225 Cal.App.2d 619, 632 (1964) ("The true implied contract consists of

16

obligations arising from a mutual agreement and intent to promise where the agreement and promise have not been expressed in words."). The Court has previously provided plaintiff an opportunity to amend his complaint to address this deficiency. (*See* Prior Hearing.) Accordingly, the Court **GRANTS** Nano Defendants' motion to dismiss and **DISMISSES WITH PREJUDICE** plaintiff's claim of breach of implied contract. *See Foman*, 371 U.S. at 182.

## 2. Breach of Fiduciary Duty (Count V)

In California, "[t]he elements of a cause of action for breach of fiduciary duty are: (1) existence of a fiduciary duty; (2) breach of the fiduciary duty; and (3) damage proximately caused by the breach." *Gutierrez v. Girardi*, 194 Cal.App.4th 925, 932 (Cal. Ct. App. 2011). "[B]efore a person can be charged with a fiduciary obligation, he must either undertake to act on behalf and for the benefit of another, or must enter into a relationship which imposes that undertaking as a matter of law." *Committee on Children's Television, Inc. v. General Foods Corp.*, 35 Cal.3d 197, 221 (1983). "Such a relation ordinarily arises where a confidence is reposed by one person in the integrity of another[.]" *Herbert v. Lankershim*, 9 Cal.2d 409, 483 (1937); *see also Wolf v. Superior Court*, 107 Cal.App.4th 25, 29 (2003). "Traditional examples of fiduciary relationships in the commercial context include trustee/beneficiary, directors and majority shareholders of a corporation, business partners, joint adventures, and agent/principal." *Wolf*, 107 Cal.App.4th at 30.

Here, plaintiff asserts that Nano Defendants' "custodianship" over plaintiff's and the proposed class' XRB investments, through their control over BitGrail and absolute control over essentially every aspect of XRB and its value, including its continued existence, created a special relationship giving rise to a fiduciary duty to plaintiff and the proposed class. (Opp. at 19 (citing FAC ¶ 80).) In this regard, the FAC baldly alleges that Nano Defendants' "significant control creates a special relationship giving rise to a fiduciary duty[.]" (*See id.*) Such "conclusory allegations of law . . . are insufficient to defeat a motion to dismiss." *Adams*, 355 F.3d at 1183. Plaintiff fails to provide any authority for his assertion that these allegations of custodianship

suffice to state a cause of action for breach of fiduciary duty under California law.[10] The Court

has previously provided plaintiff an opportunity to amend his complaint to address this deficiency.

(*See* Prior Hearing.)  Accordingly, the Court **GRANTS** Nano Defendants' motion to dismiss and

**DISMISSES WITH PREJUDICE** plaintiff's claims for breach of fiduciary duty.  *See Foman*, 371 U.S.

at 182.

### 3. Aiding and Abetting Breach of Fiduciary Duty (Count VI)

"The elements of a claim for aiding and abetting a breach of fiduciary duty are: (1) a third

party's breach of fiduciary duties owed to plaintiff; (2) defendant's actual knowledge of that

breach of fiduciary duties; (3) substantial assistance or encouragement by defendant to the third

party's breach; and (4) defendant's conduct was a substantial factor in causing harm to plaintiff."

*Nasrawi v. Buck Consultants LLC*, 231 Cal.App.4th 328, 343 (2014).  Plaintiff asserts a theory of

the claim that the Nano Defendants aided and abetted breaches of fiduciary duty by the BitGrail

Defendants.  (*See* FAC ¶ 225.)

With respect to the breach of fiduciary duty owed to plaintiff by third-party BitGrail

Defendants, plaintiff again makes the custodianship argument.  The FAC alleges that "BitGrail

was an XRB dedicated exchange, built from scratch to serve the buying, selling, and trading of

XRB" and that plaintiff and the class "purchased and staked their XRB on BitGrail's exchange as

a result of [Nano] Defendants' extensive promotion and encouragement."  (Opp. at 21 (citing FAC

¶¶ 3-4, 167-70).)  Based thereon, plaintiff avers that "BitGrail had *custody* of Plaintiff's and the

