Pages 1 - 46

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

```
JAMES FABIAN,                  )
                               )
          Plaintiff,           )
                               )
  VS.                          )     NO. CV 19-00054-YGR
                               )
NANO F/K/A RAIBLOCKS F/K/A     )
HIEUSYS LLC, ET AL.,           )
                               )
          Defendants.          )
_____)
```

Oakland, California
Tuesday, September 24, 2019

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                    LEVI AND KORSINSKY, LLP
                    1101 30th Street, NW
                    Suite 115
                    Washington, DC  20007
                BY: **JOHN A. CARRIEL, ESQUIRE**

                    SILVER MILLER LAW
                    117 NE 1 Avenue
                    Miami, FL  33132
                BY: **TODD R. FRIEDMAN, ESQUIRE**

For Defendants:
                    SCOOLIDGE, PETERS, RUSSOTTI & FOX LLP
                    135 Madison Avenue - 5th Floor
                    New York, NY  10016
                BY: **PETER SCOOLIDGE, ESQUIRE**
                    **PETER FOX, ESQUIRE**

Reported By:     Pamela Batalo-Hebel, CSR No. 3593, RMR, FCRR
                 Official Reporter

```
APPEARANCES CONTINUED:

For Defendants:
                    CORNERSTONE LAW GROUP
                    351 California Street - Suite 600
                    San Francisco, CA  94104
           BY:  PAUL J. BYRNE, ESQUIRE
```

1    <u>**Tuesday - September 24, 2019**</u>                    **2:00 p.m.**

2                              **P R O C E E D I N G S**

3                              **---000---**

4         **THE CLERK:**  Calling CV 19-0054, Fabian vs. Nano f/k/a

5    Raiblocks f/d/a Hieusys LLC, et al.

6         Counsel, please come forward and state your appearances.

7         **MR. CARRIEL:**  John Carriel on behalf of Plaintiff

8    Fabian.

9         **MR. FRIEDMAN:**  Good afternoon, Your Honor.  Todd

10   Friedman also on behalf of the plaintiff.

11        **THE COURT:**  Okay, Gentlemen.  Good afternoon.  Welcome

12   to California.

13        **MR. FRIEDMAN:**  Thank you.

14        **MR. CARRIEL:**  Thank you.

15        **MR. SCHOOLIDGE:**  Good afternoon, Your Honor.  Peter

16   Schoolidge for the defendants Heiusys LLC, Colin Lemahieu, Troy

17   Retzer, and Mica Busch.

18        **MR. FOX:**  Peter Fox for the same defendants.

19        **MR. BYRNE:**  Good afternoon.  Paul Byrne for the same

20   defendants, Your Honor.

21        **THE COURT:**  Okay.  Good afternoon to you all as well.

22        All right.  A written order will issue with respect to

23   this matter, but let's go through it.  We'll see where we end

24   up.

25        You've already had one comprehensive hearing on the

1  matter, but given the significant changes in the Complaint, I

2  thought it was worthwhile to have another hearing.  You will

3  not be allowed to so amend your Complaint again in this manner.

4  You will only be allowed to amend it to the extent you're

5  provided leave.  Do you understand?

6          **MR. CARRIEL:**  Yes, Your Honor.

7          **THE COURT:**  All right.  Before we get started, a

8  procedural issue.  What is the status of the other parties?

9  Have they been served?  That is Francesco Firano and BG

10  Services.

11          **MR. CARRIEL:**  Yes, Your Honor.

12      They have not been served yet.  Our thinking was to see

13  how the bankruptcy proceeding played out in Italy, and it has

14  concluded, and at this point, since he has been declared

15  bankrupt, we're not sure that it would be in the best interests

16  to serve him as it would only further deplete any of the

17  potential funds recovered for the class because he would likely

18  use BitGrail funds to defend that action.

19          **THE COURT:**  So what are you going to do with him?

20          **MR. CARRIEL:**  It depends on the outcome of this

21  proceeding, Your Honor.

22          **THE COURT:**  All right.

23      So let's start with the federal securities claims.  Again,

24  I think everyone understands that Section 15(a), that claim

25  rises and falls with Section 12; correct?

1          **MR. CARRIEL:**  Yes, Your Honor.

2          **MR. SCHOOLIDGE:**  Yes, Your Honor.

3          **THE COURT:**  And it doesn't look to me as if you

4     provided me, frankly, with any more authority on this notion of

5     whether claims under the statute can be tolled, that is, the

6     statute of limitations, so I think my earlier analysis would

7     be, as I mentioned the first time -- which is to follow the

8     First, Second, Third, Fifth, Sixth, and Eighth Circuits and

9     find that the equitable tolling does not apply.  And if that's

10    the case, then with respect to those claims, it appears to me

11    that they are barred by the statute of limitations.

12         **MR. CARRIEL:**  Your Honor, we would argue that if that

13    is the case, that Plaintiff Fabian's claims should continue

14    under *American Pipe*.  They should still be tolled.

15         **THE COURT:**  You mean individually?

16         **MR. CARRIEL:**  Yes, Your Honor.

17         **THE COURT:**  Well, how, again, would -- well, a

18    response.

19         **MR. FOX:**  Your Honor, we argued in our motion papers

20    that --

21         **THE COURT:**  Let me ask -- usually, Mr. Fox, I don't

22    have defense counsel gang up on plaintiff's counsel, so are you

23    going to tell me in advance who is taking which issues?

24         **MR. FOX:**  Certainly, Your Honor.  I'm going to handle

25    timeliness; and to the extent that it becomes relevant for the

1   purposes of this argument, *Howey*; and I will also handle the

2   implied contract claim; the fraud claim; the negligent

3   misrepresentation claim; and the unjust enrichment claim.

4        My partner, Mr. Schoolidge, will handle statutory standing

5   under 12(a)(1); *Morrison*, again to the extent that those even

6   become relevant for the purposes of the argument; negligence;

7   breach of fiduciary duty; constructive fraud; and aiding and

8   abetting breach of fiduciary duty.

9        **THE COURT:**  Okay.  Thank you.  Go ahead.

10       **MR. FOX:**  So the *American Pipe* tolling doctrine is an

11  equitable doctrine.  It doesn't apply as a matter of right, and

12  there is authority for that in our opening brief in support of

13  the motion.

14       In cases where the plaintiff is responsible for his own

15  prejudice, such as the *Weitzner* case which we cited from the

16  Third Circuit in our opening brief, tolling for individual

17  claims has been denied under *American Pipe*.

18       Those arguments were set forth in the opening brief, and

19  the Plaintiffs did not respond to those arguments in their

20  opposition.

21       It's our view that under applicable case law in this

22  circuit and in this district, they've waived any argument to

23  the contrary.

24       **THE COURT:**  Response on the legal issues, not the

25  waiver.

1    **MR. CARRIEL:**  There are not any facts in this case

2    to -- that indicate that plaintiffs -- that plaintiff is

3    responsible for any untimeliness here.  There is none set forth

4    in the Complaint, there is none in the opposition --

5    **THE COURT:**  Well, it's your obligation affirmatively

6    to make sure that your claim falls within the applicable

7    statute of limitations.  This issue was raised on the first

8    round.  You had notice of it at the first round, and you need

9    to plead facts to show that the claim should proceed.

