# Exhibit 1



# BITGRAIL

## gennaio 2018 - dicembre 2019

# INDICE

## BITGRAIL

11/02/2018 Il Sole 24 Ore    6
Scandalo «Nano», svaniti 150 milioni

11/02/2018 La Repubblica - Nazionale    7
Giallo in Italia Su Bitgrail furto da 200 milioni

13/02/2018 MF - Nazionale    8
Criptovalute, furto da 160 milioni all'italiana BitGrail

13/02/2018 Il Sole 24 Ore    9
Bitcoin, sale l'allarme in Europa: «Alto rischio di perdere il denaro»

13/02/2018 La Repubblica - Nazionale    10
L'Italian Job delle criptovalute spariti nel nulla 170 milioni

14/02/2018 Il Sole 24 Ore    11
Sui 150 milioni di «Nano» spariti un'inchiesta della polizia Postale

14/02/2018 QN  - Il Giorno - Nazionale    12
Criptovalute rubate, in fumo 150 milioni

14/02/2018 QN - La Nazione - Nazionale    13
UN FURTO da quasi 200 milioni di euro, forse uno d...

14/02/2018 QN -  Il Resto del Carlino - Nazionale    14
Criptovalute rubate, in fumo 150 milioni

15/02/2018 La Repubblica - Firenze    15
NANO MONETE RISPARMIATORI POCO PROTETTI

15/02/2018 La Repubblica - Firenze    16
Mini-Bitcoin, beffa da 158 mln arrivano le prime denunce

16/02/2018 La Repubblica - Firenze    18
NANO MONETE I BEFFATI SONO 60MILA

17/02/2018 Milano Finanza    19
Chi e l'italiano che si e fatto hackerare 158 milioni di dollari

05/03/2018 Wall Street Journal - Europe    20
Exchanges Pose Cryptocurrency Risk

09/03/2018 Wall Street Journal - Europe                                          22
Crypto Under Fire in Japan

27/03/2018 Libero - Nazionale                                                    23
Bankitalia ammette: non serviamo più

18/04/2018 Wall Street Journal - Europe                                          24
Crypto Exchanges Pushed for Greater Clarity

18/05/2018 Il Venerdi di Repubblica                                              26
PROVE TECNICHE DI BIT GENERATION

22/05/2018 La Repubblica - Firenze                                               32
Dubbi sul furto di minibitcoin sequestrata la piattaforma

29/05/2018 La Repubblica - Firenze                                               34
Sequestrati i beni finanziari e virtuali del creatore di Bitgrail.com

12/06/2018 La Repubblica - Nazionale                                             35
Gli hacker sgonfiano la bolla bitcoin

16/07/2018 Wall Street Journal - Europe                                          37
Thefts of Cryptocurrencies Mount

17/07/2018 La Repubblica - Firenze                                               39
Trading online boom di true i falsi investitori fanno aari d'oro

12/12/2018 QN - La Nazione - Nazionale                                           41
La procura della Repubblica di Firenze ha chiesto ...

26/01/2019 Il Sole 24 Ore                                                        42
Fallisce la piattaforma italiana per le criptovalute

28/01/2019 QN - La Nazione - Firenze                                             43
Crac virtuale da 120 milioni di euro

29/01/2019 La Repubblica - Firenze                                               44
Dichiarato il fallimento di Webcoin e Bitgrail

29/01/2019 QN - La Nazione - Nazionale                                           45
«Sono anch'io vittima di un maxi furto»

11/02/2019 ItaliaOggi Sette                                                      46
BonelliErede assiste 3mila utenti contro la piattaforma exchange BitGrail

25/07/2019 Il Sole 24 Ore Dossier                                               47
Valuta virtuale al test del cripto-fallimento

13/09/2019 Financial Times                                                                                                       49
**How to win a power play**

23/09/2019 QN -  Il Resto del Carlino - Nazionale                                                                 53
**Gli studi d'affari e l'innovazione Due italiani nella top 50 d'Europa «Ricerca e sviluppo per crescere»**

# BITGRAIL

**32 articoli**

**24 ORE**

La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

**Criptovalute.** Piattaforma italiana dietro l'ammanco e minacce di morte ai manager - Indagine in corso

# Scandalo «Nano», svaniti 150 milioni

**Biagio Simonetta**

Una storia di un ammanco milionario sta scuotendo il mondo delle criptovalute. Una storia che inizia a Firenze, passa per un ufficio dell'Arizona, e non è chiaro dove finirà. Gli attori protagonisti sono BitGrail Srl, unica piattaforma di scambio presente in Italia, e gli sviluppatori della crtiptomoneta Nano, con sede a Scottsdale. Nel mezzo, 17 milioni di Nano (circa 150 milioni), svaniti nel nulla.

Tutto è emerso il 9 febbraio alle 21.30, quando sul sito ufficiale della Srl fiorentina è comparso un comunicato che spiega l'accaduto: «da controlli di verifica interna di congruità delle operazioni di prelievo – è scritto – sono emerse delle transazioni non autorizzate che hanno portato ad un ammanco di 17 milioni di Nano costituenti parte dei portafogli gestiti da Bitgrail S.r.l. Per l'attività fraudolenta di cui sopra, è stata presentata in data odierna regolare denuncia querela presso le autorità di polizia competente e le indagini di polizia sono in corso. Si informa che le altre valute depositate non sono state interessate dai prelievi non autorizzati».

Poche ore dopo, su Medium, una nota a firma Nano Core Team, ha posto pesanti dubbi sull'operato di BitGrail: «Dalla nostra indagine preliminare non è emersa alcuna doppia spesa nel libro mastro e non abbiamo motivo di credere che la perdita sia dovuta a un problema nel protocollo Nano. I problemi sembrano essere legati al software di BitGrail». Quelli di Nano scrivono che prima dell'8 febbraio non avevano conoscenza dell'insolvenza di BitGrail. E aggiungono che nella conversazione, Francesco Firano (amministratore di BitGrail, ndr) ha chiesto loro di «modificare il libro mastro per coprire le sue perdite, una direzione che non avremmo mai perseguito». Infine, le accuse dirette: «Abbiamo ora sufficienti motivi per credere che Firano abbia ingannato il Nano Core Team e la comunità riguardo alla solvibilità dello scambio BitGrail per un significativo periodo di tempo». Accuse pesantissime che Firano respinge senza indugio. Contattato dal Sole24ORE, l'amministratore di BitGrail spiega l'accaduto: «Ho chiesto personalmente a quelli di Nano un'operazione di fork, con l'intento di risanare le perdite degli utenti, non per insabbiare l'accaduto come hanno scritto gli sviluppatori della moneta nel loro comunicato. Le loro accuse nei miei confronti sono pesanti. E devo dire che mi hanno messo in serio pericolo. In questa storia, del resto, ci sono persone che hanno perso molti soldi». Il trentunenne fiorentino racconta di come il suo account Twitter sia preso d'assalto da utenti di mezzo mondo: «È pieno di minacce di morte nei miei confronti, qualcuno ha pubblicato anche l'indirizzo di casa mia. È una situazione abbastanza paradossale, creata dal comunicato ufficiale diramato dagli sviluppatori di Nano». E adesso cosa succede? «Abbiamo presentato denuncia alla Polizia Postale, - aggiunge Firano - fornendo anche gli indirizzi (mail comprese) sui quali questi coin mancanti sono finiti. Adesso c'è un'indagine in corso e mi auguro che si faccia luce al più presto su quanto accaduto».



**la Repubblica**

Criptovalute

# Giallo in Italia Su Bitgrail furto da 200 milioni

L'audace colpo dei soliti ignoti torna a funestare il mondo delle criptovalute. Bersaglio del furto sono i Nano, valute virtuali che sono «parte dei portafogli gestiti dalla Bitgrail», una società italiana guidata da tale Francesco Firano che si firma sui social come "The Bomber". Diciassette milioni di Nano - per un valore di circa 195 milioni di dollari - si sono volatilizzati. La denuncia arriva dalla Bitgrail, che ha accertato «transazioni non autorizzate», oggetto ora di una «denuncia querela presso le autorità di polizia».

In via cautelativa «verranno temporaneamente sospese tutte le funzionalità del sito, compresi i prelievi e i depositi», avvisa Bitgrail. Ma un comunicato della stessa Nano afferma che« abbiamo sufficienti ragioni per credere che Firano abbia sviato la Nano e la comunità per quel che riguarda la solvibilità del mercato Bitgrail per un significativo periodo di tempo».

La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

# Criptovalute, furto da 160 milioni all'italiana BitGrail

BitGrail, piattaforma di scambio italiana di criptovalute, è stata vittima di un furto. In un messaggio comparso sul proprio sito, la società riporta «un ammanco di 17 milioni di Nano», una delle tante monete virtuali scambiate. Alla quotazione attuale, il bottino supera i 159 milioni di dollari. Ma, secondo la valutazione al momento del furto, ammontava a 195 milioni. BitGrail afferma di aver presentato «regolare denuncia presso le autorità di polizia competente» e riferisce di «indagini in corso». La piattaforma sostiene che «le altre valute depositate non sono state interessate dai prelievi non autorizzati». Per «tutelare gli utenti» ed «effettuare ulteriori accertamenti su quanto avvenuto» sono state «temporaneamente sospese tutte le funzionalità del sito». Quindi scambi, prelievi e depositi non solo di Nano ma di qualsiasi altra criptovaluta disponibile su BitGrail. Francesco Firano, 31enne fondatore della società che ha sede a Firenze, ha fatto sapere che è impossibile rimborsare totalmente i clienti interessati dal furto. Il team che ha creato la criptovaluta Nano ha affermato che il furto non è legato a un problema con il protocollo della criptovaluta, incolpando BitGrail per quanto accaduto. «Firano ha ingannato il Nano Core Team e la comunità per quanto riguarda la solvibilità dell'exchange BitGrail per un periodo di tempo significativo», si legge in un comunicato del team. Nano ha inoltre dichiarato di aver dato alle autorità tutte le informazioni sull'incidente e ha anche pubblicato una copia di una conversazione con Firano in cui lui suggerisce al team di modificare il libro mastro per coprire le sue perdite. Il team di Nano ha ribattuto che è impossibile farlo e comunque non lo avrebbe fatto anche se avesse potuto. Firano, che ha ricevuto minacce di morte su Twitter, ha quindi spiegato di aver chiesto personalmente «un'operazione di fork, con l'intento di risanare le perdite degli utenti, non per insabbiare l'accaduto come hanno scritto gli sviluppatori della moneta nel loro comunicato. Le loro accuse nei miei confronti sono pesanti. E devo dire che mi hanno messo in serio pericolo. In questa storia, del resto, ci sono persone che hanno perso molti soldi».

La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

**24 ORE**

La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

## AVVERTIMENTO DI EBA, ESMA, EIOPA
### Bitcoin, sale l'allarme in Europa: «Alto rischio di perdere il denaro»

Vito Lops ▸ pagina 30

---

**Criptovalute.** Eba, Esma ed Eiopa avvertono i consumatori

# Bitcoin, sale l'allarme in Europa: «Alto rischio di perdere il denaro»

## «Preoccupazione per gli acquisti crescenti»

**Vito Lops**

Ci sono dei rischi altissimi per i consumatori che acquistano criptovalute. A lanciare l'allarme sono le tre agenzie europee responsabili per le banche (Eba), i mercati mobiliari (Esma) e le assicurazioni (Eiopa) in un «avvertimento ai consumatori sugli alti rischi dell'acquisto e detenzione delle cosiddette valute virtuali». Le tre autorità si definiscono «preoccupate dal fatto che un numero crescente di consumatori acquisti valute virtuali con l'aspettativa che il loro valore continui a crescere senza essere consci dell'alto rischio di perdere il denaro investito». Bitcoin, Ripple, Ethereum e molte altre criptovalute sono risultate estremamente volatili negli ultimi mesi. Il settore è scivolato dai massimi storici di metà dicembre (capitalizzazione a 800 miliardi di dollari) agli attuali 423 miliardi. Certo, se si considera che 12 mesi fa le criptomonete valevano 20 miliardi, le valutazioni attuali rispecchiano comunque un balzo quantico. Ma in ogni caso è la volatilità a farla da padrone e non è certo un elemento governabile, né tantomeno adeguato ai piccoli risparmiatori.

«Se acquistate valute virtuali siate consapevoli del fatto che avete un alto rischio di perdere gran parte e persino tutto l'investimento fatto» scrivono Eba, Esma ed Eiopa nell'avvertimento congiunto agli investitori. Le tre autorità radunano i principali rischi in sette capitoli. Il primo è, appunto, quello della volatilità e del rischio "bolla". Poi c'è l'assenza di protezione legale. «Sebbe-

ne nel corso del 2018 entreranno in vigore le norme antiriciclaggio che si applicheranno anche alle piattaforme di scambio delle criptovalute e ai portafogli digitali, queste ultime restano non regolate nella normativa europea». Tra gli altri rischi, la mancanza di trasparenza, di certezze nella possibilità di scambiarle con le valute tradizionali e regolamentate, le informazioni ingannevoli che spesso si riceve da chi propone l'investimento in Bitcoin e nelle altre valute. «Non investite denaro che non potete permettervi di perdere», aggiungono le tre Autorità, ricordando che l'acquisto di valute virtuali da un operatore finanziario vigilato non ne attenua affatto la pericolosità.

Senza dimenticare altri potenziali rischi. Non è da escludere l'ipotesi - nel caso in cui chi acqui-

### Volatilità sul Bitcoin

Bitcoin / Dollaro Usa



6740    8725

20000
15000
10000
5000

01/11/17    12/02/18

sti criptovalute decida di mantenerle in deposito presso la piattaforma - di perdere l'investimento se la piattaforma viene hackerata. L'ultimo caso in ordine cronologico risale a domenica quando è balzato alla cronaca il furto di 17 milioni di Nano (circa 195 milioni di dollari), denunciato dalla piattaforma di scambio italiana Bitgrail Srl. Un ammanco pesante, che pone ancora volta seri dubbi sull'intero mondo delle criptovalute. E poi ci sono molti computer di utenti inconsapevoli (vengono chiamati in gergo "pc zombie") la cui potenza viene utilizzata dagli hacker per minare nuove criptovalute. Questo fenomeno è chiamato "criptomining", cioè produzione abusiva di queste valute. Si calcola che nel mondo un'azienda su 5 sia colpita dagli hacker che sfruttano la potenza di calcolo dei computer per generare criptovalute, all'insaputa delle vittime. A mettere insieme i dati è la società di sicurezza Check Point Software Technologies, che ha stilato un rapporto relativo al periodo luglio-dicembre 2017. Si scopre, che il "criptomining" consente ai criminali informatici «di utilizzare fino al 65% della potenza di un processore dell'utente finale».

Tra i virus malevoli più usati per questo scopo c'è "Coinhive": è progettato per produrre la criptovaluta Monero quando un utente visita una pagina web, ovviamente senza la sua approvazione. È emerso nel settembre 2017 e ha già infettato il 12% delle aziende a livello globale.

🐦 @vitolops

© RIPRODUZIONE RISERVATA



## la Repubblica

La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

Il caso

# L'Italian Job delle criptovalute spariti nel nulla 170 milioni

## Le monete Nano svanite dalla piattaforma tricolore Bitgrail. Dagli Usa accuse al fondatore

### In Rete insulti contro il 31enne Firano, che dice: "Gli hacker sono entrati da un baco della valuta"

**ETTORE LIVINI**, MILANO

L'Italia delle criptovalute festeggia alla grande (come tradizione del Belpaese) il suo primo crac. La moneta implicata - il Nano, un mini-Bitcoin - è virtuale. I soldi spariti nel nulla dalla piattaforma toscana Bitgrail - 170 milioni di euro, mica noccioline - sono invece veri. E Francesco Firano - "The Bomber" per i social, il 31enne che gestiva la società - è oggi l'uomo "più ricercato del web" come scherzano (ma non troppo) su Reddit le migliaia di risparmiatori coinvolti. «Avviso importante: tutti quelli che mi minacciano di morte possono farlo ordinatamente sotto questo tweet», ha cinguettato lui - che nega ogni responsabilità - domenica su Twitter. Detto, fatto. In poche ore centinaia di persone l'hanno ordinatamente mandato a quel paese: «Imbecil», dalla Spagna. «Ti metterei una bomba nel...», dal Brasile, «Divertiti in prigione, fenomeno», dall'Italia, «suicidati», il consiglio più garbato arrivato dagli States.

Il crac Bitgrail è la prova nei fatti del folle mondo che ruota intorno alle criptovalute. Il Nano è stato fino all'autunno scorso

(quando si chiamava Raiblock) una delle tante monete nate all'ombra del Bitcoin, un "microbo" che valeva una decina di milioni di dollari. Poi a fine novembre - senza ragioni precise - ha preso l'ascensore: a metà dicembre valeva 300 milioni, il 3 gennaio 4 miliardi. Mille euro investiti ai Morti erano diventati 300 mila a San Silvestro. Gli algoritmi di Bitgrail, società con 30 mila euro di capitale, gestivano il 25% di questo turbinoso giro d'affari.

Poi qualche rotella di questo ingranaggio da Luna Park ha iniziato a scricchiolare: dopo la Befana Bitgrail ha bloccato le iscrizioni, il 10 gennaio ha congelato

il ritiro dei soldi investiti in Nano. Problemi procedurali - ha tranquillizzato tutti "The Bomber" - «mi sono rimboccato le maniche, lavoro giorno e notte per far fronte a transazioni a volte superiori del 20% a quelle del giorno prima!». L'8 febbraio è stato l'inizio della fine. "The Bomber" ha preso la cornetta e chiamato il Nano Core team, la società Usa che gestisce la criptovaluta. «Sono spariti 170 milioni di euro di Nani, garantitemi una sorta di "sanatoria" per risolvere la situazione». Incassato il «no», ha alzato bandiera e comunicato al mercato il buco.

Cos'è successo davvero? Un hacker, è l'ipotesi di Firano, è entrato nel sistema della criptovaluta e ha "rubato" i Nano approfittando di una falla. «La perdita non è legata ai nostri protocolli», rispondono oltreoceano. Anzi: «Abbiamo ragione di credere che Firano abbia truffato Nano Core team e i trader sulla sua solvibilità».

La prova? Una serie di operazioni sospette sul conto Bbjn in deposito a Firenze - spiegano - dove tra il 19 e il 23 ottobre sarebbero spariti 9 milioni di nano, rimbalzati su sei operazioni anonime prima di tornare - ripuliti e non si sa in capo a chi - su Bitgrail o su Mercatox, un'altra piattaforma. Come dire che i soldi se li è persi (se non rubati) "The Bomber". Il diretto interessato - indignato - ha sganciato la sua ultima bomba via tweet alle 23 di domenica «sono dichiarazioni false» e ha sospeso l'attività social.

La certezza, al momento, è solo una: i risparmiatori hanno perso 170 milioni e Bitgrail è il terzo crac per dimensioni nella storia delle criptovalute dopo quelli delle giapponesi Coincheck e Mt. Gox. Il web è diviso tra chi ritiene "The Bomber" il colpevole o la vittima. Le autorità Ue, con tempismo, hanno messo in guardai ieri contro i pericoli delle criptovalute. Le indagini su Bitgrail sono partite. Ma in questo mondo virtuale, dove conti e transazioni sono spesso anoni-

me, fare chiarezza non sarà facile.



diffusione:97980
tiratura:140038

**24 ORE**

**Criptovalute.** Al vaglio le operazioni anomale sulla piattaforma Bitgrail srl

# Sui 150 milioni di «Nano» spariti un'inchiesta della polizia Postale

**Ivan Cimmarusti**
ROMA

L'inchiesta è per furto. Nel mirino della polizia Postale è finito l'ammanco da 17 milioni della criptovaluta Nano, per un valore di circa 150 milioni di dollari. Il fascicolo è stato avviato dopo che sono state registrate operazioni anomale sulla piattaforma di scambio italiana Bitgrail srl, la quale ha per prima diffuso una nota registrando la scomparsa del capitale in criptomoneta.

La notizia - già raccontata nell'edizione di domenica scorsa del Sole 24 Ore - ora trova nuovo vigore con l'apertura dell'indagine che presto potrebbe riservare interessanti sorprese. Perché nel mirino della polizia Postale è finita l'attività della piattaforma italiana di scambio, Bitgrail srl, gestita da un italiano, Francesco Firano, di Firenze. Gli investigatori stanno ricostruendo tutte le movimentazioni finanziarie fatte attraverso la piatta-

forma di scambio, individuando aspetti tutti da chiarire e che potrebbero svelare come si è consumato il furto, che ha portato svariati investitori a perdere il proprio capitale. Una operazione che avrebbe lasciato almeno una traccia sui server, e che ora gli investigatori della Postale stanno seguendo per mettere a punto una informativa da depositare alla magistratura.

Ma andiamo con ordine. Il Nano Core Team - titolare della criptomoneta - afferma di essere venuta a conoscenza l'8 febbraio scorso della perdita del portafoglio di Bitgrail srl attraverso Francesco Firano. Lo stesso, stando a quanto detto dal Nano Core Team, avrebbe anche chiesto di modificare il libro mastro per celare l'ammanco.

Alle 21:30 del 9 febbraio successivo compare sul sito di Bitgrail una nota: «da controlli di verifica interna di congruità delle operazioni di prelievo sono emerse delle transazioni

non autorizzate che hanno portato ad un ammanco di 17 milioni di Nano costituenti parte dei portafogli gestiti da Bitgrail srl. La notizia ha provocato una flessione della criptomoneta, passata in poche ore da 11,5 dollari a 8,25. Una nota degli sviluppatori Nano Core Team afferma che «dalla nostra indagine preliminare non è emersa alcuna doppia spesa nel libro mastro e non abbiamo motivo di credere che la perdita sia dovuta a un problema nel protocollo di Nano. I problemi sembrano essere legati al software Bitgrail». Gli sviluppatori hanno aggiunto che «abbiamo ora sufficienti motivi per credere che Firano abbia ingannato il Nano Core Team e la comunità riguardo alla solvibilità dello scambio Bitgrail per un significativo periodo di tempo». Nei giorni scorsi il Sole 24 Ore ha avuto modo di ascoltare Firano, il quale esclude le responsabilità dell'ammanco.



La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

diffusione:40615
tiratura:61974

**IL GIORNO**

FURTO PIATTAFORMA ITALIANA: NIENTE RIMBORSI
## Criptovalute rubate, in fumo 150 milioni

MILANO «È IMPOSSIBILE risarcire quanto rubato». Cioè 17 milioni di criptomonete Nano, circa 153 milioni di euro al valore attuale. Persi per sempre. La doccia fredda arriva da BitGrail, la piattaforma fiorentina per lo scambio di valute virtuali che qualche giorno fa ha subito il maxi furto (allora il valore dei Nano rubati sfiorava i 200 milioni di dollari) e che ora afferma di avere «pronto un piano di recupero» che comunicherà «appena sicuri della sua fattibilità a livello legale e contabile». Intanto, le «indagini in corso» stanno costringendo il sito a sospendere tutte le operazione (prelievi compresi) mentre chi ha perso tutto resta con il cerino in mano. I furti e gli attacchi hacker sono, infatti, uno dei principali rischi delle monete virtuali, basta ricordare quello da oltre 500 milioni di dollari subito dall'exchange giapponese Coincheck che provocò un crollo dei prezzi del Bitcoin e delle altre criptomonete. La verità è che non ci sono leggi, controlli, supervisori, garanzie e, dunque, la sicurezza dell'investimento è affidata alla piattaforma e agli accorgimenti delle persone per non farsi truffare. E, mentre gli allarmi si moltiplicano, ieri Mario Draghi, rispondendo a uno studente su Twitter, ha avvertito: «Ci penserei attentamente prima di investire in bitcoin» ma «non è responsabilità della Bce regolamentarlo». Più netta Bankitalia che, con il dg Salvatore Rossi, li definisce «aggeggi speculativi». Il prezzo dei bitcoin, dopo i crolli di inizio anno, viaggia attorno agli 8.600 dollari, meno della metà del picco di 20 mila sfiorato a dicembre. Alessia Gozzi © RIPRODUZIONE RISERVATA

La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

diffusione:73546
tiratura:101009

# Lupin virtuale ruba 200 milioni di euro

*L'ammanco dal «portafoglio» di una società fiorentina. Minacce all'amministratore*

**UN FURTO** da quasi 200 milioni di euro, forse uno dei più grossi «colpi» virtuali mai messi a segno. Di sicuro il più ingente capitato agli investigatori della polizia postale di Firenze, incaricati dalla procura di indagare sulla sparizione di 17 milioni di «Nano», una delle tante valute virtuali. Un «Nano», tanto per dare un parametro di misura, all'ultima quotazione valeva quasi dodici dollari.

Il tesoro in criptovaluta è sparito dal portafoglio – elettronico, ovviamente – della «Bitgrail», società fiorentina (ha sede in via Capponi) che si qualifica come «piattaforma di scambio italiana di criptovalute». A dare l'annuncio dell'ammanco, è stata la stessa Bitgrail, in un annuncio sul proprio sito.

**LA PIATTAFORMA** sostiene che «le altre valute depositate non sono state interessate dai prelievi non autorizzati». Per «tutelare gli utenti» ed «effettuare ulteriori accertamenti su quanto avvenuto» sono state «temporaneamente sospese tutte le funzionalità del sito». Quindi scambi, prelievi e depositi non solo di Nano ma di qualsiasi altra criptovaluta disponibile su BitGrail. La compagnia conclude il suo comunicato scusandosi con i clienti e promettendo ulteriori comunicazioni «a breve».

La notizia, una vera «bomba» in

### LE INDAGINI
**Gli 007 della polposta cercano di far luce fra eventuali «bug» che hanno causato l'intrusione**

questo particolare e per molti sconosciuto mondo economico, ha avuto ripercussioni «personali» anche sull'amministratore della Bitgrail, Francesco Firano, 31 anni, noto nell'ambiente con il nickname «The bomber». A Firano sarebbe infatti giunte minacce di morte di titolari della moneta virtuale sparita. Inoltre, è nata un'accesa disputa tra l'amministratore fiorentino e lo sviluppatore americano di Nano, Zack Shapiro, sulle modalità di "rientro" del cospicuo ammanco. «L'amministratore delegato della BitGrail S.r.l.– si legge in una nota della società fiorentina - ha proposto un fork come ipotetica soluzione al fine di restituire ai legittimi proprietari le coin rubate. La reazione dei due Dev di Nano è stata inaspettatamente di chiusura totale al dialogo.Ci è stato quindi impossibile valutare di comune accordo altre possibili soluzioni. Precisiamo che fino al giorno prima dell'accaduto, intrattenevamo cordialmente contatti quotidiani con Zack Shapiro per questioni inerenti Nano e BitGrail. «Abbiamo pronto un piano di recupero che comunicheremo appena sicuri della sua fattibilità a livello legale e contabile», conclude la Bitgrail. Nel frattempo, gli 007 della polposta cercano di far luce fra eventuali «bug» che hanno permesso questa intrusione da Lupin 2.0.

**stefano brogioni**



**il Resto del Carlino**

La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

FURTO PIATTAFORMA ITALIANA: NIENTE RIMBORSI

# Criptovalute rubate, in fumo 150 milioni

MILANO «È IMPOSSIBILE risarcire quanto rubato». Cioè 17 milioni di criptomonete Nano, circa 153 milioni di euro al valore attuale. Persi per sempre. La doccia fredda arriva da BitGrail, la piattaforma fiorentina per lo scambio di valute virtuali che qualche giorno fa ha subito il maxi furto (allora il valore dei Nano rubati sfiorava i 200 milioni di dollari) e che ora afferma di avere «pronto un piano di recupero» che comunicherà «appena sicuri della sua fattibilità a livello legale e contabile». Intanto, le «indagini in corso» stanno costringendo il sito a sospendere tutte le operazione (prelievi compresi) mentre chi ha perso tutto resta con il cerino in mano. I furti e gli attacchi hacker sono, infatti, uno dei principali rischi delle monete virtuali, basta ricordare quello da oltre 500 milioni di dollari subito dall'exchange giapponese Coincheck che provocò un crollo dei prezzi del Bitcoin e delle altre criptomonete. La verità è che non ci sono leggi, controlli, supervisori, garanzie e, dunque, la sicurezza dell'investimento è affidata alla piattaforma e agli accorgimenti delle persone per non farsi truffare. E, mentre gli allarmi si moltiplicano, ieri Mario Draghi, rispondendo a uno studente su Twitter, ha avvertito: «Ci penserei attentamente prima di investire in bitcoin» ma «non è responsabilità della Bce regolamentarlo». Più netta Bankitalia che, con il dg Salvatore Rossi, li definisce «aggeggi speculativi». Il prezzo dei bitcoin, dopo i crolli di inizio anno, viaggia attorno agli 8.600 dollari, meno della metà del picco di 20 mila sfiorato a dicembre. Alessia Gozzi ©
RIPRODUZIONE RISERVATA

**la Repubblica**

IN PRIMO PIANO

# NANO MONETE RISPARMIATORI POCO PROTETTI

Emilio Barucci

La notizia non è una sorpresa nel mondo delle criptovalute: un furto di ben 17 milioni di Nano monete, del valore di circa 160 milioni di euro. Il problema è che siamo in mondo grigio e che il livello di protezione dei risparmiatori è purtroppo molto basso. pagina IX La notizia non è una sorpresa nel mondo delle criptovalute: un furto di ben 17 milioni di Nano monete, del valore di circa 160 milioni di euro. Il furto (via rete) sarebbe avvenuto presso la società di exchange BitGrail. Gli investitori coinvolti dovrebbero essere circa centomila.

Nano moneta è una criptovaluta, una valuta virtuale sorta sulla scia del successo di bitcoin. BitGrail è un cambia valute moderno che fornisce un servizio di cambio tra le valute correnti (dollari o euro) e le criptovalute.

L'unica differenza con quelli che troviamo per strada è che questi exchange svolgono il loro servizio su internet e che le criptovalute possono essere lasciate su un loro conto.

Le criptovalute possono essere utilizzate come mezzo di pagamento con trasferimenti effettuati su una piattaforma digitale. Nel caso più famoso, bitcoin, la piattaforma è blockchain. Per avere accesso a questo circuito occorre cambiare gli euro in criptovalute. Le transazioni di criptovaluta vengono confermate (validate) dai nodi della piattaforma che, risolvendo un complicato problema matematico, certificano la loro validità registrando il trasferimento sulla blockchain. Così facendo il trasferimento di criptovaluta "entra nella storia" e non può essere modificato se non riscrivendo, con l'accordo di una larga fetta di nodi della rete, il registro delle transazioni a partire da quella che si vuole modificare. Tutto avviene sotto condizione di anonimato dei soggetti coinvolti che vengono identificati con un codice.

I furti di moneta, così come la scoperta di bugs nei protocolli utilizzati, rappresentano il punto debole delle criptovalute in quanto la loro credibilità, e il loro successo, dipendono dall'integrità della piattaforma e dalla sicurezza che le transazioni effettuate non possano essere colpite da parte di un hacker. Il problema è che porre rimedio ad un furto è molto difficile (occorre riscrivere il libro mastro della piattaforma) e rintracciare l'autore del furto rischia di essere impresa ancora più ardua.

L'unica raccomandazione che può essere fatta a chi vuole avventurarsi in questo mondo è di non lasciare le criptovalute su un exchange ma di trasferirle su un wallet protetto crittograficamente.

E' un po' curioso che mentre si discute delle "sole" rifilate dalle banche ai risparmiatori, la vicenda delle criptovalute venga vista con indulgenza. Il fenomeno in realtà è serio. Basta pensare che i possessori di obbligazioni delle banche popolari erano solo 10.000 e che le obbligazioni valevano 330 milioni. L'amministratore di BitGrail ha detto: «Un exchange non è una banca, non è un luogo sicuro. Non c'è lo Stato o l'Europa che rimborsa o risarcisce chi opera nelle criptovalute...». Ha ragione. Auguriamoci che gli investitori fossero stati adeguatamente informati di ciò.

Il problema è che siamo in mondo grigio e che il livello di protezione dei risparmiatori è purtroppo molto basso.

La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

# la Repubblica

La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

L'inchiesta

## Mini-Bitcoin, beffa da 158 mln arrivano le prime denunce

Sono di investitori italiani, segnalano alla polizia postale la sparizione dei soldi dati alla società fiorentina

luca serranò

Un colpo "epocale", per modalità e valore del bottino, un crac per migliaia e migliaia di persone che credevano di aver trovato la gallina dalle uova d'oro speculando sulle monete virtuali. Per gli investigatori, ancora un rompicapo, mentre le denunce dei clienti beffati si moltiplicano.

 Continuano le indagini della polizia postale della Toscana, coordinata dalla Procura, sulla clamorosa scomparsa dalla piattaforma italiana di exchange Bitgrail di circa 158milioni di euro nella criptovaluta Nano, una specie di mini-Bitcoin: secondo gli esperti, si tratta di uno dei furti più consistenti nella giovane storia delle criptovalute. Il colpo, che potrebbe aver coinvolto circa 100.000 investitori, è stato denunciato lo scorso venerdì dall'amministratore della piattaforma, Francesco Firano, fiorentino, 31 anni, ex programmatore di computer convertito alla finanza virtuale: in breve la notizia è rimbalzata sul web, e sul tavolo della Polposta sono arrivate le prime denunce da parte dei clienti beffati.

 Massimo il riserbo sulle indagini, ma secondo indiscrezioni al momento si sarebbero fatti avanti diversi investitori italiani, che avrebbero perso cifre da capogiro. Nei prossimi giorni è attesa una raffica di denunce dagli altri clienti sparsi in giro per il mondo. «Ribadiamo che abbiamo presentato regolare denuncia alle autorità competenti - si legge in un comunicato diffuso da Bitgrail, sulla scia delle proteste sollevate dall'ammanco - segnalando le informazioni riguardanti i responsabili dell'hack ed i bug sfruttati (non imputabili al nostro software). Ci sono delle indagini in corso e chi di dovere avrà tutti i dati, tutti gli strumenti e la nostra piena collaborazione per chiarire ogni aspetto di questa faccenda». Restano i dubbi sulle dinamiche che governano il mondo selle criptovalute e sulla sicurezza delle transazioni. Solo due settimane fa, gli hacker aveva preso di mira uno dei più importanti exchange giapponesi, Coincheck, con il più grande furto di monete virtuali (in questo caso la valuta Nem, tra le dieci più capitalizzate) mai avvenuto: 46,3 miliardi di yen, pari a 340 milioni di euro, spariti nel nulla. Oltre 260mila gli investitori coinvolti.

 Gli uomini della Polposta al momento non si sbilanciano sulle possibili analogie tra i due casi, e si concentrano in prima battuta sui dati messi a disposizione dallo stesso Fiorano: «Abbiamo segnalato alla polizia dove riteniamo che siano finite quelle criptovalute», ha confermato lui a Repubblica, spiegando di aver indicato «un indirizzo mail di iscrizione». L'inchiesta, in cui si ipotizza il reato di "frode informatica connessa con furto di indebito utilizzo dell'identità digitale di uno o più soggetti", procede dunque sulle poche tracce lasciate durante il furto. Si lavora per recuperare il "tesoro", e per chiarire se davvero il colpo sia stato opera di una banda di pirati informatici. I punti Il gestore della piattaforma parla di furto di hacker 1La sparizione Il primo a presentarsi alla polizia postale per segnalare l'ammanco di 158 milioni è stato lo stesso gestore della fiorentina Bitgrail, Francesco Firano.

 2Gli hacker Secondo Firano la sparizione delle Nano monete, una criptovaluta simile ai Bitcoin, sarebbe da collegare ad un'intrusione informatica.

 3La traccia Sempre il gestore di Bitgrail asserisce di aver dato alla polizia una traccia, un indirizzo mail del sottoscrittore che avrebbe aperto"la porta" agli hacker.

Case 4:19-cv-00054-YGR   Document 93   Filed 01/17/20   Page 18 of 162

la Repubblica

diffusione:153773
tiratura:235596

4Le denunce Molti sottoscrittori della Nano moneta sui social dicono di non credere alla ricostruzione e alcuni hanno chiesto alla polizia fiorentina di indagare.

La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

diffusione:153773
tiratura:235596

# la Repubblica

IN PRIMO PIANO

# NANO MONETE I BEFFATI SONO 60MILA

Laura Montanari

Il giallo sul furto delle criptomonete è all'inizio.

Sulla piattaforma che fa capo alla BitGrail srl ci sono ancora 4 milioni di Nano monete, circa 37 milioni di euro stando al valore del giorno in cui l'exchange è stato bloccato. E negli Usa spunta un comitato con 500 investitori che chiedono i soldi. pagina V Il giallo sul furto delle criptomonete è all'inizio. Sulla piattaforma che fa capo alla BitGrail srl ci sono ancora 4 milioni di Nano monete - circa 37 milioni di euro stando al valore del giorno in cui l'exchange è stato bloccato -, sono quello che gli hacker non sono riusciti o non hanno fatto in tempo o, ancora, non hanno voluto rapinare. Perché? Rispondere a questa domanda farebbe fare un salto in avanti alle indagini.

Ma al momento questa domanda non ha risposte così come resta un mistero come mai il furto si sia concentrato sulle Nano monete e non sui Bitcoin o su altre. Sono gli investigatori della polizia postale di Firenze ad occuparsi del clamoroso ammanco di 17 milioni di Nano-coins sparite nel nulla. La denuncia da parte dell'amministratore delegato della società, Francesco Firano, 31 anni, fiorentino, è dello scorso 8 febbraio e a quella data i Nano-coins avevano un controvalore complessivo di 158milioni di euro. Chi ha messo a segno questo colpo sulla prima piattaforma italiana che faceva trading con le criptomonete, cioè con i soldi virtuali, quelli che esistono soltanto dentro la Rete? Secondo Firano è tecnicamente impossibile risalire a quando il colpo è stato messo a segno, tuttavia dagli accertamenti risulta che gli utenti danneggiati dalla razzia delle Nano monete siano «60mila e non 110mila come avevamo stimato in un primo momento».

Molti di questi utenti però sono inferociti e scrivono sui social attacchi alla BitGrail, società con sede a Firenze, nata pochi mesi fa. L'accusa è quella di non aver sorvegliato o di aver dato tardi l'allarme. Gli stessi sviluppatori di questa valuta virtuale puntano il dito contro Firano e la sua gestione di BitGrail tanto che il giovane programmatore fiorentino ha annunciato di ricorrere a vie legali contro. Via mail, un utente che scrive dagli Stati Uniti e che sostiene di aver perso 10mila dollari, ha riferito (cosa che al momento non si può verificare attraverso altra fonte) che un gruppo di investitori si è organizzato in un comitato che avrebbe raccolto 500 adesioni. Naturalmente chiedono di avere indietro i loro soldi. Le Nano monete hanno registrato grandissime variazioni di valore passando da 10 centesimi di dollaro dell'ottobre 2017, ai 30 dollari a dicembre. La procura di Firenze, il pm è Sandro Cutrignelli, ha aperto un'inchiesta ipotizzando il reato di «frode informatica connessa con furto di indebito utilizzo dell'identità digitale di uno o più soggetti». In questo momento sul sito di Bitgrail «sono disabilitate le principali funzionalità dell'exchange (trading, depositi e prelievi)» e questo è dovuto, si legge sulla pagina della piattaforma, «per aspetti prettamente legali». Poi si legge: «Abbiamo pronto un piano di recupero che comunicheremo appena sicuri della sua fattibilità a livello legale e contabile».

Ma siccome non ci sono regole certe nel mondo delle criptovalute anche per gli eventuali risarcimenti sono al lavoro i legali: «Dobbiamo capire se la perdita va divisa fra tutti gli iscritti anche quelli che possiedono altre valute o soltanto fra quelli che hanno Nano monete» dice Firano. Insomma le certezze sono ancora poche.

Foto: Il tesoro rimasto Nella piattaforma BitGrail sono rimaste Nano monete per un valore di circa 37 milioni. Sull'ammanco indaga la polposta

La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

Case 4:19-cv-00054-YGR   Document 93   Filed 01/17/20   Page 20 of 162

**MF | MILANO FINANZA**

diffusione:64661
tiratura:109699

La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

## CRIPTOVALUTE E CYBERCRIME
## Chi è l'italiano che si è fatto hackerare 158 milioni di dollari

**BITCOIN** Una piattaforma italiana di scambio di criptovalute subisce il furto di 158 milioni di euro. Il ceo Firano: impossibile restituire il maltolto a 110 mila clienti. Ma la vicenda ha molti punti oscuri

**COPERTINA**

# Il Bomber hackerato

di **Marcello Bussi**

«Ma tu daresti i tuoi soldi in mano a uno che si fa chiamare The Bomber?», si domanda un lettore commentando la vicenda BitGrail. The Bomber in questione è Francesco Firano, ceo della piattaforma di scambio di criptovalute BitGrail, che lo scorso 9 febbraio ha denunciato alla Polizia Postale di Firenze di avere subito un furto di 11 milioni di pezzi della criptovaluta Nano, pari in quel momento a 158 milioni di euro. La Procura di Firenze ha aperto un'inchiesta ipotizzando il reato di «frode informatica connessa con furto e indebito utilizzo dell'identità digitale di uno o più soggetti». Il giorno dopo il 31enne fiorentino ha twittato che «sfortunatamente non c'è modo di ridare indietro agli utenti il 100%» del maltolto. Gli utenti in questione sono circa 110 mila. Altrettanti clienti di BitGrail non hanno invece subito danni perché possessori di criptovalute diverse dal Nano che, secondo The Bomber, sono «al sicuro». Tuttavia ogni attività della piattaforma di scambio è stata sospesa. Firano ha accusato gli sviluppatori di Nano di «non voler collaborare» e li ha denunciati per diffamazione. Gli sviluppatori Colin Le Mathieu e Zack Shapiro hanno infatti incolpato BitGrail di voler insabbiare il furto. Per loro la causa dell'ammanco «è collegata al software di BitGrail», come hanno scritto in una nota ufficiale su Medium, aggiungendo che non erano «a conoscenza delle insolvenze di Bitgrail prima dell'8 febbraio». Gli sviluppatori hanno anche pubblicato la copia di una conversazione con Firano in cui The Bomber suggerisce al team di modificare il libro mastro per coprire le sue perdite. Il team di Nano ha detto che si tratta di una cosa impossibile e che comunque non l'avrebbe fatto anche se avesse potuto. The Bomber ha replicato di aver chiesto personalmente «un'operazione di fork con l'intento di risanare le perdite degli utenti e non per insabbiare l'accaduto, come hanno scritto gli sviluppatori della moneta nel loro comunicato. Le loro accuse nei miei confronti sono pesanti. E devo dire che mi hanno messo in serio pericolo. In questa

storia, del resto, ci sono persone che hanno perso molti soldi». Firano ha quindi rivelato di avere ricevuto molte minacce di morte («qualcuno ha pubblicato anche l'indirizzo di casa mia»).

L'operazione richiesta dal ceo di BitGrail non è insolita nel caso di furti. Quando nel 2016 è stato hackerato Dao, gli sviluppatori di Ethereum hanno eseguito un hard fork per recuperare i fondi e prevenire ulteriori furti. La loro azione non ha però avuto pieno successo, dal momento che una parte della



### LE MONTAGNE RUSSE DEL BITCOIN
Quotazioni in dollari

```
20000
15000
10000
5000
15 NOVEMBRE 2017        16 FEBBRAIO 2018
```
GRAFICA MF-MILANO FINANZA

comunità di Ethereum si è opposta. Di conseguenza oggi vengono estratte due versioni di ethereum, la catena nata dall'hard fork (Eth) e la catena originale hackerata (Etc). Ciononostante la mossa di Ethereum ha creato un precedente per il recupero di fondi rubati. Ma in quel caso tutto si è svolto all'interno della comunità di Ethereum, mentre BitGrail e Nano sono due entità separate. Leggendo alcuni post di Reddit, inoltre, emerge un'accusa clamorosa: Bitgrail e Mercatox (un'altra piattaforma dove si scambiano i Nano) avrebbero inviato nello stesso momento milioni di pezzi della criptovaluta allo stesso indirizzo. Parte di questo ammontare sarebbe stato spedito da BitGrail Representative 1, che si sospetta sia il cold wallet, ovvero il portafoglio non collegato a internet dove vengono custodite le criptova-

lute di Firano. Il tutto mentre i due exchange congelavano i prelievi dei loro clienti. In poche parole, un comportamento del genere solleva il sospetto che The Bomber si sia autoderubato fingendo poi di essere stato colpito da un attacco degli hacker. In fondo questo è il sospetto che aleggia sempre ogni volta che viene hackerato un exchange.

Le indagini sono appena partite e quindi non è il caso di mettere la croce addosso a nessuno. Certo, fa impressione vedere che una piattaforma nata da poco tempo e che più volte ha bloccato i prelievi avesse 220 mila clienti. Perfino uno degli exchange ritenuti più affidabili, l'americana Coinbase, nei giorni scorsi ha avuto un clamoroso incidente: alcuni clienti che usano la carta di credito per gli acquisti di criptovalute sono stati colpiti da transazioni non autorizzate e ripetute che in alcuni casi hanno svuotato il loro conto bancario. Coinbase ha assicurato che «ogni cliente sarà rimborsato per intero per qualsiasi addebito errato». Dan Romero, vicepresidente di Coinbase, ha spiegato che «Visa ha modificato il Merchant Category Code per gli acquisti di valuta digitale con un codice che consente alle grandi banche e agli emittenti di carte di addebitare ai consumatori commissioni aggiuntive».

I casi BitGrail e Coinbase (assolutamente non comparabili) sono l'ennesimo segnale della necessità di una regolamentazione del mondo delle criptovalute. Ma venerdì 16, parlando in un convegno a Monaco di Baviera, lo zar Usa della sicurezza cyber, Rob Joyce, ha dichiarato che «c'è ancora molta strada da fare prima che il governo degli Stati Uniti inizi a regolamentare il bitcoin». Joyce ha quindi sottolineato la necessità di comprendere meglio i rischi e i benefici della criptovaluta prima di varare qualsiasi tipo di regime normativo. Negli Stati Uniti la messa al bando non è assolutamente presa in considerazione e una sua regolamentazione è ancora lontana. Questo ha dato il via alla ripresa delle quotazioni del bitcoin, che dal minimo dell'anno toccato il 6 febbraio a 5.947 dollari lo ha portato a superare quota 10 mila giovedì 15. Il rally ha coinvolto le altre principali criptovalute, con il litecoin che ha raddoppiato il suo valore. (riproduzione riservata)



# Exchanges Pose Cryptocurrency Risk

Hacks this year at two digitai bourses bring losses since 2014 to more than $1.4 billion
BY PAUL VIGNA

Cryptocurrency traders are learning that where they buy and sell digitai tokens can be just as risky as choosing a coin or picking a price. Investors have l o s t more than $ 7 0 0 million this year in hacks of two major cryptocurrency exchanges. The thefts at Florence-based BitGrail and Japan's Coincheck bring total investor hacking l o s s e s since 2014 to around $1.4 billion, according to a Wall Street Journal review of recent hacks. The hacks r e f l e c t an oftenoverlooked risk of trading in bitcoin and related digital currencies: While scores of online exchanges have sprung up in the p a s t t w o years as crypto prices surged, they typically bear little resemblance to the well-financed, better-regulated v e n u e s that enable investors to buy and sell stocks, bonds and commodities. Given the peer-to-peer nature of cryptocurrencies, inv e s t o r s don't have to deal directly w i t h exchanges w h e n they buy t h e s e a s s e t s . But many have done so b e c a u s e exchanges s e e m safer and more convenient, a judgment some have come to regret. Jeff Furman, a 22-year-old student at Northern Virginia Community College, said he l o s t about $ 6 0 , 0 0 0 w o r t h of nano tokens on the BitGrail exchange in a hack d i s c l o s e d in February. "It's hard for me," he said. He sold some nano at a profit but w i s h e s he had sold the rest. "I didn't h e e d my o w n gut." Unlike traditional stock and futures exchanges, whose busin e s s e s center on matching up trades for a small fee, crypto exchanges also safeguard investors' virtual tokens. It is a task that many aren't up to, investors and technology experts say. "As cryptocurrencies grow, hackers are g o i n g to go after digital wallets" and exchanges even more, said George Waller, an adviser at security firm BlockSafe Technologies Inc. Wallet companies act as cryptocurrency brokerage firms and o f t e n work closely w i t h exchanges. The t w o recent hacks show the particular vulnerability inv e s t o r s can face w h e n buying unproven, speculative tokens on startup exchanges that aren't regulated and derive a large chunk of volume from the new, u n t e s t e d currencies. The w e b s i t e coinmarketcap.com tracks data for about 190 cryptocurrency exchanges, but only a handful are regulated in the U.S. There are established digital-currency exchanges such as Coinbase's GDAX, Gemini from Cameron and Tyler Winklevoss's Gemini Trust Co., and Japan's BitFlyer that are regulated and employ a variety of security measures. All are regulated by New York state's Department of Financial Services, which requires measures d e s i g n e d to detect, prevent and respond to fraud and mark e t manipulation. There is nothing to compel an exchange to submit to regulations, however, and many don't. Moreover, it is possible to buy standardized tradingprogram software, meaning all the exchange operators have to do e s s e n t i a l l y is come up w i t h a name and logo. The result is that many new exchanges are plagued by "shoddy m a n a g e m e n t and shoddy systems," said David Fragale, co-founder of security-services firm Atonomi. A mature financial-services firm, Mr. Fragale said, would implement security controls and risk-management and compliance s y s t e m s . They w a n t to know w h o their customers are and w h a t kinds of high-risk activity is taking place on their platforms. On many smaller exchanges, that isn't happening, and retail investors are exposing their money to a kind of counterparty risk from the exchanges t h e m s e l v e s , said Jonathan Levin, chief executive of research firm Coinanlysis. "People don't know how to protect themselves." Many of the n e w e r exchanges-BitGrail launched in 2017-hurried to

La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

capitalize on an exploding market for smaller, speculative cryptocurrencies that large exchanges wouldn't handle, said Charles Hayter, CEO of research site CryptoCompare. Established exchanges that h o s t stock, options or futures trading face a variety of federal standards for fair access, cybersecurity and other areas of regulation. They also work closely w i t h heavily regulated banks or brokerage firms, w h i c h regularly reimburse customers w h e n a hack or technology problem leads to l o s s e s . BitGrail, run by Italian entrepreneur Francesco Firano, w a s operating w i t h o u t any significant regulatory oversight. It f o c u s e d on nano, a tiny cryptocurrency that began trading in 2015 under the name raiblocks. For m o s t of its history, raiblocks traded for p e n n i e s . Then, in December, it surged from around 20 cents to about $36. Mr. Firano didn't respond to requests for comment. Coincheck had applied with Japanese regulators for a cryptocurrency-exchange license. In r e c e n t w e e k s , Coincheck has said it plans to compensate its customers. A s p o k e s w o m a n for the exchange said this week that "we are finalizing h o w we can pay back money for affected customers." Customers don't have to put their money on an exchange w h e n investing in a cryptocurrency, the spokesw o m a n added. Indeed, w h e n organized cryptomarkets began appearing, it ostensibly added a layer of p r o t e c t i o n and an institutional element to the nascent market. One of the first such markets w a s Mt. Gox, w h i c h o p e n e d in 2010. Within a f e w years, it w a s handling around 70% of bitcoin transactions globally. The site had extremely weak security protocols, however. In 2014, it announced that 8 5 0 , 0 0 0 bitcoin had b e e n stolen, w o r t h $ 4 5 0 million at the time. The site later recovered 2 0 0 , 0 0 0 bitcoin, w h i c h today are w o r t h considerably more than they were in 2014. Creditors are still battling to recover their l o s t funds. -Takashi Mochizuki and Alexander Osipovich contributed to this article. Crypto Danger Investors have l o s t m o r e t h a n $ 7 0 0 million t h i s year i n hacks o f t w o m a j o r c r y p t o c u r r e n c y exchanges, Coincheck and BitGrail. Losses due to hacks on cryptocurrency plaforms $800 million Losses from select cyberattacks on cryptocurrency platforms

Foto: T h e Japanese pop group V i r t u a l Currency Girls p e r f o r m at a concert in Tokyo. T i c k e t s for t h e s h o w are paid for in cryptocurrencies.

La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

**THE WALL STREET JOURNAL.**

# Crypto Under Fire in Japan

BY STEVEN RUSSOLILLO A ND KOSAKU NARIOKA

Moves against several exchanges follow $530 million hacking at Coincheck Japan's financial regulator punished several cryptocurrency exchanges on Thursday, including suspending operations at t w o of t h e m f o r a month. CURRENCIES The new r e s t r i c t i o n s f o l l o w an apparent $530 million heist at one of its larger crypto platforms, Coincheck Inc. The Financial Services Agency said t w o of the country's smaller exchanges, FSHO and Bit Station, had been ordered to halt operations f o r a month due to a lack of proper procedures to protect customers' assets. The agency said the owner of Bit Station had improperly used customers' bitcoin f o r personal use. It also asked Coincheck to better protect clients, take anti-money-laundering measures and overhaul operations. The regulator said that seven cryptocurrency exchanges, including Coincheck, lacked proper internal controls and needed to submit plans to improve their operations by March 22. Coincheck said in a statement that it takes the measures seriously and aims to restore customers' trust. FSHO and Bit Station didn't immediately respond to requests f o r comment. The Japanese regulator's moves come as restrictions are tightening globally on cryptocurrencies, which gained more prominence last year following a surge in prices. But 2018 has been different, w i t h many countries around the w o r l d , including China, South Korea and the U.S., getting stricter in their regulatory e f f o r t s . Japan is typically considered a country with one of the loosest regulatory landscapes f o r crypto exchanges and investors. But the environment shifted after Coincheck said in January that it lost about $530 million in customer funds. Coincheck has said it plans to compensate its customers. Bitcoin recently traded at around $10,000, according to research site Coindesk. The price f e l l sharply on Wednesday after reports emerged that a bitcoin exchange in Hong Kong called Binance had problems executing orders. Binance said it halted withdrawals after what it called "a large scale phishing and stealing attempt" and said no funds were stolen. Hours b e f o r e the Binance news surfaced Wednesday, the U.S. Securities and Exchange Commission issued an investor alert about digital-currency exchanges. " T h e SEC does not r e v i e w the trading protocols used by these platforms, which determine h o w orders interact and execute, and access to a platform's trading services may not be the same f o r all users," the commission wrote. "Investors should not assume the trading protocols meet the standards of an SEC-registered national securities exchange." Hacking has been a problem f o r the cryptocurrency market in recent years, with major attacks taking place in just the past f e w months. A small Italian exchange, ==BitGrail==, was hacked in February, and thieves stole about $170 million of a little-known cryptocurrency called nano. Since 2014, exchange hacks have cost investors about $1.4 billion, according to an analysis by The Wall Street Journal. One of the most well-known hacks happened in 2014 in Japan, w h e n the exchange at Mt. Gox said that 850,000 bitcoin, worth about $450 million then, had been stolen.

Foto: Coincheck President Koichiro Wada at a news conference in Tokyo on Thursday.

La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

# Libero

## La sfera di cristallo è su internet
# Bankitalia ammette: non serviamo più

*Il vice direttore generale di Palazzo Koch, Fabio Panetta confessa: «Per valutare la fiducia dei depositanti e le loro attese sull'inflazione e Borsa analizziamo Twitter». Allora cosa fanno i 7mila addetti alla vigilanza tradizionale?*

**SERGIO LUCIANO**

■■■ Mica dormono, in via Nazionale! Sono vigili sull'innovazione, magari si perdono qualche puntata ma poi si mettono in pari. Al punto che - parola di Fabio Panetta, vice-direttore generale della Banca d'Italia - l'istituto che fu di emissione monitora i social media «e in particolare Twitter per calcolare le aspettative d'inflazione o per valutare la fiducia dei depositanti»!

Cioè, è chiaro? Il mondo si è accorto che Facebook è al soldo di chiunque voglia arraffare profili privati dei suoi utenti per tentare di coartarne le opinioni politiche e lo scandalo ha costretto Mark Zuckerberg, padrone del social media, a chiedere scusa; Francia, Germania, Commissione europea e Parlamento Ue preparano leggi per la prevenzione e la repressione delle "fake news" - insomma, le bufale - che inquinano i social media; e la Banca d'Italia che fa?

Lei, beata, monitora Twitter per valutare la fiducia dei depositanti. Emozione a Wall Street: chissà che domani il titolo dell'uccellino blu non recuperi un po' di quel 20% di quotazione che ha perso nelle ultime due settimane.

Del resto, sempre meglio essere monitorati dalla Banca d'Italia - almeno qualcuno che li prenda sul serio! - quando, come Twitter, si ha il proprio amministratore delegato e cofondatore Jack Dorsey che venti giorni fa ha pubblicato proprio sul suo social un enorme mea culpa: «Non siamo orgogliosi di come le persone hanno approfittato del nostro servizio», ha scritto, «o della nostra capacità di affron-



## I NUMERI IN ITALIA

| | | |
|---|---|---|
| **Popolazione totale** | **Utenti Intermet** | **Utenti attivi sui social media** |
| **59,33** milioni | **43,31** milioni | **34,00** milioni |
| **Urbanizzazione** 69% | **Penetrazione** 73% | **Penetrazione** 57% |

## PIATTAFORME SOCIAL MAGGIORMENTE ATTIVE
Attività dichiarata dagli utenti



| | |
|---|---|
| YOUTUBE | 62% |
| FACEBOOK | 60% |
| INSTAGRAM | 33% |
| GOOGLE+ | 29% |
| TWITTER | 23% |
| LINKEDIN | 18% |
| PINTEREST | 15% |
| TUMBLR | 8% |

P&G/L

tare il problema in tempi sufficientemente veloci». Nessuno è profeta in patria, avranno pensato i dipendenti di Twitter: se il nostro fondatore ci fustiga, consoliamoci con Panetta!

### SOCIETÀ QUOTATE

Ma c'è di più. Il banchiere ha aggiunto che la Banca d'Italia usa i social-media anche «per monitorare la fiducia dei consumatori verso determinate società quotate e i suoi effetti sulla volatilità e i volumi di scambi». E questo già si capisce meglio, perché la gente si confessa sui social, anche se magari più che altre per vomitare insulti o innalzare inni: diciamo che le opinioni pacate e le analisi lucide scarseggiano.

Quindi per carità: meglio

monitorare questa roba qui che le nomination del Grande Fratello. Oppure le quotazioni immobiliari: «Facciamo ricerche sui singoli annunci immobiliari online che servono ai ricercatori della Banca d'Italia», ha fatto sapere Panetta, «per capire la microstruttura del mercato immobiliare italiano».

E come dargli torto, visto che ormai l'80% delle transazioni immobiliari nascono dal web? Veramente ci sarebbe anche il catasto, le conservatorie notarili eccetera, ma sanno di vecchio e poi vuoi mettere la antica e condivisa truffa di non dichiarare mai nel rogito di compravendita il prezzo vero su cui pagare le tasse, con la nuova e più eccitante possibilità di sparare prezzi folli sul web, tanto poi si sa che nessuno ci crede? Pe-

raltro, c'è tanto da fare e da studiare - ma veramente - per le banche centrali sul web.

### CRIPTOVALUTE

Per esempio le famose criptovalute, quelle robe digitali che sostituiscono il denaro, nel senso che prendono quello vero dalle tasche dei gonzi e lo sostituiscono con quello finto. C'è una società a Firenze, Bitgrail, che ha bruciato 150 milioni di dollari investiti in una criptovaluta dell'Arizona chiamata "nano", un buco peggiore di Banca Etruria: una bella monitorata ci poteva pure stare, col senno di poi. Insomma, le tecnologie digitali, dopo aver spappolato il settore della musica, quello delle agenzie di viaggio, in buona parte quello dell'informazione, stanno per spappo-

lare anche le banche. Per ora sottraendogli il business dei pagamenti: buon per noi, che paghiamo meno commissioni sulle carte di credito, male per le banche, cui noi però continuiamo ad affidare i nostri soldi. Ora inizia l'attacco concentrico: prestiti digitali, factoring digitale, tutto in mano ad Amazon o Apple o Google & Co. Giusto che la Banca d'Italia (7mila dipendenti) se ne occupi: un po' per capire, un po' per difendere.

Non il passato ammuffito, ma i diritti della gente, che non ammuffiscono mai. E che sui social finora sono stati solo e sempre calpestati. Con buona pace dei trend-topic di Twitter, dove si descrive un mondo che spesso, e per fortuna, con quello reale c'ha poco a che fare.

© RIPRODUZIONE RISERVATA



La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

# Crypto Exchanges Pushed for Greater Clarity

BY PAUL VIGNA

New York Attorney General Eric Schneiderman is ramping up pressure on cryptocurrency exchanges to increase transparency in an industry that prizes anonymity and light regulation.

The attorney general office's on Tuesday sent a letter—part of an initiative by Mr. Schneiderman to bring clarity to these highly speculative and volatile markets—requesting information from 13 exchanges specializing in bitcoin and other cryptocurrencies, saying investors often don't have the basic facts needed to protect themselves.

Mr. Schneiderman's office said the program, called Virtual Markets Integrity Initiative, is part of its responsibility to protect consumers and ensure the integrity of financial markets, and its goal is to ensure that investors can have a better understanding of the risks and protections afforded them on these sites.

The letter and questionnaire were sent to companies including New York-based **Gemini Trust** Co. and **itBit Trust** Co., as well as **Coinbase**



Eric Schneiderman says investors often don't have the facts to protect themselves.

Inc.'s GDAX and **BitFlyer USA** Inc.

Transparency is "something we deeply believe in," said Charles Cascarilla, the CEO of itBit, which operates as a registered trust company. "It's the best way to make sure markets operate as they should."

"We look forward to cooperating with and submitting our responses to the questionnaire," Gemini said. The company, which also operates under a trust charter, said it already provides information about fees, trading requirements, and trading programs on its website. Coinbase and BitFlyer weren't immediately available for comment.

Cryptocurrencies such as bitcoin, ripple and ether exploded in popularity in 2017, driving an investment boom that pushed bitcoin up 1,375%. As investors poured into the sector, however, the exchanges themselves sometimes proved to be unreliable.

Service disruptions were common, and hacks and thefts also cost investors about $1.4 billion since 2014, according to a Wall Street Journal review of hacks.

The market has "captured the imagination of millions of people world-wide," according to a draft of Mr. Schneiderman's letter, but is also a "highly speculative sector, featuring significant volatility, instability, and risk."

The letter requests information on basic trading rules, fee structures, policies and safeguards to prevent conflicts of interest and fraud, protection of customer assets, and the use of automated programs, or "bots" on the exchanges. The letter acknowledges that some of the questions may have answers the exchanges already provide on their websites.

It asked for the exchanges to respond to its questionnaire in full by May 1. The attorney general's office plans to publish the information "in a publicly accessible format."

The attorney general isn't the first New York regulator to address the issue of transparency in cryptocurrencies. The state's Department of Financial Services began looking into regulation of cryptocurrency exchanges in 2014, an effort that culminated in a bitcoin-license program implemented by the state.

Despite that effort and others like it, many exchanges are still a high risk for investors. In February, an Italian exchange called BitGrail had about $170 million of a cryptocurrency called nano stolen in a hack. In January, hackers stole $530 million in assets from Japanese exchange Coincheck, though the company later compensated customers and this month was bought by internet brokerage Monex Group Inc.



La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato



New York's attorney general wants to publish data about exchanges in a publicly accessible format. Coinbase's office in San Francisco.

La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato


diffusione:241005
tiratura:352683

**COPERTINA** ○ CRIPTICHE VALUTE

# PROVE TECNICHE DI **BIT** GENERATION

ANDREY RUDAKOV/BLOOMBERG VIA GETTY

La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

**18** · IL VENERDÌ · 18 MAGGIO 2018

diffusione:241005
tiratura:352683

**il venerdì** *di Repubblica*

La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

COPERTINA ○ CRIPTICHE VALUTE

# BITCOIN GLOSSARIO PER L'USO

DISEGNI DI STEFANO SAVI SCARPONI



### CRIPTO VALUTE
I bitcoin sono una criptovaluta, cioè una moneta digitale che sta al di fuori dei circuiti delle banche centrali



### BLOCKCHAIN
È la tecnologia che sta alla base dei bitcoin e delle altre criptovalute. Si tratta di un registro decentralizzato, replicato su migliaia di computer, che tiene il censimento di ogni transazione

### MINING
I bitcoin si creano durante il processo di estrazione (*mining*), come ricompensa per la manutenzione del sistema. In buona sostanza chi si occupa del *mining* riceve in cambio una quota di bitcoin



### SUPER COMPUTER
Per il *mining* servono macchine dedicate, computer che notte e giorno eseguono gli algoritmi che certificano che le transazioni siano andate a buon fine



**P**ISA. Nell'autunno di quattro anni fa ho comprato dieci euro di bitcoin. All'Internet Festival di Pisa ospitavano uno dei primi bancomat dove cambiare soldi veri nella criptovaluta. L'idea era di monitorare l'andamento e scriverne per il giornale. Ma a lungo il prezzo non si mosse, e la calma piatta affossava la storia. Avanti rapido a metà dicembre 2017. Un bitcoin vale quasi 20 mila dollari e mi torna in mente il timido investimento di allora ormai lievitato a 400 euro. Se ne avessi comprati 100, adesso potrei acquistare una Vespa nuova. Se fossero stati mille, addirittura un garage a Roma. La storia finalmente c'era. Peccato che non ci fossero più i bitcoin. Nel senso che nella app del mio telefono il vecchio saldo di 0,0313 Btc era diventato 0. Eppure non li avevo spesi. Per sciogliere il mistero rintraccio Fausto Soriani, l'informatico a cui era venuta l'idea del bancomat originario. Mi fa: «Non è che hai cambiato il telefono, nel frattempo, e il *wallet*, il borsellino elettronico, si è resettato?». In effetti il mio vecchio iPhone l'ha ereditato mia madre. Quando ci vediamo a Natale recupero l'applicazione e riesco

**QUATTRO ANNI FA NE HO COMPRATI 10 EURO. FOSSERO STATI 100 OGGI VARREBBERO UNA MOTO**

a trasferire il peculio, nel frattempo sceso a 300 euro, dal vecchio al nuovo telefono nell'intervallo tra i mandarini e il panettone. Mia madre è sollevata, ma perplessa: «Pensa se i miei risparmi in banca, che mi fruttano zero interessi, fossero cresciuti a questi ritmi! Però se invece di darlo a me il telefono tu l'avessi buttato o perduto, avresti perduto anche tutti i soldi?». Ha ragione su entrambi i fronti. Da vedova di un bancario finanziariamente molto cauto, vorrebbe saperne di più. Chi le ha inventate, quelle monete? Dove si comprano? Da cosa dipende il prezzo?

Il testo che segue è lo spericolato tentativo di dare a lei, e a tutti quelli che si sono arresi di fronte alla spaventosa complessità della materia, risposte semplificate ma decenti. Se le userete solo per far bella figura in società, ora che l'Agenzia delle entrate ha disposto che i bitcoin vadano denunciati nella dichiarazione dei redditi, o anche per investire, è esclusivamente responsabilità vostra. Come scrivono su Twitter quelli che non vogliono grane *RT ≠ endorsement*, il fatto che ritwitti, che rilanci la notizia, non significa che la sottoscriva.

## ₿ IL NOSTRO VIRGILIO

Per trovare una via nella selva di tecnicismi ho bisogno di una guida paziente. Punto su Soriani, che mi ha già aiutato nel recupero delle credenziali. Merita un capitoletto a parte questo quarantenne che ha impiegato otto anni («Ho un percorso scolastico accidentato») per finire un liceo scientifico dalla cui stessa classe è uscito un ragazzo medaglia d'argento e di bronzo alle Olimpiadi internazionali della matematica, si è poi iscritto a Ingegneria informatica, che ha lasciato dopo neanche un anno (come Bill Gates e Mark Zuckerberg, *entre autres*) e poi ha seguito un paio di corsi regionali, quelli che nessuno prende sul serio, per diventare sistemista. E siccome era molto bravo l'università di Pisa l'ha assunto, ma ora ha preso un anno di aspettativa per dedicarsi alle sue creature. Quelle di cui siamo venuti a parlare: «A seconda di come andranno le cose in questi mesi deciderò se rientrare o mettermi in proprio e magari impegnarmi anche in progetti non profit».

Non dice quanti bitcoin possiede questo neopapà mite, capelli corti e barba appena brizzolata, un lobo trafitto da tre piercing testimoni di un'allergia al conformismo che oggi esprime nelle valute

18/05/2018
Pag. 18 N.1574 - 18 maggio 2018

Case 4:19-cv-00054-YGR   Document 93   Filed 01/17/20   Page 29 of 162

diffusione:241005
tiratura:352683

**il venerdì** di Repubblica

La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato



### BANCOMAT
Chi non fa *mining* può ottenere i bitcoin cambiandoli contro denaro reale in appositi bancomat o nei cambiavalute (*exchange*) online. Tra i più celebri, Coinbase, Kraken e Bitfinex

### WALLET
Le criptovalute si custodiscono in appositi borsellini (*wallet*) elettronici. Possono essere "caldi" (accessibili online) o "freddi" (chiavette Usb o dischi fissi non connessi a internet)

### SEED PHRASE
È una lista di dodici parole generate in modo del tutto casuale da un software. (ad es: mais matita casco legno mappa bici cactus cornice mouse giornale postino scotch). Servirà a dotarci di una password per mandare o per ricevere i bitcoin

### EXCHANGE
Nel 2009 i bitcoin valgono quasi niente. Nel 2010 il primo *exchange* li scambia a 0,003$. Sfondano le tre cifre nel 2013. A fine 2017 arrivano quasi a 20 mila dollari. Oggi 1 bitcoin vale oltre novemila dollari



ALL'INIZIO ERANO I BITCOIN. ORA ESISTONO OLTRE **1500 CRIPTOVALUTE**. SOPRA APP PER SAPERE QUANTO VALGONO, CUSTODIRLE E SPENDERLE

CHESNOT/GETTY IMAGES

digitali alternative. Ma avendo cominciato molto presto potrebbe essere una fortuna non trascurabile. Che può lievitare ulteriormente o precipitare, se l'anatema di Nouriel Roubini, tra i pochissimi economisti ad aver avvertito dell'arrivo della Grande recessione, si realizzerà: «I bitcoin sono una frode, arriveranno a zero!». Ma una cosa per volta.

## CHE COSA SONO

La genesi è già un film che non è stato ancora scritto per contumacia del protagonista. Succede infatti che nel 2008 Satoshi Nakamoto, uno nessuno o centomila programmatori di cui si ignora l'identità, fa circolare in una mailing list di esperti di crittografia un paper dal titolo *Bitcoin: A Peer-to-Peer Electronic Cash System*. L'idea è quella di una valuta digitale che non ha bisogno di alcuna autorità centralizzata, banca o altra istituzione governativa, per garantire che gli scambi avvengano regolarmente. Quel compito lo assolveranno, dal basso, i membri stessi della nuova rete.

Come su Napster o a BitTorrent, dove ci si scambiano film o musica da persona a persona, qui si scambia questo inedito denaro. A evitare che qualcuno faccia il furbo e provi a spendere la stessa somma più volte ci pensa un'infrastruttura informatica che si chiama *blockchain*. La sua caratteristica principale è di essere una banca dati distribuita su tanti computer la quale tiene traccia di ogni transazione. Immaginate, tagliando con l'accetta, un enorme registro contenuto in un file che diventa più pesante, come un documento di Word a cui aggiungi del testo, ad ogni nuova compravendita (oggi è sui 150 Gigabit, ovvero 150 volte i 44 volumi della *Enciclopedia Britannica*). Quel super file si trova fisicamente replicato su oltre 12000 *nodi*, ovvero computer, nel mondo. Ogni 10 minuti tutti i passaggi di bitcoin, per pagare una pizza come un con- ⏩

RICERCHE SPOT NON MODERATE - Rassegna Stampa 20/12/2019 - 20/12/2019

28

il venerdì di Repubblica

La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

**COPERTINA** ○ CRIPTICHE VALUTE

tainer di droga, avvenuti in quel lasso di tempo, vengono impacchettati per formare un *block*, un anello della catena che per essere valida deve essere continua, senza interruzioni. Detto altrimenti: ogni blocco è come un'automobilina, con una targa sul davanti e una sul dietro che devono corrispondere a quelle del blocco precedente e di quello successivo.

A certificare, attraverso complessi calcoli matematici, che tutto ciò avvenga senza alterazioni pensano i membri della comunità. Di cui Soriani fa parte.

### ₿ COME SI CREANO

Questa febbrile attività si chiama *mining*, estrazione, e la compiono in automatico dei software. L'allusione mineraria è piuttosto pertinente perché, proprio come nella corsa all'oro del Klondike, le ricompense si riducono col tempo e con l'arrivo di nuovi cercatori. All'inizio, nel lontano 2010 in cui il misterioso Nakamoto *minò* da solo circa un milione di bitcoin, la metà di quelli allora esistenti, chi si aggiudicava per primo, in una sorta di asta planetaria, la certificazione di un blocco, veniva retribuito dal sistema con 50 bitcoin. Una parcella che è già scesa a 12,5 bitcoin e continuerà a dimezzarsi man mano che ci avvicineremo al limite massimo di bitcoin in circolazione (21 milioni, contro i 17 attuali, la soglia pensata nelle specifiche originarie per evitare rischi di inflazione).

Il compenso, a scanso di equivoci, non va a una singola persona ma a una squadra di *miners*, anche varie migliaia, che mettono insieme la potenza di calcolo dei propri computer per poter eseguire le operazioni matematiche che individuano la *proof-of-work*, la firma numerica che invera tutta la sequenza.

### ₿ CHI LI CREA

Per l'attività di estrazione servono macchine speciali. Soriani me le mostra nel retrobottega del Computer Shop, il negozio di informatica che ospita anche il bancomat di bitcoin (Btc) in una zona industriale pisana allegra come il Nebraska e non totalmente asfaltata, dove quando piove si aprono crateri che fanno invidia a Roma. In una saletta piccola, accanto a una grossa stampante, ci sono l'Application specific integrated circuit (Asic) e il

suo alimentatore, due parallelepipedi di metallo grandi ognuno come una magnum di Champagne ma con nessuna preoccupazione per l'estetica. Potrebbero essere, soprattutto per la grossa ventola e il rumore che generano, componenti di frigoriferi o di qualche macchina utensile.

L'Asic lo produce la cinese Bitmain ed è un terminale senza schermo né tastiera in grado di fare solo una cosa: eseguire, notte e giorno, l'algoritmo in grado di *minare* i bitcoin. Soriani l'ha comprato online a ottobre per 1400 dollari, gliel'hanno spedito dopo tre mesi («Sono monopolisti, fanno quello che vogliono e nell'attesa lo usano loro») e quando l'ha ricevuto, nel pieno del boom, avrebbe potuto rivenderlo a quasi il triplo perché a quelle tariffe tutti volevano scavare. Ma già adesso la sua valutazione è andata giù e tra due-tre mesi calcola che il reddito prodotto non compenserà neppure l'elettricità consumata. Le vere idrovore elettriche si trovano però nella stanza accanto, regno dell'amico Mauro Fiore, che sta saldando dei chip su una scheda-madre facendo bene attenzione che i suoi dre-

**FAUSTO SORIANI «A SECONDA DI COME MI ANDRANNO LE COSE DECIDERÒ SE TORNARE IN UFFICIO»**

adlock non finiscano sullo stagno fuso. Lì accanto c'è la loro Ferrari, ovvero l'assemblaggio su un telaio di alluminio di dodici schede video Nvidia, da mille euro l'una, con una potenza di calcolo complessiva pari a 25 Xbox di ultima generazione, con la quale estraggono Ethereum, Litecoin o una qualsiasi delle altre 1565 criptovalute nate negli ultimi anni sull'onda del successo dei bitcoin. Anche qui la discrezionalità umana è minima. Fausto o Mauro guardano su un doppio schermo, che somiglia ai monitor di Borsa, quali blocchi di transazioni promettono una commissione più alta e puntano su quelle. Tutto il resto lo fa l'algoritmo, insieme a centinaia o migliaia di programmi uguali sparpagliati in altrettante macchine in tutto il mondo. Dice Soriani: «Nei giorni buoni possono produrre l'equivalente di un'ottantina di euro, da cui va tolta la bolletta della luce, che a 2,4 Kw al giorno equivale a 11 euro e cinquanta centesimi. E poi l'ammortamento del costo della macchina». Moltiplicate per trenta, e non viene fuori un capitale. A meno che quegli spiccioli di bitcoin crescano esponenzialmente.

### ₿ DOVE SI COMPRANO

Sebbene siti come Siacoin consentano un *mining* senza macchine dedicate (basta mettere a disposizione una parte del proprio disco fisso e la connessione a Internet, una sorta di Airbnb dei dati), i bitcoin e le altre criptovalute si possono anche comprare. Offline, in uno della decina di bancomat italiani, oppure online in uno dei tanti *exchange*, cambiavalute come CoinBase, Kraken o Bitfinex, per citare i più celebri. Tendenzialmente bastano un documento di identità e una carta di credito, oppure un bonifico, al netto di una piccola commissione che si aggira tra lo 0,1-0,2 per cento dell'importo. Purtroppo nel febbraio 2014 fu facilissimo farne uscire illegittimamente 850 mila (450 milioni di dollari al cambio di allora) da Mt. Gox, l'*exchange* giapponese che gestiva il 70 per cento delle transazioni globali. A quanto pare si trattò di un *inside job*: un dipendente con accesso alle credenziali spostò quella fortuna su suoi conti. Come



IL **PIONIERE** FAUSTO SORIANI, NEL NEGOZIO INFORMATICO DI PISA CHE OSPITA UNO DEI DIECI **BANCOMAT** ITALIANI DI BITCOIN. NELLA PAGINA ACCANTO BOOST VC, UN VENTURE CAPITAL CALIFORNIANO DOVE ACCETTANO CRIPTOVALUTE

RICCARDO STAGLIANO

diffusione:241005
tiratura:352683

# il venerdì di Repubblica



RAMIN TALAIE/CORBIS VIA GETTY IMAGES

La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

potrebbe fare un qualsiasi bancario infedele di Cavriago che dirotta su Cuba con la cassa, ma molto più agevolmente. «Con il paradosso che i 200 mila bitcoin ritrovati e congelati per l'indagine giudiziaria» nota Soriani, «si sono apprezzati enormemente (1,6 miliardi) facendo guadagnare, anche al netto delle restituzioni, i gestori».

Restano il danno di immagine e la lezione più generale. Per fare un bonifico da 450 milioni in banca ti devono identificare. In un conto online, oltre a username e password, ti serve almeno un pin. Mentre in un *exchange* se entri in possesso di una chiave privata hai tutto quel che serve per far sgattaiolare metà del Pil della Somalia. O l'equivalente di 200 milioni di dollari in Nano, un'altra criptomoneta, com'è successo tre mesi fa a BitGrail, un cambiavalute fiorentino.

### ₿ DOVE SI CONSERVANO

E allora capiamo meglio dove si custodiscono i bitcoin. Il contenitore delle vostre monete è il *wallet*, che viene detto "caldo" quando è accessibile online (più comodità, ma più rischi di attacchi hacker) o "freddo", quando si tratta di una chiavetta Usb o altro hardware non connesso alla rete (meno comodo, l'unico rischio è quello di perderlo). In verità, più che contenere il denaro, il portamonete è importante perché protegge le chiavi necessarie per spendere i bitcoin. E qui entriamo nel sottomondo più esoterico, quello della crittografia asimmetrica. La matrice della vostra password è la *seed phrase*, una lista di dodici parole generate in maniera casuale da un software. Tipo: «Mais matita casco legno mappa bici cactus cornice mouse giornale postino scotch». Potete memorizzarle, scriverle su un taccuino o mandarvele per posta: l'importante è non perderle o farsele copiare. A partire da queste 12 parole, il *wallet* produce una stringa di 64 caratteri che costituiscono la "chiave privata", quella che vi servirà per spendere/spedire i soldi. La chiave privata subisce poi un'ulteriore trasformazione diventando un'altra stringa di lettere e numeri che corrisponde al vostro indirizzo bitcoin, la chiave pubblica che potete dare in giro e che è indispensabile per ricevere denaro. Il motivo per cui potete condividerla è che non c'è modo per risalire dalla chiave pubblica a quella privata, così come non si ricostruisce la *seed phrase* a partire dalla privata, da qui l'asimmetria nella cifratura. (Ai puristi scandalizzati per la brutalità delle semplificazioni consiglio un bel respirone: il 90 per cento della popolazione non è tenuta a saper niente di tutto questo).

### ₿ NON È TUTTO ORO…

Intanto il drappello dei critici cresce. Non obiettano tanto l'imprinting criminale dell'essere stati moneta di scambio del *deep web.* Quanto di essere diventati un investimento tossico. Oltre a Roubini, per cui i bitcoin sono «una truffa», «la più grande bolla di tutti i tempi», la re-➡

Case 4:19-cv-00054-YGR   Document 93   Filed 01/17/20   Page 32 of 162

**COPERTINA ◯ CRIPTICHE VALUTE**

censione del re degli investitori Warren Buffett è «veleno per topi al quadrato». Tuttavia molte grandi banche, dopo una forte contraerea iniziale, sembrano arrendersi al vecchio adagio *if you can't beat them, buy them*, se non puoi batterli, comprali. Jp Morgan ha annunciato di volere aprire un desk di cambio, così come sta per fare Goldman Sachs. E hanno anche ammesso per la prima volta che i bitcoin costituiscono un «rischio» per il loro business, poiché consentono pagamenti senza l'intermediazione di istituti di credito. Una prospettiva che, in tempi di populismo rampante, accende grandi entusiasmi.

La Banca d'Italia, due mesi prima del grande rialzo di dicembre, aveva messo in guardia: «Non investite, troppe incertezze». Il suo direttore generale Salvatore Rossi, in un confronto pubblico col popolare divulgatore informatico Salvatore Aranzulla, ha negato loro anche il nome («Non sono criptovalute, perché non sono veri mezzi di pagamento né riserve di valore, ma *criptoasset*!»). Come in tutte le speculazioni, però, il verdetto dipende da quando entri e da quando esci. Anche Soriani, che è entrato prestissimo, distingue nettamente: «La maggior parte delle nuove denominazioni sono strumenti speculativi per chi ha perso il treno dei bitcoin. Hanno zero chance e spingono a un trading compulsivo peggiore della ludopatia di certi videopoker». Concordo. Io controllo occasionalmente il

saldo sulla mia app che oggi dice 230 euro, ovvero la metà di quanto valeva tre mesi fa. Ma anche venti volte quanto li avevo pagati nel 2014. Al solito la bellezza è nell'occhio di chi guarda.

Per chiudere il cerchio, decido di rientrare almeno dell'investimento iniziale. Vado su Kraken.com, cambio 0,0013 bitcoin in 10 euro e li trasferisco sul mio conto corrente. Funziona! Da virtuali questi soldi che non possiamo chiamare soldi ma piuttosto investimento sono diventati reali. Faccio anche leggere l'articolo a mia madre a cui resta più di un dubbio. Soprattutto su come i *minatori* riescano a garantire il funzionamento del sistema (ma di fronte all'insensata complicatezza di queste operazioni matematiche gli stessi protagonisti talvolta alzano le mani. E quanti di noi saprebbero spiegare come funzionano i derivati? *Credo quia absurdum*). Alla sua domanda «in pratica cosa ci posso comprare» risponderà, pur nel cospicuo *décalage* tra marketing e realtà, l'articolo successivo. Una certezza le resta: «Mi sembra una cosa troppo rischiosa: non li comprare!». La voce della saggezza. La nostra disavventura iniziale è finita comunque meglio che all'inglese James Howells che nel 2009, quando i bitcoin non valevano niente, ne aveva comprati 7500 ma la sua chiave privata è rimasta sepolta in un disco esterno finito sventuratamente in una discarica di Newport. Quattro milioni di sterline riposano in pace sotto tonnellate di rifiuti e guano. Il pisano Soriani, invece, si gode la Canossa degli amici che fino a un anno fa lo prendevano in giro per la sua fissazione e ora gli chiedono consigli su dove investire. Se avessero ragione ieri, o se l'abbiano oggi, è presto per dirlo.

**Riccardo Staglianò**

TRA I CRITICI DEI BITCOIN [1] L'INVESTITORE **WARREN BUFFETT** [2] L'ECONOMISTA **NOURIEL ROUBINI** [3] IL BANCHIERE **SALVATORE ROSSI** [4] IL CEO DI MICROSOFT **BILL GATES**



PIERRE TEYSSOT/AP/GETTY IMAGES

GETTY IMAGES (X 2)

IMAGOECONOMICA

UNA CAMERIERA DEL BAR "MANI AL CIELO" DI **ROVERETO** (TRENTO) MOSTRA COME PAGARE IN BITCOIN. ACCANTO FEDERICO MONTI, TITOLARE DI "BITCOIN COMPRO EURO", IL PRIMO **CAMBIAVALUTE** DELLA CITTADINA. SOTTO BITCOIN CARD, **PREPAGATE** IN BITCOIN DAL VALORE MASSIMO DI CENTO EURO



PIERRE TEYSSOT / AGF

**ALLA FINE MIA MADRE MI DIRÀ: «NON COMPRARLI, TROPPO RISCHIOSI»**

GETTY IMAGES



# la Repubblica

La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

**L'inchiesta**

## Dubbi sul furto di minibitcoin sequestrata la piattaforma

**FRANCA SELVATICI,** *pagina IV*

**L'inchiesta**

# Dubbi sul furto di minibitcoin sequestrata la piattaforma

## Bloccati i beni dell'amministratore di Bitgrail che denunciò la scomparsa di 120 milioni

**FRANCA SELVATICI**

Il 9 febbraio scorso il giovane tecnico informatico fiorentino Francesco Firano (32 anni) denunciò con un comunicato la sparizione di 17 milioni di nanovalute, per un controvalore di oltre 120 milioni di euro, dalla piattaforma exchange online Bitgrail.com da lui amministrata e utilizzata da 220 mila utenti. Un furto informatico clamoroso, dovuto – secondo Firano – a un attacco di hackers, che aveva provocato la scomparsa dell'80% dei Nano presenti nella piattaforma exchange. Dopo aver bloccato la piattaforma, Firano presentò denuncia alla polizia postale, senza riuscire però a convincere gli utenti che, pagando una commissione, la usavano per acquistare, depositare e scambiare criptovalute e che hanno perduto in alcuni casi enormi guadagni.

Il 26 aprile un cliente norvegese ha presentato istanza di fallimento della Bg Service, già BitGrail, la società che gestiva la piat-

In febbraio Firano fece denuncia alla polizia postale senza però riuscire a convincere gli utenti

taforma. Il 2 maggio, dopo aver letto l'annuncio che Bg Service intendeva riaprirla, il cliente ha chiesto al tribunale fallimentare di mantenerla bloccata e di disporre d'urgenza il sequestro del patrimonio della Bg Service. Richiesta immediatamente accolta dal tribunale fallimentare che lo stesso 2 maggio ha nominato un curatore e un custode del patrimonio della società. Nei giorni

successivi altri clienti hanno aderito alla richiesta di fallimento e nel procedimento è intervenuta anche la procura della Repubblica con i sostituti Sandro Cutrignelli e Fabio Di Vizio, che indagano con la polizia postale sulla scomparsa dei 17 milioni di nanovalute e che hanno chiesto, a tutela dei creditori, anche il fallimento della Web Coin, la società con la quale Francesco Firano aveva iniziato la sua avventura nella finanza online.

Nell'udienza del 16 maggio i giudici fallimentari hanno ascoltato le ragioni della Bg Service, che esclude di essere un'impresa commerciale fallibile e nega di essere debitrice dei clienti perché la piattaforma exchange si limiterebbe a consentire lo scambio delle valute virtuali, che restano nella proprietà degli utenti e possono essere negoziate e ritirate soltanto da loro. Bg Service ribadisce di essere rimasta vittima di un furto, evento imprevedibile e inevitabile. Argomenti che non hanno convinto i giudici fallimentari. Per loro Bg Service è un'impresa commerciale con un indebitamento superiore ai 500 mila euro e quindi fallibile. E' pacificamente insolvente perché non è in grado di restituire i Nano rubati per un controvalore di 120 milioni di euro. E non ha fornito la prova di aver adottato tutte le misure in grado di prevenire atti di furto informatico. Se la piattaforma venisse riaperta – affermano i giudici - il patrimonio della società potrebbe essere nuovamente depauperato, forse anche ad opera dello stesso amministratore Francesco Firano, che in febbraio, pochi giorni prima del drammatico comunicato sul furto dei 17 milioni di Nano dalla piattaforma Bit-

Grail.com, risulterebbe aver depositato su un suo conto un milione e 700 mila euro in Bitcoin. Per questo motivo il tribunale fallimentare ha confermato il blocco della piattaforma e il sequestro del patrimonio della Bg Service che la gestiva e ha anche disposto in via d'urgenza il sequestro delle

disponibilità finanziarie e in moneta virtuale di Firano, fino al controvalore di 120 milioni di euro. Proseguono intanto le indagini sulla scomparsa delle nanovalute, per risalire agli autori del colossale furto.

**Firano sostiene di aver subito un furto sulla sua piattaforma**



diffusione:175237
tiratura:274745

# la Repubblica



BLOOMBERG/BLOOMBERG VIA GETTY IMAGES

La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

# la Repubblica

La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

## L'inchiesta

# Sequestrati i beni finanziari e virtuali del creatore di Bitgrail.com

**A Firano sono stati congelati 120 milioni, pari all'ammanco di nanovalute. Il tribunale gli versa l'affitto e gli passa 500 euro al mese**

**FRANCA SELVATICI**

«Sono stato io a denunciare la scomparsa di 17 milioni di nanovalute», ripete Francesco Firano, il giovane tecnico informatico fiorentino che nel 2017 aveva creato la piattaforma exchange online Bitgrail.com, arrivata a contare 220 mila utenti che su di essa acquistavano, depositavano e scambiavano criptovalute. «Ho prestato ampia collaborazione agli investigatori», si difende, dichiarandosi parte lesa del colossale ammanco, pari all'80% delle nanovalute presenti nella piattaforma, per un valore di 120 milioni di euro. Non gli credono i clienti che hanno presentato istanza di fallimento e non gli crede, almeno per ora, il tribunale fallimentare, che non solo ha bloccato la piattaforma Bitgrail e disposto il sequestro del patrimonio della società Big Service che la gestiva, ma ha anche confermato il sequestro delle disponibilità finanziarie e di quelle in moneta virtuale di Firano, fino al controvalore di 120 milioni di euro. Ora è tutto in mano a un custode, autorizzato dal tribunale a pagargli l'affitto e a prelevare per lui ogni mese dal suo conto presso la Cassa di risparmio di Firenze la somma di 500 euro «individuata come sufficiente per le correnti spese di vita».

Nel frattempo prosegue l'indagine dei pm Sandro Cutrignelli e Fabio Di Vizio e della polizia postale sulla scomparsa dei Nano,

dovuta secondo Firano a un attacco di hackers. È la prima inchiesta in Europa sulle insidie del mercato delle criptovalute. Il giovane tecnico informatico sostiene di essere il semplice depositario delle valute virtuali, che restano di proprietà dei clienti, gli unici che possono negoziarle e ritirarle. Il furto — a suo dire — è stato un evento imprevedibile e inevitabile, e dunque da parte sua non vi è alcun obbligo di restituire la valuta agli utenti né di risarcirli. Il tribunale fallimentare obietta che il codice civile libera il depositario dall'obbligo di restituire i beni rubati solo nel caso in cui dimostri che il furto non è ad esso imputabile, e che non vi è stata negligenza, né dolo, né frode. Inoltre il depositario deve avvisare immediatamente il depositante della perdita dei beni. Firano li ha avvisati il 9 febbraio scorso: ma secondo la polizia postale le nanovalute si sarebbero volatilizzate fra il 20 e il 23 ottobre 2017.

©RIPRODUZIONE RISERVATA



Nella piattaforma online si acquistavano, depositavano e scambiavano criptovalute



diffusione:175237
tiratura:274745

# la Repubblica

La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

**Criptovalute**

# Gli hacker sgonfiano la bolla bitcoin

Ondata di vendite dopo l'attacco informatico a una piccola piattaforma di scambi. Valori dimezzati da inizio anno

*Sulla crisi pesa il fatto che la criptovaluta non ha avuto una diffusione di massa*

*Un terzo del valore è in mano a 1.600 persone, e solo mille sono investitori a lungo termine*

**LUCA PAGNI,** MILANO

È come la farfalla che in Cina, sbattendo le ali, provoca un maremoto da qualche altra parte nel mondo. Allo stesso modo, nel fine settimana un furto commesso da ignoti hacker ai danni di Coinrail, una piccola piattaforma per lo scambio delle monete virtuali in Corea del Sud, ha provocato uno sconquasso sul mercato dei bitcoin. E non da poco: le quotazioni sono crollate del 12 per cento già domenica sui vari siti di scambio delle criptovalute, con un dato poi confermato alla riapertura della Borsa di Chicago, dove sono quotati i derivati sul bitcoin.

Il dato di rilievo è la rottura della quota settemila dollari, che non è solo una soglia piscologica: da ieri il bitcoin – che nonostante il proliferare di cloni rimane la moneta virtuale sempre più diffusa al mondo – vale attorno a 6.700 dollari, bruciando così 46 miliardi di dollari degli investitori. Statisticamente, si tratta del prezzo più basso degli ultimi due mesi, visto che era sceso sotto questo livello già a marzo, per poi recuperare fino a 10mila dollari. Ma ciò che conta è la tendenza: siamo lontani anni luce dalle quotazioni raggiunte nel dicembre scorso, quando il bitcoin era in piena bolla. E, in ogni caso, da inizio anno, ha perso il 50 per cento del suo valore. Un calo che ha riguardato tutte le monete virtuali. Per dare il dettaglio: ai massimi di fine 2017, in giro per il globo c'erano criptovalute per 830 miliardi di dollari, ora siamo scesi a poco meno di 300 miliardi.

Ma per quali motivo il furto ai danni di un operatore nemmeno di primo piano ha fatto crollare il mercato? La risposta non è tanto legata al danno economico in sè (Coinrail è in fondo alla classifica delle prime 100 piattaforme per valore movimentato), ma al danno di immagine che colpisce al cuore la tecnologia alla base del bitcoin, che viene sempre raccontata come difficilmente attaccabile dagli hacker. È vero che finora i "ladri" informatici se la sono presa con le piattaforme più piccole e che si ipotizza meno difese da intrusioni informatiche: ieri è accaduto a Coinrail, nei mesi scorsi al giapponese Coincheck e a febbraio a un piccolo operatore italiano denominato BitGrail. Ma tanti piccoli mattoncini stanno costruendo un muro: secondo un calcolo del Wall Street Journal, dal 2014 le violazioni informatiche ai danni degli exchange sono costate agli investitori almeno 1,4 miliardi di dollari. Oltre a una perdita costante di fiducia.

Ma non è solo questo il motivo per cui bitcoin e i suoi fratelli minori stanno perdendo in popolarità e valore economico. La moneta virtuale è ancora poco usata, non ha avuto quella diffusione di massa che i suoi sostenitori si aspettavano, in modo che fosse slegata dai pericoli dell'inflazione. Anche in questo caso parlano i dati: secondo uno studio di Chainanalysis, società di consulenza specializzata nell'analizzare i fenomeni legati al riciclaggio e ai reati commessi attraverso le criptomonete, anche

la "ricchezza" creata dalle monete virtuali – così come avviene per le banconote emesse dagli stati sovrani – è circoscritta in poche mani. Lo studio ha rivelato come un terzo del valore dei bitcoin in circolazione

sia in mano a 1.600 persone, di cui mille persone che hanno un'ottica di investimento di lungo periodo e gli altri 600 sono speculatori a breve periodo. Percentuali che scendono ulteriormente quando si parla

delle altre criptovalute, visto che il bitcoin rimane non solo la moneta virtuale più diffusa, ma anche la più liquida. Anche se per il momento non è bastato a decretarne il successo.



12/06/2018
Pag. 35

Case 4:19-cv-00054-YGR    Document 93    Filed 01/17/20    Page 37 of 162

**la Repubblica**

diffusione:175237
tiratura:274745

## Titolo



Monete virtuali, la capitalizzazione

Fonte: CoinMarketCap

La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

# Thefts of Cryptocurrencies Mount

**BY STEVEN RUSSOLILLO
AND EUN-YOUNG JEONG**

Executives at **Bithumb**, a popular cryptocurrency exchange in South Korea, sensed something awry last month.

After a rival was hacked earlier in June, Bithumb experienced a rise in failed user logins and unauthorized access attempts, according to an exchange official. Bithumb added more online security personnel to conduct extensive checks and moved more of its digital-currency reserves into offline storage.

It wasn't enough. On June 19, Seoul-based Bithumb said it lost over $30 million in bitcoin and other cryptocurrencies in a cyberattack. It has since recovered some, lowering its loss estimate to $17 million.

Since 2011, there have been 56 cyberattacks directed at cryptocurrency exchanges, initial coin offerings and other digital-currency platforms around the world, according to an analysis by Autonomous Research, a London-based financial-services research firm, bringing the total of hacking-related losses to $1.63 billion. Some of the biggest hacks occurred at Japanese exchanges **Mt. Gox** in 2014 and **Coincheck** Inc. this past January. The most recent hack took place on July 9, when hackers swiped $23.5 million in cryptocurrencies from an Israeli platform called **Bancor**.

The increasing frequency of hacks points to the vulnerabilities of cryptocurrencies and the platforms people use to trade them, adding to broader investor worries about fraud and lax regulation.

Many attacks have centered on Asia, a hotbed for cryptocurrency trading. Four of the seven hacks so far this year have been in the region, with over $800 million in cryptocurrencies stolen—already more than any other calendar year. Cyberthieves could be targeting more popular trading venues, a potential risk for investors in the U.S. and elsewhere.

Unlike stock exchanges, which facilitate trading but don't actually hold securities on behalf of investors, many cryptocurrency exchanges charge fees for trading and store currencies for their customers. Analysts say that makes cryptocurrency ex-

*Please turn to page B2*

## Crypto Thefts Mount

*Continued from the prior page*
changes sitting ducks. Thieves who manage to break in can do something akin to robbing a bank—getting hold of valuable cryptocurrencies that they can cash out of.

Cryptocurrency exchanges are "easy to breach, with minimum effort and expense from attackers and with maximum return on investment," said Robert Statica, president of BLAKFX, a cybersecurity firm in New York.

Recent cyberattacks have hurt market sentiment. After a steep slide this year, bitcoin dropped further after the Bithumb incident in June. Currently sitting at around $6,300, bitcoin trades near its low for the year and well off its record near $20,000 established in December.

The hacks are "bad for users, bad for exchanges and terrible for confidence," said John Sedunov, an assistant professor of finance at Villanova University. "If I don't have confidence in where I'm storing my crypto assets or where I'm investing, how can I really trust any of this?"

Not all investors are ruffled by the hacks. Lee Gui-im, a retiree in Seoul, hasn't been able to access her cryptocurrency assets for a month after **Coinrail**, the other South Korean exchange breached last month, temporarily shut all services. That hasn't discouraged the 61-year-old from continuing to attend meetups to identify her next cryptocurrency investment.

"Every exchange is in danger of hacks. This isn't just Coinrail's problem," said Ms. Lee as she was leaving a block-

chain company info session this past week. "I haven't lost faith in [crypto] coins—just exchanges."

There are 205 cryptocurrency exchanges in operation, many of which are based in Asia, according to research firm CoinMarketCap.

Chainalysis, a New York-based blockchain-analytics firm, said South Korea has been a ripe area for hackers because of the market's rapid growth in a short amount of time. The South Korean won is one of the most commonly used fiat currencies for trading cryptocurrencies.

"There simply are many targets there," said Kim Grauer, senior economist at Chainalysis, adding that "some exchanges have not been able to maintain the proper level of defense as they have grown."

Regulatory gaps in South Korea also make it less compelling for exchanges to step up security efforts, said Stacy Scott, managing director at cybersecurity and investigations firm Kroll.

A government inspection of 21 cryptocurrency exchanges in South Korea earlier this year found that no firm met all 85 inspection standards established by authorities, but there is no law to penalize exchanges that fall short.

Bithumb said in late June it is working with other exchanges around the world to track down and recover stolen digital coins that may have been moved to other trading venues. Coinrail planned to resume services on Sunday after a monthlong operating hiatus. The exchange said it has so far recovered three types of virtual currencies that were stolen, but hasn't disclosed how much it lost. An earlier Wall Street Journal article estimated that $40 million in digital coins was taken.

La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato





## A number of recent hacking incidents highlight the vulnerabilities of virtual-currency platforms.

More than

# $1.6 billion

has been lost from cyberattacks on cryptocurrencies*

| Exchange/ platform | Origin | Date of hack | Value of coin loss, in millions | |
|---|---|---|---|---|
| Coincheck | Japan | Jan. 2018 | | $535 |
| Mt. Gox | Japan | Jan. 2014 | | 450 |
| BitGrail | Italy | Feb. 2018 | | 170 |
| Bitfinex | Hong Kong | Aug. 2016 | | 77 |
| NiceHash | Slovenia | Dec. 2017 | | 70 |
| DAO | Germany | April 2016 | | 55 |
| Coinrail | S. Korea | June 2018 | | 40 |
| Youbit | S. Korea | April 2017 | | 35 |
| Parity | U.K. | July 2017 | | 32 |
| Bithumb | S. Korea | June 2018 | | 32 |
| Bancor | Israel | July 2018 | | 24 |

*From exchanges, initial coin offerings and other digital currency platforms

Sources: CoinDesk (bitcoin price); Autonomous Research (attacks); the companies (countries)

$471
2014

Losses from cyberattacks on cryptocurrency exchanges and platforms each year, in millions of dollars

$225
2016

$185
2017

$830
2018 YTD

$20,000
15,000
10,000
5,000

$8
2015

How many U.S. dollars one bitcoin buys

2014   '17   '18



**The frequency of hacks points to cryptocurrencies' vulnerabilities**

JEAN CHUNG/BLOOMBERG NEWS

La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

# la Repubblica

La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

### L'indagine

# Trading online boom di truffe i falsi investitori fanno affari d'oro

### Di che cosa stiamo parlando

Si moltiplicano anche in Toscana le denunce per truffe nel trading online. Il più delle volte le vittime vengono agganciate per telefono, con la proposta di facili guadagni grazie a investimenti in valute estere o in criptovalute. Il raggiro sulla rete sta diventando una nuova forma di crimine e la polizia postale è impegnata su questo fronte.

## La polizia postale sta esaminando una serie di casi-fotocopia che dall'inizio dell'anno hanno rastrellato soldi

**LUCA SERRANÒ**

I truffatori hanno fiutato l'affare in tempo reale. Un raggiro semplice ma efficace, per sfruttare il boom del trading online e il miraggio dei soldi facili suscitato tra gli investitori più ingenui e impreparati. «Lanciano la rete nel mucchio, tanto qualcuno che cade nel tranello c'è sempre», commenta un investigatore di lungo corso.

Aumentano in modo esponenziale le truffe nel trading on line, con una raffica di denunce presentate dall'inizio dell'anno. Gli uomini della polizia postale della Toscana sono al lavoro su una lunga serie di casi–fotocopia, che in tutto hanno provocato ammanchi per centinaia di migliaia di euro. Il più delle volte le vittime sono state adescate per telefono da un operatore sconosciuto, con tutta probabilità dall'estero, che ha proposto di investire cifre consistenti sul mercato delle valute estere o in criptovalute, con la promessa di interessi tra il 30 e il 40% o anche superiori: in alcune occasioni i truffatori si sono fatti avanti anche con l'offerta di un bonus, ricalcando lo schema proposto nei siti per le scommesse sportive. Sempre uguale l'epilogo. Invitati a consultare l'andamento delle valute su un sito – in realtà solo un demo-, gli investitori hanno visto sparire i soldi da un momento all'altro, a causa di un "improvviso crollo del mercato". Inutili le proteste o i tentativi di rintracciare i responsabili. «È importante non improvvisarsi e rivolgersi sempre a persone fidate, che operano da tempo nel settore – spiega ancora un investigatore – Spesso poi bastano pochi accorgimenti, come controllare i paesi verso cui si eseguono i bonifici».

Dai dati raccolti dalla polizia postale, in Toscana sono diverse decine le persone raggirate in questo modo dall'inizio dell'anno, alcune per poche centinaia di euro e la maggior parte per cifre ingenti, tra i venti e i trentamila euro. Tra le vittime anche alcuni investitori alle prese con pesanti difficoltà economiche, che hanno accolto la proposta di trading come una occasione di possibile riscatto, salvo poi ritrovarsi beffati. Proprio la gravità dei fatti contestati spinge gli investigatori a non trascurare alcuno spun-

### I punti

#### Il primo aggancio è telefonico poi spunta anche il falso sito

**1** Il raggiro si costruisce in rete: ". "Lanciano la rete nel mucchio, tanto qualcuno che cade nel tranello c'è sempre", commenta un investigatore di lungo corso.

**2** Il più delle volte le vittime sono adescate per telefono da un operatore sconosciuto, con tutta probabilità dall'estero, che propone di investire sul mercato delle valute estere o in criptovalute

**3** Gli investitori sono invitati a consultare l'andamento delle valute su un sito, che in realtà è solo una demo

to d'indagine. Gli accertamenti sono ancora in corso e procedono nel massimo riserbo, nel difficile tentativo di trovare una traccia del denaro e dare un nome e un volto ai malviventi. Intanto, la Polposta prosegue l'inchiesta sul clamoroso furto di 17 milioni di nanovalute – per un controvalore di oltre 120 milioni di euro – dalla piattaforma exchange online Bitgrail.com, denunciato il 9 febbraio scorso dall'amministratore, il tecnico informatico fiorentino Francesco Firano. Poco più di un mese fa il tribunale fallimentare ha confermato il blocco della piattaforma e il sequestro del patrimonio della Bg Service che la gestiva, e ha anche disposto in via d'urgenza il sequestro delle disponibilità finanziarie e in moneta virtuale di Firano, fino al controvalore di 120 milioni di euro.

©RIPRODUZIONE RISERVATA



Case 4:19-cv-00054-YGR   Document 93   Filed 01/17/20   Page 41 of 162

# la Repubblica

diffusione:153773
tiratura:235596



La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

## La procura della Repubblica di Firenze ha chiesto ...

La procura della Repubblica di Firenze ha chiesto il fallimento per <mark>Bitgrail</mark>, piattaforma italiana di scambio di criptovalute che nel febbraio del 2018 ha denunciato il furto di 17 milioni di nano - valuta digitale nata negli Usa -, per un valore di circa 160 milioni euro. Chiesto il fallimento anche del gestore della piattaforma, come ditta individuale. Ieri mattina si sono tenute le prime udienze di entrambi i procedimenti davanti al tribunale fallimentare di Firenze. Sul furto di criptovaluta subito dalla piattaforma di exchange lo scorso febbraio la procura fiorentina ha aperto anche un'inchiesta penale ancora in corso, coordinata dal pm Sandro Cutrignelli e condotta dalla polizia postale.

**24 ORE**

# Fallisce la piattaforma italiana per le criptovalute

## CRIPTOVALUTE

### L'exchange Bitgrail denunciava un anno fa un ammanco da 150 milioni

**Stefano Capaccioli**
**Pierangelo Soldavini**

Si arricchisce di una nuova puntata la telenovela di Bitgrail, l'exchange italiano per criptovalute che un anno fa venne proiettato alla ribalta delle cronache mondiali del criptomondo per un ammanco di circa 150 milioni di dollari. Per quella che allora era l'unica piattaforma di exchange presente in Italia si è aperta la via del fallimento con una doppia sentenza del Tribunale di Firenze, che trasforma Bitgrail in una sorta di MtGox italiano.

Il giapponese MtGox era il maggior exchange globale che sospese le attività nel 2014 dopo il presunto furto di bitcoin per un controvalore pari a circa 450 milioni di dollari. Lo stesso è successo un anno fa a Bitgrail, piattaforma che non permetteva la conversione in valuta a corso legale se non passando attraverso una specifica criptovaluta, il Nano. Iniziata come ditta individuale, poi è passata in gestione a una srl nel gennaio 2018. Un mese dopo la società ha denunciato ammanchi per 17 milioni di Nano, per poi cessare la propria attività, anche a seguito della tempestiva richiesta di sequestro di criptovaluta da parte della Procura della Repubblica di Firenze, ottenuta dal Tribunale fallimentare. Agli atti sono stati sequestrati alla società circa 2.345 bitcoin e 4 milioni di Nano per circa 36 milioni di euro e all'amministratore Francesco Firano circa 170 bitcoin e oltre 500.000 euro.

Il Tribunale fallimentare ha disposto una consulenza tecnica (Ctu) da cui emerge, contrariamente a quanto dichiarato da Firano, che gli ammanchi erano iniziati nel maggio 2017.

Firano ha sempre sostenuto che l'ammanco era attribuibile a un problema del software che aveva permesso la sottrazione dei fondi, scoperto nel febbraio 2018. La Polizia Postale ha ricostruito i movimenti della piattaforma, indicando i profitti della stessa tra il novembre 2017 e il gennaio 2018 di quasi 2 milioni di euro, di cui i tre quarti per le commissioni sugli scambi e il rimanente per i prelievi effettua-ti. Quello che è successo è che la piattaforma non ha saputo gestire le richieste reiterate della stessa operazione, permettendo multipli prelievi degli utenti e provocando conseguentemente l'ammanco, dato che le criptovalute venivano spostate in un unico wallet sotto il controllo del fallito, rendendole indistinguibili da quelle appartenute ai singoli utenti.

Queste tipologie hanno portato il Tribunale a inquadrare il rapporto tra l'utente e la piattaforma quale deposito irregolare, con debito della società e della ditta individuale, entrambe soggette a fallimento, nei confronti degli utenti. La Corte ha spiegato che, anche qualora la qualificazione fosse quella del deposito regolare, vi sarebbe comunque responsabilità essendo la perdita avvenuta per fatto imputabile al debitore e, in ogni caso, essendo mancata la tempestiva denuncia al depositante. Nella migliore delle ipotesi, insomma, si tratta di negligenza, nella peggiore si tratta di una vera e propria truffa. A stabilirlo sarà il giudice.

Nel frattempo la procedura fallimentare si trova a dover fare i conti con tutte le difficoltà legate alla composizione tra le norme della procedura fallimentare e la natura della criptovaluta, anche perché traspare che la piattaforma non eseguiva alcun genere di controllo in merito alla identità del registrante, né teneva alcuna traccia degli indirizzi Ip utilizzati in fase di registrazione o per le operazioni, generando incertezze sulla dimostrazione della qualità di creditore.

© RIPRODUZIONE RISERVATA



La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

## Le tappe

### L'ammanco

Nel febbraio del 2018, Firano denuncia che la piattaforma «Nano» è stata bucata e comunica la sparizione di 17 milioni di Nano, pari all'80% dei depositi appartenenti agli utenti C'è chi aveva un 'wallet' di un valore di quasi cinque milioni di euro



# la Repubblica

Il caso

## Dichiarato il fallimento di Webcoin e Bitgrail

Nell'inchiesta sulla sparizione di 17 milioni di nanovalute, per un controvalore di oltre 120 milioni di euro, denunciata il 9 febbraio 2018 dal tecnico informatico fiorentino Francesco Firano arriva un primo punto fermo. Il Tribunale fallimentare di Firenze ha dichiarato fallite la Webcoin e la Bitgrail, società di Firano che si sono succedute nella gestione di Bitrgrail.com, una piattaforma exchange on line con sede a Signa che, tra i vari servizi offerti, permetteva l'acquisto, lo scambio e il deposito di diverse tipologie di criptovalute, le monete di Internet ed era utilizzata da 220 mila utenti. Il fallimento delle società era stato chiesto da un cliente norvegese, a cui poi si sono aggiunti altri clienti e la procura con i pm Fabio Di Vizio e Sandro Cutrignelli titolari dell'inchiesta penale sul maxi furto che aveva provocato la scomparsa dell'80 per cento dei Nano presenti nella piattaforma. Dopo averla bloccata Firano presentò una denuncia alla polizia postale, senza riuscire però a convincere gli utenti e, per ora, il tribunale fallimentare. **– g.a.**

La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato



QUELA NAZIONE



La valuta era solo virtuale, ma il crac della Bitgrail, per il tribunale, è stato reale

**IL CASO «BITGRAIL»** PARLA IL TITOLARE DELLA PIATTAFORMA FALLITA

# «Sono anch'io vittima di un maxi furto»

«NON SONO A CONOSCENZA dell'esistenza di alcun fascicolo nei miei confronti. Sono stato io a far denuncia per il furto dei bitcoin. E tutti gli elementi agli atti dell'indagine sono stato sempre io a fornirli».

Francesco Firano, cervellone del web e fondatore della società «Bitgrail» con sede a Signa, recentemente dichiarata fallita dal tribunale di Firenze dopo un ammanco di criptovalute per un valore pari a 170 milioni di euro, respinge qualsiasi sospetto.

E «CORREGGE» anche alcuni comportamenti che gli sarebbero stati addebitati. «Non è vero che abbia cercato di prelevare a febbraio: ho cercato di farlo a maggio, dopo il furto. A febbraio invece ho cercato di vendere alcuni bitcoin perché

tra il 4 e il 5 febbraio il loro valore stava crollando».

Il fascicolo aperto dai pm Fabio Di Vizio e Sandro Cutrignelli, cerca di far luce su quell'ammanco che ha inevitabilmente condotto, causa «illiquidità» al crac dell'azienda di Firano, la Webcoin/Bit-

## L'AMMANCO
**Un anno fa sparì dal portafoglio del sito di stock exchange «Nano» per 120 milioni di euro**

grail.

Nella denuncia presentata dalla stesso titolare della piattaforma *stock exchange* si ipotizza che qualcuno si sia insinuato in una falla del sistema di sviluppo dei «Na-

no», una criptomoneta il cui valore, dagli 0,01 dollari iniziali in pochi mesi era balzato niente meno che a 36 dollari. Al momento dell'ammanco dal portafoglio Bitgrail, un Nano valeva 5,85 euro: i 17 milioni di euro spariti dalla piattaforma (pari all'80% dei depositi), in quel momento, equivalevano a circa 120 milioni di euro.

MA DAVVERO c'è stato un «buco» nel sistema «Nano»? E' quello che sta cercando di capire la procura con un'indagine affidata alla polizia postale. La procura ha chiesto e ottenuto il fallimento Bitgrail, accodandosi all'istanza di alcuni utenti che nell'ammanco denunciato un anno fa hanno perso un ingente valore di criptovaluta.

ste.bro.



La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

RICERCHE SPOT NON MODERATE - Rassegna Stampa 20/12/2019 - 20/12/2019

**ItaliaOggi** Sette

La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

# *BonelliErede assiste 3mila utenti contro la piattaforma exchange BitGrail*

Una delle prime «azioni collettive» in Italia legate al complesso mondo delle criptovalute l'ha seguita *BonelliErede*. Lo studio ha assistito oltre 3mila utenti danneggiati dall'ammanco di 17 milioni della criptovaluta Nano (XRB), pari a circa 120 milioni di euro, a opera di BitGrail, gestore della piattaforma italiana operante in qualità di *exchange* nel mercato delle criptovalute. Il Tribunale di Firenze ha dichiarato il fallimento di BitGrail, e la decisione ha fatto seguito a un provvedimento del 2 maggio 2018, con cui lo stesso Tribunale aveva ordinato l'inibitoria dell'operatività di BitGrail, il sequestro dei



**Monica Iacoviello**

beni della società e la nomina di un curatore speciale, all'esito di un procedimento cautelare promosso da alcuni utenti della piattaforma assistiti da BonelliErede, in seguito alla scoperta di un ammanco di 17 milioni della criptovaluta Nano. BonelliErede ha assistito oltre 3mila utenti danneggiati dall'ammanco, coordinati dal signor Espen Enger, con un team multidisciplinare composto dall'of counsel **Giuseppe Sbisà**, dal socio **Monica Iacoviello** e dal senior associate **Alessandra Frigerio**. Al fianco degli utenti ha agito anche l'avvocato **Nicola Pabis Ticci** dello studio *Bigliardi Pabis Ticci & Associati* del Foro di Firenze.



La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

**Caso pilota.** A Firenze per la decisione sul crack «Nano» i giudici riconoscono lo status di beni alle criptovalute

# Valuta virtuale al test del cripto-fallimento

di **Stefano Elli**

È come se a regolare il traffico delle astronavi di Star Trek ci fossero le norme per la circolazione delle carrozze a cavallo. Iperbole ardita, ma non tanto distante dal reale per quanto riguarda il mondo delle criptovalute. E così il primo grande crack italiano su una cripto, quello della moneta battezzata «Nano», della piattaforma di scambio Bitgrail, datato febbraio 2018, verrà perseguito grazie a norme fallimentari che risalgono, nelle loro linee fondamentali e pure dopo le riforme, al Codice del 1942.

Con la sentenza pubblicata il 21 gennaio 2019 il Tribunale di Firenze ha dichiarato l'insolvenza della società Bg Services Srl (già Bitgrail srl), che gestiva la piattaforma exchange denominata Bitgrail. La cosa interessante è la definizione che il Tribunale fallimentare di Firenze ha dato della criptovaluta oggetto delle distrazioni: secondo i giudici fiorentini le criptovalute costituirebbero «beni» ex articolo 810 del Codice civile, cioè cose che possono essere oggetto di diritti.

Sulla scorta di questa considerazione il tribunale ha sancito, tra l'altro, il rapporto negoziale tra exchange, wallet e utente, che deve perciò essere qualificato in termini di deposito "irregolare": significa che, trattandosi di beni immateriali fungibili, il depositario è obbligato a restituire al depositante la stessa quantità e valore del bene deposita-

to, a prescindere che sia il medesimo o no. «E a me pare che sul punto non vi siano dubbi», spiega Roberto De Vita, penalista esperto di tematiche legate al cyber crime.«La definizione che della criptovaluta viene data nel decreto 231 del 2007 parla di "rappresentazione di valore digitale". Dunque di un bene fungibile. Ciò che fungibile non è (perché non è reversibile) – prose-

gue De Vita – è invece la blockchain, che è definita come una catena visibile e tracciabile di azioni non reversibili tra interlocutori che possono essere anonimi».

Se approderà in Tribunale, il fallimento della Nano e del suo inventore Francesco Firano, 31enne, nickname «the bomber», diventerà una procedura interessante: non solo perché si tratterà del primo fallimento all'interno del quale il curatore avrà il compito di ripartire (anche tra anonimi) degli attivi che hanno le sembianze virtuali di criptovalute. Non solo per i suoi esiti e per le definizioni tecnico giuridiche del fenomeno, ma pure per le metodologie di acquisizione e protezione delle prove d'accusa e di difesa.

Se si sia trattata di una «distrazione» da 17 milioni di Nano (controvalore teorico 195 milioni di dollari), come denunciato dalla stessa Bitgrail che avrebbe fatto emergere le transazioni non autorizzate, e su chi le abbia commesse, saranno i pm e i loro consulenti tecnici a dimostrarlo. A tentare di scagionare gli imputati saranno gli avvocati e i loro consulenti. Una singolarità: a fron-

teggiarsi nel ruolo di periti, in questo genere di processi, non saranno più medici psichiatri, periti balistici o commercialisti prestati al diritto penale dell'economia. Ma soprattutto tecnici e ingegneri informatici.

Non a caso uno dei consulenti più ascoltati è il generale in congedo della Guardia di Finanza Umberto Rapetto, già comandante del Nucleo speciale frodi telematiche. Spiega Filippo Cocco, legale impegnato su più fronti (anche su processi informatici): «Non tutti hanno la piena consapevolezza che la tutela dell'integrità della conservazione e genuinità dei dati informatici siano elementi centrali per stabilire l'accertamento dei fatti. E poi l'importanza della conformità dei codici Ascii, che rappresentano il Dna, la denominazione di origine controllata di ogni file. È centrale capire se la loro copia

forense sia conforme o se sia stata adulterata. Questo è un elemento determinante per consentire l'utilizzo della prova. Un altro fattore sottovalutato è poi la catena della custodia della prova digitale: il supporto su cui è stato custodito il file. E se questo è importante per i file in cui sono contenute, per esempio, le intercettazioni telefoniche (che spesso non si sono potute utilizzare proprio per un'avvenuta "contaminazione informatica"), a maggior ragione ciò vale per tutti gli atti irripetibili (e dunque soggetti a incidente probatorio) che riguardano controversie che hanno la propria stessa origine nel mondo virtuale».

© RIPRODUZIONE RISERVATA



## ATTENZIONE COSTANTE

«Il Sole 24 Ore» ha monitorato da subito la diffusione delle valute virtuali, segnalandone lo sviluppo, discutendone i possibili vantaggi e criticità.

Già nel 2015, sulle pagine di Nòva24, un forum con esperti e operatori discuteva del funzionamento e delle prospettive dell'«internet del denaro» (Il Sole 24 Ore, 3 maggio 2015). La popolarità crescente anche tra gli investitori non professionali ha portato inoltre ad affrontare il tema sulle pagine di «Plus24». Qui accanto, la pagina realizzata per l'edizione del 29 dicembre 2018)



La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

## Ukraine

# How to win a power play

Inventive legal tactics secured damages for energy assets lost in Russia's annexation of Crimea. By **Yuri Bender**

While the past five years have seen fierce military battles for territory on the steppe of Donbas, another contest of great significance for Ukraine has played out in Europe's courtrooms.

In Sweden and the Netherlands, Ukrainian lawyers have successfully defended their country's industrial assets from Russian counterparts in a series of arbitrations.

At the centre of this legal tussle has been Kiev-based law firm Aequo, which started approaching Ukrainian businesses six months after Russia's annexation of Crimea in March 2014. Its plan was to help protect their assets on the south-eastern Ukrainian peninsula from expropriation by Moscow.

One of the biggest losers in the annexation was Naftogaz, Ukraine's state-owned energy company, which lost control of offshore and onshore gas fields to Russia. It decided in 2015 to pursue claims against Gazprom, Russia's state energy monopoly.

Naftogaz appointed Aequo and co-counsel Covington & Burling, the US law firm. "At that time, it was difficult to find a reputable and experienced law firm in Ukraine, which was not conflicted, to act against Russia and Russian state companies," says Pavlo Byelousov, a partner at Aequo and head of its international arbitration and cross-border litigation. International law firms were also reluctant to act, as those with offices in Russia were concerned about staff safety and future operations in that country.

Moreover, few counsel believed a legal victory over Russia with regard to Crimean claims was achievable or enforceable. Aequo therefore adopted an unusual, ultimately successful legal argument, under the Russia-Ukraine bilateral investment treaty (BIT), leading to a partial award against Gazprom by an international court in The Hague in the Netherlands in February 2019.

The amount of damages will be set at the next stage of the arbitration. Naftogaz estimates the value of group assets expropriated by Russia in Crimea at around $5bn plus interest.

Rather than asking the court to rule on the status of Crimea under international law, Mr Byelousov argued that "Russia is liable for any and all losses to Ukrainian and foreign investors [resulting] from the annexation of Crimea, since Russia assumed physical and effective control and jurisdiction over Crimea by formally annexing and admitting it" into its territory.

Aequo did not plunge blindly into this legal cauldron. It already knew



Court victories have moved Ukraine closer to energy independence

La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

FOTO. REUTERS

La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

## Dispute Resolution

| Rank | Law firm | Originality | Leadership | Impact | Total |
|---|---|---|---|---|---|
| Standout | **Hogan Lovells** Argued before the Court of Justice of the European Union successfully for the uniform application of EU law in an eight-year bilateral investment treaty dispute between its client, the Slovak Republic, and Dutch insurer Achmea. With all EU member states agreeing to terminate bilateral investment treaties concluded between them, the ruling sets a precedent for EU law to take precedence over international law in matters of conflicting interest, and will affect hundreds of other pre-existing awards. *Commended: Markus Burgstaller.* | 7 | 9 | 9 | 25 |
| Highly commended | **Aequo** Successfully proposed new arguments validated in the Permanent Court of Arbitration in The Hague extending the Russia-Ukraine bilateral investment treaty to cover Crimea, the Ukrainian peninsula annexed by Russia in 2014. This allowed Ukraine's national oil and gas company, Naftogaz, to bring an investment dispute against the Russian Federation to reimburse all Naftogaz's oil and gas assets, lost to the state during Russia's annexation of Crimea. The litigation is ongoing due to appeals. | 8 | 8 | 6 | 22 |
| Highly commended | **Freshfields Bruckhaus Deringer** Represented logistics company UPS in its appeal against the European Commission's decision to block its acquisition of TNT Express while allowing FedEx to do the same. The firm successfully argued that the EU's economic analysis was flawed. It is the first time the Court of Justice of the European Union has considered an econometric model. | 7 | 7 | 8 | 22 |
| Highly commended | **Paul Hastings** Representing a group of Italian industrial companies that rely on an internal, private electricity grid, the firm successfully challenged the imposition of electricity dispatching fees levied by the Italian grid operator. The firm convinced the Court of Justice of the European Union that private electricity grids in Italy should not be subject to the same obligations as those connected to the public grid. | 8 | 7 | 7 | 22 |
| Highly commended | **Pérez-Llorca** Demonstrated that French carsharing company BlaBlaCar is a social network and not a public transportation company for the purposes of Spanish legislation, arguing that once a trip is organised through the platform, the driver and rider are acquaintances. The ruling has allowed BlaBlaCar to continue operating in Spain, one of its most profitable countries. | 8 | 7 | 7 | 22 |
| Highly commended | **Simmons & Simmons** The firm took a leading role alongside Justice Robin Knowles and Chief Master Marsh in rewriting the civil procedure rules for disclosure in commercial disputes in England and Wales. In pilot since January 2019, parties must consider using technology or ediscovery in disclosure. If they choose not to use tech, they must justify why not. The move aims to reduce companies' ability to bury each other under onerous disclosure requirements. | 7 | 7 | 8 | 22 |
| Highly commended | **Slaughter and May** Acted for British Airways in its defence of £3.6bn of claims brought in the UK by international purchasers of airfreight, who alleged a cartel in the global air cargo market. Lawyers successfully challenged the interpretation of the scope of English law on economic torts, the presumption of innocence and related confidentiality rights of named individuals, and the English court's jurisdiction to hear follow-on competition damages claims, resolving previously unsettled points of law. | 7 | 8 | 7 | 22 |

| | Originality | Leadership | Impact | Total |
|---|---|---|---|---|
| **Aequo** Helped pharmaceutical company Darnitsa cancel market authorisation of competitor Zdorovya's copycat version of Citramon-Darnitsa, one of its most widely sold drugs. The Supreme Court of Ukraine judgment marked the first court verdict in Ukraine where a trademark infringement was terminated by cancelling market authorisation of the infringing product. | 7 | 7 | 7 | 21 |
| **BonelliErede** When $170m disappeared from cryptocurrency platform Bitgrail, the firm represented users who wanted to withdraw their funds to prevent further loss. Lawyers achieved an immediate block of the exchange and seizure of the cryptocurrency assets, a first in civil proceedings in Italy. Bankruptcy proceedings are ongoing. | 7 | 8 | 6 | 21 |
| **ClientEarth** The environmental law charity bought €30 of shares in Polish state-controlled energy group Enea in order to challenge the company's decision to invest €1.2bn in coal power plant Ostroleka C and to educate other shareholders about the financial and climate risks. When Enea ignored the 80 per cent of shareholders that opposed the decision, the firm brought a successful case against the company, proving the investment was economically unviable in the face of rising carbon and falling renewables prices. | 7 | 8 | 6 | 21 |
| **Hogan Lovells** Represented Eurasian Natural Resources Corporation in the Court of Appeal, arguing that it should not be forced to share documentation produced from an internal whistleblowing enquiry with the UK's Serious Fraud Office. The result ensures that documentation stemming from internal investigations would not have to be made available to prosecutors, upholding the principle of legal professional privilege. | 6 | 7 | 8 | 21 |
| **Pinsent Masons** Acting for Teva Pharmaceutical in a dispute against Truvada, the firm successfully challenged the requirements for obtaining a supplementary protection certificate, which extends the validity of a patent beyond the expiry date. The Court of Justice of the European Union ruled SPCs no longer apply to combinations of drugs that are not part of the original patent. | 7 | 8 | 6 | 21 |
| **Uría Menéndez Abogados** Defended Galician bank Abanca against a class action suit brought by Spanish consumer rights group Adicae on behalf of 11,000 customers who had allegedly misunderstood their mortgage terms. The firm successfully argued that the court address commonality in such a case and devised a methodology by which Abanca's legal team could answer each plaintiff, saving time and reducing costs. | 7 | 7 | 7 | 21 |
| **Allen & Overy** Acting for G-Research, the firm recovered stolen information from an ex-employee of the company who resigned without notice and fled to Hong Kong. Civil and criminal lawyers collaborated to pursue all available remedies, including the first private prosecution for violation of a serious crime prevention order. | 7 | 7 | 6 | 20 |
| **Gide Loyrette Nouel** Defended a client accused of unlawfully disclosing information relating to T-Mobile USA's ongoing $15bn takeover bid by French-listed Iliad. The firm convinced the Autorité des Marchés Financiers, France's financial markets watchdog, to reconsider its regional interpretation of the law as it relates to unlawful disclosure of information. Gide's client was cleared of all charges and the AMF's position is now more closely aligned with those of the UK Financial Conduct Authority and US regulators. | 6 | 7 | 7 | 20 |
| **Red Lion Chambers** Represented alleged terrorist Assad Sabra in absentia before the Special Tribunal for Lebanon, a specialist international court in The Hague, concerning his alleged role in the murder of former prime minister of Lebanon, Rafik Hariri, and 21 others in a car bombing in Beirut in 2005. This was the first in-absentia international trial since the Nuremberg trials and the first international criminal law proceedings to consider complex telecommunication material. | 7 | 7 | 6 | 20 |
| **Dechert** Represented the state of Bolivia in arbitration proceedings against former president Gonzalo Sánchez de Lozada. As Mr Lozada had fled to Virginia, the firm used a US federal statute to force discovery against him, the first time this has been used by a state against a former head of state in arbitration proceedings. | 7 | 6 | 6 | 19 |

The rows above are labelled **Commended** in the side rail.

both protagonists well. The firm had acted for Naftogaz before, having been engaged by Norwegian lead counsel Wikborg Rein during a Stockholm Chamber of Commerce arbitration over gas supply and transit contracts. It will also act for the Ukrainian supplier in a new arbitration initiated by Gazprom.

"Ukrainian lawyers in both litigation and arbitration, working with European and US firms, are enjoying huge successes in the international courts, showing their quality, innovation and customer service," says Andy Hunder, president of the American Chamber of Commerce in Ukraine. "Some of them find it harder to fight a case for their clients in a local court, as Ukraine is still in the process of reforming its legal system and judiciary."

The Stockholm arbitration panel had in February 2018 awarded the Ukrainian side a total of $4.6bn in compensation "for Gazprom's failure to deliver the agreed volumes of gas for transit", according to Naftogaz, which referred to the case as "the largest commercial arbitration ever". Naftogaz suggested that mutual claims amounting to $125bn threatened to bankrupt both companies.

One local analyst, who declines to be named, credits the awards to the skills of Naftogaz business development director Yuriy Vitrenko, "who was successful in putting together a team of mainly external, very well-paid lawyers who were motivated to get into the legal history books".

Certainly, the stock of both Mr Vitrenko and Naftogaz chief executive Andriy Kobolyev is soaring in Ukraine. The ▶

49

## Enabling Business Growth and Transformation

| Rank | Law firm | Originality | Leadership | Impact | Total |
|---|---|---|---|---|---|
| Standout | **Baker McKenzie** Advised Alawwal Bank on its merger with the Saudi British Bank, valued at $5bn, one of the largest mergers to date between two listed companies in the Middle East. The firm navigated the UK's new Market Abuse Regulation and Saudi transaction rules to achieve a successful share-for-share merger and set the market standard for future transactions of this kind. | 7 | 9 | 8 | 24 |
| Highly commended | **Allen & Overy** Designed a complex dual structure enabling DWF to be listed on the main market of the London Stock Exchange. The dual structure is designed to accommodate jurisdictions that do not allow non-legal professionals to participate in running a law firm. | 7 | 8 | 7 | 22 |
| Highly commended | **BonelliErede** Advised a consortium of Italian insurance companies and brokers on the structure of a blockchain-based platform designed to improve efficiency in the provision of quotes. Lawyers ensured transparency in the model, which is open to new members, and developed the mechanics to ensure that data shared through the platform would not conflict with antitrust laws. | 7 | 8 | 7 | 22 |
| Highly commended | **DLA Piper** Enabled the takeover of Spanish toll road operator Abertis by Italian transport company Atlantia for $18.2bn. Lawyers gained regulatory clearance in the US, Canada, Argentina, Chile, Brazil and France to enable global expansion. | 7 | 8 | 7 | 22 |
| Highly commended | **Womble Bond Dickinson** Advised Newcastle City Council on a project to transfer its parks, allotments and recreation grounds to a newly established charitable trust. A separate trust with a board of directors will facilitate development of greater expertise and scope to explore additional revenue streams such as concerts and other cultural events. | 8 | 7 | 7 | 22 |
| Commended | **Bird & Bird** Developed a legal framework for Intergalactic Gaming Galaxy, a web-based platform designed to support the esports, or competitive videogaming, industry. The firm helped IGG set up a blockchain currency that can act as both "in-game currency" and as competition prize money, which can be paid out automatically to a winning team or player. Commended: William Deller. | 7 | 7 | 7 | 21 |
| Commended | **BonelliErede** Overcame complex tax considerations to enable the merger of Italian property company Beni Stabili and French real estate investment trust Covivio. The firm established a branch of Covivio in Italy, requiring an unprecedented securities arrangement to enable the merger. | 7 | 7 | 7 | 21 |
| Commended | **Bracewell** Advised Neptune Energy Group on the $2bn financing towards its acquisition of Engie E&P's upstream oil and gas business, which included 319 exploration and production licences in 12 countries. Lawyers structured the financing to provide for long termination periods, enabling greater security and flexibility. The structure has been replicated in similar transactions. | 6 | 7 | 8 | 21 |
| Commended | **Hogan Lovells** After the renewal of Uber's licence to operate in London was declined, the firm helped the ride-hailing company make significant changes to its corporate culture to regain trust. Changes to its board-led governance, communications protocols and the introduction of an independent assurance procedure helped win Uber a 15-month licence from Transport for London. | 7 | 8 | 6 | 21 |
| Commended | **Pinsent Masons** The firm established a legal framework to allow the development of an app for Amazon's Alexa device that provides real-time mortgage and property value quotes. Lawyers established that vocal consent was enough for compliance purposes in order to comply with GDPR (General Data Protection Regulation) requirements. Commended: Alexander Bayer. | 7 | 8 | 6 | 21 |
| Commended | **Sayenko Kharenko** Established Ukraine online auction platform ProZorro.Sale for the sale of state-owned assets of insolvent banks undergoing liquidation. It developed a corporate governance structure for the state-owned enterprise, with an administrator function that allows the platform to operate independently and transparently. The firm says the platform has facilitated more than 6,600 auctions with a total value of more than €400m. | 7 | 7 | 7 | 21 |
| Commended | **Ecija** Developed and implemented an automated whistleblowing reporting system for a client. The system protects potential whistleblowers' anonymity and privacy under the EU's GDPR (General Data Protection Regulation) while ensuring their concerns can be effectively investigated by the compliance committee to avert or mitigate corporate liability or reputational damage. | 6 | 8 | 6 | 20 |

| Rank | Law firm | Originality | Leadership | Impact | Total |
|---|---|---|---|---|---|
| Commended | **Freshfields Bruckhaus Deringer** Advised on the legal framework for Uber's clean air initiative, in what the lawyers describe as "compliance by design". They ensured that the scheme, which added up to 15 pence per mile to each ride, was integrated into the business model without cost to drivers. Uber expects to raise more than £200m to help drivers transition to electric vehicles, anticipating the first 20,000 upgrades by 2022. | 6 | 6 | 8 | 20 |
| Commended | **Shearman & Sterling** Structured the initial public offering of Slovenia's largest bank, Nova Ljubljanska Banka (NLB), which had received a state-aid injection in 2013 and was in effect nationalised. To comply with European Commission restrictions on state aid, the Slovenian government had pledged to privatise more than 50 per cent of the bank by year-end 2018. The firm took the lead in analysing risks, including the Slovenian state guarantee covering NLB's liability risk associated with Croatian foreign deposit litigation. | 6 | 7 | 7 | 20 |
| Commended | **VdA** Lawyers designed an expedited cross-border demerger and merger process between Coty Spain and Coty Portugal to enable the efficient transfer of assets in the US-headquartered beauty company's global reorganisation. | 6 | 7 | 6 | 19 |
| Commended | **White & Case** Secured European Commission approval for the acquisition of Tele2 Netherlands by Deutsche Telekom subsidiary, T-Mobile Netherlands. The firm worked closely not just with its own client and its economic advisers, but also with the target company to challenge the EC's assumption that four or more mobile operators were necessary for competitiveness. | 6 | 6 | 7 | 19 |

## Enabling Business Growth and Transformation

| Rank | In-house legal team | Originality | Leadership | Impact | Total |
|---|---|---|---|---|---|
| Standout | **Aviva** Advised the business on the launch of a subscription-based home and motor insurance product that can be changed on a monthly basis depending on the level of cover the customer needs. The legal team advised on data handling to make the product viable and designed an annual contract. | 8 | 8 | 8 | 24 |
| Standout | **FarFetch** The legal team, now 18 lawyers operating across the UK, China, Russia, Portugal and the US, have enabled the ecommerce platform's global expansion. Lawyers guided the company through its $5.8bn initial public offering on the New York Stock Exchange in 2018 and various acquisitions. | 7 | 8 | 8 | 23 |
| Highly commended | **BlaBlaCar** Developed economic models to demonstrate that French carsharing company BlaBlaCar was not functioning as a public transport company, overcoming claims brought against it by local bus companies in Spain. | 7 | 8 | 7 | 22 |
| Commended | **Teva Pharmaceuticals Europe** Developed a successful patent litigation strategy led by the pharmaceutical company's European litigations team, which enabled lawyers to quantify their commercial impact, helping Teva enter the generics market faster than competitors and boosting profits. | 6 | 7 | 7 | 20 |

legal victories come on top of a restructure of Naftogaz to drive out large-scale corruption and arbitrage schemes traditionally conducted by shady intermediaries with political connections.

Both men are in the frame for key political roles, enjoying the confidence of the new president, Volodymyr Zelensky, and are praised by commentators and advisers for helping Ukraine achieve a degree of energy independence.

If Naftogaz can invest the further damages it is seeking in domestic gas production, "this could make Ukraine a gas-exporting country over the medium to longer term", says Timothy Ash, senior emerging markets sovereign strategist at Bluebay Asset Management.

Other Ukrainian companies have joined the fray to claim damages relating to assets seized by Russia in Crimea. These include energy companies Ukrnafta, DTEK and Ukrenergo, and banking groups Oschadbank and PrivatBank.

While Russia has refused to participate in arbitrations for many BIT claims relating to Crimea, because it did not recognise the tribunals'

La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

RICERCHE SPOT NON MODERATE - Rassegna Stampa 20/12/2019 - 20/12/2019

## Ukraine



Naftogaz chief executive Andriy Kobolyev, front right, with his Gazprom counterpart, Alexei Miller in 2014

jurisdictions, this stance could be changing.

"In May, Moscow said it would take part in international arbitrations brought by Ukrainian parties, even where it does not recognise a tribunal's jurisdiction," says Florence Cahill, a senior analyst at London-based political risk and dispute consultancy GPW. She adds, however, that the importance of Gazprom to Russia's self-image will be critical to Kremlin calculations.

"Conceding too readily to Naftogaz would be a humiliation for Russia," warns Ms Cahill. "Gazprom plays a very special geopolitical role. It is effectively a tool through which Russia exercises its foreign policy. Any insult or embarrassment to Gazprom is an affront to [president Vladimir] Putin's leadership."

Some even fear the victory against Gazprom may prove bittersweet for Ukraine and its companies, which have lost assets both in Crimea and the country's eastern industrial heartland of Donbas.

Continued purchases of Russian fuel by Ukraine's state enterprises give Moscow influence over Ukrainian elites, whose dependence on Russia can leave them compromised, and leverage in future deals over assets, trade and territory.

"The government of Ukraine should be prepared that the Russians at some point may decide to negotiate and finally pay compensation for those assets, especially in Crimea," says one leading financier in Kiev, who declines to be named.

"But having done that, Russia will claim in exchange legal title over those assets, minimising the probability of those areas being returned to Ukraine." ❶

PHOTO: REUTERS

大成 DENTONS

## Challenging the status quo in the legal profession.

Dentons, The world's largest law firm is here.*

dentons.com

© 2019 Dentons. Dentons is a global legal practice providing client services worldwide through its member firms and affiliates. Please see dentons.com for Legal Notices.

*Acritas Global Elite Law Firm Brand Index 2013–2018.

La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

## il Resto del Carlino

# Gli studi d'affari e l'innovazione
# Due italiani nella top 50 d'Europa
# «Ricerca e sviluppo per crescere»

**Luigi Manfredi**
◼ MILANO

**I**NNOVAZIONE. È una delle parole chiave di questi anni ormai 4.0. Ed è la sfida che stanno affrontando le grandi law firm d'affari italiane, in un mondo – anche quello della consulenza legale – sempre più globalizzato. È di questi giorni la pubblicazione di «FT Innovative Lawyers», ricerca del Financial Times con la collaborazione di RSG Consulting. che ha fotografato gli studi legali più innovativi d'Europa, le cosiddette law firm «forward thinkers». La graduatoria premia quest'anno – ed è il terzo consecutivo per entrambi – due studi d'affari italiani, Toffoletto De Luca Tamajo e BonelliErede che si piazzano nella top 50. Toffoletto, law firm specializzata in diritto del lavoro e sindacale, è presente nella macroarea «Business of Law» in due categorie: «Data, Knowledge and Intelligence» e «New Products and Services».

**IL PRIMO** riconoscimento va alla creazione di particolari strumenti integrati nel software gestionale interno Elibra, per migliorare i rapporti con i clienti e la gestione economica dei progetti. Nella categoria 'New Products and Services' lo studio è «commended» per la creazione dei prodotti legali. Si tratta di servizi specifici a un costo preciso e predefinito per il cliente e gestiti con efficienza da un team dedicato. «Investire in innovazione è sempre stato uno dei nostri driver di crescita ed è per questo che alcuni anni fa

▲ **GESTIONE E RAPPORTI CON I CLIENTI**

Nella foto in basso l'avvocato Franco Toffoletto, managing partner dello studio.
In alto Stefano Simontacchi, presidente di BonelliErede.
Toffoletto De Luca Tamajo e BonelliErede sono nella top 50 degli studi d'affari più innovativi d'Europa

abbiamo creato anche il dipartimento di 'Ricerca & Sviluppo', commenta l'avvocato Franco Toffoletto, managing partner dello studio. Bonelli Erede, al primo posto dei grandi studi legali italiani nella classifica del fatturato, è menzionato dalla ricerca del Financial Times nella macroarea «Legal Expertise» in due categorie: 'Dispute Resolution' e 'Enabling Business Growth and Transformation'.

**IN QUEST'ULTIMA** in particolare è stata classificata 'highly commended' l'assistenza prestata alle principali compagnie di assicurazioni italiane e ai principali broker assicurativi nazionali e internazionali in tutti gli aspetti legati all'implementazione e alla gestione di una piattaforma basata sulla tecnologia blockchain secondo un modello di open innovation. È classificato inoltre «commended» nella categoria 'Dispute Resolution' il ruolo di advisor di BonelliErede nell'ambito dell'inizia-



tiva di più investitori contro il gestore della piattaforma Bitgrail. In concreto l'innovazione sta modificando la struttura tradizionale degli studi legali. Martelli & Partners, forte specializzazione in ambito fiscale e societario, ha lanciato ad esempio 'Cicerone', una app di intelligenza artificiale in grado di generare autonomamente atti giudiziari di qualsiasi genere tra cui comparse di costituzione, memorie e atti monitori, decreti ingiuntivi e altro ancora.

**IL FUNZIONAMENTO** si articola in tre fasi. Il primo step prevede la scansione del documento, la lettura semantica e l'individuazione automatica degli elementi e delle eccezioni processuali; in una seconda fase il programma propone all'avvocato un questionario sull'atto; nella fase finale il calcolatore, sulla base della lettura semantica e delle risposte fornite, crea automaticamente un modello di documento pre-compilato soggetto solo a procedura di revisione da parte dell'avvocato. «Cicerone è stato progettato con l'obiettivo di ottimizzare i tempi di elaborazione di un atto giudiziario – commenta l'avvocato Giovanni Battista Martelli, ceo di Martelli & Partners –. L'applicazione è in grado di ridurre di due terzi i tempi classici di elaborazione dei documenti legali e di gestire di conseguenza un elevato numero di pratiche come quelle provenienti da clienti quali assicurazioni e banche. L'efficientamento dei tempi di lavoro ci consente di ampliare il business, il tutto a totale beneficio economico dello studio e del cliente finale».

© RIPRODUZIONE RISERVATA

La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

diffusione:90759
tiratura:118602

il Resto del Carlino




PER
SAPERNE
DI PIÙ

## Atti giudiziari
## con 'Cicerone'

È una app di intelligenza
artificiale creata da Martelli
& Partners in grado
di generare
autonomamente
atti giudiziari di qualsiasi
genere tra cui comparse di
costituzione, memorie atti
monitori, decreti ingiuntivi
e altro ancora

La proprietà intellettuale è riconducibile alla fonte specificata in testa alla pagina. Il ritaglio stampa è da intendersi per uso privato

# Exhibit 2

REPUBBLICA ITALIANA

TRIBUNALE DI FIRENZE

RF.178/ 2018 e 205/2018

composto dai sig.ri magistrati

Dott.   **Silvia Governatori**        Presidente est.

Dott.   **Rosa Selvarolo**           Giudice

Dott.   **Cristian Soscia**          Giudice

riunito in camera di consiglio ha pronunciato la seguente

S E N T E N Z A

In nome del Popolo Italiano

Nel procedimento promosso da:

Eirik Ulersoy, elett. dom. per mandato in atti presso  prof. avv. Giuseppe Sbisà, avv. Monica Iacoviello e avv. Alessandra Frigerio del foro di Milano e avv. Nicola Pabis Ticci del foro di Firenze ed   elett. dom. in  Firenze presso quest'ultimo

Creditore Istante   proc. 178/2018

Pubblico Ministero in persona del dott. Fabio Di Vizio

Istante proc. 205/2018

Nei confronti di:

FIRANO  FRANCESCO,  nato a Firenze l'11.4.1986,   quale   titolare dell'impresa individuale  WEBCOIN SOLUTIONS DI FRANCESCO FIRANO,   CF FRNFNC86D11D612E con  sede in  Signa via Roma 235,  rappresentato e difeso dall'avv. Francesco Ballati, Marco Della Vedova e Prof. Avv.  Francesco D'Angelo,  elettivamente domiciliato presso lo stesso per mandato in atti

Debitore

Con l'intervento di:

Daniel Folie e Paride Novi, elett. dom. per mandato in atti presso  prof. avv. Giuseppe Sbisà, avv. Monica Iacoviello e avv. Alessandra Frigerio del foro di Milano e avv. Nicola Pabis Ticci del foro di Firenze ed    elett. dom. in  Firenze presso quest'ultimo

Fatto e diritto

1.1 Con ricorso  depositato in data 26.4.2018 Eirik Ulversoy ha  chiesto la pronuncia di fallimento  di  FRANCESCO FIRANO quale  titolare dell'impresa individuale  WEBCOIN SOLUTIONS DI FRANCESCO FIRANO.

A sostegno della domanda il ricorrente ha esposto che Francesco Firano, operando  prima attraverso l'impresa individuale Webcoin Solutions e poi quale amministratore unico e socio di maggioranza di BitGrail, società appositamente costituita a tale scopo – ha realizzato e gestito il software e sito internet ww.BitGrail.com; che BitGrail.com è una piattaforma exchange on line che, tra i vari servizi offerti, permette l'acquisto, lo scambio e il deposito di diverse tipologie di

Firmato Da: GOVERNATORI SILVIA Emesso Da: POSTECOM CA3 Serial#: 12de50



Sent. n. 17/2019 pubbl. il 21/01/2019

criptovalute, a fronte del pagamento di una commissione; che a partire dall'aprile 2017 era stato possibile ottenere, depositare e fare trading su tale piattaforma anche della criptovaluta Nano, il cui valore unitario alla data di deposito del ricorso era di circa USD 7,12 o € 5,85; che il ricorrente era tra gli utenti che, registrandosi su BitGrail, aveva aperto un proprio conto – protetto da una password - su detto exchange, utilizzando la piattaforma per depositare criptovalute, scambiare tra loro criptovalute, in particolare con la possibilità di lasciare le somme così ottenute in deposito sul proprio conto su BitGrail.com, scambiarle con altri membri operanti sulla piattaforma, oppure ritirarle, trasferendole così su conti personali o di terzi estranei alla piattaforma, i cui servizi erano offerti a pagamento; che il gestore della piattaforma manteneva il controllo dei singoli conti degli utenti, monitorando le attività e potendo arrivare a bloccare le transazioni, i depositi o i prelievi di criptovaluta, oltre che l'accesso al sito e al conto personale; che era stabilito dalle condizioni generali di BitGrail che in caso di blocco o chiusura del conto da parte del gestore l'utente avesse espressamente diritto alla restituzione delle criptovalute accreditate sul proprio conto, con conversione in Bitcoin e trasferimento all'indirizzo Bitcoin personale dell'utente al di fuori di BitGrail.com; che nel mese di gennaio 2018 Francesco Firano aveva introdotto limiti via via più stringenti al prelievo delle criptovalute dalla piattaforma, e seguito di svariate problematiche riscontrate dagli utenti già dal settembre/ottobre 2017 e successivamente il 12.1.2018 aveva bloccato ogni trasferimento di criptovaluta dai conti su BitGrail a conti esterni, costituendo la società a responsabilità limitata BitGrail con il sig. Andrea Davoli; che dopo una temporanea ripresa dei prelievi (limitati per quantitativo massimo giornaliero), il 28 gennaio 2018 il gestore di BitGrail aveva definitivamente bloccato la possibilità per gli utenti di prelevare le proprie criptovalute; che il 9 febbraio 2018 il gestore di BitGrail (nel frattempo divenuto la società BitGrail srl) aveva pubblicato un comunicato in cui aveva dato atto della "sparizione" di 17 milioni di Nano – pari a circa 120 milioni di euro, appartenenti agli utenti dell'exchange e del blocco di tutti i servizi, affermando che l'ammanco di Nano coinvolgeva l'80% dei Nano appartenenti agli utenti, dichiarando di essere nell'impossibilità di restituire tutti i Nano sottratti, e proponendo un "piano di rientro"; che il 14 marzo 2018 BitGrail aveva reso visibili su conti di ciascun utente solo il 20% dei Nano dovuti, offrendo al posto dei Nano sottratti (e quindi al posto dell'80% delle somme iniziali degli utenti) uno "strumento finanziario" creato dalla BitGrail, denominato "BitGrail shares".

Quanto alla propria posizione Eirik Ulversoy ha esposto che il 9.2.2018 allorchè erano stati bloccati tutti i servizi di BitGrail, egli aveva sul proprio conto 412 BitCoin Cash, pari a quella data a circa € 450.000, e 437.905 Nano, pari a quella data a circa 4,23 milioni di Euro, mentre al momento del ricorso risultavano solo 98.763 Nano, pari a circa 869.114 Euro con conversione dei Nano mancanti in BitGrail shares, senza il suo consenso.

Tanto premesso, deducendo la sussistenza di un gravissimo inadempimento nei confronti degli utenti della piattaforma e di una insanabile situazione di illiquidità dell'impresa individuale Webcoin al momento del trasferimento della piattaforma a BitGrail srl, con incapacità di entrambe

Firmato Da: GOVERNATORI SILVIA Emesso Da: POSTECOM CA3 Serial#: 12de50



di far fronte ai propri obblighi restitutori – per una perdita dichiarata dallo stesso Firano esser pari a 17 milioni di Nano, ossia oltre 120 milioni di Euro – il ricorrente ha chiesto la dichiarazione di fallimento  di Francesco Firano, titolare di Webcoin, nonché – con separato ricorso - di BG Services  srl (già BitGrail srl) , instando per la riunione dei due procedimenti.

1.2. Con separato ricorso del 10.5.2018 anche il Pubblico Ministero  ha chiesto la pronuncia di fallimento di Francesco Firano – in virtù della legittimazione derivante dalla pendenza di procedimento penale aperto in relazione alla denuncia di "sparizione" di 17 milioni di Nano presentata dallo stesso Firano il 9.2.2018 -  e  ha chiesto l'adozione di provvedimento di sequestro ai sensi dell'art. 15 comma 8 L.F, essendo emerso nel corso delle investigazioni che "nei giorni tra il 2  e il 5 febbraio 2018, due giorni prima della comunicazione effettuata dalla Nano Foundation dell'avvenuto furto e 3 giorni prima della denuncia presentata…il Firano attraverso 9 operazioni sequenziali, ha depositato nel suo portafogli sulla piattaforma The Rock un totale di 230 Bitcoin, criptomoneta che al cambio nel periodo di riferimento corrispondeva a circa 1.700.000 euro", essendo emerso "che i versamenti dei Bitcoin, sul wallet del Firano, provenivano da indirizzi riconducibili a quelli utilizzati dai clienti della BitGrail per effettuare i depositi sulla predetta piattaforma". Il PM segnalava altresì il tentativo di Francesco Firano di ritirare presso sportelli ATM parte dei bitcoin depositati presso l'exchange italiano The Rock Trading srl.

1.3.Con decreto inaudita altera parte  ex art. 15 comma 8 L.F.del 10.5.2018 (confermato il 25.5.2018 a seguito di radicamento del contraddittorio) il Tribunale emetteva decreto di sequestro delle disponibilità finanziarie e/o in moneta virtuale appartenenti a Francesco Firano ed in specie di quelle da quest'ultimo detenute attraverso The Rock Trading srl presso MISTRAL PAY e/o altri intermediari finanziari, fino al controvalore di € 120.000.000.

Per l'udienza  fissata ex art. 15 LF  si costituiva Francesco Firano ed esponeva che la piattaforma BitGrail, che era stata ceduta alla BG solutions srl nel gennaio 2018, era una piattaforma exchange on line qualificabile come "un prestatore di servizi relativo all'utilizzo di valuta virtuale ai sensi dell'art. 1 del D.L.. n. 231/2007 (come da ultimo modificato con il D.lgs.n. 90/2017);  che il contratto stipulato tra l'exchanger e i suoi utenti è un contratto di servizi con il quale il professionista garantisce alcune prestazioni funzionali a consentire lo scambio, la compravendita e la conservazione, tramite account, di diverse tipologie di valute virtuali, fra le quali, la criptovaluta denominata "Nano" ; che non era riconosciuta all'exchanger alcuna facoltà di utilizzo delle somme depositate dagli utenti sui propri account; che era stata data agli utenti ampia informativa sui rischi legati alla volatilità della moneta virtuale e sui rischi anche di natura tecnica che possono interessare il loro corretto funzionamento, con una clausola di limitazione di responsabilità; che l'attività principale era ed è proprio la fornitura di servizi finalizzati allo scambio di valute virtuali, mentre le attività di deposito erano residuali e strumentali al solo fine di permetterne lo scambio; che difatti non vi era alcuna remunerazione collegata al deposito, ma unicamente una commissione sui prelievi e scambi di criptovalute; che gli utenti non potevano

Firmato Da: GOVERNATORI SILVIA Emesso Da: POSTECOM CA3 Serial#: 12de50



cambiare euro o altre divise legali in criptovalute e viceversa; che la piattaforma, per sua natura rivolta ad utenti esperti, aveva avuto un notevole successo anche per l'opera svolta dagli sviluppatori della valuta Nano, che avevano promosso detta piattaforma, per la sua maggiore affidabilità rispetto all'alternativa esistente; che il valore della criptovaluta Nano al momento della sua introduzione nell'aprile del 2017 era di circa 0,01 $, ed era salito vertiginosamente per arrivare a $ 36 (dunque con un incremento di 3.600 volte del valore iniziale); che in ragione della conseguente aumentata importanza degli scambi il Firano aveva deciso di costituire una società di capitali per gestire la piattaforma; che nel febbraio del 2018 il Firano aveva preso contezza di una serie di ammanchi a seguito di alcuni prelievi indebiti effettuati da alcuni utenti, per circa 17 milioni di Nano, i quali avevano sfruttato, probabilmente, la vulnerabilità del software Nano sviluppato dal team che lo aveva ideato; che la BG aveva presentato prontamente denuncia querela per l'ammanco, comunicandolo anche sul web, procedendo altresì nel tentativo di trovare una soluzione condivisa con gli utenti derubati; che al fine di agevolare una soluzione la BG aveva annunciato che dal 2 maggio la piattaforma avrebbe ripreso la propria operatività; che aveva tuttavia sospeso la stessa appena appreso del sequestro della piattaforma disposta dal Tribunale su istanza del Pubblico Ministero.

Tanto premesso contestava che la BG o il Firano potessero ritenersi responsabili del furto e/o ammanco, e che pertanto l'asserito controvalore non costituiva in alcun modo un debito della BG e ancor meno del Firano; contestava l'esistenza dei presupposti per l'adozione del sequestro, sia in punto di periculum, perché il tentativo di prelievo di denaro era stato fatto senza alcun intento sottrattivo, e peraltro con movimentazione esclusivamente di somme proprie,  sia in punto di fumus boni juris. Sotto tale ultimo profilo la difesa del Firano ha  esposto che le criptovalute oggetto dei depositi non sono di proprietà del gestore della piattaforma, ma dei depositanti, e che pertanto si applicherebbe il principio *res perit domino*; che di conseguenza non vi sarebbe alcun debito del Firano nei confronti degli utenti della piattaforma, in specie considerata l'assenza nei Terms of Use di specifici obblighi di custodia in capo al gestore e, al contrario la previsione dell'assunzione dei rischi connessi all'utilizzo della piattaforma in capo agli utenti, che lascerebbe intendere che le conseguenze di eventi non direttamente riferibili alla condotta di BitGrail e connessi ai servizi, che essa si è limitata a garantire, non potrebbero che gravare sugli utilizzatori; che ove si volesse ricondurre la fattispecie al contratto di deposito,  nella specie si sarebbe in presenza di un furto, suscettibile di integrare quell'evento imprevedibile e inevitabile non imputabile al depositario, che ne determina la liberazione dall'obbligo di restituzione, ai sensi dell'art. 1780 comma 1 c.c.; che comunque non sarebbe provato il diritto alla  restituzione delle somme, o al risarcimento del danno per la mancata restituzione delle somme, dovendosi escludere qualsiasi riconoscimento di debito nell'offerta  di soluzioni amichevoli effettuata dal Firano al precipuo fine di evitare possibili controversie legali, con danno reputazionale; che comunque l'ammanco sarebbe stato successivo al trasferimento della piattaforma alla BG Services con conseguente esclusione di responsabilità del

Firmato Da: GOVERNATORI SILVIA Emesso Da: POSTECOM CA3 Serial#: 12de50



Firano. Il Firano ha altresì contestato la sussistenza dei presupposti di fallibilità di cui all'art. 1 L.f. deducendo che Webcoin non risulta avere o avere avuto un attivo patrimoniale superiore a 300.000 euro o un volume di ricavi lordi superiore ad € 200.000, in specie considerato che le provvigioni incassate durante l'esercizio 2017 in criptovalute non risultavano convertite in euro, e non potendo ritenersi sussistenti debiti superiori ad € 500.000 per le medesime ragioni per cui ha contestato la sussistenza di responsabilità degli ammanchi di criptovaluta. In ogni caso, secondo la difesa del convenuto, in nessun modo detta responsabilità sarebbe ascrivibile al Firano, ma, semmai, alla BG essendo gli eventi riferiti ad un periodo successivo al subentro nella gestione della piattaforma. Peraltro si tratterebbe di crediti contestati, non portati da alcun titolo, e non assistiti da alcun previo accertamento, del tutto inidonei a supportare una pronuncia di fallimento.  Ha inoltre dedotto che l'ammanco – derivato da furto – era stato reso possibile da una fallacità del sistema Nano, imputabile al Nano Team, mentre il Firano e la BG avevano adottato le cautele opportune per quelli che erano gli aspetti di competenza della piattaforma da loro gestita.

1.4. Nel procedimento sono intervenuti Daniel Folie, Paride Novi e Benson Wong, aderendo alla richiesta di fallimento deducendo di essere creditori  dell'exchange BitGrail.com, precisando che Benson Wong si era iscritto alla piattaforma il 25.12.2017 allorchè era gestita dall'impresa individuale Webcoin, con transazioni eseguite nel periodo 26-28 dicembre, con un deposito di 26.000,98 Nano per un controvalore di € 236.114; Daniel Folie di essersi iscritto alla piattaforma il 31.12.2017 eseguendo trading fino all'8 gennaio 2018, con un deposito di 7.964,49 Nano per un controvalore di € 72.317 e Paride Novi di essersi iscritto il 28.12.2017 e che aveva in deposito 417,77 Nano, pari a circa 3.793 euro.

1.5 A seguito dell'esecuzione del sequestro, il custode, avv. Ariani, ha riferito che  sono state sequestrate le seguenti disponibilità del Firano: sulla piattaforma di exchange gestita da The Rock Trading srl  il  saldo di 167.76776304 BTC, 514,691,08 EUR e 0,00080000BCG; presso CR Firenze 39.000 euro circa; presso BNL 10 euro; presso Banco di Lucca e Tirreno € 1.000; sul portale Poloniex.com 2 bitcoin, pari a circa 16.800 USD

1.6. Il procedimento è stato istruito con consulenza tecnica d'ufficio, e produzioni documentali, sulle quali le parti hanno svolto ampie deduzioni.

   2. Deve essere dichiarato il fallimento    FRANCESCO FIRANO quale   titolare dell'impresa individuale   WEBCOIN SOLUTIONS DI FRANCESCO FIRANO   ricorrendo i requisiti soggettivo ed oggettivo richiesti dagli artt. 1 e 5 della l.f., ed essendo pacificamente competente il Tribunale di Firenze,   considerato che l'impresa ha sede in Signa.

2.1.     La natura di impresa commerciale  del debitore   emerge dal tipo di attività svolta di realizzazione di siti web, gestione software e hardware e servizi connessi a tecnologie informatiche.

2.2. Con riferimento al presupposto di cui all'art. 1  per la dichiarazione di fallimento, deve osservarsi che il Pubblico Ministero ha prodotto fin dal 12.6.2018 un prospetto redatto dalla Polizia

Firmato Da: GOVERNATORI SILVIA Emesso Da: POSTECOM CA3 Serial#: 12de50



Postale e delle Telecomunicazioni della Toscana in data 11.6.2018, la quale, analizzando i dati della piattaforma BitGrail e accedendo alla scheda Profits, ha potuto visualizzare i profitti registrati dal 1.11.2017 al 30.1.2018. Da tale prospetto – cui sono allegate le stampe di visualizzazione delle relative pagine del sito – emerge che in detto periodo l'impresa individuale di Francesco Firano prima, fino all'11 gennaio 2018, e successivamente la BG Services che le è subentrata,  hanno maturato ricavi (profits)  relativi agli scambi ("trading profit") per €  1.428.031,22; relativi ai prelievi (withdraws profit) per € 497.155,88, e per depositi per €  71.781,60 (si evidenzia fin da ora che questi sono specificamente riferiti alla criptovaluta Nano, identificata dal codice XRB), per un totale di profitti pari ad  € 1.996.968,70.

Ne consegue che sono ravvisabili  i presupposti di fallibilità con riferimento all'art. 1 L.F., tanto più che il Firano non ha prodotto, secondo il proprio onere, documentazione contabile da cui risulti l'esclusione dall'area di fallibilità di cui alla norma citata, che contrasti le risultanze dell'accertamento della Polizia Postale sopra riferito.

2.3.1. Al fine di affermare la sussistenza della condizione di procedibilità di cui all'art. 15 L.F. e di sussistenza dello stato di insolvenza è necessario analizzare in cosa sia consistita l'attività della Webcoin Solutions e valutare se sia ravvisabile  una responsabilità del gestore del sito per gli ammanchi  di criptovaluta, con conseguente sussistenza di debiti.

2.3.2 Con riferimento in primo luogo alla moneta virtuale oggetto di scambio, prelievo e deposito attraverso la piattaforma BitGrail, si osserva che la valuta virtuale trova una sua definizione nel d.lgs. 90/2017 che, in attuazione della  direttiva UE n. 2015/849, modificando le definizioni dell'art. 1, comma 2, della legge antiriciclaggio,  con la lettera qq) definisce la valuta virtuale come «*la rappresentazione digitale di valore, non emessa da una banca centrale o da un'autorità pubblica, non necessariamente collegata a una valuta avente corso legale, utilizzata come mezzo di scambio per l'acquisto di beni e servizi e trasferita, archiviata e negoziata elettronicamente*».

Sulla base del medesimo decreto (lettera ff del medesimo art. 1 comma 2)  sono definiti come  prestatori di servizi relativi all'utilizzo di valuta virtuale «*ogni persona fisica o giuridica che fornisce a terzi, a titolo professionale, servizi funzionali all'utilizzo, allo scambio, alla conservazione di valuta virtuale e alla loro conversione da ovvero in valute aventi corso legale*».

In un contenzioso (afferente questione tributaria  di applicazione I.V.A all'operazione di cambio di valuta contro criptovaluta e viceversa, ritenuta prestazione di servizio a titolo oneroso in presenza del pagamento della differenza tra il prezzo di acquisto delle valute e quello di vendita ricaricato dall'operatore ai propri clienti) relativo alla valuta virtuale  denominata "bitcoin", la Corte di Giustizia UE (Quinta Sezione, sentenza 22 ottobre 2015, causa C-264/14) ne ha parimenti fornito una definizione spiegando che   " *la valuta virtuale «bitcoin» è utilizzata principalmente per pagamenti tra privati via internet nonché in taluni negozi online che accettano detta valuta. Questa valuta virtuale non ha un unico emittente ma viene creata direttamente in una rete tramite uno*

Firmato Da: GOVERNATORI SILVIA Emesso Da: POSTECOM CA3 Serial#: 12de50



*speciale algoritmo. Il sistema della valuta virtuale «bitcoin» consente la detenzione e la cessione anonime di valori in «bitcoin» all'interno della rete da parte di utenti che hanno indirizzi «bitcoin». Un indirizzo «bitcoin» potrebbe essere comparato a un numero di conto corrente bancario", e, sulla base di una relazione del 2012 della Banca centrale europea sulle valute virtuali, " una valuta virtuale -può essere definita come un tipo di moneta digitale, non regolamentata, emessa e controllata dai suoi sviluppatori e utilizzata ed accettata tra i membri di una specifica comunità virtuale. La valuta virtuale «bitcoin» fa parte delle valute virtuali «a flusso bidirezionale», che gli utenti possono acquistare e vendere in base ai tassi di cambio. Tali valute virtuali sono simili ad ogni altra valuta convertibile per quanto riguarda il loro uso nel mondo reale. Esse consentono l'acquisto di beni e servizi sia reali che virtuali. Le valute virtuali sono diverse dalla moneta elettronica, come definita nella direttiva 2009/110/CE del Parlamento europeo e del Consiglio, del 16 settembre 2009, concernente l'avvio, l'esercizio e la vigilanza prudenziale dell'attività degli istituti di moneta elettronica, che modifica le direttive 2005/60/CE e 2006/48/CE e che abroga la direttiva 2000/46/CE (GU L 267, pag. 7), in quanto, a differenza da tale moneta, nel caso delle valute virtuali i fondi non sono espressi nell'unità di calcolo tradizionale, ad esempio in euro, ma nell'unità di calcolo virtuale, ad esempio il «bitcoin»".*

Sulla base delle definizioni normative e giurisprudenziali sopra richiamate risulta dunque che la criptovaluta è "una digitalizzazione di valore", che viene utilizzata come mezzo di scambio per acquistare beni o servizi, caratterizzandosi per non essere emessa da una banca centrale o altra pubblica autorità, e per non essere necessariamente collegata ad una valuta avente corso legale.

Dette valute virtuali, che sono trasferite, archiviate e negoziate elettronicamente proprio per la loro natura di digitalizzazione di valore, vengono acquistate attraverso delle apposite piattaforme, e possono attraverso le medesime piattaforme essere oggetto di scambio, oltre ad essere depositate in uno spazio di archiviazione. Esse, quali digitalizzazione di valore, si prestano ad essere oggetto di operazioni speculative: anzi, a ben vedere, essendo essenzialmente valori finanziari, si prestano particolarmente proprio ad operazioni speculative in ragione della estrema variabilità dei livelli di fluttuazione che le caratterizzano.

Poiché le criptovalute possono essere oggetto di diritti, vanno considerate quali "beni" ai sensi dell'art. 810 c.c..

2.3.3. Le criptovalute oggetto di acquisto, scambio e deposito su BitGrail erano molteplici, ed in particolare era oggetto di scambio sulla piattaforma la criptovaluta Nano rispetto alla quale si sono verificati gli ammanchi lamentati dal ricorrente e dagli intervenuti ed esposti dal Pubblico Ministero.

2.4.1 Francesco Firano ha articolato la propria difesa sostenendo che:

a) il rapporto fra la piattaforma e gli utenti è tale per cui il deposito assumerebbe una valenza meramente accessoria e strumentale rispetto all'attività di gestione della piattaforma, ed era del tutto gratuito;

Firmato Da: GOVERNATORI SILVIA Emesso Da: POSTECOM CA3 Serial#: 12de50



Sent. n. 17/2019 pubbl. il 21/01/2019

b) se si intende parlare di deposito non vi sarebbero dubbi sul fatto che si tratterebbe di un deposito regolare, non sussistendo alcun elemento giuridico in forza del quale configurare un diverso rapporto;

c) il Firano prima e la BG poi avrebbero adottato le cautele e le misure ritenute opportune sotto il profilo della sicurezza informatica;

d) a causa di vizi propri del software Nano, non riconducibili alla piattaforma (tanto che nessun'altra criptovaluta è stata oggetto di attacchi e di furti), si sono dovuti constatare alcuni indebiti prelievi di Nano, in numero contenuto e artificiosamente mascherati, da parte di alcuni utenti, che sono riusciti, in sintesi, a duplicare l'entità dei prelievi così da creare l'ammanco complessivo di circa 15,5 milioni di Nano di proprietà degli utenti;

e) non sarebbe dato di conoscere con esattezza la data degli ammanchi di cui il Firano si sarebbe reso conto solo l'8.2.2018 procedendo immediatamente alla denuncia;

f) gli ammanchi sarebbero dipesi da falle nel software Nano.

2.4.2 La ricostruzione del Firano è contestata dal ricorrente, dagli intervenuti e dal Pubblico Ministero sostenendo che nella specie  il rapporto tra gli utenti e il gestore della piattaforma dovrebbe qualificarsi quale deposito irregolare, con conseguente sussistenza  dell'obbligo di restituzione del *tantundem eiusdem generis* ai sensi dell'art. 1782 c.c..

Comunque, ove anche si facesse applicazione delle norme sul deposito regolare, sussisterebbe responsabilità risarcitoria del gestore  in conseguenza della mancata adozione di tutte le misure necessarie a garantire la sicurezza del deposito, in specie considerato che non sarebbe stato rispettato l'onere di immediata denunzia del fatto generatore dell'ammanco, rilevante ai sensi dell'art. 1780 primo comma  c.c.

2.5.1  Per disporre di tutti gli elementi necessari al fine di valutare la responsabilità della Webcoin è stata disposta una CTU    affinchè il consulente descrivesse "*il funzionamento della piattaforma exchange online gestita da BG Services s.r.l., con particolare riferimento:*

*- alle modalità di svolgimento del rapporto tra piattaforma e utente sin dal momento della registrazione di quest'ultimo su BitGrail.com e i servizi offerti dalla piattaforma;*

*- alla conservazione e alla collocazione delle criptovalute all'interno della piattaforma;*

*- ai poteri di supervisione e controllo sulle transazioni e sulle movimentazioni delle criptovalute da parte del gestore della piattaforma e agli eventuali ulteriori poteri del gestore.*

Al CTU è stato altresì chiesto di riferire "*sulle circostanze dell'ammanco di Nano denunciato da Firano Francesco nel febbraio 2018, anche sull'effettiva datazione dello stesso*" individuandone le cause, e di accertare  "*se fossero state adottate tutte le misure di sicurezza dalla piattaforma e nel caso di risposta positiva descrivendo le stesse e fornendo ogni elemento utile per la valutazione di adeguatezza della misura in considerazione della natura e dell'attività e delle caratteristiche della criptovaluta*".

Firmato Da: GOVERNATORI SILVIA Emesso Da: POSTECOM CA3 Serial#: 12de50



Sent. n. 17/2019 pubbl. il 21/01/2019

2.5.2. Preliminarmente deve darsi atto che la consulenza si è svolta nel pieno contraddittorio tra le parti – tanto che al CTU è stata concessa una proroga dopo che il consulente del Firano ha chiesto di poter discutere in un nuovo incontro degli elementi emersi dopo l'ultimo incontro peritale e dopo la consegna della bozza del CTU e delle risposte dei CTP. In seguito il CTU ha sottoposto ai CTP una nuova bozza e le parti hanno fatto pervenire le proprie osservazioni, e il consulente ha predisposto la stesura finale della relazione, tenendo conto di tutte le osservazioni – con ampie ed articolate argomentazioni, fondate sulla descrizione analitica delle indagini svolte nel pieno contraddittorio, immuni da vizi logici.

Il Tribunale ritiene del tutto infondata l'eccezione di nullità della perizia avanzata dalla difesa del Firano  sostenendo che  il CTU avrebbe dovuto,  a mente dell'art. 195 c.p.c., limitarsi a depositare la bozza, allegando le osservazioni e  una sintetica valutazione.

Osserva al riguardo il Collegio che a fronte del  consistente numero di osservazioni avanzate dai CTP  e della loro complessità – ciò che nitidamente emerge dall'esame delle relazioni dei CTP allegate   dal CTU – la scelta effettuata dal consulente di una ristesura finale dell'elaborato peritale in modo che risultassero in essa integrate  le osservazioni dei consulenti, al contempo fornendo risposta alle osservazioni medesime – è  scelta da apprezzare e condividere  atteso che è stata efficacemente adottata al fine di rendere alle parti e al Tribunale una relazione organica, completa e dotata dell'imprescindibile chiarezza espositiva, nulla togliendo al contraddittorio.

2.5.3. Devono essere quindi respinte le richieste di chiarimenti ed integrazione della CTU formulate a verbale di udienza in data  11.12.2018  dalla difesa del convenuto, considerato che  le contestazioni  che le supportano non intaccano l'impianto ricostruttivo della consulenza, che ha ampiamente tenuto conto delle difese del convenuto.

2.6.1 Nel merito dell'esito degli accertamenti peritali, si osserva che il  CTU, rispondendo alla prima parte del quesito, ha riferito che BitGrail forniva *"un servizio di deposito e trading di 10 diverse criptomonete…tramite un portafoglio che l'utente poteva aprire e mantenere attivo gratuitamente, senza commissioni per l'exchange esclusi i costi di prelievo (che non rappresentavano necessariamente un guadagno per l'exchange ma consistevano in un rimborso forfait delle transaction fee da esso sostenute) e quelli di trading (per il quale l'exchange incassava invece una percentuale di 0.020% sul transato). Il deposito serviva esclusivamente per poter permettere agli utenti di avere la liquidità necessaria sull'Exchange per effettuare le operazioni di cambio, non si trattava quindi di un vero e proprio wallet. Non esistevano quindi costi di deposito, fatto salvo per un breve periodo all'inizio della piattaforma durante il quale erano stati attivati dei costi irrisori di deposito (poi quasi subito rimossi) per evitare il problema delle transazioni "SPAM". Per la moneta Nano, non erano presenti costi di prelievo"* nonché   un *"servizio di "trading", mediante il quale gli utenti potevano vendere le criptomonete attestate sul loro wallet per acquistarne altre"*

Firmato Da: GOVERNATORI SILVIA Emesso Da: POSTECOM CA3 Serial#: 12de50



Sent. n. 17/2019 pubbl. il 21/01/2019

2.6.2. Quanto alle modalità di svolgimento del rapporto tra piattaforma ed utente il rapporto iniziava con la registrazione, durante la quale l'utente indicava alcuni suoi dati e otteneva l'accesso alla sua area riservata, che doveva essere ulteriormente vincolato da autenticazione a due fattori (con conferma codice PIN ricevuto via email) per avere accesso alle funzioni di trading.

Il Consulente ha segnalato che per quanto dichiarato dal sig. Firano durante le operazioni di CTU, la piattaforma non eseguiva alcun genere di controllo approfondito in merito all'identità del registrante, né teneva alcuna traccia degli indirizzi IP utilizzati per la registrazione o per i successivi accessi od operazioni, con la conseguenza che in caso di attività illecita (come il furto di criptomoneta) non poteva essere fornito alcun supporto utile a identificare i potenziali autori.

Quindi l'utente "ricaricava" il proprio wallet (assegnatogli con la registrazione) con la criptomoneta di sua preferenza – trasferendola autonomamente a partire da un proprio portafoglio – potendo successivamente impiegarla all'interno dell'exchange per comprarne altra, di tipo diverso, ritirando poi quanto acquistato (o quanto depositato) tramite la funzione "withdraw".

Una volta versati i fondi, in criptomonete sul wallet "*gli utenti potevano gestirli autonomamente ma sempre tramite i servizi forniti e abilitati dall'Exchange, che era preposto a gestire gli spostamenti di criptomonete (quindi trasferimenti tra "monete virtuali" di tipo diverso ma sempre all'interno dell'exchange, che possiamo immaginare come bonifici intra banca) allo stesso modo dei prelievi (trasferimenti di criptomonete dall'exchange verso indirizzi esterni, in gestione diretta da parte dell'utente e quindi di sua proprietà, che possiamo immaginare come bonifici SEPA verso banche esterne o prelievi di contante)*".

Il CTU ha precisato che "*I fondi trasferiti dagli utenti sull'indirizzo loro assegnato non vi rimanevano, venivano invece spostati per le criptomonete principali (Bitcoin, Ethereum, Nano, etc…) verso un indirizzo principale di BitGrail con uno script che ogni notte raccoglieva i fondi dai singoli indirizzi per trasferirli verso di esso*" . Tale modalità, secondo il CTP di parte Firano era necessaria per consentire i prelievi in sicurezza a partire dall'ammontare di criptovaluta effettivamente depositato da ogni utente sul proprio indirizzo assegnato da BitGrail[1].

2.6.3. Rispondendo all'ulteriore quesito sottopostogli il CTU ha accertato che "*le criptomonete venivano conservate in "hot wallet" (cioè portafogli configurati sui server di produzione, cioè quelli connessi a Internet e su cui erano attivi gli utenti e il portafoglio dell'exchange) dove queste rimanevano a disposizione dell'exchange che ne gestiva i prelievi o le compravendite tra criptomonete diverse.*

*Questi portafogli erano controllati esclusivamente tramite il codice dell'exchange oppure da coloro che detenevano le chiavi private dei wallet, quindi da Francesco Firano e il socio Andrea*

---

[1] "tale funzionalità era necessaria per consentire i prelievi: se un utente X deposita 10 NANO sul proprio indirizzo assegnato da BitGrail, e poi, tramite trading, riesce ad ottenere un balance di 100 NANO, è chiaro che non sarà possibile per l'exchange consentire il prelievo di 100 NANO dall'indirizzo dove in deposito ci sono unicamente 10 NANO, per questo motivo, quindi, era importante accentrare i fondi.".

Firmato Da: GOVERNATORI SILVIA Emesso Da: POSTECOM CA3 Serial#: 12de50



*Davoli, che avevano accesso al sistema anche via SSH (un sistema di controllo remoto utilizzato per gestire sistemi)."*

Il CTU ha quindi precisato – e ciò è ovvia conseguenza di quanto sopra riportato – che *"Gli utenti non avevano la possibilità di gestire autonomamente i loro fondi senza fare uso delle funzionalità della piattaforma BitGrail, in primo luogo perché gli indirizzi di deposito loro assegnati venivano in breve tempo svuotati per far convogliare le criptomonete verso gli indirizzi principali dell'exchange, in secondo luogo perché gli utenti non disponevano di alcuna chiave privata. Senza autenticarsi sulla piattaforma BitGrail, che doveva essere attiva e funzionante, era quindi impossibile per gli utenti eseguire attività di trading ma anche semplicemente ritirare i propri fondi, così come – per fare un esempio pratico – per un correntista è impossibile ritirare i fondi depositati presso la propria banca se gli sportelli sono chiusi, il portale web è inattivo e i servizi di credito/debito tramite carte non sono funzionanti".*

Di conseguenza, poiché i fondi di tutti gli utenti erano gestiti centralizzandoli su di un unico conto, il CTU ha affermato, con conclusione inconfutabile ed inconfutata, che *"l'unico modo per attribuire a un utente il suo capitale è quello di valutare i dati contenuti sul database, non essendo i wallet "fisicamente" distinti. Non è però possibile, in caso di ammanco, capire di quale utente fossero i fondi scomparsi, dato che i fondi di tutti gli utenti venivano raccolti su di un unico conto".*

Il CTU ha precisato nelle conclusioni che *"Non risulta che…sia mai stato disposto movimento di fondi all'esterno dell'exchange dal gestore, a parte il 12 dicembre 2017, data in cui sono stati trasferiti parte dei fondi dall'indirizzo representative BitGrail1 al BitGrail2, in corrispondenza del cambio d'infrastruttura verso la nuova piattaforma: in tale data, 13 milioni di XRB sono stati spostati "a mano", senza utilizzare le funzioni dell'exchange, che non hanno quindi tracciato il movimento nel database.*

*Da tale data, l'indirizzo BitGrail 1 è diventato un "cold wallet", al fine di mantenervi alcuni milioni di Nano da escludere dall'operatività dell'Exchange che invece continuava a operare utilizzando come "hot wallet" l'account BitGrail 2. Il fine di questa operazione è mantenere "al sicuro" e offline, fuori dalla rete, un conto (BitGrail 1) e utilizzare invece per l'operatività quotidiana il secondo conto (BitGrail 2) così come previsto dalle best practices."*

2.7. Alla luce di quanto accertato dal CTU e sopra riportato ritiene il Collegio che emergano chiari elementi per ritenere che le criptovalute, ed in specie quelle denominate Nano – per quanto concerne gli ammanchi oggetto dell'odierna analisi – sono beni fungibili, trattandosi di rappresentazioni digitali espresse in unità portatrici di un medesimo valore, che venivano fatte confluire dal gestore della piattaforma verso un indirizzo principale di Bitgrail ove erano archiviate quali masse di criptovalute omogenee. Al riguardo risulta priva di pregio l'asserzione per cui i Nano non sarebbero "denaro" né tanto meno "cose fungibili", avendo una loro precisa identità anche distinta da quella di ogni altra criptovaluta: se ciò fosse vero, anche il denaro non sarebbe un bene fungibile (il chè certamente va escluso, salvi i casi di collezionismo numismatico) considerato che i

Firmato Da: GOVERNATORI SILVIA Emesso Da: POSTECOM CA3 Serial#: 12de50



Sent. n. 17/2019 pubbl. il 21/01/2019

dollari sono diversi dagli euro e dalle sterline e ogni banconota reca un numero di serie. E, a ben vedere anche la banconota non è che una "nota di banca", ossia, essenzialmente, una informazione.

Va quindi  osservato che anche il rapporto tra utenti ed exchange per la criptovaluta Nano era un rapporto misto di deposito e trading, non potendoci essere commercio in difetto del correlato deposito per tutte le caratteristiche di funzionamento del commercio di criptovaluta e della piattaforma descritte analiticamente dal CTU.

Proprio in ragione della loro fungibilità, una volta che le criptovalute degli utenti erano convogliate sull'indirizzo principale di BitGrail, le valute (ovviamente divise per specie) non recavano elementi distintivi  circa la loro appartenenza ai singoli utenti, dando così luogo ad un deposito irregolare, cui consegue lo specifico obbligo per il depositario di mantenere sempre a disposizione dei depositanti la quantità integrale, con un coefficiente di cassa del 100%.

Si osservi che lo spostamento in un unico indirizzo dell'exchange assolve per le criptomonete alla medesima funzione  economica di ogni deposito irregolare, ossia alla maggiore efficienza nel custodire insieme i beni di diversi depositari, per i quali è irrilevante l'identità della singola criptomoneta, purchè sia sempre a loro disposizione la quantità, *rectius* il valore,  di loro titolarità.

Con la conseguenza, propria di ogni deposito irregolare di beni fungibili,  che, quando non siano stati individuati al momento della consegna – come è avvenuto esattamente nella specie, ove si consideri quanto riferito dal CTU sul fatto che "*l'unico modo per attribuire a un utente il suo capitale è quello di valutare i dati contenuti sul database, non essendo i wallet "fisicamente" distinti. Non è però possibile, in caso di ammanco, capire di quale utente fossero i fondi scomparsi, dato che i fondi di tutti gli utenti venivano raccolti su di un unico conto* " -  entrano nella disponibilità del depositario che acquista il diritto di servirsene e, pertanto, ne diventa proprietario ("La facoltà di servirsi del danaro depositato costituisce un elemento naturale della fattispecie di cui all'art. 1782 c.c.": Cass. 12552/2000), pur essendo tenuto a restituirne altrettanti della stessa specie e qualità, salvo che sia stata apposta un'apposita clausola derogatoria, (Cass. 20 aprile 2001, N. 5843; 23.8.2011 N. 17512;22.3.2013, N. 7262), clausola derogatoria assente nel caso di specie.

Tale conclusione trova conferma nella circostanza di fatto per cui il Firano ha potuto trasferire tutte le criptovalute  manualmente verso una nuova piattaforma: significativa al riguardo è la circostanza accertata dalla Polizia Postale e posta dal P. M. a fondamento dell'istanza di sequestro per cui "*nei giorni tra il 2  e il 5 febbraio 2018, due giorni prima della comunicazione effettuata dalla Nano Foundation dell'avvenuto furto e 3 giorni prima della denuncia presentata…il Firano attraverso 9 operazioni sequenziali, ha depositato nel suo portafogli sulla piattaforma The Rock un totale di 230 Bitcoin, criptomoneta che al cambio nel periodo di riferimento corrispondeva a circa 1.700.000 euro*", essendo emerso "*che i versamenti dei Bitcoin, sul wallet del Firano, provenivano da indirizzi riconducibili a quelli utilizzati dai clienti della BitGrail per effettuare i depositi sulla predetta piattaforma*".

Firmato Da: GOVERNATORI SILVIA Emesso Da: POSTECOM CA3 Serial#: 12de50



Sent. n. 17/2019 pubbl. il 21/01/2019

2.8. Quanto ai poteri di supervisione e controllo sulle transazioni e sulle movimentazioni delle criptovalute da parte del gestore della piattaforma e agli eventuali ulteriori poteri del gestore, il CTU ha accertato che il gestore dell'exchange aveva conoscenza delle chiavi private con le quali potevano essere spesi i fondi attestati sui vari wallet, e che le chiavi venivano impiegate tramite i "nodi" che gestivano le varie criptomonete per attivare i vari prelievi che gli utenti man mano richiedevano oppure per convogliare i fondi che gli utenti man mano versavano sui loro indirizzi dedicati.

Il CTU ha evidenziato che "*L'unico caso in cui le criptomonete sono risultate essere utilizzate direttamente da Firano, fuori dall'exchange, è stato in data 12 dicembre 2017, quando circa 13 milioni di Nano sono stati spostati dall'indirizzo utilizzato fino ad allora a quello nuovo, creato contestualmente alla revisione del codice*".

Il CTU ha riferito che l'exchange riceveva ordini di trading o di prelievo da parte degli utenti e, tramite il codice con cui era sviluppato, provvedeva a informare il nodo che gestiva ogni rispettiva criptomoneta circa le transazioni che dovevano essere eseguite, indicando ad esempio per i prelievi la cifra da trasferire e l'indirizzo di destinazione.

Il CTU ha spiegato che il "__*nodo*__ *è un software Nano installato dal sig. Firano su un computer (o macchina virtuale) collegato all'exchange BitGrail. Il nodo conteneva le funzioni di creazioni account, blocchi, transazioni, firma, etc… in sostanza il* __nodo è un wallet Nano in tutto e per tutto autosufficiente, ma da solo non può fare nulla senza ricevere__ *comandi dall'esterno, attraverso un canale chiamato "RPC" che viene utilizzato per impartire ordini di trasferimenti, creazione indirizzi o qualunque altro dei comandi disponibili ed elencati all'indirizzo* __https://github.com/nanocurrency/raiblocks/wiki/RPC-protocol__"

Secondo la ricostruzione offerta dal consulente "*Il sig. Firano, ovvero BitGrail, era l'unico responsabile della sua manutenzione. Sempre il sig. Firano era la persona che aveva proceduto alla sua installazione e che si occupava della sua manutenzione e aggiornamento ogni qualvolta il team Nano rilasciava degli aggiornamenti del software per migliorare la stabilità, sicurezza o aggiungere nuove funzionalità. Lo stesso era inoltre l'unico responsabile delle comunicazioni da/verso il nodo, in particolare dell'invio di comandi, della corretta interpretazione delle risposte ricevute a fronte di richieste, della gestione di eventuali errori, poiché la comunicazione tra exchange BitGrail e nodo era protetta e riservata*".

Il nodo, dunque, "*risiedeva direttamente nell'ambiente BitGrail*".

Secondo la ricostruzione del CTU, ogni volta che il nodo riceveva una richiesta di eseguire una transazione da BitGrail, ne generava il codice, lo firmava con le chiavi private e segrete in esso memorizzate e la trasmetteva verso gli altri nodi della rete Nano, propagando così pubblicamente la transazione e "attivando" quindi la transazione così come un bonifico viene "attivato" nel momento in cui viene comunicato, come minimo, al destinatario dei fondi. Nel mondo della blockchain distribuita, il "bonifico" viene comunicato a tutti i nodi che, chi prima chi dopo, lo segnano nella

Firmato Da: GOVERNATORI SILVIA Emesso Da: POSTECOM CA3 Serial#: 12de50



Sent. n. 17/2019 pubbl. il 21/01/2019

loro blockchain locale e propagano ulteriormente la notizia del trasferimento così che tutti i nodi vengano raggiunti e aggiornati.

L'exchange – così come il suo gestore – aveva visibilità solamente sulle transazioni che il software dell'exchange BitGrail aveva lanciato e delle quali il sistema aveva ricevuto notifica dai nodi che gestivano le criptomonete.

Non erano stati implementati sistemi di controllo e supervisione dei wallet a livello di blockchain, verificando ad esempio sul nodo (previa verifica dell'avvenuta sincronizzazione e aggiornamento con le transazioni in corso) se le transazioni emesse erano state effettivamente inoltrate sulla rete ma, soprattutto, se esistevano transazioni di uscita dal conto ("account", nel protocollo Nano) di cui l'exchange non era a conoscenza, cosa che risulta essere proprio la circostanza dell'ammanco di Nano.

2.9.1  Quanto all'ammanco denunciato da Firano nel febbraio del 2018, va in primo luogo evidenziato che, ben diversamente da quanto sostenuto dal convenuto  nelle proprie difese, lungi dall'essersi verificato nell'immediatezza della denuncia, esso è databile tra maggio 2017 e dicembre 2017, con alcune fuoriuscite anche a gennaio 2018, dal nuovo indirizzo BitGrail 2, la cui migrazione è avvenuta dal dicembre 2017 a fine anno. Il Tribunale osserva che la datazione è stata ricostruita affidabilmente dal  CTU -  con motivazione ampia e congrua -  dando atto di aver utilizzato  il metodo della ricerca della transazione precedente sul database BitGrail, transazione certamente datata – se presente – come tutte quelle contabilizzate nel logfile dell'exchange. Il metodo della transazione precedente è stato poi raffinato con verifiche sui backup della blockchain eseguiti dal team di sviluppo Nano e da verifiche su transazioni con stesso destinatario e stessa cifra occorse in periodi prossimi.

2.9.2 Va evidenziato – trattandosi di questione di sicuro rilievo – che non solo l'ammanco risale temporalmente a molti mesi prima della denuncia, e che il Firano si era accorto della presenza di ammanchi significativi, quali sono stati quelli del luglio 2017 al momento del loro verificarsi.

Ciò risulta  chiaramente dai messaggi della  chat Telegram attiva con il team di sviluppo Nano (all'interno della quale Firano era entrato a dicembre 2016 per uscirne a dicembre 2017) dei quali  il Tribunale può tenere conto, considerato che si tratta di  documenti già prodotti in atti  dalla Procura, rispetto ai quali il CTU, onde rendere il dato utilizzato oggettivo e condiviso, ha provveduto – nell'ambito dei poteri istruttori conferitigli dal Tribunale, nel rispetto dell'art. 15 comma 4 L.F. – a richiedere copia originale della chat ai partecipanti, ottenendo copia ricavata direttamente da esportazione Telegram, che ha allegato.

2.10. Procedendo ad analizzare  le modalità dell'ammanco,  nel corso delle operazioni peritali è stato accertato pacificamente tra le parti che esso è avvenuto durante il normale utilizzo e ciclo di vita dell'exchange, da parte di normali utenti, inserendo la propria mail e i propri dati, utilizzando il proprio wallet -  senza furto di chiavi, forzature di sistemi, né sconfitta della sicurezza

Firmato Da: GOVERNATORI SILVIA Emesso Da: POSTECOM CA3 Serial#: 12de50



Sent. n. 17/2019 pubbl. il 21/01/2019

perimetrale, installazione di trojan/backdoor, o vulnerabilità nel protocollo matematico delle criptomonete.

In particolare il CTU ha verificato che esso  "*è stato causato da prelievi multipli (detti anche "double withdraws") che si verificano in circostanze non provate chiaramente. Secondo la dichiarazione del Sig. Firano, infatti, tali prelievi occorrevano in occasioni di malfunzionamento del nodo (egli fa riferimento a possibili "crash" del nodo) tuttavia a oggi non abbiamo certezza della dinamica di tali malfunzionamenti. Potevano esserci altre modalità durante le quali occorrevano tali prelievi multipli o anche situazioni nelle quali il nodo si comportava diversamente da come doveva, magari per sovraccarico: l'assenza del codice sorgente della piattaforma BitGrail dell'epoca impedisce di poter simulare l'accaduto. Sicuramente, l'analisi delle transazioni aventi lo stesso TXID presenti in modo massivo a luglio 2017 nella tabella "withdraws" indica come i doppi prelievi erano quasi sempre legati a tentativi multipli di prelievo molto ravvicinato e della stessa cifra, così come tra l'altro rilevato da Firano già a luglio 2017, così come riportato nella chat Telegram attiva con il team di sviluppo Nano all'interno della quale Firano era entrato a dicembre 2016 per uscirne a dicembre 2017*".

Il consulente ha chiarito che con il termine  "prelievi multipli"– per come si è verificato nel caso in esame −  ci si riferisce a  due o più prelievi di pari importo eseguiti da un medesimo conto intestato a BitGrail. Il CTU ha spiegato che nel caso in esame le richieste di prelievo da parte degli utenti BitGrail comportavano un "bonifico" dal conto unico generale BitGrail al conto indicato dall'utente. Egli ha accertato che "*il protocollo Nano prevede sin dalla sua origine la possibilità di evitare prelievi multipli generando la richiesta di prelievo per chi gestisce un unico conto per più soggetti: come emerso nel corso della CTU per far ciò occorre costruire la transazione e tra i parametri da impostare vi è il bilancio del conto e l'hash dell'ultima transazione. Procedendo in tale maniera, anche se arrivassero due richieste di prelievo identiche, solo la prima avrebbe effetto: cioè la transazione sarebbe idempotente*"[2]. *La ragione per la quale la rete Nano ha potuto eseguire le transazioni BitGrail richieste in modo multiplo (ossia quelle non autorizzate oltre la prima, effettivamente autorizzata) deriva dunque dal fatto che BitGrail conservava tutta la criptovaluta Nano in un unico portafoglio con un saldo sufficiente a soddisfare qualsiasi richiesta di prelievo. Inoltre, cosa più importante, l'hash (cioè la firma, una sorta di "Codice CRO" come nei bonifici) di ognuna delle singole transazioni componenti le transazioni multiple era diverso, nonostante BitGrail richiedesse al nodo un prelievo più volte "convinto" che si trattasse sempre dello stesso prelievo. E in effetti agli occhi del nodo le transazioni sono state elaborate come transazioni*

---

[2] Idempotenza" è la proprietà di eseguire una volta sola un comando anche se impartito più volte, anche se identico e in rapida successione. Per fare un esempio "banale" ma chiarificatore: durante il prelievo di contante con il bancomat, anche tentando di premere più volte il pulsante di prelievo, la funzione "idempotente" fa sì che il dispositivo emetta una e una sola disposizione di prelievo, fornendo il contante richiesto una volta sola e tracciando il prelievo una volta sola nell'estratto conto del cliente.

Firmato Da: GOVERNATORI SILVIA Emesso Da: POSTECOM CA3 Serial#: 12de50



Sent. n. 17/2019 pubbl. il 21/01/2019

*diverse, mentre per BitGrail le transazioni di prelievo effettivamente uscite erano singole, con un unico valore hash e un'unica "entry" nel database "withdraws", che teneva traccia appunto di ogni singola richiesta di prelievo "ufficiale", andata poi a buon fine o meno. Dunque ... il prelievo multiplo è da intendersi come una forma abbreviata di "multiple richieste di prelievo da parte di BitGrail" e non di uscite multiple da parte del nodo, che per ogni richiesta faceva uscire i fondi una volta sola, quindi non è la rete Nano che disponeva uscite in maniera multipla ma l'exchange BitGrail che richiedeva più volte al nodo di fare uscire dei fondi che, in realtà, erano già usciti alla prima richiesta".*

L'ammanco denunciato da Firano a febbraio 2018 è stato, quindi, causato da una richiesta di invio generata più volte da BitGrail a fronte di una unica richiesta da parte dell'utente. Al nodo Nano tali richieste sono pervenute come richieste differenti tra loro, altrimenti, se fossero state idempotenti come descritto nel corpo della relazione, il nodo Nano le avrebbe scartate evitando il problema che si è verificato.

Il CTU ha precisato che *"Pur non avendo avuto modo di riscontrare in dettaglio la circostanza nel codice sorgente di BitGrail poiché indisponibile, sulla base della descrizione fornita da Firano è emerso che a seguito di una prima richiesta di prelievo BitGrail cercava traccia dell'esecuzione all'interno del servizio esterno di block explorer Raiblocks. Occorre precisare che lo strumento Raiblocks non nasce per l'uso fatto da BitGrail pertanto ogni controllo fatto su di esso non poteva essere considerato affidabile. Per ovvi motivi il nodo poteva inoltre essere disallineato al momento della verifica. In tali casi BitGrail inviava una nuova richiesta che di fatto si presentava diversa dalla precedente. Talvolta queste richieste venivano quindi eseguite più volte generando il prelievo multiplo.*

*In ogni caso, qualsiasi fosse la causa scatenante, è chiaro che ogni prelievo multiplo è nato come richiesta multipla da parte di BitGrail. Il nodo Nano ha eseguito le richieste pervenute da BitGrail, non avendo visione sulla reale contabilità dell'exchange"*.

Gli ammanchi si sono verificati perché gli utenti che si sono appropriati dei Nano avevano scoperto che, richiedendo un prelievo in determinati momenti, vi erano buone probabilità di ottenere due prelievi identici, di cui uno contabilizzato ed "ufficiale" ed uno ulteriore che veniva effettuato una seconda volta, ma non veniva contabilizzato dall'exchange mentre era regolarmente iscritto all'interno della blockchain nel nodo Nano affiancato all'exchange: di conseguenza vi è stata una fuoriuscita di criptovaluta Nano dalla piattaforma senza che le transazioni venissero registrate nel database dell'exchange.

Il CTU ha descritto dettagliatamente le misure che avrebbero potuto essere adottate dal gestore di BitGrail, evidenziando che *"Indipendentemente dal motivo per il quale le transazioni non risultavano immediatamente disponibili sul nodo, Bitgrail verificava il buon esito del comando di trasferimento (generato a seguito di richiesta di prelievo di un utente) cercando i riferimenti all'interno del block explorer RaiBlocks che però non era attendibile e, per stessa definizione del*

Firmato Da: GOVERNATORI SILVIA Emesso Da: POSTECOM CA3 Serial#: 12de50



Sent. n. 17/2019 pubbl. il 21/01/2019

*protocollo, essendo sostanzialmente un altro nodo nella rete, poteva ovviamente essere non sincronizzato come lo era BitGrail, il che avrebbe dovuto renderlo non idoneo per alcun genere di controllo di esecuzione delle transazioni*" e che "*laddove il prelievo multiplo fosse stato effettivamente causato da malfunzionamenti del nodo (che si ricorda essere solo un mero esecutore di comandi di richiesta di trasferimento non idempotenti pervenuti da Bitgrail), ... Bitgrail avrebbe dovuto interrompere le operazioni, verificare la contabilità e l'effettiva esecuzione delle richieste pendenti prima di dar seguito a nuove disposizioni*"

Con riferimento alle osservazioni del CTP del convenuto, Epifani, sull'impossibilità di generare e firmare transazioni fuori dal nodo prima del 16 dicembre 2017, il CTU ha rilevato  che "*in realtà la funzione segnalata da Epifani permette d'inviare al nodo un comando di creazione di un blocco anche quando il nodo non possiede le chiavi private. Risulta invece sempre stato possibile eseguire firme fuori dal nodo (cosa di cui già dal 2014 si discute anche in ambito di altre criptomonete) con procedure note già da giugno 2017 e pubblicate su diversi manuali online da parte della comunità Nano.*

*Dai vari scritti, emerge come l'utilizzo del nodo come "centro contabile" era previsto – come in generale avviene anche per le altre criptomonete – solamente per gli utenti singoli, con il loro wallet privato, senza attività intense o concorrenti. Gli exchange sono sempre stati invitati a gestire in modo autonomo le transazioni, proprio perché conferire tutta la fiducia al nodo implica un alto rischio, non soltanto per le eventuali doppie transazioni.*" Si tratta dunque di un rischio che, ad avviso del Tribunale, avrebbe dovuto essere gestito dal gestore della piattaforma, che avrebbe potuto e dovuto limitarlo,  nel momento in cui offriva i propri servizi.

E, ben vero che il 16 febbraio 2018  è stata apportata da parte degli sviluppatori Nano una modifica  alla funzione Send in modo da renderla idempotente,   tuttavia secondo il CTU "*questo non significa che prima di queste modifiche non fosse possibile generare e firmare blocchi offline o garantire idempotenza, erano ovviamente operazioni da fare fuori dal nodo, scrivendo opportuno codice nella piattaforma Bitgrail*".

Il  Firano, che  era consapevole della necessità – per questioni di sicurezza – di firmare fuori dal nodo, tanto che per i Bitcoin ha confermato al CTU che procedeva esattamente in tale maniera, generando e firmando le transazioni di prelievo in Bitcoin fuori dal nodo "*Non aveva invece ritenuto di poterlo fare per i prelievi di Nano perché il nodo non forniva gli strumenti per farlo in modo agevole*" mentre "*tale evenienza si poteva controllare in modo agevole (ad esempio non firmando transazioni in ingresso se non in modo coordinato con i prelievi) e in ogni caso la difficoltà maggiore dello sviluppo del codice per la firma fuori dal nodo avrebbe garantito la completa gestione delle transazioni che invece, demandate al nodo, si è visto poter andare completamente fuori controllo*".

Si trattava certamente di soluzione che avrebbe implicato complicazioni e maggiori spese nello sviluppo e nella gestione: ma, ad avviso del Tribunale, il Firano avrebbe dovuto adottarle, per

Firmato Da: GOVERNATORI SILVIA Emesso Da: POSTECOM CA3 Serial#: 12de50



Sent. n. 17/2019 pubbl. il 21/01/2019

adempiere con diligenza alle proprie obbligazioni, considerata la necessità di garantire la sicurezza di transazioni, effettuate tramite un deposito, con il pagamento di commissioni rilevanti, come quantificate sopra, sia pure parametrate principalmente all'operazione di *trading*, cui era collegato funzionalmente il deposito. Si osserva che benchè per il deposito non fosse di regola previsto un apposito compenso, se non per un certo periodo, tuttavia atteso il collegamento funzionale tra deposito e trading non può fondatamente sostenersi che il deposito fosse effettivamente "gratuito", così come in un volo aereo in cui sia incluso un pasto, esso, lungi dall'essere gratuitamente offerto, è semplicemente stato calcolato tra i costi della compagnia ricompresi nel prezzo complessivo.

Va dunque ravvisata una responsabilità del Firano – quand'anche si ritenesse di versare in una ipotesi di deposito regolare (ciò che invero il Tribunale esclude, come sopra argomentato al punto 2.7) - per non aver adottato misure idonee ad evitare la perdita dei beni, tanto più ove si consideri quanto ricostruito circa la datazione degli ammanchi e la consapevolezza acquisitane dal Firano fin dal luglio 2017, e ancora più il 12.12.2017, allorchè ha migrato " a mano" con 9 transazioni la cifra di circa 13 milioni di Nano dall'indirizzo BitGrail1 all'indirizzo BitGrail2.

2.11.Tanto premesso deve osservarsi che in sede di CTU è stato verificato che tramite il predetto meccanismo del prelievo multiplo sono stati sottratti a luglio 2017 circa 2.5 milioni di Nano, mentre circa 7,5 milioni di Nano sono fuoriusciti ad ottobre 2017.

Per quanto rileva in questa sede, quand'anche il Firano non avesse avuto modo di avvedersi degli ammanchi (non rilevanti, per quanto ricostruito) anteriori al luglio 2017- ciò che secondo il CTU è possibile - valutando quindi le misure necessarie ad evitare il loro ripetersi, tuttavia dopo tale data è indiscutibilmente ravvisabile una sua grave responsabilità nel non aver adottato le misure idonee ad evitare il danno per fatti di cui, come sopra detto, ha avuto sicura contezza.

A fronte del significativo ammanco di ben 2.5.milioni di Nano, Firano avrebbe dovuto, secondo un canone di ordinaria diligenza, attivarsi per accertare esattamente la causa e adottare misure idonee. Ciò non è avvenuto tanto che la sua reazione - avendo rilevato chiaramente l'attacco in corso nelle date del 14-15 e 16 luglio 2017 e la sua tipologia, come evidenziato dal CTU – è stata quella di mettere in blacklist gli utenti collegati a questi episodi: ossia 5 o 6 account. Si tratta all'evidenza di una soluzione che anche ex ante non poteva che essere considerata del tutto inadeguata: sarebbe come se, a fronte del furto effettuato da alcuni ladri che abbiano una copia delle chiavi di una casa, agevolmente acquistabili sul mercato – ci si limiti a levare loro le chiavi: in effetti gli attacchi sono "rallentati", ma giusto il tempo di dare ai "ladri" (vecchi e/o nuovi) il tempo di munirsi di nuove chiavi e di utilizzarle in assenza dell'adozione di un sistema di prevenzione da parte dell'exchange del ripetersi dei fenomeni di appropriazione di criptovalute, resi possibili proprio dalle modalità di funzionamento della piattaforma.

Anzi quello che è stato accertato dal CTU è che vi era – tra l'altro - una "*gestione delle scritture contabili dell'exchange estremamente approssimativa che pone evidentemente in capo a BitGrail una condotta di estrema negligenza (rimediare ad errori tramite spostamenti manuali non*

Firmato Da: GOVERNATORI SILVIA Emesso Da: POSTECOM CA3 Serial#: 12de50



Sent. n. 17/2019 pubbl. il 21/01/2019

*tracciati apre la strada a qualunque scenario)*" con i quali ha cercato di rimediare ad un, ulteriore, baco nel sistema (che non merita qui approfondire, ma ampiamente analizzato, comunque, dal CTU). Al contempo non è stata adottata una misura di sicurezza (quale adottata dopo febbraio 2018) per quantificare l'entità del furto: ossia un controllo "che avrebbe potuto essere eseguito con sforzi minimi" secondo il CTU con la semplice verifica periodica del saldo totale di ogni criptomoneta dell'exchange, comparata con il saldo degli indirizzi di raccolta dei fondi, anche in forma di controllo quantomeno approssimativo per rilevare ammanchi particolarmente rilevanti, eseguibile con frequenza anche giornaliera con una semplice query - controllo che non risulta mai fatto – invero inspiegabilmente – fino al febbraio 2018.

3. Da quanto sopra esposto si ricava l'attendibile sussistenza di debiti di Firano che, ove si abbia riguardo alla qualifica del deposito delle criptovalute in termini di deposito irregolare, è pari al valore che le stesse avevano al momento degli ammanchi, per 120 milioni di euro (considerato che l'80% delle stesse è stato sottratto).

Ma anche in ipotesi di qualificazione del rapporto tra la Webcoin Solutions e gli utenti in termini di deposito regolare (che invero il Tribunale non ravvisa), vi sarebbe certamente responsabilità risarcitoria del Firano. Ciò sia ove si consideri il disposto dell'art. 1780 c.c. , atteso che non solo le perdite sono derivate da un fatto a lui imputabile, ma anche è mancata l'immediata denunzia ai depositanti dei fatti per cui aveva perduto la detenzione - considerata la negligenza nella prestazione dei servizi successiva a luglio, con ammanchi di 7,5 milioni di Nano (contro i 2,5 del luglio), che porta ad una valutazione dei debiti in misura tale da superare lo sbarramento procedurale fissato dall'art. 15 LF e la soglia di cui all'art. 1 L.F.

La medesima responsabilità dovrebbe comunque ravvisarsi anche ove si intendesse fuoriuscire dall'inquadramento nel contratto tipico di deposito o in contratto misto a deposito, risultando comunque la relazione contrattuale disciplinata dai canoni generali degli artt. 1176 c.c. (diligenza nell'adempimento secondo i parametri del buon padre di famiglia e della natura dell'attività professionale esercitata) e 1218 c.c., sulla responsabilità contrattuale del debitore.

4. Per quanto attiene poi alla sussistenza del presupposto oggettivo di cui all'art. 5 l.f., si osserva che la condizione di insolvenza emerge dalla palese sproporzione tra l'ingente entità dell'esposizione debitoria conseguente alla gestione dell'impresa (che certamente dovranno essere oggetto di analitico e puntuale accertamento nel prosieguo della procedura) e le disponibilità di Francesco Firano, quali risultano dall'esecuzione del sequestro, tanto più considerato che l'impossibilità di restituire le risorse sottratte o di garantire un risarcimento adeguato emerge nitidamente dal contenuto dei comunicati pubblicati sul sito ww.BitGrail.com, con proposta di soluzioni transattive, riportate dal ricorrente e dal Pm negli atti introduttivi, ed allegate. L'impresa, peraltro, è stata cancellata dal registro delle imprese.

Firmato Da: GOVERNATORI SILVIA Emesso Da: POSTECOM CA3 Serial#: 12de50



Sent. n. 17/2019 pubbl. il 21/01/2019

5. Come curatore fallimentare si nominano, congiuntamente, considerati i presumibili profili di complessità nella gestione della procedura,     il dott.  Giampiero Castaldi e l'avv. Tommaso Ariani

## P.Q.M.

Visti gli artt. 1, 5, 6 e 16 del R.D. 16/03/1942 n. 267

### dichiara

il fallimento    di    FIRANO  FRANCESCO  quale  titolare  dell'impresa  individuale .
WEBCOIN  SOLUTIONS  DI  FRANCESCO  FIRANO   CF  FRNFNC86D11D612E   con sede in Signa Via Roma 235

### nomina

giudice delegato la dott. Silvia Governatori e curatori  il dott. Giampiero Castaldi e l'avv. Tommaso Ariani    i   quali faranno   pervenire la propria accettazione entro 2 giorni dalla comunicazione.

### ordina

alla fallita di depositare in cancelleria entro 3 giorni i bilanci e le scritture contabili obbligatorie, nonché l'elenco dei creditori, ove non ancora eseguito.

### assegna

ai creditori ed ai terzi che vantano diritti reali o personali su cose in possesso della fallita termine fino a 30 giorni prima dell'adunanza  per la presentazione al curatore delle domande di insinuazione ai sensi dell'art. 93 come modificato dal  D.L.  n. 179/2012 convertito nella L. 221/2012

### stabilisce

che l'esame dello stato passivo abbia luogo dinanzi al giudice delegato nella adunanza  del 07/05/2019  ad ore 10:30

### Autorizza

la prenotazione a debito delle spese e diritti della presente sentenza e degli adempimenti consequenziali.

### dispone

la pubblicazione e annotazione della sentenza ai sensi dell'art. 17 L.F. a cura della Cancelleria, che procederà altresì alla formazione del fascicolo ai sensi dell'art. 90 L.F..

Così deciso in Firenze il    19/12/2019 , dal Tribunale come sopra composto, su relazione della dott. Governatori.

La presidente est
Dr.  Silvia Governatori

Firmato Da: GOVERNATORI SILVIA Emesso Da: POSTECOM CA3 Serial#: 12de50



# Exhibit 2A

ITALIAN REPUBLIC

COURT OF FLORENCE

Bankruptcy Docket Nos. 178/2018 and 205/2018

Composed of the Judges

| | | |
|---|---|---|
| Ms | **Silvia Governatori** | Judge Rapporteur |
| Ms | **Rosa Selvarolo** | Judge |
| Mr | **Cristian Soscia** | Judge |

rendered in chambers the following

DECISION

In the name of the Italian people

In the proceedings commenced by:

Eirik Ulersoy, with address for service, by virtue of the produced power of attorney, at the offices of Professor Giuseppe Sbisà (Lawyer), Ms Monica Iacoviello (Lawyer) and Ms Alessandra Frigerio (Lawyer) of the Milan Bar and of Mr Nicola Pabis Ticci (Lawyer) of the Florence Bar, and specifically at the latter's offices in Florence

Applicant Creditor, proceedings No. 178/2018

Public Prosecutor in the person of Mr Fabio Di Vizio

Applicant, proceedings No. 205/2018

Against:

FIRANO FRANCESCO, born in Florence on 11 April 1986, as the owner of the sole proprietorship WEBCOIN SOLUTIONS DI FRANCESCO FIRANO, Tax ID No. FRNFNC86D11D612E, with registered office in Signa, Via Roma 235, represented and defended by the Lawyers Mr Francesco Ballati, Mr Marco Della Vedova and Professor Francesco D'Angelo, with address for service, by virtue of the produced power of attorney, at the latter's offices,

Debtor

With the joinder of:

Daniel Folie and Paride Novi, with address for service, by virtue of the produced power of attorney, at the offices of Professor Giuseppe Sbisà

## Decision No. 17/2019 published on 21 January 2019

In Fact and In Law

1.1 On 26 April 2018, Eirik Ulversoy filed a petition requesting that Mr FRANCESCO FIRANO, as owner of the sole proprietorship WEBCOIN SOLUTIONS DI FRANCESCO FIRANO, be declared bankrupt.

To support of his petition, the Applicant declared the following: that Mr Francesco Firano, first through its sole proprietorship Webcoin Solutions and, then, as the Chief Executive Officer and majority shareholder of BitGrail (a company that had been established expressly for this purpose), designed and managed the www.BitGrail.com software and internet website; that BitGrail.com is an online exchange platform through which, among several available services, different types of cryptocurrencies can be purchased, exchanged and deposited against the payment of a fee; that since April 2017 it had been possible to obtain, deposit and trade on such platform the "Nano" cryptocurrency, whose unitary value at the date when the application was filed was equal to approximately USD 7.12 or €5.85; that the Applicant was one of the users that, after registering with BitGrail, had opened a password protected personal account on such exchange platform to deposit and trade cryptocurrencies, and more specifically to deposit the obtained cryptocurrencies on his BitGrail.com account, exchange them with other users of the platform or withdraw them and transfer them to personal or third parties' accounts outside of the platform, whose services were provided for a consideration; that the platform operator could control users' single accounts by monitoring their activities and could also block transactions, deposits or withdrawals of cryptocurrency, as well as access to the site and to the personal account; that BitGrail's general terms provided that if an account was blocked or closed by the operator, the user was expressly entitled to be refunded of the cryptocurrencies credited on his account, with conversion into Bitcoin and transfer to the personal Bitcoin address of the user outside of BitGrail.com; that in January of 2018, after users had experienced several problems in September/October 2017, Mr Francesco Firano started introducing increasingly strict limits for the withdrawal of cryptocurrencies from the platform, and that, subsequently, on 12 January 2018, Mr Firano completely blocked all transfers of cryptocurrencies from the BitGrail accounts to external accounts and established the limited liability company "BitGrail" with Mr Andrea Davoli; that after temporarily reinstating withdrawals (albeit limited by a maximum daily amount), on 28 January 2018 BitGrail's operator had completely blocked the possibility for users to withdraw their cryptocurrencies; that on 9 February 2018 BitGrail's operator (which, at that point, had

become the BitGrail S.r.l. company) released a statement in which it affirmed that 17 million Nanos – equal to approximately EUR 120 million –, owned by the users of the exchange platform, had "disappeared" and that all the services of the platform had been blocked; the BitGrail's operator also stated that the shortfall affected 80% of the Nanos owned by users and that BitGrail was unable to return all the Nanos that had been stolen, proposing a "repayment plan"; that on 14 March 2018, BitGrail made visible on each user's account only 20% of the Nanos due, and offered, in lieu of the stolen Nanos (and therefore, in lieu of 80% of the users' initial amounts), a "financial instrument" created by BitGrail and called "BitGrail shares".

With regard to its position, Mr Eirik Ulversoy stated that on 9 February 2018 – when all of BitGrail's services had been blocked – he had in his account 412 BitCoin Cash (equal, as of that date, to approximately EUR 450,000) and 437,905 Nanos (equal, as of that date, to EUR 4.23 million), while on the date when the application was filed his account showed only 98,763 Nanos (equal to approximately EUR 869,114) while the missing Nanos had all been converted into BitGrail shares without his approval.

Given the above, the Applicant claimed that the platform had significantly failed to meet its obligations towards the users and that the Webcoin sole proprietorship, at the moment when the platform was transferred to BitGrail srl, lacked liquidity to an extent that could not be remedied, a circumstance that prevented both entities to repay the sums that were due to the users – thereby causing a loss to the user that Mr Firano himself quantified in 17 million Nanos, that is, more than 120 million Euros. As a result, the Applicant filed a petition to have Mr Firano, the owner of Webcoin, be declared insolvent, as well as a separate petition to have BG Services srl (formerly BitGrail srl) declared insolvent, requesting the two proceedings to be joined.

1.2 By a separate petition filed on 10 May 2018, also the Public Prosecutor – which intervened in the proceedings by virtue of the pending criminal proceedings related to the "disappearance" of the 17 million Nanos – requested that Mr Firano be declared bankrupt. The Public Prosecutor also requested a seizure order under Article 15, paragraph 8 of the Italian Bankruptcy Law, since during the investigation it was discovered that "*in the days between 2 and 5 February 2018, two days before the statement on the theft released by Nano Foundation and 3 days before the report was filed … Mr Firano, through 9 sequential operations, deposited in its wallet on the 'The Rock' platform a total of 230 Bitcoins, cryptocurrency that, at the time of the events, amounted to approximately EUR 1,700,000*" and that "*the Bitcoin deposits on Mr Firano's wallet, originated from addresses linked to those used by BitGrail's*

*customers to make deposits on the aforementioned platform*". The Public Prosecutor also reported Mr Firano's failed attempts to withdraw from ATM terminals part of the Bitcoins deposited on the Italian exchange platform called The Rock Trading srl.

1.3 On 10 May 2018, by an *ex parte* order under Article 15, paragraph 8 of Italian Bankruptcy Law (later confirmed on 25 May 2018 after the Debtor was heard), the Court issued a seizure warrant to seize Mr Francesco Firano's financial assets and/or virtual currency and especially those held by Mr Firano through The Rock Trading srl at MISTRAL PAY and/or other financial intermediaries, for an amount equal to EUR 120,000,000.

In view of the hearing scheduled pursuant to Article 15 Italian Bankruptcy Law Mr Francesco Firano filed an appearance in which it claimed: that the BitGrail platform, which had been transferred to BG solutions srl in January 2018, was an online exchange platform that could be qualified as a "service provider for the use of virtual currency pursuant to Article 1 of Legislative Decree No. 231/2007 (as amended by Legislative Decree No. 90/2017); that the agreement executed between the exchanger and its users is a service agreement through which the exchanger guarantees the possibility to perform the exchange, sale and purchase and deposit, through an account, of various types of virtual currencies, including the 'Nano' cryptocurrency; that the exchanger was not allowed to use the amounts deposited by the users in their accounts; that users had been extensively informed on the risks associated with the volatility of the virtual currency and on the technical risks associated with their correct functioning, with a limitation of liability clause; that the primary activity was (and still is) the provision of services for the exchange of virtual currencies, while the deposit activities were only ancillary and only instrumental to the exchange; that, for this very reason, amounts deposited in the account accrued no interests and a fee was charged for any withdrawal and exchange of cryptocurrency; that users were prevented from exchanging Euro or other legal currencies into cryptocurrencies and vice versa; that the platform was aimed primarily at expert users and that had been very successful also due to the work performed by the developers of the Nano currency, which had advertised the platform due to its higher degree of reliability compared to other platforms; that the value of the Nano cryptocurrency when it was first introduced in April 2017 was equal to approximately \$0.01 and had then impressively increased to reach \$36 (that is, 3,600 times its original value); that due to the resulting increased value of the exchanges Mr Firano had decided to establish a corporation to manage the platform; that in February 2018, Mr Firano had become aware of a series of shortfalls, for an amount of approximately 17 million Nanos, following some

unlawful withdrawals made by users, which had most likely relied on the vulnerability of the Nano software developed by Nano's developing team; that BG had promptly filed a report for the shortfall, had released a statement about it on the web and had also attempted to find a shared solution with the robbed users; that in order to facilitate a solution, BG had announced that from 2 May the platform would become again operational; that, however, the platform's operation had been suspended as soon as Mr Firano had become aware of the seizure ordered by the Court upon application of the Public Prosecutor.

Given the above, Mr Firano objected to the claim that either BG or Mr Firano could be held liable for the theft and/or shortfall and that the alleged countervalue could not in any way be considered as BG's or Mr Firano's debt. Mr Firano also claimed that the requirements for ordering a seizure had not been met, both with regard to the danger in delay (*periculum*), because the attempt to withdraw the money had not been carried out with the intent to embezzle the money – and the sums that had been withdrawn were Mr Firano's own sums – and with regard to the presumption of a *prima facie* case (*fumus boni iuris*). With regard to this latter profile, Mr Firano's defence held: that the cryptocurrencies that were deposited are not owned by the platform operator, but by the depositors and that, therefore, the "*res perit domino*" ("the thing is lost to the owner") principle applies; that, as a result, Mr Firano is not liable for any sum towards the platform's users, especially because there is no specific custodian's obligation for the operator as to the cryptocurrencies in the Terms of Use, which, on the contrary, provide that users would bear the risks associated with the platform's use; a circumstance that, according to Mr Firano's defence, allegedly supports the view that any consequence deriving from events that are not directly ascribable to BitGrail's conduct and linked to the services provided by BitGrail would be borne only by the users; that even if the agreement could be qualified as a deposit agreement, the events at issue should be qualified as a theft, that is, as an unforeseeable and unavoidable event that cannot be ascribed to the custodian and that, pursuant to Article 1780, paragraph 1 Italian Civil Code releases the custodian from the duty to return the deposited items; that, in any case, the right to be returned the sum or to be paid damages due to the failed return of the amounts was not proven and that Mr Firano's offer to pursue amicable solutions to avoid possible legal disputes (with possible harm to the reputation) could not be qualified as an acknowledgment of the existence of the debt; that in any case the shortfall occurred after the platform was transferred to BG Services and therefore Mr Firano should be excluded from liability. Mr Firano also held that the requirements set out by Article 1 Italian Bankruptcy Law were not met, since Webcoin has never owned assets exceeding EUR 300,000 or gross revenues exceeding EUR 200,000 – especially considering

## Decision No. 17/2019 published on 21 January 2019

that the fees collected in cryptocurrencies in the 2017 financial year were not converted into Euro – and since the company's liabilities do not exceed EUR 500,000 – the latter, following the same line of reasoning according to which Mr Firano could not be held liable for the cryptocurrency's shortfalls. In any case, according to the Defendant's defence, such liability could not in any way be ascribed to Mr Firano and should be ascribed to BG, since the events under examination took place after BG became the platform operator. Furthermore, these credits are challenged, unsupported by a title and not yet ascertained, and therefore entirely unsuitable to support a bankruptcy order. Furthermore, Mr Firano also claimed that the shortfall – originating from theft – was made possible by a bug in the Nano system that is entirely ascribable to the Nano Team, while Mr Firano and BG had implemented suitable safeguards applicable to the services provided by their platform.

1.4  Mr Daniel Folie, Mr Paride Novi and Mr Benson Wong intervened in the proceedings and joined the petition to have the Court declare Mr Firano bankrupt by claiming to be creditors of the BitGrail.com exchange. They specified: that Mr Benson Wong had become a platform user on 25 December 2017, when the platform was managed by the Webcoin sole proprietorship, with transactions performed on 26-27 December and with a deposit of 26,000.98 Nanos, amounting to EUR 236,114; that Mr Daniel Folie registered with the platform on 31 December 2017 and traded until 8 January 2018, with a deposit of 7,964.49 Nanos, amounting to EUR 72,317; and that Mr Paride Novi registered with the platform on 28 December 2017 and deposited 417.77 Nanos, equal to approximately EUR 3,783.

1.5 Following enforcement of the seizure, the Receiver, Mr Ariani (Lawyer), reported that the following assets owned by Mr Firano had been seized: on the exchange platform managed by The Rock Trading srl, the amounts of BTC 167,76776304, EUR 514,691.08 and BCG 0.00080000; at the CR Firenze bank, the amount of approximately EUR 39,000; at BNL bank, the amount of EUR 10; at the Banco di Lucca e Tirreno bank, the amount of EUR 1,000; on the Poloniex.com portal, 2 Bitcoins, equal to approximately USD 16,800.

1.6 As to the evidence, during the proceedings a court-appointed expert witness report was carried out and the parties filed documents, on which they extensively commented in their briefs.

2. This Court finds that Mr FRANCESCO FIRANO, as the owner of the WEBCOIN SOLUTIONS DI FRANCESCO FIRANO sole proprietorship, is to be declared bankrupt, since both the subjective and objective requirements set out by Arts. 1 and 5 of Italian Bankruptcy Law have been met.

## Decision No. 17/2019 published on 21 January 2019

These proceedings clearly fall under the jurisdiction of the Court of Florence, since the business has its registered offices in Signa.

2.1 The Debtor's qualification as a commercial enterprise emerges from the type of activity performed by the Debtor, namely the development of websites, the management of software and hardware applications and IT-related services.

2.2 With regard to the requirement to be declared bankrupt set out in Article 1, it must be noted that the Public Prosecutor filed on 12 June 2018 a report drafted on 11 June 2018 by the Tuscan Region's Postal and Telecommunications Police, which, by analysing data from the BitGrail platform and accessing he Profits sheet, was able to access the profits recorded between 1 November 2017 and 30 January 2018. This summary report – which includes, as attachments, screenshots of the corresponding pages of the website – shows that in that period, first, up until 11 January 2018, Mr Francesco Firano's sole proprietorship and, later on, the BG Services company, which took over in the platform's management, generated trading profits amounting to EUR 1,428,031.22, withdraws profits amounting to EUR 497,155.88 and deposit profits amounting to EUR 71,781.60 (it must be noted that these profits are specifically referred to the Nano cryptocurrency, identified with the code "XRB"), for an overall profit of EUR 1,996,968.70.

It follows that the requirement set out in Article1 Italian Bankruptcy Law to be declared bankrupt is met. In addition, Mr Firano – which bore the burden of proof – failed to produce accounting documents refuting the fulfilment of the requirement under Article 1 and the results of the aforementioned investigation of the Postal Police.

2.3.1 To ascertain the fulfilment of the requirement set out by Article 15 Italian Bankruptcy Law and the state of insolvency, the nature of the activities carried out by Webcoin Solutions should be investigated, determining whether the website's operator can be held liable for the cryptocurrency shortfall and the resulting debt.

2.3.2 First, with regard to the virtual currency that was exchanged, withdrawn and deposited through the BitGrail platform, it should be noted that the virtual currency is defined by Legislative Decree No. 90/2017, which, by way of implementation of EU Directive No. 2015/849, amended the definitions provided by Article 1, paragraph 2 of the Anti-Money Laundering Act. More specifically, Legislative Decree No. 90/2017, at letter qq) defines virtual currency as "*a digital representation of value which is*

*neither issued by a central bank or a public authority, nor necessarily attached to a legal tender, and which is used as a means of payment and can be transferred, stored or traded electronically*".

The same Decree (letter ff of the same Article 1, paragraph 2) establishes that a provider of services related to the use of virtual currency is "*any natural or legal person providing to third parties, on a professional basis, services aimed at facilitating the use, exchange, storage of virtual currency and their conversion from or into legally established currencies*".

In a dispute concerning the virtual currency called "bitcoin" (and dealing with the tax issue of the application of VAT to the exchange of legal currency into virtual currency and vice versa – which was qualified as a provision of service for consideration in light of the payment by customers of the difference between the currencies' purchase price and their sale price, as charged by the operator to its customers), the Court of Justice of the EU (Fifth Chamber, Judgment of 22 October 2015, Case C-264/14) provided a definition of such virtual currency. More specifically, it held that that "*the 'bitcoin' virtual currency is used, principally, for payments made between private individuals via the internet and in certain online shops that accept the currency. The virtual currency does not have a single issuer and instead is created directly in a network by a special algorithm. The system for the 'bitcoin' virtual currency allows anonymous ownership and the transfer of 'bitcoin' amounts within the network by users who have 'bitcoin' addresses. A 'bitcoin' address may be compared to a bank account number*" and, referring to a 2012 report by the European Central Bank on virtual currencies "*a virtual currency can be defined as a type of unregulated, digital money, which is issued and controlled by its developers and accepted by members of a specific virtual community. The 'bitcoin' virtual currency is one of the virtual currency schemes with 'bidirectional flow', which users can purchase and sell on the basis of an exchange rate. Such virtual currencies are analogous to other convertible currencies as regards their use in the real world. They allow both real and virtual goods and services to be purchased. Virtual currencies differ from electronic money, as defined in Directive 2009/110/EC of the European Parliament and the Council of 16 September 2009 on the taking up, pursuit and prudential supervision of the business of electronic money institutions amending Directives 2005/60/EC and 2006/48/EC and repealing Directive 2000/46/EC (OJ 2009 L 267, p. 7), in so far as, unlike that money, for virtual currencies the funds are not expressed in traditional accounting units, such as in euro, but in virtual accounting units, such as the 'bitcoin'*".

**Decision No. 17/2019 published on 21 January 2019**

On the basis of these definitions provided by the aforementioned regulations and case law, cryptocurrencies can be qualified, therefore, as a "digitalization of value" that is used as a means of exchange for the purchase of goods and services and that is characterized by the fact that it is not issued by a central bank or by other public authority and that is not necessarily attached to a legally established currency.

These virtual currencies, which are electronically transferred, stored and traded due to their very nature of digitalization of value, are purchased on specific platforms and through these same platforms may be exchanged and deposited in a storage space. These virtual currencies, as a digitalization of value, are subject to operations of a speculative nature; as a matter of fact, given their nature of financial assets, characterised by an extreme volatility, they are particularly suitable for speculative transactions.

Since rights can be established on cryptocurrencies, they must be considered as "assets" for purposes of the application of Article 810 Italian Civil Code.

2.3.3 Several cryptocurrencies could be purchased, exchanged and stored on BitGrail, including the Nano cryptocurrency affected by the shortfall claimed by the Applicant and the intervening parties and presented by the Public Prosecutor.

2.4.1 Mr Francesco Firano, in its defence, argued that:

a) the relationship between the platform and its users was such that the deposit is a merely ancillary and instrumental function to the primary activity of managing the platform, and was provided entirely free of charge;

b) even focusing on the deposit, it is clear that it should be considered a regular deposit ("*deposito regolare*"), as there are no legal elements to argue that it is a different type of relationship;

c) Mr Firano, first, and then BG adopted all the necessary and suitable measures to guarantee IT security;

d) due to defects affecting the Nano software and not related to the platform (a circumstance proven by the fact that none of the other cryptocurrencies was attacked or affected by theft), some limited and artificially hidden unlawful withdrawals of Nano were made by some users who were able, in essence, to duplicate the amount of the withdrawals and ultimately cause the shortfall for a total amount of 15.5 million Nano owned by the users;

e) it is impossible to precisely identify the date of the shortfalls, which Mr Firano only discovered on 8 February 2018, immediately filing a report about it;

f) the shortfalls were caused by flaws in the Nano software.

2.4.2    Mr Firano's description of events is contested by the Applicant, the intervening parties and the Public Prosecutor, who all claimed that in the case at hand the relationship between user and the platform operator should be qualified as an irregular deposit ("*deposito irregolare*"), with application of the obligation to return the same amount of goods of the same kind (*tantundem eiusdem generis*) pursuant to Article 1782 Italian Civil Code.

In any case, even applying the rules governing the regular deposit, the operator should be held liable having failed to implement all the necessary measures to guarantee the deposit's security, especially considering the operator's violation of his obligation to promptly report the event causing the shortfall pursuant to Article 1780, paragraph 1 Italian Civil Code.

2.5.1. To gather all the necessary elements to assess Webcoin's liability, the Court appointed an expert witness, requesting him to describe "*the operation of the online exchange platform managed by BG Services S.r.l., with specific reference to:*

*- the methods of operation of the relationship between platform and user since the latter's registration with Bitgrail.com and the services offered by the platform;*

*- the storage and placement of the cryptocurrencies inside the platform;*

*- the supervisory and monitoring powers over the transactions and over the movements of cryptocurrencies by the platform operator and to any further powers of the platform operator.*"

The court-appointed expert witness was also requested to investigate the "*circumstances of the Nano shortfall complained of by Francesco Firano in February 2018, as well as on the actual date thereof*" in order to identify its causes, and to ascertain "*whether all the platform's safety measures had been adopted and if so, describe them and provide useful elements to assess the suitability of such measures in light of the nature, activity and characteristics of the cryptocurrencies*".

2.5.2. At the outset, it should be acknowledged that the expert witness operations were carried out in full compliance with the adversarial principle – so much so that an extension was granted to the court-appointed expert after Mr Firano's expert had requested to discuss at a new meeting some elements that had emerged after the last expert meeting and after the court-appointed expert had filed the draft report and the party-appointed experts had submitted their replies. Afterwards, the court-appointed expert submitted to the party-appointed experts a new draft of the report and the parties filed their observations; then, the court-appointed expert drafted the final version of the report which took into account all the

parties' observations – and included extensive and articulated arguments based on an analytical description of the investigation that had been carried out, in compliance with the adversarial principle and without logical defects.

The objection raised by Mr Firano's defence as to the alleged inadmissibility of the court-appointed expert witness' report, arguing that the court-appointed expert witness was expected, pursuant to Article 195 Italian Code of Civil Procedure, to merely file the draft of the report including the observations and a short assessment, is, in the view of this Court, entirely ungrounded.

In this regard, in light of the many observations of the party-appointed experts and their complexity – which clearly emerge from the court-appointed expert witness' analysis of the party-appointed experts' reports – the Court appreciates and endorses the court-appointed expert's choice to re-draft the final version of the report so that it would include the observations of the party-appointed experts and the court-appointed expert's replies to them. Indeed, such choice was taken to provide this Court and the parties with a complete and thorough report that was clear and fully compliant with the adversarial principle.

2.5.3 Therefore, the Defendant's defence attorneys' requests presented at the hearing held on 11 December 2018 to clarify and supplement the court-appointed expert witness' report must be rejected. The objections raised in that regard do not affect the analysis conducted by the court-appointed expert witness, which extensively took into account the Defendant's arguments.

2.6.1 Moving to the merits of the expert's analysis, the court-appointed expert, in his reply to the first part of the question, indicated that BitGrail provided "*a deposit and trading service for 10 different cryptocurrencies ... within a portfolio the user was able to open and maintain active free of charge, without any exchange commissions, except for the costs of withdrawal (which did not necessarily represent a gain for the exchange but consisted of a lumpsum reimbursement of the transaction fees incurred), and those of trading (for which the exchange collected instead a percentage of 0.020% on the transaction). The only purpose of the deposit, therefore, was to allow users to keep the necessary liquidity in the Exchange to be able to perform exchange operations; this function, therefore, cannot be qualified as a real wallet. Deposit costs therefore did not exist, except for a short period at the beginning of the platform, during which low costs of deposit had been activated (and then almost immediately removed) to avoid the problem of "SPAM" transactions. With regard to the Nano currency, there were no withdrawal*

## Decision No. 17/2019 published on 21 January 2019

*fees"* as well as *"a 'trading' service, through which users could sell the cryptocurrencies stored in their wallets to purchase other cryptocurrencies"*.

2.6.2. With regard to the methods of operation of the platform-user relationship, it started with registration, during which the user indicated some of his data and obtained access to his customer area, which could be further protected by a two-factor authentication (with confirmation of the PIN code received via e-mail) to be granted access to the trading functions.

The court-appointed expert found that, despite Mr Firano's arguments presented during the expert operations, the platform did not carry out any in-depth verification on the identity of the registering user, nor kept track of the IP addresses used for the registration or for subsequent accesses or operations, with the result that in case of unlawful activity (such as the stealing of cryptocurrency) no useful support could be provided by the platform in the identification of the possible authors.

Then the user "recharged" his wallet (assigned to him with the registration) with his cryptocurrency of choice – transferring it autonomously starting from its own wallet – being subsequently able to use it inside the exchange to buy another cryptocurrency, of a different type, withdrawing then what had been purchased (or what had been deposited) via the "withdraw" function.

Once the funds were received, as a cryptocurrency in the wallet, *"the users were able to manage them independently, but always through the services provided and allowed by the Exchange, appointed to manage the movements of cryptocurrencies (thus transfers between "virtual currencies" of different types, but still within the exchange, which we can imagine as intra-bank transfers) as well as withdrawals (transfer of cryptocurrencies from exchange to external addresses, directly managed by the user, who was thus the owner, which we can imagine as Sepa bank transfers towards external banks or cash withdrawals)"*.

The court-appointed expert specified that *"the funds transferred by the users on the address allocated to them did not stay there, as they were instead moved for the main cryptocurrencies (Bitcoin, Ethereum, Nano, etc.) towards a BitGrail main address with a script that each night would collect the funds from the single addresses to transfer them towards it"*. According to Mr Firano's party-appointed expert, this function was necessary to allow to safely perform the withdrawals starting from the amount of cryptocurrency that had actually been deposited by each user on its address assigned by BitGrail[1].

---

[1] "This function was necessary to allow withdrawals: if a user X deposited 10 NANO on his address assigned by BitGrail and then, by trading it, it received a 100 NANO balance, clearly the exchange would have not allowed a

2.6.3. In answering an additional question that had been asked, the court-appointed expert ascertained that "*the cryptocurrencies were stored in "hot wallets" portfolios set up on production servers, that is, those connected to the Internet, and on which the users and the portfolio of the exchange were active) where they were kept at the disposal of the exchange that managed their withdrawals or the purchases and sales between different cryptocurrencies.*

*These portfolios were exclusively controlled through the exchange code or by those who held the private keys of the wallets, hence by Francesco Firano or by those who had  via SSH (a remote control system used to manage systems) to the server*."

The court-appointed expert then specified – and this comes as a direct consequence of the above – that "*Users were incapable of autonomously managing their funds without the use of the BitGrail platform's functions, firstly because <u>the deposit addresses allocated to them were quickly emptied</u> to convoy the cryptocurrencies towards the main addresses of the exchange, and secondly because <u>the users did not have any private key</u>. Without authenticating oneself on the BitGrail platform, which had to be active and working, it was thus impossible for the users to carry out trading activities, but also to simply withdraw their funds, as it would be impossible for an account holder – to give a practical example – to withdraw the funds deposited with one's bank if the offices are closed, the web portal is inactive, and the services of the credit/debit card are not functioning*".

 As a result, since all the funds of all the users were managed by centralizing them in one single account, the court-appointed expert found, as an undisputable and undisputed conclusion, that "*the only way the user could be allocated his capital was to assess the data contained in the database, as the wallets were not "physically" separated. However, it is not possible to understand, in the event of shortfall, whose user the disappeared funds belonged to, given that the funds of all the users were gathered on a single account*".

In his conclusions, the court-appointed expert specified that "*(…) the only recorded case of a transfer of funds out of the exchange platform performed by the operator is the one occurred on 12 December 2017, when part of the funds were transferred from the BitGrail 1 representative address to the BitGrail 2 address, on the occasion of the infrastructure change to the new platform: on such date, 13*

---

100 NANO withdrawal from the address on which only 10 NANO were deposited, for this reason, therefore, it was important to centralise the funds".

**Decision No. 17/2019 published on 21 January 2019**

*million XRBs were transferred "manually", without resorting to the exchange functions; the exchange functions, therefore, did not record the transfer in the database.*

*From that date, the BitGrail 1 address had become a "cold wallet", in order to keep some of the millions of Nano to exclude from the operations of the Exchange, which instead continued to operate by using the BitGrail 2 account as a "hot wallet". The purpose of this operation was to maintain an account (BitGrail 1) "secure" and offline, outside the network, and instead to use the second account (BitGrail 2) for the daily operations, as required by best practices*".

2.7 In light of the aforementioned circumstances ascertained by the court-appointed expert, this Court's view is that clear elements have emerged to conclude that cryptocurrencies, and especially the Nano cryptocurrency – with specific reference to the shortfalls of the case at hand – are interchangeable goods. This is because they are digital representations expressed in units which all bear the same value, and that were directed by the platform operator to a BitGrail main address, where they were stored as volumes of homogeneous cryptocurrencies. In this regard, the claim that Nano are neither "money" nor "interchangeable goods" – given their alleged specific identity, that is different from any other cryptocurrency – is unfounded: in fact, following this line of reasoning, even money would not be considered an interchangeable good (a circumstance that should definitely be excluded, save for the cases of numismatic collections), since Dollars are different from Euros and Pounds and any bill bears a different serial number. As a matter of fact, even a banknote is but a "note from a bank", that is, essentially a piece of information.

It should then be noted that even the relationship between user and exchange regarding the Nano cryptocurrency was a relationship comprising deposit and trading activities, since it was impossible to trade without depositing the cryptocurrency, due to the specific features characterizing the trade of cryptocurrency and the platform, as thoroughly described by the court-appointed expert.

Precisely because of their interchangeability, once the users' cryptocurrencies were directed toward BitGrail's main address, the currencies (obviously divided by type) no longer bore the distinctive elements associated with ownership by a single user, thereby giving rise to a relationship of irregular deposit. This type of deposit is characterised by the obligation for the custodian to always keep available to the depositors the full amount of their goods, with a 100% cash ratio.

## Decision No. 17/2019 published on 21 January 2019

It is worth noting that the transfer of all the cryptocurrencies into the exchange's single address is consistent with the economic purpose of any "irregular deposit", that is, the achievement of a higher degree of efficiency in storing and protecting together the assets of the various depositaries. For these depositaries, the identity of the single cryptocurrency is irrelevant, while it is very important for them to always have available the quantity (better: value) of cryptocurrency they own.

With the result, typical of any irregular deposit of interchangeable assets, that when these interchangeable assets have not been identified upon delivery – as it is the case here, as held by the court-appointed expert who stated that "*the only way the user could be allocated his capital was to assess the data contained in the database, as the wallets were not "physically" separated. However, it is not possible to understand, in the event of shortfall, whose user the disappeared funds belonged to, given that the funds of all the users were gathered on a single account*" – the assets become available to the custodian who acquires the right to use them and therefore becomes their owner ("the power to use the cash deposited represents a natural element of the circumstance described under Article 1782 Italian Civil Code": Italian Supreme Court, decision No. 12552/2000). At the same time, the custodian is under an obligation to return as many assets of the same kind and quality, save when a derogation clause has been executed by the parties (Italian Supreme Court, decisions No. 5843 of 20 April 2001; No. 17512 of 23 August 2011; No. 7262 of 22 March 2013); a derogation clause that was not executed in the case at hand.

This conclusion is confirmed by the fact that Mr Firano could manually transfer all the cryptocurrencies onto a new platform. In this regard, the circumstance ascertained by the Postal Police, on which the Public Prosecutor based his application to have assets seized, is telling: "*in the days between 2 and 5 February 2018, two days before the statement on the theft released by Nano Foundation and 3 days before the report was filed ... Mr Firano, through 9 sequential operations, deposited in its wallet on the Rock platform a total of 230 Bitcoins, cryptocurrency that, at the time of the events, amounted to approximately EUR 1,700,000*" and that "*the Bitcoin deposits on Mr Firano's wallet, originated from addresses linked to those used by BitGrail's customers to make deposits on the aforementioned platform*".

2.8 With regard to the powers to supervise and control the transactions and the operations made with cryptocurrencies by the platform operator and the operator's possible additional powers, the court-appointed expert verified that the platform operator had knowledge of the private keys with which the funds located in the wallets could be spent and that the keys were used through "nodes" that managed the

cryptocurrencies to activate the withdrawals that users progressively requested or to direct the funds that users gradually deposited to their dedicated addresses.

The court-appointed expert indicated that "*The only instance in which the cryptocurrencies were proved to have been directly used by Firano, outside the exchange, was on 12 December 2017, when approximately 13 million of Nano were moved from the address hitherto used to the new one, simultaneously with review of the code*".

The court-appointed expert stated that the exchange received trading or withdrawal orders from the users and, through its code, took care of informing the specific node that managed each relevant cryptocurrency of the transaction that it needed to perform (for instance, for withdrawals the node would indicate the amount to be transferred and the destination address).

The court-appointed expert explained that "*the __node__ is a Nano software installed by Mr Firano on a computer (or virtual machine) connected to the BitGrail exchange. The node contained the functions of account creation, blocks, transactions, signature, etc... in essence, <u>the node is a Nano wallet that is for all effects totally self-sufficient, but that cannot do anything on its own, without receiving</u> external commands, through a channel called "RPC" which is used to issue orders for transfers, building addresses, or any other of the commands available and listed at this address <u>https://github.com/nanocurrency/raiblocks/wiki/RPC-protocol</u>*".

According to the expert, "*Mr Firano, or BitGrail, was the only one who had proceeded to install the node and was responsible for its maintenance, whenever the Nano team released software updates to improve stability, security, or add new functionality. The same was also the sole person responsible for all the communications from/to the node, more specifically the sending of commands, the correct interpretation of the responses received pursuant to the requests, of the management of any errors, given that the communication between the BitGrail exchange and the node was protected and reserved.*"

The node, therefore, "*resided directly within the BitGrail environment*".

According to the court-appointed expert, every time the node received a request to perform a transaction from BitGrail, it generated the transaction code, provided a signature with private and secret keys that were memorized inside it and transmitted the transaction to the other nodes of the Nano network, thereby publicly spreading the transaction and therefore "activating" the transaction (not unlike a bank transfer is "activated" when it is notified, at least, to the recipient of the funds). In the world of the distributed blockchain, a "bank transfer" is communicated to all the nodes that, sooner or later, memorize

it in their local blockchain and then send further notification of the transfer so that all the nodes are reached and updated.

The exchange – and its operator – could see only those transactions that the BitGrail exchange software had launched and that the nodes managing the cryptocurrencies had notified to the system.

At blockchain level, no control system or systems for the monitoring of the wallets had been implemented; this could have been accomplished, for example, by verifying on the node (after verifying that the node had been synchronized and updated with the ongoing transactions) if the issued transactions had been actually transmitted to the network and, especially, if outgoing transactions existed that were unknown to the exchange, which is precisely what happened in the case of the Nano shortfall.

2.9.1 With regard to the shortfall reported by Mr Firano in February 2018, it should be noted at the outset that, unlike what has been claimed by the Defendant in his defences, the shortfall was not immediately reported; in fact, it has been ascertained that the shortfall occurred between May 2017 and December 2018, with some withdrawals occurring as late as January 2018 from the new BitGrail2 address, whose migration occurred since December 2017 to the end of that year. In this regard, this Court finds that the court-appointed expert reliably identified the dates, providing extensive and adequate reasons. In addition, to identify such dates, the expert applied the prior transaction method to the BitGrail database, a transaction with certain date – if available –, as all the other transactions recorded in the exchange's logfile.  The previous transaction method was then refined through checks on the backups of the blockchain performed by Nano's development team and through checks on transactions showing the same recipient and the same amount in close periods of time.

2.9.2 As a matter of primary importance, it should be noted not only that the shortfalls date back to several months prior the report filed by Mr Firano, but also that Mr Firano had become aware of the significant shortfalls – such as the one that occurred in July 2017 – when these occurred.

This emerges clearly from the messages on the Telegram chat with the Nano's development team (that Mr Firano had joined in December 2016 and left in December 2017), which this Court can use in adjudicating this case because they are included in documents filed by the Public Prosecutor. In addition, to make this information objective and shared between the parties, the court-appointed expert – by virtue of the powers conferred on him by this Court and in accordance with Article 15, paragraph 4 Italian Bankruptcy Law – requested an original copy of the chat to the participants, obtaining a copy directly exported from Telegram, which he attached to his report.

## Decision No. 17/2019 published on 21 January 2019

2.10 Moving now to address the causes of the shortfall, during the expert operations it was undisputedly ascertained and shared between the parties that the shortfall took place during the exchange's normal operation and life cycle and by regular users through their own e-mail, data and wallet, with no stolen key, no crack of the systems, no piercing of the perimeter security program, no trojan/backdoor and no vulnerability of the mathematical protocol of the cryptocurrencies.

More specifically, the court-appointed expert ascertained that the shortfall "*was caused by multiple withdrawals (also called "double withdrawals") that occurred in circumstances which are not clearly proven. According to the statement of Mr Firano, indeed, these withdrawals occurred on occasions of the malfunctioning of the node (he makes reference to possible "crashes" of the node), however, today we have no certainty regarding the dynamics of such malfunctions. There could be other ways during which these multiple withdrawals could have happened, such as, for example, by sending with a double click in quick succession with the withdrawal command, commands sent very close together, or even situations where the node behaved differently from how it was supposed to, perhaps due to overload: the unavailability of the BitGrail platform source code of that time makes it impossible to simulate the incident. Certainly, the analysis of the transactions with the same TXID that were present in a massive way in July 2017 in the "withdraws" table indicates how the double withdrawals were almost always related to multiple withdrawal attempts very close together and for the same amount, as also noted by Firano already in July 2017, as well as reported in the Telegram chat with the Nano development team within which Firano had entered in December 2016 and exited in December 2017*".

The expert clarified that the expression "multiple withdrawals" – as applied to the case under review – should be understood as two or more withdrawals of an equal amount made from the same BitGrail account. The court-appointed expert explained that in this specific case the withdrawal requests made by BitGrail users determined a "transfer" from the single general BitGrail account onto the account indicated by the user. The expert verified that "*the Nano protocol, since its first establishment, provides for the possibility to avoid multiple withdrawals by generating the withdrawal request for operators who manage a single account on behalf of multiple subjects: as it has emerged during the expert investigation, in order to do so it is necessary to build the transaction, and the parameters to set include the account balance and the hash of the most recent transaction. When this procedure is implemented, even if two identical withdrawal requests are received, it is only the first one that is performed: the transaction, in*

*other words, would be idempotent[2]". The reason why the Nano network was able to perform multiple BitGrail transactions (that is, unauthorized transactions that followed the first one, which had been authorized) was that BitGrail stored all the Nano cryptocurrency in a single wallet with a balance that was sufficient to justify any withdrawal request. Furthermore, and more importantly, each one of the multiple transactions bore a different hash (that is, the signature, some kind of "CRO Code", as in bank transfers), even if BitGrail requested a withdrawal to the node multiple times, "persuaded" that it was always the same withdrawal. Indeed, the node interpreted the transactions as different transactions, while BitGrail understood the actual withdrawals as a single transaction, with a single hash and a single "entry" in the "withdraws" database, which kept track of each single "official" withdrawal request, irrespective of whether or not such withdrawal was successful. Well then… the expression "multiple withdrawal" should be interpreted as an abbreviated form of "multiple withdrawal requests send by BitGrail" and not as multiple exists from the node; in fact, for each request, the node allowed the funds to leave the account only once. Therefore, it was the BitGrail exchange that actually requested to the node multiple times to allow the funds to leave the wallet (funds that, in fact, had already left the account after the first request) and not the Nano network that allowed the multiple withdrawals".*

Therefore, the shortfall reported by Mr Firano in February 2018 was caused by a withdrawal request generated multiple times by BitGrail even if the user requested the withdrawal only once. The Nano node received such requests as different requests; otherwise, had these requests been idempotent as described in the text of the report, the Nano node would have disregarded them and avoided the issue altogether.

The court-appointed expert indicated that "*even if it was not possible to verify in detail this circumstance in the BitGrail source code (as the source code was unavailable), based on the description provided by Mr Firano it appears that, following a first withdrawal request, BitGrail searched for evidence of its implementation inside Railblock's external block explorer service. It must be noted that the Railblock tool was not designed to perform the function that BitGrail was requesting it to perform, and therefore any verification carried out through it could not be deemed reliable. For obvious reasons, the node could also be misaligned when the check was carried out. In these cases BitGrail sent a new request*

---

[2] "Idempotence" is the property of executing a command only once, even if issued multiple times, even if identical and in rapid succession. To give a "trivial" but clarifying example: during cash withdrawals at an ATM, also trying to press the withdrawal button several times, the "idempotent" function means that the device can emit one and only one withdrawal command, providing the requested cash only once, and tracking the withdrawal only once in the account statement of the customer.

*that was different from the previous one. Sometimes these requests were performed multiple times and generated the multiple withdrawal.*

*In any case, irrespective of the cause, it is clear that any multiple withdrawal originated as a multiple request by BitGrail. The Nano node performed the requests received by BitGrail without the possibility to verify the actual number of requests in the exchange*".

The shortfalls took place because the users who stole the Nano had realized that, by requesting a withdrawal at specific times, it was likely that two identical withdrawals would be granted: one was recorded and considered "official', while the other was not recorded by the exchange despite being regularly recorded in the blockchain of the Nano node: as a result, several amounts of Nano cryptocurrency left the account without these transactions ever being recorded in the exchange's database.

The court-appointed expert described in detail the measures that could have been implemented by BitGrail's operator, and pointed out that "*Regardless of the reason for which the transactions were not immediately available on the node, BitGrail verified the successful completion of the transfer command (generated as a result of a withdrawal request of a user), looking for references inside the RaiBlocks block explorer; the latter, however, was not reliable and, by the same definition of the protocol, being basically another node in the network, could obviously not be synchronised as BitGrail was, which would make it unsuitable for any kind of control of execution of the transactions*" and that "*where the multiple withdrawals had actually been caused by the malfunction of the node (which, it is noted, is merely an executor of the non-idempotent transfer request commands received from BitGrail), ... BitGrail should have stopped operations, checked the accounting and the actual execution of the pending requests before executing new dispositions*."

With regard to the observations presented by the Defendant's party appointed expert, Mr Epifani, on the impossibility to generate and sign transactions outside of the node before 16 December 2017, the court-appointed expert found that "*in reality the function detected by Epifani allows one to send a command to the node to create a block, even when the node does not have the private keys. It has, however, always been possible to execute the signing outside the node (which is something that since 2014 had already been discussed, also in the context of other cryptocurrencies) with procedures known since June 2017 and published on several online manuals by the Nano community.*

*From several documents, it emerges how the use of the node as "accounting centre" was envisaged – as, in general, it is also the case for other cryptocurrencies – only for single users, with their*

*private wallet, and without intense or concurrent activity. The exchanges have always been invited to autonomously manage the transactions, precisely because blindly trusting the node implies a high risk, not only for possible double withdrawals*". This is a risk that, in this Court's view, should have been managed by the platform operator, which could and should have limited such risk while providing its services.

While it is true that on 16 February 2018 changes were made by the Nano developers to the "Send" function to make it idempotent, according to the court-appointed expert "*this does not mean, however, that before these changes it was not possible to create and sign the blocks offline or to ensure idempotency, which were clearly operations to be done outside the node, by writing the adequate code in the BitGrail platform*".

Mr Firano, who was aware of the need – for security issues – to sign out from the node (so much so that he confirmed to the court-appointed expert that he had proceeded exactly in this manner for Bitcoin, by creating and signing Bitcoin withdrawal transactions outside of the node), "*did not think he could do it for Nano withdrawal because the node did not provide the tools to do it easily*" while "*this eventuality could be checked in an easy way (for example by not signing inbound transactions unless they are in some way coordinated with the withdrawals) and that, in any case, the major difficulty in the development of the code for signing outside the node would have been to ensure the complete management of the transactions, that instead, where delegated to the node, could go completely out of control*".

This was certainly an arrangement that would have generated more difficulties and higher expenses in the development and management of the platform. However, it is this Court's view that Mr Firano should have implemented such arrangements, to duly fulfil its obligations, as it was necessary to ensure the security of transactions that were performed through a deposit, with the payment of significant fees (as quantified above), even if "benchmarked" primarily against the trading operations, to which the deposit was functionally associated. Even though no specific consideration was provided for the deposit, the functional connection between the deposit and trading activities makes it cannot be validly claimed that the deposit was actually free of charge, just like a meal offered during a flight, whose cost, far from being free of charge, is simply included by the airline in the total cost of the ticket.

Therefore, even if this were a case of "regular deposit" (a circumstance that this Court excluded, as explained at point 2.7), Mr Firano is liable for not implementing suitable safeguards to avoid the loss

of assets. This, especially considering what has been ascertained as to the dates of the shortfalls and as to Mr Firano's awareness of such shortfalls, which dates back to July of 2017 and has become even more clear on 12 December 2017, when he "manually" migrated through 9 transactions approximately 13 million Nano from the BitGrail1 address to the BiGral2 address.

2.11 Given the above, it must be noted that the court-appointed expert verified that through the aforesaid multiple withdrawal mechanism approximately 2.5 million Nano were stolen in July 2017 and approximately 7.5 million Nano were stolen in October 2017.

For our purposes, even if Mr Firano had been unable to become aware of the (irrelevant) shortfalls occurred before July 2017 – something that the court-appointed expert deems possible – assessing therefore the measures necessary to avoid them occurring again, after such date it is clearly possible to identify a serious liability on the part of Mr Firano in his failure to implement measure suitable to avoid the harm, given that, at that point, he had certainly become aware of the shortfalls.

In light of the extensive shortfall of as many as 2.5 million Nano, Mr Firano was expected, with the due diligence required by the Italian Civil Code, to take action to determine the cause of such shortfall and to implement suitable safeguards. However, none of this happened and – despite clearly detecting the attack and its nature on 14-15 and 16 July of 2017, as pointed out by the court-appointed expert – Mr Firano's reaction was to blacklist the 5 or 6 accounts associated with such attack. This is clearly a solution that even at that time could be considered as entirely inadequate. It were as if, after a house was burglarized by burglars who used a copy of the house keys that had been easily purchased on the market to get access to the house, the only safeguard adopted by the owner of the house were to remove the keys from the burglars' possession: the attacks to the house would certainly be "stalled", but only for the time necessary to the (old and/or new) burglars to purchase new keys and use them, absent the implementation by the exchange of a system for the prevention of cases of appropriation of cryptocurrencies which had been made possible by the platform's methods of operation.

In fact, the court-appointed expert also ascertained the existence of an "*extremely inadequate approach to the management of the exchange's accounting records, which shows BitGrail's extremely careless conduct (trying to remedy errors through manual unrecorded transfers sets the stage for any possible scenario)*". Mr Firano implemented these manual transfers also in order to address additional bugs in the system, that cannot be addressed here, but that are covered, in detail, in the report provided by the court-appointed expert. At the same time, no security measure (similar to that adopted after February

2018) was implemented to quantify the extent of the theft: that is, a control that, according to the court-appointed expert, "could have been run with minimal effort" through the periodic verification of the total balance of each cryptocurrency of the exchange, compared with the balance of the funds' collection addresses – even as an approximate form of control to detect particularly significant shortfalls – and that could have been carried out even daily through a simple query; a type of control that, rather inexplicably, was never performed until February 2018.

3. All of the above shows the existence of Mr Firano's debts, which, should the deposit be considered as an "irregular deposit", amount to the value of the cryptocurrencies at the time of the shortfalls, that is EUR 120 million (considering that 80% of the cryptocurrency was stolen).

But even if the relationship between Webcoin Solutions and its users was qualified as a "regular deposit" (although this is not the view of this Court), Mr Firano would still be liable for damages. This, in accordance with Article 1780 Italian Civil Code, since not only the losses originated from Mr Firano's conduct, but Mr Firano also failed to promptly report to the depositors the circumstance that he had lost some of the assets – in light of the negligence shown in the provision of services carried out after July, with shortfalls amounting to 7.5 million Nano (versus the 2.5 million of July), which leads to a quantification of the debts as exceeding the procedural threshold established by Article 15 Italian Bankruptcy Law and the threshold of Article 1 Italian Bankruptcy Law.

Should the rules applicable to the deposit agreement or to the "mixed purpose" deposit agreement be deemed inapplicable to the case at hand, Mr Firano's liability would in any case be confirmed also under the general rules applicable to all contractual relationships as set out in Article 1176 and ff. Italian Civil Code (a reasonable man's diligence in performing the obligations, also according to the nature of his professional activity) and Article 1218 ff. Italian Civil Code on the debtor's contractual liability.

4. With regard to the existence of the objective requirement set out by Article 5 Italian Bankruptcy Law, it should be noted that the condition of insolvency emerges from the clear disproportion between the substantial debt exposure resulting from the management of the company (which will have to be addressed specifically and in detail in the following stages of the proceedings) and Mr Francesco Firano's financial resources as resulting from the seizures. In addition, it should be taken into account that the content of the statements published on the www.BitGral.com website, which referred to settlement solutions (also cited by the Applicant and the Public Prosecutor in their petitions and attached thereto), clearly show that it will be impossible for the Defendant to return the stolen amounts or to guarantee the

payment of adequate damages. Furthermore, the company was de-registered from the Companies' Register.

5. Taking into account that the managing of the procedure will most likely be very complex, Mr Giampiero Castaldi and Mr Tommaso Ariani (attorney) are appointed as Receivers.

FOR THESE REASONS

Having considered Articles 1, 5, 6 and 16 of Royal Decree No. 267 of 16 March 1942

THIS HONOURABLE COURT

Orders

That Mr FRANCESCO FIRANO, as the owner of the WEBCOIN SOLUTIONS DI FRANCESCO FIRANO sole proprietorship, with Tax ID No. FRNFNC86D11D612E, with registered offices in Signa, Via Roma No. 253, be declared bankrupt.

Appoints

Ms. Silvia Governatori as Bankruptcy Judge and Mr Giampiero Castaldi and Tommaso Ariani as Receivers, who will confirm their acceptance within 2 days from the notification.

Orders

to the bankrupt sole proprietorship to file within 3 days with the Court's Registry the financial statements and the mandatory accounting records, as well as the list of creditors, unless already provided.

Authorises

creditors and third parties who claim the existence of *in rem* or personal rights on assets held by the bankrupt sole proprietorship to file proof of debt with the Receivers by up to 30 days before the hearing, in accordance with Article 93, as amended by Law Decree No. 179/2012, converted into Law No. 221/2012

Orders

the assessment of the list of liabilities to take place before the Bankruptcy Judge at the hearing scheduled for 7 May 2019 at 10:30am

Authorises

the pre-payment of the court fees for this decision and subsequent requirements

Orders

the publication of the decision in accordance with Article 17 Italian Bankruptcy Law by the Court's Registry which will also take care of creating the insolvency file pursuant to Article 90 Italian Bankruptcy Law.

It is so decided in Florence on 19 December 2019 by the Court in the aforementioned composition, after having heard the report of Ms Governatori.

Judge Rapporteur

Ms Silvia Governatori

# Exhibit 3

Sent. n. 18/2019 pubbl. il 21/01/2019

**N.R.G. 179/2018 Pre-fallimentare.**

**+ 505/2018 Pre- fallimentare**



**REPUBBLICA ITALIANA**

**IN NOME DEL POPOLO ITALIANO**

TRIBUNALE DI FIRENZE

SEZIONE FALLIMENTARE

Il Tribunale composto da

Dott.ssa Silvia Governatori                 Presidente

Dott.ssa Rosa Selvarolo                      Giudice

Dott.  Cristian Soscia                          Giudice rel.

ha pronunciato la seguente

**SENTENZA**

nei procedimenti iscritti ai 179/2018 e 505/2018 Ruolo pre-fallimentare,  per la dichiarazione di fallimento della società BG SERVICES – SOCIETA' A RESPONSABILITA' LIMITATA (già BITGRAIL S.R.L.), con sede in Signa (FI), Via Roma n. 325.

Con ricorso depositato in Cancelleria in data 26.4.2018 Eirik Ulversøy ha chiesto dichiararsi il fallimento della società in epigrafe, esponendo:

- che il sig. Francesco FIRANO, dapprima mediante l'impresa individuale "WebCoin" e, successivamente, con la società BitGrail s.r.l., oggi BG Services s.r.l., ha realizzato e gestito il software e il sito internet www.bitgrail.com ("BitGrail.com"), piattaforma c.d. *exchange online* di scambio e deposito di criptovalute, tra le quali anche quelle denominate "Nano" o XRB (oltre che i più noti "Bitcoin");

1



Sent. n. 18/2019 pubbl. il 21/01/2019

- che l'istante, previa iscrizione sulla piattaforma, deteneva un *wallet* (portafoglio) di criptovalute, contenente Nano e Bitcoin;

- che nelle date del 12.1.2018 e del 28.1.2018 il gestore del sito ha, dapprima temporaneamente, poi definitivamente, bloccato la possibilità per gli utenti di prelevare le proprie criptovalute, poiché aveva riscontrato un ammanco di circa 17 milioni di Nano appartenenti agli utenti dell'*exchange*, pari all'80% del totale depositati sulla piattaforma;

- che il gestore ha successivamente comunicato che il rimanente 20% delle criptovalute era a disposizione degli utenti, e che gli stessi potevano riottenerle previa rinuncia ad azioni legali nei confronti di BitGrail, e previa adesione a un piano di rientro;

- che, nel frattempo, la notizia dell'ammanco dei Nano era stata riportata dagli organi di stampa, i quali avevano sollevato dubbi sulla ricostruzione dei fatti operata dal Firano, rilevando come le transazioni fraudolente fossero avvenute in realtà alcuni mesi prima dall'annuncio del gestore (e, in particolare, nell'ottobre 2017);

- che il 14.3.2018 BitGrail ha reso visibili sul *balance* (il saldo dei vari conti) degli utenti solo il 20% dei Nano dovuti, offrendo al posto dei Nano sottratti una nuova criptovaluta generata dalla stessa BitGrail e chiamata "BitGrail Shares", la cui titolarità sarebbe stata attribuita agli utenti se questi avessero accettato l'accordo transattivo proposto dal Firano, che prevedeva la rinuncia alla restituzione dell'80% dei propri Nano sottratti dai rispettivi *wallet* e il riacquisto mensile da parte di BitGrail delle BitGrail Shares a un tasso di cambio prefissato, con pagamento in BitCoin;

- che il 20.4.2018 il gestore ha modificato la proposta di piano di rientro che, nella nuova versione, ha comunque previsto il rimborso parziale dei Nano sottratti attraverso la devoluzione, il primo giorno di ogni mese, del 50% degli incassi delle *fee* di *trading* del mese precedente;

- che il creditore istante al momento del blocco (9.2.2018) aveva nel proprio *wallet*, oltre a 421 Bitcoin Cash, 437.095 Nano (pari a quella data a circa 4,23 milioni di euro) mentre, a seguito dell'ammanco, si era ritrovato con solo 98.763 Nano, paria circa € 869.114.

tanto esposto, il ricorrente ha rilevato che sussisteva lo stato di insolvenza della società debitrice, che si era resa cessionaria dell'azienda prima esercitata in forma individuale dal

2

Firmato Da: SOSCIA CRISTIAN Emesso Da: ARUBAPEC S.P.A. NG CA 3 Serial#: 1c6b6da60cc844c76448abc25de39911c - Firmato Da: GOVERNATORI SILVIA Emesso Da: POSTECOM CA3 Serial#: 12de50



Sent. n. 18/2019 pubbl. il 21/01/2019

Firano con la ditta WebCoin (cancellata dal registro delle imprese in data 21.2.2018), di cui pure era stato richiesto il fallimento con separato ricorso.

Previa richiesta del creditore istante, il 2.5.2018 il tribunale *inaudita altera parte* ha ordinato a BG Services s.r.l. di bloccare la piattaforma www.bitgrail.com con oscuramento del sito, nonché disposto il sequestro del patrimonio dell'impresa debitrice, nominando quale curatore speciale della piattaforma e custode del patrimonio l'Avv. Tommaso Ariani e quale suo coadiutore il dott. Paolo Del Checco, fissando per la comparizione delle parti l'udienza del 16.5.2018.

Con atto depositato il 14.5.2018 sono intervenuti nel procedimento prefallimentare i sig.ri Daniel Folie, Paride Novi e Benson Wong, nella loro qualità di creditori di BitGrail, chiedendo anch'essi il fallimento della società.

È intervenuto nella presente procedura, per la conferma dei provvedimenti urgenti assunti *ex* art. 15, comma 8, L.F., anche l'Ufficio della Procura della Repubblica presso il Tribunale di Firenze, nelle persone dei Sostituti Procuratori dott. Fabio Di Vizio e dott. Sandro Cutrignelli.

Con decreto reso il 16.5.2018 previa regolare istaurazione del contraddittorio, il Tribunale ha integralmente confermato i provvedimenti urgenti già emessi.

Con memoria del 5.6.2018 si è costituita la società BG SERVICES S.R.L. Previo *excursus* sulla natura della criptovaluta e sulla normativa di riferimento, l'impresa debitrice ha esposto:

- che il contratto tra l'*exchanger* e i clienti prevedeva una serie di servizi, funzionali a consentire lo scambio la compravendita e la conservazione, solo in via residuale, di diverse tipologie di valute virtuali, tra cui i Nano, e che alcuna facoltà di utilizzo delle somme depositate dagli utenti era riconosciuta al gestore della piattaforma;

- che la società doveva inquadrarsi nell'ambito dei "prestatori di servizi relativi all'utilizzo di valuta virtuale" come definiti dal d.lgs. 231/2007 come modificato dal d.lgs. 90/2017, con il solo obbligo di iscriversi nella sezione speciale del registro OAM (Organismo Agenti e Mediatori) una volta che fosse stato istituito;

- che la criptovaluta Nano, sviluppata negli USA da un gruppo di persone detto "Dev Team" o "Team Nano" era caratterizzata da specificità e innovatività nelle sue caratteristiche tecnico-informatiche (c.d. bassa latenza) e nella sua struttura (non tradizionale *blockchain* ma c.d."Block-lattice"), con conseguente profilo di rischio maggiore rispetto alle altre criptovalute;

3

Firmato Da: SOSCIA CRISTIAN Emesso Da: ARUBAPEC S.P.A. NG CA 3 Serial#: 1c6b6da60cc844c76448abc25de3911c - Firmato Da: GOVERNATORI SILVIA Emesso Da: POSTECOM CA3 Serial#: 12de50



Sent. n. 18/2019 pubbl. il 21/01/2019

– che il Firano nel mese di febbraio 2018 ha scoperto una serie di ammanchi di criptomoneta a causa di prelievi indebiti (c.d. "doppi prelievi"), per circa 17 milioni di Nano, di utenti che avevano sfruttato la vulnerabilità del software Nano;

– che le falle del software, prima negate dagli sviluppatori, sono state poi di fatto riconosciute dagli stessi.

In diritto la resistente ha eccepito l'insussistenza dei requisiti soggettivo ex art. 1, comma 2, L.F. e oggettivo per la dichiarazione di fallimento, sottolineando come non poteva considerarsi debitrice del controvalore della criptovaluta sottratta, che transitava sulla piattaforma a titolo di deposito regolare e non, come ha sostenuto il creditore istante, irregolare.

Secondo la tesi difensiva, la BG e il Firano avrebbero posto in essere tutte le misure richieste dall'ordinaria diligenza, dovendosi ricondurre la responsabilità dell'ammanco agli sviluppatori del Nano Team, posto che le criptovalute erano state prelevate sfruttando le vulnerabilità del nodo Nano, tant'è che gli sviluppatori, a seguito della denuncia del Firano, rilasciarono una versione aggiornata del software per ovviare ai problemi riscontrati.

L'Ufficio della Procura della Repubblica presso il Tribunale di Firenze, intervenuto nel presente giudizio, ha chiesto dichiararsi il fallimento dell'impresa in epigrafe, evidenziando:

- che l'ammanco di Nano doveva farsi risalire al mese di ottobre 2017, quando l'attività d'impresa era svolta in forma individuale e si era verificato non sui *wallet* "privati" degli utenti, ma sul *wallet* o account comune, non accessibile ai fruitori della piattaforma;

- che la società fallenda era comunque responsabile, essendosi verificato il passaggio, seppur senza atti formali, dell'attività aziendale dall'impresa individuale – oggi cancellata – a quella societaria;

- che la criptovaluta transitava sull'*exchange* sotto il controllo del gestore, senza la possibilità di stabilire quali singole valute facessero capo ai singoli utenti, con la conseguenza che le stesse dovevano considerarsi come cose fungibili.

In diritto l'Ufficio della Procura ha rilevato come, sussistendo un'obbligazione di custodia in capo al gestore, e pur a voler considerare il deposito come regolare, BG Services non aveva comunque provveduto alla tempestiva denuncia ex art. 1780 c.c.; che la perdita delle *res* doveva imputarsi al gestore stesso, che non aveva adottato tutte le misure idonee a prevenire la sottrazione della criptovaluta.

4

Firmato Da: SOSCIA CRISTIAN Emesso Da: ARUBAPEC S.P.A. NG CA 3 Serial#: 1c6b6da60cc844c76448abc25de3911c - Firmato Da: GOVERNATORI SILVIA Emesso Da: POSTECOM CA3 Serial#: 12de50



Infine, con ricorso depositato il 13.11.2018 anche la società TECHNANO PTY LTD ha chiesto dichiararsi il fallimento della BG Services s.r.l., allegando di essere creditore della stessa, per la mancata restituzione di criptovaluta XRB – Nano del controvalore di oltre € 1.300.000,00.

All'esito della comparizione delle parti e dell'emissione dei provvedimenti urgenti ex art. 15, comma 8, L.F., è stata disposta consulenza tecnica d'ufficio con nomina del dott. Paolo Dal Checco, che, previa concessione di proroga, ha depositato la relazione nel termine stabilito.

All'udienza dell'11.12.2018, previa riunione dei fascicoli, le parti hanno discusso la causa, e il giudice relatore si è riservato di riferire al collegio per la decisione.

*******

### 1) Competenza e titolarità dell'impresa

Preliminarmente, va rilevato come sussista la competenza territoriale del tribunale adito, avendo la società sede in Signa (FI), e sia accertata la natura commerciale dell'impresa, avente ad oggetto,

Ancora in via preliminare, deve rilevarsi come risulti pacifico che alla data dell'istanza di fallimento la piattaforma www.bitgrail.com fosse gestita dalla società BG Services s.r.l, già BitGrail s.r.l., costituita l'8.1.2018, di cui il sig. Francesco Firano è amministratore e socio di maggioranza (proprietario dell'85% delle quote).

È la stessa resistente ad addurre tale circostanza, giustificando il passaggio della gestione dell'impresa da individuale (WebCoin di Firano Francesco) a societaria a causa della sempre più elevata complessità dell'attività, con l'aumento del numero di transazioni sulla piattaforma e con la crescita dell'entità degli scambi giornalieri.

### 2) Definizione di criptovaluta e suo inquadramento giuridico

Venendo al merito, al fine di verificare il superamento delle soglie di fallibilità e lo stato di insolvenza e, in generale, per meglio comprendere la vicenda sottoposta all'attenzione del tribunale, appare opportuno inquadrare giuridicamente il sistema delle c.d. criptovalute, e in particolare la natura (materiale e giuridica) delle stesse, sulla base della legislazione vigente, della dottrina e della giurisprudenza in materia, consapevoli che l'analisi dovrà costantemente adattare gli istituti giuridici dell'ordinamento alla peculiarità della fattispecie, che presenta indubbi aspetti di complessità, derivanti dall'assoluta novità dello strumento (che invero solo di recente è stato oggetto di attenzione del legislatore, delle autorità di vigilanza e della giurisprudenza, anche comunitaria), e dalla necessaria preventiva conoscenza di nozioni

5

Firmato Da: SOSCIA CRISTIAN Emesso Da: ARUBAPEC S.P.A. NG CA 3 Serial#: 1c6b6da60cc844c76448abc25de39911c - Firmato Da: GOVERNATORI SILVIA Emesso Da: POSTECOM CA3 Serial#: 12de50



Sent. n. 18/2019 pubbl. il 21/01/2019

tecnico-specialistiche di tipo informatico, che si intersecano inevitabilmente con gli aspetti giuridici.

Sotto il profilo tecnico, in via di assoluta semplificazione e prendendo spunto dagli studi in materia e dalle definizioni comuni, la criptovaluta è la rappresentazione informatica di un valore, decentralizzata e digitale la cui implementazione si basa sui principi della crittografia per convalidare le transazioni e la generazione di moneta in sé.

Le criptovalute vengono implementate su reti i cui nodi sono computer di utenti disseminati in tutto il globo. Su questi computer vengono eseguiti appositi programmi che svolgono funzioni di "portamonete" (o "portavalori digitali"), senza controlli di autorità centrali, avvenendo le transazioni e il rilascio collettivamente e in rete.

Il controllo decentralizzato di ciascuna criptovaluta funziona attraverso una tecnologia di contabilità generalizzata, una catena di blocchi o *blockchain*, che funge da database delle operazioni, come libro mastro distribuito, generalmente gestita da una rete *peer-to-peer* che aderisce collettivamente a un protocollo per la convalida di nuovi blocchi.

Una volta registrati con un particolare sistema di marcatura temporale (*timestamping*), i dati in un dato blocco non possono essere modificati retroattivamente senza la modifica di tutti i blocchi successivi, il che richiede la collusione della maggioranza della rete.

Il sistema sopra (sommariamente) delineato, in sostanza, fa sì che la criptovaluta possa essere "coniata" da qualunque utente e sia sfruttabile per compiere operazioni di scambio, possibili grazie ad un software open source e ad una rete *peer to peer*.

Sotto il profilo normativo, poi, va rilevato come di recente il legislatore nazionale abbia dato - seppur nell'ambito delle disposizioni dettate per la prevenzione dell'utilizzo del sistema finanziario a scopo di riciclaggio dei proventi di attività criminose e di finanziamento del terrorismo – una definizione di criptovaluta.

Con il d.lgs. 90/2017 infatti, che attuala la direttiva UE n. 2015/849, modificando le definizioni dell'art. 1, comma 2, della legge antiriciclaggio,  è introdotta con la lettera qq) la nozione di valuta virtuale, definita come «*la rappresentazione digitale di valore, non emessa da una banca centrale o da un'autorità pubblica, non necessariamente collegata a una valuta avente corso legale, utilizzata come mezzo di scambio per l'acquisto di beni e servizi e trasferita, archiviata e negoziata elettronicamente*»; il decreto poi fornisce anche una definizione dei prestatori di servizi relativi all'utilizzo di valuta virtuale, vale a dire «*ogni persona fisica o giuridica che fornisce a terzi, a titolo*

6

Firmato Da: SOSCIA CRISTIAN Emesso Da: ARUBAPEC S.P.A. NG CA 3 Serial#: 1c6b6da60cc844c76448abc25de39911c - Firmato Da: GOVERNATORI SILVIA Emesso Da: POSTECOM CA3 Serial#: 12de50



Sent. n. 18/2019 pubbl. il 21/01/2019

*professionale, servizi funzionali all'utilizzo, allo scambio, alla conservazione di valuta virtuale e alla loro conversione da ovvero in valute aventi corso legale».*

Le criptovalute, dunque, possono essere  considerate "beni" ai sensi dell'art. 810 c.c., in quanto oggetto di diritti, come riconosciuto oramai dallo stesso legislatore nazionale, che la considera anche, ma non solo, come mezzo di scambio, evidentemente in un sistema pattizio e non regolamentato, in cui i soggetti che vi partecipano, accettano – esclusivamente in via volontaria – tale funzione, con tutti i rischi che vi conseguono e derivanti dal non rappresentare la criptovaluta moneta legale o virtuale (in altre parole, non vi è alcun obbligo giuridico dei partecipanti al "microsistema" di accettare pagamenti di beni o servizi con criptovaluta).

Ancora, e questa volta sotto il profilo fiscale, la criptovaluta è stata presa in considerazione dalla Corte di Giustizia Europea (causa C-264/14, pronuncia del 22.10.2015), la quale ha riconosciuto che un'operazione di cambio di valuta tradizionale contro criptovalute e viceversa, compiute mediante pagamento della differenza tra il prezzo di acquisto delle valute e quello di vendita praticato dall'operatore ai propri clienti, costituisce, ai fini Iva, una prestazione di servizio a titolo oneroso

Ferma la considerazione come mezzo di scambio, va rilevato che la criptovaluta, rappresentando in buona sostanza la digitalizzazione di un valore, per ciò solo negoziabile, può essere utilizzata anche ad altri scopi, come quello speculativo: i soggetti che accettano *transazioni* (da intendersi in senso ampio di operazioni di scambio/pagamento)  in criptovaluta, o tra criptovalute di tipo diverso, possono ben sperare che la criptovaluta aumenti di valore quando è in loro possesso, per poi cambiarla in moneta reale (da un soggetto che sia disposto a fare tale scambio) e lucrando sulla differenza tra il prezzo di acquisto ei il prezzo di vendita, e cioè tra quanto inizialmente "investito" e quanto "ricavato" alla fine dell'operazione.

### 3) Rapporti piattaforma – utenti e natura del deposito di criptovaluta

Venendo al caso di specie, come sopra accennato, ai fini della dichiarazione di fallimento occorre verificare la ricorrenza in capo all'impresa debitrice dei presupposti soggettivi (superamento dei limiti dimensionali ex art. 1, comma 2, L.F.) e dello stato di insolvenza.

È dunque assolutamente dirimente comprendere la natura giuridica dei rapporti tra piattaforma e utenti: da come voglia inquadrarsi la stessa, infatti, discendono una serie di

Firmato Da: SOSCIA CRISTIAN Emesso Da: ARUBAPEC S.P.A. NG CA 3 Serial#: 1c6b6da60cc844c76448abc25de39911c - Firmato Da: GOVERNATORI SILVIA Emesso Da: POSTECOM CA3 Serial#: 12de50



Sent. n. 18/2019 pubbl. il 21/01/2019

conseguenze, diametralmente opposte, che portano, a seconda della tesi a cui si voglia aderire, alla mancanza o alla sussistenza dei presupposti per la dichiarazione di fallimento.

La resistente ha dedotto, invero, che la società ha gestito la piattaforma di scambio solo per pochi giorni, dall'8 gennaio al 12 febbraio 2018, data nella quale il Firano avrebbe scoperto l'ammanco di Nano (avvenuto l'8 febbraio) e denunciato il fatto all'Autorità Giudiziaria; a seguito della scoperta la società aveva infatti cautelativamente bloccato l'operatività della piattaforma, a tutela degli utenti.

Sarebbero poi seguiti mesi ove la società ha tenuto contatti con gli utenti e con le autorità di vigilanza, fino alla decisione di riaprire la piattaforma, rimasta tuttavia priva di esito a causa dell'intervento del tribunale.

Da un lato, poi, i creditori istanti e l'Ufficio del Pubblico Ministero hanno sottolineato la natura fungibile della bene-criptovaluta Nano, e la configurabilità del rapporto tra utente e piattaforma come deposito irregolare, con conseguente acquisto della proprietà delle criptovalute da parte del gestore e insorgenza dell'obbligo di restituirne altrettante della stessa specie, obbligo che, all'evidenza, la società non può rispettare, vista la sottrazione dell'80% dei Nano depositati sulla piattaforma. Ad ogni modo, secondo gli istanti e la Procura, seppur volessero applicarsi le norme del deposito regolare, la BG Services s.r.l. non avrebbe posto in essere tutte le misure necessarie per garantire la sicurezza del deposito, di talché la perdita della detenzione della cosa sarebbe comunque imputabile, anche tenuto conto che il Firano avrebbe scoperto l'ammanco già nel mese di ottobre 2017.

Dall'altro lato, la difesa dell'impresa debitrice ha negato tale ricostruzione, proponendo i seguenti assunti:

- i Nano non rappresentano monete, in senso legale;

- la piattaforma non è una banca;

- le attività della piattaforma non sono in alcun modo riconducibili ad uno schema analogo al deposito bancario, non avendo con questo alcun elemento in comune.

Ne deriva quindi, secondo la resistente:

a) che il rapporto fra la piattaforma e gli utenti sarebbe tale per cui il "deposito" assume una valenza meramente accessoria e strumentale rispetto all'attività di gestione della piattaforma ed era del tutto gratuito;

Firmato Da: SOSCIA CRISTIAN Emesso Da: ARUBAPEC S.P.A. NG CA 3 Serial#: 1c6b6da60cc844c76448abc25de39911c - Firmato Da: GOVERNATORI SILVIA Emesso Da: POSTECOM CA3 Serial#: 12de50



Sent. n. 18/2019 pubbl. il 21/01/2019

b) seppur si voglia parlare di deposito, questo sarebbe regolare, non sussistendo alcun elemento giuridico in forza del quale configurare un diverso rapporto;

c) il Firano prima, la BG poi avrebbero adottato tutte le cautele e le misure ritenute opportune sotto il profilo della sicurezza informatica;

d) ciò nonostante, a causa di vizi propri del software Nano, non riconducibili alla piattaforma (tanto che alcuna altra criptovaluta era stata oggetto di "attacchi" e di furti), sono avvenuti indebiti prelievi di Nano, in numero contenuto e artificiosamente mascherati, da parte di alcuni utenti che sono riusciti, in sintesi, a duplicare l'entità dei prelievi così da creare l'ammanco complessivo di circa 15,5 milioni di Nano di proprietà degli utenti;

e) non è dato conoscere con esattezza la data in cui si sono verificati tali ammanchi, dal momento che la *blockchain* di Nano non lascia, a differenza delle altre criptovalute, una timestamp certa; ad ogni modo, il Firano si sarebbe reso conto degli ammanchi in data 8 febbraio 2018 e avrebbe proceduto immediatamente alla denuncia;

f) gli ammanchi sarebbero dipesi da falle nel software sviluppato dal Nano Team che portavano al continuo crash del nodo; non era peraltro compito o onere del Firano quello di procedere alla continua verifica dei quantitativi depositati, tenendo anche conto dell'elevatissimo numero di indirizzi cui i Nano erano riferibili (con circa 50.000 utenti).

### 3.1.) La CTU: risultati e conseguenze giuridiche

Al fine di comprendere che tipo di attività svolgesse la piattaforma BitGrail e quali fossero i rapporti con gli utenti, è stata espletata consulenza tecnica d'ufficio con il seguente quesito, che qui di seguito si riporta per chiarezza espositiva:

*«Esaminati gli atti e i documenti contenuti nel fascicolo ed in particolare gli accertamenti tecnici versati in atti ed esperite tutte le indagini necessarie:*

*Descriva il ctu il funzionamento della piattaforma exchange online gestita da BG Services s.r.l., con particolare riferimento:*

*- alle modalità di svolgimento del rapporto tra piattaforma e utente sin dal momento della registrazione di quest'ultimo su Bitgrail.com e i servizi offerti dalla piattaforma;*

*- alla conservazione e alla collocazione delle criptovalute all'interno della piattaforma;*

*- ai poteri di supervisione e controllo sulle transazioni e sulle movimentazioni delle criptovalute da parte del gestore della piattaforma e agli eventuali ulteriori poteri del gestore;*

9

Firmato Da: SOSCIA CRISTIAN Emesso Da: ARUBAPEC S.P.A. NG CA 3 Serial#: 1c6b6da60cc844c76448abc25de3911c - Firmato Da: GOVERNATORI SILVIA Emesso Da: POSTECOM CA3 Serial#: 12de50



Sent. n. 18/2019 pubbl. il 21/01/2019

*Riferisca il ctu sulle circostanze dell'ammanco di Nano denunciato da Firano Francesco nel febbraio 2018, anche sull'effettiva datazione dello stesso e ne individui le cause.*

*Accerti infine il ctu se fossero state adottate tutte le misure di sicurezza dalla piattaforma e nel caso di risposta positiva descrivendo le stesse e fornendo ogni elemento utile per la valutazione di adeguatezza della misura in considerazione della natura e dell'attività e delle caratteristiche della criptovaluta».*

Il Consulente Informatico Forense, dott. Paolo Dal Checco, in contraddittorio con i CTP, ha depositato ampia relazione e spiegato in modo chiaro, preciso e dettagliato le modalità di funzionamento di BitGrail e dei controlli del gestore, i rapporti con gli utenti e come sia avvenuto l'ammanco dei Nano.

Con riferimento alle **modalità di funzionamento della piattaforma**, il CTU ha appurato che Bitgrail svolgeva due tipologie di servizi:

a) servizio di deposito di 10 diverse criptomonete tramite un portafoglio (*wallet*) che l'utente poteva aprire e tenere attivo gratuitamente, senza commissioni per l'exchange, esclusi i costi di prelievo (per Nano non erano previsti nemmeno questi costi). Il deposito doveva servire soltanto a permettere di effettuare i diversi scambi;

b) servizio di *trading*. (possibilità di negoziare/scambiare) le criptovalute depositate nei *wallet*.

Il **rapporto con la piattaforma** iniziava, per l'utente, con la registrazione, con la quale lo stesso otteneva l'accesso in un'area riservata (senza particolari controlli approfonditi su identità registrante) e l'assegnazione di un proprio *wallet* da ricaricare. Una volta versati i fondi (*rectius*: le criptomonete) sul *wallet*, l'utente poteva sì negoziarli autonomamente, ma sempre tramite l'intermediazione della piattaforma, che era preposta a gestire gli spostamenti (dentro e fuori l'*exchange* stesso); a ogni utente veniva assegnato un indirizzo di deposito per ogni tipo di criptovaluta per la quale desiderava creare un proprio *wallet*.

Il CTU precisa che i fondi trasferiti dagli utenti sull'indirizzo loro assegnato non rimanevano sullo stesso, ma venivano invece spostati, con riferimento quantomeno alle criptomonete principali (bitcoin, eth, Nano), verso un indirizzo principale di Bitgrail con uno *script* (che è, in parole semplici, un programma scritto in un particolare linguaggio di programmazione) che ogni notte raccoglieva i fondi dai singoli indirizzi per trasferirli verso di esso.

Quanto alla **conservazione e collocazione delle criptovalute all'interno della piattaforma**, esse venivano conservate in *hot wallet* (portafogli configurati sui server di produzione, cioè

10

Firmato Da: SOSCIA CRISTIAN Emesso Da: ARUBAPEC S.P.A. NG CA 3 Serial#: 1c6b6da60cc844c76448abc25de3911c - Firmato Da: GOVERNATORI SILVIA Emesso Da: POSTECOM CA3 Serial#: 12de50



Sent. n. 18/2019 pubbl. il 21/01/2019

quelli connessi a Internet e su cui erano attivi gli utenti e il portafoglio dell'*exchange*) dove queste rimanevano a disposizione dell'*exhange* che ne gestiva i prelievi o le compravendite tra criptomonete diverse. Questi portafogli erano controllati esclusivamente tramite il codice dell'*exchange* oppure da coloro che detenevano le chiave private dei wallet (Francesco Firano e il suo socio Andrea Davoli). Gli utenti non avevano la possibilità di gestire autonomamente i loro fondi senza fare uso delle funzionalità della piattaforma perché:

a) gli indirizzi di deposito assegnati a ciascuno erano in breve tempo svuotati per far convogliare le criptomonete verso gli indirizzi principali dell'*exchange*;

b) gli utenti non disponevano delle chiavi private: senza autenticarsi sulla piattaforma, che doveva essere attiva e funzionante, per gli utenti era impossibile svolgere attività di trading, ma anche, semplicemente, ritirare i propri fondi (il CTU paragona la situazione a quella del correntista che non può ritirare il denaro depositato presso la propria banca se gli sportelli sono chiusi, se non funziona il portale web e se i servizi di credito/debito tramite carte non sono funzionanti).

In questo scenario, ha continuato il consulente, in cui i fondi di tutti gli utenti vengono gestiti centralizzandoli su di un unico conto, «*l'unico modo per attribuire a un utente il suo capitale è quello di valutare i dati contenuti sul **database**, non essendo i wallet "fisicamente" distinti. Non è però **possibile in caso di ammanco, capire di quale utente fossero i fondi scomparsi, dato che i fondi di tutti gli utenti venivano raccolti su di un unico conto**»*.

Il gestore dell'*exchange* aveva conoscenza delle chiavi private con le quali potevano essere spesi i fondi attestati sui vari *wallet* ma non risulta che le utilizzasse direttamente: queste venivano impiegate tramite i nodi che gestivano le varie criptomonete per attivare i vari prelievi che gli utenti man mano richiedevano oppure per convogliare i fondi che gli utenti man mano versavano sui loro indirizzi dedicati.

L'*exchange* riceveva ordini di *trading* o di prelievo da parte degli utenti e, tramite il codice con cui era sviluppato, provvedeva a informare il nodo che gestiva ogni rispettiva criptomoneta circa le transazioni che dovevano essere eseguite, indicando ad esempio per i prelievi (cioè per i trasferimenti di criptomoneta da Bitgrail ad altra piattaforma di gestione), il numero di criptomonete da trasferire e l'indirizzo di destinazione.

Per chiarezza espositiva, il CTU precisa il concetto di nodo, fondamentale per comprendere la vicenda.

Firmato Da: SOSCIA CRISTIAN Emesso Da: ARUBAPEC S.P.A. NG CA 3 Serial#: 1c6b6da60cc844c76448abc25de39911c - Firmato Da: GOVERNATORI SILVIA Emesso Da: POSTECOM CA3 Serial#: 12de50



Sent. n. 18/2019 pubbl. il 21/01/2019

Esso è un software Nano installato dal Firano su un computer collegato all'*exchange* Bitgrail. Il nodo conteneva le funzioni di creazione dell'account, blocchi, transazioni, firma etc; in sostanza il nodo è un *wallet* Nano in tutto e per tutto autosufficiente ma da solo non può fare nulla senza ricevere comandi dall'esterno, attraverso un canale chiamato RPC che viene utilizzato per impartire ordini di trasferimenti, creazione indirizzi o qualunque altri dei comandi disponibili.

Dall'esame dei meccanismi di funzionamento della piattaforma è emerso che il sig. Firano, prima quale imprenditore individuale e poi quale legale rappresentante della società, fosse l'unico responsabile della manutenzione e aggiornamento del nodo Nano.

Sempre il CTU spiega che «*Ogni volta che il nodo riceveva una richiesta di eseguire una transazione da Bitgrail, ne generava il codice, lo firmava con le chiavi private e segrete in esso memorizzate e la trasmetteva verso gli altri nodi della rete Nano, propagando così pubblicamente la transazione e "attivando" quindi la transazione così come un bonifico viene "attivato" nel momento in cui viene comunicato, come minimo, al destinatario dei fondi. Nel mondo della blockchain distribuita, il "bonifico" viene comunicato a tutti i nodi che, chi prima chi dopo, lo segnano nella loro blockchain in locale e propagano ulteriormente la notizia del trasferimento così che tutti i nodi vengono raggiunti e aggiornati*». Dunque «*L'exchange – così come il suo gestore – aveva visibilità solamente sulle transazioni che il software dell'exchange aveva lanciato e delle quali il sistema aveva ricevuto notifica dai nodi che gestivano le criptomonete*».

Quanto alle **cause dell'ammanco**, è stato appurato che le stesse siano derivate dalla sommatoria di più richieste inviate da Bitgrail al nodo Nano, che hanno causato doppi o multipli prelievi a fronte invece della singola richiesta impartita dagli utenti a Bitgrail.

In sostanza, il software dell'*exchange* Bitgrail non era in grado di verificare e gestire l'esito delle richieste di prelievo da parte degli utenti che venivano rigirate direttamente al nodo Nano, inviando (quando non rilevava l'effettiva fuoriuscita dei fondi) più volte richieste di prelievi di pari importo e generando così i prelievi multipli, in genere doppi.

I prelievi degli utenti venivano richiesti sull'*exchange* dagli stessi (che indicavano la cifra da prelevare e l'indirizzo su cui versarla) e da lì diventavano istruzione di trasferimento per il nodo Nano tramite un meccanismo di comunicazione asincrono e senza caratteristiche d'**idempotenza**, che è quella proprietà dei sistemi informatici di eseguire una volta sola un comando seppur impartito più volte, anche se identico e in rapida successione.

12

Firmato Da: SOSCIA CRISTIAN Emesso Da: ARUBAPEC S.P.A. NG CA 3 Serial#: 1c6b6da60cc844c76448abc25de39911c - Firmato Da: GOVERNATORI SILVIA Emesso Da: POSTECOM CA3 Serial#: 12de50



Sent. n. 18/2019 pubbl. il 21/01/2019

Va rilevato che le circostanze sopra descritte sono pacifiche tra le parti.

È emerso dunque che il rapporto tra piattaforma e utente fosse regolato da una serie di condizioni di utilizzo (*terms of use*) che prevedevano la fornitura, da parte di BitGrail, di vari servizi, essenzialmente finalizzati alla negoziazione di criptovalute le quali, giocoforza, dovevano essere depositate sulla piattaforma.

L'istituto del deposito rientra dunque nella fattispecie in esame.

Sul punto, la difesa dell'impresa debitrice ha sostenuto che, se di deposito deve parlarsi, questo debba certamente configurarsi come regolare.

Secondo la tesi della resistente la natura fungibile del bene non è di per sé sufficiente a integrare la fattispecie del deposito irregolare, dovendosi prevedere in via espressa o per *facta concludentia* la possibilità di servirsi delle cose depositate, circostanza che nel caso di specie non si sarebbe verificata: infatti gli spostamenti operati da BG sui fondi depositati dagli utenti dagli indirizzi personali agli indirizzi centralizzati dell'*exchange*, non integrerebbero quel "potere di disposizione" verso i terzi (inteso come trasferimento della titolarità del diritto) ma costituirebbero dei meri spostamenti ad uso interno, rientranti nella discrezionalità circa le modalità di custodia delle criptovalute depositate.

Né rileverebbe il fatto che BG avesse potere di bloccare la piattaforma, dal momento che il potere di intervento non muta natura del deposito, posto che la gestione della piattaforma e la determinazione delle regole di accesso era e non poteva che essere della BG (in analogia con quanto accade nella fattispecie del deposito titoli presso una banca: la natura certamente regolare non sarebbe in alcun modo esclusa dal potere della banca di regolare l'accesso e più in generale disciplinarne e organizzarne l'utilizzo da parte degli utenti).

Ancora, la facoltà di servirsi dei beni depositati che caratterizza il deposito irregolare, sarebbe cosa ben diversa dalla facoltà di regolare l'uso dei locali "virtuali" (*id est* della piattaforma Bitgrail), e quindi a nulla potrebbe rilevare neppure che talora vi siano state sospensioni all'operatività ovvero operazioni funzionali unicamente alla custodia (benché la BG non assumesse obblighi specifici in tale senso). Non solo, secondo l'impresa debitrice non avrebbero rilevanza - ai fini della qualificazione giuridica - neppure le modalità di gestione, che attengono all'esecuzione del rapporto e non anche alla ricostruzione della fattispecie.

Da tali assunti deriverebbe, dunque, l'esenzione da responsabilità di BG Services per la perdita di Nano, in quanto non sussisterebbero gli elementi contrattuali e fattuali del deposito

13

Firmato Da: SOSCIA CRISTIAN Emesso Da: ARUBAPEC S.P.A. NG CA 3 Serial#: 1c6b6da60cc844c76448abc25de39911c - Firmato Da: GOVERNATORI SILVIA Emesso Da: POSTECOM CA3 Serial#: 12de50



Sent. n. 18/2019 pubbl. il 21/01/2019

irregolare, con conseguente insussistenza sia del presupposto soggettivo che di quello oggettivo, non essendovi alcun obbligo restitutorio della criptomoneta "persa".

Il Firano inoltre avrebbe adottato tutte le misure necessarie per garantire la sicurezza degli scambi sulla piattaforma, e comunque tempestivamente informato l'Autorità Giudiziaria del furto della criptomoneta.

La tesi, pur ampiamente argomentata, non può essere accolta.

Deve ritenersi, in primo luogo, che la criptovatuta, in questo caso del tipo Nano - XRB, sia bene fungibile.

Essa è infatti, da un lato, un'unità monetaria simile ad una valuta che tuttavia non è qualificata come moneta legale (a questa tesi aderisce il legislatore nazionale), ma si tratta anche di un bene, oggetto di trasferimenti e transazioni.

La criptovaluta è sia consumabile in ragione del suo uso (quando viene speso) sia fungibile perché tutti i Nano sono della stessa natura e della stessa qualità, in quanto appartenenti al medesimo protocollo informatico, e sono soggetti alla medesima *ratio* di altri beni che permettono di effettuare pagamenti (naturalmente, sulla base di un accordo tra gli utilizzatori).

Nel caso di specie, dalla descrizione delle modalità di funzionamento della piattaforma si evince chiaramente che BG Services s.r.l. aveva il controllo sui fondi depositati e la facoltà di servirsi delle valute depositate dagli utenti.

Nello specifico, movimentava le valute dagli indirizzi di destinazione degli utenti agli indirizzi "generali" della piattaforma e utilizzava tali valute così accentrate per dare esecuzione alle svariate richieste di prelievo provenienti dai diversi utenti (cfr. pag. 12 CTU).

Nelle sue conclusioni, il CTU ribadisce che «*La criptomoneta veniva conservata in modalità "hot wallet" (a caldo, su PC connessi e attivi) nei nodi configurati all'interno dell'infrastruttura BitGrail. L'unico in grado di movimentare e disporre di tali fondi è il gestore dell'exchange, che possedeva e possiede le chiavi private dell'indirizzo "representative"* [cioè quello di interfaccia con gli utenti] *così come anche delle decine di migliaia di indirizzi di deposito dei singoli utenti <u>sui quali gli utenti versavano i loro fondi e dai quali venivano prelevati per convogliarli tutti, periodicamente, sull'indirizzo principale</u>*».

È emerso poi in sede di operazioni di CTU che i prelievi "fraudolenti" siano iniziati alcuni mesi prima della denuncia del febbraio 2018, già nel 2017 (pag. 29 CTU).

14

Firmato Da: SOSCIA CRISTIAN Emesso Da: ARUBAPEC S.P.A. NG CA 3 Serial#: 1c6b6da60cc844c76448abc25de39911c - Firmato Da: GOVERNATORI SILVIA Emesso Da: POSTECOM CA3 Serial#: 12de50



Il consulente ha anche appurato che il Firano si era accorto dell'ammanco sin dal mese di luglio 2017, in occasione di importanti "doppi prelievi" avvenuti a metà di luglio 2017, tant'è che aveva descritto il problema in una chat di gruppo Telegram allegata al report investigativo Nano, prodotto dal Pubblico Ministero e acquisito ai documenti allegati alla CTU.

In data 12.12.2017, poi, è stata disposta dal gestore la movimentazione di fondi all'esterno dell'exchange, con trasferimento dei fondi dall'indirizzo *representative* BitGrail1 al BitGrail2, in corrispondenza del cambio d'infrastruttura verso la nuova piattaforma: «*in tale data, 13 milioni di XRB sono stati spostati "a mano", senza utilizzare le funzioni dell'exchange, che non hanno quindi tracciato il movimento nel database. Da tale data, l'indirizzo BitGrail 1 è diventato un "cold wallet", al fine di mantenervi alcuni milioni di Nano da escludere dall'operatività dell'Exchange che invece continuava a operare utilizzando come "hot wallet" l'account BitGrail 2. Il fine di questa operazione è mantenere "al sicuro" e offline, fuori dalla rete, un conto (Bitgrail 1) e utilizzare invece per l'operatività quotidiana il secondo conto (Bitgrail 2) così come previsto dalle best practices*» (pag. 66 CTU).

Quanto poi alla sottrazione delle criptovalute, «*L'ammanco denunciato da Firano a febbraio 2018 – che è risultato in realtà coinvolgere un periodo che va dal maggio 2017 al dicembre 2017 con qualche fuoriuscita anche a gennaio 2018 – è stato causato da prelievi multipli ("double withdraws") che si verificano in circostanze non provate chiaramente*».

Secondo il sig. Firano tali prelievi occorrevano in occasioni di malfunzionamento del nodo (crash) della cui dinamica tuttavia non si ha certezza.

Il CTU al contrario ha rilevato che i prelievi multipli potevano verificarsi anche tramite altre modalità, o anche situazioni nelle quali il nodo si comportava diversamente da come doveva, ad esempio per sovraccarico, ma tali evenienze rimangono nell'ambito delle ipotesi non verificabili, stante l'assenza del codice sorgente della piattaforma Bitgrail dell'epoca.

Ha comunque affermato il CTU che «*Sicuramente l'analisi delle transazioni aventi lo stesso TXID (cioè provenienti dallo stesso utente) presenti in modo massivo a luglio 2017 nella tabella "withdraws" indica come i doppi prelievi erano quasi sempre legati a tentativi multipli di prelievo molto ravvicinato e della stessa cifra, così come rilevato da Firano già a luglio 2017, così come riportato nella chat Telegram attiva con il team di sviluppo Nano all'interno della quale Firano era entrato a dicembre 2016 per uscirne a dicembre 2017*».

Prelievo multiplo, secondo la ricostruzione della consulenza, significa che sono stati eseguiti due o più prelievi di pari importo da un medesimo conto intestato a Bitgrail.

15

Firmato Da: SOSCIA CRISTIAN Emesso Da: ARUBAPEC S.P.A. NG CA 3 Serial#: 1c6b6da60cc844c76448abc25de39911c - Firmato Da: GOVERNATORI SILVIA Emesso Da: POSTECOM CA3 Serial#: 12de50



Sent. n. 18/2019 pubbl. il 21/01/2019

In altre parole le richieste di prelievo da parte degli utenti Bitgrail comportavano una sorta di "bonifico" dal conto unico generale Bitgrail al conto indicato dall'utente; alcuni utenti tuttavia sono riusciti a ottenere più bonifici pur non avendo a disposizione la cifra di criptomoneta effettivamente prelevata.

In pratica, il meccanismo era che l'utente inviava l'ordine di prelievo, che Bitgrail trasmetteva al nodo Nano, che a sua volta lo processava ed eseguiva.

La ragione per cui la rete Nano ha potuto eseguire le transazioni Bitgrail richieste in modo multiplo (ossia quelle non autorizzate oltre la prima, effettivamente autorizzata) **deriva dal fatto che Bitgrail conservava tutta la criptovaluta Nano in un unico portafoglio con un saldo sufficiente a soddisfare qualsiasi richiesta di prelievo**.

Inoltre, cosa più importante – ha chiaramente spiegato il CTU - «*l'hash (cioè la firma, una sorta di "Codice CRO" come nei bonifici) di ognuna delle singole transazioni componenti le transazioni multiple era diverso, nonostante Bitgrail richiedesse al nodo un prelievo più volte "convinto" che si trattasse sempre dello stesso prelievo. E in effetti agli occhi del nodo le transazioni sono state elaborate come transazioni diverse, mentre per Bitgrail le transazioni di prelievo effettivamente uscite erano singole, con un unico valore hash e un'unica entry nel database withdraws, che teneva traccia punto di ogni singola richiesta di prelievo ufficiale, andata poi a buon fine o meno. Dunque, occorre precisare che il prelievo multiplo è da intendersi come una forma abbreviata di "multiple richieste di prelievo da parte di Bitgrail" e non di uscita multipla da parte del nodo, che per ogni richiesta faceva uscire i fondi una volta sola, <u>quindi non è la rete Nano che disponeva uscite in maniera multipla ma l'exchange Bitgrail che richiedeva più volte al nodo di fare uscire dei fondi che in realtà erano già usciti alla prima richiesta</u>. L'ammanco denunciato da Firano a febbraio è stato, quindi, <u>causato da una richiesta di invio generata più volte da Bitgrail a fronte di un'unica richiesta da parte dell'utente. Al nodo Nano tali richieste sono pervenute come richieste differenti tra loro altrimenti, se fossero state idempotenti come descritto, il nodo Nano le avrebbe scartate evitando il problema che si è verificato</u>*».

Alla luce di tali circostanze, deve affermarsi la natura irregolare del deposito, in quanto BG Services s.r.l. aveva facoltà di disporre della cosa depositata ex art. 1782 c.c., e ne acquisiva conseguentemente la proprietà non sussistendo apposita clausola derogatoria sul punto (cfr.; Cass. 23 agosto 2011, n. 17512: "*In caso di deposito irregolare di beni fungibili, che non siano stati individuati al momento della consegna, essi entrano nella disponibilità del depositario, che acquista il*

16

Firmato Da: SOSCIA CRISTIAN Emesso Da: ARUBAPEC S.P.A. NG CA 3 Serial#: 1c6b6da60cc844c76448abc25de39911c - Firmato Da: GOVERNATORI SILVIA Emesso Da: POSTECOM CA3 Serial#: 12de50



Sent. n. 18/2019 pubbl. il 21/01/2019

*diritto di servirsene e, pertanto, **ne diventa proprietario**, pur essendo tenuto a restituirne altrettanti della stessa specie e qualità, salvo che al negozio sia stata apposta apposita clausola derogatoria"*; Cass. 22 marzo 2013, n. 7262: *"in caso di deposito irregolare di beni fungibili, come il denaro, che non siano stati individuati al momento della consegna, essi entrano nella disponibilità del depositario, che acquista il diritto di servirsene e, pertanto, ne diventa proprietario, pur essendo tenuto a restituirne altrettanti della stessa specie e qualità; e ciò, salvo che al negozio sia stata apposta un'apposita clausola derogatoria"*).

E, in effetti, dalla CTU si ricava che:

- affinché gli utenti potessero prelevare i fondi precedentemente depositati, era necessaria e indispensabile l'intermediazione dell'*exchange*, dato che il meccanismo di prelievo era fornito proprio dai servizi attivi per gli utenti di Bitgrail,  non potevano operare in autonomia indipendentemente dalla piattaforma ( come invece avrebbero potuto fare se avessero avuto a disposizione le loro chiavi private);

- i fondi depositati dagli utenti negli *hot wallet* venivano prelevati e convogliati tutti, periodicamente, sull'indirizzo principale;

- addirittura BitGrail in data 12.12.2017 ha operato il trasferimento "in massa", per motivi di sicurezza, delle criptovalute da BitGrail1 a BitGrail2, con conseguente creazione di un conto "off line", precluso all'accesso e alla disponibilità degli utenti;

- i prelievi multipli erano stati conseguenza della richiesta multipla da parte di Bitgrail al nodo Nano, che non aveva visione sulla reale contabilità dell'*exchange*, in quanto quest'ultimo   ha semplicemente eseguito le richieste pervenute da Bitgrail (che erano multiple, nonostante che all'*exchange* risultassero uniche);

-  in pratica, il controllo sulla disponibilità dei fondi era in capo a Bitgrail dal momento che, poiché la criptovaluta usciva dall'unico conto di Bitgrail, anche se l'utente non avesse avuto adeguato saldo, in caso di richiesta di transazione da parte di Bitgrail al nodo Nano, quest'ultimo non conosceva la composizione interna delle disponibilità di criptovaluta dei singoli utenti, e dunque non aveva modo di effettuarle alcuna verifica su tale consistenza.

L'ammanco si è verificato proprio perché gli utenti che hanno sottratto i capitali di Nano avevano scoperto che, richiedendo un prelievo in particolari momenti, si aveva buona probabilità di ottenere due prelievi identici, uno contabilizzato e "ufficiale", l'altro che invece

17

Firmato Da: SOSCIA CRISTIAN Emesso Da: ARUBAPEC S.P.A. NG CA 3 Serial#: 1c6b6da60cc844c76448abc25de3911c - Firmato Da: GOVERNATORI SILVIA Emesso Da: POSTECOM CA3 Serial#: 12de50



Sent. n. 18/2019 pubbl. il 21/01/2019

veniva lanciato per la seconda volta ma rimaneva non contabilizzato nell'*exchange* mentre invece era regolarmente iscritto all'interno della blockchain nel nodo Nano affiancato all'exchange.

Gli utenti, in sostanza, richiedevano un prelievo di una certa somma di criptovaluta e ne ricevevano il doppio o addirittura il multiplo e ciò perché, per come era configurato il sistema *exchange* e per la struttura stessa della criptomoneta, le transazioni doppie, e cioè i c.d. prelievi multipli, erano emessi dal nodo Nano senza che l'*exchange* ne avesse tracciato l'esecuzione, di talché sulla piattaforma e nella "contabilità" dell'*exchange* stessa queste operazioni di prelievo risultavano come non avvenute.

In altre parole, è uscito un certo numero di XRB dalla piattaforma in modo fraudolento, cioè, senza che le transazioni venissero storicizzate nel database dell'*exchange*.

Ritiene il Tribunale che le conclusioni a cui è giunto il CTU siano suffragate da idonee e approfondite motivazioni, scevre da vizi logici.

Va rilevato che la consulenza si è svolta nel pieno contraddittorio tra le parti – tanto che al CTU è stata concessa una proroga dopo che il consulente dell'impresa debitrice ha chiesto di poter discutere in un nuovo incontro degli elementi emersi dopo l'ultimo incontro peritale e dopo la consegna della bozza del CTU e delle risposte dei CTP. In seguito il CTU ha sottoposto ai CTP una nuova bozza e le parti hanno fatto pervenire le proprie osservazioni, e il consulente ha predisposto la stesura finale della relazione, tenendo conto di tutte le osservazioni – con ampie ed articolate argomentazioni, fondate sulla descrizione analitica delle indagini svolte nel pieno contraddittorio, immuni da vizi logici.

Il Tribunale ritiene del tutto infondata l'eccezione di nullità della perizia avanzata dalla difesa dell'impresa debitrice, sostenendo che il CTU avrebbe dovuto, a mente dell'art. 195 c.p.c., limitarsi a depositare la bozza, allegando le osservazioni e una sintetica valutazione.

Osserva al riguardo il Collegio che a fronte del consistente numero di osservazioni avanzate dai CTP e della loro complessità – ciò che nitidamente emerge dall'esame delle relazioni dei CTP allegate dal CTU – la scelta effettuata dal consulente di una ristesura finale dell'elaborato peritale in modo che risultassero in essa integrate le osservazioni dei consulenti, al contempo fornendo risposta alle osservazioni medesime – è scelta da apprezzare e condividere atteso che è stata efficacemente adottata al fine di rendere alle parti

18

Firmato Da: SOSCIA CRISTIAN Emesso Da: ARUBAPEC S.P.A. NG CA 3 Serial#: 1c6b6da60cc844c76448abc25de3911c - Firmato Da: GOVERNATORI SILVIA Emesso Da: POSTECOM CA3 Serial#: 12de50



Sent. n. 18/2019 pubbl. il 21/01/2019

e al Tribunale una relazione organica, completa e dotata dell'imprescindibile chiarezza espositiva, nulla togliendo al contraddittorio.

Devono essere quindi respinte le richieste di chiarimenti ed integrazione della CTU formulate a verbale di udienza in data 11.12.2018 dalla difesa del convenuto, considerato che le contestazioni che le supportano non intaccano l'impianto ricostruttivo della consulenza, che ha ampiamente tenuto conto delle difese del convenuto.

Invero, tali richieste riguardano aspetti che non influiscono sulle circostanze rilevanti ai fini della decisione, e cioè valutazioni del CTU sulla condotta negligente e sulla mancanza di adeguati controlli del nodo Nano e della predisposizione di un adeguato sistema di sicurezza che prevenisse possibili crash del sistema da parte del Firano.

Tuttavia, ai fini delle valutazioni che il tribunale deve effettuare in questa sede (superamento delle soglie dimensionali e accertamento dello stato di insolvenza) ciò che conta è il dato oggettivo dell'ammanco, collegato alla natura irregolare del deposito, per la quale non rileva l'eventuale mancanza di diligenza del depositario.

Dalla consulenza, in definitiva, risulta che il rapporto tra piattaforma e consulenza avesse natura mista, di deposito e *trading* (non potendoci essere commercio in difetto del correlato deposito per tutte le caratteristiche di funzionamento del commercio di criptovaluta e della piattaforma descritte analiticamente dal CTU).

Proprio in ragione della loro fungibilità, una volta che le criptovalute degli utenti erano convogliate sull'indirizzo principale di BitGrail, le valute (ovviamente divise per specie) non recavano elementi distintivi circa la loro appartenenza ai singoli utenti, dando così luogo ad un deposito irregolare, cui consegue lo specifico obbligo per il depositario di mantenere sempre a disposizione dei depositanti la quantità integrale, con un coefficiente di cassa del 100%.

Si osservi che lo spostamento in un unico indirizzo dell'*exchange* assolve per le criptomonete alla medesima funzione economica di ogni deposito irregolare, ossia alla maggiore efficienza nel custodire insieme i beni di diversi depositari, per i quali è irrilevante l'identità della singola criptomoneta, purché sia sempre a loro disposizione la quantità, *rectius* il valore, di loro titolarità.

Firmato Da: SOSCIA CRISTIAN Emesso Da: ARUBAPEC S.P.A. NG CA 3 Serial#: 1c6b6da60cc844c76448abc25de39911c - Firmato Da: GOVERNATORI SILVIA Emesso Da: POSTECOM CA3 Serial#: 12de50



Sent. n. 18/2019 pubbl. il 21/01/2019

Dalla configurazione del rapporto tra piattaforma e utente, con riferimento al deposito di criptovaluta, come deposito irregolare, ne deriva l'acquisto della proprietà in capo alla BG delle res fungibili e l'insorgenza dell'obbligo restitutorio del *tantundem eiusdem generis*.

Come riconosciuto dalla stessa resistente, a causa dell'ammanco di criptovaluta verificatosi a partire dal 2017, la restituzione non è possibile.

*5) Requisiti dimensionali e stato di insolvenza*

Quanto alla sussistenza dei requisiti dimensionali, il decreto correttivo entrato in vigore il 1/1/08 ha risolto il problema interpretativo dell'individuazione della parte sulla quale gravava l'onere di dare la prova delle dimensioni dell'impresa, in particolare se tale onere gravasse sul creditore istante o sul debitore, stabilendo espressamente che spetta al fallendo dimostrare il possesso congiunto dei tre requisiti.

Nel caso di specie la resistente ha asserito che la società sarebbe stata operativa solo per pochissimi giorni, e che dunque giocoforza non sarebbero superate le soglie di cui all'art. 1, comma 2, L.F., come si evince anche dal bilancio depositato (doc. 47 fascicolo debitore).

Tale ricostruzione è tuttavia smentita dai dati fattuali.

Quanto all'attivo patrimoniale, deve rilevarsi come alla seconda relazione preliminare sull'attività di sequestro dell'Avv. Tommaso Ariani , curatore speciale e custode del patrimonio di BG Services del 22.5.2018, sia allegata relazione tecnica del Dott. Paolo Dal Checco, nella quale a ogni quantità di criptovaluta sequestrata viene associato un controvalore in euro sulla base delle quotazioni correnti, per cui risulta che solamente i BitCoin (2344,98614792 BTC) e i Nano (4.001.097.979,11 XRB) sequestrati avrebbero un controvalore rispettivamente di circa 16 milioni di euro e di circa 20 milioni di euro.

Dunque, pur nella consapevolezza della possibile oscillazione di tali valori, legati alle quotazioni delle criptomonete, deve ragionevolmente ritenersi che tali poste, che fanno parte del patrimonio della debitrice (pur non inserite nelle attività della situazione patrimoniale prodotta dalla società) facciano superare la soglia di € 300.000,00 dell'attivo.

Con riferimento poi alla soglia dell'ammontare dei debiti, gli stessi superano gli € 500.000,00, visto l'ammanco di criptovalute – che, come detto sono di proprietà di BitGrail, stante la sussistenza della fattispecie del deposito irregolare – sottratte all'*exchange* con il sistema dei "prelievi multipli", per circa 11,5 milioni di Nano (di cui 10 milioni solo nei mesi da luglio 2017 a ottobre 2017), corrispondenti a circa 9,7 milioni di euro.

20

Firmato Da: SOSCIA CRISTIAN Emesso Da: ARUBAPEC S.P.A. NG CA 3 Serial#: 1c6b6da60cc844c76448abc25de3911c - Firmato Da: GOVERNATORI SILVIA Emesso Da: POSTECOM CA3 Serial#: 12de50



Sent. n. 18/2019 pubbl. il 21/01/2019

È dunque superata anche la soglia di procedibilità ex art. 15, ult. comma, L.F.

Quanto allo stato di insolvenza, secondo il prevalente orientamento della dottrina e della giurisprudenza, la valutazione dello stesso va compiuta in modo oggettivo (attraverso una molteplicità di fatti esteriori idonei a dimostrare l'incapacità dell'imprenditore a soddisfare regolarmente le proprie obbligazioni), indipendentemente dall'accertamento delle cause e dell'imputabilità delle stesse all'imprenditore (Cass. SS.UU., sent. n. 115/2001, Cass., sent. n. 4789/2005).

Come è noto, ai fini della configurazione dell'insolvenza l'imprenditore deve trovarsi nella situazione di non essere "più in grado" di soddisfare le proprie obbligazioni, e cioè nell'impossibilità di ottemperare agli obblighi negozialmente assunti e di estinguere i rapporti obbligatori in corso; l'impotenza così delineata deve impedire il soddisfacimento delle obbligazioni in maniera "regolare", ossia tale da permanere per un apprezzabile periodo di tempo e, quindi, strutturalmente e non temporaneamente, viceversa non ravvisandosi insolvenza laddove la situazione di impotenza patrimoniale sia solo transitoria.

Nel caso di specie è palese lo stato di decozione dell'impresa, posto che la stessa non è più in grado di restituire agli utenti, a seguito della sottrazione di Nano sulla piattaforma, altrettante criptovalute della stessa specie e quantità di quelle depositate dagli utenti stessi.

Deve dunque procedersi alla dichiarazione di fallimento.

Come curatore fallimentare si nominano, congiuntamente, considerati i presumibili profili di complessità nella gestione della procedura, il dott. Giampiero Castaldi e l'avv. Tommaso Ariani.

**P.Q.M.**

Visti gli artt. 1, 5, 6 e 16 del R.D. 16/03/1942 n. 267

*dichiara*

il fallimento di BG SERVICES – SOCIETA' A RESPONSABILITA' LIMITATA (già BITGRAIL S.R.L.), con sede in Signa (FI), Via Roma n. 325, n. REA FI – 656632, C.F./P.IVA 06791600486 e, per l'effetto,

*nomina*

giudice delegato il dott. Cristian Soscia e curatori il dott. Giampiero Castaldi e l'avv. Tommaso Ariani i quali faranno pervenire la propria accettazione entro 2 giorni dalla comunicazione;

21

Firmato Da: SOSCIA CRISTIAN Emesso Da: ARUBAPEC S.P.A. NG CA 3 Serial#: 1c6b6da60cc844c76448abc25de3911c - Firmato Da: GOVERNATORI SILVIA Emesso Da: POSTECOM CA3 Serial#: 12de50



*ordina*

alla fallita di depositare in cancelleria entro 3 giorni i bilanci e le scritture contabili obbligatorie, nonché l'elenco dei creditori, ove non ancora eseguito;

*assegna*

ai creditori ed ai terzi che vantano diritti reali o personali su cose in possesso della fallita termine fino a 30 giorni prima dell'adunanza per la presentazione al curatore delle domande di insinuazione ai sensi dell'art. 93 come modificato dal D.L. n. 179/2012 convertito nella L. 221/2012

*stabilisce*

che l'esame dello stato passivo abbia luogo dinanzi al giudice delegato nella adunanza del

**21 maggio 2019, ore 9,00**

*autorizza*

la prenotazione a debito delle spese e diritti della presente sentenza e degli adempimenti consequenziali.

*dispone*

la pubblicazione e annotazione della sentenza ai sensi dell'art. 17 L.F. a cura della Cancelleria, che procederà altresì alla formazione del fascicolo ai sensi dell'art. 90 L.F.

Così deciso in Firenze, nella Camera di Consiglio del 19 dicembre 2018

**IL RELATORE ED ESTENSORE**                    **LA PRESIDENTE**

Cristian Soscia                                             Silvia Governatori

22



# Exhibit 3A

**Decision no. 18/2019 published on 21 January 2019**

**Docket No. 179/2018 Pre-Bankruptcy**

**+ 505/2018 Pre-Bankruptcy**



ITALIAN REPUBLIC

IN THE NAME OF THE ITALIAN PEOPLE

COURT OF FLORENCE

BANKRUPTCY DIVISION

The Court, composed of

Silvia Governatori                                    President

Rosa Selvarolo                                        Judge

Cristian Soscia                                       Judge Rapporteur

Issued the following

**DECISION**

In the proceedings registered under pre-bankruptcy docket numbers 179/2018 and 505/2018, on the bankruptcy order concerning the company BG SERVICES – SOCIETÀ A RESPONSABILITÀ LIMITATA [Italian limited liability company] (formerly BITGRAIL S.R.L.), with registered office in Signa (Florence), at Via Roma no. 325 (the "Company").

On 26 April 2018, Eirik Ulversøy filed a bankruptcy petition with the Court Registry in relation to the Company, requesting that it be declared bankrupt on the grounds that:

- Mr Francesco FIRANO, first through "WebCoin" as a sole proprietor and, later, through BitGrail s.r.l., today BG Services s.r.l., created and managed the software and website www.bitgrail.com ("BitGrail.com"), a platform for the online exchange and deposit of cryptocurrencies, including Nano and XRB currencies (as well as the widely-known "Bitcoin");

- After registering on the platform, the petitioner held a wallet of cryptocurrencies, including Nano and Bitcoin currencies;

- On 12 January 2018 and 28 January 2018, the website administrator, at first temporarily, and later permanently, blocked users from withdrawing their cryptocurrencies, since an amount of approximately 17 million Nano which belonged to the platform users – equal to 80% of the aggregate amount deposited on the platform – went missing;

- The administrator subsequently informed users that they could recover ownership of the remaining 20% of the cryptocurrencies by waiving any legal actions against BitGrail and joining a repayment plan;

- In the meantime, the media reported the news of the missing Nano; the information provided by the media raised doubts about the determination of facts made by Firano, pointing out that the fraudulent transactions had occurred a few months before the website administrator's notice (*i.e.*, October 2017);

- On 14 March 2018, in the users' balance section (where the balance of each account is shown), BitGrail showed only 20% of the Nano and, in lieu of Nano, offered a new cryptocurrency created by BitGrail ("BitGrail Shares"); users were offered ownership of BitGrail Shares on condition that they accepted the settlement agreement proposed by Firano, whereby users would waive their right to be returned 80% of the Nano taken from their respective wallets and BitGrail's would repurchase the BitGrail Shares at a fixed exchange rate every month, with payment in BitCoins;

- On 20 April 2018, the website administrator changed the proposed repayment plan which, under the new version, provided for the partial reimbursement for the missing Nano by returning, on the first day of each month, 50% of the trading fee collected in the previous month;

- When the accounts were blocked (*i.e.*, 9 February 2018), the petitioner had 437,095 Nano in his wallet (worth about EUR 4.23 million at the time), in addition to 421 Bitcoin Cash; after the Nano shortfall, the petitioner had only 98,763 Nano, worth about EUR 869,114.

Based on the above, the petitioner requested that the Company – which took over the business previously carried out by Firano through WebCoin (struck off from the Business Register on 21 February 2018) and for which a bankruptcy petition had been filed – be declared insolvent.

Upon a motion filed by the petitioner, on 2 May 2018, the Court issued an *ex parte* order against BG Services s.r.l. to block the www.bitgrail.com platform and take down the website. Moreover, by that same order, all the assets owned by the Company were seized and Mr. Tommaso Ariani, Attorney, was appointed as special administrator (*amministratore speciale*) of the platform and receiver (*custode*) of the

Company's assets, and Mr Paolo Del Checco was appointed as his assistant. A hearing for the parties was set for 16 May 2018.

By petitions filed on 14 May 2018, Messrs Daniel Folie, Paride Novi and Benson Wong joined the pre-bankruptcy proceedings as creditors of BitGrail, requesting that the Company be declared bankrupt.

Mr Fabio Di Vizio and Mr Sandro Cutrignelli intervened in these proceedings on behalf of the Public Prosecutor's Office of the Court of Florence to ratify the *ex parte* orders issued in accordance with Article 15, paragraph 8, of the Italian Bankruptcy Law.

On 16 May 2018, after hearing the parties, the Court issued an order ratifying the interim measures.

On 5 June 2018, BG SERVICES S.R.L. filed a notice of appearance. After offering an analysis on the features of cryptocurrencies and the applicable legal framework, the Company alleged that:

- The contract between the exchanger and the users provided for several additional services that were ancillary to the exchange, sale and, only on a residual basis, custody of different types of virtual currencies, including Nano, and that the platform administrator was not entitled to use the amounts deposited by the users;

- The Company ought to be considered as a "a supplier of services involving virtual currencies", as defined by Legislative Decree No. 231/2007, as amended by Legislative Decree No. 90/2017, which only provides for an obligation for the Company to register in the special section of the *Organismo Agenti e Mediatori* (OAM, Agents and Mediators Organism) after its establishment;

- The Nano cryptocurrency, developed in the USA by a group known as the "Dev Team" or "Team Nano", was characterised by specific and innovative technical and IT features (low latency) and its structure (*i.e.*, "Block lattice" instead of the traditional "blockchain"), and was riskier than other cryptocurrencies;

- In February 2018, Firano discovered that a certain amount of cryptocurrency (approximately 17 million Nano) had been illegally withdrawn ("double withdrawal") by users who had exploited the vulnerability of the Nano software; and

- The developers acknowledged the software flaws, after initially denying them.

From a legal standpoint, the Company claimed that the subjective requirements laid down in Article 1, paragraph 2, of the Bankruptcy Law and the objective requirements for issuing a bankruptcy order were not met. It also pointed out that it could not be considered a debtor with respect to the cryptocurrencies that had been hacked. This is because cryptocurrencies were held in a regular deposit (*deposito regolare*)

# Decision no. 18/2019 published on 21 January 2019

by the administrator, which therefore could not freely use the deposited cryptocurrency, and not in an irregular deposit (*deposito irregolare*), as claimed by the petitioner.

BG and Firano argued that they had taken all reasonable actions, and that the developers of the Nano Team ought to be held liable for the missing currency, since the cryptocurrencies had been taken by exploiting the vulnerabilities of the Nano node, so much so that the developers, following the complaint by Firano, released an updated version of the software to remedy such problems.

The Public Prosecutor's Office of the Court of Florence, which intervened in these proceedings, requested that the Company be declared bankrupt. It pointed out that:

- The Nano went missing in October 2017, when the business was being carried out as a sole proprietorship, and the missing amount was not taken from the users' private wallets, but from the shared account or wallet, which the platform users cannot access;

- The Company was liable after the assignment of business, although without any formalities, from the sole proprietorship (which no longer exists); and

- The cryptocurrencies were held on the exchange platform under the administrator's control and had to be considered interchangeable, since it was not possible to establish which specific currencies were owned by individual users.

From a legal standpoint, the Public Prosecutor's Office pointed out that the administrator had an obligation to act as a custodian. Therefore, even if this relationship entailed a regular deposit arrangement, BG Services should have submitted a notice as required under Article 1780 of the Italian Civil Code. Moreover, the Public Prosecutor's Office found that the administrator was responsible for the loss in question, because it failed to take suitable actions to prevent the cryptocurrencies from being hacked.

Finally, by petition filed on 13 November 2018, the company TECHNANO PTY LTD requested that BG Services s.r.l. be declared bankrupt, claiming to be a creditor as a result of the failure by the Company to return XRB – Nano cryptocurrency for a value of more than EUR 1,300,000.00.

After the parties appeared and the interim measures were issued under Article 15, paragraph 8, of the Italian Bankruptcy Law, an expert witness report was requested, and Mr Paolo Dal Checco was appointed as court-appointed expert.

After the granting of a deadline extension, the expert filed his expert report by the required date.

## Decision no. 18/2019 published on 21 January 2019

At the hearing on 11 December 2018, after joining the proceedings, the parties argued the case and the judge rapporteur referred the case to the panel for a ruling.

*******

### 1) *Jurisdiction and Business Ownership*

As a preliminary matter, this Court may adjudicate the case because the Company's registered office is in Signa (Florence) and the evidence shows that the Company was a commercial business dealing with [*sic*]

As an additional preliminary matter, it is undisputed that, at the petition filing date, BG Services s.r.l., formerly BitGrail s.r.l., established on 8 January 2018, was the administrator of the www.bitgrail.com platform. It is also undisputed that Mr Francesco Firano is the director and majority shareholder of the Company (holding 85% of its share capital).

The Company confirmed this, claiming that the business was transferred from a sole proprietorship (WebCoin of Francesco Firano) to a corporation due to the increasing complexity of the activities carried out, as a higher volume of transactions and daily trades were made on the platform.

### 2) *Definition of Cryptocurrency and Legal Framework*

Turning to the substance of this case, we need to establish whether the bankruptcy thresholds and insolvency requirements are satisfied. More in general, to better understand the events that are the subject of these proceedings, we must first identify the legal framework governing cryptocurrency systems, having regard to their specific (substantive and legal) features, based on the current legislation, legal doctrine and case law on this subject. In this process, we must bear in mind that the general principles of our legal system must be interpreted in light of the specific nature of this case, which is certainly complex as cryptocurrencies are a pure novelty (only recently has the law, the supervisory authorities and the case law, including of the EU courts, dealt with this matter). Moreover, this case involves specialised technical knowledge, which is inextricably intertwined with the legal aspects.

From a technical viewpoint, taking a purely simplistic view, and based on the studies conducted on the subject and commonly accepted definitions, a cryptocurrency is a computerised, decentralised and digital representation of value in which encryption techniques are used to regulate transactions and the creation of units of currency.

Cryptocurrency activity is carried out on networks where the nodes are represented by users' computers scattered across the globe. These computers run special programmes which act as currency wallets (or

"digital currency wallets"). These are not subject to supervision by central authorities, as cryptocurrency is collectively issued and traded online.

The decentralised control of each cryptocurrency takes place by applying a generalised accounting technology, a blockchain, which serves as a transaction log, through a shared master ledger. This is generally managed by a peer-to-peer network that collectively applies a protocol for the validation of new blocks.

Once registered with a specific timestamping system, the data in a given block cannot be changed without modifying all subsequent blocks, which requires a joint action by most of the network.

Basically, under the system (briefly) described above, the cryptocurrency may be "minted" by any user and used to perform exchange transactions through an open-source software and a peer-to-peer network.

From a statutory viewpoint, it should be noted that Italian law has recently provided a definition of cryptocurrency – albeit under the regulations for preventing the use of the financial system for money laundering and terrorist financing.

Legislative Decree No. 90/2017, which implemented Directive (EU) 2015/849, modified the definitions contained in Article 1, paragraph 2, of the Italian Anti-Money Laundering Law, and introduced the following definition of virtual currency under letter qq): "*a digital representation of value which is neither issued by a central bank or a public authority, nor necessarily attached to a legal tender, and which is used as a means of payment and can be transferred, stored or traded electronically*". Legislative Decree No. 90/2017 also provides a definition of suppliers of services involving a virtual currency: "*any natural or legal person providing to third parties, on a professional basis, services aimed at facilitating the use, exchange, storage of virtual currency and their conversion from or into legally established currencies*". Therefore, cryptocurrencies may be considered "property" (*beni*) in accordance with Article 810 of the Italian Civil Code, over which rights may be claimed. This has been acknowledged under Italian law, which also considers cryptocurrency, among other things, as a means of payment, clearly in an unregulated system based on private agreement, in which the parties accept – on an exclusively voluntary basis – this function and all attendant risks arising from the fact that a cryptocurrency is neither a legal nor a virtual tender (in other words, participants in this "microsystem" have no obligation to accept payments made with a cryptocurrency for goods or services).

Moreover, the European Court of Justice (case C-264/14, judgment of 22 October 2015) analysed the tax implications of cryptocurrencies, establishing that, for VAT purposes, a transaction to exchange

traditional currencies for cryptocurrencies and vice versa, performed in return for payment of a sum equal to the difference between, on the one hand, the purchase price paid by the operator and the sale price obtained by him from his clients, constitutes the provision of services for consideration.

Although acknowledged as a means of payment, it should be noted that the cryptocurrency, essentially representing a negotiable digitised value, may also be used for other purposes, including speculative ones: the parties that accept transactions (to be understood, broadly, to include exchange/payment transactions) in a cryptocurrency or between different cryptocurrencies, clearly expect the cryptocurrency to increase its value while they own it, so as to trade it for traditional currency (with a party willing to carry out such transaction) and obtain a financial gain represented by the difference between the purchase price and the sale price, *i.e.*, between what was initially "invested" and the "proceeds" resulting from the transaction.

### 3)   *Platform Trading – Users and Cryptocurrency Deposits*

As mentioned, in this case, for purposes of issuing a bankruptcy order, we need to establish whether the Company satisfies the subjective requirements (*i.e.*, the quantitative thresholds under Article 1, paragraph 2 of the Bankruptcy Law) and is insolvent.

Therefore, it is key to understand the legal relationship between the users and the platform: depending on the interpretation made, completely different conclusions may be drawn as to whether the above bankruptcy requirements are met or not.

The Company claims that it managed the exchange platform only for a few days, from 8 January to 12 February 2018, the date on which Firano discovered the shortfall of Nano (occurred on 8 February) and reported it to the Judicial Authority. Following this, the Company blocked the platform's operation as a precautionary measure to protect users.

In the following months, the Company allegedly liaised with the users and supervisory authorities, until it decided to reopen the platform. However, reopening was stayed by the Court.

On the one hand, the petitioners and the Public Prosecutor's Office stressed that the Nano cryptocurrency is a fungible asset, and that the relationship with users is based on an irregular deposit arrangement. This means that the administrator acquires ownership of the cryptocurrencies and must return an equal number of such assets. Clearly, the Company cannot fulfil this obligation, since 80% of the Nano deposited on the platform have been stolen. In any case, according to the petitioners and the Public Prosecutor's Office, BG Services s.r.l. did not take all the necessary measures to ensure deposit security. Therefore,

the Company is liable for the loss of the assets held in custody, considering – among other things – that Firano allegedly discovered the unauthorised withdrawal as early as October 2017.

On the other hand, the Company denied these allegations, maintaining that:

- Nano is no legal tender;

- The platform is not a bank; and

- The platform's activities are not in any way governed by a system similar to bank deposits, and have nothing in common with it;

Therefore, according to the Company:

a) The trading carried on by users through the platform is such that a "deposit" is merely an arrangement ancillary to the platform's management and is provided completely free of charge;

b) Even assuming that such relationship entails a deposit arrangement, it would be a regular deposit, since no legal grounds can support a different relationship;

c) Firano and then BG allegedly implemented all safeguards and measures considered appropriate for IT security purposes;

d) Despite that, due to Nano software flaws, for which the platform was not liable (as demonstrated by the fact that no other cryptocurrency was "hacked" or stolen), Nano units were unduly and covertly withdrawn and in small amounts by some users who basically copied withdrawal transactions resulting in approximately 15.5 million Nano belonging to users being stolen;

e) No one can establish the exact date on which such amounts were withdrawn, since the Nano blockchain does not provide specific timestamps, unlike other cryptocurrencies; however, Firano allegedly discovered that Nano units had gone missing on 8 February 2018 and promptly reported it;

f) The cryptocurrencies purportedly went missing as the result of flaws in the software developed by the Nano Team, which caused the node to crash repeatedly. Moreover, Firano had no duty or responsibility to constantly monitor the amounts deposited, especially considering the extremely large number of addresses of Nano holders (approximately 50,000 users).

### 3.1.) The Court-Appointed Expert Witness Report: Findings and Legal Implications

A Court-appointed expert witness report has been requested to understand the type of business performed through the BitGrail platform and the relationships established with the users. The query posed to the court-appointed expert witness is set out below for ease of understanding:

## Decision no. 18/2019 published on 21 January 2019

*"Having examined all the case files and the documents included in the dossier and especially the filed expert reports and having performed all the necessary investigations:*

*May the Court-Appoint Expert describe the functioning of the online exchange platform managed by BG Services s.r.l. with specific reference to:*

*- the methods of operation of the relationship between platform and user since the latter's registration with Bitgrail.com and the services offered by the platform;*

*- the storage and placement of the cryptocurrencies inside the platform;*

*- the supervisory and monitoring powers over the transactions and over the movements of cryptocurrencies by the platform operator and to any further powers of the platform operator;*

*May the Court-appointed Expert address circumstances of the Nano shortfall complained of by Francesco Firano in February 2018, also with regard to its actual date and identify its causes.*

*Lastly, may the Court-Appointed Expert ascertain whether all the platform's safety measures had been adopted and if so, describe them and provide useful elements to assess the suitability of such measures in light of the nature, activity and characteristics of the cryptocurrencies".*

Paolo Dal Checco, the IT Consultant, filed an extensive report, taking into consideration the party-appointed expert witnesses' observations, and provided a clear, precise and detailed explanation on the operation of BitGrail, the controls of the administrators, the relationships established with the users and how the Nano were hacked.

With reference to the **platform operation**, the court-appointed expert witness established that BitGrail offered two types of services:

a) A deposit service for 10 different cryptocurrencies within a wallet the user was able to open and maintain completely free of charge, without any exchange commissions, except for the costs of withdrawal (no such costs were applied to the Nano). The deposit was only provided to carry out the exchange transactions; and

b) A service for the trading/exchanging of cryptocurrencies in the wallet.

The user established a **relationship with the platform** by registering an account (without any checks as to the identity of the registered user), with access to a personal area and a rechargeable wallet. Once the funds (or rather, cryptocurrencies) were stored in the wallet, the user could trade them autonomously, but through the platform's intermediation, which was designed to manage transfers (into and from the

exchange account). Each user was assigned a deposit address for each type of cryptocurrency for which the user created a wallet.

The court-appointed expert witness pointed out that the funds transferred by the users to their address were not stored therein. Cryptocurrencies – at least the main ones (*i.e.*, Bitcoin, ETH, Nano) – were moved into a centralised BitGrail address through a script (which, in essence, is a programme written in a specific programming language). Every night, this script would collect all funds from single addresses to transfer them to the centralised address.

With reference to the **cryptocurrency storage and deposit on the platform,** the cryptocurrencies were stored in "hot wallets" (portfolios set up on production servers, that is, those connected to the Internet, and on which the users and the portfolio of the exchange were active) where they were kept at the disposal of the exchange that managed their withdrawals or the purchases and sales between different cryptocurrencies. These portfolios were exclusively controlled through the exchange code or by those who held the private keys of the wallets (Francesco Firano and his partner Andrea Davoli). The users were not able to autonomously manage their funds without using the platform functions, because:

a) The deposit addresses assigned to each of them were quickly emptied and the cryptocurrency was transferred to the centralised exchange addresses; and

b) Users did not have private keys: without logging onto the platform, which had to be up and running, users could not carry out any trade transactions, nor could they simply withdraw their funds (the court-appointed expert witness report compares this scenario to that of a bank account holder, which may not withdraw the money deposited with the bank if its branches are closed, its web portal does not work and the debit/credit card services are not available).

The consultant added that, in this scenario, in which all users' funds are managed through a single centralised account, "*the only way the user could be allocated his capital was to assess the data contained in the __database__, as the wallets were not "physically" separated. However, it is not possible to understand, in the event of shortfall, __whose user the disappeared funds belonged to, given that the funds of all the users were gathered on a single account__*".

The exchange administrator knew the private keys to be used to spend the funds of the various wallets, but there is no evidence that the administrator personally used them: these keys were used through the nodes that managed the various cryptocurrencies to activate the withdrawals made from time to time by users or to channel funds that users transferred to their dedicated addresses over time.

The exchange received trading or withdrawal orders from the users and, through its code, took care of informing the specific node that managed each relevant cryptocurrency of the transaction that it needed to perform, specifying, for instance, for withdrawals (that is, for cryptocurrency's transfers from Bitgrail to another platform) the amount of cryptocurrency to be transferred and the destination address.

For ease of understanding, the court-appointed expert witness provided a definition of "node", which is a key element.

The node is a Nano software installed by Mr Firano on a computer connected to the Bitgrail exchange. The node contained the functions of account creation, blocks, transactions, signature, etc... in essence, the node is a Nano wallet that is for all effects totally self-sufficient, but that cannot do anything on its own, without receiving external commands, through a channel called "RPC" which is used to issue orders for transfers, building addresses, or any other of the commands available.

The analysis carried out on the platform operation shows that Firano, first as a sole proprietor and later as the company's legal representative, was the only person responsible for the maintenance and updating of the Nano node.

The court-appointed expert also explained that "*Every time the node received a request to perform a transaction from BitGrail, it generated the transaction code, provided a signature with private and secret keys that were memorized inside it and transmitted the transaction to the other nodes of the Nano network, thereby publicly spreading the transaction and therefore "activating" the transaction (not unlike a bank transfer is "activated" when it is notified, at least, to the recipient of the funds). In the world of the distributed blockchain, a "bank transfer" is communicated to all the nodes that, sooner or later, memorize it in their local blockchain and then send further notification of the transfer so that all the nodes are reached and updated*". Therefore "*The exchange – and its operator – could see only those transactions that the BitGrail exchange software had launched and that the nodes managing the cryptocurrencies had notified to the system*".

With reference to the **how the amounts were hacked**, it was established that this was the result of multiple withdrawal requests sent by BitGrail to the Nano node. When a user made one withdrawal request to BitGrail for a specific amount, that amount was withdrawn twice or more times.

In essence, the BitGrail exchange software was not able to verify and manage the outcome of withdrawal requests from users. These were directly passed on to the Nano node. When the BitGrail exchange

software did not detect the outflow of funds, it would send the same withdrawal request several times and generated multiple (usually double) withdrawals for the same amount.

Withdrawals were requested on the exchange by the user (who indicated the amount to be withdrawn and the address to its transfer). Those requests became transfer orders for the Nano node through an asynchronous communication mechanism not characterised by **idempotence**, which is the property of executing a command only once, even if issued multiple times, even if identical and in rapid succession.

It should be noted that the parties have not challenged the circumstances described above.

Essentially, the user-platform relationship was regulated by terms of use which involved the provision by BitGrail of services, essentially concerning the trading of cryptocurrencies, which had to be deposited on the platform.

Therefore, a deposit contract was certainly formed in the case at hand.

On this point, the Company's attorneys argued that, assuming a deposit contract was concluded, this would certainly be a regular deposit (*deposito regolare*).

The Company argued that the interchangeability of the assets is not in itself sufficient to identify the contract as an irregular deposit. Indeed, the right to use the deposited assets must be expressly provided for by contract or by implicit or tacit consent. According to the Company, this is not the case: the transfers of the users' funds carried out by BG from the users' personal addresses to the centralised exchange addresses did not amount to a "power to dispose of" the assets and carry out transactions with third parties (with a transfer of ownership). In the Company's opinion, these transfers had only an internal function and were legitimate as they were within the scope of the administrator's discretionary power to decide how to hold the cryptocurrencies in deposit.

Nor is the fact that BG had the power to block the platform relevant in any way, since the power to take such action does not change the substance of the deposit. Only BG could have been in charge of managing the platform and establishing its access rules. (This is similar to a securities deposit service provided by a bank: the fact that the bank has the power to regulate access to the deposit and, generally, control and organise its use by the users would not change a regular deposit into an irregular deposit.)

Furthermore, the Company holds that the right to use the deposited assets, which characterises irregular deposits, is completely different from the power to regulate the use of a "virtual" location (*i.e.*, the BitGrail platform). The fact that, in some cases, the platform operation was suspended or that operations instrumental to custody of the deposit were carried out is also irrelevant (although BG did not undertake

any specific obligations in this regard). Moreover, according to the Company, the management methods, which pertain to the performance of the contractual obligations and do not provide any indications as to the type of relationship established, are also irrelevant for legal classification purposes.

Based on these premises, the Company concluded that BG Services is not liable for the hacked Nano, as the contractual and factual elements of irregular deposits are missing in this case. As a result, the subjective and objective requirements are not met and there is no obligation for the Company to return the "missing" cryptocurrency.

Moreover, according to the Company, Firano took all the necessary measures to ensure secure platform exchanges, and promptly informed the Judicial Authority that the cryptocurrency had been hacked.

This view cannot be shared, despite the extensive arguments provided in support thereto.

It must be considered, first of all, that cryptocurrencies – in this case the Nano - XRB – are fungible.

This is because a cryptocurrency is, on the one hand, a monetary unit similar to a currency which, although not recognised as legal tender (as provided for under Italian law), and, on the other hand, an asset that may be the subject of transactions, including transfers.

A cryptocurrency is both a consumable asset, because of its use (when it is spent), and a fungible asset, because all the Nano are of the same type and have the same qualities as they are subject to the same computer protocol. Moreover, Nano has the same characteristics as other assets that are used as a means of payments (based on an agreement between users).

In this case, from the description on how the platform is operated, it is clear that BG Services s.r.l. had control over the deposited funds and could use the currencies deposited by the users.

Specifically, BG Services transferred the currencies from the destination addresses of the users to the "general" addresses of the platform and used these centralised currencies to carry out the various withdrawal requests received from the users (see page 12 of the court-appointed expert witness report).

In his conclusions, the court-appointed expert witness restates that: "*The cryptocurrency was stored in "hot wallet" mode (on connected and active PCs) in the nodes hosted inside the BitGrail infrastructure. Only the operator of the exchange was allowed to transfer and use such funds because s/he was the only one holding the private keys of both the "representative" address* [*i.e.*, the interface with users] *and of the tens of thousands of deposit addresses assigned to single users **into which users deposited their funds and from which they were withdrawn to convey them all from time to time onto the main address***".

## Decision no. 18/2019 published on 21 January 2019

During the assessment carried out by the court-appointed expert witness, it was established that the "fraudulent" withdrawals started a few months before the report of February 2018, that is to say, as early as 2017 (page 29 of the court-appointed expert witness report).

The e also found that Firano had discovered the shortfall in mid-July 2017, when considerable amounts were withdrawn twice ("double withdrawals"), so much so that he described the problem in a Telegram group chat attached to the Nano investigative report produced by the public prosecutor and on record as an annex to the court-appointed expert witness report.

On 12 December 2017, the administrator moved funds out of the exchange, from the representative address BitGrail1 to BitGrail2, when a change of infrastructure was undertaken to a new platform: "[O]*n such date, 13 million XRBs were transferred "manually", without resorting to the exchange functions; the exchange functions, therefore, did not record the transfer in the database. From that date, the BitGrail 1 address had become a "cold wallet", in order to keep some of the millions of Nano to exclude from the operations of the Exchange, which instead continued to operate by using the BitGrail 2 account as a "hot wallet". The purpose of this operation was to maintain an account (Bitgrail 1) "secure" and offline, outside the network, and instead to use the second account (Bitgrail 2) for the daily operations, as required by best practices*" (page 66 of the court-appointed expert witness report).

As for the hacked cryptocurrencies, "*The shortfall reported by Firano in February 2018 –which actually involved a period from May 2017 to December 2017 with some withdrawals also in January 2018 – was caused by multiple withdrawals (also called "double withdrawals") that occurred in circumstances which are not clearly proven*".

According to the statement of Mr Firano, these withdrawals occurred during "crashes" of the node, of which we have no certainty as to the dynamics.

On the contrary, the court-appointed expert witness found that multiple withdrawals could occur in other ways and identified situations in which the node did not function properly, for example, due to overload. However, these scenarios are merely hypothetical and cannot be verified, because the source code of the BitGrail platform used at that time is not available.

The court-appointed expert witness stated that: "*Certainly, the analysis of the transactions with the same TXID that were present in a massive way in July 2017 in the "withdraws" table indicates how the double withdrawals were almost always related to multiple withdrawal attempts very close together and for the same amount, as also noted by Firano already in July 2017, as well as reported in the Telegram chat*

*with the Nano development team within which Firano had entered in December 2016 and exited in December 2017*".

According to the court-appointed expert witness, "multiple withdrawal" means that the same amount was withdrawn twice or more times from the same account held in the name of BitGrail.

In other words, a withdrawal request placed by a BitGrail user resulted in a sort of transfer of electronic funds from the BitGrail general account to the account indicated by the user. However, some users were able to receive multiple transfers for the same amount, including when that amount of cryptocurrency was not available to them anymore.

Essentially, the procedure involved a withdrawal request from users; BitGrail would forward the request to the Nano node; the Nano node would process the request and make the transfer.

The reason why the Nano network was able to perform multiple BitGral transactions (that is, unauthorized transactions that followed the first one, which had been authorized) **was that BitGrail stored all the Nano cryptocurrency in a single wallet with a balance that was sufficient to justify any withdrawal request**.

Furthermore, and more importantly – the court-appointed expert explained –, "*each one of the multiple transactions bore a different hash (that is, the signature, some kind of "CRO Code", as in bank transfers), even if BitGrail requested a withdrawal to the node multiple times, "persuaded" that it was always the same withdrawal. Indeed, the node interpreted the transactions as different transactions, while BitGrail understood the actual withdrawals as a single transaction, with a single hash and a single "entry" in the "withdraws" database, which kept track of each single "official" withdrawal request, irrespective of whether or not such withdrawal was successful. Well then… the expression "multiple withdrawal" should be interpreted as an abbreviated form of "multiple withdrawal requests send by BitGrail" and not as multiple exists from the node; in fact, for each request, the node allowed the funds to leave the account only once. <u>Therefore, it was the BitGrail exchange that actually requested to the node multiple times to allow the funds to leave the wallet (funds that, in fact, had already left the account after the first request) and not the Nano network that allowed the multiple withdrawals.</u> The shortfall reported by Firano in February was <u>caused by a transfer request generated by BitGrail multiple times upon receiving a single request from the user. These requests were sent to the Nano node as separate requests. Had they been idempotent, the Nano node would have disregarded them and prevented any problem</u>*".

**Decision no. 18/2019 published on 21 January 2019**

Based on the above, we must conclude that the deposit at issue in this case is an irregular deposit, insofar as BG Services s.r.l. had the right to use the deposited assets in accordance with Article 1782 of the Italian Civil Code and acquired ownership thereof, as no explicit exception was provided for this provision. (See Italian Supreme Court Decision No. 17512 of 23 August 2011: "*In case of an irregular deposit* (deposito irregolare) *of fungible assets which have not been specifically identified upon delivery, the custodian may dispose of and use those assets. Therefore, the custodian* **_becomes the owner_** *of the assets and must return an equal number of assets of the same kind, unless otherwise expressly provided for in writing*"; Italian Supreme Court Decision No. 7262 of 22 March 2013: "*in case of an irregular deposit of fungible assets, such as cash, which have not been specifically identified upon delivery, the custodian may dispose of those assets and use them. The custodian therefore* **_becomes the owner_** *of the assets, although he must return assets of the same type in the same quantity, unless otherwise expressly provided for in writing*".)

The Court-Appointed Witness Report found that:

- To withdraw previously deposited funds, users had to rely on the exchange functions, since the withdrawal mechanism was provided precisely by the active services for the users of BitGrail and those users could not operate independently of the platform (as they would otherwise have been able to do if, for example, they had their private keys);

- The funds deposited by users in the hot wallets were withdrawn and periodically conveyed to the main address;

- On 12 December 2017, BitGrail went so far as to transfer all cryptocurrencies from BitGrail1 to BitGrail2 for security reasons, creating an "off-line" account, which the users could not access;

- The multiple withdrawals were the result of BitGrail's multiple request sent to the Nano node, which had no knowledge of the exchange accounting system, as it only executed the requests received from BitGrail (multiple requests, although the exchange considered them as single requests);

- BitGrail was in charge of assessing whether funds were available. This is because the cryptocurrency was transferred from BitGrail's general account and, even if the user did not have sufficient funds – in case of a transaction requested by BitGrail to the Nano node – the Nano node did not know the specific amount of cryptocurrency available to each user and was unable to carry out any assessment in this regard.

In conclusion, the shortfall took place because the users that stole the Nano capital had discovered that, by requesting a withdrawal at certain specific times, there was a good probability of obtaining two identical withdrawals, one accounted for and "official" and the other launched for the second time without being accounted for in the exchange, while being duly registered inside the blockchain in the Nano node made to back up the exchange.

The users would, essentially, request withdrawal of a certain amount and receive the same amount twice or more times. This is because, due the configuration of the exchange system and the features of the cryptocurrency, the Nano node carried out "double" transactions, *i.e.*, multiple withdrawals, without the exchange having tracked the execution. Therefore, there was no trace of these transactions on the platform nor in the exchange accounting system.

In other words, a certain number of fraudulent XRB withdrawals occurred, that is, without the transactions being recorded in the exchange database.

This Court believes that the conclusions reached by the court-appointed expert witness are based on compelling, solid and flawless reasons.

It should be noted that the court-appointed expert witness carried out his assessments taking into consideration the parties' observations. This is the reason why he was granted an extension after the Company's expert witness requested a further meeting to discuss the elements that had emerged after the previous meeting with the court-appointed expert witness, following delivery of the draft court-appointed expert witness report and the submissions filed by the party-appointed expert witnesses. Later, the court-appointed expert witness submitted a new draft to the party-appointed expert witnesses. After the parties had submitted their observations, the court-appointed expert witness prepared the final report, which took into account all observations and provided extensive and comprehensive considerations based on an analytical and flawless description of the assessments carried out with the parties' participation.

This Court believes that the objection raised by the Company on the inadmissibility of the court-appointed expert witness report is totally unfounded. The allegation is that the court-appointed expert witness report should have simply filed the draft, attaching the parties' observations and a summary assessment, in accordance with Article 195 of the Italian Code of Civil Procedure.

In this regard, considering the large number and complexity of observations submitted by the party-appointed expert witnesses – as shown by the party-appointed expert witness reports attached by the court-appointed expert witness – this Panel points out that the court-appointed expert witness acted

properly in resubmitting the report so as to incorporate, and reply to, the parties' observations. This choice was made in the view of providing the parties and the Court with a comprehensive, detailed and clearly structured report, without affecting the parties' right to be heard.

We therefore reject the requests for clarifications and supplementation submitted by the Company in relation to the court-appointed expert witness report, which are incorporated in the minutes of the hearing held on 11 December 2018. The objections underlying those requests do not affect the substance of the analysis carried out in the court-appointed expert witness report, which duly took into account the Company's observations.

These requests concern aspects that do not affect circumstances relevant to the decision, namely the court-appointed expert witness's assessments on negligence, the implementation of adequate controls with respect to the Nano node, and whether Firano set up an adequate security system suitable to prevent crashes.

However, for the purposes of the assessments which the Court is called to make in this case (on bankruptcy thresholds and insolvency), the fact that needs to be taken into consideration is the objective Nano shortfall, which is linked to the deposit being an irregular deposit. In this respect, the custodian's negligence (if any) is irrelevant.

Based on the court-appointed expert witness report, the user-platform relationship involved both deposit and trading services (since the specific features of cryptocurrency trade and the platform did not allow for any trading without the prior deposit of funds, as analytically described by the court-appointed expert witness).

As cryptocurrencies are fungible assets, after the users' cryptocurrencies were transferred to the main BitGrail address (divided by type), no information was available in relation to their owners. This means that the deposit was an irregular deposit, and that the custodian was obliged to make available to the holders the full quantity originally deposited, with a 100% cash ratio.

It should be noted that transfer of assets into a shared exchange address achieves, in relation to the cryptocurrency, the same underlying purpose of any irregular deposit, *i.e.*, a more efficient management of the assets deposited by different holders, for which identification of individual cryptocurrencies is purposeless, as long as the same quantity – or rather value – is available at all times.

## Decision no. 18/2019 published on 21 January 2019

Based on the features of the user-platform relationship, and that the cryptocurrency was held in an irregular deposit, BG acquired ownership of such fungible assets and was required to return an equal number of assets of the same kind.

As acknowledged by the Company, the assets cannot be returned due to the hacking of cryptocurrency occurred in 2017.

5) ***Size requirements and insolvency***

With reference to the size requirements, the corrective Decree that came into force on 1 January 2008 has solved the interpretation issues concerning the party that must satisfy the burden of proof in this regard, *i.e.*, either the petitioning creditor or the debtor, expressly establishing that the burden of proof concerning the three requirements is on the latter.

In this case, the Company claimed that it had been active only for a few days, and that the thresholds limits set forth in Article 1, paragraph 2 of the Italian Bankruptcy Law are not exceeded, as shown in the financial statements filed in these proceedings (document 47 filed by the Company).

However, this view is not corroborated by the facts.

With respect to the assets, the expert report filed by Paolo Dal Checco is attached to the second preliminary seizure report of 22 May 2018 by Mr. Tommaso Ariani, special administrator (*curatore speciale*) and receiver (*custode*) of BG Services' assets. The expert report, in which a value expressed in euro is associated to each quantity of cryptocurrency based on current prices, shows that BitCoin (2344.98614792 BTC) and Nano (4,001,097,979.11 XRB) were seized for a value of about 16 million euros and 20 million euros, respectively.

Therefore, while bearing in mind possible fluctuation of these values, which are linked to the quotations of the cryptocurrency, it may be reasonable to assume that these items, which form part of the debtor's assets (although not included as assets in the balance sheet provided by the company) exceed the EUR 300,000.00 assets threshold.

With reference to the debt threshold, liabilities exceed EUR 500,000.00, given the shortfall of cryptocurrencies – which, as mentioned above, are owned by BitGrail under the irregular deposit – and which were withdrawn from the exchange through "multiple withdrawals", for some 11.5 million Nano (of which 10 million in the months between July 2017 and October 2017), for a value of approximately 9.7 million euros.

# Decision no. 18/2019 published on 21 January 2019

Therefore, the threshold for filing bankruptcy petitions referred to in Article 15, last paragraph of the Italian Bankruptcy Law, is also exceeded.

As regards insolvency, according to the prevailing interpretation of the legal doctrine and case law, this assessment must be carried out on objective grounds (based on several external facts suitable to prove that a company is unable to regularly meet its payment obligations), regardless of the reasons for the insolvency and of whether the company may held responsible in relation thereto (Decision No. 115/2001 of the Italian Supreme Court, Joint Divisions, and Decision No. 4789/2005 of the Italian Supreme Court).

For the purposes of assessing whether a company is insolvent, the company must be "unable" to meet its payment obligations, that is, it is no longer able to fulfil its contractual obligations and pay its debts. Such inability must prevent the company from fulfilling its obligations "regularly", *i.e.*, it must last for a considerable period and be structural (not temporary). On the contrary, where such inability to fulfil payment obligations is only temporary, the company is not insolvent.

In this case, the Company is clearly insolvent, since it is unable to return an equal number of cryptocurrencies of the same kind to its users, following the hacking of Nano on the platform.

The bankruptcy petition is therefore granted.

Taking into account that the managing of the procedure will most likely be very complex, Mr Giampiero Castaldi and Mr Tommaso Ariani (attorney) are appointed as Receivers.

## FOR THESE REASONS

Having considered Articles 1, 5, 6 and 16 of Royal Decree No. 267 of 16 March 1942

## THIS HONOURABLE COURT

### *orders*

That BG SERVICES – SOCIETÀ A RESPONSABILITÀ LIMITATA (formerly BITGRAIL S.R.L.), with registered office in Signa (Florence), at Via Roma no. 325, Economic and Administrative Index No. FI – 656632, Tax Code and VAT No. 06791600486, be declared bankrupt, and for this purpose

### *appoints*

Mr Cristian Soscia as Bankruptcy Judge and Mr Giampiero Castaldi and Tommaso Ariani as Receivers, who will confirm their acceptance within 2 days from the notification;

### *orders*

to the bankrupt company to file within 3 days with the Court's Registry the financial statements and the mandatory accounting records, as well as the list of creditors, unless already provided;

# Decision no. 18/2019 published on 21 January 2019

*authorises*

creditors and third parties who claim the existence of *in rem* or personal rights on assets held by the bankrupt company to file proof of debt with the Receivers by up to 30 days before the hearing, in accordance with Article 93, as amended by Law Decree No. 179/2012, converted into Law No. 221/2012

*orders*

the assessment of the list of liabilities to take place before the Bankruptcy Judge at the hearing of **21 May 2019, at 9:00am** before the presiding judge

*authorises*

the pre-payment of the court fees for this decision and subsequent requirements.

*orders*

the publication of the decision in accordance with Article 17 Italian Bankruptcy Law by the Court's Registry which will also take care of creating the insolvency file pursuant to Article 90 Bankruptcy Law.

It is so decided in Florence in chambers on 19 December 2019

**THE JUDGE RAPPORTEUR**                    **THE PRESIDENT**

Cristian Soscia                                           Silvia Governatori

# Exhibit 4

 **Camera di Commercio Firenze**

# Camera di Commercio Industria Artigianato e Agricoltura di FIRENZE

Registro Imprese - Archivio ufficiale della CCIAA

*In questa pagina viene esposto un estratto delle informazioni presenti in visura che non può essere considerato esaustivo, ma che ha puramente scopo di sintesi*

## VISURA STORICA DI SOCIETA' DI CAPITALE

### BG SERVICES - SOCIETA' A RESPONSABILITA' LIMITATA



EHGQ2R

*Il QR Code consente di verificare la corrispondenza tra questo documento e quello archiviato al momento dell'estrazione. Per la verifica utilizzare l'App RI QR Code o visitare il sito ufficiale del Registro Imprese.*

### DATI ANAGRAFICI

| | |
|---|---|
| Indirizzo Sede legale | SIGNA (FI) VIA ROMA 235 CAP 50058 |
| Indirizzo PEC | fif162019@procedurepec.it |
| Numero REA | FI - 656632 |
| Codice fiscale e n.iscr. al Registro Imprese | 06791600486 |
| Partita IVA | 06791600486 |
| Forma giuridica | societa' a responsabilita' limitata |
| Data atto di costituzione | 08/01/2018 |
| Data iscrizione | 12/01/2018 |
| Procedure in corso | fallimento |
| Data ultimo protocollo | 05/08/2019 |
| Amministratore Unico | FIRANO FRANCESCO *Rappresentante dell'Impresa* |

### ATTIVITA'

| | |
|---|---|
| Stato attività | attiva |
| Data inizio attività | 12/01/2018 |
| Attività prevalente | altre attivita' dei servizi connessi alle tecnologie dell'informatica nca ulteriori specifiche: realizzazione e vendita software, siti e portali web e vendita di hardware ed ... |
| Codice ATECO | 62.09.09 |
| Codice NACE | 62.09 |
| Attività import export | - |
| Contratto di rete | - |
| Albi ruoli e licenze | - |
| Albi e registri ambientali | - |

### L'IMPRESA IN CIFRE

| | |
|---|---|
| Capitale sociale | 30.000,00 |
| Soci | 2 |
| Amministratori | 3 |
| Titolari di cariche | 0 |
| Sindaci, organi di controllo | 0 |
| Unità locali | 0 |
| Pratiche inviate negli ultimi 12 mesi | 3 |
| Trasferimenti di quote | 2 |
| Trasferimenti di sede | 0 |
| Partecipazioni (1) | - |

### CERTIFICAZIONE D'IMPRESA

| | |
|---|---|
| Attestazioni SOA | - |
| Certificazioni di QUALITA' | - |

### DOCUMENTI CONSULTABILI

| | |
|---|---|
| Bilanci | - |
| Fascicolo | sì |
| Statuto | sì |
| Altri atti | 10 |

(1) Indica se l'impresa detiene partecipazioni in altre società, desunte da elenchi soci o trasferimenti di quote

Registro Imprese
Archivio ufficiale della CCIAA
Documento n . A ZPV9ZZCXV34D57046748
estratto dal Registro Imprese in data 23/12/2019

**BG SERVICES - SOCIETA' A RESPONSABILITA' LIMITATA**
Codice Fiscale 06791600486

## Indice

1 Sede ................................................................. 2

2 Informazioni da statuto/atto costitutivo ..................................... 2

3 Capitale e strumenti finanziari ................................. 4

4 Scioglimento, procedure concorsuali, cancellazione ............... 4

5 Soci e titolari di diritti su azioni e quote ................................... 4

6 Amministratori ..................................................... 6

7 Soggetti che operano in procedure concorsuali ...................... 6

8 Attività, albi ruoli e licenze ................................... 7

9 Storia delle modifiche ................................................ 7

10 Aggiornamento impresa ...................................... 14

## 1  Sede

| | |
|---|---|
| Indirizzo Sede legale | SIGNA (FI)<br>VIA ROMA 235  CAP 50058 |
| Indirizzo PEC | fif162019@procedurepec.it |
| Partita IVA | 06791600486 |
| Numero repertorio economico amministrativo (REA) | FI - 656632 |

## 2  Informazioni da statuto/atto costitutivo

| | |
|---|---|
| Registro Imprese | Codice fiscale e numero di iscrizione: 06791600486<br>Data di iscrizione: 12/01/2018<br>Sezioni: Iscritta nella sezione ORDINARIA |
| Estremi di costituzione | Data atto di costituzione: 08/01/2018 |
| Sistema di amministrazione | amministratore unico (in carica) |
| Oggetto sociale | LA SOCIETA', PREVIO OTTENIMENTO DELLE AUTORIZZAZIONI AMMINISTRATIVE EVENTUALMENTE NECESSARIE E CON L'ESCLUSIONE DI OGNI ATTIVITA' RISERVATA LEGGE,<br>HA PER OGGETTO L'ATTIVITA' DI:<br>... |
| Poteri da statuto | ALL'AMMINISTRATORE UNICO, OVVERO AI DUE CO-AMMINISTRATORI, IN FORMA FRA LORO<br>CONGIUNTA O DISGIUNTA O CON TALUNI POTERI IN FORMA CONGIUNTA ED ALTRI IN FORMA<br>DISGIUNTA, (FATTO COMUNQUE SALVO QUANTO DISPOSTO DALL'ULTIMO COMMA<br>... |

### Estremi di costituzione

**iscrizione Registro Imprese**

Codice fiscale e numero d'iscrizione: 06791600486
del Registro delle Imprese di FIRENZE
Data iscrizione: 12/01/2018

Registro Imprese
Archivio ufficiale della CCIAA
Documento n . A ZPV9ZZCXV34D57046748
estratto dal Registro Imprese in data 23/12/2019

**BG SERVICES - SOCIETA' A RESPONSABILITA' LIMITATA**
Codice Fiscale 06791600486

| | |
|---|---|
| **sezioni** | Iscritta nella sezione ORDINARIA il 12/01/2018 |
| **informazioni costitutive** | Sigla della denominazione: BITGRAIL SRL<br>Data atto di costituzione: 08/01/2018 |
| **Sistema di amministrazione e controllo** | |
| **durata della società** | Data termine: 31/12/2050 |
| **scadenza esercizi** | Scadenza primo esercizio: 31/12/2018 |
| **sistema di amministrazione e controllo contabile** | Sistema di amministrazione adottato: amministratore unico |
| **forme amministrative** | **amministratore unico** (in carica) |

**Oggetto sociale**

```
LA SOCIETA', PREVIO OTTENIMENTO DELLE AUTORIZZAZIONI AMMINISTRATIVE
EVENTUALMENTE NECESSARIE E CON L'ESCLUSIONE DI OGNI ATTIVITA' RISERVATA LEGGE,
HA PER OGGETTO L'ATTIVITA' DI:
A) REALIZZAZIONE E VENDITA SOFTWARE, SITI E PORTALI WEB E VENDITA DI HARDWARE
ED ACCESSORI NONCHE' ASSISTENZA TECNICA E CORSI DI FORMAZIONE PER LA
REALIZZAZIONE DEI SUDDETTI PRODOTTI E PER LA VENDITA DEGLI STESSI ED ANCORA LA
VENDITA AL DETTAGLIO E ALL'INGROSSO DI MACCHINE E MACCHINARI D'UFFICIO E DI
PRODOTTI O PACCHETTI SOFTWARE A MEZZO INTERNET;
B) LA RICERCA, LA PROGETTAZIONE PER CONTO PROPRIO, LA PRODUZIONE E LA
DIFFUSIONE, ANCHE SU SUPPORTI O MEZZI INFORMATICI E TELEMATICI, NONCHE' LA
COMMERCIALIZZAZIONE E LA VENDITA, ANCHE PER CONTO TERZI, DI OGNI TIPO DI BENE,
SERVIZIO, SUPPORTO, CONSULENZA E FORMAZIONE, UTILIZZANDO STRUMENTI INFORMATICI,
TELEMATICI, ELETTRONICI, MULTIMEDIALI, SU INTERNET ED ATTRAVERSO OGNI TIPO DI
TELECOMUNICAZIONE, DEI PRODOTTI E SERVIZI EDITORIALI E GRAFICI;
C) LA PROGETTAZIONE, LA REALIZZAZIONE E LA COMMERCIALIZZAZIONE DI SOFTWARE DI
QUALSIASI NATURA;
D) LA CONSULENZA, PROGETTAZIONE E LA GESTIONE DI RETI TELEFONICHE, TELEMATICHE,
ELETTRONICHE, MULTIMEDIALI E PER LA TRASMISSIONE VOCALE, VIDEO, DATI, COMPRESE
QUELLE PEER-TO-PEER; E) LA CONSULENZA ED ASSISTENZA NELLA GESTIONE
DELL'ORGANIZZAZIONE AZIENDALE E DEI PRODOTTI SOFTWARE, NELL'UTILIZZO DI
ELABORATORI ELETTRONICI DI QUALSIASI TIPO ED ADIBITI A QUALSIASI ATTIVITA'; LA
VENDITA E LA MESSA A DISPOSIZIONE DI ACCESSI INTERNET, LA REALIZZAZIONE PER
CONTO PROPRIO E DI TERZI DI PAGINE WEB E RICERCHE DI MERCATO;
F) IL COMMERCIO, ANCHE NELLA FORMA ELETTRONICA (E-COMMERCE), E/O VENDITA A
DISTANZA, E/O PER CORRISPONDENZA, DI BENI E SERVIZI IN GENERE NONCHE' LE ASTE E
QUALSIASI ATTIVITA' AD ESSE ATTINENTI PER VIA TELEMATICA.
LA SOCIETA' POTRA' COMPIERE TUTTE LE OPERAZIONI COMMERCIALI ED IMMOBILIARI
UTILI E NECESSARIE AL RAGGIUNGIMENTO DELL'OGGETTO SOCIALE, RICORRERE AL
CREDITO, OTTENERE E PRESTARE FIDEJUSSIONI E COMPIERE OPERAZIONI FINANZIARIE
COMUNQUE MAI RIVOLTE AL PUBBLICO.
```

**Poteri**

**poteri da statuto**

```
ALL'AMMINISTRATORE UNICO, OVVERO AI DUE CO-AMMINISTRATORI, IN FORMA FRA LORO
CONGIUNTA O DISGIUNTA O CON TALUNI POTERI IN FORMA CONGIUNTA ED ALTRI IN FORMA
DISGIUNTA, (FATTO COMUNQUE SALVO QUANTO DISPOSTO DALL'ULTIMO COMMA
DELL'ARTICOLO 2475 DEL CODICE CIVILE) OVVERO AL CONSIGLIO DI AMMINISTRAZIONE
COMPETONO TUTTI I POTERI PER LA GESTIONE ORDINARIA E STRAORDINARIA DELLA
SOCIETA', FATTE SALVE EVENTUALI LIMITAZIONI DISPOSTE DAI SOCI AL MOMENTO DELLA
NOMINA.
IL CONSIGLIO DI AMMINISTRAZIONE, NEI LIMITI PREVISTI DALL'ARTICOLO 2381 DEL
CODICE CIVILE, PUO' DELEGARE LA PROPRIA ATTRIBUZIONE IN MATERIA GESTIONALE IN
TUTTO O IN PARTE AD UNO O PIU' SINGOLI AMMINISTRATORI, ATTRIBUENDO LORO IL
TITOLO DI "AMMINISTRATORE DELEGATO" AI FINI DELLA RAPPRESENTANZA LEGALE DELLA
```

Registro Imprese
Archivio ufficiale della CCIAA
Documento n . A ZPV9ZZCXV34D57046748
estratto dal Registro Imprese in data 23/12/2019

**BG SERVICES - SOCIETA' A RESPONSABILITA' LIMITATA**
Codice Fiscale 06791600486

SOCIETA'.
L'ORGANO AMMINISTRATIVO PUO' NOMINARE DIRETTORI, INSTITORI O PROCURATORI PER IL
COMPIMENTO DI DETERMINATI ATTI O CATEGORIE DI ATTI, STABILENDONE I POTERI.

### Altri riferimenti statutari

clausole di gradimento

Informazione presente nello statuto/atto costitutivo

clausole di prelazione

Informazione presente nello statuto/atto costitutivo

### 3  Capitale e strumenti finanziari

| Capitale sociale in Euro | Deliberato: | 30.000,00 |
| --- | --- | --- |
| | Sottoscritto: | 30.000,00 |
| | Versato: | 30.000,00 |
| | Conferimenti in denaro | |

### 4  Scioglimento, procedure concorsuali, cancellazione

| fallimento | Data iscrizione procedura: 22/01/2019 |
| --- | --- |
| | Data provvedimento: 21/01/2019 |

### Scioglimento e procedure concorsuali

fallimento

*comunicazioni del curatore*

Data iscrizione procedura: 22/01/2019
Data provvedimento: 21/01/2019
Tribunale: FIRENZE
Numero provvedimento: 18
Data Provvedimento: 21/01/2019
Giudice delegato: CRISTIAN SOSCIA
Data udienza esame stato passivo: 21/05/2019
Data termine domanda ammissione: 21/04/2019
Luogo udienza: Ufficio G.d. Presso Palazzo Di Giustizia Di Firenze, Viale Guidoni
Ulteriori informazioni:
FALLIMENTO N. 16/2019 R.F.

rapporto del curatore

DEPOSITO RAPPORTO RIEPILOGATIVO DEL 24/07/2019 (EX ART.33 CO5 LF)

### 5  Soci e titolari di diritti su azioni e quote

Sintesi della composizione societaria e degli altri titolari di diritti su azioni o quote sociali al 14/02/2018

Registro Imprese
Archivio ufficiale della CCIAA
Documento n . A ZPV9ZZCXV34D57046748
estratto dal Registro Imprese in data 23/12/2019

**BG SERVICES - SOCIETA' A RESPONSABILITA' LIMITATA**
Codice Fiscale 06791600486



Il grafico e la sottostante tabella sono una sintesi degli assetti proprietari dell'impresa relativa ai soli diritti di proprietà, che non sostituisce l'effettiva pubblicità legale fornita dall'elenco soci a seguire, dove sono riportati anche eventuali vincoli sulle quote.

| Socio | Valore | % | Tipo diritto |
|---|---|---|---|
| FIRANO FRANCESCO<br>FRNFNC86D11D612E | 25.500,00 | 85 % | proprieta' |
| DAVOLI ANDREA<br>DVLNDR84T14I496B | 4.500,00 | 15 % | proprieta' |

### Elenco dei soci e degli altri titolari di diritti su azioni o quote sociali al 14/02/2018

**capitale sociale**

Capitale sociale dichiarato sul modello con cui è stato depositato l'elenco dei soci: 30.000,00 Euro

### Proprieta'

**FIRANO FRANCESCO**

Quota di nominali: 25.500,00 Euro
Di cui versati: 25.500,00
Codice fiscale: FRNFNC86D11D612E
Tipo di diritto: proprieta'
*Domicilio del titolare o rappresentante comune*
SIGNA (FI) VIA ROMA 235 CAP 50058

### Proprieta'

**DAVOLI ANDREA**

Quota di nominali: 4.500,00 Euro
Di cui versati: 4.500,00
Codice fiscale: DVLNDR84T14I496B
Tipo di diritto: proprieta'
*Domicilio del titolare o rappresentante comune*
RUBIERA (RE) VIA MAESTRI 23 CAP 42048

### Variazioni sulle quote sociali che hanno prodotto l'elenco sopra riportato

Registro Imprese
Archivio ufficiale della CCIAA
Documento n . A ZPV9ZZCXV34D57046748
estratto dal Registro Imprese in data 23/12/2019

**BG SERVICES - SOCIETA' A RESPONSABILITA' LIMITATA**
Codice Fiscale 06791600486

| | |
|---|---|
| **pratica con atto del 13/02/2018** | Data deposito: 14/02/2018<br>Data protocollo: 14/02/2018<br>Numero protocollo: FI -2018-11191 |

## 6  Amministratori

| | | |
|---|---|---|
| Amministratore Unico | FIRANO FRANCESCO | Rappresentante dell'impresa |

**Forma amministrativa adottata**
amministratore unico

Numero amministratori in carica: 1

**Elenco amministratori**

**Amministratore Unico**
FIRANO FRANCESCO

Rappresentante dell'impresa
Nato a FIRENZE (FI)  il 11/04/1986
Codice fiscale:  FRNFNC86D11D612E

*domicilio*

SIGNA (FI) VIA ROMA 235 CAP 50058

*carica*

**amministratore unico**
Nominato con atto del 08/01/2018
Data iscrizione: 12/01/2018
Durata in carica:  a tempo indeterminato
Data presentazione carica: 09/01/2018

## 7  Soggetti che operano in procedure concorsuali

| | |
|---|---|
| Curatore Fallimentare | CASTALDI GIAN PIETRO |
| Curatore Fallimentare | ARIANI TOMMASO |

**Curatore Fallimentare**
CASTALDI GIAN PIETRO

Nato a GENOVA (GE)  il 12/08/1942
Codice fiscale:  CSTGPT42M12D969V

*domicilio*

FIRENZE (FI) VIA DI SAN NICCOLO' 1 CAP 50125
Indirizzo di posta elettronica certificata: fif162019@procedurepec.it

*carica*

**curatore fallimentare**
Nominato con atto del 21/01/2019
Data iscrizione: 22/01/2019

**Curatore Fallimentare**
ARIANI TOMMASO

Nato a FIRENZE (FI)  il 16/09/1980
Codice fiscale:  RNATMS80P16D612J

*domicilio*

FIRENZE (FI) VIA DE' BENCI 24 CAP 50122   PRESSO STUDIO

*carica*

**curatore fallimentare**
Nominato con atto del 21/01/2019
Data iscrizione: 22/01/2019

Registro Imprese
Archivio ufficiale della CCIAA
Documento n . A ZPV9ZZCXV34D57046748
estratto dal Registro Imprese in data 23/12/2019

BG SERVICES - SOCIETA' A RESPONSABILITA' LIMITATA
Codice Fiscale 06791600486

## 8  Attività, albi ruoli e licenze

| Data d'inizio dell'attività dell'impresa | 12/01/2018 |
|---|---|
| Attività prevalente | ALTRE ATTIVITA' DEI SERVIZI CONNESSI ALLE TECNOLOGIE DELL'INFORMATICA NCA ULTERIORI SPECIFICHE: REALIZZAZIONE E VENDITA SOFTWARE, SITI E PORTALI WEB E VENDITA DI HARDWARE ED ... |

### Attività

**inizio attività**
*(informazione storica)*

Data inizio dell'attività dell'impresa: 12/01/2018

**attività prevalente esercitata dall'impresa**

ALTRE ATTIVITA' DEI SERVIZI CONNESSI ALLE TECNOLOGIE DELL'INFORMATICA NCA
ULTERIORI SPECIFICHE:
REALIZZAZIONE E VENDITA SOFTWARE, SITI E PORTALI WEB E VENDITA DI HARDWARE ED
ACCESSORI NONCHE' ASSISTENZA TECNICA E CORSI DI FORMAZIONE PER LA REALIZZAZIO
NE DEI SUDDETTI PRODOTTI E PER LA VENDITA DEGLI STESSI

**Classificazione ATECORI 2007 dell'attività prevalente**
*(fonte Agenzia delle Entrate)*

Codice: 62.09.09 - altre attivita' dei servizi connessi alle tecnologie dell'informatica nca
Importanza: prevalente svolta dall'impresa

**attivita' esercitata nella sede legale**

REALIZZAZIONE E VENDITA SOFTWARE, SITI E PORTALI WEB E VENDITA DI HARDWARE ED
ACCESSORI NONCHE' ASSISTENZA TECNICA E CORSI DI FORMAZIONE PER LA REALIZZAZIONE
DEI SUDDETTI PRODOTTI E PER LA VENDITA DEGLI STESSI

**classificazione ATECORI 2007 dell'attività**
*(fonte Agenzia delle Entrate)*

Codice: 62.09.09 - altre attivita' dei servizi connessi alle tecnologie dell'informatica nca
Importanza: primaria Registro Imprese

## 9  Storia delle modifiche

| Protocolli evasi | | |
|---|---|---|
| | Anno 2019 | 3 |
| | Anno 2018 | 10 |

### Atti iscritti e/o depositati nel Registro Imprese di FIRENZE
**Protocollo n. 63261/2019 del 05/08/2019**

**moduli**

C1 - comunicazione unica presentata ai fini r.i.
S2 - modifica societa' , consorzio g.e.i.e, ente pubblico econ.

**atti**

• procedure concorsuali deposito rapporto riepilogativo
Data atto: 24/07/2019
Data iscrizione: 29/08/2019
comunicazione

**Iscrizioni**

Data iscrizione: 29/08/2019
ALTRE MODIFICHE STATUTARIE – ATTI E FATTI SOGGETTI A DEPOSITO.
PRECEDENTE:
008 – RAPPORTO CURATORE (ASSENTE)

Registro Imprese
Archivio ufficiale della CCIAA
Documento n . A ZPV9ZZCXV34D57046748
estratto dal Registro Imprese in data 23/12/2019

BG SERVICES - SOCIETA' A RESPONSABILITA' LIMITATA
Codice Fiscale 06791600486

**Protocollo n. 6352/2019
del 24/01/2019**

*moduli*

**C4 - com. unica presentata ai fini r.i. e agenzia delle entrate**
**P - iscrizione nel ri e rea di atti e fatti relativi a persone**
Numero modelli: 1
**S2 - modifica societa' , consorzio g.e.i.e, ente pubblico econ.**
**S3 - scioglimento liquidazione fallimento cancellazione societa'**

*atti*

**• procedure concorsuali comunicazione dati per insinuazione al passivo**
Data atto: 21/01/2019
Data iscrizione: 11/02/2019
comunicazione

*Iscrizioni*

Data iscrizione: 11/02/2019
VARIAZIONE INDIRIZZO PEC IMPRESA. INDIRIZZO PEC PRECEDENTE:
BGSERVICESSRL@PEC.IT

Data iscrizione: 11/02/2019
COMUNICAZIONE CURATORE
ESTREMI DELLA COMUNICAZIONE:
TRIBUNALE: FIRENZE N. PROVVEDIMENTO: 18 DATA PROVVEDIMENTO: 21/01/2019 DATA
UDIENZA ESAME STATO PASSIVO: 21/05/2019 DATA TERMINE DOMANDA AMMISSIONE:
21/04/2019
LUOGO UDIENZA: UFFICIO G.D. PRESSO PALAZZO DI GIUSTIZIA DI FIRENZE, VIALE
GUIDONI
GIUDICE DELEGATO: CRISTIAN SOSCIA
FALLIMENTO N. 16/2019 R.F.

Data iscrizione: 11/02/2019
**• CASTALDI GIAN PIETRO**
Codice fiscale: CSTGPT42M12D969V
MODIFICA RESIDENZA ANAGRAFICA E/O DOMICILIO FISCALE
DI: CASTALDI GIAN PIETRO VALORI PRECEDENTI:
RESIDENZA: VIA DI SAN NICCOLO', 1 FIRENZE (FI) – ITALIA DOMICILIO FISCALE: VIA
DI SAN NICCOLO', 1 FIRENZE (FI) – ITALIA

**Protocollo n. 5173/2019
del 21/01/2019**

*moduli*

**CF - comunicazioni d'ufficio di proc. concorsuali e altri provv.**
**P - iscrizione nel ri e rea di atti e fatti relativi a persone**
Numero modelli: 1

*atti*

**• procedure concorsuali sentenza dichiarativa di fallimento tribunale di firenze rf.16/2019**
Data atto: 21/01/2019
Data iscrizione: 22/01/2019

*Iscrizioni*

Data iscrizione: 22/01/2019
PROCEDURE CONCORSUALI
FALLIMENTO: EMESSA SENTENZA DICHIARATIVA DI FALLIMENTO. DATA PROVVEDIMENTO:
21/01/2019.
ESTREMI DELLA COMUNICAZIONE:
TRIBUNALE: FIRENZE N. PROVVEDIMENTO: 18/2019 DATA PROVVEDIMENTO: 19/12/2018
DATA DEPOSITO: 21/01/2019 N. PROCEDIMENTO STORICO: 16/2019 N. PROCEDIMENTO
NELL'ANNO: 315/2019 GIUDICE DELEGATO: SOSCIA CRISTIAN

Data iscrizione: 22/01/2019
**• CASTALDI GIAN PIETRO**
Codice fiscale: CSTGPT42M12D969V

Registro Imprese
Archivio ufficiale della CCIAA
Documento n . A ZPV9ZZCXV34D57046748
estratto dal Registro Imprese in data 23/12/2019

BG SERVICES - SOCIETA' A RESPONSABILITA' LIMITATA
Codice Fiscale 06791600486

NOMINA CARICA E/O QUALIFICA/E DI:

E' STATA NOMINATA  ALLA CARICA DI CURATORE FALLIMENTARE CON ATTO DEL

21/01/2019


Data iscrizione: 22/01/2019
• ARIANI TOMMASO
Codice fiscale: RNATMS80P16D612J

NOMINA CARICA E/O QUALIFICA/E DI:

E' STATA NOMINATA  ALLA CARICA DI CURATORE FALLIMENTARE CON ATTO DEL

21/01/2019

**Protocollo n. 19581/2018
del 27/03/2018**

*moduli*

S5 - inizio, modifica, cessazione di  attivita' nella sede legale
C1 - comunicazione unica presentata ai fini r.i.

**Protocollo n. 16680/2018
del 13/03/2018**

*moduli*

C4 - com. unica presentata ai fini r.i. e agenzia delle entrate
S2 - modifica societa' , consorzio g.e.i.e, ente pubblico econ.
S5 - inizio, modifica, cessazione di  attivita' nella sede legale

**Protocollo n. 16645/2018
del 13/03/2018**

*moduli*

S2 - modifica societa' , consorzio g.e.i.e, ente pubblico econ.

*atti*

• altri atti
Data atto: 06/03/2018
Data iscrizione: 20/03/2018

*Iscrizioni*

Data iscrizione: 20/03/2018

VARIAZIONE INDIRIZZO PEC IMPRESA. INDIRIZZO PEC PRECEDENTE:

BITGRAIL@PEC.IT

**Protocollo n. 15640/2018
del 07/03/2018**

*moduli*

S2 - modifica societa' , consorzio g.e.i.e, ente pubblico econ.
C1 - comunicazione unica presentata ai fini r.i.

*atti*

• modifiche atto costitutivo (soc di capitali e cooperative)
Data atto: 06/03/2018
Data iscrizione: 12/03/2018
atto pubblico
Notaio: DEL FREO TOMMASO
Repertorio n: 1207
Località: FIRENZE (FI)
Registrazione n.: 7139-1T del 07/03/2018
Località di registrazione: FIRENZE (FI)

*Iscrizioni*

Data iscrizione: 12/03/2018

VARIAZIONE DELLA DENOMINAZIONE. DENOMINAZIONE PRECEDENTE:

BITGRAIL - SOCIETA' A RESPONSABILITA' LIMITATA


Data iscrizione: 12/03/2018

VARIAZIONE OGGETTO SOCIALE. OGGETTO SOCIALE PRECEDENTE:

OGGETTO SOCIALE:

LA SOCIETA' HA PER OGGETTO L'ATTIVITA' DI:

 A) CONSULENZA ED ASSISTENZA

Registro Imprese
Archivio ufficiale della CCIAA
Documento n . A ZPV9ZZCXV34D57046748
estratto dal Registro Imprese in data 23/12/2019

**BG SERVICES - SOCIETA' A RESPONSABILITA' LIMITATA**
Codice Fiscale 06791600486

INFORMATICA, SVILUPPO DI SITI WEB, DI PIATTAFORME INFORMATICHE, DI SISTEMI
DECENTRALIZZATI DI TRANSAZIONE, CREAZIONE DI PIATTAFORME DI SCAMBIO PER LA
CREAZIONE E GESTIONE "SMART CONTRACT"
B) SVILUPPO DI PRODOTTI, BREVETTI,
SERVIZI RELATIVI A ATTIVITA' INFORMATICHE BASATE SULLA CRITTOGRAFIA E SULLA
TECNOLOGIA "BLOCKCHAIN";
C) ACQUISTO ED UTILIZZO DELLE RAPPRESENTAZIONI
DIGITALI DI VALORE, UTILIZZATE, SU BASE VOLONTARIA, COME MEZZO DI SCAMBIO PER
L'ACQUISTO DI BENI E SERVIZI (CD. VALUTE VIRTUALI), LORO GESTIONE, DETENZIONE
ED INTERMEDIAZIONE; CON PRECISAZIONE CHE DETTE VALUTE VIRTUALI NON SONO EMESSE
DA BANCHE CENTRALI O DA AUTORITA' PUBBLICA, NON COSTITUISCONO MONETA LEGALE E
NON SONO ASSIMILABILI ALLA MONETA ELETTRONICA; CON L'ESPRESSA PREVISIONE CHE LE
ATTIVITA' DI CUI AI PRECEDENTI PUNTI A), B) E C), L'ATTIVITA' DI EMISSIONE DI
VALUTA VIRTUALE, DI CONVERSIONE DI MONETA LEGALE IN VALUTE VIRTUALI E VICEVERSA
E DI GESTIONE DEI RELATIVI SCHEMI OPERATIVI NON POTRANNO IN ALCUN MODO
RIGUARDARE ATTIVITA' "RISERVATE", QUALI, A TITOLO NON ESAUSTIVO, L'ATTIVITA'
BANCARIA E L'ATTIVITA' DI RACCOLTA DEL RISPARMIO, L'ATTIVITA' DI PRESTAZIONE DI
SERVIZI DI PAGAMENTO E L'ATTIVITA' DI PRESTAZIONI DI SERVIZI DI
INVESTIMENTO;
D) EMISSIONE, DISTRIBUZIONE, INTERMEDIAZIONE, GESTIONE E
CONSULENZA DI CARTE PREPAGATE, VOUCHER, GIFT CARDS, BUONI SCONTO;
E) LA RICERCA, LA PROGETTAZIONE PER CONTO PROPRIO, LA PRODUZIONE E LA
DIFFUSIONE, ANCHE SU SUPPORTI O MEZZI INFORMATICI E TELEMATICI, NONCHE' LA
COMMERCIALIZZAZIONE E LA VENDITA, ANCHE PER CONTO TERZI, DI OGNI TIPO DI BENE,
SERVIZIO, SUPPORTO, CONSULENZA E FORMAZIONE, UTILIZZANDO STRUMENTI INFORMATICI,
TELEMATICI, ELETTRONICI, MULTIMEDIALI, SU INTERNET ED ATTRAVERSO OGNI TIPO DI
TELECOMUNICAZIONE, DEI PRODOTTI E SERVIZI EDITORIALI E GRAFICI; LA
PROGETTAZIONE, LA REALIZZAZIONE E LA COMMERCIALIZZAZIONE DI SOFTWARE DI
QUALSIASI NATURA;
F) LA CONSULENZA, PROGETTAZIONE E LA GESTIONE DI RETI
TELEFONICHE, TELEMATICHE, ELETTRONICHE, MULTIMEDIALI E PER LA TRASMISSIONE
VOCALE, VIDEO, DATI, COMPRESE QUELLE PEER-TO-PEER;
G) LA CONSULENZA ED ASSISTENZA NELLA GESTIONE DELL'ORGANIZZAZIONE AZIENDALE E
DEI PRODOTTI
SOFTWARE, NELL'UTILIZZO DI ELABORATORI ELETTRONICI DI QUALSIASI TIPO ED ADIBITI
A QUALSIASI ATTIVITA'; LA VENDITA E LA MESSA A DISPOSIZIONE DI ACCESSI
INTERNET, LA REALIZZAZIONE PER CONTO PROPRIO E DI TERZI DI PAGINE WEB E
RICERCHE DI MERCATO;
H) IL COMMERCIO, ANCHE NELLA FORMA ELETTRONICA
(E-COMMERCE), E/O VENDITA A DISTANZA, E/O PER CORRISPONDENZA, DI BENI E SERVIZI
IN GENERE NONCHE' LE ASTE E QUALSIASI ATTIVITA' AD ESSE ATTINENTI PER VIA
TELEMATICA.

**Protocollo n. 11191/2018
del 14/02/2018**
*moduli*

S - elenco soci e titolari di diritti su azioni o quote sociali
C1 - comunicazione unica presentata ai fini r.i.

Registro Imprese
Archivio ufficiale della CCIAA
Documento n . A ZPV9ZZCXV34D57046748
estratto dal Registro Imprese in data 23/12/2019

**BG SERVICES - SOCIETA' A RESPONSABILITA' LIMITATA**
Codice Fiscale 06791600486

| | |
|---|---|
| *atti* | • trasferimento ed altre operazioni su quote di srl<br>Data atto: 13/02/2018<br>Data iscrizione: 21/02/2018<br>scrittura privata autenticata<br>Notaio: DLFTMS80T26D612E<br>Repertorio n: 1167<br>Registrazione n.: 4739-1T del 14/02/2018<br>Località di registrazione: TZL |

**Protocollo n. 11168/2018
del 14/02/2018**

| | |
|---|---|
| *moduli* | **S2 - modifica societa' , consorzio g.e.i.e, ente pubblico econ.**<br>**UL - apertura modifica cessazione di unita' locale o aziendale**<br>Numero modelli: 1<br>**C1 - comunicazione unica presentata ai fini r.i.** |
| *atti* | • modifiche atto costitutivo (soc di capitali e cooperative)<br>Data atto: 13/02/2018<br>Data iscrizione: 21/02/2018<br>atto pubblico<br>Notaio: DEL FREO TOMMASO<br>Repertorio n: 1166<br>Località: FIRENZE (FI)<br>Registrazione n.: 4726-1T del 13/02/2018<br>Località di registrazione: FIRENZE (FI) |
| *Iscrizioni* | Data iscrizione: 21/02/2018<br>TRASFERIMENTO DELLA SEDE LEGALE. INDIRIZZO PRECEDENTE:<br>FIRENZE (FI) VIA PIER CAPPONI 89 |

**Protocollo n. 10668/2018
del 12/02/2018**

| | |
|---|---|
| *moduli* | **UL - apertura modifica cessazione di unita' locale o aziendale**<br>Numero modelli: 1<br>**C1 - comunicazione unica presentata ai fini r.i.** |

**Protocollo n. 9769/2018
del 06/02/2018**

| | |
|---|---|
| *moduli* | **S - elenco soci e titolari di diritti su azioni o quote sociali**<br>**C1 - comunicazione unica presentata ai fini r.i.** |
| *atti* | • trasferimento ed altre operazioni su quote di srl<br>Data atto: 30/01/2018<br>Data iscrizione: 12/02/2018<br>scrittura privata autenticata<br>Notaio: DLFTMS80T26D612E<br>Repertorio n: 1141<br>Registrazione n.: 3849-1T del 06/02/2018<br>Località di registrazione: TZL |

Registro Imprese
Archivio ufficiale della CCIAA
Documento n . A ZPV9ZZCXV34D57046748
estratto dal Registro Imprese in data 23/12/2019

**BG SERVICES - SOCIETA' A RESPONSABILITA' LIMITATA**
Codice Fiscale 06791600486

**Protocollo n. 3585/2018
del 16/01/2018**

*moduli*

S5 - inizio, modifica, cessazione di  attivita' nella sede legale
P - iscrizione nel ri e rea di atti e fatti relativi a persone
Numero modelli: 1
**C2 - comunicazione unica presentata ai fini r.i. e inps**

**Protocollo n. 1874/2018
del 09/01/2018**

*moduli*

S1 - iscrizione di  societa,consorzio, g.e.i.e., ente pubb. econ.
S - elenco soci e titolari di diritti su azioni o quote sociali
P - iscrizione nel ri e rea di atti e fatti relativi a persone
Numero modelli: 1
**C1 - comunicazione unica presentata ai fini r.i.**

*atti*

• **atto costitutivo**
Data atto: 08/01/2018
Data iscrizione: 12/01/2018
atto pubblico
Notaio: DEL FREO TOMMASO
Repertorio n: 1096
Località: FIRENZE (FI)
Registrazione n.: 874-1T del 09/01/2018
Località di registrazione: FIRENZE (FI)
• **nomina/conferma amministratori**
Data atto: 08/01/2018
Data iscrizione: 12/01/2018
atto pubblico
Notaio: DEL FREO TOMMASO
Repertorio n: 1096
Località: FIRENZE (FI)
Registrazione n.: 874-1T del 09/01/2018
Località di registrazione: FIRENZE (FI)

*Iscrizioni*

Data iscrizione: 12/01/2018
ISCRIZIONE NELLA SEZIONE ORDINARIA DEL REGISTRO DELLE IMPRESE

Data iscrizione: 12/01/2018
• **FIRANO FRANCESCO**
Codice fiscale: FRNFNC86D11D612E
NOMINA CARICA E/O QUALIFICA/E DI:
ISCRIVE LA PROPRIA NOMINA  DI CUI HA AVUTO NOTIZIA IN DATA 08/01/2018 ALLA
CARICA DI AMMINISTRATORE UNICO CON ATTO DEL 08/01/2018 DURATA: A TEMPO
INDETERMINATO LA PERSONA DICHIARA DI AGIRE DA SOLA
DATA PRESENTAZIONE 09/01/2018

**Estremi atto di costituzione**

Tipo dell'atto: **atto costitutivo**
Notaio: DEL FREO TOMMASO
Numero repertorio: 1096
Località: FIRENZE (FI)

Registro Imprese
Archivio ufficiale della CCIAA
Documento n . A ZPV9ZZCXV34D57046748
estratto dal Registro Imprese in data 23/12/2019

BG SERVICES - SOCIETA' A RESPONSABILITA' LIMITATA
Codice Fiscale 06791600486

## Sedi secondarie e unità locali cessate

### Unita' Locale n. 1

*indirizzo*

*attivita' esercitata*

Sede Operativa
Data apertura: 12/01/2018
SIGNA (FI)
VIA ROMA 235  CAP 50058

ALTRE ATTIVITA' DEI SERVIZI CONNESSI ALLE TECNOLOGIE DELL'INFORMATICA NCA
ULTERIORI SPECIFICHE:
CONSULENZA E ASSISTENZA INFORMATICA, SVILUPPO SITIWEB, DI PIATTAFORME
INFORMATICHE, DI SISTEMI DECENTRALIZZATI DI TRANSAZIONE DI CRIPTOMONETE,
CREAZIONE DI PIATTAFORME DI SCAMBIO PERLA CREAZIONE E GESTIONE "SMARTCONTRACT";
SVILUPPO DEI PRODOTTI, BREVETTI, SERVIZI RELATIVI AD ATTIVITA' INFORMATICHE
BASATE SULLA CRITTOGRAFIA, E SULLA TECNOLOGIA "BLOCKCHAIN"

**cessazione**

Data cessazione: 13/02/2018
Causale: trasformazione in sede legale

## Informazioni storiche REA

*denuncia modifica del 27/03/2018*

Data effetto: 06/03/2018
• **variazione dell' attivita' prevalente dell' impresa**

VALORE PRECEDENTE: ALTRE ATTIVITA' DEI SERVIZI CONNESSI ALLE TECNOLOGIE
DELL'INFORMATICA NCA        ULTERIORI SPECIFICHE:
CONSULENZA ED ASSISTENZA INFORMATICA, SVILUPPO DI SITI WEB, DI PIATTAFORME
INFORMATICHE, DI SISTEMI DECENTRALIZZATI DI TRANSAZIONE DI CRIPTOMONETE,
CREAZIONE DI PIATTAFORME DI SCAMBIO PER LA CREAZIONE E GESTIONE "SMART
CONTRACT"; SVILUPPO DI PRODOTTI, BREVETTI, SERVIZI RELATIVI AD ATTIVITA'
INFORMATICHE BASATE SULLA CRITTOGRAFIA,E SULLA TECNOLGIA " BLOCKCHAIN".

*denuncia modifica del 13/03/2018*

Data effetto: 06/03/2018
• **inizio attivita'**

REALIZZAZIONE E VENDITA SOFTWARE, SITI E PORTALI WEB E VENDITA DI HARDWARE ED
ACCESSORI NONCHE' ASSISTENZA TECNICA E CORSI DI FORMAZIONE PER LA REALIZZAZIO
NE DEI SUDDETTI PRODOTTI E PER LA VENDITA DEGLI STESSI

• **cessazione di parte dell' attivita'**

CONSULENZA ED ASSISTENZA INFORMATICA,SVILUPPODI SITI WEB, DI PIATTAFORME INFO
RMATICHE, DI SISTEMI DECENTRALIZZATI DI TRANSAZIONE DI CRIPTOMONETE, CREAZION
E DI PIATTAFORME DI SCAMBIO PER LA CREAZIONE E GESTIONE "SMART CONTRACT"; SVI
LUPPO DI PRODOTTI, BREVETTI, SERVIZI RELATIVI AD ATTIVITA' INFORMATICHE BASAT
E SULLA CRITTOGRAFIA, E SULLA TECNOLOGIA " BLOCKHAIN"

• **variazione attivita' primaria**

VALORE PRECEDENTE: ALTRE ATTIVITA' DEI SERVIZI CONNESSI ALLE TECNOLOGIE
DELL'INFORMATICA NCA        ULTERIORI SPECIFICHE:
CONSULENZA ED ASSISTENZA INFORMATICA, SVILUPPO DI SITI WEB, DI PIATTAFORME
INFORMATICHE, DI SISTEMI DECENTRALIZZATI DI TRANSAZIONE DI CRIPTOMONETE,
CREAZIONE DI PIATTAFORME DI SCAMBIO PER LA CREAZIONE E GESTIONE "SMART
CONTRACT"; SVILUPPO DI PRODOTTI, BREVETTI, SERVIZI RELATIVI AD ATTIVITA'
INFORMATICHE BASATE SULLA CRITTOGRAFIA,E SULLA TECNOLGIA " BLOCKCHAIN".

*denuncia modifica del 14/02/2018*

Data effetto: 13/02/2018
• **cessazione unita' locale**

n.1, SIGNA (FI) VIA ROMA 235

*denuncia modifica del 12/02/2018*

Data effetto: 12/01/2018
• **apertura unita' locale**

SIGNA (FI) VIA ROMA 235

Registro Imprese
Archivio ufficiale della CCIAA
Documento n . A ZPV9ZZCXV34D57046748
estratto dal Registro Imprese in data 23/12/2019

**BG SERVICES - SOCIETA' A RESPONSABILITA' LIMITATA**
Codice Fiscale 06791600486

| *denuncia modifica del 16/01/2018* | Data effetto: 12/01/2018 |
|---|---|
| | **• variazione dell' attivita' prevalente dell' impresa** |
| | ALTRE ATTIVITA' DEI SERVIZI CONNESSI ALLE TECNOLOGIE DELL'INFORMATICA NCAULTE RIORI SPECIFICHE:CONSULENZA ED ASSISTENZA INFORMATICA, SVILUPPO DI SITI WEB, DI PIATTAFORMEINFORMATICHE, DI SISTEMI DECENTRALIZZATI DI TRANSAZIONE DI CRIP TOMONONETE,CREAZIONE DI PIATTAFORME DI SCAMBIO PER LA CREAZIONE E GESTIONE "SMA RTCONTRACT"; SVILUPPO DI PRODOTTI, BREVETTI, SERVIZI RELATIVI AD ATTIVITA'INF ORMATICHE BASATE SULLA CRITTOGRAFIA,E SULLA TECNOLGIA " BLOCKCHAIN". |
| | **• inizio attivita'** |
| | ALTRE ATTIVITA' DEI SERVIZI CONNESSI ALLE TECNOLOGIE DELL'INFORMATICA NCAULTE RIORI SPECIFICHE:CONSULENZA ED ASSISTENZA INFORMATICA, SVILUPPO DI SITI WEB, DI PIATTAFORMEINFORMATICHE, DI SISTEMI DECENTRALIZZATI DI TRANSAZIONE DI CRIP TOMONETE,CREAZIONE DI PIATTAFORME DI SCAMBIO PER LA CREAZIONE E GESTIONE "SMA RTCONTRACT"; SVILUPPO DI PRODOTTI, BREVETTI, SERVIZI RELATIVI AD ATTIVITA'INF ORMATICHE BASATE SULLA CRITTOGRAFIA,E SULLA TECNOLGIA " BLOCKCHAIN". |
| | **• variazione attivita' primaria** |
| | VALORE PRECEDENTE: (ASSENTE) |
| | **• variazione stato attivita'** |
| | VALORI PRECEDENTI: DATA INIZIO ATTIVITA': (ASSENTE) STATO: INATTIVA |

**10  Aggiornamento impresa**

| Data ultimo protocollo | 05/08/2019 |
|---|---|