Class' XRB that was stored on BitGrail's exchange" and "[t]here can be no dispute that BitGrail

therefore had a fiduciary duty to Plaintiff and the Class."  (*Id.* (emphasis supplied).)  However,

plaintiff again fails to provide any authority for his assertion that his allegations of custodianship

suffice to state a cause of action for breach of fiduciary duty under California law.  *See Adams*,

---

[10]  The only case to which plaintiff cites, *In re Bank of New York Mellon Corp. False Claims Act Foreign Exchange Litigation*, is inapposite.  (Opp. at 19 (citing 851 F.Supp.2d 1190 (N.D. Cal. 2012)).)  Therein, the court found a fiduciary duty where plaintiff funds had *contracted with defendants* for custodial services, namely the effectuation of foreign exchange transactions pursuant to a "standing-instruction" method, which included incidental transactions to obtain the correct currency.  *In re Bank of New York Mellon*, 851 F.Supp.2d at 1193-94.

United States District Court
Northern District of California

355 F.3d at 1183. As noted above, the Court has previously provided plaintiff an opportunity to amend his complaint to address the deficiency of his argument that custodianship supports finding a fiduciary duty under California law. (*See* Prior Hearing.) Accordingly, the Court **GRANTS** Nano Defendants' motion to dismiss and **DISMISSES WITH PREJUDICE** plaintiff's claim for aiding and abetting a breach of fiduciary duty. *See Foman*, 371 U.S. at 182.

### 4. Negligence (Count VII)

"In order to establish negligence under California law, a plaintiff must establish four required elements: (1) duty; (2) breach; (3) causation; and (4) damages." *Illeto v. Glock Inc.*, 349 F.3d 1191, 1203 (9th Cir. 2003) (citing *Martinez v. Pacific Bell*, 225 Cal.App.3d 1557, 1564 (1990)). Nano Defendants argue that plaintiff's FAC fails to allege duty, breach, and causation. (MTD at 22-23.) The Court addresses each.

"The threshold element of a cause of action for negligence is the existence of a duty to use due care toward an interest of another that enjoys legal protection against unintentional invasion." *Bily v. Arthur Young & Co.*, 3 Cal.4th 370, 397 (1992). Plaintiffs may not simply aver that a defendant owed them a duty. *See, e.g.*, *Bem v. Stryker Corp.*, No. C 15-2485 MMC, 2015 WL 4573204, at *1 (N.D. Cal. July 29, 2015). In California, "each person has a duty to use ordinary care and is liable for injuries caused by his [or her] failure to exercise reasonable care in the circumstances." *Cabral v. Ralphs Grocery Co.*, 51 Cal.4th 764, 771 (2011) (internal quotation marks omitted).

Here, plaintiff alleges that Nano Defendants had a "legal duty to exercise reasonable care with respect to the management of XRB[.]" (FAC ¶ 228.) In support of his assertion of a duty, plaintiff's FAC includes allegations of Nano Defendants' actions and statements directed toward plaintiff and prospective and current XRB customers in support of the BitGrail Exchange. (*See id.* ¶¶ 110-122.)

Next, to determine whether that duty extends to plaintiff, California courts consider: (i) "the foreseeability of the harm to the plaintiff"; (ii) "the degree of certainty that the plaintiff suffered injury"; (iii) the closeness of the connection between the defendant's conduct and the injury suffered"; (iv) "the moral blame attached to the defendant's conduct"; (v) "the policy of

preventing future harm"; and (vi) "the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach and the availability, cost, and prevalence of insurance for the risk involved." *See Rowland v. Christian*, 69 Cal.2d 108, 113 (1968).[11]

Here, five of the six factors weigh in favor of finding a duty. It was foreseeable that a lack of security on the primary exchange for Nano Coins would cause harm to individuals who, like plaintiff, deposited their Nano Coins on that exchange and that any security failure on that exchange would result in harm to plaintiff and other similarly situated individuals. Further, it is plausible that Nano Defendants' alleged conduct, if true, could be viewed as morally reprehensible and this type of action could further the goal of preventing future harm. Imposing a duty to exercise care in this instance will not result in an undue burden on the Nano Defendants or the industry at large. Moreover, Nano Defendants' conduct was proximately connected to plaintiff's injury, even if through the actions of the BitGrail Defendants. The *Rowland* factors weigh in favor of finding a duty owed by Nano Defendants to plaintiff. *See Castillo*, 2016 WL 9280242 at *3 (finding a duty owed by employer to spouses of employees to protect their personal information). Accordingly, the Court finds that plaintiff has alleged that Nano Defendants had a duty to exercise reasonable care with respect to their management of XRB. Plaintiff's FAC also includes sufficient allegations that Nano Defendants breached that duty. (*See* FAC ¶ 229.)