10   **MR. CARRIEL:**  The facts that we plead in the Complaint

11   and in our opposition to the renewed motion to dismiss are

12   that, first, the claims were filed only 22 days after the

13   statute of limitations would have been -- would have expired.

14   Second, the Nano defendants took concerted efforts to

15   delay the filing of timely claims in this case in that they

16   settled with the first putative class action representative

17   that filed the *Brola* case in the Southern District of New York

18   and they funded $1 million towards a legal fund in Italy to

19   pursue the Italian bankruptcy proceedings.

20   These facts lend toward the idea that the Nano

21   development -- developers took efforts to delay the filing of a

22   more timely claim.

23   **THE COURT:**  Well, okay.

24   A response.

25   **MR. FOX:**  Your Honor, we're not aware of any case law

1   and the plaintiff hasn't cited to any indicating that any of

2   those facts are relevant for the purposes of *American Pipe*

3   tolling.

4       For the purposes of *American Pipe* tolling, what's relevant

5   is whether the plaintiff was a member of the putative class in

6   the predecessor class action, and as in the case of *Weitzner*,

7   whether either on his own or through -- we would argue through

8   his agent he was able to participate in that class action.

9       **THE COURT:**  Okay.  Well, let's move on.

10      With respect to the state law claims -- we'll go through

11  this.  Defendants have asked that I exercise supplemental

12  jurisdiction.  Would there be a basis for jurisdiction under

13  CAFA?  I thought it was pled.

14      **MR. FOX:**  I believe you're correct, Your Honor.

15  Because of the size of the class action, there may be a basis

16  for jurisdiction -- for original jurisdiction over these state

17  law claims.

18      **THE COURT:**  Okay.

19      The breach of the implied contract claim.  Again,

20  Mr. Carriel, it seems to me at most what you have here is a

21  relationship, but a relationship does not in and of itself give

22  rise to mutual assent, to an implied contract.

23      There's a relationship with us here in the courtroom.

24  We're all related to, you know -- we're all coming together

25  with respect to this action.  That doesn't mean there's

1  contracts.  So just because parties are in the room, so to

2  speak, doesn't mean that there is a contract or an implied

3  contract.  And that seems to be all you really have, which

4  isn't sufficient.

5      Any comments?

6      **MR. CARRIEL:**  Your Honor, we argue in our opposition

7  to the motion to dismiss that the Nano developers' actions and

8  conduct gave rise to implied contracts, and these actions

9  specifically were they developed and marketed XRB, they created

10  the BitGrail Exchange with Defendant Firano and maintained its

11  operations alongside him, and that implied --

12      **THE COURT:**  None of what you have just said

13  articulates the terms of a contract.

14      **MR. CARRIEL:**  Fair enough, Your Honor.  And if that is

15  the case, these facts certainly articulate the existence of a

16  relationship that was breached, so it would roll into our

17  fiduciary duty claims.

18      **THE COURT:**  All right.  Well, I don't think you have a

19  breach of contract claim.  Similarly, I don't think you have

20  alleged the breach of fiduciary duty.  You keep talking about

21  custodianship.

22      There is law in California, specific law, about what the

23  elements of a fiduciary duty are, and this reference to

24  "custodianship" isn't -- it's just a word, actually, without

25  any kind of legal meaning that doesn't satisfy the existence

1    of -- or that doesn't satisfy each of the elements.

2         So before you can have a breach, you have to have the

3    existence of a duty.  And, again, just because people have some

4    relationship or connection or are in the room, as they say,

5    that doesn't create a fiduciary duty.

6         People try to argue fiduciary duty in all sorts of

7    contexts; for instance, banking context.  It doesn't apply.

8    It's just that's what the law is.  You have to have a special

9    kind of relationship that creates the duty based upon case law,

10   and I'm not seeing that you've been able to do that.

11        Any comments?

12        **MR. CARRIEL:**  We allege that the duty that was created

13   here could be one of two things.  It could be either the Nano

14   developers' creation and control over the XRB protocol, which

15   is the code that --

16        **THE COURT:**  I don't want to talk about breach.  I want

17   to talk about --

18        **MR. CARRIEL:**  The duty.

19        **THE COURT:**  -- the duty and how the duty between

20   particular players is created.  So, for instance, a trustee has

21   a special relationship with a beneficiary of the trust.

22   There's a lot of case law on that.  Those are the two different

23   players.

24        Here you have a commercial context, a buyer and a seller.

25   There's no fiduciary duty between a buyer and a seller.  How is

1    this any different?

2             **MR. CARRIEL:**  The seller here wasn't just a seller.

3    It was also the creator of the Exchange and --

4             **THE COURT:**  What kind of law do you have to support

5    your notion that the maker of an exchange who is a seller of

6    components for that exchange -- how that creates the existence

7    of a fiduciary duty?  I need law.  If you don't have law and

8    you don't have some way of extending existing law on the duty

9    issue, then, again, I don't know how you can succeed.

10            **MR. CARRIEL:**  Our opposition cites to *Los Angeles*

11   *County Employees Retirement Association vs. Bank of New York*

12   *Mellon Corporation*.  And in that case, the court held that the

13   key factor in the existence of a fiduciary relationship lies in

14   the control by a person over the property of another.

15       And here that control was -- that is on page 18 and 19 of

16   our opposition brief.  And in this case, that control is the

17   Nano developers' control over the XRB protocol or control over

18   BitGrail such as when they exercise that control to prevent

19   Defendant Firano from shutting down the Exchange.

20            **THE COURT:**  Response.

21            **MR. SCHOOLIDGE:**  Your Honor, I think what they're

22   asking for here is a ruling that would expand the fiduciary

23   duty to anyone who ever developed software that was later used

24   by someone down the road in some attenuated way and a problem

25   happened.

1    The defendants are not alleged to have had control over

2  the specific deposit that Mr. Fabian made.  They didn't have

3  control over the software that BitGrail operated.  They wrote

4  some code a while back and then put it out there in the world,

5  and it was used by third parties, and that's not, under

6  California law, what gives rise to a fiduciary duty.  There is

7  no knowing undertaking by the defendants of a fiduciary

8  relationship, and there is no relationship that, as a matter of

9  law, imposes a fiduciary duty here.  There is no relationship.

10         **THE COURT:**  And your response to the case authority

11  cited?

12         **MR. FOX:**  If I may, Your Honor, I'm familiar with the

13  case.  That's the FX litigation.

14         **THE COURT:**  Okay.  Didn't I just say that I wasn't

15  going to allow you to double team?

16         **MR. FOX:**  You're right.

17         **MR. SCHOOLIDGE:**  So, Your Honor, in that case, there

18  was actually custodianship because the plaintiffs had deposited

19  money with a third party.

20     Here the third party is not the defendants.  The third

21  party is another party that is named as a defendant in this

22  case but hasn't been served and is just really a phantom party.