With respect to causation, Nano Defendants correctly note that plaintiff's generic allegation does not suffice, nor did plaintiff refute or otherwise contest the argument. (*See* Opp. at 21-23.) During the September 24 hearing, plaintiff relied on paragraphs 160 and 171 of the FAC, which incorporate statements in the Italian Court Documents, as allegations of causation based on "double withdrawals," which permitted the alleged theft, as the result of an exploited fault in the Nano Protocol developed by Nano Defendants. (*See* FAC ¶¶ 160, 171.) The Court agrees and

---

[11] The Court notes that Nano Defendants are incorrect that the factors articulated in *Rowland* "address the propriety of an exception to the premises liability where the plaintiff is a trespasser or licensee[.]" *See* Dkt. No. 64 ("Reply") at 11 n. 71; *see, e.g. Castillo*, 2016 WL 9280242 at *3 (applying the *Rowland* factors to determine whether a duty of care extended to plaintiffs in negligence cause of action).

declines to adopt the *factual findings* of the Italian bankruptcy court as Moving Defendants suggest. Accordingly, the Court **DENIES** Nano Defendants' motion to dismiss plaintiff's negligence claim.

### 5. Fraud (Count VIII)

The elements of a California fraud claim are: (i) misrepresentation of a past or existing material fact; (ii) knowledge of the statement's falsity; (iii) intent to defraud; (iv) justifiable reliance; and (iv) resulting damage. *Lazar v. Superior Court*, 12 Cal.4th 631, 638 (1966). These elements must be plead with particularity. Fed. R. Civ. P. 9(b); *see Small v. Fritz Companies, Inc.*, 30 Cal.4th 167, 184 (2003). Nano Defendants argue that plaintiff has failed to allege reliance because of the thirty-six statements identified in the FAC, only two were made prior to plaintiff's final purchase of Nano Coins. (MTD at 24.) However, this argument ignores plaintiff's allegation that he relied on Nano Defendant's false statements and representations in "staking" or *holding* his XRB on the BitGrail Exchange.[12] (*See* FAC ¶¶ 188, 235.) Accordingly, the Court **DENIES** Nano Defendants' motion to dismiss plaintiff's fraud claim.[13]

### 6. Negligent Misrepresentation (Count IX)

"The elements of negligent misrepresentation are similar to intentional fraud except for the requirement of scienter; in a claim for negligent misrepresentation, the plaintiff need not allege the defendant made an intentionally false statement, but simply one as to which he or she lacked any reasonable ground for believing the statement to be true." *Charnay v. Cobert*, 145 Cal.App.4th 179, 184 (2006) (citing *Bily v. Arthur Young & Co.*, 3 Cal.4th 370, 407-08 (1992)). As noted

---

[12] Nano Defendants' contention that plaintiff's allegation that the other thirty-four statements fraudulently induced him to "maintain" his holdings on BitGrail is "foreclosed by the fact that documents integral to the Amended Complaint show that Firano froze the exchange on January 12, 2018" fails. (MTD at 24-25.) This argument introduces a factual issue not appropriate for a motion to dismiss.

[13] The Court notes that plaintiff, despite characterizing his fraud claim as one for "fraudulent concealment" in his opposition (*see* Opp. at 23) clarified, during the September 24 hearing, that his fraud claim is one for affirmative fraud. As the Court explained during the hearing, and plaintiff concedes in his opposition, a claim for fraudulent concealment under California law requires that "the defendant was under a duty to disclose the fact to the plaintiff[.]" (*See* Opp. at 23 (citing *Taragan v. Nissan N. Am., Inc.*, No. C 09-3660 SBA, 2013 WL 3157918, at *5 (N.D. Cal. Jun. 20, 2013)).)

above, the elements of a fraud claim are: (i) misrepresentation of a past or existing material fact; (ii) knowledge of the statement's falsity; (iii) intent to defraud; (iv) justifiable reliance; and (iv) resulting damage. *Lazar*, 12 Cal.4th at 638.