23         **THE COURT:**  Okay.

24     Any response?

25         **MR. CARRIEL:**  Defense counsel argues that there are no

1   facts lending towards the idea that the Nano developers assumed

2   any of -- any responsibilities or any special relationship or

3   duties to plaintiff investors, but that's just not the case.

4   The Amended Complaint alleges that --

5           **THE COURT:**  What paragraph?

6           **MR. CARRIEL:**  Paragraph 88.

7           **THE COURT:**  I don't see where it does that in

8   paragraph 88.

9           **MR. CARRIEL:**  It's on page 20 inside the image.  The

10  last -- second to the last line inside there is, "We're

11  investigating creating an irrevocable trust to document our

12  commitment to the distribution."  So there's that.

13      And in addition to that, we also allege that the Nano

14  developers acknowledge the need to conduct a security audit

15  over the Nano protocol, which is the protocol that was lacking

16  safeguards which caused the loss of the funds in this case.

17  And that's --

18          **THE COURT:**  What paragraph?

19          **MR. CARRIEL:**  -- paragraph 140 to 141.

20      And on top of all of that, the Nano developers took it

21  upon themselves to spend $1 million to fund the bankruptcy

22  proceeding --

23          **THE COURT:**  Where is that?

24          **MR. CARRIEL:**  That is paragraph 12.

25          **THE COURT:**  I don't understand how that -- I don't

1   understand how what they did in paragraph 12 has anything to do

2   with the creation of a fiduciary duty between the plaintiff and

3   the defendant.

4           MR. CARRIEL:  Those actions --

5           THE COURT:  The existence of a fiduciary duty exists

6   because of the parties' relationship to each other, not because

7   of some action with respect to a non-party.

8           MR. CARRIEL:  Well, the non-party isn't an

9   unaffiliated entity.  The non-party in this case is BitGrail

10  and Firano, and as --

11          THE COURT:  I need you to look objectively -- to

12  answer my question objectively.  I understand, again, that

13  people are related.  They're in the room.  That's not the

14  question.

15      The question is from an objective point of view, what is

16  it about the relationship between the plaintiff and these

17  defendants, and you give me paragraphs 80, 140, and 141.  I'll

18  go back and look at those.  But how they're dealing with some

19  other party, whether or not they had any involvement, I don't

20  understand how that objectively helps your -- articulate what

21  the relationship is.

22          MR. CARRIEL:  The relationship here is their creation

23  of XRB and the XRB protocol or --

24          THE COURT:  So are you saying that any software

25  developer has a fiduciary duty?

1    What would the law exam look like based upon your -- I'm

2    trying to get you to articulate something objectively.  What

3    does it look like?  Software developer and a purchaser?  What

4    is it?

5         **MR. CARRIEL:**  I would argue that in certain cases,

6    such as this one, a software developer can have duties to their

7    purchasers which would arise from the software developer

8    describing their software and saying that it works a certain

9    way and that it has certain safeguards and security

10   implementations when, in fact, it does not.

11        **THE COURT:**  So if you buy an app and because you

12   bought the app on your phone and somehow a bug goes through and

13   messes up your calendaring system through the app, all of a

14   sudden, a software developer is going to have a fiduciary duty

15   to the purchaser because that software developer said it was

16   secure and it wasn't?

17        **MR. CARRIEL:**  Not necessarily --

18        **THE COURT:**  Okay.  Well, then what is it about the

19   relationship between a software developer and a purchaser that

20   creates a fiduciary duty, objectively speaking?

21        **MR. CARRIEL:**  What makes this case different is

22   that --

23        **THE COURT:**  What makes it different objectively,

24   period, in all cases such as these?

25        **MR. CARRIEL:**  These were investments, not the use of

1    an app.

2          **THE COURT:**  So a purchaser -- an investor.  So you're

3    saying a software developer and an investor, through the

4    developer's product, is what creates a fiduciary duty?

5          **MR. CARRIEL:**  Investment in the developer's product

6    rather than through it.

7          **THE COURT:**  Any response?

8          **MR. SCHOOLIDGE:**  Your Honor, there was no allegation

9    of an investment in the developer's product.

10       Mr. Fabian bought the coins from third parties that are

11   not even alleged in the Complaint -- we don't know who they

12   were -- on an exchange in Italy from someone who's not even in

13   the case, and there were no sales from the Nano defendants to

14   anyone.  They didn't sell software.

15         **THE COURT:**  The reference to paragraphs 88, 140, and

16   141, any comments?

17         **MR. SCHOOLIDGE:**  Your Honor, with regard to 88 -- I'm

18   just looking at it -- I think that in fact it proves the

19   opposite of what they are saying.  It says, "We are

20   investigating creating an irrevocable legal trust," not that

21   they have created one, in which case that would perhaps give

22   rise to a fiduciary duty.

23       The others I think we pretty much covered in our papers,

24   Your Honor.

25         **THE COURT:**  Okay.  Any final comments?

1    **MR. CARRIEL:**  Your Honor, I would also like to point

2    to paragraphs 116, 168, and 142.

3    116 deals with the Nano developers giving investment

4    advice.  168 deals with the Nano developers claiming that

5    BitGrail was safe.  We argue that this gives rise to a breach

6    of fiduciary duty because the Nano developers had inside

7    confidential information through their control over BitGrail,

8    information that revealed that BitGrail was, in fact, not safe,

9    yet they were publicly telling investors that it was safe.

10    **THE COURT:**  Any response?

11    **MR. SCHOOLIDGE:**  At bottom, the fiduciary duty is

12    about relationships of trust and confidence between parties.

13    There was no relationship whatsoever between Mr. Fabian and

14    these defendants.

15    **THE COURT:**  Okay.  Everybody agrees the aiding and

16    abetting a fiduciary duty rises and falls with the breach of

17    fiduciary duty?

18    **MR. SCHOOLIDGE:**  Agreed, Your Honor.

19    **MR. CARRIEL:**  Yes, except that the breach of fiduciary

20    duty would be BitGrail's breach rather than the Nano

21    defendants' breach.

22    **THE COURT:**  Well, the fiduciary duty claim is brought

23    against all defendants, not just the BitGrail defendants.

24    **MR. CARRIEL:**  Yes, Your Honor.

25    **THE COURT:**  Why --

1    **MR. CARRIEL:** Except the aiding and abetting breach of

2  fiduciary duty is brought against the Nano defendants for

3  aiding and abetting the BitGrail defendants' breach of

4  fiduciary duty, which is --

5    **THE COURT:** Oh, I see what you're saying.  Okay.

6    Now, with respect to negligence, negligence, unlike

7  fiduciary duty, is a much more generic tort, and it's very

8  broad.

9    As I look at the five different factors or six different

10 factors that exist under *Rowland vs. Christian*, California

11 Supreme Court case from 1968, which is the seminal case on this

12 topic, five of the six factors seem to suggest that there is a

13 duty.