Like intentional fraud, negligent misrepresentation must be pled with specificity. *See Small.*, 30 Cal.4th at 184. Where a business entity is involved, a "plaintiff [must] allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written." *Tarmann v. State Farm Mut. Auto. Ins.*, 2 Cal.App.4th 153, 157 (1991).

Nano Defendants' arguments with respect to plaintiff's negligent misrepresentation claim replicate those discussed above regarding fraud and fail for the same reasons. (*See* MTD at 23-24.) Accordingly, the Court **DENIES** Nano Defendants' motion to dismiss plaintiff's negligent misrepresentation claim.

### 7. Constructive Fraud (Count X)

"To state a claim for constructive fraud under California law, a plaintiff must allege: (1) a fiduciary or confidential relationship; (2) an act, omission or concealment involving a breach of that duty; (3) reliance; and (4) resulting damage." *Sacramento E.D.M., Inc. v. Hynes Aviation Indus.*, 965 F.Supp.2d 1141, 1152 (E.D. Cal. 2013); Cal. Civ. Code § 1573. As explained above, plaintiff has failed to allege a fiduciary or confidential relationship. *See supra*, III.B.2. The Court has previously provided plaintiff an opportunity to amend his complaint to address this deficiency. (*See* Prior Hearing.) Therefore, his constructive fraud claim fails, and the Court **GRANTS** Nano Defendants' motion and **DISMISSES WITH PREJUDICE** the constructive fraud claim. *See Foman*, 371 U.S. at 182.

### 8. Quasi-Contract Claim or Unjust Enrichment (Count XI)

Although California does not recognize "a standalone cause of action for 'unjust enrichment," such a claim "describe[s] the theory underlying a claim that a defendant has been unjustly conferred a benefit through mistake, fraud, coercion, or request [and] [t]he return of that benefit is the remedy typically sought in a quasi-contract cause of action." *Asitana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (internal quotations omitted).

Here, plaintiff does not allege that he and the purported class purchased Nano Coins from, or otherwise directly conferred a monetary benefit upon, the Nano Defendants. (*See generally*, FAC.) Instead, he alleges that the Nano Defendants were unjustly enriched because the value of their own holdings of Nano Coins appreciated as a result of the purchase of Nano Coins by plaintiff and the purported class. (*See* FAC ¶ 253 ("Nano Defendants were unjustly enriched by [his] and [the] Class'[s] purchase and trading of XRB, because XRB's price appreciated as a result of [his] and the Class's purchase and trading of XRB, thereby enriching the Nano Defendants with large appreciation of value of their own XRB holdings, the ability of a large market to sell and dump their XRB at a large profit, and potentially obtain fees and payments for directing trading volume at exchanges like Bit Grail.").) Plaintiff does not provide any authority for his assertion that such facts support a claim for restitution, which typically arises where one must return a benefit to the conveyer. *Munoz v. MacMillan*, 195 Cal.App.4th 648, 661 (2011) ("Common law principles of restitution require a party to *return* a benefit when the retention of such benefit would unjustly enrich the recipient[.]"). The Court has previously provided plaintiff an opportunity to amend his complaint to address this deficiency. (*See* Prior Hearing.) Accordingly, the Court **GRANTS** Nano Defendants' motion and **DISMISSES WITH PREJUDICE** plaintiff's quasi-contract, or unjust enrichment, claim. *See Foman*, 371 U.S. at 182.

## IV.     CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Nano Defendants' motion to dismiss. In summary, the following of plaintiff's claims against Nano Defendants remain: negligence (Count VII), fraud (Count VIII), and negligent misrepresentation (Count IX).

This Order terminates Docket Number 60.

**IT IS SO ORDERED.**

Dated: October 4, 2019

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**