14   The only thing, frankly, that is potentially missing here

15 is causation; that is, that the Complaint doesn't really

16 provide any facts to suggest causation, and a legal conclusion

17 in paragraph 230 is not enough.

18   So first on the overview, we'll start with the defendants.

19 Who is doing this one?  Mr. Fox?

20   **MR. FOX:** Mr. Schoolidge will be handling negligence.

21   **THE COURT:** Okay.

22   **MR. SCHOOLIDGE:** We kind of had to pick what to focus

23 on for this one because there are so many claims in the

24 Complaint and so many arguments being made, page limit being

25 what it is, so we focused on proximate cause, but we don't

think there is a duty alleged either.  A lot of the stuff that they allege as a duty are just pretty much anything that had to do with the coin or anything that the defendants were doing. For example, you know, developing the XRB protocol is alleged to be a duty or maintaining it is alleged to be a duty.  Why, I'm not sure.  It's not pled in the Complaint.  They don't explain it in the opposition brief.

But turning to proximate cause, I think it's pretty clear that there were a lot of things that happened between my clients developing this Nano protocol and Mr. Fabian losing his coins.

Francesco Firano came along --

**THE COURT:**  Once you start arguing the facts, you lose.  This is a motion to dismiss.  It's not summary judgment. In a motion to dismiss, I accept the facts in the Complaint as true and any plausible inferences which inure to the benefit of the plaintiff, not the defense.  You are arguing facts.

**MR. SCHOOLIDGE:**  Well, I'm not arguing facts.  These facts are in the Complaint.  They allege that Francesco developed BitGrail.  They allege that --

**THE COURT:**  You started your sentence by saying, "It's pretty clear that there were a lot things happening between my clients developing the Nano protocol and Mr. Fabian losing his coins."

**MR. SCHOOLIDGE:**  In the Complaint.  There is

1   allegations of things --

2         THE COURT:  Right.  That's my point, is you're arguing

3   the facts in the Complaint and what is it that ultimately

4   results in causation as opposed to a lack thereof, any

5   allegation, which is where I was going.

6         MR. SCHOOLIDGE:  Well, there is no connection -- there

7   is no allegation that my clients caused the loss.  There is

8   allegations of what happened between my clients developing the

9   protocol and the loss happening, but I think that those

10  allegations show pretty clearly that my clients were not close

11  in proximity either in terms of events or time to Mr. Fabian's

12  loss.

13        THE COURT:  All right.

14     A response.

15        MR. CARRIEL:  The causation here is the double

16  withdrawals that occurred which is what permitted certain

17  anonymous users to steal 170-million worth of XRB from

18  BitGrail.  They exploited a fault in the XRB code which was

19  developed by the Nano developers and maintained by the Nano

20  developers, so the causation here is they failed to enact

21  adequate security measures in the Nano protocol which caused

22  the theft of 170 million XRB.

23        THE COURT:  What paragraph?

24        MR. CARRIEL:  160 and 171 as well.

25        THE COURT:  And what?

1        **MR. CARRIEL:**  171.

2        **THE COURT:**  Okay.

3     Any response on those two paragraphs?

4        **MR. SCHOOLIDGE:**  So paragraph 160 contains many

5  paragraphs quoting from the Italian bankruptcy court opinions,

6  which in turn found that Mr. Firano was faulty in his

7  development of the platform such that it would send individual

8  requests that appeared to the Nano Node to be separate requests

9  for identical amounts, thus causing the Nano Node to provide

10 withdrawals to users that were not entitled to them.  That's a

11 lot of intervening cause that they don't explain.

12       **THE COURT:**  Well, they don't have to.  The question is

13 is there a plausible connection.

14    Any comment on 171?

15       **MR. SCHOOLIDGE:**  I would say that, Your Honor, 171 is

16 just completely 180 degrees contradicted by the other material

17 that they incorporate by reference in their Complaint and rely

18 on heavily.

19    The Italian bankruptcy court found in fact that Mr. Firano

20 was responsible.  He made these same arguments to the court,

21 and the court rejected them based on expert witness findings

22 that were extensive.

23       **THE COURT:**  Well, I don't know anything about Italian

24 courts, so just because some court makes some finding, even a

25 United States court -- just because they make a finding doesn't

1  mean any court is bound by that unless it's the Supreme Court

2  or the circuit court in the same case.

3  **MR. SCHOOLIDGE:**  Your Honor, I'm not saying that the

4  Court is bound by it, but what we're saying is that they

5  incorporated by reference into their Complaint as true facts,

6  and they can't just selectively pick some little pieces that

7  sound like they help them and then ignore the rest of it when

8  they've incorporated it by reference.  I mean, it's just before

9  the Court as they're pleading.  We're not asking for any kind

10  of a ruling on whether the Court should accept those opinions

11  as binding or anything like that.  This is just stuff they put

12  in their Complaint that contradicts the attorney argument they

13  put in their Complaint.

14  **THE COURT:**  Any response?

15  **MR. CARRIEL:**  Your Honor, just because the Complaint

16  contains several paragraphs from the Italian bankruptcy

17  proceedings does not mean that we incorporate by reference the

18  entirety of the Italian bankruptcy proceedings.  The arguments

19  that Defense counsel is putting forth are all factual arguments

20  and --

21  **THE COURT:**  Well, then articulate the causation.  If

22  you have contradictory paragraphs, I need an articulation of

23  causation; otherwise, the claim fails.

24  **MR. CARRIEL:**  Your Honor, in the Complaint, we do not

25  have contradictory paragraphs.  Defense counsel is reading

1   paragraphs that were not cited in the Complaint.  They're

2   reading them from the Italian bankruptcy proceeding as a whole.

3   Those are not in the Complaint.  There's nothing contradictory

4   about our discussion of causation.

5          **THE COURT:**  Okay.  Well, then, make clear what your

6   argument is so he can respond.

7          **MR. SCHOOLIDGE:**  My argument?  Well, Your Honor, my

8   argument is that the entirety of the Italian bankruptcy

9   opinions made quite clear, based on expert findings, that what

10  happened was --

11         **THE COURT:**  Are those opinions in this Complaint

12  and -- or have you asked for judicial notice or something?  If

13  not, I can't refer to them.

14         **MR. SCHOOLIDGE:**  Your Honor, we do in our opening and

15  *Davis vs.* --

16         **THE COURT:**  Not a brief.  I need it in the Complaint

17  or I need to have taken judicial notice for me to -- you

18  can't -- you can't just refer to things outside the context of

19  the pleadings in a Rule 12 motion.

20         **MR. SCHOOLIDGE:**  Understood, Your Honor.  We did note

21  that there was extensive quoting of the opinions in our opening

22  brief, and we asked the Court to take judicial notice of the

23  entire opinions, and we attached them as exhibits.

24     *Davis vs. HSBC* is the precedent we cite for the

25  proposition that the Court can consider them.

1        **THE COURT:**  Well, let's talk about judicial notice.

2  Is it proper or not?  Did you oppose?

3        **MR. CARRIEL:**  We did, Your Honor.  Well, so defense

4  attached the Italian bankruptcy -- well, translated versions of

5  the Italian bankruptcy decisions to its motion to dismiss.  We

6  opposed that on the basis that --

7        **THE COURT:**  What law?

8        **MR. CARRIEL:**  -- they were not authenticated.

9    I'm sorry?

10        **THE COURT:**  First of all, is it improper as a matter

11  of law to take judicial notice, or are you solely resting on

12  authentication?

13        **MR. CARRIEL:**  Our opposition solely rested on

14  authentication.  However --

15        **THE COURT:**  Okay.  So are you concerned that it is not

16  authentic?  Do you have a different version of that decision?

17        **MR. CARRIEL:**  We do not, Your Honor.  Now, we've

18  become aware of the fact that the Italian -- the attorney in

19  the Italian bankruptcy proceeding attached an affidavit to the

20  reply in further support of the motion to dismiss

21  authenticating the translations which we believe only further

22  lends to the notion that the Nano developers are -- have been

23  behind the Italian bankruptcy proceedings this entire time,

24  when coupled with the $1 million that they put toward funding

25  it.

1        **THE COURT:**  Back to the contradiction argument.  So do

2   I have -- I don't know that I have clarity on the issue.

3        **MR. FOX:**  Your Honor, if I may be heard on the

4   question of incorporation by reference?

5        **THE COURT:**  Well, I know how to incorporate by

6   reference.

7        **MR. FOX:**  On the question as to whether it's proper

8   on -- in this case.

9        **THE COURT:**  It doesn't sound like he's got a real

10  argument with respect to that topic.  At first he said

11  authentication.  Then you provided the authentication.  So now

12  I'm looking for clarity on the contradiction that is alleged by

13  the defense.

14       **MR. SCHOOLIDGE:**  The contradiction is that they're

15  claiming that the breaches of some duties that are not totally

16  clear by the defendants were the cause of Mr. Fabian's loss,

17  but the Italian bankruptcy opinion goes through in great detail

18  and addresses how in fact this came about, and it's that

19  Francesco Firano, when he set up the BitGrail --

20       **THE COURT:**  Hold on a minute because I'm told that you

21  did not submit a request for judicial notice.  What document

22  number is your request for judicial notice?

23       **MR. FOX:**  Your Honor, I believe that was a

24  misstatement.  There was no formal motion requesting judicial

25  notice.  The argument for -- that the Court should review the

1  Italian bankruptcy opinions under the doctrine of incorporation

2  by reference appears in footnote 3 of our reply which cites the

3  *Davis vs. HSBC* and to *Doe 1 vs CVS Pharmacy*.

4      It's not our understanding that where a document has been

5  heavily relied upon and, in this case, excerpted multiple times

6  in the pleading that a separate request for judicial notice is

7  required.  Our understanding based on *Davis vs. HSBC* is that

8  the Court may -- may; it's discretionary -- treat those

9  materials that are incorporated by reference as part of the

10  Complaint and assume that all the facts that appear in those

11  materials are true.  And I'm looking at page 1160 in the *Davis*

12  *vs. HSBC* case.

13      **THE COURT:**  I'll take a look at that.  I was with you

14  up until the end.  I don't think anyone at a pleading stage has

15  to accept things necessarily as true, especially when we have

16  securities cases where people want to attach all sorts of

17  things like articles and everything else.  We don't do that.

18  But I'll take a look at *Davis*.

19      All right.  Back to your articulation.

20      **MR. SCHOOLIDGE:**  So the expert witness that the court

21  retained in the Italian bankruptcy court opinion found that

22  Mr. Firano set up the BitGrail Exchange such that all the coins

23  in everyone's account would be pooled into one wallet, one

24  cryptocurrency wallet, and that whenever there was a request to

25  withdraw by a user, it would be drawn from that wallet.

1    And Mr. Firano, when he would make a request to the Nano

2    Node to withdraw coins for a user, would send a unique

3    transaction identifier each time to the Nano Node.  So for all

4    the Nano Node knew, these were uniques transactions that were

5    being made for the first time and were not double withdrawals.

6    And the court actually found to the contrary, explicitly

7    said that the Nano defendant -- the Nano parties were not at

8    fault.  It was Mr. Firano's mismanagement of the platform that

9    he had set up and his failure to have a proper accounting

10   system that was the cause of the losses and then also third

11   parties finding that out and exploiting it.

12   So how -- I'm saying how can there be proximate cause

13   between the Nano defendants developing a protocol, you know,

14   years earlier, putting it out in the world, and then Mr. Fabian

15   losing his coins when there were all these things that happened

16   in between there that contradict any conclusion that there was

17   proximate cause by these defendants.

18        **THE COURT:**  All right.

19   Now respond, assuming for purposes of argument,

20   Mr. Carriel, that I do review that opinion and incorporate it

21   by reference given your reference to it in the Complaint.

22        **MR. CARRIEL:**  First, Your Honor, the Italian

23   bankruptcy court did not find that the Nano developers were not

24   at fault.  That was just not a finding in either of the

25   opinions.

1          **THE COURT:**  All right.  So let's just resolve that

2   issue.

3       So Docket 64-1, Mr. Schoolidge, what page?

4          **MR. SCHOOLIDGE:**  So, Your Honor, this is not

5   paginated, but if you can --

6          **THE COURT:**  I have an ECF number.  Oh, I see.  So

7   I'm -- well, no, I do have a document.  This has an ECF number.

8   I see all the Italian.

9          **MR. SCHOOLIDGE:**  It's page 15 of the --

10          **MR. FOX:**  Your Honor, if I may, the translated version

11   was attached as an exhibit to the Memorandum of Law that was

12   filed on August 16th, I believe, and the relevant passage is

13   in --

14          **THE COURT:**  Hold on.  Which is the docket number?

15   Docket 60?

16          **MR. FOX:**  Yes.  It would be --

17          **THE COURT:**  So it's 60-1?

18          **MR. FOX:**  60-1.

19          **THE COURT:**  All right.  Twenty-two pages --

20          **MR. FOX:**  Correct.

21          **THE COURT:**  -- of the ECF.  So what page number?

22          **MR. FOX:**  Page number 15.

23          **THE COURT:**  Of 22.

24          **MR. FOX:**  Correct.  This should be the page that

25   begins at the top with italicized text in the middle of a

1  sentence that reads, "with the Nano development team within

2  which Firano had entered into December 2016 and exited December

3  2017."

4  **THE COURT:**  My page 15 of 22, the very first line

5  begins with the phrase, "During the assessment carried out."

6  Is that the same page?

7  **MR. FOX:**  Then we're on 16.

8  **THE COURT:**  Page 16 of 22 starts that with, "The

9  development team within which" -- that one?

10  **MR. FOX:**  Correct.

11  **THE COURT:**  That's page 16 of 22, Docket 60-1.  So --

12  **MR. SCHOOLIDGE:**  So then, Your Honor, about seven

13  lines up from the bottom --

14  **THE COURT:**  Okay.

15  **MR. SCHOOLIDGE:**  -- reads, "Therefore, it was the

16  BitGrail Exchange that actually requested to the node multiple

17  times to allow the funds to leave the wallet (funds that, in

18  fact, had already left the account after the first request and

19  not the Nano network that allowed the multiple withdrawals),"

20  period.

21  **MR. FOX:**  That's also on page 1 of our opening brief.

22  **THE COURT:**  All right.

23  Mr. Carriel?

24  **MR. CARRIEL:**  Your Honor, the Italian bankruptcy

25  decisions also have language that explicitly explain that the

1   issue here was the Nano Node lacking the idempotence safety

2   feature.

3           THE COURT:  All right.  What page?

4           MR. CARRIEL:  We quoted within the Complaint --

5           THE COURT:  No.  Just give -- I'm going to go -- one

6   of the things that you learn as a judge is to always take what

7   lawyers say with a grain of salt and go to source material.  So

8   I'll be going to the source material.

9       Where in the source material is that?

10          MR. CARRIEL:  In addition to this quotation, which I

11  am currently looking for, this entire argument is undercut by

12  the fact that the Nano development team adopted idempotence on

13  February 16, 2018, two days after the hack was announced.

14          MR. SCHOOLIDGE:  Your Honor, evidence of subsequent

15  remedial measures is not admissible to prove liability.

16          THE COURT:  We're not at a proof stage.  We're at a

17  pleading stage.

18          MR. FOX:  If I may, Your Honor, just on --

19          THE COURT:  Hold on.

20          MR. CARRIEL:  This is not the exact quote that I was

21  referring to, but something similar.  Page 4 of 60-1.

22          THE COURT:  Okay.  Go ahead.

23          MR. CARRIEL:  The last bullet point before the last

24  paragraph on that page.

25          THE COURT:  That they acknowledged the software flaws

1    after initially denying them?

2          MR. CARRIEL:  Yes, Your Honor.  The software flaws

3    that they're referring to is the lack of idempotence in the

4    Nano protocol.

5          The point here, Your Honor, is that the bankruptcy

6    proceedings have language that can be cited to to support the

7    notion that the Nano developers were entirely at fault.  It

8    also has language that can be cited to to support the notion

9    that Firano was at fault, but these should be taken with a

10   grain of salt because the bankruptcy proceedings were about

11   Firano and BitGrail, not about the culpability of the Nano

12   defendants, which we argue in our opposition to the motion to

13   dismiss.

14         Moreover, at the motion to dismiss stage, all facts should

15   be drawn, as you mentioned earlier, in the light most favorable

16   to plaintiffs, not defendants.  What defendants are arguing

17   here is essentially trying to draw the light -- draw these

18   facts --

19         THE COURT:  To the extent that I think you don't have

20   sufficient facts on causation, what else can you allege in the

21   Complaint?

22         MR. CARRIEL:  In addition to the Nano protocol, there

23   is the fact that we allege that the Nano developers created

24   BitGrail alongside Firano and managed its operations with

25   respect to XRB such as when they prevented Firano from shutting

1  down the BitGrail exchange when he warned them that there was

2  an issue that these funds were going missing.

3      Their prevention of BitGrail from shutting down caused the

4  loss of tens of millions of dollars worth of XRB because, as we

5  allege, they were first informed of the issue with the double

6  withdrawal transactions in July of 2017, and these transactions

7  continued to occur for another seven, eight months.

8      THE COURT:  Okay.  We're going to keep moving here.

9      MR. SCHOOLIDGE:  Your Honor, just before we move on,

10  could I just draw the Court's attention to the fact that

11  Mr. Carriel just stood here and read language from page 4 of

12  that opinion that is a summary of the arguments that Mr. Firano

13  made that were rejected by the court?

14      THE COURT:  All right.  Noted.

15      MR. SCHOOLIDGE:  Thank you.

16      THE COURT:  We now move to negligent

17  misrepresentation.

18      So one of the questions I have with respect -- I'm sorry.

19  I missed fraud.  Let me go to fraud first.

20      I think the key amendment to the Complaint with respect to

21  fraud is plaintiff's allegations that he relied on the false

22  representations and statements in holding on to his XRB on the

23  Exchange.  That's different than before.

24      It looks to me like defendants want to argue something

25  about a freeze on the Exchange, but that's outside the

1   pleadings and not ripe for discussion.

2       One of the questions that I have with respect to fraud --

3   and it applies, too, with respect to negligent

4   misrepresentation, assuming that either or both of those can

5   proceed -- is that it seems to me that those are personal

6   claims.  They are not class claims because you haven't pled

7   reliance or justifiable reliance or an ability to address

8   either of those individual issues in a class context.

9       So if all you're left with is fraud and negligent

10  misrepresentation and/or negligence, how do you state a class

11  claim for any of those individual torts?

12       MR. CARRIEL:  We allege that the class in its entirety

13  relied on these misrepresentations or omissions, rather,

14  because it's a fraudulent concealment claim.

15       The notion here --

16       THE COURT:  Well, fraudulent concealment you can only

17  get there with a fiduciary duty.  People don't have -- even in

18  a 12 context, people don't have -- unless there is, again, a

19  special relationship, omission claims are treated differently.

20  So are you -- I thought you were proceeding on an affirmative

21  claim.  You're not?

22       MR. CARRIEL:  I'm not sure that I understand the

23  distinction that you're making.

24       THE COURT:  An affirmative claim versus an omission?

25  I affirmatively tell you something.  "Mr. Carriel, it is

1   raining outside."  I've affirmatively told you it is raining

2   outside, and you go and you buy an umbrella, and it turns out

3   it's a bright and sunny day, and you claim that I

4   misrepresented the state of the weather to you to your damage

5   of $2 for buying an umbrella.

6       If I don't say anything and you go and you buy an umbrella

7   and you realize it's a bright and sunny day and I knew perhaps

8   that -- or maybe it would be different -- I'm not exactly

9   sure -- but I don't have a duty to tell you anything unless

10  there's some special relationship.

11      So if you're suing somebody on an affirmative basis, then

12  you have to identify the actual misrepresentations upon which

13  you are suing them, and I thought there were 36.

14          **MR. CARRIEL:**  Yes, Your Honor.

15          **THE COURT:**  If you're suing them for failing to tell

16  you something, then you need to identify what the failure is

17  and then you have to explain why they had a duty in the first

18  place to explain that to you.  That's an omission.

19      Do you understand the distinction?

20          **MR. CARRIEL:**  Yes, Your Honor.  And --

21          **THE COURT:**  So what are you proceeding on?

22          **MR. CARRIEL:**  Affirmative.

23          **THE COURT:**  Okay.

24          **MR. CARRIEL:**  Affirmatively fraudulently concealing

25  the fact that the funds were not safe with affirmative

1  statements such as "your funds are safe" when they knew in fact

2  that they were not safe.

3      THE COURT:  So how do you get to justifiable reliance;

4  that is, you don't have a statute -- typically in consumer

5  fraud cases, there are statutes that -- and case law that talks

6  about the manner in which class action can proceed with a

7  reliance component because of a statute.

8      Reliance is an individual issue unless somehow explained

9  otherwise.  Someone could be sitting in this courtroom and

10  invested and lost money.  How is it that the plaintiff can tell

11  me or can allege justifiable reliance for that person that they

12  don't even know?

13      MR. CARRIEL:  The justifiable reliance here is it is

14  justified to rely on the word of the developers of XRB when

15  they're discussing XRB.

16      THE COURT:  So it sounds like you have nothing really

17  personal or no other way of addressing the issue.  This hasn't

18  been briefed, but it concerns me.

19      Any response from the defense?

20      MR. FOX:  Yes, Your Honor.

21      There are no allegations of reliance anywhere in this

22  Complaint.  There's no allegations that Mr. Fabian read a

23  specific statement, that any specific statement influenced any

24  decision either to purchase or to hold a Nano Coin.  There is

25  no identification of which specific statements are false.

1    Fraud in federal court needs to be pled under Rule 9(b),

2    and if you look at footnote 154 of our opening brief, we cite

3    case law for the proposition that in cases with respect to

4    allegations of misrepresentations under Rule 9(b), the

5    plaintiff needs to identify the specific statement that is

6    alleged to be false, why it's false, the circumstances under

7    which it was rendered, and who spoke.  So in our view,

8    Your Honor -- and this is in our papers -- they haven't

9    properly alleged falsity.

10   To your prior point, they also haven't alleged reliance.

11   They haven't alleged intent to defraud.  It's anybody's guess

12   why, assuming that these statements were false -- why the

13   defendants intended to induce reliance.  You need to read the

14   whole pleadings backwards/forwards and take a guess.  It's

15   simply not spelled out, and under the relevant case law, it

16   needs to be.

17   **THE COURT:**  Well, if you have a business entity and

18   the plaintiff alleges the names of the persons who made the

19   statements and their authority to speak and who spoke and what

20   they said, that's sufficient under California law with respect

21   to that issue.  Like I said, we have 36 statements specifically

22   identified.

23   **MR. FOX:**  My understanding from the pleadings -- and

24   nothing to the contrary appears in the opposition brief -- is

25   that the alleged misstatements have to do with BitGrail.  There

1    are far fewer than 36 statements related to BitGrail.

2        In fact --

3            **THE COURT:**  Well, there only has to be one.

4            **MR. FOX:**  That's right.  But I can -- if Your Honor

5    will indulge me, I can walk you through the statements that

6    were made during the relevant time period.

7        In fact, there are only two statements that were made

8    prior to Mr. Fabian's final purchase of the coins related to

9    BitGrail.  They appear at paragraphs 112 and 114.  That's a

10   re-Tweet that says something to the effect of *XRB is now*

11   *trading on BitGrail.*  I don't understand that that's alleged to

12   be false.

13       There's a statement on paragraph 117 in which one of the

14   defendants says something to the effect of *if Nano can get into*

15   *Blockfolio, coin holders will be able to track their losses and*

16   *gains.*  I don't believe that that's alleged to be false, and,

17   in fact, it's a statement of opinion.  That's it prior to his

18   final purchase.

19       Now, after he purchased with respect to the theory that he

20   was fraudulently induced to hold the coins, there are only two

21   statements between his final purchase and January 12th, which

22   is when, if Your Honor chooses to incorporate by reference the

23   Italian bankruptcy decisions and if Your Honor does so, under

24   *Davis vs. HSBC*, the Court should treat those decisions as part

25   of the Complaint and accept all of the facts in those decisions

1    as true -- January 12th is the date when the accounts were

2    frozen.

3         So there is only two statements --

4         **THE COURT:**  Let me -- because I'm going to go back and

5    look, but I find it hard to believe this notion that *Davis* says

6    that all facts are to be stated as true, especially when

7    they're someone's opinions on what facts may or may not be.

8         What is your jump cite for that specific claim which you

9    have now made multiple times?

10        **MR. FOX:**  I looked at it this morning.  That is why

11   I've made it.

12        If it is not on 1160, it is right around there because

13   that's the passage in *Davis* that discusses the doctrine

14   controlling incorporation by reference.

15        **THE COURT:**  Yeah.  But someone's opinion, it can't be

16   a fact.

17        **MR. FOX:**  Well, my interpretation of the case law

18   would be that you would treat an opinion in a document that's

19   incorporated by reference the same way you would treat an

20   opinion that appears on the face of the Complaint.  In other

21   words --

22        **THE COURT:**  But why?  A plaintiff doesn't have to

23   accept that.  I can certainly accept as fact that an opinion

24   was made and the date that it was made and that a trial

25   happened and that certain evidence was taken, but to conclude

1   the conclusion of an individual that may be contrary to someone

2   else's belief is not fact.  It's opinion.

3       **MR. FOX:**  My understanding is that the limit of *Davis*,

4   what it stands for, is that the Court should -- once the Court

5   decides to rely on matters that are incorporated by reference,

6   the Court should treat those materials as though they were on

7   the face of the Complaint.

8       **THE COURT:**  It seems a stretch, but I'll look at it.

9       **MR. FOX:**  If I may return to the two statements after

10  the final purchase, one is at paragraph 109, and I believe that

11  says something to the effect of *there are two hard-working*

12  *gents trying to fix a problem*.  Again, as far as I understand,

13  not alleged to be false, and as with respect to all of these

14  statements, there is no allegation that there was -- that

15  Mr. Fabian ever read them or relied on them or that they

16  affected his decision-making in any way.

17      And another one at paragraph 165, which also says

18  something like *We're working on a problem with the node.  All*

19  *funds are safe.*

20      **THE COURT:**  Okay.

21      **MR. FOX:**  And with respect to this last one, again, no

22  allegations of intent to defraud, no allegations of scienter,

23  no allegations that the speaker knew that there was anything

24  false about the statement, no allegations that Mr. Fabian read

25  the statement, no allegations that he considered the statement

1    with respect to any decision that he was going to make.

2         And if Your Honor chooses not to rely on the Italian

3    decisions, the other statements after January 12th are of the

4    same vein.

5         **THE COURT:**  Any comment?

6         **MR. CARRIEL:**  Your Honor, defense counsel is trying to

7    argue a securities fraud case under federal securities laws.

8    We do not allege that there was fraud in connection with the

9    purchase or sale of securities.  We allege that after

10   Mr. Fabian and the class purchased their XRB tokens, the Nano

11   development team fraudulently concealed facts that they knew.

12   This is not about misrepresentations in connection with the

13   purchase or sale.  So that is why there are no allegations of

14   fraud prior to his purchase.  That is irrelevant for our

15   claims.

16        May I have my co-counsel step in to make one point?

17        **THE COURT:**  One point.

18        **MR. FRIEDMAN:**  Sure, Judge.

19        Paragraph 185 I direct the Court to.  There is an express

20   allegation right there that the plaintiff did rely on the

21   truthfulness of all the representations set forth in the

22   Complaint.  After months of following the representations

23   published by those people and relying on the truthfulness of

24   their representations, Plaintiff Fabian began investing in XRB.

25        **THE COURT:**  Which gets me back to the issue on

1    reliance.

2              MR. FRIEDMAN:  Right.

3              THE COURT:  Which is that paragraph 185 talks about

4    the conduct of the plaintiff himself.  You cannot make that

5    representation on behalf of all the members of the class.

6              MR. FRIEDMAN:  It may be a difficult claim to bring on

7    behalf of the class, but certainly at this stage, what the

8    plaintiff is arguing in this claim is very simple, and it is

9    that beginning in July of 2017, the defendants became apprised

10   that there was a significant problem, whether it be the problem

11   of the Exchange by BitGrail or whether it be a problem with the

12   Nano Node.  There's an issue of fact there that certainly

13   should resolve in favor of the plaintiffs at this stage.  And

14   that the defendants were apprised of that in writing, and that

15   in the Italian bankruptcy decisions, there is reference that

16   they were -- that the expert in that case saw a copy of a text

17   message from Firano, the principal of the Exchange, to the Nano

18   defendants telling them, "Guys, we have a problem here with our

19   exchange and the listing and trading of XRB."

20        Notwithstanding that knowledge, we have various

21   representations made by the Nano defendants on social media

22   saying, "Don't worry.  Your funds are safe."  Saying, "Don't

23   worry.  We're working here on any issues that are popping up."

24   And that there are multiple red flags throughout that are being

25   either ignored or downplayed by the defendants.

1    **THE COURT:** Okay. And I would just note, though --

2    and, again, you can respond to this -- paragraphs 183 through

3    196 are all paragraphs relative to -- and you even say it -- to

4    the lead plaintiff. It has nothing to do with the class.

5    **MR. CARRIEL:** Yes, Your Honor. However, reliance on a

6    class-wide basis, we argue, is better dealt with at a later

7    stage in the litigation such as class certification. At this

8    point, we allege that the class of investors, which is all XRB

9    holders on BitGrail, were justifiable in relying --

10   **THE COURT:** You have to have facts. That's a

11   conclusion. You do have facts that you allege, 183 to 196.

12   **MR. CARRIEL:** We also have factual allegations that

13   the Nano developers created XRB, and therefore any statement

14   they made about XRB would have been relied upon and viewed by

15   holders and investors.

16   **THE COURT:** Why would you think that? Why would you

17   think that?

18   **MR. CARRIEL:** Because they invested in XRB so they are

19   likely to trust the word of the creators of XRB.

20   **THE COURT:** How do you know? Okay.

21   Last claim -- constructive fraud again, it's going to rise

22   and fall with the fiduciary issues because you need a

23   confidential relationship.

24   The quasi-contract claim, I don't know how you can state

25   this claim. There is no articulation of how the defendants

1  were enriched or that there's any benefit that was given to

2  them that bears in some way on a claim for restitution which is

3  how the unjust enrichment law is viewed for purposes of the

4  common law.

5      So I don't know that that can survive because you haven't

6  really alleged anything in that regard.

7      Anything else you want me to consider?

8      **MR. FOX:**  Just very briefly, Your Honor, if I might be

9  heard in rebuttal on the issue of fraud?

10     Mr. Carriel argued that we are arguing a federal

11  securities fraud case with respect to the element of "in

12  connection with a security."  We are arguing California law.

13  We are arguing the five fingers of fraud, the basic elements of

14  fraud, that everybody learns in torts as a first-year law

15  student.  Reliance is an element.

16     If there is a misrepresentation, it needs to induce you to

17  do something, and if it's not purchase the coin or hold the

18  coin, I don't know what it is.  So that's why we're talking

19  about purchases and holding.

20     And, secondly, with respect to reliance, with respect to

21  the allegations for Mr. Fabian's individual claim that appear

22  around paragraph 180, 183, etc., that were just discussed, we

23  would submit that those are not sufficient under Rule 9(b), and

24  we would submit they are not sufficient under Rule 8 because

25  they don't identify the specific statements on which Mr. Fabian

1   allegedly heard or relied.  They don't provide any detail as to

2   how they affected his decision-making.  They're just

3   boilerplate, of the type that the Supreme Court in *Iqbal* and

4   *Twombly* has --

5           **THE COURT:**  Well, on that point I would disagree with

6   you.  It used to be we would have 10-page Complaints.  That's

7   in the old days.  Now this one is 67.  Certainly much more than

8   some of the stuff I've seen.

9       Okay.  Anything else from the plaintiffs?

10          **MR. CARRIEL:**  No, Your Honor.

11          **MR. FRIEDMAN:**  There is one more thing, Your Honor.

12      With regard to the negligence claim that the plaintiffs

13  are bringing, it is more multifaceted than simply the issue

14  with the dispute between whether the Nano Node has a problem or

15  whether the BitGrail Exchange has a problem.

16      The negligence ties into exactly what I spoke about

17  previously on the fraud claim with regard to the defendants

18  becoming apprised of the issue and failing to disclose that on

19  social media.  It has to do with the defendants making

20  representations that everything is fine on social media.  It

21  also has other facets, including making representations about

22  hanging on to and holding XRB.  For example, we've alleged --

23          **THE COURT:**  Okay.  Look, first of all, we've already

24  done that.

25      Second of all, now you really are talking about negligent

1   misrepresentation, not negligence, because negligence, there

2   has to be a duty to do a particular thing which caused damage.

3   Now you're arguing that they said things which -- anyway, I

4   think --

5           MR. CARRIEL:  That's right, Your Honor.

6           THE COURT:  -- you're conflating issues and --

7           MR. FRIEDMAN:  I may be, but I only mean it to say

8   that it is multifaceted to the extent that not only did they

9   make misrepresentations, they also -- the defendants are

10  alleged to have forcibly kept the BitGrail Exchange open and

11  kept it open for trading when these problems were occurring and

12  after the defendants had knowledge of it.  Those are

13  allegations in the Complaint.

14      There are allegations that the defendants hosted chat

15  rooms.  However, that, again, would tie into the

16  misrepresentations.

17      But the overarching point, Your Honor, is that the

18  defendants failed to act reasonably consistent with a

19  reasonable duty of care to simply either apprise holders of

20  these tokens, that there was a problem on the Exchange, or to

21  remove -- or to stop trading on the Exchange or to even conduct

22  the security audit of the Exchange a year after they were

23  apprised that the Exchange had a problem.  They did nothing.

24      So they failed to act, they failed to apprise the public,

25  so there's a host of reasons why there is a negligence claim

1    available.

2              **THE COURT:**  All right.  Thank you, Gentlemen.

3         **MR. SCHOOLIDGE:**  Thank you, Your Honor.

4         **MR. FOX:**  Thank you, Your Honor.

5              (Proceedings adjourned at 3:14 p.m.)

1

2

3                        <u>CERTIFICATE OF REPORTER</u>

4          I certify that the foregoing is a correct transcript

5   from the record of proceedings in the above-entitled matter.

6

7   DATE:    Wednesday, October 23, 2019

8

9   *Pamela Batalo Hebel*

10  _____
    Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
11  U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25