**SCOOLIDGE PETERS RUSSOTTI & FOX LLP**
Peter Scoolidge (NY 4682100)
peter@sprfllp.com
Peter Fox (NY 4832606)
pfox@sprfllp.com
2 Park Avenue
New York, NY 10016
(212) 729-7708 tel
*Attorneys for Defendants Hieusys, LLC,*
*Colin LeMahieu, Troy Retzer, and Mica Busch*

**ZUCKERMAN SPAEDER LLP**
Shawn Naunton (NY 3958691)
snaunton@zuckerman.com
Devon Galloway (NY 5459896)
dgalloway@zuckerman.com
485 Madison Avenue
New York, NY 10022
(212) 704-9600 tel
*Attorneys for Defendant Zack Shapiro*

**CORNERSTONE LAW GROUP**
Paul J. Byrne (SBN 190860)
pbyrne@cornerlaw.com
351 California St Ste 600
San Francisco CA 94104
(415) 357-2094 tel
(415) 655-8238 fax
*Attorneys for Defendants Hieusys, LLC, Colin*
*LeMahieu, Troy Retzer, Mica Busch, and Zack Shapiro*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES FABIAN, individually; and on behalf of All Others Similarly Situated; | § Case Number: 4:19-cv-54-YGR |
| | § |
| | § **DECLARATION OF** |
| *Plaintiff,* | § **PETER FOX** |
| | § |
| v. | § |
| | § |
| NANO f/k/a RAIBLOCKS f/k/a HIEUSYS, LLC; COLIN LEMAHIEU; MICA BUSCH; ZACK SHAPIRO; TROY RETZER; BG SERVICES, S.R.L. f/k/a BITGRAIL S.R.L. f/k/a WEBCOIN SOLUTIONS; AND FRANCESCO "THE BOMBER" FIRANO, | § |
| | § |
| | § |
| | § |
| | § |
| | § |
| | § |
| *Defendants.* | § |

I, Peter Fox, hereby declare as follows:

1.      I am a partner at the law firm of Scoolidge Peters Russotti & Fox, LLP.

2.      My firm represents Defendants Hieusys, LLC, Colin LeMahieu, Troy Retzer and Mica Busch (together, with Zack Shapiro, the "Nano Defendants") in the above-captioned matter.

3.      I am submitting this declaration in support of the Nano Defendants' opposition to Plaintiff James Fabian's motion to consolidate.

4.      Annexed hereto as Exhibit A is a true and correct copy of a "redline" comparison of the operative complaint in this action to the complaint filed in this district in the action, *Clemens v. Nano*, 20-CV-5351, on August 3, 2020.

5.      Annexed hereto as Exhibit B is a true and correct copy of the Notice of Deposition of Mr. Fabian served on May 29, 2020.

6.      Annexed hereto as Exhibit C is a true and correct copy of the Nano Defendants' First Set of Interrogatories served on May 29, 2020.

7.      Annexed hereto as Exhibit D is a true and correct copy of the Nano Defendants' First Requests for the Production of Documents served on May 29, 2020.

8.      Annexed hereto as Exhibit E is a true and correct copy of the transcript of the deposition of Mr. Fabian taken on August 7, 2020.

9.      Annexed hereto as Exhibit F is a true and correct copy of Mr. Fabian's Second Supplemental Responses and Objections to the Nano Defendants' First Set of Interrogatories served on July 14, 2020.

Dated: August 17, 2020
       New York, NY

                                        /s/ Peter Fox_____
                                        Scoolidge Peters Russotti & Fox, LLP
                                        2 Park Avenue, 19th Floor
                                        New York, NY 10016
                                        (212) 729-7708
                                        pfox@sprfllp.com

# EXHIBIT A

# Text Comparison

Initial Document:
6903743_1.pdf

Changed Document:
_Clemens.pdf

Summary
Differences exist between the documents.

3016 word(s) added
7054 word(s) deleted
962 word(s) moved
14514 word(s) matched

5 page(s) added
16 page(s) deleted
51 page(s) replaced

Insert      Word(s) inserted
~~Delete~~   Word(s) deleted
Move        Word(s) moved
Different    Word(s) different only in style

1  Rosanne L. Mah (State Bar No. 242628)
   Email: rmah@zlk.com
2  **LEVI & KORSINSKY, LLP**
   ~~44 Montgomery~~ Street, Suite ~~650~~
3  San Francisco, California ~~94104~~
   Telephone: (415) 373-1671
4  Facsimile: (415) 484-1294

5  *Counsel for ~~Plaintiff JAMES FABIAN~~*

6  [*Additional Counsel listed on signature block*]

7                    **UNITED STATES DISTRICT COURT**

8            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

9

10  JAMES ~~FABIAN,~~ individually and on behalf of    Case No. ~~19-cv-54-YGR~~
    all others similarly situated,

11                                                      **~~FIRST AMENDED~~ CLASS ACTION
                      Plaintiff,                        COMPLAINT**

12          v.
                                                        **JURY TRIAL DEMANDED**
13  NANO F/K/A RAIBLOCKS F/K/A HIEUSYS,
    LLC; COLIN LEMAHIEU; MICA BUSCH;
14  ZACK SHAPIRO; TROY RETZER; BG
    SERVICES, S.R.L. F/K/A BITGRAIL S.R.L.
15  F/K/A WEBCOIN SOLUTIONS; AND
    FRANCESCO "THE BOMBER" FIRANO,
16
                      Defendants.
17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

This page does not exist in the compared document.

1   Rosanne L. Mah (State Bar No. 242628)
    Email: rmah@zlk.com
2   **LEVI & KORSINSKY, LLP**
    388 Market Street, Suite 1300
3   San Francisco, California 94111
    Telephone: (415) 373-1671
4   Facsimile: (415) 484-1294

5   *Counsel for Plaintiffs*

6   [*Additional Counsel listed on signature block*]

7

8                    **UNITED STATES DISTRICT COURT**

9               **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10  CRAIG CLEMENS, ANAN THAMARNAN,          Case No.
    ALEC OTTO, KYLE PENN, JAMES SUPPLE,
11  MICHAEL MIGIERO, PETER DEDES,           **CLASS ACTION COMPLAINT**
    JESSE CASE, RICHARD BARILLA,
12  MICHAEL OLIVER, ROBERT IRELAND,         **JURY TRIAL DEMANDED**
    EDWARD SEIMON, MATTHEW BATTISTINI,
13  and KADEEM BLANCHARD, individually and
    on behalf of all others similarly situated,
14
                        Plaintiff,
15
            v.
16
    NANO F/K/A RAIBLOCKS F/K/A HIEUSYS,
17  LLC; COLIN LEMAHIEU; MICA BUSCH;
    ZACK SHAPIRO; TROY RETZER; BG
18  SERVICES, S.R.L. F/K/A BITGRAIL S.R.L.
    F/K/A WEBCOIN SOLUTIONS; AND
19  FRANCESCO "THE BOMBER" FIRANO,

20                      Defendants.

21

22

23

24

25

26

27

28

                                                              Case No.
_____
                       CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

NATURE AND SUMMARY OF THE ACTION ............................................................... 2

JURISDICTION AND VENUE ......................................................................................... 8

CLASS ACTION ALLEGATIONS ................................................................................. 10

SUBSTANTIVE ALLEGATIONS .................................................................................. 14

    I.      Background on Blockchain Technology.................................................... 14

    II.     Creation of XRB ...................................................................................... 15

    III.    XRB is Not Decentralized ....................................................................... 16

    IV.    Cryptocurrency Faucets and the XRB Faucet......................................... 18

    V.     The Nano Defendants' Efforts to List XRB on Established Exchanges...... 22

    VI.    XRB is Listed on Exchanges and Bona Fide Offered to the Investing Public ............ 23

    VII.   The Nano Defendants and Firano Create and Launch BitGrail Together ................. 24

    VIII.  Defendants Heavily Solicit the Purchase of XRB on BitGrail ................................ 27

        A.     Instructing Members of the Investing Public to Purchase XRB ...................... 27

        B.     Encouraging the Public to Spread the Word.................................................... 31

        C.     Increasing Social Media and Online Presence................................................. 31

        D.    Downplaying Speculation: the "HODL Mentality"........................................ 33

    IX.    The Nano Defendants Close the Nano Faucet and Extract Millions in Profits ........... 33

    X.     Defendants' Representations Regarding their Duties and Obligations to Investors..... 35

    XI.    Nano's Recommendations Fail to Disclose the XRB Protocol's and the BitGrail Exchange's Lack of Safeguards Protecting the Class' Deposits ................................. 37

        A.     The Trading Platform Problem ....................................................................... 37

        B.     The Verification Problem ................................................................................ 38

        C.     The $170 Million Disappearing XRB Problem ............................................... 38

        D.    Lack of Idempotence in the Nano Protocol Resulted in the Theft of the Class' XRB Worth $170 Million ............................................................... 39

        E.     Defendants Breached Their Duties Owed the Class and Concealed the Theft of the Class' XRB Investments for Eight Months.......................................... 41

1          **TABLE OF CONTENTS**

2    INTRODUCTION ................................................................................................................. 1

3    NATURE AND SUMMARY OF THE ACTION ................................................................. 2

4    JURISDICTION AND VENUE .......................................................................................... 6

5    PARTIES ............................................................................................................................. 7

6    CLASS ACTION ALLEGATIONS .................................................................................. 10

7    SUBSTANTIVE ALLEGATIONS ................................................................................... 14

8        I.      Background on Blockchain Technology ................................................................ 14

9        II.     Creation of XRB ................................................................................................... 15

10       III.    XRB is Not Decentralized .................................................................................... 16

11       IV.     Cryptocurrency Faucets and the XRB Faucet ...................................................... 18

12       V.      The Nano Defendants' Efforts to List XRB on Established Exchanges ................ 22

13       VI.     XRB is Listed on Exchanges and Bona Fide Offered to the Investing Public ...... 23

14       VII.    The Nano Defendants and Firano Create and Launch BitGrail Together .............. 25

15       VIII.   Defendants Heavily Solicit the Purchase of XRB on BitGrail ............................. 27

16               A.      Instructing Members of the Investing Public to Purchase XRB ................ 27

17               B.      Encouraging the Public to Spread the Word .............................................. 31

18               C.      Increasing Social Media and Online Presence ........................................... 32

19               D.      Downplaying Speculation: the "HODL Mentality" ................................... 34

20       IX.     The Nano Defendants Close the Nano Faucet and Extract Millions in Profits ...... 34

21       X.      Defendants' Representations Regarding their Duties and Obligations to Investors ..... 36

22       XI.     Nano's Recommendations Fail to Disclose the XRB Protocol's and the BitGrail
                 Exchange's Lack of Safeguards Protecting the Class' Deposits ........................... 38

23               A.      The Trading Platform Problem .................................................................. 38

24               B.      The Verification Problem ........................................................................... 39

25               C.      The $170 Million Disappearing XRB Problem .......................................... 39

26               D.      Lack of Idempotence in the Nano Protocol Resulted in the Theft of the Class'
                         XRB Worth $170 Million ......................................................................... 40

27

28

6903743_1.pdf - Page 3 - Replace

Case 4:19-cv-00054-YGR Document 147-1 Filed 08/17/20 Page 11 of 426
Case 4:19-cv-00054-YGR Document 53 Filed 07/25/19 Page 3 of 67

XII.    XRB Are Unregistered Investment Contract Securities .................................... 45

ADDITIONAL FACTS SPECIFIC TO LEAD PLAINTIFF FABIAN ................................................ 47

COUNT I ............................................................................................................ 48

COUNT II ........................................................................................................... 49

COUNT III .......................................................................................................... 50

COUNT IV .......................................................................................................... 50

COUNT V ........................................................................................... 51

COUNT VI .......................................................................................................... 54

COUNT VII ......................................................................................................... 54

COUNT VIII ........................................................................................................ 56

COUNT IX .......................................................................................................... 57

COUNT X ........................................................................................................... 58

COUNT XI .......................................................................................................... 60

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ii

E.    Defendants Breached Their Duties Owed the Class and Concealed the Theft of the Class' XRB Investments for Eight Months ................................................ 42

COUNT I ........................................................................................................... 46

COUNT II .......................................................................................................... 47

COUNT III ......................................................................................................... 49

COUNT IV .......................................................................................................... 50

**INTRODUCTION**

~~Plaintiff~~ James ~~Fabian ("Plaintiff" or "Fabian"),~~ individually and on behalf of all other persons similarly situated, by ~~his~~ undersigned attorneys, ~~alleges~~ in this ~~First Amended~~ Class Action Complaint (the "~~Amended~~ Complaint") claims ~~for: (i) violations of Sections 12(a)(1) and 15(a) of the Securities Act of 1933 (the "Securities Act") (the "Securities Act Claims"); (ii) breach of contract;[†] (iii) breach of implied contract;[2] (iv) breach of fiduciary duty; (v) aiding and abetting breach of fiduciary duty; (vi) negligence; (vii) negligent misrepresentation; (viii) fraud; (ix) constructive fraud; and (x) quasi contract seeking restitution based upon his own knowledge and acts, and based on facts obtained upon investigation by his~~ counsel, which include, *inter alia:* (a) documents and solicitation materials released by Defendants Nano f/k/a RaiBlocks f/k/a Hieusys, LLC ("Nano" or the "Company"), Colin LeMahieu ("LeMahieu"), Mica Busch ("Busch"), Zack Shapiro ("Shapiro"), Troy Retzer ("Retzer" and together with Nano, LeMahieu, Busch and Shapiro, the "Nano Defendants"), B.G. Services SRL f/k/a BitGrail SRL f/k/a Webcoin Solutions ("BitGrail"), and Francesco "The Bomber" Firano ("Firano" together with BitGrail, the "BitGrail Defendants") (collectively, "Defendants") in connection with their promotion of a cryptocurrency called NANO (f/k/a RaiBlocks) ("XRB"); (b) public statements made by Defendants concerning XRB and its listing on BitGrail -- an Italian-based cryptocurrency exchange; (c) media publications concerning XRB and BitGrail; and (d) the bankruptcy decisions issued by the Tribunale Di Firenze of Italy against ~~against~~ Defendant BitGrail in *In re BG Services (BitGrail S.R.L.),* Trib. Florence, n.18/2019 (the "BitGrail Decision") and against Defendant Firano in *In re Firano,* Trib. Florence, n. 18/2019 (the "Firano Decision").

~~Plaintiff believes~~ that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.  Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

---

[†] ~~Plaintiff's claim for breach of contract~~ is ~~asserted solely against~~ the ~~BitGrail Defendants (defined below).~~

[2] ~~Plaintiff's claim for breach of implied contract is asserted solely against~~ the Nano ~~Defendants (defined below).~~

**INTRODUCTION**

1. Plaintiffs Craig Clemens, Anan Thamarnan, Alec Otto, Kyle Penn, James Supple, Michael Migiero, Peter Dedes, Jesse Case, Richard Barilla, Michael Oliver, Robert Ireland, Edward Seimon, Matthew Battistini, and Kadeem Blanchard (together, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege in this Class Action Complaint (the "Complaint") claims against Defendants Nano f/k/a RaiBlocks f/k/a Hieusys, LLC ("Nano" or the "Company"), Colin LeMahieu ("LeMahieu"), Mica Busch ("Busch"), Zack Shapiro ("Shapiro"), Troy Retzer ("Retzer" and together with Nano, LeMahieu, Busch and Shapiro, the "Nano Defendants"), B.G. Services SRL f/k/a BitGrail SRL f/k/a Webcoin Solutions ("BitGrail"), and Francesco "The Bomber" Firano ("Firano" together with BitGrail, the "BitGrail Defendants") (collectively, "Defendants") for: (i) negligence; (ii) negligent misrepresentation; (iii) fraud; and (iv) breach of contract; seeking restitution based upon Plaintiffs' own knowledge and acts, and based on facts obtained upon investigation by their counsel, which include, *inter alia*: (a) documents and solicitation materials released by Defendants in connection with their promotion of a cryptocurrency called NANO (f/k/a RaiBlocks) ("XRB"); (b) public statements made by Defendants concerning XRB and its listing on BitGrail -- an Italian-based cryptocurrency exchange; (c) media publications concerning XRB and BitGrail; and (d) the bankruptcy decisions issued by the Tribunale Di Firenze of Italy against Defendant BitGrail in *In re BG Services (BitGrail S.R.L.)*, Trib. Florence, n.18/2019 (the "BitGrail Decision") and against Defendant Firano in *In re Firano*, Trib. Florence, n. 18/2019 (the "Firano Decision").

2. Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

3. This Complaint is meant to be consolidated with the Amended Complaint filed in this forum in the class action lawsuit styled *Fabian v. Nano et. al.*, U.S. District Court - Northern District of California - Case No. 4:19-cv-00054-YGR (SK) (the "*Fabian* Action"); so Plaintiffs in this related action may be added as plaintiffs in the *Fabian* Action. This Complaint adds no material substance to

6903743_1.pdf - Page 5 - Replace

## NATURE AND SUMMARY OF THE ACTION

1. This is a class action on behalf of a class of investors consisting of all individuals and entities who transferred fiat currency or cryptocurrency to ~~BitGrail to~~ invest in XRB or transferred XRB to BitGrail ~~from April 1, 2017 through February 8, 2018, inclusive,~~ and who suffered financial injury as a result thereof (the "Class" who purchased or held XRB on BitGrail during the "Class Period"). This action seeks to recover rescissory, compensatory, punitive and injunctive relief under ~~Sections 12(a)(1) and 15(a) of the Securities Act [15 U.S.C. §§ 77l(a)(1) & 77o(a)] and~~ various state and common law claims against Nano, certain of its top officials, certain influential promoters that received compensation in exchange for selling XRB or soliciting the general public to purchase XRB, and its partner the BitGrail Defendants.

2. The Nano Defendants developed XRB, which they each promoted, offered, traded and sold to the general public for the Nano Defendants' personal financial benefit. XRB has never been registered as a security with the Securities and Exchange Commission and is not exempt from registration.

~~3.~~ The Nano Defendants began working with the BitGrail Defendants to create BitGrail's "RaiBlocks dedicated exchange" (the "BitGrail Exchange") in approximately December 2016. Indeed, Defendant LeMahieu personally worked with Defendant Firano and a member of Nano's core development team—an individual known as "mikerow"[3]— until October 2017 in developing the BitGrail Exchange. In the words of mikerow on an online cryptocurrency discussion forum (www.bitcointalk.~~org ("Bitcoin Talk"))~~ on May 4, 2017, the BitGrail Exchange was "written from 0 for XRB."

~~4.~~ The BitGrail Exchange launched in April 2017 (www.bitgrail.com). Throughout the Class Period, each of the Nano Defendants remained substantially involved in the ~~maintenance of the~~ BitGrail Exchange's XRB-related operations and retained significant control over Defendant Firano's decision making concerning the BitGrail Exchange.

---

[3] "Mikerow" left the Nano development team in late-2017 following a disagreement regarding the Nano Defendants' decision to cease the Nano Faucet (defined *infra*).

1    the Amended Complaint in the *Fabian* Action beyond merely naming new Plaintiffs and setting forth

2    the facts underlying their claims.

3                         **NATURE AND SUMMARY OF THE ACTION**

4         1.    This is a class action on behalf of a class of investors consisting of all individuals and

5    entities who are citizens of the United States and who -- from April 1, 2017 through March 31, 2018,

6    inclusive -- transferred to BitGrail fiat currency or cryptocurrency to invest in XRB or transferred XRB

7    to BitGrail and who suffered financial injury as a result thereof (the "Class" who purchased or held

8    XRB on BitGrail during the "Class Period"). This action seeks to recover rescissory, compensatory,

9    punitive and injunctive relief under various state and common law claims against Nano, certain of its

10    top officials, certain influential promoters that received compensation in exchange for selling XRB or

11    soliciting the general public to purchase XRB, and its partner the BitGrail Defendants.

12         2.    The Nano Defendants developed XRB, which they each promoted, offered, traded and

13    sold to the general public for the Nano Defendants' personal financial benefit.

14         3.    XRB has never been registered as a security with the Securities and Exchange

15    Commission and is not exempt from registration.

16         4.    The Nano Defendants began working with the BitGrail Defendants to create BitGrail's

17    "RaiBlocks dedicated exchange" (the "BitGrail Exchange") in approximately December 2016. Indeed,

18    Defendant LeMahieu personally worked with Defendant Firano and a member of Nano's core

19    development team—an individual known as "mikerow"[1]— until October 2017 in developing the

20    BitGrail Exchange. In the words of mikerow on an online cryptocurrency discussion forum

21    (www.bitcointalk.org) on May 4, 2017, the BitGrail Exchange was "written from 0 for XRB."

22         5.    The BitGrail Exchange launched in April 2017 (www.bitgrail.com). Throughout the

23    Class Period, each of the Nano Defendants remained substantially involved in maintaining the BitGrail

24    Exchange's XRB-related operations and retained significant control over Defendant Firano's decision

25    making concerning the BitGrail Exchange.

26

    ————————————————

27    [1] "Mikerow" left the Nano development team in late-2017 following a disagreement regarding the Nano
    Defendants' decision to cease the Nano Faucet (defined *infra*).

28

5. Throughout the Class Period, the Nano Defendants directed the investing public to purchase XRB through, and stake XRB at, BitGrail by, *inter ~~alia~~,* (i) commissioning, and contributing to, the creation of the BitGrail Exchange; (ii) providing specific investment instructions and assurances that the BitGrail Exchange was secure and could be trusted to safeguard investment assets; and (iii) collaborating with the BitGrail Defendants in maintaining ~~and~~ the BitGrail ~~Exchange's~~ on its XRB-related ~~related~~ operations.

6. In July 2017, during a private group chat ~~including~~ Defendant Firano and the Nano Defendants, Firano reported to the Nano team that there was an error in the code (the "XRB Protocol") for maintaining XRB's ledgers and transferring XRB from the BitGrail Exchange into private wallets, which caused certain transactions to be entered two or more times.[4] The Double Withdrawal Transactions occurred because the XRB Protocol lacked "idempotence."[5]

7. Due to the XRB Protocol lacking idempotence, the Double Withdrawal Transactions were accomplished even if the account transferring the XRB off of the BitGrail Exchange lacked sufficient funds to complete the multiple transactions—by transferring XRB belonging to other accountholders off of the BitGrail Exchange to the private wallet destination.

8. Approximately 2.5 million XRB were stolen in July 2017 by exploiting XRB's lack of idempotence in the XRB Protocol, which permitted Double Withdrawal Transactions. The error permitting the Double Withdrawal Transactions was exploited by anonymous users of the BitGrail Exchange from July 2017 through and including January 2018 to ultimately obtain over 15 million XRB rightfully belonging to the Class.

---

[4] While these withdrawals involved two or more identical transactions being processed, these erroneous transactions are, for simplicity, referred to herein as "Double Withdrawals Transactions."

[5] As explained by the Tribunal in the BitGrail Decision: "'~~Idempotence~~' is the property of executing a command only once, even if issued multiple times, even if identical and in rapid succession. To give a 'trivial' but clarifying example: during cash withdrawals at an ATM, also trying to press the withdrawal button several times, the 'idempotent' function means that the device can emit one and only one withdrawal command, providing the requested cash only once, and tracking the withdrawal only once in the account statement of the customer."

3

6. Throughout the Class Period, the Nano Defendants directed the investing public to purchase XRB through, and stake XRB at, BitGrail by, *inter alia*: (i) commissioning, and contributing to, the creation of the BitGrail Exchange; (ii) providing specific investment instructions and assurances that the BitGrail Exchange was secure and could be trusted to safeguard investment assets; and (iii) collaborating with the BitGrail Defendants in maintaining the BitGrail Exchange on its XRB-related operations.

7. In July 2017, during a private group chat between Defendant Firano and the Nano Defendants, Firano reported to the Nano team that there was an error in the code (the "XRB Protocol") for maintaining XRB's ledgers and transferring XRB from the BitGrail Exchange into private wallets, which caused certain transactions to be entered two or more times.[2] The Double Withdrawal Transactions occurred because the XRB Protocol lacked "idempotence."[3]

8. Due to the XRB Protocol lacking idempotence, the Double Withdrawal Transactions were accomplished even if the account transferring the XRB off of the BitGrail Exchange lacked sufficient funds to complete the multiple transactions—by transferring XRB belonging to other accountholders off of the BitGrail Exchange to the private wallet destination.

9. Approximately 2.5 million XRB were stolen in July 2017 by exploiting XRB's lack of idempotence in the XRB Protocol, which permitted Double Withdrawal Transactions.

10. The error permitting the Double Withdrawal Transactions was exploited by anonymous users of the BitGrail Exchange from July 2017 through and including January 2018 to ultimately obtain over 15 million XRB rightfully belonging to the Class.

---

[2] While these withdrawals involved two or more identical transactions being processed, these erroneous transactions are, for simplicity, referred to herein as "Double Withdrawals Transactions."

[3] As explained by the Tribunal in the BitGrail Decision: "'Idempotence' is the property of executing a command only once, even if issued multiple times, even if identical and in rapid succession. To give a 'trivial' but clarifying example: during cash withdrawals at an ATM, also trying to press the withdrawal button several times, the 'idempotent' function means that the device can emit one and only one withdrawal command, providing the requested cash only once, and tracking the withdrawal only once in the account statement of the customer."

9.     Throughout the BitGrail Exchange's existence, Defendant Firano "highly recommended to [the Nano Defendants] that we close the markets because of major issues with the NANO protocol, but they were hesitant and forced me to keep it open and sometimes begged as well."[6]

10.     On or about February 8, 2018, the BitGrail Defendants announced that over 15 million XRB, bearing a market value of approximately $170 million, which were supposedly safely stored on BitGrail, were "lost."

11.     Less than 24 hours after investors learned that the entirety of their XRB holdings were "lost," the Nano Defendants released to their XRB investors an "Official Statement Regarding BitGrail Insolvency," denying any responsibility and pointing their finger at BitGrail:

> BitGrail is an independent business and Nano is not responsible for the way Firano or BitGrail conduct their business. We have no visibility into the BitGrail organization, nor do we have control over how they operate.

*See* Nano Core Team, *Official Statement Regarding BitGrail Insolvency* (Feb. 9, 2018).

12.     Since that announcement, the Nano Defendants have made every effort to distance themselves from BitGrail and their substantial involvement with BitGrail's operations related to purchasing, selling, and storing custody of XRB.  Indeed, the Nano Defendants have even gone so far as to fund a lawsuit against its former partners, the BitGrail Defendants, to avoid unwanted attention for their actions.  For example, on April 6, 2018, a putative class action (which has since been settled on an individual non-public basis) was filed in the United States District Court for the Southern District of New York.  A mere three (3) days later, on April 9, 2018, the Nano Defendants announced that the Company was "sponsoring" a "legal fund" purportedly designed to "provide all victims of the hack of the cryptocurrency exchange BitGrail with equal access to representation" and enable such investors to seek recourse against the exchange.

---

[6] The foregoing is from a public statement Defendant Firano published on May 2, 2018 on Medium.com regarding his relationship with the Nano Defendants and BitGrail's operations.  This post was entitled "On NANO and BitGrail and The Repercussions of Supporting Technology That Is Not Ready For Mass Consumption" and is referred to herein as the "Firano Statement."

11.     Throughout the BitGrail Exchange's existence, Defendant Firano "highly recommended to [the Nano Defendants] that we close the markets because of major issues with the NANO protocol, but they were hesitant and forced me to keep it open and sometimes begged as well."[4]

12.     On or about February 8, 2018, the BitGrail Defendants announced that over 15 million XRB, bearing a market value at the time of approximately $170 million, which were supposedly safely stored on BitGrail, were "lost."

13.     Less than 24 hours after investors learned that the entirety of their XRB holdings were "lost," the Nano Defendants released to their XRB investors an "Official Statement Regarding BitGrail Insolvency," denying any responsibility and pointing their finger at BitGrail:

> BitGrail is an independent business and Nano is not responsible for the way Firano or BitGrail conduct their business. We have no visibility into the BitGrail organization, nor do we have control over how they operate.

*See* Nano Core Team, *Official Statement Regarding BitGrail Insolvency* (Feb. 9, 2018).

14.     Since that announcement, the Nano Defendants have made every effort to distance themselves from BitGrail and their substantial involvement with BitGrail's operations related to purchasing, selling, and storing custody of XRB.

15.     Indeed, the Nano Defendants have even gone so far as to fund a lawsuit against its former partners, the BitGrail Defendants, to avoid unwanted attention for their actions.  For example, on April 6, 2018, a putative class action (which has since been settled on an individual non-public basis) was filed in the United States District Court for the Southern District of New York.  A mere three (3) days later, on April 9, 2018, the Nano Defendants announced that the Company was "sponsoring" a "legal fund" purportedly designed to "provide all victims of the hack of the cryptocurrency exchange BitGrail with equal access to representation" and enable such investors to seek recourse against the exchange.

---

[4] The foregoing is from a public statement Defendant Firano published on May 2, 2018 on Medium.com regarding his relationship with the Nano Defendants and BitGrail's operations.  This post was titled "On NANO and BitGrail and The Repercussions of Supporting Technology That Is Not Ready For Mass Consumption" and is referred to herein as the "Firano Statement."

13. On February 16, 2018 -- after the 15 million XRB had been "lost" -- the Nano Defendants updated the XRB Protocol to include idempotence, thereby preventing future Double Withdrawal Transactions from occurring.

14. Defendants: (a) ~~unlawfully issued, distributed, and promoted the ongoing sale of XRB -- an unregistered security; (b) were responsible for managing BitGrail's safekeeping of the unregistered security on BitGrail – itself an unregistered exchange; (c)~~ successfully solicited the general public to entrust BitGrail with their substantial assets by promoting, encouraging, and otherwise directing investors to establish XRB trading accounts at BitGrail; (d) expressly endorsed and assured the public that BitGrail was a safe, secure, and valid exchange; (e) continued to endorse and promote the use of BitGrail as a safe, secure, and valid exchange, notwithstanding having direct insider information of specific issues likely to jeopardize accountholders XRB investments months prior to the February 8, 2018 announcement; and (f) profited from the purchase and sale of XRB on BitGrail and other exchanges.

~~15. Plaintiff's Securities Act Claims arise from Defendants' offer and sale of XRB—which constituted the offer and sale of an investment contract security because, *inter alia*, Defendants touted, and Plaintiff and XRB purchasers were conditioned to expect, and did reasonably expect, that XRB received would increase in value and become worth more than the fiat or digital currencies invested. Defendants are strictly liable for offering and selling these unregistered securities.~~

~~16. Plaintiff's claim for breach of contract against the BitGrail Defendants arises from "the agreement executed between the exchanger and its users [being] a service agreement through which the exchanger guarantees the possibility to perform the exchange, sale and purchase and deposit, through an account, of various types of virtual currencies, including the 'Nano' cryptocurrency." *See* BitGrail Decision. The BitGrail Defendants breached this contract by failing to maintain the Class' XRB deposits on the BitGrail Exchange, as evidenced by the loss of $170 million worth of the Class' XRB investments announced in February 2018.~~

~~17. Plaintiff's claim for breach of implied contract against the Nano Defendants arises from the implied contracts that the Nano Defendants had with Plaintiff and the Class through their~~

16. On February 16, 2018 -- after the 15 million XRB had been "lost" -- the Nano Defendants updated the XRB Protocol to include idempotence, thereby preventing future Double Withdrawal Transactions from occurring.

17. Defendants: (a) successfully solicited the general public to entrust BitGrail with their substantial assets by promoting, encouraging, and otherwise directing investors to establish XRB trading accounts at BitGrail; (d) expressly endorsed and assured the public that BitGrail was a safe, secure, and valid exchange; (e) continued to endorse and promote the use of BitGrail as a safe, secure, and valid exchange, notwithstanding having direct insider information of specific issues likely to jeopardize accountholders XRB investments months prior to the February 8, 2018 announcement; and (f) profited from the purchase and sale of XRB on BitGrail and other exchanges.

18. Plaintiffs' claims for negligence against the Nano Defendants arise from the Nano Defendants' failure to adopt adequate idempotency measures in the XRB Protocol and the BitGrail Defendants' failure to safeguard the Class' XRB deposits, resulting in the theft of the Class' XRB— representing a $170 million loss.

19. Plaintiffs' claims for negligent misrepresentation arise from Defendants' assurances through January 2018 that the Class' XRB deposits on the BitGrail Exchange were "safe" despite having actual knowledge of, or recklessly disregarding, the fact that the Double Withdrawal Transactions were occurring as early as July 2017—when according to the Tribunal in the BitGrail Decision, Defendant Firano notified the Nano Defendants of the issue in a private group chat.

20. Plaintiffs' claims for fraud arise from Defendants' intentional concealment of the losses occurring on the BitGrail Exchange throughout the Class Period by falsely assuring that the Class' funds were safe. Plaintiff and the Class detrimentally relied on these false assurances by maintaining their XRB funds on the BitGrail Exchange rather than withdrawing the XRB to their personal wallets. Because the Nano Defendants created XRB and maintained the XRB Protocol and repeatedly vouched that the BitGrail Defendants could be trusted, Plaintiff's reliance on Defendants false assurances was justifiable. To the Class' detriment, Defendants each benefited from their concealment of the XRB

participation in creating and running the BitGrail Exchange as well as through their creation of XRB and maintenance of its protocols. These implied contracts were breached by the Nano Defendants: (i) forcing of Defendant Firano to keep the BitGrail Exchange operating despite having been aware of the error in the XRB Protocol, permitting the Double Withdrawal Transactions to occur since July 2017; and (ii) permitting the Double Withdrawal Transactions to occur in the first place by failing to implement necessary idempotence safeguards in the XRB Protocol—a safeguard the Nano Defendants included *after* the Class had already lost $170 million worth of XRB—on February 16, 2018.

18. Plaintiff's claim for breach of fiduciary duty against the Nano Defendants arises from their breach of their duties to the Class—both in their capacity as the developers of XRB and as their involvement in, or control over, the BitGrail Exchange's XRB-related operations—by: (i) forcing Defendant Firano to keep the BitGrail Exchange online despite having actual knowledge in July 2017 of, or recklessly disregarding, the fact that the Double Withdrawal Transactions were causing significant losses to the Class' funds on the BitGrail Exchange; (ii) failing to maintain adequate controls preventing the theft of XRB from the BitGrail Exchange; and (iii) concealing the fact that the Class' funds were, in fact, not "safe" on the BitGrail Exchange. The Nano Defendants benefited from their breaches of duties owed the Class by selling millions of XRB—which rose in value from $0.01 for each XRB in April 2017 to over $32 for each XRB in December 2017, largely as a result of the significant XRB trading volume the BitGrail Exchange provided.

19. Plaintiff's claim for breach of fiduciary duty against the BitGrail Defendants arises from their breach of their duties to the Class in their capacity as the owners of the BitGrail Exchange by: (i) failing to rebuff the Nano Defendants' insistence on keeping the BitGrail Exchange online despite having actual knowledge of, or recklessly disregarding, the fact that the Double Withdrawal Transactions were occurring; and (ii) concealing the fact that the Class' funds were being depleted from July 2017 through January 2018 through the exploitation permitting the Double Withdrawal Transactions to occur.

20. Plaintiff's claim for aiding and abetting breach of fiduciary duty against the Nano Defendants arises from their aiding the BitGrail Defendant's breaches of their duties to the Class by

This page does not exist in the compared document.

forcing Defendant Firano to keep the BitGrail Exchange online -- permitting the ongoing theft of the Class' funds -- and concealing their knowledge that the Class' XRB deposits on BitGrail were being stolen from July 2017 through January 2018.

21. Plaintiff's claims for negligence against Defendants arise from the Nano Defendant's failure to adopt adequate idempotency measure in the XRB Protocol and the BitGrail Defendant's failure to safeguard the Class' XRB deposits, resulting in the theft of the Class' XRB—representing a $170 million loss.

22. Plaintiff's claims for negligent misrepresentation arise from Defendants' assurances through January 2018 that the Class' XRB deposits on the BitGrail Exchange were "safe" despite having actual knowledge of, or recklessly disregarding, the fact that the Double Withdrawal Transactions were occurring as early as July 2017—when according to the Tribunal in the BitGrail Decision, Defendant Firano notified the Nano Defendants of the issue in a private group chat.

23. Plaintiff's claims for fraud and constructive fraud arise from Defendants' intentional concealment of the losses occurring on the BitGrail Exchange throughout the Class Period by falsely assuring that the Class' funds were safe. Plaintiff and the Class detrimentally relied on these false assurances by maintaining their XRB funds on the BitGrail Exchange rather than withdrawing the XRB to their personal wallets. Because the Nano Defendants created XRB and maintained the XRB Protocol and repeatedly vouched that the BitGrail Defendants could be trusted, Plaintiff's reliance on Defendants false assurances was justifiable. To the Class' detriment, Defendants each benefited from their concealment of the XRB losses by the Nano Defendants' sale of millions of XRB at inflated prices and the BitGrail Defendants' ability to extract transaction fees operating the BitGrail Exchange.

24. Plaintiff's quasi contract claim seeking restitution arises because Defendants induced Plaintiff and the Class to create accounts on the BitGrail Exchange, purchase XRB through the exchange, and maintain their XRB on the platform despite Defendants' knowledge of ongoing theft of the Class' funds. Defendants were unjustly enriched by Plaintiff's and the Class' use of the BitGrail Exchange by the Nano Defendants' sale of XRB at inflated prices and the BitGrail Defendants' extraction of transaction fees from the exchange's operation.

losses by the Nano Defendants' sale of millions of XRB at inflated prices and the BitGrail Defendants' ability to extract transaction fees operating the BitGrail Exchange.

21. Plaintiff's claim for breach of contract against the BitGrail Defendants arises from "the agreement executed between the exchanger and its users [being] a service agreement through which the exchanger guarantees the possibility to perform the exchange, sale and purchase and deposit, through an account, of various types of virtual currencies, including the 'Nano' cryptocurrency." *See* BitGrail Decision. The BitGrail Defendants breached this contract by failing to maintain the Class' XRB deposits on the BitGrail Exchange, as evidenced by the loss of $170 million worth of the Class' XRB investments announced in February 2018.

22. Plaintiffs and the Class are among the members of the public who invested in tens of millions of dollars' worth of XRB to be held in, and exchanged from, their BitGrail accounts, and who, from April 2017 through March 2018, through no fault of their own, suffered a loss of more than $170 million worth of XRB when their investment holdings were simply "lost."

23. For these reasons, Plaintiffs on behalf of themselves, and all similarly situated XRB investors, seeks compensatory, injunctive, and rescissory relief, providing rescission and repayment of all investments made to purchase, or store, XRB Tokens on BitGrail prior to February 8, 2018.

## JURISDICTION AND VENUE

24. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) and 1332(d)(2)(A) because this is a class action in which the matter or controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs, and in which some members of the Class are citizens of a state different from Defendants.

25. The Court has personal jurisdiction over each of the Defendants because each either conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

25. ~~Plaintiff~~ and the Class are among the members of the public who invested in tens of millions of dollars' worth of XRB to be held in, and exchanged from, their BitGrail accounts, and who, from ~~July~~ 2017 through ~~January~~ 2018, through no fault of their own, suffered a loss of more than $170 million worth of XRB when their investment holdings were simply "lost."

26. For these reasons, ~~Plaintiff~~ on behalf of ~~himself,~~ and all similarly situated XRB investors, seeks compensatory, injunctive, and rescissory relief, providing rescission and repayment of all investments made to purchase, or store, XRB Tokens on BitGrail prior to February 8, 2018.

## JURISDICTION AND VENUE

27. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) and 1332(d)(2)(A) because this is a class action in which the matter or controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs, and in which some members of the Class are citizens of a state different from Defendants.

28. ~~This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and Section 22 of the Securities Act [15 U.S.C. § 77v] because Plaintiffs allege violations of Sections 12(a)(1) and 15(a) of the Securities Act [15 U.S.C. §§ 77l(a)(1) and 77o(a)]. Plaintiff's federal claims further provide this Court with supplemental jurisdiction over their state and common law claims under 28 U.S.C. § 1367.~~

29. The Court has personal jurisdiction over each of the Defendants because each either conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

30. Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C. § 77v, as well as under 28 U.S.C. § 1391, because: (a) the conduct at issue took place and had an effect in this District; (b) a substantial portion of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect in this District.

This page does not exist in the compared document.

## PARTIES

31.    Plaintiff is an individual domiciled ~~in Discovery Bay, California~~ and is *sui juris*.  On February 8, 2018, Plaintiff had ~~23,033~~ XRB frozen by Defendants -- valued on or about February 8, 2018 at over Two Hundred ~~Sixty~~ Thousand Dollars ($~~260,000.00~~).

32.    Defendant Nano f/k/a RaiBlocks f/k/a Hieusys, LLC ("NANO") is a Texas company which lists its principal place of business in Austin, Texas.  According to NANO's own published promotional materials, NANO is a "low-latency payment platform" that "utilizes a novel block-lattice architecture" on which "each account has [its] own blockchain as part of a larger directed acyclic graph."  In layman's terms, NANO purports to have created a faster, cheaper, and more scalable blockchain and cryptocurrency that improves upon earlier blockchains and cryptocurrencies such as the widely-popular bitcoin.

33.    Defendant Colin LeMahieu ("LeMahieu") is an individual domiciled in Austin, Texas and is *sui juris*.  According to Nano's own published promotional materials, LeMahieu founded NANO in 2014 and serves as the Company's Lead Developer, "spearheading development of the core protocol."

34.    Defendant Mica Busch ("Busch") is an individual domiciled in Chicago, Illinois and is *sui juris*.  According to NANO's own published promotional materials, at all relevant times, Busch was a key member of Nano's core team, serving as a "Control System Developer" for Nano's "Residential" and "Enterprise" markets.

35.    Defendant Zack Shapiro ("Shapiro") is an individual domiciled in Brooklyn, New York and is *sui juris*.  According to Nano's own published promotional materials, at all relevant times, Shapiro was a key member of Nano's core team, as he "runs Mobile, Wallets, and Product" for the company and ~~serves~~ as the company's head iOS Developer.

36.    Defendant Troy Retzer ("Retzer") is an individual domiciled in Hilton Head Island, South Carolina and is *sui juris*.  According to Nano's own published promotional materials, Retzer is a key member of Nano's core team, as he manages and directs the company's marketing and Community and Public Relations efforts.

26.     Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C. § 77v, as well as under 28 U.S.C. § 1391, because: (a) the conduct at issue took place and had an effect in this District; (b) a substantial portion of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect in this District.

## **PARTIES**

### **Plaintiffs**

27.     Plaintiff Craig Clemens is an individual domiciled Pacific Palisades, California, and is *sui juris*. On February 8, 2018, Plaintiff Clemens had 31372 XRB frozen by Defendants -- valued on or about February 8, 2018 at over Three Hundred and Seventy Five Thousand Dollars ($375,000.00).

28.     Plaintiff Matthew Battistini is an individual domiciled Ellenton, Florida, and is *sui juris*. On February 8, 2018, Plaintiff Battistini had 330 XRB frozen by Defendants -- valued on or about February 8, 2018 at over Four Thousand Dollars ($4,000.00).

29.     Plaintiff Kadeem Blanchard is an individual domiciled Tampa, Florida, and is *sui juris*. On February 8, 2018, Plaintiff Blanchard had 200 XRB frozen by Defendants -- valued on or about February 8, 2018 at over Two Thousand Five Hundred Dollars ($2,500.00).

30.     Plaintiff Edward Seimon is an individual domiciled Chaska, Minnesota, and is *sui juris*. On February 8, 2018, Plaintiff Seimon had 800 XRB frozen by Defendants -- valued on or about February 8, 2018 at over Nine Thousand Six Hundred Dollars ($9,600.00).

31.     Plaintiff Kyle Penn is an individual domiciled Los Angeles, Minnesota, and is *sui juris*. On February 8, 2018, Plaintiff Penn had 329.48 XRB frozen by Defendants -- valued on or about February 8, 2018 at over Four Thousand Dollars ($4,000.00).

32.     Plaintiff Alec Otto is an individual domiciled North Hollywood, California, and is *sui juris*. On February 8, 2018, Plaintiff Otto had 391 XRB frozen by Defendants -- valued on or about February 8, 2018 at over Four Thousand Five Hundred Dollars ($4,500.00).

This page does not exist in the compared document.

1     33.    Plaintiff Robert Ireland an individual domiciled Port Washington, Wisconsin, and is *sui*

2  *juris*. On February 8, 2018, Plaintiff Ireland had 74.25 XRB frozen by Defendants -- valued on or about

3  February 8, 2018 at over One Thousand Dollars ($1,000).

4     34.    Plaintiff Michael Oliver is an individual domiciled Traverse City, Michigan, and is *sui*

5  *juris*. On February 8, 2018, Plaintiff Oliver claims to have had an amount of XRB frozen by the

6  Defendants, and incurred losses as a result.

7     35.    Plaintiff Richard Barilla is an individual domiciled Jersey City, New Jersey, and is *sui*

8  *juris*. On February 8, 2018, Plaintiff Barilla had 4144 XRB frozen by Defendants -- valued on or about

9  February 8, 2018 at over Fifty Thousand Dollars and ($50,000.00).

10     36.    Plaintiff Jesse Case is an individual domiciled Chicago, Illinois, and is *sui juris*. On

11  February 8, 2018, Plaintiff Case had 112.7 XRB frozen by Defendants -- valued on or about February

12  8, 2018 at over One Thousand Five Hundred Dollars ($1,500.00).

13     37.    Plaintiff Peter Dedes is an individual domiciled Chicago, Illinois, and is *sui juris*. On

14  February 8, 2018, Plaintiff Dedes had 1800.67 XRB frozen by Defendants -- valued on or about

15  February 8, 2018 at over Twenty Two Thousand Dollars ($22,000.00).

16     38.    Plaintiff Anan Thamarnan is an individual domiciled Rowland Heights, California, and

17  is *sui juris*. On February 8, 2018, Plaintiff Thamarnan had 674.06 XRB frozen by Defendants -- valued

18  on or about February 8, 2018 at over Eight Thousand Dollars ($8,000.00).

19     39.    Plaintiff James Supple is an individual domiciled Rockville Centre, New York, and is

20  *sui juris*. On February 8, 2018, Plaintiff Supple had 2570.50 XRB frozen by Defendants -- valued on

21  or about February 8, 2018 at over Thirty One Thousand Dollars ($31,000.00).

22     40.    Plaintiff Michael Migliero is an individual domiciled Austin, Texas, and is *sui juris*. On

23  February 8, 2018, Plaintiff Migliero had 17000 XRB frozen by Defendants -- valued on or about

24  February 8, 2018 at over TTwo Hundred and Five Thousand Dollars ($205,000.00).

25                       **Defendants**

26     41.    Defendant Nano f/k/a RaiBlocks f/k/a Hieusys, LLC ("NANO") is a Texas company

27  which lists its principal place of business in Austin, Texas.  According to NANO's own published

28

37. Defendant B.G. Services SRL f/k/a BitGrail SRL f/k/a Webcoin Solutions ("BitGrail") was a cryptocurrency exchange operating in Italy which was primarily focused on creating and sustaining a market for XRB/Nano. In July 2018, an Italian Court of Appeals ordered BitGrail's assets to be frozen with the anticipation that the minimal funds remaining will eventually be used to refund investors such as ~~Plaintiff~~.

38. Defendant Francesco "The Bomber" Firano ("Firano") is an individual believed to be domiciled in Italy and the sole proprietor of BitGrail. Firano has consistently blamed the Nano Defendants for the "loss"/theft of the putative class's funds from BitGrail.

39. In addition to those persons and entities set forth as Defendants herein, there are likely other parties who may well be liable to ~~Plaintiff~~ and the Class but respecting whom ~~Plaintiff~~ currently ~~lacks~~ specific facts to permit ~~him~~ to name such person or persons as a party defendant. By not naming such persons or entities at this time, ~~Plaintiff is~~ not waiving ~~his~~ right to amend this pleading to add such parties, should the facts warrant the addition of such parties.

## **CLASS ACTION ALLEGATIONS**

40. A class action is the proper form to bring ~~Plaintiff's~~ and the Class' claims under Rule 23 of the Federal Rules of Civil Procedure. The proposed class is so large that joinder of all members would be impractical. Additionally, there are questions of law or fact common to the class, the claims or defenses of the representative parties are typical of the claims or defenses of the class, and the representative parties will fairly and adequately protect the interests of the class.

41. ~~Plaintiff brings~~ this nationwide class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of ~~himself~~ and all members of the following class:

> **All BitGrail investors and accountholders who are citizens of the United States and who, between April 1, 2017 and March 31, 2018, and who transferred bitcoins, alternative cryptocurrencies, or any other form of monies or currency to BitGrail to purchase, invest in, or stake XRB. Excluded from the class are: Defendants themselves, Defendants' retail employees, Defendants' corporate officers, members of Defendants' boards of directors, Defendants' senior executives, Defendants' affiliates, and any and all judicial officers (and their staff) assigned to hear or adjudicate any aspect of this litigation.**

promotional materials, NANO is a "low-latency payment platform" that "utilizes a novel block-lattice architecture" on which "each account has [its] own blockchain as part of a larger directed acyclic graph." In layman's terms, NANO purports to have created a faster, cheaper, and more scalable blockchain and cryptocurrency that improves upon earlier blockchains and cryptocurrencies such as the widely-popular bitcoin.

42. Defendant Colin LeMahieu ("LeMahieu") is an individual domiciled in Austin, Texas and is *sui juris*. According to Nano's own published promotional materials, LeMahieu founded NANO in 2014 and serves as the Company's Lead Developer, "spearheading development of the core protocol."

43. Defendant Mica Busch ("Busch") is an individual domiciled in Chicago, Illinois and is *sui juris*. According to NANO's own published promotional materials, at all relevant times, Busch was a key member of Nano's core team, serving as a "Control System Developer" for Nano's "Residential" and "Enterprise" markets.

44. Defendant Zack Shapiro ("Shapiro") is an individual domiciled in Brooklyn, New York and is *sui juris*. According to Nano's own published promotional materials, at all relevant times, Shapiro was a key member of Nano's core team, as he "runs Mobile, Wallets, and Product" for the company and served as the company's head iOS Developer.

45. Defendant Troy Retzer ("Retzer") is an individual domiciled in Hilton Head Island, South Carolina and is *sui juris*. According to Nano's own published promotional materials, Retzer is a key member of Nano's core team, as he manages and directs the company's marketing and Community and Public Relations efforts.

46. Defendant B.G. Services SRL f/k/a BitGrail SRL f/k/a Webcoin Solutions ("BitGrail") was a cryptocurrency exchange operating in Italy which was primarily focused on creating and sustaining a market for XRB/Nano. In July 2018, an Italian Court of Appeals ordered BitGrail's assets to be frozen with the anticipation that the minimal funds remaining will eventually be used to refund investors such as Plaintiffs.

This page does not exist in the compared document.

47. Defendant Francesco "The Bomber" Firano ("Firano") is an individual believed to be domiciled in Italy and the sole proprietor of BitGrail. Firano has consistently blamed the Nano Defendants for the "loss"/theft of the putative class's funds from BitGrail.

48. In addition to those persons and entities set forth as Defendants herein, there are likely other parties who may well be liable to Plaintiffs and the Class but respecting whom Plaintiffs currently lack specific facts to permit them to name such person or persons as a party defendant. By not naming such persons or entities at this time, Plaintiffs are not waiving their right to amend this pleading to add such parties, should the facts warrant the addition of such parties.

## CLASS ACTION ALLEGATIONS

49. A class action is the proper form to bring Plaintiffs' and the Class' claims under Rule 23 of the Federal Rules of Civil Procedure. The proposed class is so large that joinder of all members would be impractical. Additionally, there are questions of law or fact common to the class, the claims or defenses of the representative parties are typical of the claims or defenses of the class, and the representative parties will fairly and adequately protect the interests of the class.

50. Plaintiffs bring this nationwide class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all members of the following class:

> **All BitGrail investors and accountholders who are citizens of the United States and who, between April 1, 2017 and March 31, 2018, and who transferred bitcoins, alternative cryptocurrencies, or any other form of monies or currency to BitGrail to purchase, invest in, or stake XRB. Excluded from the class are: Defendants themselves, Defendants' retail employees, Defendants' corporate officers, members of Defendants' boards of directors, Defendants' senior executives, Defendants' affiliates, and any and all judicial officers (and their staff) assigned to hear or adjudicate any aspect of this litigation.**

51. This action satisfies all of the requirements of Federal Rules of Civil Procedure, including numerosity, commonality, predominance, typicality, adequacy, and superiority.

52. Members of the Class are so numerous and geographically dispersed that joinder of all members is impractical.

42. This action satisfies all of the requirements of Federal Rules of Civil Procedure, including numerosity, commonality, predominance, typicality, adequacy, and superiority.

43. Members of the Class are so numerous and geographically dispersed that joinder of all members is impractical.

44. While the exact number of class members remains unknown at this time, upon information and belief, there are at least hundreds if not thousands of putative Class members.

45. Again, while the exact number is not known at this time, it is easily and generally ascertainable by appropriate discovery.

46. It is impractical for each class member to bring suit individually.

47. Plaintiff does not anticipate any difficulties in managing this action as a class action.

48. There are many common questions of law and fact involving and affecting the parties to be represented.

49. When determining whether common questions predominate, courts focus on the issue of liability; and if the issue of liability is common to the class and can be determined on a class-wide basis, as in the instant matter, common questions will be held to predominate over individual questions

50. Common questions include, but are not limited to, the following:

    (i)    whether the XRB offered for sale by Defendants constitute securities under federal securities laws;

    (ii)    whether Defendants violated federal securities laws in offering, selling, or soliciting the offer and sale of, unregistered securities—in the form of XRB;

    (iii)    whether by virtue of Defendants' custodianship over the proposed class' investments or by their control over the Nano Protocol, Defendants owed a fiduciary duty to Plaintiff and the proposed class and if so, whether that duty was breached;

    (iv)    whether Defendants promoted XRB and BitGrail despite being aware of the exchange's shortcomings;

    (v)    whether Defendants are liable for steering Plaintiff and the Class to BitGrail;

53.   While the exact number of class members remains unknown at this time, upon information and belief, there are at least hundreds if not thousands of putative Class members.

54.   Again, while the exact number is not known at this time, it is easily and generally ascertainable by appropriate discovery.

55.   It is impractical for each class member to bring suit individually.

56.   Plaintiffs do not anticipate any difficulties in managing this action as a class action.

57.   There are many common questions of law and fact involving and affecting the parties to be represented.

58.   When determining whether common questions predominate, courts focus on the issue of liability; and if the issue of liability is common to the class and can be determined on a class-wide basis, as in the instant matter, common questions will be held to predominate over individual questions

59.   Common questions include, but are not limited to, the following:

(i)     whether the XRB offered for sale by Defendants constitute securities under federal securities laws;

(ii)    whether Defendants violated federal securities laws in offering, selling, or soliciting the offer and sale of, unregistered securities—in the form of XRB;

(iii)   whether by virtue of Defendants' custodianship over the proposed class' investments or by their control over the Nano Protocol, Defendants owed a fiduciary duty to Plaintiffs and the proposed class and if so, whether that duty was breached;

(iv)    whether Defendants promoted XRB and BitGrail despite being aware of the exchange's shortcomings;

(v)     whether Defendants are liable for steering Plaintiffs and the Class to BitGrail;

(vi)    whether Defendants are liable for negligently auditing, vetting and/or supervising BitGrail;

(vii)   whether statements made by Defendants about BitGrail were false or were made without due regard for the safety of those who read or heard the statements;

(vi)     whether Defendants are liable for negligently auditing, vetting and/or supervising BitGrail;

(vii)    whether statements made by Defendants about BitGrail were false or were made without due regard for the safety of those who read or heard the statements;

(viii)   whether Defendants benefitted from the ~~Class's~~ purchasing and holding of XRB;

(ix)     whether Defendants capitalized on their XRB holdings at the expense of the Class;

(x)      whether Defendants have converted the funds belonging to ~~Plaintiff~~ and the Class;

(xi)     whether Defendants owed duties to ~~Plaintiff~~ and the Class, and whether Defendants breached those duties;

(xii)    whether Defendants' conduct was unfair or unlawful;

(xiii)   whether Defendants owe restitution to ~~Plaintiff~~ and the Class;

(xiv)    whether ~~Plaintiff~~ and the Class have sustained damages as a result of Defendants' conduct; and

(xv)     whether Defendants have within their power the ability to, and should, institute an equitable remedy that would resolve the harm that has befallen ~~Plaintiff~~ and the Class.

~~51.~~  These common questions of law or fact predominate over any questions affecting only individual members of the Class.

~~52.~~  ~~Plaintiff's~~ claims are typical of those of the other Class members because, *inter alia*, all members of the Class were injured through the common misconduct described above and were subject to Defendants' unfair and unlawful conduct.

~~53.~~  ~~Plaintiff is~~ advancing the same claims and legal theories on behalf of ~~himself~~ and all members of the Class.

(viii)  whether Defendants benefitted from the Class purchasing and holding of XRB;

(ix)  whether Defendants capitalized on their XRB holdings at the expense of the Class;

(x)  whether Defendants have converted the funds belonging to Plaintiffs and the Class;

(xi)  whether Defendants owed duties to Plaintiffs and the Class, and whether Defendants breached those duties;

(xii)  whether Defendants' conduct was unfair or unlawful;

(xiii)  whether Defendants owe restitution to Plaintiffs and the Class;

(xiv)  whether Plaintiffs and the Class have sustained damages as a result of Defendants' conduct; and

(xv)  whether Defendants have within their power the ability to, and should, institute an equitable remedy that would resolve the harm that has befallen Plaintiffs and the Class.

60.  These common questions of law or fact predominate over any questions affecting only individual members of the Class.

61.  Plaintiffs' claims are typical of those of the other Class members because, *inter alia*, all members of the Class were injured through the common misconduct described above and were subject to Defendants' unfair and unlawful conduct.

62.  Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all members of the Class.

63.  Plaintiffs will fairly and adequately represent and protect the interests of the Class in that they have no disabling conflicts of interest that would be antagonistic to those of the other members of the Class.

64.  Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in complex consumer class action litigation of this nature, to represent them. Plaintiffs seek no relief that is antagonistic or adverse to the members of the Class.

54.    Plaintiff will fairly and adequately represent and protect the interests of the Class in that he has no disabling conflicts of interest that would be antagonistic to those of the other members of the Class.

55.    Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel, experienced in complex consumer class action litigation of this nature, to represent him.  Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class.

56.    The infringement of the rights and the damages Plaintiff has suffered are typical of other Class members.

57.    To prosecute this case, Plaintiff has retained counsel experienced in class action litigation and has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

58.    Class action litigation is an appropriate method for fair and efficient adjudication of the claims involved herein.  Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; as it will permit a large number of Class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require.

59.    Class action treatment will permit the adjudication of relatively modest claims by certain Class members, who could not individually afford to litigate a complex claim against well-funded corporate defendants like Nano.

60.    Further, even for those Class members who could afford to litigate such a claim, it would still be economically impractical.  The nature of this action and the nature of laws available to Plaintiff make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and the Class for the wrongs alleged because:  Defendants would necessarily gain an unconscionable advantage if they were allowed to exploit and overwhelm the limited resources of each individual Class member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to

65. The infringement of the rights and the damages Plaintiffs have suffered are typical of other Class members.

66. To prosecute this case, Plaintiffs have retained counsel experienced in class action litigation and have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

67. Class action litigation is an appropriate method for fair and efficient adjudication of the claims involved herein. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; as it will permit a large number of Class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require.

68. Class action treatment will permit the adjudication of relatively modest claims by certain Class members, who could not individually afford to litigate a complex claim against well-funded corporate defendants like Nano.

69. Further, even for those Class members who could afford to litigate such a claim, it would still be economically impractical. The nature of this action and the nature of laws available to Plaintiffs make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and the Class for the wrongs alleged because: Defendants would necessarily gain an unconscionable advantage if they were allowed to exploit and overwhelm the limited resources of each individual Class member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each member of the Class to recover on the cause of action alleged; individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation; the Class is geographically dispersed all over the world, thus rendering it inconvenient and an extreme hardship to effectuate joinder of their individual claims into one lawsuit; there are no known Class members who are interested in individually controlling the prosecution of separate actions; and the

which ~~Plaintiff was~~ exposed is representative of that experienced by the Class and will establish the right of each member of the Class to recover on the cause of action alleged; individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation; the Class is geographically dispersed all over the world, thus rendering it inconvenient and an extreme hardship to effectuate joinder of their individual claims into one lawsuit; there are no known Class members who are interested in individually controlling the prosecution of separate actions; and the interests of justice will be well served by resolving the common disputes of potential Class members in one forum.

~~61.~~ ~~Plaintiff reserves~~ the right to modify or amend the definition of the proposed class and to modify, amend, or create proposed subclasses before the Court determines whether certification is appropriate and as the parties engage in discovery.

~~62.~~ The class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

~~63.~~ Because of the number and nature of common questions of fact and law, multiple separate lawsuits would not serve the interest of judicial economy.

~~64.~~ As a result of the foregoing, ~~Plaintiff~~ and the Class have been damaged in an amount that will be proven at trial.

~~65.~~ ~~Plaintiff has~~ duly performed all of ~~his~~ duties and obligations, and any conditions precedent to ~~Plaintiff~~ bringing this action have occurred, have been performed, or else have been excused or waived.

## SUBSTANTIVE ALLEGATIONS

### I. Background on Blockchain Technology

~~66.~~ A "blockchain" is essentially a digitized, decentralized, public ledger that cryptographically records, preserves, and presents information. The general idea is that each "block" contains information, such as details on transactions that are made. After a "block" is created (with cryptography so as to verify its contents), the information inside of it cannot be changed. The "block" then becomes part of the "blockchain" and an encrypted version of the information contained therein

1  interests of justice will be well served by resolving the common disputes of potential Class members

2  in one forum.

3      70.    Plaintiffs reserve the right to modify or amend the definition of the proposed class and

4  to modify, amend, or create proposed subclasses before the Court determines whether certification is

5  appropriate and as the parties engage in discovery.

6      71.    The class action is superior to all other available methods for the fair and efficient

7  adjudication of this controversy.

8      72.    Because of the number and nature of common questions of fact and law, multiple

9  separate lawsuits would not serve the interest of judicial economy.

10     73.    As a result of the foregoing, Plaintiffs and the Class have been damaged in an amount

11  that will be proven at trial.

12     74.    Plaintiffs have duly performed all of their duties and obligations, and any conditions

13  precedent to Plaintiffs bringing this action have occurred, have been performed, or else have been

14  excused or waived.

## SUBSTANTIVE ALLEGATIONS

### I.    Background on Blockchain Technology

17     75.    A "blockchain" is essentially a digitized, decentralized, public ledger that

18  cryptographically records, preserves, and presents information. The general idea is that each "block"

19  contains information, such as details on transactions that are made. After a "block" is created (with

20  cryptography so as to verify its contents), the information inside of it cannot be changed. The "block"

21  then becomes part of the "blockchain" and an encrypted version of the information contained therein

22  becomes publicly available along with all the previous "blocks" in the chain. After this process is

23  complete, another block is created with additional information and so on and so forth.

24     76.    To date, most "blockchains" are used to record transactions involving virtual currencies,

25  *e.g.*, bitcoin.  However, a "blockchain" could be used to record all types of information.  For example,

26  a blockchain could be used for deed recordation/transfers or even transfers of stock certificates.

27

28

becomes publicly available along with all the previous "blocks" in the chain. After this process is complete, another block is created with additional information and so on and so forth.

67.    To date, most "blockchains" are used to record transactions involving virtual currencies, *e.g.*, bitcoin.  However, a "blockchain" could be used to record all types of information.  For example, a blockchain could be used for deed recordation/transfers or even transfers of stock certificates.

## II.    Creation of XRB

68.    XRB was originally launched in or about December 2014 under the brand name RaiBlocks.  XRB was initially represented by the stock ticker "MRAI." In mid-2016, the RaiBlock's stock ticker symbol was changed to XRB.  In January 2018, shortly before the "hack" was announced, the Nano Defendants rebranded RaiBlocks once again as "Nano."

69.    As early as February 2016, if not earlier, Defendant LeMahieu promoted XRB on online fora, as a free way to transact and settle micropayments:



70.    The promotion of XRB ramped up in and after March 2016, including promoting XRB on various online social networks, such as Reddit and Twitter.

71.    Around this time, Defendants planned, formulated, and began executing a marketing campaign designed to develop popular interest in and mass adoption of XRB.

## II.   **Creation of XRB**

77.   XRB was originally launched in or about December 2014 under the brand name RaiBlocks.  XRB was initially represented by the stock ticker "MRAI." In mid-2016, the RaiBlock's stock ticker symbol was changed to XRB.  In January 2018, shortly before the "hack" was announced, the Nano Defendants rebranded RaiBlocks once again as "Nano."

78.   As early as February 2016, if not earlier, Defendant LeMahieu promoted XRB on online fora, as a free way to transact and settle micropayments:



79.   The promotion of XRB ramped up in and after March 2016, including promoting XRB on various online social networks, such as Reddit and Twitter.

80.   Around this time, Defendants planned, formulated, and began executing a marketing campaign designed to develop popular interest in and mass adoption of XRB.

81.   For example, in a March 3, 2016 Reddit post, Defendant LeMahieu advertised XRB's competitive edge as its unique capacity to eliminate confirmation delays and fees: "RaiBlocks

72. For example, in a March 3, 2016 Reddit post, Defendant LeMahieu advertised XRB's competitive edge as its unique capacity to eliminate confirmation delays and fees: "RaiBlocks [XRB/Nano] places transactions in to ledger on an individual basis. This removes the concept of block intervals, block sizes, and all the other complicated paramtes that destroy scalabity."



### III. XRB is Not Decentralized

73. XRB is not a decentralized cryptocurrency.

74. The Nano Defendants have made multiple representations to imply that they are merely part of a larger network that has collectively developed and maintained a decentralized protocol. Such representations from the Nano Defendants are demonstrably false. Investors in XRB rely almost exclusively on the efforts of the Nano Defendants and their core team.[7]

75. To illustrate, on or about September 10, 2018, Reddit user DeepBlueMachine presented the following questions and concerns to the Nano Team concerning its apparent centralized nature:

> 1. NANO centralization concerns, where 70-80% NANO are centralized even currently.
>
> 2. 90% of github commits by one person working on the team Colin.
>
>     . . .
>
> 3. Whales initially might have hired third-world country folks to solve captcha and gain control of Nano. Currently 100 addresses hold 65% of all 133 million NANO which is kind of crazy.

---

[7] *See* https://www.nano.org/en/team/ (last visited Oct. 8, 2018).

1   [XRB/Nano] places transactions in to ledger on an individual basis.  This removes the concept of block

2   intervals, block sizes, and all the other complicated paramtes that destroy scalability."



11   **III.**     **XRB is Not Decentralized**

12      82.     XRB is not a decentralized cryptocurrency.

13      83.     The Nano Defendants have made multiple representations to imply that they are merely

14   part of a larger network that has collectively developed and maintained a decentralized protocol.  Such

15   representations from the Nano Defendants are demonstrably false.  Investors in XRB rely almost

16   exclusively on the efforts of the Nano Defendants and their core team.[5]

17      84.     To illustrate, on or about September 10, 2018, Reddit user DeepBlueMachine presented

18   the following questions and concerns to the Nano Team concerning its apparent centralized nature:

19         1.     NANO centralization concerns, where 70-80% NANO are
               centralized even currently.

20

21         2.     90% of github commits by one person working on the team Colin.
                      . . .

22         3.     Whales initially might have hired third-world country folks to solve
               captcha and gain control of Nano. Currently 100 addresses hold 65%

23                of all 133 million NANO which is kind of crazy.

24      85.     In response, Defendant Retzer acknowledged that Nano is centralized, that Defendant

25   LeMahieu is responsible for developing at least 90 percent of all of Nano's underlying coding and

26   programing, and that just 100 unique accounts own and hold at least 65 percent of the existing XRB:

27       [5] *See* https://www.nano.org/en/team/ (last visited Oct. 8, 2018).

76. In response, Defendant Retzer acknowledged that Nano is centralized, that Defendant LeMahieu is responsible for developing at least 90 percent of all of Nano's underlying coding and programing, and that just 100 unique accounts own and hold at least 65 percent of the existing XRB:

> 1. **Nano has been steadily moving towards decentralization this year without really any active programs pushing it.** As it becomes more of a focus I expect this trend to continue.
>
> 2. **Colin was the lone dev for a few years, so if you look at total commits then yea, he is going to have the majority of them**. He also has not led the last 2 releases.
>                                      . . .
> 3. **The did hire people to solve the captcha. Anyone was able to do this.** People buy more bitcoin miners in order to have more bitcoin.

(Emphasis added).

77. Moreover, the Nano Core Team possesses more than 50 percent of the total voting power. In addition to the Nano Core Team, a total of nine other representatives comprise the ownership of over 96 percent of the total voting power.

78. The Nano Core Team handles all aspects of business development and marketing. As Defendant LeMahieu wrote in January 2018 on Reddit, it is merely wishful thinking that non-Nano Core Team members will contribute to Nano's development, and the Nano Core Team will not wait for those contributions to materialize:

> Right now we have about 12 people, half core and half business developers. I think this count is good for working on what we're doing right now which is getting wallets and exchanges worked on. **Ideally people outside our team will start developing technology around xrb taking advantage of the network effect to build more technology faster than we could internally. That being said we're going to look in a few months to see if there's anything out there people aren't developing that should be and we'll see what people we need to make it happen.**

(Emphasis added).

79. While the Nano Defendants might claim it is working towards the goal being a decentralized, that goal has yet to be achieved. As Defendant LeMahieu acknowledged in a post contrasting Nano from Ripple on Reddit on September 27, 2018, Nano is not yet decentralized (rather,

1.  **Nano has been steadily moving towards decentralization this year without really any active programs pushing it.** As it becomes more of a focus I expect this trend to continue.

2.  **Colin was the lone dev for a few years, so if you look at total commits then yea, he is going to have the majority of them.** He also has not led the last 2 releases.

. . .

3.  **The did hire people to solve the captcha. Anyone was able to do this.** People buy more bitcoin miners in order to have more bitcoin.

(Emphasis added).

86.     Moreover, the Nano Core Team possesses more than 50 percent of the total voting power.  In addition to the Nano Core Team, a total of nine other representatives comprise the ownership of over 96 percent of the total voting power.

87.     The Nano Core Team handles all aspects of business development and marketing.  As Defendant LeMahieu wrote in January 2018 on Reddit, it is merely wishful thinking that non-Nano Core Team members will contribute to Nano's development, and the Nano Core Team will not wait for those contributions to materialize:

> Right now we have about 12 people, half core and half business developers. I think this count is good for working on what we're doing right now which is getting wallets and exchanges worked on. **Ideally people outside our team will start developing technology around xrb taking advantage of the network effect to build more technology faster than we could internally. That being said we're going to look in a few months to see if there's anything out there people aren't developing that should be and we'll see what people we need to make it happen.**

(Emphasis added).

88.     While the Nano Defendants might claim it is working towards the goal being a decentralized, that goal has yet to be achieved.  As Defendant LeMahieu acknowledged in a post contrasting Nano from Ripple on Reddit on September 27, 2018, Nano is not yet decentralized (rather, that is the goal the Nano Core Team is working toward), the Nano Defendants make the important decisions, and the Nano Defendants implement those important decisions: "Nano [XRB] is 100% **aiming** for decentralized interbank settlement though our approach is compared to [Ripple]. **We're**

that is the goal the Nano Core Team is working toward), the Nano Defendants make the important decisions, and the Nano Defendants implement those important decisions: "Nano [XRB] is 100% **aiming** for decentralized interbank settlement though our approach is compared to [Ripple]. **We're** plugging in to the existing FX trading economy with a currency that has instant settlement. . . **We're** taking incremental steps which will be far, far easier for FX to adopt instead of trying to boil the oceans from the start." (Emphasis added).

80.     Stated otherwise, the Nano Defendants wield absolute control over essentially every aspect of XRB; and its value—and continued existence—is based entirely on their actions or inactions. This significant control creates a special relationship giving rise to a fiduciary duty that the Nano Defendants owed investors such as Plaintiff and the proposed Class.

## IV.     Cryptocurrency Faucets and the XRB Faucet

81.     To incentivize the adoption and use of XRB, Defendants focused on distributing XRB to as many people as possible. Rather than sell XRB for a price per coin, Defendants used a method of distribution known as a "faucet."

82.     It is critical to keep in mind that developers utilize faucets to generate public use, adoption and interest. By giving away cryptocurrency for free, individuals can amass cryptocurrency without spending any money on purchasing the cryptocurrency. Individuals who collect cryptocurrencies have a vested interest in their development, use, and mass adoption. Consequently, faucets provide a way to build and grow a community of people who are interested in increasing the value of that particular cryptocurrency.

83.     To collect cryptocurrency from a faucet, an individual takes the following steps: (1) visit a website featuring the subject faucet; (2) type in the wallet address where the individual wants the cryptocurrency delivered; (3) click on a captcha (e.g., clicking an "I am not a robot" box); and (4) wait for a period of time before repeating the process (e.g., 10 minutes, 1 hour, etc.).

84.     Below is an example of a faucet distributing XRB:

plugging in to the existing FX trading economy with a currency that has instant settlement. . . **We're taking incremental steps which will be far, far easier for FX to adopt instead of trying to boil the oceans from the start.**" (Emphasis added.)

89. Stated otherwise, the Nano Defendants wield absolute control over essentially every aspect of XRB; and its value—and continued existence—is based entirely on their actions or inactions. This significant control creates a special relationship giving rise to a fiduciary duty that the Nano Defendants owed investors such as Plaintiffs and the proposed Class.

**IV.    Cryptocurrency Faucets and the XRB Faucet**

90. To incentivize the adoption and use of XRB, Defendants focused on distributing XRB to as many people as possible. Rather than sell XRB for a price per coin, Defendants used a method of distribution known as a "faucet."

91. It is critical to keep in mind that developers utilize faucets to generate public use, adoption and interest. By giving away cryptocurrency for free, individuals can amass cryptocurrency without spending any money on purchasing the cryptocurrency. Individuals who collect cryptocurrencies have a vested interest in their development, use, and mass adoption. Consequently, faucets provide a way to build and grow a community of people who are interested in increasing the value of that particular cryptocurrency.

92. To collect cryptocurrency from a faucet, an individual takes the following steps: (1) visit a website featuring the subject faucet; (2) type in the wallet address where the individual wants the cryptocurrency delivered; (3) click on a captcha (e.g., clicking an "I am not a robot" box); and (4) wait for a period of time before repeating the process (e.g., 10 minutes, 1 hour, etc.).

93. Below is an example of a faucet distributing XRB:



6903743_1.pdf - Page 22 - Replace



85. Once an individual completes this simple process, the faucet then distributes a (small) percentage of the total amount of cryptocurrency dedicated to the faucet. For example, a developer team might assign 10 million of its coins to a faucet, and then permit 100 individuals per hour to collect .01 percent of that allocated sum from the faucet. In practice, this means that the first 100 people to go to the faucet's website, type in their wallet address, and click on the captcha, will collect 1,000 coins per hour.

86. Beginning in early 2016, the Nano Defendants opened a faucet for distributing XRB (hereafter, the "Nano Faucet"). The Nano Faucet operated for approximately ~~one and a~~ half years before closing on or about October 15, 2017. The Nano Defendants regularly advertised and promoted the Nano Faucet on social networks, such as Defendant LeMahieu's March 4, 2016 post on Reddit's Cryptocurrency subreddit, with 900,000 members:



1

2

3

4

5

6     94.     Once an individual completes this simple process, the faucet then distributes a (small)

7  percentage of the total amount of cryptocurrency dedicated to the faucet.  For example, a developer

8  team might assign 10 million of its coins to a faucet, and then permit 100 individuals per hour to collect

9  .01 percent of that allocated sum from the faucet.  In practice, this means that the first 100 people to go

10  to the faucet's website, type in their wallet address, and click on the captcha, will collect 1,000 coins

11  per hour.

12     95.     Beginning in early 2016, the Nano Defendants opened a faucet for distributing XRB

13  (hereafter, the "Nano Faucet").  The Nano Faucet operated for approximately one-and-a-half years

14  before closing on or about October 15, 2017. The Nano Defendants regularly advertised and promoted

15  the Nano Faucet on social networks, such as Defendant LeMahieu's March 4, 2016 post on Reddit's

16  Cryptocurrency subreddit, with 900,000 members:



25     96.     The Nano Defendants had exclusive control and authority over every aspect of the Nano

26  Faucet, including how much XRB it distributed (*e.g.*, 100 XRB per click), to how many people the

27  distributions were made (e.g., the first 100 people), and the frequency of these distributions.

28

87.   The Nano Defendants had exclusive control and authority over every aspect of the Nano Faucet, including how much XRB it distributed (*e.g.*, 100 XRB per click), to how many people (e.g., the first 100 people), and the frequency of these distributions.

88.   For example, on March 7, 2016, Defendant LeMahieu ~~wrote,~~ "We're currently at 1.5% publicly distributed," meaning, the Nano Defendants had distributed 1.5 percent of the total supply of XRB via the faucet.  Defendant LeMahieu continued, providing a link to the "distribution schedule" design by the Nano Defendants.



89.   On April 3, 2016, Defendant LeMahieu further demonstrated his control over the Nano Faucet: "The short of the story is I think we have a way to make the faucet work and scale.  We'll total up faucet clicks and pay them out in bulk daily or hourly rather than instantly."



97.     For example, on March 7, 2016, Defendant LeMahieu wrote: "We're currently at 1.5% publicly distributed," meaning, the Nano Defendants had distributed 1.5 percent of the total supply of XRB via the faucet.  Defendant LeMahieu continued, providing a link to the "distribution schedule" design by the Nano Defendants.



98.     On April 3, 2016, Defendant LeMahieu further demonstrated his control over the Nano Faucet: "The short of the story is I think we have a way to make the faucet work and scale.  We'll total up faucet clicks and pay them out in bulk daily or hourly rather than instantly."



6903743_1.pdf - Page 24 - Replace

90. The Nano Faucet was an undeniable success. Defendants assigned the then-total-existing supply of XRB to the faucet. They permitted between 100 and 150 individuals to claim approximately 1,000 XRB per hour throughout that time period. By October 2017, individuals across the world had claimed more than 120 million XRB, or approximately 40 percent of the then-existing total supply of XRB.

91. In fact, the Nano Defendants acknowledged that many individuals devoted themselves to collecting XRB full-time, like a job:



92. Similarly, Defendant LeMahieu recognized on September 18, 2017 that many "people who use xrb's faucet specifically for hours a day [do so] as their entire job . . .



21

99.     The Nano Faucet was an undeniable success. Defendants assigned the then-total-existing supply of XRB to the faucet.  They permitted between 100 and 150 individuals to claim approximately 1,000 XRB per hour throughout that time period.  By October 2017, individuals across the world had claimed more than 120 million XRB, or approximately 40 percent of the then-existing total supply of XRB.

100.     In fact, the Nano Defendants acknowledged that many individuals devoted themselves to collecting XRB full-time, like a job:



101.     Similarly, Defendant LeMahieu recognized on September 18, 2017 that many "people who use xrb's faucet specifically for hours a day [do so] as their entire job . . .



## V. The Nano Defendants' Efforts to List XRB on Established Exchanges

93. The Nano Defendants repeatedly represented to the public that they sought to list XRB on as many exchanges as possible to promote the purchase and adoption of XRB.

94. On March 4, 2016, Defendant LeMahieu wrote on the Cryptocurrency subreddit – which had over 900,000 members – that XRB would be "getting listed" on two popular cryptocurrency exchanges in America and Russia – Bittrex (www.bittrex.com) and YoBit (www.yobit.net):



95. In other words, Defendant LeMahieu implied that XRB had an international following and demand, and that XRB would soon appreciate in value and grow in adoption by listing it on online exchanges.

96. On March 19, 2016, Defendant LeMahieu advised that XRB/Nano began marketing to the public in March 2016, which would address the lack of stability in XRB's price: "Part of the reason we've been out so long and haven't received much attention is we haven't been marketing until just about the beginning of March. We've been working on stability and the ad clearing demo, at this point we think those two goals are achieved so we're hitting the pavement."

1

2

3    **V.    The Nano Defendants' Efforts to List XRB on Established Exchanges**

4          102.    The Nano Defendants repeatedly represented to the public that they sought to list XRB

5    on as many exchanges as possible to promote the purchase and adoption of XRB.

6          103.    On March 4, 2016, Defendant LeMahieu wrote on the Cryptocurrency subreddit – which

7    had over 900,000 members – that XRB would be "getting listed" on two popular cryptocurrency

8    exchanges in America and Russia – Bittrex (www.bittrex.com) and YoBit (www.yobit.net):

9

10

11

12    

13

14

15

16

17

18

19

20

21          104.    In other words, Defendant LeMahieu implied that XRB had an international following

22    and demand, and that XRB would soon appreciate in value and grow in adoption by listing it on online

23    exchanges.

24          105.    On March 19, 2016, Defendant LeMahieu advised that XRB/Nano began marketing to

25    the public in March 2016, which would address the lack of stability in XRB's price: "Part of the reason

26    we've been out so long and haven't received much attention is we haven't been marketing until just

27

28

97.    Defendant LeMahieu continued, encouraging mass promotion of XRB: "As always having XRB(RaiBlacks) [NANO] will only be useful if more people want to use it so getting the word out, telling anyone you find about the faucet and to try it out is what will ultimately make it useful."



98.    Similarly, on April 21, 2016, Defendant LeMahieu submitted a post on the Bitcointalk forum complaining about the Nano Defendants' inability to get XRB listed on an exchange: "I've talked with Bittrex, Poloniex, C-Cex, many, many others over a period of almost 9 months trying to get accepted.  I doubt many more are irritated at the situation than I am, if "any" of them would contact me back I'd be helping them get it listed."

## VI.    XRB is Listed on Exchanges and Bona Fide Offered to the Investing Public

99.    Due to the fact that larger exchanges were unwilling to list XRB, in late 2017, the Nano Defendants determined to simply create a new exchange that would be built from the ground up and dedicated to XRB.  Accordingly, in approxiamtely December 2016, the Nano Defendants approached Defendant Firano to create a "RaiBlocks dedicated exchange."

100.    Shortly thereafter, one of the numerous exchanges that the Nano Defendants pleaded with to list XRB agreed to list the asset.  Specifically on March 4, 2017, XRB's first listing was obtained on an obscure exchange named Cryptopia—a New Zealand-based cryptocurrency exchange that has since gone into liquidation.

1 about the beginning of March.  We've been working on stability and the ad clearing demo, at this point

2 we think those two goals are achieved so we're hitting the pavement."

3      106.   Defendant LeMahieu continued, encouraging mass promotion of XRB: "As always

4 having XRB(RaiBlacks) [NANO] will only be useful if more people want to use it so getting the word

5 out, telling anyone you find about the faucet and to try it out is what will ultimately make it useful."

6      107.   Similarly, on April 21, 2016, Defendant LeMahieu submitted a post on the Bitcointalk

7 forum complaining about the Nano Defendants' inability to get XRB listed on an exchange: "I've talked

8 with Bittrex, Poloniex, C-Cex, many, many others over a period of almost 9 months trying to get

9 accepted.  I doubt many more are irritated at the situation than I am, if "any" of them would contact me

10 back I'd be helping them get it listed."

11

12 

13

14

15

16

17

18

19

20

21

22 **VI.   <u>XRB is Listed on Exchanges and Bona Fide Offered to the Investing Public</u>**

23      108.   Due to the fact that larger exchanges were unwilling to list XRB, the Nano Defendants

24 decided in late-2017 to simply create a new exchange that would be built from the ground up and

25 dedicated to XRB.  Accordingly, in approxiamtely December 2016, the Nano Defendants approached

26 Defendant Firano to create a "RaiBlocks dedicated exchange."

27

28

101.  Within weeks, on March 24, 2017, Cryptopia announced that it would be delisting XRB from its platform because of "excessive load from recaptcha click farmers, death threats to support, account abuse, deposit spamming and network syncing issues."

102.  The Cryptopia delisting pressured the Nano Defendants to secure XRB's listing on another exchange—regardless of its reputation—leading to XRB ~~becoming~~ listed on or about March 25, ~~2017,~~ on a recently created and highly unreliable exchange—Mercatox.

103.  XRB's Mercatox listing immediately resulted in frustrations for the potential XRB investors attempting to purchase XRB through Mercatox.  For example, on May 4, 2017, a user on the Bitcointalk forum posted:



104.  In early-April 2017, the Nano Defendants were anxious to create and sustain a market for XRB so they could profit ~~by~~ (a) turning off the Nano ~~Faucet~~ thereby significantly reducing XRB's supply and ~~consequently~~ increasing XRB's trading ~~price~~ and then (b) selling their own XRB holdings at a significant premium.  Given that Mercatox was highly unreliable and frequently did not process transactions, the Nano Defendants devoted a substantial amount of their effort to working with Defendant Firano on creating and launching BitGrail as quickly as possible.

**VII.  The Nano Defendants and Firano Create and Launch BitGrail Together**

105.  The Nano Defendants began working with Defendant Firano to create BitGrail's "RaiBlocks dedicated exchange" *i.e.*, the BitGrail Exchange in approximately December 2016.

106.  Indeed, Defendant LeMahieu personally worked with Defendant Firano as well as multiple former members of XRB's then-"core" development team to create and launch the BitGrail

109. Shortly thereafter, one of the numerous exchanges with which the Nano Defendants pleaded to list XRB agreed to list the asset.

110. On March 4, 2017, XRB's first listing was obtained on an obscure exchange named Cryptopia—a New Zealand-based cryptocurrency exchange that has since gone into liquidation.

111. Within weeks, on March 24, 2017, Cryptopia announced that it would be delisting XRB from its platform because of "excessive load from recaptcha click farmers, death threats to support, account abuse, deposit spamming and network syncing issues."

112. The Cryptopia delisting pressured the Nano Defendants to secure XRB's listing on another exchange—regardless of its reputation—leading to XRB being listed on or about March 25, 2017 on a recently created and highly unreliable exchange—Mercatox.

113. XRB's Mercatox listing immediately resulted in frustrations for the potential XRB investors attempting to purchase XRB through Mercatox. For example, on May 4, 2017, a user on the Bitcointalk forum posted:



114. In early-April 2017, the Nano Defendants were anxious to create and sustain a market for XRB so they could profit by: (a) turning off the Nano Faucet, thereby significantly reducing XRB's supply and consequently increasing XRB's trading price, and then (b) selling their own XRB holdings at a significant premium.

115. Given that Mercatox was highly unreliable and frequently did not process transactions, the Nano Defendants devoted a substantial amount of their effort to working with Defendant Firano on creating and launching BitGrail as quickly as possible.

Exchange.  In the words of a former XRB developer, the BitGrail Exchange was "written from 0 for XRB."  Similarly, in Defendant Firano's own words:

> *I was reached by [sic] the NANO team members to create a new exchange from the ground up that supported NANO natively, with the help of the coin designer Colin LeMahieu and the team that he had at the time.*
>
> *When BitGrail was being developed, we used the protocol that they recommended and designed and **we worked hand in hand in developing the NANO portion of the exchange.  The node implementation and API were all directed to us to be used by their team**.*
>
> *We spoke with their team almost on a daily basis and they recommended us how to run the NANO portion of the exchange.*

Firano Statement (Emphasis added).

107.    The BitGrail Exchange launched in April 2017 (www.bitgrail.com).  BitGrail was far-and-away XRB's largest marketplace -- a result of strategic positioning and widespread marketing efforts by Defendants.



108.    Throughout the Class Period, each of the Nano Defendants remained substantially involved in the maintenance of the BitGrail Exchange's XRB-related operations and retained

**VII.    The Nano Defendants and Firano Create and Launch BitGrail Together**

116.    The Nano Defendants began working with Defendant Firano to create BitGrail's "RaiBlocks dedicated exchange" *i.e.*, the BitGrail Exchange in approximately December 2016.

*117.*    Indeed, Defendant LeMahieu personally worked with Defendant Firano as well as multiple former members of XRB's then-"core" development team to create and launch the BitGrail Exchange.  In the words of a former XRB developer, the BitGrail Exchange was "written from 0 for XRB."  Similarly, in Defendant Firano's own words:

> *I was reached by [sic] the NANO team members to create a new exchange from the ground up that supported NANO natively, with the help of the coin designer Colin LeMahieu and the team that he had at the time.*

> *When BitGrail was being developed, we used the protocol that they recommended and designed and **we worked hand in hand in developing the NANO portion of the exchange.  The node implementation and API were all directed to us to be used by their team***.

> *We spoke with their team almost on a daily basis and they recommended us how to run the NANO portion of the exchange.*

Firano Statement (Emphasis added).

118.    The BitGrail Exchange launched in April 2017 (www.bitgrail.com).

119.    BitGrail was far-and-away XRB's largest marketplace -- a result of strategic positioning and widespread marketing efforts by Defendants.



significant control over Defendant Firano's decision making concerning the BitGrail Exchange.  As explained by Defendant Firano:

> *I started implementing the NANO team's recommended API as well as their implementation of the nodes.*
>
> *We consistently kept in touch and I was always transparent with them about the many issues, but **the NANO team had been hesitant in allowing me to shut down the NANO portion of the website** because it was causing major strain on our staff and hundreds to thousands of tickets and missed transactions that were consistently stuck in transfer with this coin.*
>
> ***
>
> *As we continued to work with the NANO team consistently, the majority of the time **I highly recommended to them that we close the markets because of major issues with the NANO protocol**, but they were hesitant and **forced me to keep it open and sometimes begged as well**.*
>
> *To mention again, the NANO team, especially Colin LeMahieu, had complete access to our servers for a while as we gave him direct access to the database and servers. That is how close **we worked as a team and as a preferred exchange which they forced me to keep open, despite my constant warnings about the technology and problems we were having for months**.*
>
> *I had presented many issues to the team regarding the NANO technology and they continued to recommend to us on what to fix and to make it keep going, since the other exchanges also had constant issues with the same technology. We kept the markets open, despite constant node crashes, constant support tickets and angry customers that our team had to deal with due to the NANO node sync issues that are inherent in the technology itself, which had nothing to do with BitGrail services.*
>
> *Despite the negativity towards BitGrail and myself on social media from disillusioned customers, I consistently recommended to the NANO developer team that this technology has major issues and we were having issues all the time with angry customers . . . I continually informed them of major issues with their technology and their implementation*

Firano Statement (Emphasis added).

~~109.~~    Defendant Firano's description of events is also well-documented by the Nano Defendants' public statements throughout the Class Period.  For example, on January 2, 2018, the Nano Defendants posted that Defendant Busch and Firano were "[t]wo passionate & hard-working gents"

120. Throughout the Class Period, each of the Nano Defendants remained substantially involved in maintaining the BitGrail Exchange's XRB-related operations and retained significant control over Defendant Firano's decision making concerning the BitGrail Exchange.

*121.* As explained by Defendant Firano:

> I started implementing the NANO team's recommended API as well as their implementation of the nodes.

> We consistently kept in touch and I was always transparent with them about the many issues, but **the NANO team had been hesitant in allowing me to shut down the NANO portion of the website** because it was causing major strain on our staff and hundreds to thousands of tickets and missed transactions that were consistently stuck in transfer with this coin.

> ***

> As we continued to work with the NANO team consistently, the majority of the time **I highly recommended to them that we close the markets because of major issues with the NANO protocol**, but they were hesitant and **forced me to keep it open and sometimes begged as well**.

> To mention again, the NANO team, especially Colin LeMahieu, had complete access to our servers for a while as we gave him direct access to the database and servers. That is how close **we worked as a team and as a preferred exchange which they forced me to keep open, despite my constant warnings about the technology and problems we were having for months**.

> I had presented many issues to the team regarding the NANO technology and they continued to recommend to us on what to fix and to make it keep going, since the other exchanges also had constant issues with the same technology. We kept the markets open, despite constant node crashes, constant support tickets and angry customers that our team had to deal with due to the NANO node sync issues that are inherent in the technology itself, which had nothing to do with BitGrail services.

> Despite the negativity towards BitGrail and myself on social media from disillusioned customers, I consistently recommended to the NANO developer team that this technology has major issues and we were having issues all the time with angry customers . . . I continually informed them of major issues with their technology and their implementation

that were "solving the operational challenges at @BitGrail in a high-pressure environment as a game-changing tech matures."



## VIII. Defendants Heavily Solicit the Purchase of XRB on BitGrail

### A. Instructing Members of the Investing Public to Purchase XRB

110. The Nano Defendants promoted XRB as having the following relative advantages over other cryptocurrencies: transactions in XRB are purportedly instant, carry no fees, and have no limit to their scalability. By comparison to payments via credit or debit card, XRB purports to offer nearly instantaneous settlement of transactions with no transaction fees.

111. The Nano Defendants focused on promoting and encouraging individuals to purchase, sell, and trade XRB on online exchanges, and in particular, on BitGrail. Although the termination of the Nano Faucet briefly doubled the price of XRB to nearly seventeen cents ($0.17), it was trading on the BitGrail Exchange that drove the price of XRB up to nearly ~~twelve dollars~~ ($12.00) as of the February 8, 2018 loss.

112. On April 20, 2017, the official XRB/Nano account announced that XRB was available for purchase on their recently created BitGrail Exchange:



Firano Statement (Emphasis added).

Defendant Firano's description of events is also well-documented by the Nano Defendants' public statements throughout the Class Period. For example, on January 2, 2018, the Nano Defendants posted that Defendant Busch and Firano were "[t]wo passionate & hard-working gents" that were "solving the operational challenges at @BitGrail in a high-pressure environment as a game-changing tech matures."



## VIII. Defendants Heavily Solicit the Purchase of XRB on BitGrail

### A. Instructing Members of the Investing Public to Purchase XRB

122. The Nano Defendants promoted XRB as having the following relative advantages over other cryptocurrencies: transactions in XRB are purportedly instant, carry no fees, and have no limit to their scalability. By comparison to payments via credit or debit card, XRB purports to offer nearly instantaneous settlement of transactions with no transaction fees.

123. The Nano Defendants focused on promoting and encouraging individuals to purchase, sell, and trade XRB on online exchanges, and in particular, on BitGrail. Although the termination of the Nano Faucet briefly doubled the price of XRB to nearly seventeen cents ($0.17), it was trading on the BitGrail Exchange that drove the price of XRB up to nearly Twelve Dollars ($12.00) as of the February 8, 2018 loss.

124. On April 20, 2017, the official XRB/Nano account announced that XRB was available for purchase on their recently created BitGrail Exchange:

113. Similarly, Defendants released the following infographic on how to purchase XRB describing in detail how to purchase XRB from BitGrail:



114. Indeed, the Nano Defendants recommended BitGrail on XRB/Nano's Twitter feed, on Reddit, on Slack, on Telegram, on Medium, and on its official website multiple times:





1

2

3

4

5

6

7

8

9



10      125.    Similarly, Defendants released the following infographic on how to purchase XRB

11  describing in detail how to purchase XRB from BitGrail:

12

13

14

15

16

17

18

19

20

21

22

23

24

25



26

27

28

115. As discussed in greater detail below, before the loss of 15 million XRB, the Nano Defendants expressly encouraged members of the public, including ~~Plaintiff~~ and the Class, to purchase, trade, and hold XRB on BitGrail.

116. Additionally, the Nano Defendants offered investment advice to XRB holders. For example, Defendant Shapiro advised one XRB holder on Twitter: "I recommend selling your xrb there and withdrawing btc even if it's at a loss. Thanks":



117. Similarly, Defendant Shapiro touted: "the faster $xrb can get in blockfolio,[8] the faster people can see their gains and losses and come to ~~Bit~~ Bitgrail to invest more in a coin getting more and more attention."



---

[8] Blockfolio is a service that tracks cryptocurrency prices.

126.   Indeed, the Nano Defendants recommended BitGrail on XRB/Nano's Twitter feed, on Reddit, on Slack, on Telegram, on Medium, and on its official website multiple times:



127.   As discussed in greater detail below, before the loss of 15 million XRB, the Nano Defendants expressly encouraged members of the public, including Plaintiffs and the Class, to purchase, trade, and hold XRB on BitGrail.

128.   Additionally, the Nano Defendants offered investment advice to XRB holders.   For example, Defendant Shapiro advised one XRB holder on Twitter: "I recommend selling your xrb there and withdrawing btc even if it's at a loss. Thanks":



118. Indeed, Defendants even promoted XRB's coverage on investment shows such as CNBC's Fast Money:



119. Defendant Shapiro went so far as to create an application specifically designed to monitor XRB's price:

129. Similarly, Defendant Shapiro touted: "the faster $xrb can get in blockfolio,[6] the faster people can see their gains and losses and come to Bitgrail to invest more in a coin getting more and more attention."



130. Indeed, Defendants even promoted XRB's coverage on investment shows such as CNBC's Fast Money:



---

[6] Blockfolio is a service that tracks cryptocurrency prices.

**B.    Encouraging the Public to Spread the Word**

~~120.~~    ~~The Nano Defendants promoted XRB by instructing members of the public, including Plaintiff~~ and the Class, to tell their friends, family, and acquaintances to purchase and acquire XRB.

~~121.~~    For example, on December 20, 2017, Defendant LeMahieu ~~wrote,~~ "I think the best thing an average fan could do is word of mouth and telling people about RaiBlocks [XRB].  More people being aware of it means there's the possibility someone who's never heard of it before would be interested in contributing as a vendor, developer, exchange, etc.  Good advertising or marketing will never be able to reach everyone as well as someone reaching out within their own network."



~~122.~~    In other words, the Nano Defendants encouraged and caused members of the public, including ~~Plaintiff~~ and the Class, to lend their reputations, trust, and goodwill on their fellow friends, family, and followers to influence and cause more members of the public to purchase and acquire CRB.

**C.    Increasing Social Media and Online Presence**

~~123.~~    The Nano Defendants promoted XRB on various social-network platforms, including Reddit and Twitter, among others.

~~124.~~    For example, in September 2017, Defendant LeMahieu stated on Reddit's Cryptocurrency subreddit that XRB had "been organically growing and expanding since our launch two years ago and we want to open up discussion of the technology to a broader ~~audience.''.~~

31

1

2

3

4       131.    Defendant Shapiro went so far as to create an application specifically designed to

monitor XRB's price:

5

6                                     Zack Shapiro ✔
                                      @ZackShapiro

7

8             I built a fun little $XRB price tracking

9             app. Submitting to the App Store
              today!

10

11            Super simple, lets you track the
              current price on Mercatox and see

12            your BTC balance.

13            It's open source, feel free to contribute!
              github.com/zackshapiro/ra...

14

15   **B.**      **Encouraging the Public to Spread the Word**

16       132.    The Nano Defendants promoted XRB by instructing members of the public, including

17   Plaintiffs and the Class, to tell their friends, family, and acquaintances to purchase and acquire XRB.

18

19

20

21

22

23

24

25

26

27

28

133.    For example, on December 20, 2017, Defendant LeMahieu wrote: "I think the best thing an average fan could do is word of mouth and telling people about RaiBlocks [XRB].  More people being aware of it means there's the possibility someone who's never heard of it before would be interested in contributing as a vendor, developer, exchange, etc.  Good advertising or marketing will never be able to reach everyone as well as someone reaching out within their own network."



134.    In other words, the Nano Defendants encouraged and caused members of the public, including Plaintiffs and the Class, to lend their reputations, trust, and goodwill on their fellow friends, family, and followers to influence and cause more members of the public to purchase and acquire CRB.

**C.    Increasing Social Media and Online Presence**

135.    The Nano Defendants promoted XRB on various social-network platforms, including Reddit and Twitter, among others.



125. The Nano Defendants also produced, participated in, and published videos online for members of the public, including ~~Plaintiff~~ and the Class, to watch, which were used to promote the purchase, acquisition, and appreciation of XRB's value.

126. The Nano Defendants also maintained numerous online group chats for members of the public, including the Class, to join, follow, and even contribute to on multiple fora. For example, the Nano Defendants maintained an online group chats on Slack (https://slack.raiblocks.net), Telegram (www.telegram.com) and Discord (www.discord.com). Therein, members of the public, including the Class, followed and engaged in ongoing conversations relating to XRB, such as price volatility, trading on BitGrail and other exchanges, price appreciation, and other related topics.

127. In late 2017, the Nano Defendants revamped their website and grew their team to portray themselves in a more favorable light. On December 20, 2017, Defendant LeMahieu ~~wrote,~~ "We have about 12 people in the core team; about half are code and half are business developers. On the redesigned website we're going to include bios for sure . . . ."



136.    For example, in September 2017, Defendant LeMahieu stated on Reddit's Cryptocurrency subreddit that XRB had "been organically growing and expanding since our launch two years ago and we want to open up discussion of the technology to a broader audience."



137.    The Nano Defendants also produced, participated in, and published videos online for members of the public, including Plaintiffs and the Class, to watch, which were used to promote the purchase, acquisition, and appreciation of XRB's value.

138.    The Nano Defendants also maintained numerous online group chats for members of the public, including the Class, to join, follow, and even contribute to on multiple fora.   For example, the Nano Defendants maintained an online group chats on Slack (https://slack.raiblocks.net), Telegram (www.telegram.com) and Discord (www.discord.com).  Therein, members of the public, including the Class, followed and engaged in ongoing conversations relating to XRB, such as price volatility, trading on BitGrail and other exchanges, price appreciation, and other related topics.

139.    In late 2017, the Nano Defendants revamped their website and grew their team to portray themselves in a more favorable light.  On December 20, 2017, Defendant LeMahieu wrote: "We have about 12 people in the core team; about half are code and half are business developers.   On the redesigned website we're going to include bios for sure . . . ."

**D.** **Downplaying Speculation: the "HODL Mentality"**

128. The Nano Defendants were aware that members of the public, including ~~Plaintiff~~ and the Class, were purchasing and acquiring XRB to "hodl," the jargon for patiently holding a cryptocurrency to wait for it appreciate in value before selling it. Notwithstanding their awareness of this behavior by members of the public, including ~~Plaintiff~~ and the Class, the Nano Defendants downplayed the significance of this speculative behavior as a bug and not a feature, when in fact, the opposite was true: speculation over XRB's price was the feature and the promise of future, mass adoption was the bug.

129. Defendants repeatedly acknowledged the speculative nature of XRB. For example, when a Reddit user suggested that Nano peg XRB to another nomination of value (*e.g.*, the U.S. Dollar) to stabilize the valuation, Defendant Retzer ~~replied,~~ "It is only stable to another currency. If the pegged currency fails, so does the stable coin. **We are still in the highly speculative stage of cryptocurrencies.** As time goes on and projects gain adoption and success, the volitality [sic] will decrease." (Emphasis added).

**IX.** **The Nano Defendants Close the Nano Faucet and Extract Millions in Profits**

130. By October 2017, XRB's trading volume on BitGrail was significant and the Nano Defendants determined it was time to close the Nano Faucet and obtain millions of profits in the the process.

131. The Nano Faucet was shut down on October 15, 2017. Contemporaneous with the termination of the Nano Faucet, the Nano Defendants: (a) withheld seven million XRB for themselves for their work in conceiving, developing, promoting, and selling XRB to the public; and (b) "burned" (meaning, purportedly sent to three digitals wallets that are inaccessible) the undistributed 60 percent of XRB that was not claimed during the Nano Faucet. In other words, the Nano Defendants condensed the entire value of XRB supply into the remaining 40 percent:

Wed Dec 20 2017 13:21:27 GMT-0500 (Eastern Standard Time)

meor  Colin Lemahieu  71 points · 1 year ago

We have about 12 people in the core team; about half are code and half are business developers. On the redesigned website we're going to include bios for sure, no one in our team is anonymous. I think we have pretty good coverage of what we need right now, we could always use more people capable of contributing to the core code.

The website design is well underway, we wanted to streamline and add some more things to it so it took longer than originally estimated. It'l looking like after the new year we'll have it ready.

Give Award    Share    Report    Save

### D.  Downplaying Speculation: the "HODL Mentality"

140.    The Nano Defendants were aware that members of the public, including Plaintiffs and the Class, were purchasing and acquiring XRB to "hodl," the jargon for patiently holding a cryptocurrency to wait for it appreciate in value before selling it.

141.    Notwithstanding their awareness of this behavior by members of the public, including Plaintiffs and the Class, the Nano Defendants downplayed the significance of this speculative behavior as a bug and not a feature, when in fact, the opposite was true: speculation over XRB's price was the feature and the promise of future, mass adoption was the bug.

142.    Defendants repeatedly acknowledged the speculative nature of XRB.  For example, when a Reddit user suggested that Nano peg XRB to another nomination of value (*e.g.*, the U.S. Dollar) to stabilize the valuation, Defendant Retzer replied: "It is only stable to another currency. If the pegged currency fails, so does the stable coin. **We are still in the highly speculative stage of cryptocurrencies.** As time goes on and projects gain adoption and success, the volitality [sic] will decrease." (Emphasis added).

### IX.  The Nano Defendants Close the Nano Faucet and Extract Millions in Profits

143.    By October 2017, XRB's trading volume on BitGrail was significant and the Nano Defendants determined it was time to close the Nano Faucet and obtain millions of profits in the the process.

144.    The Nano Faucet was shut down on October 15, 2017.  Contemporaneous with the termination of the Nano Faucet, the Nano Defendants: (a) withheld seven million XRB for themselves for their work in conceiving, developing, promoting, and selling XRB to the public; and (b) "burned"



132. Consistent therewith, the price of XRB nearly doubled at that time, from $0.09 per XRB to nearly $0.17 per XRB:



133. As Defendant Busch acknowledged, during the Nano Faucet, the constant distribution of XRB to the public diluted the value of his shares, but the Nano Defendants' strategy of patiently waiting to grow a robust and interested network of holders resulted in substantial price appreciation:



(meaning, purportedly sent to three digitals wallets that are inaccessible) the undistributed 60 percent of XRB that was not claimed during the Nano Faucet.  In other words, the Nano Defendants condensed the entire value of XRB supply into the remaining 40 percent:



145.    Consistent therewith, the price of XRB nearly doubled at that time, from $0.09 per XRB to nearly $0.17 per XRB:



146.    As Defendant Busch acknowledged, during the Nano Faucet, the constant distribution of XRB to the public diluted the value of his shares, but the Nano Defendants' strategy of patiently waiting to grow a robust and interested network of holders resulted in substantial price appreciation:

134. In addition, Defendant Busch wrote that the termination of the Nano Faucet eased "sell pressure." In other words, the end of the Nano Faucet meant that individuals who acquired XRB by purchasing it with fiat or cryptocurrency translated into in holders of XRB who were less interested in quickly selling their holdings:



135. In sum, Defendants stood to reap enormous returns by virtue of a robust and widespread network of individuals buying, selling, and trading XRB.

136. The Nano Faucet served as the tool by which the Nano Defendants created and grew a public network of individuals invested in the development, adoption, and sustained growth of XRB.

## X.   **Defendants' Representations Regarding their Duties and Obligations to Investors**

137. At all times material, the Nano Defendants made various statements and representations that the Nano Defendants owed various duties of care and loyalty to Plaintiff and the Class at large.

138. For example, on March 7, 2016, Defendant LeMahieu wrote, "We're investigating creating an irrevocable legal trust to document our commitment to the distribution."



This page does not exist in the compared document.

6903743_1.pdf - Page 39 - Replace

Case 4:19-cv-00054-YGR Document 147-1 Filed 08/17/20 Page 89 of 426
Case 4:19-cv-00054-YGR Document 53 Filed 07/25/19 Page 39 of 64

139.   On September 18, 2017, Defendant LeMahieu expressly recognized that the Nano Defendants' behavior, actions, and conduct was informed by their recognition of a correlation between listing XRB on larger exchanges and ensuing damages: "For a long time we weren't actively seeking because we wanted to hammer out node performance and usability issues.  **Larger exchanges mean more visibility and damage if there had been problems**."



140.   On December 18, 2017, a person posted on RaiBlocks' subreddit, "Colin, is any security audit to the source code planned?"  In other words, the person asked whether there would be any security testing of the XRB Protocol.

141.   Defendant LeMahieu responded, acknowledging that the Nano Defendants recognized the importance of conducting a security audit to detect any deficiencies or exposure, but admitted that the Nano Defendants had failed to do so.  He replied, "We don't have one contracted **though both internally and externally this is an important thing people want completed**."





147.    In addition, Defendant Busch wrote that the termination of the Nano Faucet eased "sell pressure."  In other words, the end of the Nano Faucet meant that individuals who acquired XRB by purchasing it with fiat or cryptocurrency translated into in holders of XRB who were less interested in quickly selling their holdings:



148.    In sum, Defendants stood to reap enormous returns by virtue of a robust and widespread network of individuals buying, selling, and trading XRB.

149.    The Nano Faucet served as the tool by which the Nano Defendants created and grew a public network of individuals invested in the development, adoption, and sustained growth of XRB.

**X.    Defendants' Representations Regarding their Duties and Obligations to Investors**

150.    At all times material, the Nano Defendants made various statements and representations that the Nano Defendants owed various duties of care and loyalty to Plaintiffs and the Class at large.

Case 4:19-cv-00054-YGR Document 58 Filed 07/25/19 Page 40 of 64

142. In August 2018, when users on the Internet forum, Reddit.com, raised concern over the fact that the Nano Developer's Wallet had sold over $600,000 of XRB, Defendant Retzer assured the public that the funds were sold to pay for regular expenses, including salaries. However, Defendant Retzer also ~~added, "[w]~~ith the current state of the market, it makes sense for the Nano foundation to hold cash to protect the dev fund in case of the price dropping in order to ensure that development continues into the future."

143. The following month, in September 2018, when Reddit users again asked the Nano Core Team about the large positions sold by the Nano Core Team, Defendant Retzer again acknowledged the highly-speculative nature of XRB's future: "I said a few weeks ago, when the FUD [fear, uncertainty, doubt] was that we were cashing some of the dev funds, that we were simply hedging against a further market crash (It seems a bit backwards that there was FUD that we were selling and now FUD that we are quitting because no money, but alas..).."

144. In addition, on April 9, 2018, the Nano Defendants announced that they were "sponsoring" a "legal fund" purportedly designed to "provide all victims of the hack of the cryptocurrency exchange BitGrail with equal access to representation" and enable such investors to seek recourse against the exchange.

## XI. Nano's Recommendations Fail to Disclose the XRB Protocol's and the BitGrail Exchange's Lack of Safeguards Protecting the Class' Deposits

145. Notwithstanding the Nano Defendants' widespread promotion of BitGrail as a safe haven for XRB investors, BitGrail's troubled past, uncertain present, and questionable future make the Nano Defendants' recommendations highly suspect, if not outright reckless.

### A. The Trading Platform Problem

146. In late-2017, many BitGrail users reportedly experienced problems with the Nano Protocol and reliability and security of BitGrail's trading platform.

147. For some users, account balances would inexplicably (and inaccurately) slip into negative figures.

148. For some users, single account withdrawals were processed twice.

151.   For example, on March 7, 2016, Defendant LeMahieu wrote: "We're investigating creating an irrevocable legal trust to document our commitment to the distribution."

152.   On September 18, 2017, Defendant LeMahieu expressly recognized that the Nano Defendants' behavior, actions, and conduct was informed by their recognition of a correlation between listing XRB on larger exchanges and ensuing damages: "For a long time we weren't actively seeking because we wanted to hammer out node performance and usability issues. **Larger exchanges mean more visibility and damage if there had been problems**."



153.   On December 18, 2017, a person posted on RaiBlocks' subreddit: "Colin, is any security audit to the source code planned?"   In other words, the person asked whether there would be any security testing of the XRB Protocol.

154.   Defendant LeMahieu responded, acknowledging that the Nano Defendants recognized the importance of conducting a security audit to detect any deficiencies or exposure, but admitted that the Nano Defendants had failed to do so.  He replied, "We don't have one contracted **though both internally and externally this is an important thing people want completed**."



149.   BitGrail accountholders took to social media to decry the lack of reliability and trustworthiness of BitGrail's operations or the reliability of the XRB Protocol itself.

150.   Despite the account glitches and functionality concerns that affected so many BitGrail users, the Nano Defendants did not distance themselves from the BitGrail Defendants as a direct result of the problems.  Rather, according to Defendant Firano, the Nano Defendants "forced" him to keep XRB on BitGrail despite his warnings.

**B.     The Verification Problem**

151.   In or about mid-January 2017, BitGrail proved itself unable to timely verify its new users, which left those users incapable of engaging in anything more than a very meager volume of transactions -- a frustrating circumstance that rendered the users' accounts effectively useless with regard to the purpose for which the accounts were opened.

152.   The Nano Defendants and BitGrail had a public spat over BitGrail's verification problem, and some asserted that the problem stemmed from the Nano Defendants' failure to cooperate with BitGrail's business model.

153.   Despite the verification issue that plagued so many BitGrail users, the Nano Defendants did not distance themselves from BitGrail as a direct result of the problem.

**C.     The $170 Million Disappearing XRB Problem**

154.   In early-February 2018, BitGrail announced that it had "lost" $170 Million worth of XRB from its exchange due to "unauthorized transactions."   The "missing" XRB amounted to approximately eighty percent (80%) of the XRB that BitGrail customers held in their accounts and amounts to nearly fifteen percent (15%) of all XRB in existence.

155.   In the aftermath of the purported XRB theft that devastated BitGrail's inventory of the cryptocurrency, the Nano Defendants and the Bitgrail Defendants engaged in yet another very public dispute over the cause of the problem and how it should be resolved.

156.   The Nano Defendants accused Defendant Firano of trying to cover-up the event and of asking NANO to engage in purportedly unethical behavior to solve the problem.  According to the

1

155.  In August 2018, when users on the Internet forum, Reddit.com, raised concern over the fact that the Nano Developer's Wallet had sold over $600,000 of XRB, Defendant Retzer assured the public that the funds were sold to pay for regular expenses, including salaries.  However, Defendant Retzer also added: "With the current state of the market, it makes sense for the Nano foundation to hold cash to protect the dev fund in case of the price dropping in order to ensure that development continues into the future."

156.  The following month, in September 2018, when Reddit users again asked the Nano Core Team about the large positions sold by the Nano Core Team, Defendant Retzer again acknowledged the highly-speculative nature of XRB's future: "I said a few weeks ago, when the FUD [fear, uncertainty, doubt] was that we were cashing some of the dev funds, that we were simply hedging against a further market crash (It seems a bit backwards that there was FUD that we were selling and now FUD that we are quitting because no money, but alas..)."

157.  In addition, on April 9, 2018, the Nano Defendants announced that they were "sponsoring" a "legal fund" purportedly designed to "provide all victims of the hack of the cryptocurrency exchange BitGrail with equal access to representation" and enable such investors to seek recourse against the exchange.

**XI.   Nano's Recommendations Fail to Disclose the XRB Protocol's and the BitGrail Exchange's Lack of Safeguards Protecting the Class' Deposits**

158.  Notwithstanding the Nano Defendants' widespread promotion of BitGrail as a safe haven for XRB investors, BitGrail's troubled past, uncertain present, and questionable future make the Nano Defendants' recommendations highly suspect, if not outright reckless.

**A.     The Trading Platform Problem**

159.  In late-2017, many BitGrail users reportedly experienced problems with the Nano Protocol and reliability and security of BitGrail's trading platform.

160.  For some users, account balances would inexplicably (and inaccurately) slip into negative figures.

161.  For some users, single account withdrawals were processed twice.

Nano Defendants, the problem stemmed from flaws related to BitGrail's software, not any issue in the XRB protocol.

157. BitGrail denied all allegations of wrongdoing and alleged that the Nano Defendants were unwilling to cooperate in formulating a solution.

158. In the wake of the latest of the calamities in the relationship between BitGrail and the Nano Defendants, BitGrail users have sought to move their XRB off of the BitGrail exchange into private cryptocurrency wallets; however, BitGrail has made such withdrawals impossible by suspending all account activity.

159. The XRB holders at BitGrail -- including Plaintiff and the Class -- were ushered there by the Nano Defendants, those users relied on Defendants' representations in investing their assets at BitGrail, and those users have now been burned by the Nano Defendants and the BitGrail Defendants.

**D.** **Lack of Idempotence in the Nano Protocol Resulted in the Theft of the Class' XRB Worth $170 Million**

160. Since this action's initiation, numerous additional facts have been revealed by Tribunal of Florence in Italy through its issuance of the BitGrail Decision and the Firano Decision. In reaching its decisions, the Tribunal relied upon a court-appointed expert witness to conduct an analysis of the events surrounding the "hack" of the Class' funds on BitGrail. These Decisions included the following findings:

- *During the expert operations it was undisputedly ascertained and shared between the parties that the shortfall took place during the exchange's normal operation and life cycle and by regular users through their own e-mail, data, and wallet, and no stolen key, no crack of the systems, no piercing of the perimeter security program, no trojan/backdoor and no vulnerability of the mathematical protocol of the cryptocurrencies.*

- *[T]the court-appointed expert ascertained that the shortfall 'was caused by multiple withdrawals (also called "double withdrawals") that occurred in circumstances which are not clearly proven. According to the statement of Mr Firano, indeed, these withdrawals occurred on occasions of the malfunctioning of the node (he makes reference to possible 'crashes' of the node), however, today we have no certainty regarding the dynamics of such malfunctions.*

162. BitGrail accountholders took to social media to decry the lack of reliability and trustworthiness of BitGrail's operations or the reliability of the XRB Protocol itself.

163. Despite the account glitches and functionality concerns that affected so many BitGrail users, the Nano Defendants did not distance themselves from the BitGrail Defendants as a direct result of the problems. Rather, according to Defendant Firano, the Nano Defendants "forced" him to keep XRB on BitGrail despite his warnings.

**B.    The Verification Problem**

164. In or about mid-January 2017, BitGrail proved itself unable to timely verify its new users, which left those users incapable of engaging in anything more than a very meager volume of transactions -- a frustrating circumstance that rendered the users' accounts effectively useless with regard to the purpose for which the accounts were opened.

165. The Nano Defendants and BitGrail had a public spat over BitGrail's verification problem, and some asserted that the problem stemmed from the Nano Defendants' failure to cooperate with BitGrail's business model.

166. Despite the verification issue that plagued so many BitGrail users, the Nano Defendants did not distance themselves from BitGrail as a direct result of the problem.

**C.    The $170 Million Disappearing XRB Problem**

167. In early-February 2018, BitGrail announced that it had "lost" $170 Million worth of XRB from its exchange due to "unauthorized transactions." The "missing" XRB amounted to approximately eighty percent (80%) of the XRB that BitGrail customers held in their accounts and amounts to nearly fifteen percent (15%) of all XRB in existence.

168. In the aftermath of the purported XRB theft that devastated BitGrail's inventory of the cryptocurrency, the Nano Defendants and the Bitgrail Defendants engaged in yet another very public dispute over the cause of the problem and how it should be resolved.

169. The Nano Defendants accused Defendant Firano of trying to cover-up the event and of asking NANO to engage in purportedly unethical behavior to solve the problem. According to the

- *The users would, essentially, request withdrawal of a certain amount and receive the same amount twice or more times. This is because, due to the configuration of the exchange system and the features of the cryptocurrency, the Nano node carried out 'double' transactions, i.e., multiple withdrawals, without the exchange having tracked the execution.*

- *Firano became aware of the significant shortfalls – such as the one that occurred in July 2017. . . [t]his emerges clearly from the messages on the Telegram chat with the Nano's development team (that Mr. Firano had joined in December 2016 and left in December 2017) . . ..*

- *Firano had discovered the shortfall in mid-July 2017, when considerable amounts were withdrawn twice (double withdrawals") , so much so that he described the problem in a Telegram group chat attached to the Nano investigative report produced by the public prosecutor and on record as an annex to the court-appointed expert witness report.*

- *From several documents, it emerges how the use of the node as 'accounting centre' was envisages – as, in general, it is also the case for other cryptocurrencies – only for single users, with their private wallet, and without intense or concurrent activity. The exchanges have always been invited to autonomously manage the transactions, precisely because blindly trusting the node implies a high risk, not only for possible double withdrawals.' This is a risk that, in this Court's view should have been managed by the platform operator, which could and should have limited such risk while providing its services.*

- *[T]he analysis of the transactions with the same TXID that were present in a massive way in July 2017 in the 'withdrawals' table indicates how the double withdrawals were almost always related to multiple withdrawal attempts very close together and for the same amount, as also noted by Firano already in July 2017, as well as reported in the Telegram chat with the Nano development team within which Firano had entered in December 2016 and exited in December 2017.*

- *The shortfalls took place because the users who stole the Nano had realized that, by requesting a withdrawal at specific times, it was likely that two identical withdrawals would be granted: one was recorded and considered 'official', while the other was not recorded by the exchange despite being regularly recorded in the blockchain of the Nano node: as a result, several amounts of Nano cryptocurrency left the account without these transactions ever being recorded in the exchange's database.*

~~161.~~     As demonstrated in the BitGrail Decision and the Firano Decision, the Class' funds were

stolen through an exploitation of the Nano Protocol's lack of idempotence by way of Double

1   Nano Defendants, the problem stemmed from flaws related to BitGrail's software, not any issue in the

2   XRB protocol.

3        170.   BitGrail denied all allegations of wrongdoing and alleged that the Nano Defendants

4   were unwilling to cooperate in formulating a solution.

5        171.   In the wake of the latest of the calamities in the relationship between BitGrail and the

6   Nano Defendants, BitGrail users have sought to move their XRB off of the BitGrail exchange into

7   private cryptocurrency wallets; however, BitGrail has made such withdrawals impossible by

8   suspending all account activity.

9        172.   The XRB holders at BitGrail -- including Plaintiffs and the Class -- were ushered there

10  by the Nano Defendants, those users relied on Defendants' representations in investing their assets at

11  BitGrail, and those users have now been burned by the Nano Defendants and the BitGrail Defendants.

12  **D.   Lack of Idempotence in the Nano Protocol Resulted in the Theft of the Class'**
        **XRB Worth $170 Million**

13

14       173.   Numerous additional facts have been revealed by Tribunal of Florence in Italy through

15  its issuance of the BitGrail Decision and the Firano Decision.  In reaching its decisions, the Tribunal

16  relied upon a court-appointed expert witness to conduct an analysis of the events surrounding the

17  "hack" of the Class' funds on BitGrail.  These Decisions included the following findings:

18       •   *During the expert operations it was undisputedly ascertained and shared*
             *between the parties that the shortfall took place during the exchange's*

19           *normal operation and life cycle and by regular users through their own e-*
             *mail, data, and wallet, and no stolen key, no crack of the systems, no*

20           *piercing of the perimeter security program, no trojan/backdoor and no*
             *vulnerability of the mathematical protocol of the cryptocurrencies.*

21

22       •   *[T]the court-appointed expert ascertained that the shortfall 'was caused by*
             *multiple withdrawals (also called "double withdrawals") that occurred in*

23           *circumstances which are not clearly proven.  According to the statement of*
             *Mr Firano, indeed, these withdrawals occurred on occasions of the*

24           *malfunctioning of the node (he makes reference to possible 'crashes' of the*
             *node), however, today we have no certainty regarding the dynamics of such*

25           *malfunctions.*

26       •   *The users would, essentially, request withdrawal of a certain amount and*

27           *receive the same amount twice or more times.  This is because, due to the*
             *configuration of the exchange system and the features of the*

28

Withdrawal Transactions. Furthermore, each of the Defendants became aware of this issue in July 2017 when Defendant Firano raised the issue to the Nano Defendants in a private group chat.

162. The foregoing events plainly demonstrate that the Nano Defendants: (i) failed to adopt adequate safeguards in the Nano Protocol resulting in the theft of the Class' XRB funds on the BitGrail Exchange; (ii) concealed their actual knowledge that the Double Withdrawal Transactions were resulting in the loss of the Class' funds beginning in July 2017; and (iii) knowingly, or negligently, misrepresented that the Class' funds were "safe" on the BitGrail Exchange with their unqualified recommendations of, and public representations of trust of, BitGrail as the place where XRB should be kept and traded.

**E.     Defendants Breached Their Duties Owed the Class and Concealed the Theft of the Class' XRB Investments for Eight Months**

163. Nano Defendants breached their legal duties of care relating to their management of XRB when they failed to, *inter alia*,  (i) implement idempotence into the XRB Protocol thereby permitting the theft of the Class' XRB by the use of Double Withdrawal Transactions; (ii) disclose material information related to the XRB Protocol and the BitGrail Exchange's operation while discussing information, knowledge, and exercising authority on all things XRB-related at panels, conferences, and online social networks; (iii) permit Defendant Firano to shut down the BitGrail Exchange online despite having actual knowledge, or recklessly disregarding, the ongoing theft of XRB from accountholders on the BitGrail Exchange from July 2017 through January 2018; (iv) disclose to Plaintiff and the Class the fact that the Class' XRB was being stolen through use of Double Withdrawal Transactions from July 2017 through January 2018; (v) take reasonable measures to ensure that the exchanges upon which XRB was bought, sold, and traded employed, utilized, and followed adequate security measures and protocols;  (vi) know or confirm that the material representations and statements regarding BitGrail's safety and security were accurate; and (vii) Conduct a security audit of the XRB Protocol.

164. Additionally, despite being fully aware of the Double Withdrawal Transactions as of July 2017, the Nano Defendants issued countless statements falsely or negligently assuring ~~Plaintiff~~ and the Class that their funds were safe on the BitGrail Exchange.

*cryptocurrency, the Nano node carried out 'double' transactions, i.e., multiple withdrawals, without the exchange having tracked the execution.*

- *Firano became aware of the significant shortfalls – such as the one that occurred in July 2017. . . [t]his emerges clearly from the messages on the Telegram chat with the Nano's development team (that Mr. Firano had joined in December 2016 and left in December 2017) . . ..*

- *Firano had discovered the shortfall in mid-July 2017, when considerable amounts were withdrawn twice (double withdrawals)", so much so that he described the problem in a Telegram group chat attached to the Nano investigative report produced by the public prosecutor and on record as an annex to the court-appointed expert witness report.*

- *From several documents, it emerges how the use of the node as 'accounting centre' was envisages – as, in general, it is also the case for other cryptocurrencies – only for single users, with their private wallet, and without intense or concurrent activity.  The exchanges have always been invited to autonomously manage the transactions, precisely because blindly trusting the node implies a high risk, not only for possible double withdrawals.'  This is a risk that, in this Court's view should have been managed by the platform operator, which could and should have limited such risk while providing its services.*

- *[T]he analysis of the transactions with the same TXID that were present in a massive way in July 2017 in the 'withdrawals' table indicates how the double withdrawals were almost always related to multiple withdrawal attempts very close together and for the same amount, as also noted by Firano already in July 2017, as well as reported in the Telegram chat with the Nano development team within which Firano had entered in December 2016 and exited in December 2017.*

- *The shortfalls took place because the users who stole the Nano had realized that, by requesting a withdrawal at specific times, it was likely that two identical withdrawals would be granted: one was recorded and considered 'official', while the other was not recorded by the exchange despite being regularly recorded in the blockchain of the Nano node: as a result, several amounts of Nano cryptocurrency left the account without these transactions ever being recorded in the exchange's database.*

174.    As demonstrated in the BitGrail Decision and the Firano Decision, the Class' funds were stolen through an exploitation of the Nano Protocol's lack of idempotence by way of Double Withdrawal Transactions.   Furthermore, each of the Defendants became aware of this issue in July 2017 when Defendant Firano raised the issue to the Nano Defendants in a private group chat.

165. For example:



166. Similarly:



167. The Nano Defendants publicly promoted BitGrail as a safe and reliable place for XRB

holders to stake and exchange their XRB, and XRB holders relied on that endorsement by the Nano

Defendants in choosing the exchange that would house their valuable assets.

175.   The foregoing events plainly demonstrate that the Nano Defendants: (i) failed to adopt adequate safeguards in the Nano Protocol resulting in the theft of the Class' XRB funds on the BitGrail Exchange; (ii) concealed their actual knowledge that the Double Withdrawal Transactions were resulting in the loss of the Class' funds beginning in July 2017; and (iii) knowingly, or negligently, misrepresented that the Class' funds were "safe" on the BitGrail Exchange with their unqualified recommendations of, and public representations of trust of, BitGrail as the place where XRB should be kept and traded.

**E.**    **Defendants Breached Their Duties Owed the Class and Concealed the Theft of the Class' XRB Investments for Eight Months**

176.   The Nano Defendants breached their legal duties of care relating to their management of XRB when they failed to, *inter alia*,  (i) implement idempotence into the XRB Protocol thereby permitting the theft of the Class' XRB by the use of Double Withdrawal Transactions; (ii) disclose material information related to the XRB Protocol and the BitGrail Exchange's operation while discussing information, knowledge, and exercising authority on all things XRB-related at panels, conferences, and online social networks; (iii) permit Defendant Firano to shut down the BitGrail Exchange online despite having actual knowledge, or recklessly disregarding, the ongoing theft of XRB from accountholders on the BitGrail Exchange from July 2017 through January 2018; (iv) disclose to Plaintiff and the Class the fact that the Class' XRB was being stolen through use of Double Withdrawal Transactions from July 2017 through January 2018; (v) take reasonable measures to ensure that the exchanges upon which XRB was bought, sold, and traded employed, utilized, and followed adequate security measures and protocols;  (vi) know or confirm that the material representations and statements regarding BitGrail's safety and security were accurate; and (vii) Conduct a security audit of the XRB Protocol.

177.   Additionally, despite being fully aware of the Double Withdrawal Transactions as of July 2017, the Nano Defendants issued countless statements falsely or negligently assuring Plaintiffs and the Class that their funds were safe on the BitGrail Exchange.

178.   For example:

1

2

3

4

5

6

7

8

9

10

11

12

13

14



15    179.   Similarly:

16

17



18

19

20

21

22

23

24

25

26

27

28

168. For example, when one concerned XRB holder questioned the Nano Defendants about the sagacity of relying upon the otherwise unknown BitGrail exchange and its founder and principal operator, Francesco "The Bomber" Firano, Defendant Shapiro publicly represented on Twitter that he speaks with Mr. Firano every day and that both Mr. Firano and BitGrail can be trusted:



169. As another example, a mere four days before the loss of $170 million worth of the Class's XRB was announced, the Nano Defendants represented that all of BitGrail's issues were "100% on our radar":



170. Based on Defendants' assurances, assistance, promotion, and instruction, BitGrail became the predominate and nearly exclusive home for XRB. XRB/BTC[9] was the most popular trading

---

[9] "XRB/BTC" represents the exchange of XRB for bitcoin (BTC), the most widely-used and recognizable alternative currency in the world. In other words, participants on the exchange traded bitcoin for XRB (and vice versa).

180.    The Nano Defendants publicly promoted BitGrail as a safe and reliable place for XRB holders to stake and exchange their XRB, and XRB holders relied on that endorsement by the Nano Defendants in choosing the exchange that would house their valuable assets.

181.    For example, when one concerned XRB holder questioned the Nano Defendants about the sagacity of relying upon the otherwise unknown BitGrail exchange and its seemingly-unreliable founder and principal operator Firano, Defendant Shapiro publicly represented on Twitter that he speaks with Firano every day and that both Firano and BitGrail can be trusted:



182.    As another example, a mere four days before the loss of $170 million worth of the Class's XRB was announced, the Nano Defendants represented that all of BitGrail's issues were "100% on our radar":



pair at BitGrail and constituted more than eighty percent (80%) of BitGrail's overall trading volume. Moreover, Plaintiff's and the Class's detrimental reliance on Defendants' misstatements, misrepresentations, and omissions of material fact, includes but is not limited to, causing Plaintiff to purchase, acquire, own, hold, and refrain from selling their respective XRB before suffering their respective losses on February 8, 2018.

~~171.~~ However, in early-February 2018, when BitGrail announced that it had "lost" $170 Million worth of XRB from its exchange -- approximately eighty percent (80%) of the XRB that BitGrail customers held in their accounts – the Nano Defendants suddenly sought to put ~~more~~ distance between themselves and the BitGrail ~~Defendants than even the Atlantic Ocean could provide.~~ So much so that Defendant Firano described Nano, his relationship with the Company and their subsequent falling out as follows:

> *As we continued to work with the NANO team consistently, the majority of the time I highly recommended to them that we close the markets because of major issues with the NANO protocol, but they were hesitant and forced me to keep it open and sometimes begged as well.*
>
> *To mention again, the NANO team, especially Colin LeMahieu had complete access to our servers for a while as we gave him direct access to the database and servers. That is how close we worked as a team and as a preferred exchange which they forced me to keep open, despite my constant warnings about the technology and problems we were having for months.*
>
> \*\*\*
>
> *The Nano team was relentless in directing users to the BitGrail exchange despite the major issues I had consistently warned them about. . . .*
>
> \*\*\*
>
> *They used me and BitGrail to gain entry into the virtual cryptocurrency market.*

~~172.~~ Simply stated, the Nano Defendants created the XRB currency, created the BitGrail Exchange with Defendant Firano, directed XRB investors to place their assets at BitGrail (an exchange that they essentially controlled); caused the loss of the Class' XRB by failing to include idempotence in the Nano Protocol; concealed the fact that the Class' funds were, in fact, not "safe" on the BitGrail

1       183.    Based on Defendants' assurances, assistance, promotion, and instruction, BitGrail

2  became the predominate and nearly exclusive home for XRB. XRB/BTC[7] was the most popular trading

3  pair at BitGrail and constituted more than eighty percent (80%) of BitGrail's overall trading volume.

4  Moreover, Plaintiff's and the Class's detrimental reliance on Defendants' misstatements,

5  misrepresentations, and omissions of material fact, includes but is not limited to, causing Plaintiff to

6  purchase, acquire, own, hold, and refrain from selling their respective XRB before suffering their

7  respective losses on February 8, 2018.

8       184.    However, in early-February 2018, when BitGrail announced that it had "lost" $170

9  Million worth of XRB from its exchange -- approximately eighty percent (80%) of the XRB that

10  BitGrail customers held in their accounts – the Nano Defendants suddenly sought to put immense

11  distance between themselves and the BitGrail Defendants. So much so that Defendant Firano described

12  Nano, his relationship with the Company and their subsequent falling out as follows:

13
14            *As we continued to work with the NANO team consistently, the majority of*
15            *the time I highly recommended to them that we close the markets because*
              *of major issues with the NANO protocol, but they were hesitant and forced*
              *me to keep it open and sometimes begged as well.*

16            *To mention again, the NANO team, especially Colin LeMahieu had*
17            *complete access to our servers for a while as we gave him direct access to*
              *the database and servers. That is how close we worked as a team and as a*
18            *preferred exchange which they forced me to keep open, despite my constant*
              *warnings about the technology and problems we were having for months.*

19

20                      \*\*\*

21            *The Nano team was relentless in directing users to the BitGrail exchange*
              *despite the major issues I had consistently warned them about. . . .*

22                      \*\*\*

23            *They used me and BitGrail to gain entry into the virtual cryptocurrency*
24            *market.*

25

26  [7] "XRB/BTC" represents the exchange of XRB for bitcoin (BTC), the most widely-used and

27  recognizable alternative currency in the world. In other words, participants on the exchange traded
    bitcoin for XRB (and vice versa).

28

Exchange, and when nearly all of the XRB "disappeared", the Nano Defendants disavowed any responsibility for the harm the XRB investors suffered.

173. At all times relevant hereto, Lemahieu, Busch, Shapiro, and Retzer each took to social media outlets -- including Twitter, Facebook, Medium, and Reddit -- to promote XRB and BitGrail as a purported safe haven at which investors could stake and trade their XRB for profit.

174. Unfortunately, in their fervent push to drive XRB investors to BitGrail, the Nano Defendants failed in their due diligence or knowingly disregarded many material concerns about the Nano Protocol and BitGrail's operations, safety, and reliability.

## XII. XRB Are Unregistered Investment Contract Securities

175. In addition to failing to implement necessary safeguards in the Nano Protocol and recklessly directing XRB investors to utilize BitGrail, XRB themselves are securities, which the Nano Defendants offered and sold without either registering with the necessary governmental authorities or obtaining an exemption from such registration.

176. Under the Securities Act, a "security" is defined as including any "note," "investment contract," or "instrument commonly known as a 'security.'" *See* 15 U.S.C. §§ 77b(a)(1). Here, XRB are investment contracts. In *SEC v. W.J. Howey Co.*, the United States Supreme Court established a three-part test to determine whether an offering, contract, transaction, or scheme constitutes an investment contract.[10] Under the test articulated in *Howey*, a contract, transaction, or scheme is an "investment contract" if it involves: (*i*) the investment of money; (*ii*) in a common enterprise; (*iii*) with the expectation of profits to come solely from the efforts of others.

177. When determining whether a security has been offered and sold, the focus must be on the economic realities underlying the transaction. Here, the economic realities are that Plaintiff and the Class invested funds and assets to stake and trade XRB -- each of which they expected would lead to lucrative returns. Investors in XRB used cryptocurrency or fiat currency to purchase the XRB required

---

[10] *See SEC v. W.J. Howey, Co.*, 328 U.S. 293 (1946); *see also Intern. Bhd. of Teamsters v. Daniel*, 421 U.S. 837, 852 (1979) (noting that the *Howey* test is not the only test for determining a security but has been held to embody "all the attributes that run through all of the Court's decisions defining a security").

185. Simply stated, the Nano Defendants created the XRB currency, created the BitGrail Exchange with Defendant Firano, directed XRB investors to place their assets at BitGrail (an exchange that they essentially controlled); caused the loss of the Class' XRB by failing to include idempotence in the Nano Protocol; concealed the fact that the Class' funds were, in fact, not "safe" on the BitGrail Exchange, and when nearly all of the XRB "disappeared", the Nano Defendants disavowed any responsibility for the harm the XRB investors suffered.

186. At all times relevant hereto, Lemahieu, Busch, Shapiro, and Retzer each took to social media outlets -- including Twitter, Facebook, Medium, and Reddit -- to promote XRB and BitGrail as a purported safe haven at which investors could stake and trade their XRB for profit.

187. Unfortunately, in their fervent push to drive XRB investors to BitGrail, the Nano Defendants failed in their due diligence or knowingly disregarded many material concerns about the Nano Protocol and BitGrail's operations, safety, and reliability.

## COUNT I
### Negligence
### Against Nano Defendants

188. Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 - 187 above, and further allege:

189. The Defendants had a legal duty to exercise reasonable care with respect to the management of XRB, including but not limited to maintaining the XRB Protocol; listing XRB on a secure exchange; promoting the use of secure exchanges; properly vetting the exchanges on which XRB was bought, sold and traded; making accurate representations and statements to Plaintiffs and the Class about the safety of the Class' XRB on the BitGrail Exchange; dissuading the buying, selling, and trading of XRB on BitGrail after multiple red flags and other issues arose; creating a functional, performing, and non-defective XRB token; and conducting a security audit of the XRB Protocol, among other legal duties or care.

190. Defendants breached their legal duties of care relating to their management of XRB when they failed to, *inter alia*,

to make their investments. Accordingly, Plaintiff's and the Class' investment of cryptocurrency or fiat currency constitutes an investment of money for the purposes of determining whether an investment involved a security.

178. Plaintiff and the Class were investing in a common enterprise with the Nano Defendants, as the Nano Defendants fund their operations through their ongoing sale of XRB and thus, the fortunes of both the Class and the Nano Defendants rise and fall with the success of XRB – which has at all relevant times been entirely reliant on the Nano Defendants' actions, primarily the Nano Defendants' ability to maintain and expand the functionality of XRB, thus providing financial returns to investors.

179. In short, it is indisputable that the Nano Defendants were selling investment contracts and that any success from the Nano Defendants' development, maintenance, and expansion of the functionality of XRB -- as well as any future potential increases to the value of XRB -- were entirely dependent on the Nano Defendants' actions.

180. Despite XRB's clear characterization as a "security," the Nano Defendants did not register XRB with any regulatory authority in the United States as required by federal securities laws.

181. Furthermore, the Nano Defendants neither applied for, nor received, an exemption from registration of XRB with regulatory authorities in the United States as required by federal securities laws.

182. U.S. securities regulation focuses on, *inter alia*, mandatory disclosures that require issuers of securities to make publicly available certain information that regulators deem material to investors. When those necessary disclosures are not made -- and regulators have not granted an exemption to the normal requirement of such disclosures -- investors are at risk of undue harm. Indeed, in the instant matter, XRB investors were lured into investing their funds and assets in the self-issued cryptocurrency being offered by Defendants and were further lured by the Nano Defendants into staking and exchanging those investments at BitGrail. Without adequate protections in place, Plaintiff and the Class have suffered millions of dollars of harm, and the Nano Defendants -- without regard to the regulatory environment in which they live and operate their business -- have tried to distance

This page does not exist in the compared document.

1    themselves from that harm and have refused to institute the remedy well within their grasp, simply

2    because it does not suit their own financial interests.

3              **ADDITIONAL FACTS SPECIFIC TO LEAD PLAINTIFF FABIAN**

4              183.    Commencing in or around April-May 2017, Plaintiff Fabian learned about XRB by

5    reading social media posts touting XRB -- including but not limited to those published on Twitter --

6    exemplars of which are incorporated throughout this Amended Complaint.

7              184.    As part of his due diligence in learning more about XRB, Plaintiff Fabian followed (*i.e.*,

8    subscribed to) the Twitter feeds of Defendant LeMahieu, Defendant Shapiro, and other people related

9    to XRB.

10             185.    After months of following the representations published by those people and relying on

11   the truthfulness of their representations, Plaintiff Fabian began investing in XRB.

12             186.    On or about August 16, 2017, Plaintiff Fabian purchased 1.62457112 bitcoin (BTC) on

13   Coinbase's website (www.coinbase.com) using a credit card.  The total purchase price was $7,104.30

14   with each bitcoin worth $4,308.83.

15             187.    On August 22, 2017, Plaintiff Fabian transferred his entire 1.62457112 BTC to Bittrex,

16   a cryptocurrency exchange (www.bittrex.com).

17             188.    In further reliance on the social media representations he had read from Defendant

18   LeMahieu, Defendant Shapiro, and other people related to XRB -- and in reliance on the representations

19   he had read about the safety and security of both the Nano Protocol and the BitGrail exchange --

20   Plaintiff Fabian turned to BitGrail as the exchange where he would purchase and stake his XRB.

21             189.    On August 31, 2017, Plaintiff Fabian opened an account on BitGrail and then transferred

22   .66971933 BTC from his Bittrex bitcoin wallet to BitGrail.  At the time, the .66971933 BTC had a

23   value of approximately $3,220.

24             190.    To open and manage his BitGrail account, Plaintiff logged onto BitGrail's website from

25   his home and followed the instructions provided.

26             191.    On September 1, 2017, the .66971933 BTC became available on BitGrail, and Plaintiff

27   Fabian used that entire sum to purchase approximately 21,143 XRB.

28

This page does not exist in the compared document.

6903743_1.pdf - Page 51 - Delete

Case 4:19-cv-00054-YGR Document 147-1 Filed 02/17/20 Page 115 of 426
Case 4:19-cv-00054-YGR Document 53 Filed 07/25/19 Page 51 of 67

192.    On December 12, 2017, Plaintiff Fabian transferred $2,850.00 to BitGrail to purchase another 2,000 XRB.

193.    As of December 12, 2017, Plaintiff Fabian purchased and held on BitGrail 23,143 XRB with a total purchase price of $6,070.00.

194.    In deciding to invest in XRB, open an account at BitGrail, and stake his investment holdings there, Plaintiff Fabian reviewed and relied upon the Nano Defendants' promotions on social media channels and/or statements made on the Nano Defendant's own website representing that BitGrail is a safe and reliable exchange on which to purchase and stake XRB.

195.    Shortly before Plaintiff Fabian lost control and possession of his 23,143 XRB on BitGrail, he transferred 110 XRB to a separate XRB wallet off of BitGrail. Therefore, he owned and held a total of 23,033 XRB in his BitGrail wallet.

196.    The 23,033 XRB had a market value of approximately $275,000 as of February 8, 2018.

## COUNT I
### Claim for Violation of Section 12(a)(1) of the Securities Act of 1933
### Against All Defendants

197.    Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 196 above, and further alleges:

198.    Section 12(a)(1) grants Plaintiff a private right of action against any person who offers or sells a security in violation of Section 5, and states that such person,

> Shall be liable . . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

199.    Between April 2017 and March 2018, in connection with the offer and sale of XRB, Defendants unlawfully made use of means or instruments of transportation or communication in interstate commerce or of the mails for the purposes of offering, selling, or delivering unregistered securities in direct violation of the Securities Act.

48

This page does not exist in the compared document.

200. The offer and sale of XRB constituted the offer and sale of unregistered securities under controlling federal law. XRB exhibit the following particular hallmarks of a security under the *Howey* test: (a) to receive any XRB, an investment of money, in the form of cryptocurrency and/or fiat currencies was required; (b) the investment of money was made into the common enterprise that is Defendant NANO and its ability to provide value to the XRB through the functionality and popularity of its self-created XRB; and (c) the success of the investment opportunities and any potential returns thereon were entirely reliant on Defendants' ability to maintain and expand the functionality and popularity of XRB, thus providing financial returns to investors.

201. Each of the individual Defendants constitute "seller[s]" under the Securities Act and are thus equally liable for selling unregistered securities in connection with XRB.

202. As such, Defendants have participated in the offer and sale of unregistered securities in violation of the Securities Act and are liable to Plaintiff and the Class for rescission and/or compensatory damages in excess of $5 million.

## COUNT II

### Claim for Violation of Section 15(a) of the Securities Act of 1933
### Against the Individual Defendants

203. Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 – 196 above, and further alleges:

204. Due to their ownership in and/or control over the business operations of Defendant Nano and/or BitGrail, Defendants LeMahieu, Busch, Shapiro, Retzer and Firano acted as controlling persons of Nano and/or BitGrail within the meaning of Section 15(a) of the Securities Act as alleged herein.

205. By virtue of their positions as managers, directors, and key members of Nano's core team and by their participation in and/or awareness of Defendant Nano's operations, Defendants Colin LeMahieu, Mica Busch, Zack Shapiro, Troy Retzer and Firano had the power to influence and control and did influence and control, directly or indirectly, the decision making relating to the development and success of XRB, including the decision to engage in the sale of unregistered securities in furtherance thereof.

This page does not exist in the compared document.

206. By virtue of the foregoing, Defendants Colin LeMahieu, Mica Busch, Zack Shapiro, Troy Retzer and Francesco "The Bomber" Firano are liable to Plaintiff and the Class as control persons of Defendant NANO and/or BitGrail under Section 15(a) of the Securities Act for damages in excess of $5 million.

## COUNT III
### Breach of Contract
### Against BitGrail Defendants

207. Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 – 196 above, and further alleges:

208. The BitGrail Defendants had a legally binding contract with Plaintiff and the Class.

209. The BitGrail Defendants breached their contracts with Plaintiff and the Class by failing to safeguard their funds and disabling the ability for accountholders to withdraw their XRB assets from the exchange.

210. The BitGrail Defendants breaches are the proximate cause of the damages suffered by Plaintff and the Class.

211. Defendants are liable to Plaintiff and the Class for damages resulting from Defendant BitGrail's breaches of contract in excess of $5 million.

## COUNT IV
### Breach of Implied Contract
### Against Nano Defendants

212. Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 – 196 above, and further alleges:

213. The Nano Defendants had a valid, binding and enforceable contract with Plaintiff and the Class that was not reduced to writing, but was implied based on the Nano Defendants' conduct.

214. The Nano Defendants' implied promises to Plaintiff and the Class included, but were not limited to: (i) the XRB Protocol maintained adequate safeguards to prevent the theft of the Class' XRB; (ii) the exchanges upon which XRB was bought, sold, and traded employed—particularly the BitGrail Exchange which the Nano Defendants created and with Defendant Firano—utilized and followed adequate security measures and protocols; (iii) the Nano Defendants vetted the exchanges on

This page does not exist in the compared document.

6903743_1.pdf - Page 54 - Delete

Case 4:19-cv-00054-YGR-DMR Document 147-1 Filed 08/17/20 Page 121 of 426
Case 4:19-cv-00054-YGR Document 53 Filed 07/25/19 Page 54 of 67

which XRB was purchased, sold, staked, and traded; and (iv) that the Class' XRB funds were "safe" on the BitGrail Exchange.

215. The Nano Defendants breached their implied contracts with the class by:

    a.  Encouraging Plaintiff and the Class to buy, sell, stake, and trade XRB on the BitGrail Exchange despite knowing that the XRB Protocol nor the exchange had adequate security measures and protocols;

    b.  Making material representations and statements to Plaintiff and the Class regarding BitGrail's – and other exchanges – safety and security;

    c.  Failing to implement idempotence into the XRB Protocol thereby permitting the theft of the Class' XRB by the use of Double Withdrawal Transactions;

    d.  Forcing Defendant Firano to keep the BitGrail Exchange online despite having actual knowledge, or recklessly disregarding, the ongoing theft of XRB from accountholders on the BitGrail Exchange from July 2017 through January 2018;

    e.  Concealing from Plaintiff and the Class the fact that the Double Withdrawal Transactions resulted in the theft of the Class' funds from July 2017 through January 2018; and

    f.  Continuing to promote the buying, selling, and trading of XRB on BitGrail after multiple red flags and other issues arose.

216. The Nano Defendants' foregoing breaches proximately caused damages suffered by the Plaintiff and the Class.

217. Plaintiff and the Class suffered damages in excess of $5 million.

**COUNT V**
**Breach of Fiduciary Duty**
**Against Defendants**

218. Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 – 196 above, and further alleges:

219. The BitGrail Defendants had a fiduciary relationship with, and owed fiduciary duties or loyalty of care to, Plaintiff and the Class as the owners of the BitGrail Exchange. The BitGrail Defendants breached their duties to Plaintiff and the Class by: (i) failing to safeguard the Class' funds on the BitGrail Exchange; (ii) permitting the Nano Defendants to force them to keep the BitGrail Exchange online despite having actual knowledge of, or recklessly disregarding, the fact that the Class'

This page does not exist in the compared document.

6903743_1.pdf - Page 55 - Delete

Case 4:19-cv-00054-YGR Document 147-1 Filed 08/17/20 Page 123 of 426
Case 4:19-cv-00054-YGR Document 53 Filed 07/25/19 Page 55 of 67

funds were being stolen by exploitation of the XRB Protocol through the Double Withdrawal Transactions; and (iii) concealing the fact that the Class' funds were being stolen from July 2017 through January 2018.

220. The Nano Defendants had a fiduciary relationship with, and owed fiduciary duties or loyalty and care to, Plaintiff and the Class due to their relationship with Plaintiff and the Class both in their capacity as the developers of XRB and as well as from their creation of BitGrail and involvement in, or control over, the BitGrail Exchange's XRB-related operations.

221. The Nano Defendants' status as fiduciaries to the class is evidenced by their:

   a. Serving as the primary source of information, knowledge, and authority on all things XRB-related, such as at panels, conferences, online social networks (e.g., Twitter, Reddit, etc.);

   b. Maintaining exclusive control over the XRB Protocol;

   c. Commissioning Firano to create the BitGrail Exchange as an XRB dedicated exchange;

   d. Partnering with the BitGrail Defendants to create the BitGrail Exchange and involvement in maintaining the exchange's XRB-related operations;

   e. Exercising exclusive control over the decision to list XRB on BitGrail;

   f. Maintaining superior and unique knowledge of the inadequacy of the XRB Protocol's safeguards—specifically its lack of idempotence—and the BitGrail Exchange's lack of secondary measures to prevent the Double Withdrawal Transactions;

   g. Updating Nano Protocol to include idempotence on February 16, 2018 after the Class' XRB had already been stolen from exploitation of the Double Withdrawal Transactions;

   h. Promoting and encouraging Plaintiff and the Class to buy, sell, and trade XRB on BitGrail;

   i. Making repeated assurances to Plaintiff and the Class that BitGrail was a safe and secure exchange, downplaying and explaining away red flags, and maintaining constant contact and involvement in issues involving trading XRB on BitGrail;

   j. Having the exclusive ability and acknowledging the need to conduct a security audit of the XRB Protocol;

   k. Advising the public that Nano Defendants were contemplating creating and administering trust fund for distribution of XRB;

This page does not exist in the compared document.

l. Creating legal fund to help Plaintiff and Class recover their respective losses; and

m. Acknowledging that Nano Defendants were aware that listing on larger exchanges would lead to responsibility for larger damages.

222. The Nano Defendants breached its fiduciary duties owed to Plaintiff and the Class by failing to, inter alia:

a. Failing to implement idempotence into the XRB Protocol thereby permitting the theft of the Class' XRB by the use of Double Withdrawal Transactions;

b. Failing to disclose material information related to the XRB Protocol and the BitGrail Exchange's operation while discussing information, knowledge, and exercising authority on all things XRB-related at panels, conferences, and online social networks;

c. Forcing Defendant Firano to keep the BitGrail Exchange online despite having actual knowledge, or recklessly disregarding, the ongoing theft of XRB from accountholders on the BitGrail Exchange from July 2017 through January 2018;

d. Concealing from Plaintiff and the Class the fact that the Class' XRB was being stolen through use of Double Withdrawal Transactions from July 2017 through January 2018;

e. Making repeated assurances to Plaintiff and the Class that BitGrail was a safe and secure exchange, downplaying and explaining away red flags, and claiming to maintain constant contact and involvement in issues involving trading XRB on BitGrail;

f. Failing to conduct a security audit of the XRB Protocol;

g. Creating legal fund to divert attention and blame away from the Nano Defendants; and

h. Failing to take responsibility for damages that arose in connection with listing XRB on BitGrail.

223. The Nano Defendants are liable to Plaintiff and the Class for damages resulting from the Nano Defendant's breaches of their fiduciary duties to Plaintiff and the Class in excess of $5 million.

This page does not exist in the compared document.

6903743_1.pdf - Page 57 - Delete

## COUNT VI

### Aiding and Abetting Breach of Fiduciary Duty
### Against Nano Defendants

224.   Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 196 above, and further alleges:

225.   The Nano Defendants aided and abetted the BitGrail Defendant's breaches of their fiduciary duties to Plaintiffs and the Class by forcing Defendant Firano to keep the BitGrail Exchange online permitting the ongoing theft of the Class' funds and concealing their knowledge that the Class' XRB deposits on BitGrail were being stolen through exploitation of the XRB Protocol's lack of idempotence from July 2017 through January 2018.

226.   Nano Defendants are liable to Plaintiff and the Class for damages resulting from Nano Defendant's breaches of their fiduciary duties to Plaintiff and the Class in excess of $5 million.

## COUNT VII

### Negligence
### Against Nano Defendants

227.   Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 196 above, and further alleges:

228.   The Nano Defendants had a legal duty to exercise reasonable care with respect to the management of XRB, including but not limited to maintaining the XRB Protocol; listing XRB on a secure exchange; promoting the use of secure exchanges; properly vetting the exchanges on which XRB was bought, sold and traded; making accurate representations and statements to Plaintiff and the Class about the safety of the Class' XRB on the BitGrail Exchange; dissuading the buying, selling, and trading of XRB on BitGrail after multiple red flags and other issues arose; creating a functional, performing, and non-defective XRB token; and conducting a security audit of the XRB Protocol, among other legal duties or care.

229.   Nano Defendants breached their legal duties of care relating to their management of XRB when they failed to, *inter alia*,

a.   Implement idempotence into the XRB Protocol thereby permitting the theft of the Class' XRB by the use of Double Withdrawal Transactions;

This page does not exist in the compared document.

    b.   Disclose material information related to the XRB Protocol and the BitGrail Exchange's operation while discussing information, knowledge, and exercising authority on all things XRB-related at panels, conferences, and online social networks;

    c.   Permit Defendant Firano to shut down the BitGrail Exchange online despite having actual knowledge, or recklessly disregarding, the ongoing theft of XRB from accountholders on the BitGrail Exchange from July 2017 through January 2018;

    d.   Disclose to ~~Plaintiff~~ and the Class the fact that the Class' XRB was being stolen through use of Double Withdrawal Transactions from July 2017 through January 2018;

    e.   Take reasonable measures to ensure that the exchanges upon which XRB was bought, sold, and traded employed, utilized, and followed adequate security measures and protocols;

    f.   Promote secure exchanges that had adequate security measures and protocols for buying, selling, and trading XRB;

    g.   Refrain from encouraging buying, selling, and trading XRB on exchanges that lacked adequate security;

    h.   Know or confirm that the material representations and statements regarding BitGrail's safety and security were accurate;

    i.   Make material representations and statements to ~~Plaintiff~~ and the Class about the lack of safety and security measures and protocols utilized by the exchanges on which XRB was bought, sold and traded;

    j.   Dissuade the further buying, selling, and trading of XRB on BitGrail after multiple red flags and other issues arose; and

    k.   Conduct a security audit of the XRB Protocol.

~~230.~~ The Nano Defendants' failure to properly exercise the foregoing legal duties of care to Plaintiff and the Class was the proximate cause of the damages suffered by Plaintiff and the Class.

~~231.~~ ~~Plaintiff's~~ and the Class's damages total more than ~~$5 million.~~

This page does not exist in the compared document.

**COUNT VIII**
**Fraud**
**Against Nano Defendants**

232.   Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 196 above, and further alleges:

233.   The Nano Defendants made multiple misstatements and misrepresentations to Plaintiff and the Class, and further, concealed or failed to disclose material information to Plaintiff and the Class that Nano Defendants knew not to be true or did not believe to be true, including, but not limited to:

   a.   That BitGrail was a safe, legitimate, and responsible exchange that observed and followed sufficient safety and security measures, protocols and safeguards;

   b.   That the Nano Protocol was secure and included adequate safeguards;

   c.   That the Class' XRB was being stolen through use of Double Withdrawal Transactions from July 2017 through January 2018;

   d.   That Defendant Firano informed the Nano Defendants of the Double Withdrawal Transactions as early as July 2017 and recommended that the BitGrail Exchange be taken offline;

   e.   That the Class' funds were safe because the Nano Defendants were working closely with BitGrail to resolve these issues, and that there was no reason for any concern;

   f.   That there was no need or reason to relocate or otherwise transfer XRB or any other store of value (e.g., fiat or other cryptocurrency) from BitGrail to other exchanges or wallets;

   g.   That Nano Defendants' sale of XRB was for standard operating costs and not for profit; and

   h.   That Nano Defendants had only paid themselves reasonable, small salaries and were not taking advantage of their positions to unilaterally pay themselves large and excessive salaries.

234.   The Nano Defendants made these misstatements and misrepresentations to Plaintiff and the Class, and concealed or failed to disclose material information to Plaintiff and the Class with the intent to defraud and/or induce Plaintiff and the Class to rely on these misstatements, misrepresentations, and concealment and nondisclosure of material information.

a. Implement idempotence into the XRB Protocol thereby permitting the theft of the Class' XRB by the use of Double Withdrawal Transactions;

b. Disclose material information related to the XRB Protocol and the BitGrail Exchange's operation while discussing information, knowledge, and exercising authority on all things XRB-related at panels, conferences, and online social networks;

c. Permit Defendant Firano to shut down the BitGrail Exchange online despite having actual knowledge, or recklessly disregarding, the ongoing theft of XRB from accountholders on the BitGrail Exchange from July 2017 through January 2018;

d. Disclose to Plaintiffs and the Class the fact that the Class' XRB was being stolen through use of Double Withdrawal Transactions from July 2017 through January 2018;

e. Take reasonable measures to ensure that the exchanges upon which XRB was bought, sold, and traded employed, utilized, and followed adequate security measures and protocols;

f. Promote secure exchanges that had adequate security measures and protocols for buying, selling, and trading XRB;

g. Refrain from encouraging buying, selling, and trading XRB on exchanges that lacked adequate security;

h. Know or confirm that the material representations and statements regarding BitGrail's safety and security were accurate;

i. Make material representations and statements to Plaintiffs and the Class about the lack of safety and security measures and protocols utilized by the exchanges on which XRB was bought, sold and traded;

j. Dissuade the further buying, selling, and trading of XRB on BitGrail after multiple red flags and other issues arose; and

k. Conduct a security audit of the XRB Protocol.

191. The Nano Defendants' failure to properly exercise the foregoing legal duties of care to Plaintiff and the Class was the proximate cause of the damages suffered by Plaintiff and the Class.

192. Plaintiffs' and the Class's damages total more than Five Million Dollars ($5,000,000.00).

**COUNT II**
**Fraud**
**Against Nano Defendants**

235.    Plaintiff and the Class justifiably and detrimentally relied on the Nano Defendants' foregoing false statements and representations, including purchasing, acquiring, and holding their XRB on BitGrail.

236.    Plaintiff and the Class suffered damages as a result of their reliance on the Nano Defendants' foregoing statements and representations, including losing all of their respective XRB on or about February 8, 2018.

237.    Based on the foregoing, the Nano Defendants are liable to Plaintiff and the Class for damages in excess of $5 million.

## COUNT IX
### Negligent Misrepresentation
### Against Nano Defendants

238.    Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 - 196 above, and further alleges.

239.    Nano Defendants made multiple misstatements and misrepresentations to Plaintiff and the Class, and further, concealed or failed to disclose material information to Plaintiff and the Class including, but not limited to:

    a.   That BitGrail was a safe, legitimate, and responsible exchange that observed and followed sufficient safety and security measures, protocols and safeguards;

    b.   That the Nano Protocol was secure and included adequate safeguards;

    c.   That the Class' XRB was being stolen through use of Double Withdrawal Transactions from July 2017 through January 2018;

    d.   That Defendant Firano informed the Nano Defendants of the Double Withdrawal Transactions as early as July 2017 and recommended that the BitGrail Exchange be taken offline;

    e.   That the Class' funds were safe because the Nano Defendants were working closely with BitGrail to resolve these issues, and that there was no reason for any concern;

    f.   That there was no need or reason to relocate or otherwise transfer XRB or any other store of value (e.g., fiat or other cryptocurrency) from BitGrail to other exchanges or wallets;

    g.   That Nano Defendants' sale of XRB was for standard operating costs and not for profit; and

193.   Plaintiffs re-allege, and adopts by reference herein, Paragraphs 1 - 187 above, and further allege:

194.   The Nano Defendants made multiple misstatements and misrepresentations to Plaintiffs and the Class, and further, concealed or failed to disclose material information to Plaintiffs and the Class that Nano Defendants knew not to be true or did not believe to be true, including, but not limited to the following:

a.   BitGrail was a safe, legitimate, and responsible exchange that observed and followed sufficient safety and security measures, protocols and safeguards;

b.   the Nano Protocol was secure and included adequate safeguards;

c.   Plaintiffs' and the Class' XRB was being stolen through use of Double Withdrawal Transactions from July 2017 through January 2018;

d.   Defendant Firano informed the Nano Defendants of the Double Withdrawal Transactions as early as July 2017 and recommended that the BitGrail Exchange be taken offline;

e.   Plaintiffs' and the Class' funds were safe because the Nano Defendants were working closely with BitGrail to resolve these issues, and that there was no reason for any concern;

f.   there was no need or reason to relocate or otherwise transfer XRB or any other store of value (e.g., fiat or other cryptocurrency) from BitGrail to other exchanges or wallets;

g.   the Nano Defendants' sale of XRB was for standard operating costs and not for profit; and

h.   the Nano Defendants had only paid themselves reasonable, small salaries and were not taking advantage of their positions to unilaterally pay themselves large and excessive salaries.

195.   The Nano Defendants made these misstatements and misrepresentations to Plaintiffs and the Class, and concealed or failed to disclose material information to Plaintiff and the Class with the intent to defraud and/or induce Plaintiffs and the Class to rely on these misstatements, misrepresentations, and concealment and nondisclosure of material information.

196.   Plaintiffs and the Class justifiably and detrimentally relied on the Nano Defendants' foregoing false statements and representations, including purchasing, acquiring, and holding their XRB on BitGrail.

h. ~~That~~ Nano Defendants had only paid themselves reasonable, small salaries and were not taking advantage of their positions to unilaterally pay themselves large and excessive salaries.

~~240.~~ The Nano Defendants made these misstatements and misrepresentations to ~~Plaintiff~~ and the Class without any reasonable ground for believing the statements to be true.

~~241.~~ Furthermore, the Nano Defendants failed to disclose material information without reasonably believing that the material information should have been withheld or not disclosed to ~~Plaintiff~~ and the Class.

~~242.~~ ~~Plaintiff~~ and the Class justifiably and detrimentally relied on the Nano Defendants' foregoing misstatements and misrepresentations, including purchasing, acquiring, and holding their XRB on BitGrail.

~~243.~~ ~~Plaintiff~~ and the Class suffered damages as a result of their reliance on the Nano Defendants' foregoing misstatements and misrepresentations, including losing all of their respective XRB on or about February 8, 2018.

~~244.~~ Based on the foregoing, the Nano Defendants are liable to ~~Plaintiff~~ and the Class for damages in excess of ~~$5 million.~~

### COUNT ~~X~~
### ~~Constructive Fraud~~
### Against ~~All~~ Defendants

~~245.~~ ~~Plaintiff~~ re-~~alleges,~~ and ~~adopts~~ by reference herein, Paragraphs 1 - ~~196~~ above, and further alleges:

~~246.~~ The ~~Nano~~ Defendants had ~~a fiduciary relationship with, and owed fiduciary duties or loyalty and care to, Plaintiff and the Class due to their relationship~~ with ~~Plaintiff~~ and the ~~Class, which included but was not limited to:~~ The ~~Nano Defendants'~~ status as fiduciaries to the class is evidenced by their:

a. ~~Serving as the primary source of information, knowledge, and authority on all things XRB-related, such as at panels, conferences, online social networks (e.g., Twitter, Reddit, etc.);~~

b. ~~Maintaining exclusive control over the XRB Protocol;~~

c. ~~Commission of Firano to create the~~ BitGrail ~~Exchange as an XRB dedicated exchange;~~

197.   Plaintiffs and the Class suffered damages as a result of their reliance on the Nano Defendants' foregoing statements and representations, including losing all of their respective XRB on or about February 8, 2018.

198.   Based on the foregoing, the Nano Defendants are liable to Plaintiffs and the Class for damages in excess of Five Million Dollars ($5,000,000.00).

## COUNT III
**Negligent Misrepresentation**
**Against Nano Defendants**

199.   Plaintiffs re-allege, and adopts by reference herein, Paragraphs 1 - 187 above, and further allege:

200.   Nano Defendants made multiple misstatements and misrepresentations to Plaintiff and the Class, and further, concealed or failed to disclose material information to Plaintiff and the Class including, but not limited to the following:

a.   BitGrail was a safe, legitimate, and responsible exchange that observed and followed sufficient safety and security measures, protocols and safeguards;

b.   the Nano Protocol was secure and included adequate safeguards;

c.   Plaintiffs' and the Class' XRB was being stolen through use of Double Withdrawal Transactions from July 2017 through January 2018;

d.   That Defendant Firano informed the Nano Defendants of the Double Transactions as early as July 2017 and recommended that the BitGrail Exchange be taken offline;

e.   Plaintiffs' and the Class' funds were safe because the Nano Defendants were working closely with BitGrail to resolve these issues, and that there was no reason for any concern;

f.   there was no need or reason to relocate or otherwise transfer XRB or any other store of value (e.g., fiat or other cryptocurrency) from BitGrail to other exchanges or wallets;

g.   the Nano Defendants' sale of XRB was for standard operating costs and not for profit; and

h.   the Nano Defendants had only paid themselves reasonable, small salaries and were not taking advantage of their positions to unilaterally pay themselves large and excessive salaries.

d. Partnering with the BitGrail Defendants to create the BitGrail Exchange and involvement in maintaining the exchange's XRB-related operations;

e. Exercising exclusive control over the decision to list XRB on BitGrail;

f. Maintaining superior and unique knowledge of the inadequacy of the XRB Protocol's safeguards—specifically its lack of idempotence—and the BitGrail Exchange's lack of secondary measures to prevent the Double Withdrawal Transactions;

g. Updating Nano Protocol to include idempotence on February 16, 2018 after the Class' XRB had already been stolen from exploitation of the Double Withdrawal Transactions;

h. Promoting and encouraging Plaintiff and the Class to buy, sell, and trade XRB on BitGrail;

i. Making repeated assurances to Plaintiff and the Class that BitGrail was a safe and secure exchange, downplaying and explaining away red flags, and maintaining constant contact and involvement in issues involving trading XRB on BitGrail;

j. Having the exclusive ability and acknowledging the need to conduct a security audit of the XRB Protocol;

k. Advising the public that the Nano Defendants were contemplating creating and administering trust fund for distribution of XRB;

l. Creating a legal fund to help Plaintiff and Class recover their respective losses; and

m. Acknowledging that the Nano Defendants were aware that listing on larger exchanges would lead to responsibility for larger damages.

247. The Nano Defendants engaged in various acts, omissions, and concealments involving the breach of those fiduciary duties owed to Plaintiff and the Class, including but not limited to, failing to:

a. Failing to implement idempotence into the XRB Protocol thereby permitting the theft of the Class' XRB by the use of Double Withdrawal Transactions;

b. Failing to disclose material information related to the XRB Protocol and the BitGrail Exchange's operation while discussing information, knowledge, and exercising authority on all things XRB-related at panels, conferences, and online social networks;

c. Forcing Defendant Firano to keep the BitGrail Exchange online despite having actual knowledge, or recklessly disregarding, the ongoing theft of XRB from accountholders on the BitGrail Exchange from July 2017 through January 2018;

201.    The Nano Defendants made these misstatements and misrepresentations to Plaintiffs and the Class without any reasonable ground for believing the statements to be true.

202.    Furthermore, the Nano Defendants failed to disclose material information without reasonably believing that the material information should have been withheld or not disclosed to Plaintiffs and the Class.

203.    Plaintiffs and the Class justifiably and detrimentally relied on the Nano Defendants' foregoing misstatements and misrepresentations, including purchasing, acquiring, and holding their XRB on BitGrail.

204.    Plaintiffs and the Class suffered damages as a result of their reliance on the Nano Defendants' foregoing misstatements and misrepresentations, including losing all of their respective XRB on or about February 8, 2018.

205.    Based on the foregoing, the Nano Defendants are liable to Plaintiffs and the Class for damages in excess of Five Million Dollars ($5,000,000.00).

### COUNT IV
### Breach of Contract
### Against BitGrail Defendants

206.    Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 - 205 above, and further alleges:

207.    The BitGrail Defendants had legally binding contracts with Plaintiffs and the Class.

208.    The BitGrail Defendants breached their contracts with Plaintiffs and the Class by failing to safeguard their funds and disabling the ability for accountholders to withdraw their XRB assets from the exchange.

209.    The BitGrail Defendants breaches are the proximate cause of the damages suffered by Plaintiffs and the Class.

210.    Defendants are liable to Plaintiffs and the Class for damages resulting from Defendant BitGrail's breaches of contract in excess of $5 million.

d. Concealing from Plaintiff and the Class the fact that the Class' XRB was being stolen through use of Double Withdrawal Transactions from July 2017 through January 2018;

e. Making repeated assurances to Plaintiff and the Class that BitGrail was a safe and secure exchange; downplaying and explaining away red flags; and claiming to maintain constant contact and involvement in issues involving trading XRB on BitGrail;

f. Failing to conduct a security audit of the XRB Protocol;

g. Creating legal fund to divert attention and blame away from the Nano Defendants; and

h. Failing to take responsibility for damages that arose in connection with listing XRB on BitGrail.

248. Plaintiff and the Class justifiably and detrimentally relied on the Nano Defendants' foregoing acts, omissions, and concealments involving their breaches of the fiduciary duties of care and loyalty owed to Plaintiff and the Class.

249. Plaintiff and the Class suffered damages as a result of their reliance on the Nano Defendants' foregoing acts, omissions, and concealments, including losing all of their respective XRB as disclosed on February 8, 2018.

250. Based on the foregoing, the Nano Defendants are liable to Plaintiff and the Class for damages in excess of $5 million.

### COUNT XI
### Quasi Contract Claim
### Against Nano Defendants

251. Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 – 196 above, and further alleges:

252. Plaintiff and the Class conferred a benefit on the Nano Defendants through fraud, mistake, coercion, or request, including, but not limited to the Nano Defendants' actions, omissions, and failures to disclose material information, such as:

a. That XRB would revolutionize global payment systems, such usurping the Visa, MasterCard, and Amex credit and debit payment networks by offering instant and immediate payment and settlement of transactions;

This page does not exist in the compared document.

b. That BitGrail was a safe, legitimate, and responsible exchange that observed and followed sufficient safety and security measures, protocols and safeguards;

c. That the Nano Defendants were aware of red flags and other safety issues that arose prior to February 8, 2018; and that the Nano Defendants were working closely with BitGrail to resolve these issues; and that there was no reason for any concern;

d. That there was no need or reason to relocate or otherwise transfer XRB or any other store of value (e.g., fiat or other cryptocurrency) from BitGrail to other exchanges or wallets;

e. Failing to disclose that BitGrail lacked sufficient safety and security measures, protocols, and safeguards;

f. Representing to Plaintiff and the Class that BitGrail would safely store custody of Plaintiff's and the Class's respective XRB;

g. Encouraging investing, trading, and holding of XRB on BitGrail as a sensible and reasonable investment strategy;

h. Assuring that all XRB on BitGrail was safely stored;

i. That the Nano Defendants' sale of XRB was for standard operating costs and not for profit; and

j. That the Nano Defendants had only paid themselves reasonable, small salaries and were not taking advantage of their positions to unilaterally pay themselves large and excessive salaries.

253. The Nano Defendants were unjustly enriched by the Plaintiff's and Class' purchase and trading of XRB, because XRB's price appreciated as a result of Plaintiff's and the Class's purchase and trading of XRB, thereby enriching the Nano Defendants with large appreciation of value of their own XRB holdings, the ability of a large market to sell and dump their XRB at a large profit, and potentially obtain fees or payments for directing trading volume at exchanges like BitGrail.

254. It would be inequitable and against the fundamental principles of justice, equity, and good conscience for Defendants to retain the substantial monetary benefits they have received as a result of their misconduct.

255. Based on the foregoing, Plaintiff and the Class suffered damages in excess of $5 million.

256. Defendants should disgorge all benefits conferred upon them as a result of their misconduct to make full restitution to Plaintiff and the Class.

This page does not exist in the compared document.

## **PRAYER FOR RELIEF**

WHEREFORE, ~~Plaintiff~~ and the proposed Class pray for relief and judgment against Defendants, as follows:

A. Declaring that this action is properly maintainable as a class action and certifying ~~Plaintiff~~ as the Class ~~representative~~ and ~~his~~ counsel as Class counsel;

~~B. Declaring that Defendants offered and sold unregistered securities in violation of the federal securities laws;~~

~~C. Declaring Defendants are liable to Plaintiff and the Class under Sections 12(a)(1) and/or 15(a) of the Securities Act;~~

~~D.~~ A judgment awarding ~~Plaintiff~~ and the Class equitable restitution, including, without limitation, rescission of their investments in all XRB held in accounts at BitGrail, restoration of the *status quo ante*, return to ~~Plaintiff~~ and the Class all cryptocurrency or fiat currency they paid as a result of Defendants' unlawful and unfair business practices and conduct;

~~E.~~ An award of any and all additional damages recoverable under law -- jointly and severally entered against Defendants -- including but not limited to compensatory damages, punitive damages, incidental damages, and consequential damages;

~~F.~~ An Order requiring an accounting of the remaining funds and assets raised from Plaintiff and the Class in connection with XRB;

~~G.~~ An Order imposing a constructive trust over the funds and assets rightfully belonging to ~~Plaintiff~~ and the Class;

~~H.~~ Awarding pre-judgment and post-judgment interest;

~~I.~~ Awarding ~~Plaintiff~~ and the Class reasonable attorneys' fees, expenses, and the costs of this action; and

~~J.~~ Granting other relief as this Court may deem just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the proposed Class pray for relief and judgment against Defendants, as follows:

A.    Declaring that this action is properly maintainable as a class action and certifying Plaintiffs as the Class Representatives and their counsel as Class counsel;

B.    A judgment awarding Plaintiffs and the Class equitable restitution, including, without limitation, rescission of their investments in all XRB held in accounts at BitGrail, restoration of the *status quo ante*, return to Plaintiffs and the Class all cryptocurrency or fiat currency they paid as a result of Defendants' unlawful and unfair business practices and conduct;

C.    An award of any and all additional damages recoverable under law -- jointly and severally entered against Defendants -- including but not limited to compensatory damages, punitive damages, incidental damages, and consequential damages;

D.    An Order requiring an accounting of the remaining funds and assets raised from Plaintiff and the Class in connection with XRB;

E.    An Order imposing a constructive trust over the funds and assets rightfully belonging to Plaintiffs and the Class;

F.    Awarding pre-judgment and post-judgment interest;

G.    Awarding Plaintiffs and the Class reasonable attorneys' fees, expenses, and the costs of this action; and

H.    Granting other relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand trial by jury of all claims so triable.

Dated: August 3, 2020                 Respectfully submitted,

                                      **LEVI & KORSINSKY, LLP**

                                      By: */s/ Rosanne L. Mah*
                                      Rosanne L. Mah
                                      **LEVI & KORSINSKY, LLP**
                                      388 Market Street, Suite 1300
                                      San Francisco, CA 94111

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial by jury of all claims so triable.

**LEVI & KORSINSKY, LLP**

By:    */s/ Rosanne L. Mah*
Rosanne L. Mah
**LEVI & KORSINSKY, LLP**
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 373-1671
Facsimile: (415) 484-1294

Donald J. Enright (to be admitted *pro hac vice* )
Email: denright@zlk.com
John A. Carriel (admitted *pro hac vice* )
Email: jcarriel@zlk.com
**LEVI & KORSINSKY, LLP**
1101 30th St., NW, Ste. 115
Washington, DC 20007
Telephone: (202) 524-4290
Facsimile: (202) 333-2121

David C. Silver (to be admitted *pro hac vice*)
E-mail: DSilver@SilverMillerLaw.com
Jason S. Miller (to be admitted *pro hac vice*)
E-mail: JMiller@SilverMillerLaw.com
Todd R. Friedman (admitted *pro hac vice*)
E-mail: TFriedman@SilverMillerLaw.com
**SILVER MILLER**
11780 W. Sample Road
Coral Springs, Florida 33065
Telephone:(954) 516-6000

*Counsel for Plaintiff JAMES FABIAN*

This page does not exist in the compared document.

# CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing was electronically filed with the Clerk of Court on this ___25th___ day of July 2019 by using the CM/ECF system and that a true and correct copy will be served via electronic mail to: **PETER SCOOLIDGE, ESQ.**, Scoolidge LLP, *Counsel for Defendants Hieusys LLC d/b/a Nano, Colin LeMahieu, Mica Busch, and Troy Retzer*, 315 W. 36th Street, New York, NY 10018, E-mail: Peter@ScoolidgeLLP.com; **SHAWN NAUNTON, ESQ. and VANESSA GARCIA, ESQ.**, Zuckerman Spaeder LLP, *Counsel for Defendant Zack Shapiro*, 485 Madison Avenue, New York, NY 10022, E-mail: SNaunton@zuckerman.com; VGarcia@zuckerman.com; and **PAUL J. BYRNE, ESQ.**, Cornerstone Law Group, *Counsel for Defendants Hieusys LLC d/b/a Nano, Colin LeMahieu, Mica Busch, Troy Retzer, and Zack Shapiro*, 351 California St, Ste 600, San Francisco, CA 94104, E-mail: PByrne@cornerlaw.com.

                                        */s/ Rosanne L. Mah*
                                        ROSANNE L. MAH

1

Telephone: (415) 373-1671
Facsimile: (415) 484-1294

2

Donald J. Enright*
**LEVI & KORSINSKY, LLP**
1101 30th St., NW, Ste. 115
Washington, DC 20007
Telephone: (202) 524-4292
Facsimile: (202) 363-7171

3

4

5

6

David C. Silver*
Jason S. Miller*
**SILVER MILLER**
11780 W. Sample Road
Coral Springs, FL 33065
Telephone: (954) 516-6000

7

8

9

*Counsel for Plaintiffs*

10

* to be admitted *pro hac vice*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT B

**SCOOLIDGE PETERS RUSSOTTI & FOX LLP**
Peter Scoolidge (NY 4682100)
peter@sprfllp.com
Peter Fox (NY4832606)
pfox@sprfllp.com
2 Park Avenue - 19th Floor
New York, NY 10016
(212) 729-7708 tel
*Attorneys for Defendants Hieusys, LLC,*
*Colin LeMahieu, Troy Retzer, and Mica Busch*

**ZUCKERMAN SPAEDER LLP**
Shawn Naunton (NY 3958691)
snaunton@zuckerman.com
Devon Galloway (NY 5459896)
dgalloway@zuckerman.com
485 Madison Avenue
New York, NY 10022
(212) 704-9600 tel
*Attorneys for Defendant Zack Shapiro*

**CORNERSTONE LAW GROUP**
Paul J. Byrne (SBN 190860)
pbyrne@cornerlaw.com
351 California St Ste 600
San Francisco CA 94104
(415) 357-2094 tel
(415) 655-8238 fax
*Attorneys for Defendants Hieusys, LLC, Colin*
*LeMahieu, Troy Retzer, Mica Busch, and Zack Shapiro*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES FABIAN, individually; and on behalf of All Others Similarly Situated; <br><br>       *Plaintiff,* <br><br>       v. <br><br> NANO f/k/a RAIBLOCKS f/k/a HIEUSYS, LLC; COLIN LEMAHIEU; MICA BUSCH; ZACK SHAPIRO; TROY RETZER; BG SERVICES, S.R.L. f/k/a BITGRAIL S.R.L. f/k/a WEBCOIN SOLUTIONS; AND FRANCESCO "THE BOMBER" FIRANO, <br><br>       *Defendants.* | Case No.  4:19-cv-54-YGR <br><br> **NOTICE OF DEPOSITION OF JAMES FABIAN** <br><br> **Date:**    **August 7, 2020** <br> **Time:**    **10:00 am** <br> **Place:**   **Cornerstone Law Group** <br>              **351 California St Ste 600** <br>              **San Francisco CA 94104** <br><br> Complaint Filed: January 3, 2019 |

TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on August 7, 2020 at 10:00 am, at 351 California St Ste 600, San Francisco, CA 94104, Defendants Hiusys LLC, Colin LeMahieu, Mica Busch, Zack Shapiro, and Troy Retzer, by and through their attorneys of record in this action, will take the deposition of Plaintiff James Fabian pursuant to Rule 30 of the Federal Rules of Civil Procedure on matters concerning the issue of class certification.  The deposition will continue from day to day thereafter until completed (Saturdays, Sundays and holidays excluded).

PLEASE TAKE FURTHER NOTICE that this deposition may be recorded by video technology and through the instant visual display of testimony in addition to stenographic recording.

Date: May 29, 2020

*/s/ Peter Fox*
Peter Scoolidge
Peter Fox
**SCOOLIDGE PETERS RUSSOTTI & FOX LLP**
*Attorneys for Defendants Hieusys, LLC,*
*Colin LeMahieu, Troy Retzer, and Mica Busch*

*/s/ Shawn Naunton*
Shawn Naunton
Devon Galloway
**ZUCKERMAN SPAEDER LLP**
*Attorneys for Defendant Zack Shapiro*

*/s/ Paul J Byrne*
Paul J. Byrne
**CORNERSTONE LAW GROUP**
*Attorneys for Defendants Hieusys, LLC, Colin LeMahieu, Troy Retzer, Mica Busch, and Zack Shapiro*

## CERTIFICATE OF SERVICE

I am a citizen of the United States and a resident of the State of New York.  I am employed in the City and County of New York, State of New York; I am over the age of 18 years and not a party to the within action; my business address is 2 Park Avenue, 19th Floor, New York, NY 10016.

On May 29, 2020, I served

**A NOTICE OF DEPOSITION OF JAMES FABIAN**

within on the interested parties in this action by placing a copy thereof, enclosed in a sealed envelope, addressed as follows:

John A. Carriel                              Plaintiff James Fabian
Zelle LLP
1775 Pennsylvania Ave, NW
Suite 375
Washington, DC 20006
Email: jcarriel@zelle.com

__X__(VIA MAIL) I caused the envelope, postage thereon fully prepaid, to be deposited with the United States Postage Service at Southfield, MA.

____(VIA PERSONAL SERVICE) I caused such envelope(s) to be delivered by hand on this date to the addressee(s).

____(VIA FAX) I served said document(s) by transmitting via facsimile from facsimile number (415) 974-6433 to the facsimile number(s) set forth below, or as stated on the attached service list, on this date before 5:00 p.m.

__X__(VIA EMAIL) I served said document(s) by transmitting via electronic mail.  The document(s) were scanned and attached as a .PDF document.

_____(STATE)        I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

X (FEDERAL)        I declare under penalty of perjury that the foregoing is true and correct, and that I am admitted *pro had vice* to the bar of this Court.

Executed on May 29, 2020 at Southfield, MA

/s/ Peter Fox_____
PETER FOX

CERTIFICATE OF SERVICE

# EXHIBIT C

1
2
3
4
5
6

**SCOOLIDGE PETERS RUSSOTTI & FOX LLP**
Peter Scoolidge (NY 4682100)
peter@sprfllp.com
Peter Fox (NY4832606)
pfox@sprfllp.com
2 Park Avenue - 19th Floor
New York, NY 10016
(212) 729-7708 tel
*Attorneys for Defendants Hieusys, LLC,*
*Colin LeMahieu, Troy Retzer, and Mica Busch*

7
8
9
10
11

**ZUCKERMAN SPAEDER LLP**
Shawn Naunton (NY 3958691)
snaunton@zuckerman.com
Devon Galloway (NY 5459896)
dgalloway@zuckerman.com
485 Madison Avenue
New York, NY 10022
(212) 704-9600 tel
*Attorneys for Defendant Zack Shapiro*

12
13
14
15
16

**CORNERSTONE LAW GROUP**
Paul J. Byrne (SBN 190860)
pbyrne@cornerlaw.com
351 California St Ste 600
San Francisco CA 94104
(415) 357-2094 tel
(415) 655-8238 fax
*Attorneys for Defendants Hieusys, LLC, Colin*
*LeMahieu, Troy Retzer, Mica Busch, and Zack Shapiro*

17
18

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

19
20
21
22
23
24
25
26
27
28

| | |
|---|---|
| JAMES FABIAN, individually; and on behalf of All Others Similarly Situated; <br><br>     *Plaintiff*, <br><br>     v. <br><br> NANO f/k/a RAIBLOCKS f/k/a HIEUSYS, LLC; COLIN LEMAHIEU; MICA BUSCH; ZACK SHAPIRO; TROY RETZER; BG SERVICES, S.R.L. f/k/a BITGRAIL S.R.L. f/k/a WEBCOIN SOLUTIONS; AND FRANCESCO "THE BOMBER" FIRANO, <br><br>     *Defendants*. | Case No.  4:19-cv-54-YGR <br><br> **FIRST SET OF INTERROGATORIES OF HIEUSYS LLC, COLIN LEMAHIEU, MICA BUSCH, ZACK SHAPIRO, AND TROY RETZER TO PLAINTIFF** <br><br> Complaint Filed: January 3, 2019 |

CERTIFICATE OF SERVICE

REQUESTING PARTIES: HIEUSYS LLC, COLIN LEMAHIEU, MICA BUSCH, ZACK SHAPIRO, and TROY RETZER

RESPONDING PARTING: JAMES FABIAN

SET NUMBER: One

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Hiusys LLC, Colin LeMahieu, Mica Busch, Zack Shapiro, and Troy Retzer propound the following interrogatories:

## DEFINITIONS

Each word or term used in these Interrogatories is intended to have the broadest meaning permitted under the Federal Rules of Civil Procedure and the Local Civil Rules of the United States District Court for the Northern District of California.  Furthermore, these Interrogatories shall be interpreted by reference to the definitions set forth below.

1. "Action" means and refers to the action captioned James Fabian v. Colin LeMahieu et al., Civil Case No. 4:15-CV-00054-YRG, proceeding in the United States District Court for the Northern District of California (the "Court").

2. "Complaint" shall mean the operative complaint in this action, i.e., the First Amended Class Action Complaint filed on July 25, 2019, as modified by the Court's October 4, 2019 order dismissing eight of the 11 claims you asserted in the complaint.

3. "Challenged Statement" shall mean any statement, including any oral or written communication, phrase, or image that you challenge in this action as a misrepresentation.  Challenged statements include all statements on which you base your fraud and negligent misrepresentation claims.[1]

4. "Communication" includes, without limitation, any transmission or transfer of information of any kind, whether orally, electronically, in writing, or in any other manner, at any time or place, and under any circumstances whatsoever.

5. "Document" has the full meaning ascribed to those terms under Rule 34 of the Federal Rules of Civil Procedure.

---

[1] The Court rejected your fraud and negligent misrepresentation claims to the extent they were premised on a theory of concealment.  *See* Order Granting in Part & Denying in Part Mot. to Dismiss (Dkt. No. 66), at 21 n.13.  Thus, no potentially actionable misrepresentation may be based an alleged omission.

6.     "Including" shall mean including, but not limited to.

7.     Except as otherwise specified in a particular Interrogatory below, to "identify" means to provide the following information:

a.     To "identify" a communication, shall mean to state: (i) the type of communication; (ii) the general subject matter; (iii) the date of the communication; and (iv) the author(s), addressee(s), and recipient(s) – or, if the communication was oral, the persons involved in the communication.

b.     To "identify" a document shall mean to state: (i) the type of document, (ii) its creator(s), addressee(s), recipient(s), and custodian(s), (iii) its title(s) and subject matter, and (iv) the date of its creation, publication, and transmission to you.  If a document already has been produced in this action, you may identify it using the Bates number given to it at the time of production.

c.     To "identify" a person shall mean to state the person's full name, location, and contact information (if reasonably available), and, when referring to a natural person, the place of employment and job title.  Once a person has been identified in one of your answers to these Interrogatories, only the name of that person needs to be listed in response to subsequent Interrogatories requesting the identification of that person.

8.     "Nano Defendants" shall refer to the defendants Hiusys LLC, Colin LeMahieu, Mica Busch, Zack Shaprio, and Troy Retzer.

9.     "Person" means any natural individual, partnership, proprietorship, firm, association, joint venture, corporation, subsidiary or other governmental or legal business entity, as well as individuals, and their agents, representatives, and any other person acting on their behalf.

10.     "Relating to" shall mean and include regarding, referring to, pertaining to, mentioning, discussing, describing, disclosing, concerning, confirming, constituting, supporting, evidencing, memorializing, containing, representing, or being connected with in any way, directly or indirectly, a stated subject matter.  As indicated, the terms necessarily include information which is in opposition to, as well as in support of, your positions and claims in this action.

11.     "You," and "your" shall refer to you, James Fabian, the named plaintiff in the complaint.

## **INSTRUCTIONS**

1.      In answering the Interrogatories below, you are required to disclose all information within your possession, custody, or control, regardless of location.

2.      These Interrogatories should be construed in the broadest possible manner consistent with the Federal Rules of Civil Procedure and the Local Civil Rules of the United States District Court for the Northern District of California.

3.      The words "all," "any," "each," "every," "and," and "or" shall be construed conjunctively or disjunctively as necessary to make the Interrogatories inclusive rather than exclusive.  Unless specifically provided otherwise in these Interrogatories, words imparting the singular shall include the plural and vice versa, where appropriate.

4.      As used herein, the masculine gender of any word includes the feminine and the neuter, and the feminine of any word includes the masculine and the neuter.

5.      The past tense of any verb used herein includes the present tenses, and the present tense includes the past tense.

6.      No part of any Interrogatory should be ignored merely because an objection is interposed to another part of the Interrogatory.  If a partial or incomplete production is provided, state that the production is partial or incomplete and explain why.

7.      If asserting an objection to an Interrogatory based on privilege or work product protection, provide information that will enable an assessment of the applicability of the privilege or protection.

8.      If you conclude that any Interrogatory, definition, or instruction is ambiguous, then state in your answer the matter deemed ambiguous and the construction you employed in answering the Interrogatory.

9.      Where an Interrogatory contains subparts, respond to each subpart separately.

10     These Interrogatories are continuing in nature.  If, after answering any Interrogatories, you obtain or become aware of new or additional responsive information, you are required to provide such information or documents by way of a supplemental answer.

## INTERROGATORIES

### INTERROGATORY NO. 1:

Identify each challenged statement, if any, made by:

a.) Colin LeMahieu,

b.) Mica Busch,

c.) Zack Shaprio,

d.) Troy Retzer, and

e.) Hieusys LLC

In this Interrogatory, "identify" means to quote or describe in detail the challenged statement, to state the medium or media through which the statement was made (e.g., email, Twitter post, telephone conversation), and to state where, when, by whom, and to whom the challenged statement was made.

### INTERROGATORY NO. 2:

For any challenged statement that you contend was "made" by a person who did not write or speak such statement, describe in detail your basis for such attributing the statement to that person.

### INTERROGATORY NO. 3:

For any challenged statement that you contend was not made to you, describe in detail the date on which, and the circumstances in which, you received it.

### INTERROGATORY NO. 4:

Describe in detail each specific act or omission, if any, that you contend was negligent committed by:

a.) Colin LeMahieu,

b.) Mica Busch,

c.) Zack Shaprio,

d.) Troy Retzer, and

e.) Hieusys LLC

Such description must include the date that the act or omission occurred, the circumstances in which it occurred, and when you became aware of its occurrence.  If the negligence involved an alleged omission, specify exactly what action you contend should have been, but was not, taken.  Your

description must also include the reasons why you contend such act or omission was negligent, including by describing in detail the facts that you contend created a duty toward you, and the facts you contend demonstrate how, if at all, the act or omission caused you damages.

**INTERROGATORY NO. 5:**

Identify each specific negligent act or omission that you contend gives rise to vicarious liability – i.e., liability for the act or omission of another person.  In this Interrogatory, "identify" means to describe in detail the act or omission that you content was negligent, to identify the person whom you contend is vicariously liable for the commission of the act or omission, and to describe in detail the facts that you contend make such person vicariously liable for the act or omission.

**INTERROGATORY NO. 6:**

Describe in detail all facts relating to any relationship you contend exists between any of the Nano Defendants and Francesco Firano or any other person affiliated with the cryptocurrency exchange known as BitGrail, including all facts relating to your contention that any of the Nano Defendants "controlled" or were "involved" with BitGrail  (*see* complaint ¶¶  4, 18, 108, 172, 220, 221 and 246).

**INTERROGATORY NO. 7:**

Describe in detail all monetary relief that you seek in this action, on your own behalf or on behalf of anyone else, including any "compensatory damages, punitive damages, incidental damages, and consequential damages" (*see* complaint, at 62), including any calculations, estimates, formulas, spreadsheets, other documents, or other methods you contend should be used to determine such relief.

**INTERROGATORY NO. 8:**

Describe in detail all non-monetary relief that you seek in this action, on your own behalf or on behalf of anyone else, including any "accounting" of funds or the imposition of a "constructive trust" (*see* complaint, at 62), including the facts you contend would justify such relief.

**INTERROGATORY NO. 9:**

Identify any communications with or by you, or on your behalf, relating to any challenged statement identified in response to Interrogatory No. 1, any act or omission described in your

1  response to Interrogatory No. 4, or any other matters relevant to your claims and allegations in this

2  action.

3  **INTERROGATORY NO. 10:**

4       Identify each person with knowledge relating to your claims and allegations in the complaint

5  and state the subject of that knowledge.

6  **INTERROGATORY NO. 11:**

7       Identify all litigation matters in which you have been a party.  For purposes of this

8  Interrogatory, "identify" means to provide the case name, case number, court in which the litigation

9  took place, and a description of the subject of the litigation.

10  **INTERROGATORY NO. 12:**

11       Describe in detail all facts relating to your contention that a "class action is the proper form"

12  to bring this action (complaint ¶ 40).

13  **INTERROGATORY NO. 13:**

14       Identify all documents, whether or not within your possession, custody, or control, relating to

15  the size and membership of the putative class alleged in paragraph 41 of the complaint.  For any such

16  document not within your possession, custody, or control, describe in detail the facts that cause you

17  believe such document exists.

18  Date: May 29, 2020

19

20                                           */s/ Peter Fox*_____

21                                           Peter Scoolidge

22                                           Peter Fox
    **SCOOLIDGE PETERS RUSSOTTI & FOX LLP**

23                                           *Attorneys for Defendants Hieusys, LLC,*

24                                           *Colin LeMahieu, Troy Retzer, and Mica Busch*

25                                           */s/ Shawn Naunton*_____

26                                           Shawn Naunton

27                                           Devon Galloway
    **ZUCKERMAN SPAEDER LLP**

28                                           *Attorneys for Defendant Zack Shapiro*

*/s/ Paul J Byrne*_____

Paul J. Byrne

**CORNERSTONE LAW GROUP**

*Attorneys for Defendants Hieusys, LLC, Colin LeMahieu, Troy Retzer, Mica Busch, and Zack Shapiro*

# CERTIFICATE OF SERVICE

I am a citizen of the United States and a resident of the State of New York.  I am employed in the City and County of New York, State of New York; I am over the age of 18 years and not a party to the within action; my business address is 2 Park Avenue, 19th Floor, New York, NY 10016.

On May 29, 2020, I served

**THE FIRST SET OF INTERROGATORIES OF HIEUSYS LLC, COLIN LEMAHIEU, MICA BUSCH, ZACK SHAPIRO, AND TROY RETZER TO PLAINTIFF**

within on the interested parties in this action by placing a copy thereof, enclosed in a sealed envelope, addressed as follows:

John A. Carriel                    Plaintiff James Fabian
Zelle LLP
1775 Pennsylvania Ave, NW
Suite 375
Washington, DC 20006
Email: jcarriel@zelle.com

__X__(VIA MAIL) I caused the envelope, postage thereon fully prepaid, to be deposited with the United States Postage Service at Southfield, MA.

____(VIA PERSONAL SERVICE) I caused such envelope(s) to be delivered by hand on this date to the addressee(s).

____(VIA FAX) I served said document(s) by transmitting via facsimile from facsimile number (415) 974-6433 to the facsimile number(s) set forth below, or as stated on the attached service list, on this date before 5:00 p.m.

__X__(VIA EMAIL) I served said document(s) by transmitting via electronic mail.  The document(s) were scanned and attached as a .PDF document.

(STATE)        I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.
               I declare under penalty of perjury that the foregoing is true
X (FEDERAL)    and correct, and that I am admitted *pro hac vice* to the bar of this Court.

Executed on May 29, 2020 at Southfield, MA

/s/ Peter Fox_____
PETER FOX

# EXHIBIT D

1   **SCOOLIDGE PETERS RUSSOTTI & FOX LLP**
2   Peter Scoolidge (NY 4682100)
    peter@sprfllp.com
    Peter Fox (NY4832606)
3   pfox@sprfllp.com
    2 Park Avenue - 19th Floor
4   New York, NY 10016
    (212) 729-7708 tel
5   *Attorneys for Defendants Hieusys, LLC,*
    *Colin LeMahieu, Troy Retzer, and Mica Busch*
6
    **ZUCKERMAN SPAEDER LLP**
7   Shawn Naunton (NY 3958691)
    snaunton@zuckerman.com
8   Devon Galloway (NY 5459896)
    dgalloway@zuckerman.com
9   485 Madison Avenue
    New York, NY 10022
10  (212) 704-9600 tel
    *Attorneys for Defendant Zack Shapiro*
11
    **CORNERSTONE LAW GROUP**
12  Paul J. Byrne (SBN 190860)
    pbyrne@cornerlaw.com
13  351 California St Ste 600
    San Francisco CA 94104
14  (415) 357-2094 tel
    (415) 655-8238 fax
15  *Attorneys for Defendants Hieusys, LLC, Colin*
    *LeMahieu, Troy Retzer, Mica Busch, and Zack Shapiro*
16

17              **IN THE UNITED STATES DISTRICT COURT**

18          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

19  JAMES FABIAN, individually; and on behalf of      Case No.  4:19-cv-54-YGR
20  All Others Similarly Situated;
                                                       **FIRST SET OF REQUESTS FOR**
21          *Plaintiff,*                               **PRODUCTION OF DOCUMENTS OF**
                                                       **HIEUSYS LLC, COLIN LEMAHIEU, MICA**
                                                       **BUSCH, ZACK SHAPIRO, AND TROY**
22          v.                                         **RETZER TO PLAINTIFF**

23  NANO f/k/a RAIBLOCKS f/k/a HIEUSYS, LLC;           Complaint Filed: January 3, 2019
24  COLIN LEMAHIEU; MICA BUSCH; ZACK
    SHAPIRO; TROY RETZER; BG SERVICES,
25  S.R.L. f/k/a BITGRAIL S.R.L. f/k/a WEBCOIN
    SOLUTIONS; AND FRANCESCO "THE
26  BOMBER" FIRANO,

27          *Defendants*.
28

CERTIFICATE OF SERVICE

| | |
|---|---|
| REQUESTING PARTIES: | HIEUSYS LLC, COLIN LEMAHIEU, MICA BUSCH, ZACK SHAPIRO, and TROY RETZER |
| RESPONDING PARTING: | JAMES FABIAN |
| SET NUMBER: | One |
| DATE AND TIME: | 11:00 A.M. on the day that responses are due to these requests per the Federal Rules of Civil Procedure |
| PLACE: | Cornerstone Law Group, 351 California Street, Suite 600, San Francisco, CA 94104 |

Hieusys LLC, Colin LeMahieu, Mica Busch, Zack Shapiro, and Troy Retzer (collectively, the "Nano Defendants") demand, under Rule 34 of the Federal Rules of Civil Procedure, that James Fabian produce the documents described below, for inspection and/or copying, at the date, time and place listed above.  In lieu of producing the documents requested below at the above time and place, the Nano Defendants will accept copies of the documents delivered to pfox@sprfllp.com, peter@sprflllp.com, pbyrne@cornerlaw.com, and snaunton@zuckerman.com provided that there is included with such delivery a properly executed verification that the copies of the documents requested.

## **DEFINITIONS**

Each word or term used in these Requests for Production of Documents ("RFPs) is intended to have the broadest meaning permitted under the Federal Rules of Civil Procedure and the Local Civil Rules of the United States District Court for the Northern District of California.  Furthermore, these RFPs shall be interpreted by reference to the definitions set forth below.

1.      "Action" means and refers to the action captioned James Fabian v. Colin LeMahieu et al., Civil Case No. 4:15-CV-00054-YRG, proceeding in the United States District Court for the Northern District of California (the "Court").

2.      "Complaint" shall mean the operative complaint in this action, i.e., the First Amended Class Action Complaint filed on July 25, 2019, as modified by the Court's October 4, 2019 order dismissing eight of the 11 claims you asserted in the complaint.

3.      "Challenged Statement" shall mean any statement, including any oral or written communication, phrase, or image that you challenge in this action as a misrepresentation.  Challenged

statements include all statements on which you base your fraud and negligent misrepresentation claims.[1]

4.      "Communication" includes, without limitation, any transmission or transfer of information of any kind, whether orally, electronically, in writing, or in any other manner, at any time or place, and under any circumstances whatsoever.

5.      "Document" has the full meaning ascribed to those terms under Rule 34 of the Federal Rules of Civil Procedure.

6.      "Including" shall mean including, but not limited to.

7.      "Person" means any natural individual, partnership, proprietorship, firm, association, joint venture, corporation, subsidiary or other governmental or legal business entity, as well as individuals, and their agents, representatives, and any other person acting on their behalf.

8.      "Relating to" shall mean and include regarding, referring to, pertaining to, mentioning, discussing, describing, disclosing, concerning, confirming, constituting, supporting, evidencing, memorializing, containing, representing, or being connected with in any way, directly or indirectly, a stated subject matter.  As indicated, the terms necessarily include information which is in opposition to, as well as in support of, your positions and claims in this action.

9.      "You," and "your" shall refer to you, James Fabian, the named plaintiff in the complaint.

## **INSTRUCTIONS**

1.      These RFPs call for the production of all documents within your possession, custody, or control, regardless of location.

2.      All requested documents must be produced in their entirety, with all attachments and enclosures.

---

[1] The Court rejected your fraud and negligent misrepresentation claims to the extent they were premised on a theory of concealment.  *See* Order Granting in Part & Denying in Part Mot. to Dismiss (Dkt. No. 66), at 21 n.13.  Thus, no potentially actionable misrepresentation may be based an alleged omission.

3.      These RFPs should be construed in the broadest possible manner consistent with the Federal Rules of Civil Procedure and the Local Civil Rules of the United States District Court for the Northern District of California.

4.      The words "all," "any," "each," "every," "and," and "or" shall be construed conjunctively or disjunctively as necessary to make the Interrogatories inclusive rather than exclusive.  Unless specifically provided otherwise in these RFPs, words imparting the singular shall include the plural and vice versa, where appropriate.

5.      As used herein, the masculine gender of any word includes the feminine and the neuter, and the feminine of any word includes the masculine and the neuter.

6.      The past tense of any verb used herein includes the present tenses, and the present tense includes the past tense.

7.      If asserting an objection to a request based on privilege or work product protection, describe the nature of the privilege in a privilege log.  The privilege log shall comply with Rule 26(b)(5) of the Federal Rule of Civil Procedure, and shall include the following:

a.      the type of document or electronically stored information;

b.      the general subject matter of the document or electronically stored information;

c.      the date of the document or electronically stored information;

d.      the author of the document or electronically stored information;

e.      each person(s) to whom the document or electronically stored information was addressed or copied; and

f.      the nature and basis of your claim of privilege or other reason that the information is protected from discovery in sufficient detail to determine the validity of that claim in accordance with Rule 26(b)(5).

With respect to email chains, the privilege log shall include a single entry for an entire email chain to the extent practical and technologically feasible.  That privilege log entry will be populated as follows: (a) with the "author" and "addressee" fields populated by the person listed in the "from" and "to" lines, respectively, in the first-in-time email in the chain for which the privilege or protection is claimed and (b) with a "recipient" field listing any additional persons who are identified

as recipients in the email chain (including any individuals copied on the original email for which privilege or protection is claimed and any persons whose names appear in subsequent emails in the chain).  Email attachments shall receive their own log entries, separate from their cover emails.

8.      Produce all documents by request, and request subpart as applicable.  This means all documents responsive to Request No. 1 should be produced together, and labeled as such; all documents responsive to Request No. 2; and so forth.

9.      No part of any request should be ignored merely because an objection is interposed to another part of it.  If a partial or incomplete production is provided, state that the production is partial or incomplete and explain why.

10.     If you conclude that any request, definition, or instruction is ambiguous, then state in your answer the matter deemed ambiguous and the construction you employed in responding to the request.

11.     Where a request contains subparts, respond to each subpart separately.

12      These Requests are continuing in nature and you are required to supplement your production of documents in accordance with Rule 26(e) of the Federal Rule of Civil Procedure with respect to each request.  Supplemental productions are required to be made within a reasonable time after discovery of such documents

## DOCUMENT REQUESTS

## REQUEST NO. 1:

All documents relating to each challenged statement, if any, made by:

a.)  Colin LeMahieu,

b.)  Mica Busch,

c.)  Zack Shaprio,

d.)  Troy Retzer, and

e.)  Hieusys LLC

For the avoidance of doubt, your response must be by request subpart (*see* Instruction No. 8), *and* by each separate challenged statement.

**REQUEST NO. 2:**

All documents relating to each specific act or omission, if any, that you contend was negligent committed by:

     a.)  Colin LeMahieu,

     b.)  Mica Busch,

     c.)  Zack Shaprio,

     d.)  Troy Retzer, and

     e.)  Hieusys LLC

For the avoidance of doubt, your response must be by request subpart (*see* Instruction No. 8), *and* by each separate act or omission.

**REQUEST NO. 3:**

All documents relating to the allegations set forth in paragraphs 183 through 196 of the complaint, including any account balance statements, order histories, deposit histories, withdrawal histories, trade histories, and emails associated with the foregoing.

**REQUEST NO. 4:**

All documents relating to the allegations set forth in paragraphs 4, 18, 108, 172, 220, 221 and 246 of the complaint insofar as these allegations relate to any contention that any of the Nano Defendants "controlled" or were "involved" with the cryptocurrency exchange known as BitGrail.

**REQUEST NO. 5:**

All documents relating to communications between you and:

     a.)  Francesco Firano, and

     b.)  Any other person affiliated with the cryptocurrency exchange known as BitGrail.

**REQUEST NO. 6:**

All documents relating to communications between you and any of the Nano Defendants.

**REQUEST NO. 7:**

All documents relating to your contention that a "class action is the proper form" to bring this action (complaint ¶ 40).

**REQUEST NO. 8:**

1
  All documents relating to the size and membership of the putative class alleged in paragraph

2
41 of the complaint.

3
**REQUEST NO. 9:**

4
  All documents relating to any monetary relief that you seek in this action, on your own behalf

5
or on behalf of anyone else, including any "compensatory damages, punitive damages, incidental

6
damages, and consequential damages" (*see* complaint, at 62), including all documents relating to

7
calculations, estimates, formulas, or other methods you use to determine such relief.

8
**REQUEST NO. 10:**

9
  All documents relating to any non-monetary relief that you seek in this action, on your own

10
behalf or on behalf of anyone else, including any "accounting" of funds or the imposition of a

11
"constructive trust" (*see* complaint, at 62), including all documents relating any facts you contend

12
support such relief.

13
**REQUEST NO. 11:**

14
  All documents referred to in your responses to the Nano Defendants' interrogatories

15
**REQUEST NO. 12:**

16
  All documents relied on or referred to in the complaint.

17
**REQUEST NO. 13:**

18
  To the extent not covered by other requests, all documents that you contend support your

19
claims in the complaint

20
Date: May 29, 2020

21

22
           */s/ Peter Fox*_____

23
           Peter Scoolidge
           Peter Fox

24
           **SCOOLIDGE PETERS RUSSOTTI & FOX LLP**

25
           *Attorneys for Defendants Hieusys, LLC,*
           *Colin LeMahieu, Troy Retzer, and Mica Busch*

26

27
           */s/ Shawn Naunton*_____

28
           Shawn Naunton

Devon Galloway
**ZUCKERMAN SPAEDER LLP**
*Attorneys for Defendant Zack Shapiro*


*/s/ Paul J Byrne*_____
Paul J. Byrne
**CORNERSTONE LAW GROUP**
*Attorneys for Defendants Hieusys, LLC, Colin LeMahieu, Troy Retzer, Mica Busch, and Zack Shapiro*

**CERTIFICATE OF SERVICE**

I am a citizen of the United States and a resident of the State of New York.  I am employed in the City and County of New York, State of New York; I am over the age of 18 years and not a party to the within action; my business address is 2 Park Avenue, 19th Floor, New York, NY 10016.

On May 29, 2020, I served

**THE FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS OF HIEUSYS LLC, COLIN LEMAHIEU, MICA BUSCH, ZACK SHAPIRO, AND TROY RETZER TO PLAINTIFF**

within on the interested parties in this action by placing a copy thereof, enclosed in a sealed envelope, addressed as follows:

John A. Carriel     Plaintiff James Fabian
Zelle LLP
1775 Pennsylvania Ave, NW
Suite 375
Washington, DC 20006
Email: jcarriel@zelle.com

  X   (VIA MAIL) I caused the envelope, postage thereon fully prepaid, to be deposited with the United States Postage Service at Southfield, MA.

____(VIA PERSONAL SERVICE) I caused such envelope(s) to be delivered by hand on this date to the addressee(s).

____(VIA FAX) I served said document(s) by transmitting via facsimile from facsimile number (415) 974-6433 to the facsimile number(s) set forth below, or as stated on the attached service list, on this date before 5:00 p.m.

  X   (VIA EMAIL) I served said document(s) by transmitting via electronic mail.  The document(s) were scanned and attached as a .PDF document.

   (STATE)   I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.
         I declare under penalty of perjury that the foregoing is true and correct, and that I am admitted *pro hac vice* to the bar of this Court.
  X (FEDERAL)

Executed on May 29, 2020 at Southfield, MA

/s/ Peter Fox
PETER FOX

**EXHIBIT E**

Page 1

```
 1            UNITED STATES DISTRICT COURT

 2         FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3    ----------------------------------------------x

 4    JAMES FABIAN, individually and on

      behalf of all others similarly situated,

 5

 6                    Plaintiff,

 7    vs.                        Case No.

                                 4:19-cv-00054-YGR

 8

      NANO F/K/A RAIBLOCKS F/K/A HIEUSYS,

 9    LLC; COLIN LEMAHIEU; MICA BUSCH;

      ZACH SHAPIRO; TROY RETZER; BG SERVICES,

10    S.R.L. F/K/A BITGRAIL S.R.L. F/K/A

      WEBCOIN SOLUTIONS; AND FRANCESCO

11    "THE BOMBER" FIRANO,

12                    Defendants.

13    ----------------------------------------------x

14

15      REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF

16                      JAMES FABIAN

17                 Friday, August 7, 2020

18

19

20

21

22

23

24    Reported By: Lynne Ledanois, CSR 6811

25    Job No. 4205619
```

```
                                              Page 2
 1              UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3    ---------------------------------------------x
 4    JAMES FABIAN, individually and on
      behalf of all othes similarly situated,
 5
 6                     Plaintiff,
 7    vs.                        Case No.
                                 4:19-cv-00054-YGR
 8
      NANO F/K/A RAIBLOCKS F/K/A HIEUSYS,
 9    LLC; COLIN LEMAHIEU; MICA BUSCH;
      ZACH SHAPIRO; TROY RETZER; BG SERVICES,
10    S.R.L. F/K/A BITGRAIL S.R.L. F/K/A
      WEBCOIN SOLUTIONS; AND FRANCESCO
11    "THE BOMBER" FIRANO,
12                     Defendants.
13    _____x
14
15            Videotaped remote deposition of JAMES
16     FABIAN, taken in Discovery Bay, commencing at
17     10:11 a.m., PST, on Friday, August 7, 2020
18     before Lynne Ledanois, Certified Shorthand
19     Reporter No. 6811
20
21
22
23
24
25
```

Page 3

1                    REMOTE APPEARANCES

2

3    For the Plaintiff:

4                    LEVI & KORINSKY LLP

5                    BY:  DONALD J. ENRIGHT

6                    BY:  ZACHARY NESS

7                    Attorneys at Law

8                    1101 30th Street, NW

9                    Suite 115

10                   Washington, DC 20007

11                   (202) 524-4290

12                   denright@zlk.com

13                   zness@zlk.com

14   - and -

15                   ZELLE LLP

16                   BY:  JOHN A. CARRIEL

17                   Attorney at Law

18                   1775 Pennsylvania Avenue, NW

19                   Suite 375

20                   Washington, DC 20006

21                   (202) 524-4290

22                   jcarriel@zelle.com

23

24

25

```
                                              Page 4

  1                  REMOTE APPEARANCES

  2

  3    For the Plaintiff:

  4                SILVER MILLER LLP

  5                BY:  DAVID C. SILVER

  6                Attorney at Law

  7                11780 West Sample Road

  8                Coral Springs, Florida 33065

  9                (954 ) 516-6000

 10                dsilver@silvermillerlaw.com

 11

 12    For the Defendant

 13                SCOOLIDGE PETERS RUSSOTTI & FOX

 14                BY:  PETER FOX

 15                BY:  PETER SCOOLIDGE

 16                Attorneys at Law

 17                2 Park Avenue

 18                19th Floor

 19                New York, New York 10016

 20                (212) 729-7708

 21                pfox@sprfllp.com

 22                pscoolidge@sprfllp.com

 23

 24

 25
```

Page 5

```
 1              R E M O T E   A P P E A R A N C E S

 2

 3    For the Defendant Zack Shapiro:

 4              ZUCKERMAN SPAEDER LLP

 5              BY:  DEVON GALLOWAY

 6              BY:  SHAWN NAUNTON

 7              Attorney at Law

 8              485 Madison Avenue

 9              New York, New York 10020

10              (352) 537-5411

11              dgalloway@zuckerman.com

12              snaunton@zuckerman.com

13

14

15    ALSO PRESENT:

16    Soseh Kevorkian, Videographer

17

18

19

20

21

22

23

24

25
```

Page 6

**I N D E X   O F   E X A M I N A T I O N**

Examination by:                                    Page

        Mr. Fox                                    11

        Mr. Enright                                193

///

Page 7

1           I N D E X   O F   E X H I B I T S

2    Deposition            Description                 Page

3    Exhibit 1    First Amended Class Action

4                 Complaint;                            45

5    Exhibit 2    Second Supplemental Responses

6                 and Objections to Defendant's

7                 First Set of Interrogatories;    55

8    Exhibit 3    First Set of Interrogatories

9                 of Hieusys LLC, et al.,               59

10   Exhibit 4    Twitter thread, Fabian

11               Tweets;                                89

12   Exhibit 5    Reporter's Transcript of

13               Proceedings 6/25/19,

14               Hearing;                               98

15   Exhibit 6    Coinbase Confirmation of

16               Credit Card Purchase of

17               $7,104 of BTC, 8/16/17;

18               L&K00873;                             127

19   Exhibit 7    Coinbase Confirmation of

20               Send for $6,720 worth of

21               BTC;

22               L&K_00872;                            132

23

24

25   ///

1         I N D E X   O F   E X H I B I T S

2   Deposition              Description              Page

3   Exhibit 8    Bittrex Transfer 8/31/17;      137

4   Exhibit 9    BitGrail User Account

5                Balances, (User and Date

6                Unknown),

7                L&K_00672;                     151

8   Exhibit 10   BitGrail User Account

9                Balances, (User and Date

10               Unknown),

11               L&K_00673;                     151

12  Exhibit 11   BitGrail User Account

13               Balances, (User and Date

14               Unknown),                      151

15  Exhibit 12   Bittrex Transfer History,

16               February - April 2018,

17               L&K_00885;                     163

18

19

20

21

22

23

24

25

```
                                          Page 9

 1                  Friday, August 7, 2020

 2                     10:11 a.m. PST

 3  _____

 4                  VIDEOGRAPHER:  Good morning.  We are

 5           going on the record at 10:11 a.m. on

 6           August 7th, 2020.

 7                  This is Media Unit 1 of the

 8           video-recorded deposition of James Fabian

 9           taken by counsel in the matter of James

10           Fabian et al., versus Nano F/K/A RaiBlocks

11           F/K/A Hieusys, LLC, et al., filed in the

12           United States District Court.  Case number

13           4:19-cv-00054-YGR.

14                  This deposition is being held by Zoom.

15           My name is Soseh Kevorkian from the firm

16           Veritext.  I'm the videographer located in

17           Topanga, California.  Our court reporter is

18           Lynne Ledanois, also from the firm Veritext.

19                  At this time would counsel and all

20           present please identify themselves for the

21           record.

22                  MR. FOX:  Sure.  Why don't I start?

23                  My name is Peter Fox.  I am a partner

24           at the law firm of Scoolidge Peters

25           Russotti & Fox, LLP.  We represent the
```

Page 10

```
 1        defendants in this actions, Hieusys LLC,
 2        Colin LeMahieu, Mica Busch and Troy Retzer.
 3            MR. SCOOLIDGE:  Peter Scoolidge on
 4        behalf of the same law firm, same defendants
 5        as Mr. Fox.
 6            MR. NAUNTON:  Shawn Naunton and Devon
 7        Galloway, Zuckerman Spaeder, LLP for
 8        defendant Zachary Shapiro.
 9            MR. ENRIGHT:  Is that it for
10        defendants' counsel?
11            MR. FOX:  It is.
12            MR. ENRIGHT:  Donald J. Enright with
13        Levi & Korinsky for plaintiff James Fabian.
14            MR. NESS:  Zachary Ness also from
15        Levi & Korinsky for plaintiff James Fabian.
16            MR SILVER:  David Silver, Silver
17        Miller, plaintiff James Fabian.
18            MR. CARRIEL:  John Carriel with Zelle
19        LLP for plaintiff James Fabian.
20            THE REPORTER:  Is that everybody?
21            MR. FOX:  All right.  I have 1:14 p.m.
22        Eastern Standard Time.  We are on the
23        record.  So why don't we get going.
24                 JAMES FABIAN,
25     having been duly sworn, testified as follows:
```

Page 11

1                    EXAMINATION

2   BY MR. FOX:

3        Q     I want to talk about a couple of basic

4     ground rules specific to this no longer unique

5     but traditionally unusual format that we're

6     conducting the deposition, which is remotely.

7              As we talked about -- and, Mr. Fabian,

8     I should add I'm going to go over some specific

9     rules with you in a moment.  But for everyone

10    who is participating, as we talked about off the

11    record, while you're participating you need to

12    be on camera at all times.

13             You should also be on mute at all

14    times unless you are the witness, Mr. Fabian,

15    Mr. Enright, who I understand will be defending

16    Mr. Fabian, or myself or anyone else who takes a

17    turn examining the witness.

18             MR. FOX:  Related to the camera point,

19        I do want to point out, Mr. Enright, because

20        of the -- it looks like it must be a very

21        nice day in the D.C. area.  Because of the

22        sunlight pouring in the window behind you,

23        we can't really see you.  We just sort of

24        see a silhouette.

25             Is there any way you might be able to

```
                                          Page 12
 1          turn on a light in your office or draw some

 2          shades or --

 3                  MR. ENRIGHT:  Let me see what I can

 4          do.

 5                  MR. FOX:  Thank you very much.  We'll

 6          pause while you address that.

 7                  MR. ENRIGHT:  Is that better?

 8                  MR. FOX:  It's not perfect, but it's

 9          better.  We see you.

10          Q     So, Mr. Fabian, have you ever sat for

11     a deposition before?

12          A     I have not.

13          Q     You were just sworn in.  You're

14     required to answer all of the questions that I

15     ask you under oath.  That's what that meant.

16                  And that means that you will be

17     required to tell the truth in the same way that

18     you would be required to tell the truth if you

19     were in front of a judge.

20                  And if you fail to tell the truth, the

21     consequences of that could be quite serious,

22     including and up to criminal perjury.

23                  Do you understand that?

24          A     I do, yes.

25          Q     If I ask you a question and you don't
```

1    understand the question, I would like you to let

2    me know right away and I will do my best to

3    clarify the question or rephrase it in a way

4    that you do understand.

5              If you don't let me know, I'm going to

6    assume that you understand the question.

7              Do you understand?

8         A    I do.

9         Q    Okay.  If you want to take a break,

10   you're welcome to do so.  As I mentioned off the

11   record, this deposition is potentially several

12   hours long.  I would just ask that you let me

13   finish whatever line of questioning we may be on

14   within reason.  And, you know, obviously you

15   can't take a break while there is a pending

16   question.  So you can answer any pending

17   question before we take a break.

18             Does that make sense to you?

19        A    It does, yes.

20        Q    As you can see, we have a court

21   reporter here with us online today.  She's

22   recording everything that is said at this

23   deposition.  Thus, it is important that only one

24   of us is speaking at a time and if you wait

25   until I'm done asking a question before you

Page 14

```
 1    start to answer.

 2              It's also important that you speak

 3    clearly and answer each question verbally

 4    because the court reporter cannot record nods of

 5    the head or other forms of non-verbal

 6    communication.

 7              Do you understand that?

 8       A    I do.

 9       Q    Okay.  For the same reason, during the

10    deposition, all communication between you and

11    anyone else must be spoken so that it can be

12    transcribed for the record.  This means that you

13    cannot text your lawyers or IM with them or

14    engage in any other communication with them

15    while we're live except for by speaking clearly

16    and on the record.

17              Do you understand that?

18       A    I do.

19       Q    Okay.  I want to add that while we're

20    on break, you can, of course, communicate with

21    your attorneys by whatever means is most

22    convenient for you.

23              You may hear Mr. Enright or another

24    one of the plaintiffs' counsel who may be

25    defending make an objection.  That statement is
```

Page 15

1    to preserve his objection for the record so that

2    a judge can decide its merit later if necessary.

3    You still must answer the question.

4              Do you understand that?

5        A    I do.

6        Q    All right.  Now I want to talk about

7    some special ground rules that apply today

8    because this is a remote deposition rather than

9    a live deposition the way we traditionally

10   conduct these proceedings.

11             So I'm going to ask that you position

12   the computer -- strike that.

13             Are you using a laptop or a desktop

14   today, Mr. Fabian?

15       A    It's a laptop.

16       Q    It's a laptop.  I'm going to ask that

17   you position the laptop so that we can see your

18   body from the tabletop to your head.

19             You're pretty good right now.  Would

20   you mind pushing it just a little bit further

21   away so we can have a bit more context, assuming

22   that there's room?

23       A    That.

24       Q    Could we do just a little bit more?

25       A    How's that?

```
                                              Page 16
 1            THE REPORTER:  Wait a second.  We have
 2       to -- Peter?  Peter?  Peter?  Excuse, me, I
 3       just want to make sure I can hear the
 4       witness from that distance and --
 5            MR. FOX:  Oh, yeah, why don't we --
 6       I'll ask the question again and if you can
 7       give a sentence response so, Mr. Fabian, the
 8       court reporter will be able to test the
 9       microphone.
10       Q    So is that a comfortable arrangement
11    for you, Mr. Fabian?
12       A    It is, yes, it's comfortable.
13            MR. FOX:  Madam court reporter, did
14       that come out okay?
15            THE REPORTER:  Yes.
16  BY MR. FOX:
17       Q    Second, unless I've instructed you to
18    look at a document on your computer screen,
19    which I will be sharing with you, you should try
20    to keep your eyes focused on the camera on your
21    laptop at all times and this is so that we can
22    be sure that you're not receiving any
23    communications off the record.
24            Do you understand?
25       A    I do.
```

Page 17

```
 1        Q      Okay.  We already talked about this
 2     for everybody but it's, of course, true for you
 3     as well.
 4                At no point while we're on the record
 5     can you turn off your camera, move your
 6     microphone, you need to be live at all times
 7     while the deposition is ongoing.
 8                Do you understand?
 9        A      I do.
10                MR. ENRIGHT:  While we're on the
11          record you mean?
12                MR. FOX:  While we're on the record,
13          exactly.
14     BY MR. FOX:
15        Q      Fourth, related to my instruction
16     regarding transcription, no one who is attending
17     this deposition, and that means not any of your
18     lawyers, not me, not any of my colleagues, can
19     communicate with you while the deposition is
20     ongoing except vocally and on the record.
21                And to Mr. Enright's point, by
22     "ongoing" I mean while we're on the record.
23                If anyone does try to communicate with
24     you while we're live, whether it be by text
25     message or some sort of chat function, I need
```

```
                                              Page 18
```

1    you to tell me that immediately.

2            Do you understand that?

3       A    I do.

4       Q    Is there anyone else in the house this

5    morning with you?

6       A    There is.

7       Q    Do you have any expectation that that

8    person is going to come into the room while

9    you're taking the deposition?

10      A    I've got my wife here.  I told her not

11   to.  I do have two little kids, but I've got the

12   door locked, so we should be good.

13      Q    Great.  And are you expecting anyone

14   else to come over?

15      A    I'm not.

16      Q    Okay.  I would ask that if possible,

17   nobody come into the room while you're taking

18   the deposition.  Again, when we're taking a

19   break, you're, of course, free to have people in

20   or go out and talk to them.

21            But if someone does come in, they will

22   need to be on the camera as well while they are

23   in the room.

24            Do you understand?

25      A    Yes, no problem.

1          Q     Okay.  Many of these instructions are

2     variations on a theme that you cannot use any

3     communication device other than the deposition

4     application running on your computer that you're

5     using now while we're on the record.  That means

6     you cannot look at or use your phone while the

7     deposition is ongoing.

8               Do you understand?

9          A     I do.

10         Q     Do you have your phone reachable to

11    you right now?

12         A     It is, yes.

13         Q     I'm going to ask that you take your

14    cell phone out and put it behind the laptop

15    while we're on the record.  Is that all right?

16         A     Yes.

17         Q     Do you have any applications running

18    on your computer other than the Zoom deposition

19    page right now?

20         A     I do not.

21         Q     Okay.  I'm going to ask that you not

22    open any while we're live and on the record.

23    Okay?

24         A     Yes.

25         Q     So I'm sure your counsel reviewed with

```
                                           Page 20
 1     you your responsibility to provide a quiet,
 2     private environment that's serviced by reliable
 3     high-speed internet connection.
 4                 I will say for the record that it
 5     appears that the room you are in is, indeed,
 6     quiet, private and we're getting internet, but I
 7     want to confirm that with you.
 8                 Is the room that you're in right now
 9     quiet?
10          A     It is, yes.
11          Q     Is it private?
12          A     It is, yes.
13          Q     And is it serviced by a reliable
14     high-speed internet connection?
15          A     It is.
16          Q     If the answer to any of these
17     questions changes, I want you to inform us
18     immediately.  Okay?
19          A     Okay.
20          Q     And then finally, the court reporting
21     service that's hosting this remote deposition,
22     Veritext, has service technicians standing by.
23     If you have any technical problems, you need to
24     let us know right away so the technicians can
25     fix them.
```

```
                                            Page 21

 1              Do you understand?

 2       A     I do.

 3       Q     Okay.  Great.

 4              So, Mr. Fabian, I'm going to be asking

 5       you some questions today that may touch on your

 6       interactions with your lawyers, and because

 7       we're here today to address class certification

 8       issues, these questions may touch on the

 9       structure of your engagement with them.

10              I don't want you to tell me any legal

11       advice that they gave you or repeat any legal

12       questions you may have asked them.  I only want

13       you to tell me the facts.

14              Do you understand?

15       A     I do.

16       Q     Did you discuss this deposition with

17       anyone prior to us starting this morning?

18       A     Other than legal counsel, no.

19       Q     Okay.

20       A     My wife.  I told my wife, obviously,

21       that we were having this.

22       Q     Okay.  Who among your legal team did

23       you talk to?

24       A     Gosh, I talked to John Carriel, David

25       Enright, David Silver.  I think those were the
```

```
                                           Page 22

 1      three main people the last couple of days.

 2           Q      And -- go ahead.

 3           A      And Zach, I forget Zach's last name.

 4           Q      Mr. Ness?

 5           A      Yes.

 6           Q      And when did you talk to them?

 7           A      Over the course of the last three

 8      days.

 9           Q      Was anyone else present when you had

10      these conversations with them?

11           A      There was not.

12           Q      Did you guys talk about the technology

13      that we're using today?

14           A      About Zoom, yes.

15                  MR. ENRIGHT:  Objection, calls for --

16           the question clearly is eliciting

17           attorney-client communication.  I'm going to

18           direct the witness not to answer.

19      BY MR. FOX:

20           Q      Fine.  Are you familiar with the

21      technology that we're using today?

22           A      I am.

23           Q      Do you feel comfortable using it?

24           A      I do.

25           Q      Mr. Fabian, is there any reason why
```

Page 23

1    you cannot testify fully and truthfully today?

2        A     Not that I know of, no.

3        Q     Are you on any medication right now?

4        A     I am not.

5        Q     Have you consumed any alcohol this

6    morning?

7        A     I have not.

8        Q     Did you get enough sleep last night?

9        A     I did.

10        Q     Is there anything else we should know

11    about that would not allow you to testify fully

12    and truthfully?

13        A     Not that I know of.

14        Q     Mr. Fabian, would you please state

15    your full name?

16        A     James Stefan Fabian.

17        Q     Have you ever used any other names?

18        A     I've got a nickname from elementary

19    school, Chubbs.  And that actually has shown up

20    in like phone books and stuff.  So on my -- it

21    comes up as an alias like on my credit report

22    sometimes.  Somehow it's weaved its way in.

23        Q     Okay.  Are you the plaintiff in this

24    lawsuit?

25        A     I am.

```
                                              Page 24
 1         Q      Mr. Fabian, why did you decide to
 2    bring this lawsuit?
 3         A      Basically recoup some of the losses
 4    for myself as well as other class members.
 5         Q      And what types of losses do you
 6    believe you've suffered?
 7         A      Monetary losses from the BitGrail
 8    exchange.
 9         Q      Whose idea was it to file the lawsuit?
10         A      Well, it was my idea to go to Silver
11    Miller to pursue.
12         Q      To pursue what?
13         A      Just to see what my legal options
14    were.
15         Q      Legal options for what, just so that
16    we're clear for the record?
17         A      On how to recoup my losses.
18         Q      Did anyone give you anything to file
19    this lawsuit?
20         A      Can you expand?  I don't know what
21    give me anything.
22         Q      Did anyone pay you anything to file
23    this lawsuit?
24         A      No, they didn't.
25         Q      Did anyone give you a gift to file
```

Page 25

1    this lawsuit?

2          A      No, they didn't.

3          Q      Did anyone promise you anything in

4    return for filing this lawsuit?

5          A      No, no promises.

6          Q      What do you expect to receive if you

7    win the case?

8          A      Hopefully a recoup of the losses from

9    the XRB that was lost.  I don't know how it

10   would be paid out, some kind of recouping.

11         Q      What do you expect the class will

12   receive if you win this case?

13         A      The same thing.  Some kind of monetary

14   reimbursement from the amounts that were lost.

15         Q      What do you expect to receive if you

16   lose this case?

17         A      Nothing.

18         Q      What do you expect the class will

19   receive if you lose this case?

20         A      I assume nothing as well.

21         Q      What do you think the effect on the

22   class' rights would be if you lose this case?

23         A      I have no idea.

24         Q      What do you expect to receive if you

25   settle this case?

                                          Page 26

1          A     I have no idea.

2               MR. ENRIGHT:  Objection, I'm going to

3          object to the extent that this question

4          impinges on attorney-client communications.

5               The witness can answer, but I caution

6          him not to divulge any information that he

7          received solely from his communications with

8          counsel.

9    BY MR. FOX:

10         Q     Go ahead, you can answer, Mr. Fabian.

11         A     I have no idea.

12         Q     What do you think the class would

13    receive if you settled the case?

14               MR. ENRIGHT:  Same objection.

15               THE WITNESS:  I have no idea as well.

16    BY MR. FOX:

17         Q     Do you expect to be treated any

18    different from the class members in terms of an

19    award if there is an award?

20         A     I do not.

21         Q     Who are your lawyers in this case?

22         A     The law firm of Silver Miller, Levi &

23    Korinsky and Zelle.

24         Q     How did you select these lawyers to

25    represent you?

1      A      Originally it was with -- I went with

2      Silver Miller and I reached out and contacted

3      them.

4      Q      When did you contact them?

5      A      I don't know the exact date.  It's

6      probably been about a year and a half or so.

7      Q      So maybe late 2018, early 2019, would

8      that sound right to you?

9      A      Probably somewhere around there.

10     Q      Why did you choose to reach out to

11     Silver Miller?

12     A      I had just -- you know, I had seen

13     talk about it.  I can't remember exactly where.

14     It might have been Twitter or it might have been

15     one of these cryptocurrency boards that this was

16     out there, so I just wanted to explore my

17     options.

18     Q      Do you remember who was making this

19     talk?

20     A      I do not.  And again, I can't remember

21     if it was Twitter or if it was some other kind

22     of online publication, but it was just brought

23     to -- I just thought that it was ongoing.

24     Q      Had you ever worked with Silver Miller

25     before?

```
                                              Page 28

 1          A      I had not.

 2          Q      Had you ever heard of Silver Miller

 3     before?

 4          A      I had not.

 5          Q      So how did you first hear of them?

 6                 MR. ENRIGHT:  Objection, asked and

 7          answered.  You can answer.

 8                 THE WITNESS:  Again, it was through

 9          some -- again, I can't remember.  It was

10          either through a Twitter posting, someone

11          talking about it on one of these

12          cryptocurrency forums.  Something to that

13          effect.

14     BY MR. FOX:

15          Q      Do you think that the post might have

16     been made by someone who's affiliated with

17     Silver Miller?

18                 MR. ENRIGHT:  Objection, calls for

19          speculation.  You can answer.

20                 THE WITNESS:  I don't believe so.  I

21          think there was just general talking about

22          it.

23     BY MR. FOX:

24          Q      I'm going to ask that if you happen to

25     have any posts or notices by Silver Miller
```

Page 29

```
 1      related to this engagement that you -- or access
 2      to any posts or notices related to this
 3      engagement, that you produce them.
 4           A      Okay.
 5                  MR. ENRIGHT:  I'm going to object to
 6           that to the extent that any -- we've already
 7           told you that any documents in plaintiff's
 8           possession and control that are responsive
 9           to your document request have been produced.
10                  Any information that is out in the
11           public forum that he does not have
12           possession and control of, you're free
13           to --for yourself.
14                  MR. FOX:  Okay.  Mr. Enright, I'm
15           preserving these calls for the record.
16           You're welcome to object to them.  Usually
17           we just take them under advisement and you
18           and I can talk about it after the
19           deposition.
20                  MR. ENRIGHT:  That's fine.
21      BY MR. FOX:
22           Q      Mr. Fabian, are you paying your
23      lawyers?
24           A      I'm not.
25           Q      What it your understanding of how they
```

```
                                                       Page 30
 1    are being compensated?
 2         A     Based on a contingency that through
 3    any award through the court.
 4         Q     Do you know how much that contingency
 5    is?
 6               MR. ENRIGHT:  Objection, calls for a
 7         legal conclusion given that the amount would
 8         be subject to --
 9               MR. FOX:  Don, there is no speaking
10         objections in this proceedings, so --
11               MR. ENRIGHT:  Fine.  Fair enough.  I
12         will state my basis very simply.  Objection,
13         calls for a legal conclusion.
14    BY MR. FOX:
15         Q     Okay.  You can still answer,
16    Mr. Fabian, although I will mention you were
17    frozen for a few seconds on my end.
18               Can you hear me?
19         A     Yes, I was going to say I missed that.
20    I can now.  I did miss that last question.  It
21    did freeze on my end as well.
22               MR. FOX:  Madam court reporter, can
23         you read back the question?
24               THE REPORTER:  Sure.
25               (Requested testimony read by the
```

```
                                              Page 31
 1         reporter.)
 2              THE WITNESS:  I believe it's about
 3         33 percent.  Somewhere around there.
 4    BY MR. FOX:
 5         Q    Mr. Fabian, do you know if someone
 6    else is paying your lawyers?
 7         A    I don't know.
 8         Q    Do you know whether anyone is loaning
 9    them money in connection with this case?
10         A    I do not know.
11         Q    Did anyone other than your lawyers ask
12    you to sign anything related to financing this
13    case?
14         A    They did not.
15         Q    Do you have a written agreement with
16    your lawyers?
17         A    I do.
18         Q    Are there any terms in that agreement
19    that we did not just discuss?
20         A    Not that I know of.
21         Q    So it's your testimony that the
22    agreement simply says that they are working on
23    contingency at a rate of approximately
24    33 percent.  There's nothing more in that
25    agreement to your knowledge.  Is that your
```

1    testimony?

2         A     I mean, there's a lot of stuff in the

3    document, of course.  But related to fees, yes.

4         Q     Okay.  Do you know what the terms are

5    other than the terms concerning the fee?

6         A     Off the top of my head, no.

7         Q     I'm going to call for the production

8    of that agreement.

9               Are there any other written agreements

10   you have with your lawyers?

11        A     Not that I know of.

12        Q     Would you have an agreement with

13   someone that you didn't know about?

14        A     No.

15        Q     I just ask that you double check to

16   make sure that there's simply the one agreement

17   when you put together to collect those documents

18   for the production.

19              Do you have any non-written agreements

20   with your lawyers?

21        A     I do not.

22        Q     So just to clarify, your testimony is

23   that your lawyers never made any promises to you

24   that are not written down in that agreement we

25   were just speaking about; is that correct?

1       A       Correct.

2       Q       Did you make any promises to them that

3    are not written down?

4       A       I did not.

5       Q       Mr. Fabian, who are the defendants in

6    this action?

7       A       The defendants I believe is the Nano

8    team, as well as -- his name is Bomber Firano.

9       Q       Do you know who's on the Nano team

10   that have been sued in this case?

11      A       Zack Shapiro, Mica Busch.  Those are

12   the two names that I know.

13      Q       What do you know about Zack Shapiro?

14      A       Not much.  I just know that he was in

15   development of the XRB Nano team.  You know, he

16   was very vocal about it on Twitter over the past

17   few years.  I think he continues to be.  It

18   sounds like he was the lead person behind XRB

19   Nano.

20      Q       Okay.  And why did you decide to sue

21   him?

22      A       This is based on advice to my counsel

23   and their investigation.

24      Q       All right.  Did they explain to you

25   why they thought it would be a good idea to sue

```
                                            Page 34
 1    him?
 2         A    There was discussions on why they were
 3    going that route.
 4              MR. ENRIGHT:  I object that this calls
 5         for -- this question elicits attorney-client
 6         communication.  I'll direct you not to
 7         answer.
 8              MR. FOX:  We may come back to this.
 9         Q    What do you know about Mica Busch?
10         A    I wasn't too sure about his
11    involvement.  He seemed more like a person that
12    was on Twitter doing a lot of the promotion of
13    it, of the brand of XRB Nano.  We've seen a lot
14    of tweets, a lot of marketing type stuff.
15              I don't know what his official role
16    is, but that's how it seemed to me.
17         Q    Are there allegations to that effect
18    in the complaint, do you know?
19         A    I'm not sure.
20         Q    And why did you decide to sue Mica
21    Busch?
22         A    Again, it's based on advice of my
23    counsel and their investigation.
24         Q    What are your claims against these
25    defendants?
```

1     A     The -- you know, basically that there

2     was fraud, negligence and misrepresentation.

3     Q     What is the basis for your fraud claim

4     against them?

5     A     Again, that was based on my attorneys'

6     investigation and the recommendation.

7     Q     What is the basis for the negligent

8     misrepresentation claim against them?

9     A     Same.  That was based on the

10    investigation of my lawyers.

11    Q     And what is the basis for the

12    negligence claim against them?

13    A     Again, based on an investigation of my

14    lawyers.

15    Q     Do you recall any personal interaction

16    with either of the two defendants that you

17    identified?

18    A     I don't believe so.

19    Q     What are your damages in this case?

20          MR. ENRIGHT:  Objection, calls for a

21    legal conclusion.  You can answer.

22          THE WITNESS:  At the time of the loss,

23    I think it was around the 275,000-dollar

24    range.  But when this was all happening, the

25    accounts were frozen before we knew that the

Page 36

1          XRB Nano was lost.  So we couldn't move

2          them.

3                And word of this had spread and value

4          had started going down dramatically.  So it

5          was valued at quite a bit more, but I think

6          at the time of finding out it was actually

7          no longer actually there, I think it was in

8          that 275 range.

9     BY MR. FOX:

10         Q     Okay.  Do you remember about a date

11    when you think it was worth -- well, strike

12    that.

13               What was worth $275,000?

14         A     The value of my XRB Nano.

15         Q     Do you remember a date when -- and is

16    it your testimony that this is the XRB Nano that

17    you allege was lost?

18         A     Correct.

19         Q     Do you remember a date approximately

20    when you believe it was worth $275,000?

21         A     I don't know the exact date.  I think

22    it was early -- I think it was 2018 when this

23    happened, January, February of that year, I

24    believe.

25         Q     And how did you calculate that figure

Page 37

1    of $275,000?

2         A     That was based on how much it was

3    worth.  I believe on the day that it was

4    officially announced that the -- there was a

5    hack, the Nano currency was lost.

6         Q     How did you determine how much it was

7    worth on that date?

8         A     I believe there's logs on different

9    websites where you can look at how much a

10   currency was worth at any given day.

11        Q     Do you have any sense as to how that

12   price -- the reported price is determined?

13        A     I do not.

14        Q     Mr. Fabian, what do you understand to

15   be the class' damages?

16             MR. ENRIGHT:  Objection, calls for a

17        legal conclusion that the witness is not

18        qualified to provide.  He can answer.

19             THE WITNESS:  I believe as a class,

20        it's upwards of 170 million.

21   BY MR. FOX:

22        Q     How did you calculate that figure?

23             MR. ENRIGHT:  Objection, assumes facts

24        not in evidence.

25   BY MR. FOX:

Page 38

```
 1        Q     You can go ahead and answer.
 2              THE WITNESS:  Do I still answer?
 3              Based on the claims that -- not the
 4        claims, based on the documents that I have
 5        reviewed produced by my lawyers.
 6  BY MR. FOX:
 7        Q     So is it your testimony that you
 8     believe the class lost around $170 million worth
 9     of Nano?
10        A     Correct.
11        Q     And do you know anything more about
12     how your lawyers arrived at this figure?
13        A     I do not.
14              MR. ENRIGHT:  Objection, this question
15        again impinges on attorney-client
16        communications.  I'm going to direct the
17        witness --
18              MR. FOX:  Don, this is clearly facts.
19        We're talking about adding numbers.  So
20        don't talk to me about legal advice.
21              If you want to instruct him not to
22        answer, you can instruct him not to answer
23        and we'll deal with that in due course.
24              MR. ENRIGHT:  I'm going to ask the
25        court reporter to please read the question
```

```
                                                      Page 39
 1        back.
 2              THE REPORTER:  Sure.
 3              (Requested testimony read by the
 4        reporter.)
 5              MR. ENRIGHT:  So, again, I'm going to
 6        direct the witness not to answer --
 7              MR. FOX:  And that's fine.
 8              MR. ENRIGHT:  No, it's a limited
 9        instruction.  You'll let me get it out.
10        Don't interrupt me.
11              I'm going to direct the witness not to
12        answer to the extent that what you learned
13        about this or you know about this was told
14        to you by your lawyers.
15              If you have an independent knowledge
16        of this subject matter that was not told to
17        you by your lawyers, then you can answer.
18  BY MR. FOX:
19        Q     You can answer pursuant to that
20     instruction, Mr. Fabian.
21        A     I believe the question was the total
22     amount or how I arrived at that?
23        Q     Correct.
24              MR. ENRIGHT:  No, that's not the
25        question.  I would ask the court reporter to
```

```
                                                    Page 40
 1          read the question back again.
 2                  (Requested testimony read by the
 3          reporter.)
 4                  THE WITNESS:  Same answer.  I don't.
 5                  MR. FOX:  We can move on.
 6          Q     Mr. Fabian, what is the criteria for
 7     membership in the class?
 8          A     I believe that all members in the
 9     class, you know, have a commonality as far as
10     the claim and that there's also enough people to
11     support a class.
12          Q     But how would someone know whether
13     they were in the class or not in the class?
14          A     I don't know the answer to that.
15          Q     Mr. Fabian, how old are you?
16          A     Forty-one.
17          Q     And what is the highest level of
18     education you've obtained?
19          A     Bachelor of science.
20          Q     And from what school was that degree
21     issued?
22          A     Saint Mary's College of California.
23          Q     The Gaels; correct?
24          A     The Gaels, that's right.
25          Q     Big basketball school?
```

```
                                              Page 41

 1          A      Yep.

 2          Q      What was your major?

 3          A      Business and economics.

 4          Q      And where do you live?

 5          A      In Discovery Bay, California.

 6          Q      How long have you lived there?

 7          A      Just over two years.

 8          Q      Okay.  Where did you live in 2017?

 9          A      In Brentwood, California.

10          Q      And in 2018, is that when you moved to

11     Discovery Bay?

12          A      It is.

13          Q      Are you currently working?

14          A      I am.

15          Q      Where do you work?

16          A      I work for Lincoln Financial Group.

17          Q      What does Lincoln Financial Group do?

18          A      They do a lot.  On my side I work for

19     the group division, which is employee benefits.

20          Q      And what are your principal duties

21     there?

22          A      I'm in sales.

23          Q      What type of products do you sell?

24          A      So we sell group benefits to large

25     employers, so we do dental insurance, life
```

Page 42

1      insurance, vision insurance, disability

2      insurance.

3          Q      When did you start working for Lincoln

4      Financial?

5          A      I've been there for about four and a

6      half years.

7          Q      And how are you currently paid?

8          A      It's a combination of salary,

9      commission and bonus.

10         Q      What is your baseline salary?

11         A      At least 45,000.

12         Q      And how much do you typically bring in

13     in commissions?

14         A      I would say about 200,000.

15         Q      And what have bonuses been like for

16     the last couple of years?

17         A      Those are, depending on the year,

18     probably in the 10,000-dollar range.

19         Q      This is a full-time job; is that

20     correct?

21         A      It is.

22              MR. FOX:  Okay.  And madam court

23         reporter, we asked when Mr. Fabian started;

24         is that correct?

25              THE REPORTER:  I'm not sure.  Do you

Page 43

```
 1        want me to search for something?
 2               MR. FOX:  No, that's okay.
 3    BY MR. FOX:
 4        Q     Mr. Fabian, at the risk of asking you
 5     a question that I already asked, when did you
 6     start at Lincoln Financial?
 7        A     It was about four and a half years
 8     ago.  The exact date must have been -- it was
 9     around May 1st.  Was that 2016?  Around that
10     date.
11        Q     Mr. Fabian, I'm going to introduce an
12     exhibit.  I want to explain for the other
13     lawyers participating today how this is going to
14     work.
15               MR. FOX:  You all should have access
16          to exhibit share; is that correct?  If you
17          don't, it's not the end of the world because
18          there's some redundancy built into the
19          process.
20               MR. ENRIGHT:  I thought that signing
21          up for this was exhibit share.
22               MR. FOX:  Well, they are both from --
23          they are both programs from Veritext.  And
24          you should have gotten two emails providing
25          credentials.
```

Page 44

```
 1            MR. SILVER:  About an hour before the
 2       deposition, I got a link from exhibit share.
 3       Since we had some issues yesterday, it came
 4       in separate about an hour or two before the
 5       depo.
 6            MR. FOX:  Are you on there,
 7       Mr. Silver?
 8            MR. SILVER:  Yes.
 9            MR. FOX:  So I'm going to introduce an
10       exhibit.  It goes into a file on exhibit
11       share that is called something like -- I can
12       tell you precisely right now.  It's called
13       double exclamation point marked exhibits.
14            If you ever need to refer to one of
15       the exhibits that I am not currently talking
16       about, for us old-school lawyers, this would
17       be like if you want to flip through the
18       stack, that's where it's going to be.
19       Q    However, Mr. Fabian, for your purposes
20  and for the purposes of everybody following
21  along the examination, the way we're going to
22  look at these exhibits is through the share
23  screen function on Zoom.
24            So I'm going to introduce the exhibit
25  on exhibit share.  Then I'm going to share my
```

Page 45

```
 1    screen and everybody can see it at the same
 2    time.
 3              Does that make sense to you,
 4    Mr. Fabian?
 5         A    It does.
 6         Q    Okay.  So bear with me for one moment.
 7    I'm going to introduce the first exhibit.
 8         A    It's loading.
 9              (Exhibit 1 was marked.)
10  BY MR. FOX:
11         Q    This exhibit has been introduced to.
12    And, Mr. Fabian, I'm about to share it with you
13    and everyone else on our screen.
14              MR. FOX:  Madam court reporter, I'm
15         getting a note that says, "Host disabled
16         participant screen sharing."
17              THE REPORTER:  Are you in exhibit
18         share?
19              (Discussion off the record.)
20              MR. FOX:  Let's go off the record for
21         a second while we --
22              VIDEOGRAPHER:  Going off the record at
23         10:54 a.m.  This is the end of Media 1.
24              (Recess taken.)
25              VIDEOGRAPHER:  We're on the record at
```

                                                          Page 46

1          11:04 a.m.   This is the beginning of Media 2

2          in the deposition of James Fabian.

3                   MR. FOX:  Mr. Fabian, right before we

4          broke, I introduced a document as our first

5          exhibit.   It is labeled Exhibit 1.

6                   Counsel, I'm just wondering if I can

7          get a stipulation on the record, you know,

8          per the local rules that in terms of

9          numbering convention, we just go

10         sequentially 1 through however many

11         deposition exhibits there end up being in

12         this case?

13                  MR. ENRIGHT:  So you want to have

14         consecutively numbered across all

15         depositions, not separately numbered per

16         deposition?

17                  MR. FOX:  Yes, I think that is

18         actually required.

19                  MR. ENRIGHT:  If that's the rule, then

20         fine.

21                  MR. FOX:  All right.  Great.

22         Q    Mr. Fabian, right before we broke --

23    just waiting for Mr. Silver to come back.

24    Everybody does need to be on camera all the

25    time.

Page 47

```
 1            Before we broke, we enabled the screen
 2     sharing function on my Zoom, so I'm going to
 3     show you this document that we've now introduced
 4     as Exhibit 1.
 5            Can you see it now?
 6        A     Yes.
 7        Q     This document, Exhibit 1, bears a
 8     header that makes it evident that the document
 9     was filed on the court docket in this case as
10     Document Number 58.
11            Have you ever seen this document
12     before, Mr. Fabian?
13        A     I believe -- they all look familiar,
14     but this one does look familiar, yes.
15        Q     What is it?
16        A     This here, this is the -- I guess the
17     claim that was filed.
18        Q     Okay.  Do you know anything more about
19     it?
20        A     I mean, I just know the basics of it.
21        Q     Fair to say it's your first amended
22     class action complaint?
23        A     It looks like it.
24        Q     Have you read this document before,
25     Mr. Fabian?
```

Page 48

1       A       I believe I have.

2       Q       Is there any doubt that you've read

3    it?

4       A       No, I just think there might be

5    different versions, but I believe I've read

6    everything.

7       Q       If I represented to you that this is

8    the operative complaint, the last complaint that

9    was filed in the case, would you have any reason

10   to doubt that?

11      A       No.

12      Q       Does that change your testimony as to

13   whether you're sure you read it or not?

14      A       It does not.

15      Q       Mr. Fabian, I want to add as a

16   technical point, I believe if you go up to the

17   top of your screen and you click on "annotate,"

18   that will allow you to move around in the

19   document in case you want to look at a page that

20   I'm not talking about.

21               I don't think you need to do that

22   right now, but I just want to make you aware of

23   that functionality.  Okay?

24      A       Okay.

25      Q       Do you believe that all of the factual

                                                          Page 49

1       allegations made in this complaint are true?

2            A      I do.

3            Q      Did you go through each paragraph with

4       your attorneys and confirm that all of the

5       statements are accurate and that all of the

6       allegations reflect your actual experiences?

7            A      We did.

8            Q      And if there was a fact alleged in

9       here that you weren't sure about, did you ensure

10      that that fact was pled on information and

11      belief?

12           A      I would have, yes.

13                  MR. FOX:  Does somebody need to go on

14           mute?  I'm not sure what that noise was.

15                  MR. ENRIGHT:  There is a lawnmower

16           outside my office right now that

17           unfortunately I can't mute.  So...

18                  MR. FOX:  Weird that we all have that

19           power.  Not a problem.

20           Q      All right.  Mr. Fabian, I'm going to

21      take you into this complaint all the way down to

22      Page 43.

23           A      Okay.

24           Q      And we're going to look at

25      Paragraph 183.

Page 50

1           Do you see Paragraph 183 where it
2    says, and I'm quoting, "Commencing in or around
3    April-May 2017, plaintiff Fabian learned about
4    XRB by reading social media posts touting XRB --
5    including but not limited to those published on
6    Twitter -- exemplars of which are incorporated
7    throughout this amended complaint"?
8        A    I see that.
9        Q    Is it true that you first learned
10   about XRB in April or May of 2017?
11       A    It is.
12       Q    When did you first learn about the
13   BitGrail cryptocurrency exchange?
14       A    Oh, gosh.  It wasn't for a while after
15   that.  I don't know specific date.
16       Q    Do you have any sense as to how long
17   after April/May 2017 you learned about BitGrail?
18       A    Probably a couple of months after
19   that.  I don't even know if it existed back in
20   April/May, 2017.  But I think it was a couple of
21   months after.
22       Q    If I told you there were allegations
23   in the complaint where you claim that you know
24   the date that BitGrail was founded, would that
25   sound wrong to you?

                                        Page 51

1              MR. ENRIGHT:  Objection.

2              THE WITNESS:  That would --

3              MR. ENRIGHT:  Misstates the record,

4         assumes facts not in evidence.

5    BY MR. FOX:

6         Q    You can answer.

7         A    I would not know the exact date it was

8    founded.

9         Q    But it's your testimony you're not

10   sure it was in existence in April or May 2017;

11   is that correct?

12        A    I'm not sure.  I don't believe it was,

13   but I'm not sure.

14        Q    When did you first learn that you

15   could buy or sell XRB on BitGrail?

16        A    I'm not sure of the exact date.  I

17   think around that time.

18        Q    You broke up a little bit at the end

19   there.  Can you repeat your answer?

20        A    Yes, it was a couple of months after

21   that that I purchased --

22              THE REPORTER:  Okay.  The witness is

23         distorting obviously, so we need to

24         troubleshoot.

25              MR. FOX:  Okay.  Can we go off the

Page 52

```
 1          record for a moment while the videographer
 2          troubleshoots that because I also lost the
 3          image for a little while there.
 4                  THE REPORTER:  Okay.
 5                  VIDEOGRAPHER:  We're going off the
 6          record at 11:12 a.m.  This is the end of
 7          Media 3.
 8                  (Recess taken.)
 9                  VIDEOGRAPHER:  We are on the record at
10          11:15 a.m.  This is the beginning of Media 3
11          in the deposition of James Fabian.
12                  MR. FOX:  Okay.  Mr. Fabian, I
13          understand that your last answer was
14          somewhat distorted because of technical
15          problems.  So we're going to have the court
16          reporter read back the last pending question
17          and I'm going to ask that you answer it a
18          second time.
19                  THE WITNESS:  Okay.
20                  THE REPORTER:  Okay.
21                  (Requested testimony read by the
22          reporter.)
23                  THE WITNESS:  Okay.  Yes, so I believe
24          I first purchased in August, so I would have
25          known about the BitGrail website around that
```

```
                                           Page 53
 1        time.
 2     BY MR. FOX:
 3          Q     Let's go ahead and look one paragraph
 4       down in the complaint, Paragraph 184.  And also
 5       Paragraph 185.
 6                Do you see where it says, quote, "As
 7       part of his due diligence in learning about XRB,
 8       Plaintiff Fabian followed (i.e. subscribed to)
 9       the Twitter feeds of Defendant LeMahieu,
10       Defendant Shapiro and other people related to
11       XRB."
12                And then it continues in
13       Paragraph 185, "After months of following the
14       representations published by those people and
15       relying on the truthfulness of their
16       representations, Plaintiff Fabian began
17       investing in XRB."
18          A     That's correct.
19          Q     I missed that.  Did you testify that
20       you see that?
21          A     Yes, I do.
22          Q     Is it true that you followed the
23       social media accounts of these individuals for
24       months before you bought any XRB?
25          A     So following like officially follow on
```

Page 54

1    Twitter, like request to follow them, I don't
2    know if I officially followed all of them.  But
3    what I would do was put in search terms, which
4    would be XRB or Nano, and then these people's
5    feeds would come up that were talking about it.
6    So I would follow different Twitter accounts
7    that were talking about it and they were part of
8    those tweets that I saw.
9         Q    Okay.  And in Paragraph 184, does the
10   reference to -- and I'm quoting here --
11   Defendant LeMahieu refresh your recollection as
12   to who some of the other defendants in this case
13   are?
14        A    I do recognize, I think, Zack Shapiro.
15             MR. FOX:  Okay.  This was -- this was
16        so easy, I'm going to introduce another
17        exhibit and share that.  So bear with me for
18        a moment.  I'm going to leave the share
19        screen.
20             Again, counsel, if you need to refer
21        back to this Exhibit 1, which is the amended
22        complaint, that's in the exhibit share
23        folder.  And I want to introduce a second
24        exhibit and put that up on the screen
25        momentarily.

```
                                           Page 55
 1            I'm going to share my screen so
 2       hopefully everyone can see this new exhibit,
 3       which is Exhibit Number 2.
 4            (Exhibit 2 was marked.)
 5  BY MR. FOX:
 6       Q    Mr. Fabian, can you see this document?
 7       A    I can.
 8       Q    Can you see it's been marked Exhibit
 9  Number 2?
10       A    I do.
11       Q    This document is titled "Lead
12  Plaintiff's Second Supplemental Responses and
13  Objections to Defendants' First Set of
14  Interrogatories."
15            Have you ever seen this document
16  before, Mr. Fabian?
17       A    Yes.
18       Q    What is it?
19       A    I believe this is the -- like it says,
20  just responses from me on what the -- what the
21  questions brought to me by my attorneys.
22       Q    Do you know where those questions came
23  from?
24       A    I do not.
25       Q    Did you write any part of this
```

```
                                            Page 56
 1    document, Mr. Fabian?

 2         A      I did not.

 3         Q      Who wrote it?

 4         A      I believe my legal team.

 5         Q      Did they ask you what they should

 6    write?

 7         A      They did not.

 8         Q      How do you think they knew how to

 9    answer it if they didn't ask you what they

10    should write?

11              MR. ENRIGHT:  I object to this whole

12         line of questioning.  Again, this is seeking

13         attorney-client communications.  I'm going

14         to direct the witness not to answer.  You

15         cannot ask a question about conversations he

16         had with his counsel or questions his

17         counsel asked him.  Come on.

18    BY MR. FOX:

19         Q      Let's go to the last page.

20              Before we go to the last page, I'll

21    put it there so you can look at it.

22              Are these answers true to the best of

23    your knowledge and belief, Mr. Fabian?

24         A      Are you asking me a question?

25         Q      I'm asking you a question.
```

```
                                            Page 57

 1        A     I'm not following.  I see a

 2   verification that I signed.  Are you asking if I

 3   signed that correctly?

 4        Q     No.  I'm going to ask you about that

 5   in a moment.

 6              But the answers that are contained in

 7   these responses, are they true?

 8        A     Yes.

 9        Q     How do you know that they are true?

10        A     I answered everything to the best of

11   my knowledge.

12        Q     To whom did you give those answers?

13        A     To my legal team.

14        Q     Let's take a look at the verification.

15   I apologize for scrolling away there.

16              Do you see where it says, "I, James

17   Fabian, am lead plaintiff in this action.  I

18   believe based on reasonable inquiry that the

19   foregoing answers are true and correct to the

20   best of my knowledge, information and belief.  I

21   verify under penalty of perjury that the

22   foregoing is true and correct."

23        A     Yes, I see that.

24        Q     And is that your signature below the

25   verification?
```

```
                                            Page 58
 1          A     It is.
 2          Q     And did you actually sign that with a
 3     pen or is that some other form of signature?
 4          A     It's electronic form.
 5          Q     And did you review each answer to each
 6     interrogatory before you signed this?
 7          A     I did.
 8          Q     Let's go back up to Page 4.
 9                Do you see under the heading
10     Interrogatory Number 1 where it says, "Identify
11     each challenged statement, if any, made by, A,
12     Colin LeMahieu; B, Mica Busch; C, Zack Shapiro;
13     D, Troy Retzer; and E, Hieusys LLC.
14                "In this interrogatory, 'identify'
15     means to quote or describe in detail the
16     challenged statement to state the medium or
17     media through which the statement was made
18     (e.g., email, Twitter post, telephone
19     conversation), and to state where, when and by
20     whom and to whom the challenged statement was
21     made."
22          A     I see that.
23          Q     Do you know what is meant here by a
24     challenged statement?
25          A     I would need some more clarification
```

                                               Page 59

1       on challenged statement.

2           Q      How did you know that this answer was

3       truthful if you did not understand what was

4       meant by challenged statement?

5           A      I saw this document awhile ago.  So

6       I'm sure we went through it at the time.

7           Q      So it's your testimony that at one

8       point you understood what was meant by

9       challenged statement but you don't remember it

10      sitting here today?

11          A      Yes.  I would need a refresher.

12          Q      Okay.  Let's see if we can refresh

13      your recollection.

14              MR. FOX:  I'm going to introduce a

15          third exhibit.  Bear with me for one moment.

16              (Exhibit 3 was marked.)

17              MR. FOX:  Okay.  I've introduced

18          another document, which is marked as

19          Exhibit 3.  I'm about to share this document

20          with everyone through the share screen

21          function.

22      BY MR. FOX:

23          Q      Mr. Fabian, can you see a document

24      that's now marked Exhibit 3?

25          A      I can, yes.

Page 60

1        Q     Have you seen this document before?

2        A     I believe I have, yes.

3        Q     Do you know what it is?

4        A     This is the interrogatories.

5        Q     And are these the questions that you

6    were answering in Exhibit 2 that we were just

7    looking at?

8        A     I don't see any questions on the

9    screen.

10       Q     If we go down to Interrogatory

11   Number 1, which is on Page 5, do you see the

12   first question there?

13       A     I don't see a question.  I see a

14   statement, I guess.

15       Q     It's phrased in the indicative tense.

16   But does that -- does the text under the heading

17   "Interrogatory Number 1" look familiar to you?

18       A     Yes.

19       Q     And is it the same as the text we

20   looked at a moment ago that you were providing a

21   response to in your answers to the

22   interrogatories?

23       A     I believe so.

24       Q     Okay.  So let's go up to the top of

25   this document.

Page 61

1        Do you see the heading "Definitions"?
2    A    Correct.
3    Q    Do you see the third definition here
4    where it says, quote, "Challenged statement
5    shall mean any statement, including any oral or
6    written communication, phrase, or image that you
7    challenge in this action as a misrepresentation.
8    Challenged statements include all statements on
9    which you base your fraud and negligent
10   misrepresentation claims."
11       Does that refresh your recollection as
12   to what is meant by "challenged statement"?
13   A    It does, yes.
14   Q    Let's go back to the answers.  Give me
15   one moment, I'll put those up.
16       Are you looking at Exhibit 2 now
17   again, Mr. Fabian?
18   A    I am.
19   Q    Let's go back to Page 4.  And at the
20   bottom of the page do you see the heading
21   "Response to Interrogatory Number 1"?
22   A    I do.
23   Q    And going further down on to the next
24   page, do you see the part of the response where
25   it says, "Subject to the foregoing objections,

Page 62

```
 1     plaintiff states that the challenged statements
 2     are set forth in detail in the operative
 3     complaint pending in this action.  Specifically,
 4     the operative complaint contains all challenged
 5     statements of which lead plaintiff is currently
 6     aware.  Stated otherwise, based on lead
 7     plaintiff's current information, the challenged
 8     statements are limited to those in the operative
 9     complaint.  These challenged statements from the
10     operative complaint, the means of their
11     dissemination and those to whom lead plaintiff
12     believes those challenged statements were made
13     may be found as to each of the listed defendants
14     in the operative complaint as follows."
15             And then do you see where by defendant
16     you've listed a set of paragraphs?
17        A     I do.
18        Q     And are these the paragraphs of your
19     amended complaint that contain allegations of
20     statements that you contend were false or
21     misleading?
22        A     Without seeing the paragraphs
23     themselves, I believe so.
24        Q     Given what I just read to you about
25     the response, do you have any reason to think
```

Page 63

1    that you referred to a paragraph that does not

2    contain a statement that you contend was false

3    or misleading?

4        A     I do not.

5        Q     Let's go a little bit further down and

6    look at Page 6 of your answers.

7              At the very bottom of Page 6, do you

8    have the heading "Interrogatory Number 3"?

9        A     I do.

10       Q     Do you see where it says, "For any

11   challenged statement you contend was not made to

12   you, describe in detail the date on which and

13   the circumstances in which you received it"?

14       A     I see that.

15       Q     And if we go below -- now we're on

16   Page 7 under the heading "Response to

17   Interrogatory Number 3."

18             Do you see in relevant part where you

19   or your counsel has written, "Subject to the

20   foregoing objections, plaintiff states that the

21   challenged statements were generally received

22   and viewed by plaintiff on the internet promptly

23   after they were disseminated.  Specifically, and

24   without excluding any challenged statement not

25   mentioned or otherwise covered within this

Page 64

1     response, Mr. Fabian attests to viewing the

2     following statements from the operative

3     complaint at or around the time those statements

4     were made, and attests that these statements

5     influenced his decision-making in regards to his

6     activities dealing with Nano, XRB and BitGrail."

7     And then there is a list of paragraphs that

8     you're referring to.

9              Do you see that?

10     A     I do.

11     Q     By this answer, do you mean that you

12     received and read each of the challenged

13     statements referenced in your response to

14     Interrogatory Number 1 around the time that each

15     statement was made?

16     A     Correct.

17     Q     Okay.  You mentioned a moment ago that

18     you wanted to look at the individual challenged

19     statements.  And you're in luck because we're

20     going to do that.

21              So why don't we start with the

22     challenged statements that you attribute to

23     Colin LeMahieu.

24              Do you see the list of numbered

25     paragraphs that follow Mr. LeMahieu's name in

```
                                             Page 65
 1     your response to Interrogatory Number 1?
 2          A     I do.
 3          Q     So let's start with Paragraph 69.  I'm
 4     going to stop sharing this document and pull up
 5     the complaint and we'll take a look at
 6     Paragraph 69.
 7               MR. SILVER:  I need to step out for
 8          one minute if you want to stop while you're
 9          doing this so I'm not disappearing --
10               MR. FOX:  Mr. Silver, I just ask you
11          to hold on for one second until we get this
12          up.  I'm just going to ask him one question
13          on 69 and then --
14               MR. SILVER:  Whatever is easiest.  I
15          was willing to let you keep going.
16               MR. FOX:  Yes.  So if you just bear
17          with me for one moment, we'll have this up
18          in 15 seconds.
19          Q     Mr. Fabian, are you looking again at
20     Exhibit Number 1?
21          A     I am.
22          Q     Let's go take a look at Paragraph 69.
23               Do you see Paragraph 69 in front of
24     you?
25          A     I do.
```

                                              Page 66

1        Q     Can you identify -- and I'll make it a

2     little bigger so it's easier to see.  Can you

3     identify the statement that you contend was

4     false or misleading?

5               MR. ENRIGHT:  Objection, calls for a

6          legal conclusion.  The witness can answer.

7               THE WITNESS:  It's really small on my

8          side.

9     BY MR. FOX:

10       Q     I tried to make it bigger.  Did it get

11    bigger for you?

12       A     It got a little bigger, yes.

13       Q     I'll make it even bigger.

14       A     There we go.  Can you repeat the

15    question on this one?

16       Q     Can you identify the statement in this

17    paragraph that you contend was false or

18    misleading?

19       A     The communication in general was just,

20    you know, advertising the XRB at the time and

21    how promising it was.

22       Q     What is the specific statement that

23    you're talking about?

24               MR. ENRIGHT:  Same objection.  You can

25          answer.

```
                                                Page 67
 1              THE WITNESS:  I'm going off the
 2         initial line, "Disrupting web advertising:
 3         Freemium content through RaiBlocks
 4         micropayments." And then underneath it says,
 5         "This is promising."
 6              "Follow us on Twitter @RaiBlocks to
 7         help get the word out."
 8   BY MR. FOX:
 9         Q    Okay.  Is your testimony that you
10     contend all of those statements were untrue?
11         A    I don't -- I wouldn't take a stance on
12     true or untrue.  This is more like solicitation
13     to follow our XRB that it was promising.
14         Q    So the statement you're talking
15     about -- just to be clear for the record, the
16     statements you are talking about are all of the
17     statements in the screenshot?
18         A    Correct.
19         Q    Can you see when this statement was
20     made?
21         A    From the standpoint of the person that
22     posted it?
23         Q    Yes.
24         A    Yes, I believe --
25         Q    Go ahead.
```

```
                                          Page 68

 1        A      I'm sorry, did you say when it was

 2    made?

 3        Q      Yes.  Do you see when this was made?

 4        A      Oh, it says three years ago.

 5        Q      Do you see a box in the upper

 6    left-hand corner?

 7        A      Yes, February 27th, 2016.

 8        Q      When did you first read this

 9    statement?

10        A      I don't know the exact date, but

11    probably around the same time or so.

12        Q      Okay.  So you'll recall we looked at

13    Paragraph 183 of the complaint where you allege

14    that you first learned about XRB in May or June

15    of 2017.

16               How did you read this statement if you

17    didn't know about XRB at the time?

18        A      It may have been after -- again, I did

19    a lot of searching, so when I do my research,

20    you can type in a three-letter word like an

21    XR -- dollar sign XRB and do searches.  So I did

22    countless hours of that, so it might have been

23    through one of my searches.

24        Q      Do you think you could have seen this

25    after April or May 2017?
```

1      A      It could have been, yes.  I don't know
2   the exact date.
3      Q      Do you recall that we just looked at
4   your response to Interrogatory Number 3 where
5   you said that you read all of the challenged
6   statements in or around the time that they were
7   made?
8      A      Yes.
9           MR. ENRIGHT:  Objection, incomplete
10          response, incomplete and inaccurate
11          recitation of the record.
12   BY MR. FOX:
13      Q      Mr. Fabian, would you like an
14   opportunity to amend your response to
15   Interrogatory Number 3?
16      A      I don't believe so.  I mean, again, I
17   don't know the dates I saw -- the exact dates I
18   saw these.  This one just looked familiar to me,
19   so I assumed that I had seen it.  And I couldn't
20   put an exact date on when I saw it.
21      Q      Would you say that looking at a
22   document 13 months after -- or strike that.
23          Would you say that reading a statement
24   13 months after it was made was looking at it in
25   or around the time that it was made?

1      A      I mean, I think it's relative.  It's

2    current.

3      Q      So you think reading a statement over

4    a year after it was made is current.  Is that

5    your testimony?

6              MR. ENRIGHT:  Objection,

7         argumentative, asked and answered.

8              MR. FOX:  Let's move on.

9      Q      Mr. Fabian, what is -- what do you

10   contend is false or misleading about these

11   statements that you identified in Paragraph 69?

12     A      I don't know if there's anything false

13   in this.  This is just an advertisement to

14   say -- in my mind to say how the product is a

15   good product and to start following.

16     Q      Do you recall the definition of

17   "challenged statement" that we looked at a

18   moment ago in the interrogatories?

19     A      Yes.

20     Q      What was that definition

21   approximately?

22     A      I cannot tell you offhand.

23     Q      If I told you that it was to identify

24   statements that you believed were

25   misrepresentations, would that sound wrong to

```
                                            Page 71
 1     you?
 2         A     It would not sound wrong.
 3         Q     So can you identify the
 4     misrepresentation that you see here in
 5     Paragraph 69?
 6         A     I can't.
 7         Q     I'm sorry, can you repeat the answer?
 8         A     I can't, no.
 9         Q     Okay.  Let's move on to Paragraph 72,
10     which is the next challenged statement that's
11     disclosed in your answers to interrogatories.
12             MR. SILVER:  I need a two-minute
13         bathroom break.  You can keep going if you
14         want.  I have no objection to you
15         continuing.
16             MR. FOX:  Let's keep going.
17             MR. SILVER:  I'll leave my video on so
18         you can see when I run in and out.
19             MR. FOX:  Let's keep going.  We are
20         under time pressure here.
21         Q     Okay.  Paragraph 72, this is one of
22     the paragraphs that you identified as containing
23     a challenged statement made by Mr. LeMahieu;
24     correct?
25         A     I believe so.
```

Page 72

1        Q      I'm going to represent to you that it
2    is.
3               Can you identify the challenged
4    statement in this paragraph?  And let me make it
5    a little smaller so you can see the whole thing.
6        A      The question was on its
7    misrepresentation?
8        Q      Correct.  That -- can you identify a
9    misrepresentation -- the statement that you
10   contend is a misrepresentation in this
11   paragraph?
12       A      I don't know if there is a
13   misrepresentation on this one.
14       Q      Okay.  Why did you refer to it in your
15   response to Interrogatory Number 1 that called
16   for the identification of challenged statements
17   which are misrepresentations?
18       A      These were just things that I saw that
19   looked familiar to me that were items that made
20   me want to buy XRB Nano and made me want to
21   follow it.
22       Q      Does that sound responsive to
23   Interrogatory Number 1 to you?
24               MR. ENRIGHT:  Objection,
25       argumentative.

                                                    Page 73

1              THE WITNESS:  I'm not sure what you
2         mean by "responsive."
3    BY MR. FOX:
4         Q     Does that basis for including this
5    statement or referring to this paragraph in your
6    answer to Interrogatory Number 1 sound like you
7    were answering the interrogatory?
8              MR. ENRIGHT:  Objection, calls for a
9         legal conclusion.  You can answer.
10             THE WITNESS:  I thought so at the
11        time.
12   BY MR. FOX:
13        Q     Have your thoughts changed on that
14   matter?
15        A     Again, it just looks like these
16   were -- certain statements that were presented
17   were just ones on why I followed the Nano XRB
18   currency, why I purchased it and that's what I
19   was trying to point out.
20        Q     Mr. Fabian, do you see when this
21   statement was made?
22        A     March 3rd, 2016.
23        Q     And when do you think you read it?
24        A     Again, I'm not exactly sure, just
25   through my research.

Page 74

1        Q     It had to be after April or May 2017;
2    right?
3        A     It probably was.
4        Q     If it wasn't, then your allegation in
5    the complaint that you first learned about XRB
6    in April or May 2017 wouldn't be true, would it?
7        A     I'm sorry, you broke up there.
8        Q     If it was before -- if you read this
9    statement before April or May 2017, then your
10   allegation in Paragraph 183 of the complaint
11   would not be true, would it?
12       A     I don't know about that.  Again, I
13   don't know the exact date that I read this.  So
14   the dates that I presented on when I found out
15   or first learned about XRB Nano, that was by the
16   latest date that I can remember finding out
17   about it.  It could have been earlier.
18             But to the best of my knowledge,
19   that's when I first started following and doing
20   research into it.
21       Q     Do you recall whether Paragraph 183
22   was pled on information and belief?
23       A     If it was what?
24       Q     Pled on information and belief.
25       A     I'm not sure what that --

Page 75

1     Q     Did you qualify that allegation in
2     Paragraph 183 that you believed that you first
3     learned about Nano in April or May, did you
4     qualify that statement in any way?
5     A     Qualify as like show proof?
6     Q     No, qualify as put in a caveat that
7     maybe you learned about it earlier.
8     A     I can't remember.  I was going based
9     on my memory when I did start following.
10    Q     All right.  Why don't we move on to
11    the next paragraph, that's Paragraph 86.
12          Can you identify the statement in
13    Paragraph 86 that you contend was a
14    misrepresentation?
15    A     Are you able to make that larger?
16    Q     Yes, sure.
17          MR. ENRIGHT:  On my screen when you
18      make that larger, it cuts off a portion of
19      the actual graphic.
20          MR. FOX:  Don, are you able to move
21      the windows to the side?  That's what I had
22      to do to see the whole thing.
23          MR. ENRIGHT:  No, no, it cuts it off
24      at the bottom.
25          MR. FOX:  Oh, yes, okay.  All right.

```
                                            Page 76

 1              (Discussion off the record.)
 2              MR. FOX:  Yes, it doesn't look like
 3        there's any statements in the text so let's
 4        just look at the screenshot.
 5        Q      Is that a good size for you,
 6   Mr. Fabian?
 7        A      Yes, I can read it.
 8        Q      Okay.
 9        A      Okay.  I read it.
10        Q      Can you identify the statement that
11   you believe is a misrepresentation in this
12   screenshot?
13        A      Again, on this one, I don't know if
14   there is a misrepresentation.  This was just
15   brought forward on why I followed and started
16   doing research and ending up buying XRB Nano.
17        Q      When was this statement made,
18   Mr. Fabian?
19        A      It looks like March 4th of 2016.
20        Q      Okay.  When did you first read it?
21        A      I don't know the exact date.  Again,
22   through my research at some point.
23        Q      Do you think it was before March or --
24   excuse me.  Strike that.
25              Do you think it was before April or
```

Page 77

1      May 2017?

2           A      I'm not sure, to be honest.

3           Q      Do you think it was right after the

4      statement was made?

5           A      Honestly, I couldn't tell you on the

6      exact date I saw it.

7           Q      Mr. Fabian, I'm going to represent to

8      you that there are a number of paragraphs

9      referenced in your answer to Interrogatory

10     Number 1 --

11          A      Mm-hmm.

12          Q      -- that don't appear to contain any

13     false or misleading statement.  Up to you, we

14     can go through all of them if you want.

15                 But I'm sitting here telling you, in

16     the interest of saving you face and saving us

17     all time, that there are a number -- in fact,

18     all of the referred -- referenced paragraphs

19     that don't contain statements with arguable

20     misrepresentations.

21                 I'm also going to represent to you

22     that a great number of these statements were

23     made before March or April 2017.

24                 Do you want an opportunity to revise

25     your answers to those interrogatories, either

Page 78

1    your answer to Interrogatory Number 1 in which

2    you refer to all of these paragraphs that do not

3    appear to contain misrepresentations or your

4    answer to Interrogatory Number 3 in which you

5    represented under oath that you read each one of

6    these statements in or around the time that it

7    was made?

8            MR. ENRIGHT:  Objection, compound

9        question.  If you want to ask him those two

10       subparts separately, I think that will be a

11       lot more answerable.

12           MR. FOX:  Fair point.

13   Q     Mr. Fabian, would you like an

14   opportunity to revise your answer to

15   Interrogatory Number 1?

16   A     I don't believe so.  Again, these

17   were -- the things that are being presented were

18   things that looked familiar to me that I thought

19   I had seen and that I based my decisions on.  So

20   I don't know if all of them specifically said,

21   you know, fraud or misrepresentation or

22   negligence.

23           Again, some of them were -- I was just

24   going to ask if this was represented for that,

25   this is familiar, these are reasons I bought the

                                                                Page 79

1      coin in the first place, this is the reason I

2      went to BitGrail eventually to buy it.

3          Q      Do you know whether any of the

4      paragraphs that you referred to in your response

5      to Interrogatory Number 1 contain

6      misrepresentations?

7          A      Not off the top of my head, no.

8          Q      Is it possible that none of them do?

9          A      I would have to read them all to see.

10         Q      All right.  Let's -- well, you're in

11     luck because we're going to go through them.

12                With respect to Interrogatory

13     Number 3, would you like to change your response

14     to that?

15         A      Which one was Number 3?

16         Q      Where you responded under oath that

17     you -- and confirmed it in this deposition that

18     you read and relied on each one of these

19     statements in or around the time that it was

20     made.

21         A      I don't know the exact dates, but

22     these were ones that were familiar to me that I

23     had seen at some point and I consider current.

24         Q      So is your testimony you don't want to

25     change your response to Interrogatory Number 3?

Page 80

```
 1      A      Correct.
 2      Q      Let's keep going.  We were at 86,
 3   let's take a look at 89.
 4           Mr. Fabian, look at Paragraph 89,
 5   please.  I'm going to back it out a little bit
 6   which might make it easier to see.
 7           Mr. Fabian, would you please identify
 8   the statement that you contend is a
 9   misrepresentation in Paragraph 89?
10      A      I don't know if I see anything
11   fraudulent.  This is information I saw in my
12   research in order to buy the coin.
13      Q      Can you identify the statement that
14   you were referring to in your response to
15   Interrogatory Number 1?
16      A      Well, I think just -- there's just the
17   one statement, which is the one that begins
18   with, "Hey, guys."
19      Q      So this is the statement that says,
20   "Hey guys, the short of the story is I think we
21   have a way to make the faucet work and scale.
22   We'll total up faucet clicks and pay them out in
23   bulk daily rather than hourly or instantly.
24   This addresses the load concern that was
25   bringing the faucet to its knees and would have
```

```
                                      Page 81
 1      destroyed the distribution if it had continued."
 2                 Is that the statement you're referring
 3      to?
 4           A      Correct.
 5           Q      When was that statement made?
 6           A      Three years ago.  I don't see a date.
 7           Q      If you look at the first line of the
 8      paragraph, April 3rd, 2016.
 9                 Do you see that?
10           A      I do.
11           Q      Is it fair to say the statement was
12      probably made in or around April 3rd, 2016?
13           A      I would assume so, yes.
14           Q      When did you read this statement?
15           A      Again, I'm not sure of the exact date.
16           Q      Do you think it was before April or
17      May 2017?
18           A      It was probably around that time.
19           Q      So fair to say you didn't read it in
20      or around April 3rd, 2016?
21           A      Again, I don't know the exact date
22      that I saw it.  I researched literally thousands
23      of posts and so it's impossible to say what
24      date.
25           Q      Were you researching posts around
```

```
                                          Page 82
 1    April 3rd, 2016?
 2         A    I can't remember, to be honest.
 3         Q    If you had been researching posts
 4    around April 3rd, 2016, do you think you might
 5    have learned about XRB before April or June
 6    2017?
 7         A    I think it's possible.  There's
 8    hundreds or thousands of coins out there.  So
 9    there was -- I don't know.
10         Q    All right.  Let's go to Paragraph 94.
11              And Paragraph 94 appears to be the
12    same as -- it appears to include the same set of
13    statements that we looked at in Paragraph 86.
14              Any reason to disagree with that,
15    Mr. Fabian?
16         A    I don't believe so.
17         Q    So fair to say your testimony about
18    Paragraph 94 would be the same as your testimony
19    about Paragraph 86?
20         A    Correct.
21         Q    Let's move on to Paragraph 96.
22              Mr. Fabian, can you identify the
23    statement in Paragraph 96 that you contend was a
24    misrepresentation?
25         A    It's kind of cut off here.  Let me see
```

```
                                              Page 83
1     if I can move it.
2         Q     I think it's just this quote here in
3     the second part of the paragraph that begins
4     with, "Part of the reason."
5         A     Okay.  I've read it.
6         Q     Is that the statement you contend was
7     a misrepresentation?
8         A     Again, this is a statement that looks
9     familiar to me from my research.  I don't know
10    if there's any misrepresentation in it or not.
11        Q     Does it seem like a misrepresentation
12    to you sitting here today?
13              MR. ENRIGHT:  Objection, calls for a
14          legal conclusion.  But you can answer.
15              THE WITNESS:  No, it appears more of a
16          statement of what they are doing.
17    BY MR. FOX:
18        Q     When was this statement made,
19    Mr. Fabian?
20        A     It says March 19th, 2016.
21        Q     When did you first read it?
22        A     Again, I don't know the exact date.
23        Q     Possible it was before April or May
24    2017?
25        A     It could be possible.
```

```
                                           Page 84
 1         Q      Possible it was some time not in or
 2    around March 19, 2016?
 3         A      It's possible.  Again, I don't know
 4    the exact date.
 5         Q      Let's go to 97.
 6                Can you see 97 okay?
 7         A      Yes.
 8         Q      We've got a quote in the text of the
 9    paragraph and we've got a screenshot.
10                Can you identify the statement in
11    Paragraph 97 that you contend was a
12    misrepresentation?
13         A      Are you able to scroll down a little
14    bit?
15         Q      Yes.  I just want to give you a chance
16    to read the first statement that's quoted.
17         A      Yes, got that.
18         Q      And then I'll even blow this up a
19    little bit for you.
20         A      Thank you.
21                Okay.  I read it.
22         Q      Can you identify the statement that
23    you contend was a misrepresentation?
24         A      Again, I don't know if there was any
25    misrepresentation in here.  This is just
```

```
                                        Page 85
```

1      something that looked familiar to me when I was

2      doing the XRB faucet and information I found.

3          Q     All right.  When was this statement

4      made?

5          A     It was March 19th, 2016.

6          Q     And when did you first read it?

7          A     I don't have an exact date.  I don't

8      know.

9          Q     Possible it was before April or May

10     2017?

11         A     It's possible.

12         Q     Possible it wasn't in or around

13     March 19, 2016?

14         A     I guess it's possible.

15         Q     Let's go to 98.  I'll zoom out here.

16               Can you identify the statement in

17     Paragraph 98 that you contend was a

18     misrepresentation?

19         A     I don't know if I see any

20     misrepresentation.  This is just information

21     about being posted on some bigger exchanges.

22         Q     Anything that could be a

23     misrepresentation?

24         A     I mean, I don't know.  There was a lot

25     of talk about getting put on bigger exchanges

Page 86

1    like Bittrex and Poloniex and C-Cex.  And I know

2    that didn't happen, so I don't know -- when

3    something like that does happen in the

4    cryptocurrency world, the price tends to go up.

5            So I don't know if these were actual

6    conversations that they had or if they were just

7    conversations to drive interest and to drive

8    price.  I don't know what the -- what was behind

9    it.

10       Q    Are you basing your fraud claim on

11   this statement?

12           MR. ENRIGHT:  Objection, calls for a

13       legal conclusion.  You can answer.

14           THE WITNESS:  I mean, it could be

15       construed as that.  I don't know what the

16       true point of this was other than to get

17       people to buy the coin.

18   BY MR. FOX:

19       Q    When was the statement made,

20   Mr. Fabian?

21       A    Looks like April 21st, 2016.

22       Q    And when did you first read it?

23       A    I don't know the exact date.

24       Q    Is it possible it was before April or

25   May 2017?

```
                                          Page 87
 1        A     It's possible.
 2        Q     Is it possible it was not in or around
 3     April 21st, 2016?
 4        A     That could be possible.
 5        Q     Let's take a look at 138.
 6              MR. ENRIGHT:  Peter, are we getting
 7        close to a stopping point?  It's been an
 8        hour and 15 minutes.
 9              MR. FOX:  We are.  If we're thinking
10        we're going to march through every single
11        paragraph in Interrogatory Number 1, we're
12        not going to do that now.  But we're going
13        to cover 138.
14              MR. ENRIGHT:  Whatever your plans are,
15        that's fine.  I just was asking if we're
16        coming up to a point to allow people to
17        stretch their legs, get a drink.
18              MR. FOX:  I think about ten minutes.
19              MR. ENRIGHT:  Okay.
20     BY MR. FOX:
21        Q     Mr. Fabian, do you see Paragraph 138
22     there?
23        A     I do.
24        Q     I backed it out a little bit so that
25     it's easier to see.  But let me know if you want
```

```
                                                    Page 88
 1    me to zoom in.
 2              Can you identify the statement that
 3    you contend was a misrepresentation?
 4         A    Can you zoom in for me?
 5         Q    Is that better?
 6         A    It is, yes.  Okay.
 7         Q    Do you see any statements in there
 8    that look like misrepresentations to you?
 9         A    Again, I don't know if there's any
10    misrepresentation.  This is just something that
11    looked familiar to me as far as talking about
12    the faucet and the caption that they had to
13    promote the coin.
14         Q    Do you see when this statement was
15    made?
16         A    March 7th, 2016.
17         Q    When did you read this statement?
18         A    I don't know the exact date.
19         Q    Possible it was before April or May
20    2017?
21         A    Possible.
22         Q    Possible that it was not in or around
23    March 7th, 2016?
24         A    Possible.
25         Q    Mr. Fabian, did you ever use the
```

```
                                      Page 89
 1     Twitter handle @HulksterCrypto?
 2          A     I thought it was CryptoHulkster, but
 3     it's similar, yes.
 4          Q     We may have a chance to check that out
 5     in a moment.
 6          A     Okay.
 7          Q     Did there come a time when someone
 8     using the handle @cryptomacho wrote to you "Want
 9     a gem?  XRB is your answer"?
10          A     I would have to see it.  I don't know
11     if that was a solicitation or --
12          Q     Let's take a look at it.  I'm going to
13     introduce another document.
14          A     Okay.
15                (Exhibit 4 was marked.)
16   BY MR. FOX:
17          Q     Mr. Fabian, I've introduced another
18     document that's been marked as Exhibit Number 4.
19     And I'm going to share that with you right now.
20                Do you see this document and do you
21     see that it's been marked Exhibit Number 4?
22          A     I do.
23          Q     Okay.  I'm going to start at the
24     bottom because I believe that's the way this
25     flows temporally and just scroll up really
```

Page 90

```
 1     slowly.  And I want you to look at it as I
 2     scroll up and then you tell -- I want you to
 3     tell me whether you recognize the tweets that
 4     are reflected in this document.  Okay?
 5         A     Okay.
 6         Q     Do you recognize these tweets?
 7         A     They look vaguely familiar.
 8         Q     I may have misspoken a moment ago with
 9     respect to your Twitter handle.  This
10     @HulksterCrypto, is that you?
11         A     I believe so.  I thought it was the
12     other way around, but that's my picture and my
13     name, yes.
14         Q     Does this document refresh your
15     recollection as to whether @cryptomacho wrote
16     you and asked, "Want a gem?  XRB is your
17     answer"?
18         A     I don't remember if it was directed
19     towards me.  I remember seeing stuff like that
20     from different people.  I don't remember if that
21     was an actual message to me.  I don't remember.
22         Q     Do you recall whether you replied to
23     that message?
24         A     I can't recall from that point.
25         Q     Do you see where I'm toggling -- I
```

1    don't know if you can see my mouse or not.

2         A     Yes.

3         Q     Do you see where I'm toggling where it

4    says @HulksterCrypto, and it also says James

5    Fabian, replying to @cryptomacho and it looks

6    like you say, "Where can you buy it?  I don't

7    see it on any exchange.  Just XRBC."

8              Does that refresh your recollection as

9    to whether you replied to this tweet by

10   cryptomacho?

11        A     I see it.  I don't even know what XRBC

12   is to be honest.  I don't know what that's

13   referencing, "Just XRBC."  I don't know what

14   that is.

15        Q     Does this look like your reply to

16   cryptomacho's question?

17        A     It does.

18        Q     Who is @cryptomacho?

19        A     Just a -- I guess in cryptocurrency in

20   general, there's just personalities on Twitter

21   that people follow to get information from or to

22   knock ideas with.

23        Q     Do you know anything else about him?

24        A     I do not.

25        Q     Have you ever talked to him outside of

```
                                              Page 92
 1    Twitter?
 2         A     I have not.
 3         Q     Why do you think he wrote to you,
 4    "Want a gem?  XRB is your answer"?
 5              MR. ENRIGHT:  Objection, assumes facts
 6         not in evidence, misstates the record.  You
 7         can answer.
 8              THE WITNESS:  Honestly, I have no
 9         idea.
10    BY MR. FOX:
11         Q     Why do you think you replied to him,
12    "Where can I (sic) buy it?  I don't see it on
13    any exchange.  Just XRBC"?
14         A     I'm guessing I was interested at that
15    point.
16         Q     Interested in what?
17         A     In the coin itself, XRB Nano.
18         Q     Do you see what date this Twitter
19    exchange occurred on, Mr. Fabian?
20         A     It's August 26th, 2017.
21         Q     What did cryptomacho write back to you
22    after you wrote, "Where can I (sic) buy it?  I
23    don't see it on any exchange"?
24         A     It looks like he said yes.
25         Q     Did anyone else reply to that question
```

Page 93

1    that you asked?

2         A      Somebody called Broccolex and they

3    said at CultureCrypto, at Cryptomacho, at

4    BitGrail is the most popular one.

5         Q      And then if we scroll up to the next

6    day, it looks like someone named Sphil1608

7    replies to you and writes, "BitGrail and

8    Mercatox."

9                Do you see that?

10        A      I do.

11        Q      And what did you reply to Sphil1608?

12        A      It looks like, "Thanks."

13               MR. ENRIGHT:  Objection, the document

14        speaks for itself.

15               MR. FOX:  Okay.

16   BY MR. FOX:

17        Q      Do you see later in the day on

18   August 27th where you reply to Sphil, "What

19   exchange is it on?"

20        A      Yes, I see that.

21        Q      What were you referring to by the

22   pronoun "it"?

23        A      That would be for XRB.

24        Q      Do you see where you write a little

25   bit further up, "Is that XRBC?  Reddbytecoin?"

Page 94

1        A      I see that, yes.

2        Q      What do you think you meant by that

3    tweet?

4        A      I don't remember exactly.  But I'm

5    guessing sometimes coins have very similar

6    digits like XRB, XRBC, so it can be confused as

7    to what the actual coin name is.  I'm assuming I

8    was clarifying.

9        Q      Right.  It looks that way; correct?

10   Because Sphil then writes "XRB" in response to

11   you.

12          Do you see that?

13       A      Yes.

14       Q      And what date did this exchange occur

15   on?

16       A      It looks like August 27th, 2017.

17       Q      And when did you buy your first XRB?

18       A      I believe it was a few days later.

19       Q      So it's your testimony that you bought

20   your first XRB a few days after @cryptomacho

21   asked you if you wanted, quote, a gem; is that

22   correct?

23       A      On the date, the exact date, I don't

24   know the exact date because I cannot get the

25   paper trail any longer.  So that was just based

Page 95

1    off memory that it was around that time.

2         Q     If I told you that you alleged in your

3    complaint you made your first purchase on

4    September 1st, would that sound wrong to you?

5         A     I thought it was August 30th, but,

6    yes, around there.

7         Q     How many days was that after you asked

8    cryptomacho, "Where can I buy it?  I don't see

9    it on any exchange"?

10        A     It's about roughly three days.

11        Q     That would be about how many months

12   after you testified that you first learned about

13   XRB?

14        A     I would guess, what, five months or

15   so.

16        Q     Mr. Fabian, is it possible you did not

17   know about XRB until August 26th, 2017 when

18   cryptomacho offered you a gem?

19        A     I don't believe so, no.

20        Q     Is it possible?

21        A     It could be possible.

22             MR. FOX:  Okay.  Why don't we take a

23        15-minute break, everybody can use the

24        bathroom and stretch their legs.

25             VIDEOGRAPHER:  We're going off the

Page 96

 1          record at 12:18 p.m.  This is the end of
 2          Media 3.
 3                  (Recess taken.)
 4                  VIDEOGRAPHER:  We are on the record at
 5          12:37 p.m.  This is the beginning of Media 4
 6          in the deposition of James Fabian.
 7   BY MR. FOX:
 8          Q     Okay.  Mr. Fabian, just came back from
 9      about a 17-minute break and let's get right back
10      into the examination.
11                  When did you make your final purchase
12      of XRB on BitGrail?
13          A     I don't know the exact date.  I think
14      it was a few months after my initial purchase.
15          Q     If I told you there are allegations in
16      the complaint and in your declaration that you
17      just signed this week in connection with your
18      lawyers' motion for class certification that you
19      made your final purchase on December 12th, 2017,
20      would you have any reason to doubt that?
21          A     That sounds about right.
22          Q     And all of the statements that we were
23      just looking at were made before -- were made in
24      2016; correct?
25          A     I believe so, yes.

Page 97

```
 1        Q      Fair to say that there are a number of
 2    other statements in your response to
 3    interrogatory -- strike that.
 4              Is it fair to say that there are a
 5    number of other statements in paragraphs
 6    referenced in your response to Interrogatory
 7    Number 1 that were made before December 12th,
 8    2017?
 9        A      I believe so, yes.
10        Q      I'm going to represent to you that
11    there are so that we don't have to walk through
12    those additional paragraphs that are referenced
13    in that response to Interrogatory Number 1.
14              MR. FOX:  Okay.  So I'm going to
15         introduce another exhibit.  Bear with me for
16         a moment and then I will share it with you
17         and the rest of the group.
18              MR. ENRIGHT:  I'm going to excuse
19         myself.  I have a little bit of a postnasal
20         drip from allergies.  I apologize if you
21         hear some unpleasant sounds coming from me.
22         I apologize, I can't mute myself by the
23         rules.  So I apologize in advance if you
24         hear anything unpleasant coming from me as a
25         result of my allergies.
```

```
                                        Page 98
 1              MR. FOX:  Okay.  Understood.  I've
 2         introduced this document as Exhibit
 3         Number 5.
 4              (Exhibit 5 was marked.)
 5    BY MR. FOX:
 6         Q    I'm about to pull it up.
 7              Okay.  Do you see on your screen,
 8      Mr. Fabian, a document that's been marked as
 9      Exhibit Number 5?
10         A    I do.
11         Q    And by its header, it's evident that
12      this is a document that was filed in this case
13      as Document Number 57.
14              Have you ever seen this document
15      before?
16         A    I believe I have.
17         Q    What is it?
18         A    It looks like it's a motion to
19      dismiss.
20         Q    Okay.  So the title of it is
21      "Reporter's Transcript of Proceedings."
22         A    Okay.
23         Q    Does that change your testimony?
24         A    I don't know the correct legal terms
25      for the document, so if that's what it is, it
```

```
 1    is.
 2         Q     Okay.  If I told you that it was a
 3    transcript of an oral argument that the court
 4    had on -- when hearing a motion to dismiss,
 5    would you have any reason to doubt that?
 6         A     No.
 7         Q     Have you seen this document before?
 8         A     I'm not sure if I have or not.
 9         Q     Okay.  I'm going to ask you to take a
10    look down at the bottom of Page 28, which I'm
11    scrolling down to right now.
12         A     Okay.
13         Q     Do you see a reference to a
14    Mr. Carriel there at the bottom of Page 28?
15         A     I do.
16         Q     Who is Mr. Carriel?
17         A     Part of my legal counsel.
18         Q     Does he represent you in this action?
19         A     He does.
20         Q     Do you see where Mr. Carriel says, I'm
21    going to quote here, "Your Honor, I disagree.
22    There are multiple statements that the Nano team
23    made assuring investors that their funds were
24    safe on BitGrail -- promising them that --
25    promising investors and our client that they
```

Page 100

```
 1          could trust defendant Firano, the CEO of
 2          BitGrail, making statements such as, I speak
 3          to -- or I speak to Firano every day.  He's a
 4          great guy.  You can trust him.  The funds are
 5          safe."
 6                  Do you see that?
 7          A     I do.
 8          Q     Do you see below that where the court
 9          says, "But, you know, again, all of these -- and
10          in this regard, it bleeds over into the fraud
11          claim, the misrepresentation claims -- again,
12          everything in the complaint except for one post,
13          which is pretty innocuous -- happened after your
14          client acquired -- I'm not even going to say
15          purchased, but your client acquired the Nano."
16                  Do you see that?
17          A     I do.
18          Q     And do you see where Mr. Carriel says,
19          "Yes, Your Honor"?
20          A     I do.
21          Q     Was Mr. Carriel wrong to agree with
22          the court that all of the allegedly false or
23          misleading statements that you claim were made
24          were made after you acquired your last XRB on
25          BitGrail?
```

1              MR. ENRIGHT:  Objection, calls for a
2         legal conclusion.  You can answer.
3              THE WITNESS:  That they were made --
4         I'm sorry, can you repeat the question?
5    BY MR. FOX:
6         Q    Was he wrong -- was Mr. Carriel wrong
7      to agree with the court that the only actionable
8      statements in this case were made after your
9      final purchase of XRB on BitGrail?
10             MR. ENRIGHT:  Objection, misstates the
11        record, calls for a legal conclusion.  You
12        can answer.
13             THE WITNESS:  I believe some were --
14        some were after my purchase, I believe.
15   BY MR. FOX:
16        Q    It appears that Mr. Carriel was
17     agreeing with the court that all of them were
18     after the purchase.
19             And I'm asking you:  Was he wrong to
20     agree with the court on that point?
21             MR. ENRIGHT:  Objection, misstates the
22        record, calls for a legal conclusion.  The
23        witness can answer.
24             THE WITNESS:  I'm not sure if he was
25        wrong or not.

```
                                              Page 102

 1   BY MR. FOX:

 2        Q      Are you aware of any

 3   misrepresentations that were made before your

 4   final purchase of XRB on BitGrail on

 5   December 12, 2017?

 6        A      Am I aware of any that were made

 7   before my final purchase?

 8        Q      Correct.

 9        A      I believe so, yes.

10        Q      What were those?

11        A      I don't know offhand.

12        Q      Did we see any of them in the

13   paragraph we looked at before with respect to

14   your response to Interrogatory Number 1?

15        A      Those were before my final purchase,

16   yes.

17        Q      But were they misrepresentations?

18        A      The ones that we looked at I don't

19   believe are misrepresentations.

20        Q      Are there other ones that -- other

21   statements made before December 12, 2017 that

22   you believe are misrepresentation?

23        A      I believe there could be.

24        Q      What do you think Mr. Carriel meant

25   when he said, "Yes, Your Honor" in response to
```

Page 103

1    that statement by the court?

2        A     I'm not sure what he meant.

3        Q     All right.  Let's go back to the

4    interrogatory responses.  I'm going to stop the

5    share here and pull up Exhibit 2.  Bear with me

6    for a second.

7              So we're looking at your responses to

8    interrogatories again, Exhibit Number 2.

9              Do you see this document?

10       A     I do.

11       Q     Let's go back to some more statements

12   that you contend were made by Mr. LeMahieu and

13   were misrepresentations.

14             We talked about a number of them

15   before we had the break, so let's look at some

16   new ones.

17             Number 79, Paragraph 79 is one we

18   haven't looked at before, so let's take a look

19   at the complaint and take a look at that

20   paragraph.  I'm going to stop the share and pull

21   up the complaint.

22             Do you see the complaint in front of

23   you?

24       A     I do.

25       Q     Do you see Paragraph 79?

Page 104

1     A     I do.

2     Q     What is the statement in this

3     paragraph that you contend was a

4     misrepresentation?

5     A     Can you scroll down a little bit?

6     It's kind of cut off at the very end.

7     Q     Is that better?

8     A     Yes, it is.  Thank you.

9           I don't know of anything that's a

10    misrepresentation in that paragraph.

11    Q     Let's take a look at Paragraph 92.

12    I'll blow this up for you so it's easier to

13    read.  I'm going to make it smaller so you can

14    read and see the whole text before the

15    screenshot and let me know if you need it

16    bigger.

17          I don't think there's a question

18    pending, which is my fault.

19          So the question is:  Do you see --

20    which is the statement or statements in

21    Paragraph 92 that you contend are

22    misrepresentation?

23    A     I don't know if there is a

24    misrepresentation on that one.

25    Q     Okay.  Let's take a look at 109.

1             Okay.  Can you identify the statement
2     or statements that you contend were
3     misrepresentations quoted or paraphrased in
4     Paragraph 109?  Let me know if you need me to
5     scroll down.
6        A     Okay.  Can you scroll down just a
7     little bit?
8             Okay.  I don't know if there's any
9     misrepresentation in that paragraph.
10       Q     Do you see Mr. LeMahieu's name on this
11    post?
12       A     That post itself, it just
13    says,"@NANO_Updates."
14       Q     Do you have any reason to believe that
15    Mr. LeMahieu has anything to do with the
16    @NANO_Updates handle?
17       A     I don't know if he does or not.
18       Q     But just to confirm, you refer to this
19    paragraph in your response to Interrogatory
20    Number 1 as an example of a statement made by
21    Mr. LeMahieu that you contend is a
22    misrepresentation; correct?
23       A     Correct.  I would assume Nano_Updates
24    has -- is ran by the Nano team and Zack
25    Shapiro's name is on there as well.

1      Q     Right.  But for the record, you don't
2    see anything indicating that Zack Shapiro wrote
3    this tweet, do you?
4      A     Not here.
5      Q     It looks like it's a tweet about Zack
6    Shapiro; correct?
7      A     It's adding or at'ing him, so directed
8    towards him.
9      Q     Right.  So someone talking was talking
10   to him; correct?
11     A     Could be.
12     Q     Let's take a look at Paragraph 112.
13           Can you identify the statement in
14   Paragraph 112 that you contend is a
15   misrepresentation?
16     A     Can you enlarge it a little bit?
17     Q     Sure.  Is that better?
18     A     Yes, thank you.
19           I don't know if there is a
20   misrepresentation in that tweet.
21     Q     Do you see Mr. LeMahieu's name on this
22   post?
23     A     I do not.
24     Q     Whose handle do you see on this post?
25     A     It looks like nanocurrency is the one

Page 107

1    tweeting it.

2         Q     Is that different than the handle we

3    just looked at in the previous paragraph?

4         A     I can't recall if it was different.  I

5    think it was the same.

6         Q     This was Paragraph 109.  Let's go back

7    and take a look.

8              What handle do you see at Paragraph

9    109?

10        A     That's @NANO_Update, so it's

11   different.

12        Q     Okay.  Do you have any reason to

13   believe that Colin LeMahieu had anything to do

14   with this handle?

15        A     I don't know if he did.

16        Q     Let's take a look at Paragraph 113.

17   This is wider, so I'm going to zoom out a little

18   bit.

19              Can you identify the statement or

20   statements in this paragraph that you contend

21   are misrepresentations?

22              MR. ENRIGHT:  I'm going to object that

23        this calls for a legal conclusion.  The

24        witness can answer.

25              THE WITNESS:  I don't know if there is

Page 108

1          a misrepresentation on that sheet.
2      BY MR. FOX:
3          Q      Do you see Mr. LeMahieu's name
4      connected to any of these statements?
5          A      I don't believe so, no.
6          Q      Do you see a handle or some sort of
7      identifying mark on this screenshot?
8          A      I don't believe so.  There is
9      something in the very bottom right-hand corner,
10     something --
11         Q      I'll blow it up.
12                I blew it up too much, now we can't
13     see it.  There.
14         A      /u/ihateaccounts90, I don't know what
15     that is.
16         Q      Do you have any reason to believe that
17     Mr. LeMahieu has anything to do with
18     /u/ihateaccounts90?
19         A      I have no idea.
20         Q      Let's take a look at 114.
21                Can you identify the statement or
22     statements in 114 that you contend are
23     misrepresentations?
24                I'll back it out a little bit so you
25     can see the whole thing.

```
 1        A     Okay.

 2              I don't know if anything is

 3    misrepresented on that one.

 4        Q     Looking just at the tweet from

 5    @nanocurrency, do you see Mr. LeMahieu's name on

 6    this post?

 7        A     That one, no.

 8        Q     And you testified a moment ago that

 9    you don't have any basis to believe that

10    Mr. LeMahieu is connected to the @nanocurrency

11    account; is that correct?

12              MR. ENRIGHT:  Objection, misstates the

13         record.  You can answer.

14              MR. FOX:  I'll rephrase the question.

15        Q     Do you have any basis to believe that

16    Mr. LeMahieu was connected to the @nanocurrency

17    account?

18        A     I'm not sure if he is.

19        Q     Let's go to 121.  And actually, to go

20    back to that previous question, is it your

21    testimony that you have -- that you do not have

22    a basis to believe that Mr. LeMahieu was

23    connected to that account I just referenced?

24              MR. ENRIGHT:  Objection, misstates the

25         prior testimony.  You can answer.
```

```
                                          Page 110
 1             THE WITNESS:   I don't know if he has a
 2        connection or not.
 3   BY MR. FOX:
 4        Q     Do you have a basis to believe he
 5     does?
 6        A     I do not.
 7        Q     Do you have a basis to believe that
 8     he's connected to the /u/ihateaccounts90
 9     account?
10        A     I don't know if he's attached to that
11     or not.
12        Q     Do you have a basis to believe that he
13     is?
14        A     I do not.
15        Q     Do you have a basis to believe that
16     Mr. LeMahieu is in any way affiliated with the
17     @NANO_Updates account?
18        A     I don't know.
19        Q     Do you have a basis to believe that he
20     is?
21        A     I do not.
22        Q     Let's take a look at 121.  Just let me
23     know -- there's language quoted in the text, but
24     also let me know if you would like me to blow up
25     the screenshot.
```

Page 111

```
 1              Once again, I would like you to
 2      identify the statement or statements in
 3      Paragraph 121 that you contend are
 4      misrepresentations.
 5          A      Okay.  Could you blow up the
 6      screenshot now?
 7          Q      Sure.
 8          A      I don't know if there's any
 9      misrepresentation in that screenshot or
10      paragraph.
11          Q      I'm going to shrink this down again.
12      Let's take a look at 124.
13              Same question, can you identify the
14      statement or statements in Paragraph 124 that
15      you contend are misrepresentations?  Again, let
16      me know when you need me to blow up the
17      screenshot.
18          A      Yes, you can blow it up.
19              I don't know if there's anything
20      misrepresented in that.
21          Q      Let's take a look at 127.  Make it
22      smaller so we can see the whole thing.
23              Can you identify the statement or
24      statements contained in Paragraph 127 that you
25      contend contain -- than you contend are
```

Page 112

1    misrepresentations?

2              MR.  ENRIGHT:   I'm going to object to

3         the form of the question, calls for a legal

4         conclusion.

5    BY MR. FOX:

6         Q     I'll rephrase it.

7              Do you see any statements in

8    Paragraph 127 that you believe are untrue,

9    Mr. Fabian?

10        A     I don't know if any of those are

11   untrue or not.

12        Q     Do you have any basis to believe that

13   they are untrue?

14        A     I do not.

15        Q     Let's take a look at 131.

16             Would you identify any statement or

17   statements that you contend are untrue or

18   misleading?

19        A     I don't know if anything was

20   misrepresented in that paragraph.

21        Q     You know, I apologize, I don't think

22   there even were any statements in that

23   paragraph, there is a screenshot below it.

24             Can you take a look -- please take a

25   look at the screenshot as well and tell me if

1    you see any statements that you believe are

2    untrue or misleading.

3         A    I don't know if that's untrue or

4    misleading.

5         Q    Do you have any basis to believe that

6    it's untrue or misleading?

7         A    I don't.

8         Q    Do you see Mr. LeMahieu's name on this

9    post?

10        A    This one, no, just Zack Shapiro.

11        Q    Right.  But for the record, you refer

12   to this paragraph in your response to

13   Interrogatory Number 1 as a paragraph containing

14   a challenged statement made by Mr. LeMahieu;

15   correct?

16        A    I believe so.

17        Q    All right.  Let's go to 139.  And

18   again, take a look at the text first and let me

19   know when you need me to blow up the screenshot.

20             I would like you to identify any

21   statement or statements in Paragraph 139 that

22   you believe are untrue or misleading.

23        A    Can you blow it up?  There is that

24   pop-up print screen that's kind of blocking.

25        Q    Are you seeing that?

Page 114

1      A      Yes.

2      Q      I'll scroll around.  Is that better?

3      A      It is, yes.  Thank you.

4             I don't know if there's any

5      misrepresentation in this one.

6      Q      Let's go to 141.  I'm going to shrink

7      this down so we can see it.

8             Do you see any statements in

9      Paragraph 141 that you contend were untrue or

10     misleading when they were made?

11     A      Can you enlarge the screenshot?

12            I don't see any misrepresentation on

13     that one.

14     Q      Let's go to 144.  We'll shrink this

15     down so we can see it all.

16            Do you see any statement here that you

17     contend was untrue or misleading when it was

18     made?

19     A      I don't know if any of that was

20     untrue.

21     Q      When was this statement made?

22     A      April 9th, 2018.

23     Q      When did the BitGrail exchange close?

24     A      I believe that was February of 2018.

25     Q      Does this statement have anything to

1    do with any investment decision you made with

2    respect to BitGrail?

3         A     I don't believe it has anything to do

4    with my specific transaction.

5         Q     Fair to say it couldn't have anything

6    to do with yours or anyone else's specific

7    transaction since BitGrail was already closed

8    when the statement was made?

9         A     Yes.  I don't know.

10        Q     Would that be fair to say?

11        A     I believe so.

12        Q     Let's take a look at 154.  Can you

13   identify any statements or statements that you

14   contend were untrue or misleading when they were

15   made?

16        A     I don't know if there's any

17   misrepresentation on 154.

18        Q     In 154, who made the statement that's

19   alleged in that paragraph?

20        A     I don't believe it says.

21        Q     Looking at the first sentence where it

22   says, "In early" --

23        A     BitGrail.  It says, "BitGrail

24   announced."

25        Q     So fair to say these are statements

```
                                              Page 116
 1     that are alleged to have been made by BitGrail?
 2          A     Yes, safe to assume.
 3          Q     Fair to say this is not a statement
 4     made by Mr. LeMahieu?
 5                MR. ENRIGHT:  Objection, calls for a
 6          legal conclusion.
 7                THE WITNESS:  I'm not sure.
 8   BY MR. FOX:
 9          Q     Do you see Mr. LeMahieu's name in this
10     paragraph?
11          A     I do not.
12          Q     Take a look at 164.  All right.  Can
13     you identify any statement in this paragraph?
14          A     The question is can I identify a
15     statement?
16          Q     Yes.  Do you see a statement alleged
17     in this paragraph?
18          A     It's just saying that "the Nano
19     Defendants issued countless statements falsely
20     or negligently assuring Plaintiff and the Class
21     that their funds were safe on the BitGrail
22     Exchange."
23          Q     Do you see any specific statement
24     quoted in this paragraph?
25          A     No, I don't.
```

Page 117

1          Q     Do you see any specific statement
2     paraphrased in this paragraph?
3          A     No.
4          Q     But you referred to this paragraph as
5     including a challenged statement made by
6     Mr. LeMahieu in your interrogatory statements,
7     did you not?
8          A     I'm not sure who made this statement.
9          Q     That was not the question, though,
10    Mr. Fabian.
11               Your interrogatory responses to
12    Interrogatory Number 1 refer to this paragraph
13    as an example of a paragraph including a false
14    or misleading statement made by Mr. LeMahieu;
15    isn't that correct?
16         A     Off the top of my head, I can't
17    remember if that was part of that or not.
18         Q     If I represented to you that you did
19    refer to Paragraph 164 in your response to
20    Interrogatory Number 1 under the subheading for
21    Mr. LeMahieu, would you have any reason to doubt
22    that?
23         A     No, none.
24         Q     Do you still maintain that your
25    interrogatory responses are true and correct to

Page 118

1      the best of your belief?

2            A      I do.

3            Q      Let's take a look at Paragraph 188.

4                   Do you see where it says, "In further

5      reliance on the social media representations he

6      had read from Defendant LeMahieu, Defendant

7      Shapiro, and other people related to XRB -- and

8      in reliance on the representations he had read

9      about the safety and security of both the Nano

10     Protocol and the BitGrail exchange -- Plaintiff

11     Fabian turned to BitGrail as an exchange where

12     he would purchase and stake his XRB."

13                  Do you see that?

14           A      I do.

15           Q      Is that true?

16           A      It is.

17           Q      When did you decide to turn to

18     BitGrail to purchase and stake your XRB?

19           A      Again, I believe that was around

20     August 30th, I think it's 2017.  Somewhere

21     around there.

22           Q      What specific statements about the

23     safety of the BitGrail exchange had you read and

24     relied upon at this time?

25           A      I'm not sure without doing more

Page 119

1     research.

2          Q     You testified earlier that you believe

3     you learned about the BitGrail exchange shortly

4     before you opened an account, did you not?

5          A     Correct.

6          Q     So what statements by Defendant

7     LeMahieu or Defendant Shapiro did you read and

8     rely upon after you learned about the BitGrail

9     exchange and before you turned to the exchange?

10         A     I'm not sure.

11         Q     It would have needed to have been in a

12    relatively small window.  Is that fair to say?

13         A     Not necessarily.

14         Q     So is it your testimony that you read

15    and relied upon statements about the safety and

16    security of the BitGrail exchange before you

17    learned about the BitGrail exchange, Mr. Fabian?

18         A     No.

19         Q     So is it fair to say you only could

20    have read and replied upon statements about the

21    BitGrail exchange after you learned the BitGrail

22    exchange existed; correct?

23         A     I'm not sure of the exact timing of

24    when I knew it existed.

25         Q     You testified earlier that you believe

Page 120

1    you learned it existed in August 2017, did you
2    not?
3        A     Correct.
4              This one -- I don't believe this
5    says -- has a date on it.  So I don't know.
6        Q     Yeah, I'm -- strike that.
7              What specific statements about the
8    safety of the Nano protocol did you read and
9    rely upon before you turned to the BitGrail
10   exchange?
11       A     I'm not sure.
12       Q     Do you think any of these statements
13   would have been alleged in the complaint?
14       A     Could have been, yes.
15       Q     Were any of the statements that we
16   just looked at the statements that you're
17   referring to here?
18             MR. ENRIGHT:  Objection, incomplete
19        hypothetical.
20             THE WITNESS:  They could be.
21   BY MR. FOX:
22       Q     But is it your testimony that you
23   don't, sitting here today, recall which
24   statements you read and relied upon before
25   opening -- before, quote/unquote, turning to

Page 121

1   BitGrail about -- strike that.

2              Is it your testimony that you don't

3   recall which specific statements about the

4   safety of the Nano protocol you read and relied

5   upon before turning to BitGrail?

6        A    Correct.  There was a lot of

7   statements.  I don't know specifically all of

8   them.

9        Q    So it's your testimony that you read

10  statements about the safety of the Nano

11  protocol; is that correct?

12       A    Correct.

13       Q    It's your testimony you relied on

14  these statements before deciding to,

15  quote/unquote, turn to BitGrail; is that

16  correct?

17       A    Correct.

18       Q    But it's your testimony you can't

19  remember what these statements were; is that

20  correct?

21       A    Correct.

22       Q    And it's your testimony you can't

23  remember what these statements were even though

24  some of these statements might be in the

25  complaint; is that correct?

Page 122

1          A     I mean, the statements, if they are in
2     here, I relied on those.  I don't know if there
3     was additional.  Again, it was three or four
4     years ago, so it's tough to recall.
5          Q     Is it fair to say that every statement
6     we looked at so far today did not include any
7     misrepresentation?
8          A     Correct.
9          Q     Let's take a look at Paragraph 194.
10               Do you see where it says, "In deciding
11     to invest in XRB, open an account at BitGrail,
12     and stake his investment holdings there,
13     Plaintiff Fabian reviewed and relied upon the
14     Nano Defendants' promotions on social media
15     channels and/or statements made on the Nano
16     Defendants' own website representing that
17     BitGrail is" safe and reliable -- excuse me,
18     "representing that BitGrail is a safe and
19     reliable exchange on which to purchase and stake
20     XRB."
21               Do you see that?
22          A     I do.
23          Q     Is that true?
24          A     It is.
25          Q     When did you decide to open an account

Page 123

1    on BitGrail?

2         A       Again, I think it was in August.

3         Q       And what specific promotions on social

4    media channels representing that BitGrail is a

5    safe and reliable exchange had have you read and

6    relied upon at this time?

7         A       I'm sorry, which mediums?

8         Q       No, which statements.  Which

9    statements on social media channels had you read

10   and relied upon at the time you opened the

11   account?

12        A       I don't know.  I don't have the

13   statements memorized.

14        Q       Is it fair to say that these

15   statements were made after you learned about the

16   existence of BitGrail?

17        A       I don't know.

18        Q       Is it possible that you read a

19   statement about the safety and security of

20   BitGrail before you learned -- knew of the

21   existence of BitGrail?

22        A       I suppose not.

23        Q       What, quote/unquote, statements on

24   defendants' own website about BitGrail's safety

25   and security had you read and relied upon before

Page 124

1    opening an account with BitGrail?

2         A    I'm not sure of the exact statements.

3         Q    It possible that these statements are

4    in the complaint?

5         A    Possible.

6         Q    Could they be any of the ones that we

7    looked at?

8         A    I can't remember.

9         Q    If I represented to you that we didn't

10   look at any statement that came from defendants'

11   own website, would that sound wrong to you?

12        A    I would assume that's correct.

13        Q    So is it your testimony that you read

14   statements about Nano's website about the safety

15   and security of BitGrail's exchange?

16        A    Correct.

17        Q    Is it your testimony that you relied

18   on these statements in deciding to open an

19   account and stake your investments there?

20        A    Correct.

21        Q    But it's your testimony that you can't

22   remember what these statements are; is that

23   correct?

24        A    Correct.

25             MR. ENRIGHT:  Counsel, how many times

Page 125

1           are you going to rephrase these same steps?
2           You've gone over the same ground half a
3           dozen times.  You're getting the same answer
4           over and over again.
5    BY MR. FOX:
6           Q     Mr. Fabian, your answer is the same
7      even if some of these complaints are in the
8      complaint?
9           A     I'm sorry, can you repeat that?
10          Q     Your answer is you don't remember the
11     specific statements on the Nano website vouching
12     for the safety and security of the BitGrail
13     exchange is the same even if some of these
14     statements are in the complaint.  Is that your
15     testimony?
16               MR. ENRIGHT:  Objection, asked and
17          answered.
18               THE WITNESS:  Sorry, you're starting
19          to really confuse me at this point.  If it's
20          in the statement, then yes.
21    BY MR. FOX:
22          Q     Let's me rephrase the question.
23               You testified that you read statements
24     on the Nano website of the safety and security
25     of the BitGrail exchange before you opened an

Page 126

1    account; correct?

2         A    Correct.

3         Q    And you testified that you relied on

4    these statements in deciding to open an account;

5    correct?

6         A    Correct.

7         Q    And you also testified that you can't,

8    sitting here today, remember what these

9    statements were; is that correct?

10        A    Correct.

11        Q    And you testified that you think but

12   you don't know whether these statements are in

13   the complaint; is that correct?

14        A    Correct.

15        Q    Would you like to look through the

16   complaint and see if you can identify any

17   statements from the Nano website concerning

18   safety and security of the BitGrail exchange?

19             MR. ENRIGHT:   Objection, the document

20        speaks for itself.

21   BY MR. FOX:

22        Q    If I represented to you, Mr. Fabian,

23   that there are no such statements in any

24   complaint, would you have any reason to doubt

25   that?

Page 127

1        A      I don't believe so.

2        Q      Why don't we switch gears.  Let's go

3    back up to Paragraph 186 of the complaint.

4               Do you see where it says, "On or about

5    August 16th, 2017 Plaintiff Fabian purchased

6    1.62457112 Bitcoin (BTC) on Coinbase's website,"

7    there is a link, "using a credit card."  The

8    total price was $7,000 -- sorry, strike that.

9               "The total price was $7,104.30 with

10   each Bitcoin worth $4,308.83."

11              Do you see that?

12       A      I do.

13       Q      Is that true?

14       A      I believe so, yes.

15       Q      Do you have any records of this

16   transaction?

17       A      Yes, there's records that were

18   submitted from the Coinbase account.

19       Q      Okay.  Did you produce those in this

20   litigation?

21       A      I believe they should be there.

22              MR. FOX:  I'm going to introduce

23       another exhibit.  So I'm going to stop the

24       share and pull something else up.

25              (Exhibit 6 was marked.)

```
                                        Page 128

 1   BY MR. FOX:
 2        Q     Okay.  Mr. Fabian, I have introduced a
 3   new document labeled Exhibit 6.  It should be on
 4   your screen right now.
 5              Can you see it?
 6        A     I do, yes.
 7        Q     Okay.  Have you seen this document
 8   before?
 9        A     I believe so, yes.
10        Q     What is it?
11        A     This is a transaction buying Bitcoin I
12   believe on -- what is it called -- Coinbase.
13        Q     Okay.  How did you access this or
14   where was -- strike that.
15              Did this document come from you?
16        A     Yes.
17              MR. FOX:  For the record, while
18        unfortunately the exhibit share has put the
19        sticker right over the Bates stamp, but I
20        want to read into the record the fact that
21        this document bears the Bates stamp
22        L&K00873.
23        Q     Mr. Fabian, where did you get this
24   document from?
25        A     I believe this was a screenshot from
```

Page 129

1    my Coinbase account.

2        Q    Does the reflect the transaction

3    reflected in Paragraph 186 of the complaint?

4        A    I believe so.

5        Q    Do you have any other records of this

6    transaction?

7        A    No, the BitGrail website has now shut

8    down, so I could not go in there to get exact

9    numbers from there or dates.

10        Q    Right.  To be clear, this isn't a

11    transaction on BitGrail, is it, Mr. Fabian?

12        A    This is not.

13        Q    Do you see your name on this anywhere?

14        A    That one, no.

15        Q    Do you have any other records of the

16    purchase of this Bitcoin that do have your name

17    on it?

18        A    Well, it would be in my account, so

19    yes.

20            MR. FOX:  I'm going to call for the

21        production of those records.  Any documents

22        reflecting the purchase of this Bitcoin on

23        August 16th that have Mr. Fabian's name on

24        it.

25        Q    Mr. Fabian, where did you store the

Page 130

1    Bitcoin once you bought it on Coinbase?

2        A     It stayed on there until I sent it to

3    BitGrail.

4        Q     Where is "there"?

5        A     On Coinbase.

6        Q     Do you have an address for that

7    wallet?

8        A     I'm sure I do.  Not off the top of my

9    head, but I'm sure there is one in my account.

10             MR. FOX:  We're going to call for the

11        production of a document reflecting an

12        address for that Coinbase wallet.

13       Q     Let's go -- I'm going to stop the

14   share and let's go back to the complaint.

15             Let's go to Paragraph 187.  I wish

16   there was a better way to get down in this

17   document than having to scroll every single

18   time.

19             Mr. Fabian, do you see the complaint

20   in front of you here?

21       A     I do.

22       Q     Do you see Paragraph 187 where it

23   says, "On August 22nd, 2017, Plaintiff Fabian

24   transferred his entire 1.62457112 BTC to

25   Bittrex," B-I-T-T-R-E-X, "a cryptocurrency

Page 131

1    exchange"?

2         A      Yes.

3         Q      Is that true?

4         A      If it's in there, I assume so.  It

5    could have been that I needed to send it to

6    Bittrex first before I sent it to someone else.

7    But I can't remember exactly.

8         Q      Is the allegation in Paragraph 187

9    true?

10        A      I believe so.

11        Q      Do you have any records of that

12   transaction?

13        A      I'm sure in my Bittrex account.

14        Q      Did you produce those in this

15   litigation?

16        A      I can't remember.  I know I did for

17   Coinbase.  I can't remember for Bittrex or not.

18   I think I did.

19        Q      If I represented to you that we don't

20   have any documents reflecting this transaction

21   on Bittrex, would you have any reason to doubt

22   that?

23        A      No.

24               MR. FOX:  I'm going to call for the

25        production of the Bittrex records reflecting

```
                                              Page 132
 1        this transaction.
 2              Okay.  I'm going to introduce another
 3        document so I'll stop the share and we'll
 4        switch it around.  Hold on one second.
 5              Okay.  I've introduced another
 6        document, Mr. Fabian.  This one is listed as
 7        Exhibit Number 7.
 8              (Exhibit 7 was marked.)
 9   BY MR. FOX:
10        Q     Do you see that document before you?
11        A     I do.
12        Q     And I'm going to represent for the
13   record that this document bears the Bates stamp
14   L&K_00872, indicating that it was produced in
15   this case by your counsel.
16              Have you ever seen this document
17   before, Mr. Fabian?
18        A     I believe so, yes.
19        Q     What is it?
20        A     Again, looks like a screenshot from
21   purchasing -- no, sending Bitcoin.
22        Q     Okay.  Where did you get the document
23   from?
24        A     I believe this is a screenshot.
25        Q     And what's it a screenshot of?
```

```
                                        Page 133
```

1        A     This is the -- from I believe Coinbase

2     screenshot sending Bitcoin.

3        Q     And where were you sending the Bitcoin

4     for this transaction to the extent that you can

5     remember?

6        A     This one, I'm not 100 percent sure.

7     Either to another exchange, possibly BitGrail.

8        Q     Okay.  Do you have a date on this?  It

9     says August 22nd?

10       A     Yes.

11       Q     Does it strike you as likely you would

12    have sent the Bitcoin do BitGrail on

13    August 22nd?

14       A     Somewhere around there.

15       Q     If I told you that you alleged in the

16    complaint that you sent the Bitcoin to BitGrail

17    later than August 22nd, would you have any

18    reason to disagree with that?

19       A     No.

20       Q     Does this document have your name on

21    it anywhere?

22       A     I don't believe so.

23       Q     Do you have any records related to the

24    transaction alleged in Paragraph 187 that

25    haven't been produced in this case and that we

Page 134

1    haven't just talked about?

2         A     I don't believe so.  It should have

3    been produced.

4         Q     So that would include the Bittrex

5    account, that would have shown the receipt of

6    this Bitcoin; is that correct?

7         A     Again, I think we did the Bittrex, but

8    I'm not 100 percent sure.

9              MR. FOX:  Okay.  I'm going to

10        reiterate the call for production of the

11        Bittrex account connected to this alleged

12        transaction.

13        Q     Mr. Fabian, do you have access to

14   records from Coinbase that have your name on

15   them?

16        A     I mean, I have the account to log

17   into, yes.

18        Q     Okay.  And would that include the

19   transactions on Coinbase that are alleged in

20   Paragraphs 186 and 187 of the complaint?

21        A     It should include all of my

22   transactions.

23             MR. FOX:  I'm going to call for

24        production of documents from the Coinbase

25        account that have Mr. Fabian's name on them

Page 135

1      as well as information pertaining to the

2      transactions alleged in Paragraphs 186 and

3      187 of the complaint.

4      Q    Let's go back to the complaint.  I'm

5   going to take you down to Paragraph 189.  I want

6   to say renders.

7           Do you see Paragraph 189 there,

8   Mr. Fabian?

9      A    Yes.

10      Q    Why don't you take a look at it while

11   I attach a charger to my laptop so I don't

12   become disconnected from you in the middle of

13   this deposition.

14           Okay.  Do you see in Paragraph 189

15   where it says, "On August 31, 2017, Plaintiff

16   Fabian opened an account on BitGrail and

17   transferred .66971933 BTC from his Bittrex

18   account Bitcoin wallet to BitGrail.  At the

19   time, the .66971933 BTC had a value of

20   approximately $3,220."

21           Do you see that?

22      A    I do.

23      Q    Is that true?

24      A    I believe so.

25      Q    Do you have any records of this

Page 136

1    transaction?

2         A     This would be in -- yes, there should

3    be records in Coinbase and Bittrex of it.

4         Q     Why would there be records of it in

5    Coinbase?

6         A     Well, Coinbase sending it to Bittrex.

7    Bittrex sending it to BitGrail.

8         Q     Okay.  It looks like from

9    Paragraph 189 like the allegation here is just

10   connected to the transfer from Bittrex to

11   BitGrail.

12        A     Yes.

13              MR. ENRIGHT:  Objection, vague.

14              THE WITNESS:  It should be in Bittrex

15        then.

16   BY MR. FOX:

17        Q     It should be in Bittrex?

18        A     Yes.

19        Q     Okay.  Did you produce those records

20   in this litigation?

21        A     Again, I believe I did but not

22   100 percent sure.

23        Q     Okay.  Let's take a look at another

24   document.

25              It's loading, Mr. Fabian.  I've put up

                                              Page 137

1      a document that has been introduced and marked

2      as Exhibit 8.

3                    (Exhibit 8 was marked.)

4    BY MR. FOX:

5            Q      Do you recognize this document?

6            A      Yes, I believe it's one of my

7      transactions.

8            Q      Where -- did you provide this document

9      to counsel to be produced in this case?

10           A      I believe I did.

11           Q      How did you access it?

12           A      Logging into my Bittrex account.

13           Q      Do you know if it reflects the

14     transaction that's alleged in Paragraph 187?

15           A      The timing of it looks to be and the

16     amount.

17           Q      Okay.  Does it say Bittrex anywhere on

18     it?

19           A      Up at the top, yes.

20           Q      I think that's the file name that

21     we've given it.

22           A      Okay.

23           Q      Which it tells you what we think about

24     it.  But do you see the word "Bittrex" anywhere

25     on the document itself?

Page 138

1        A      No.

2        Q      Okay.  Do you see the word "BitGrail"

3    anywhere on the file itself?

4        A      No.

5        Q      Does this document have your name on

6    it?

7        A      My name, no.

8        Q      Do you have any records of the

9    transaction that's alleged in Paragraph 189

10   other than this?

11       A      Well, going into the actual account,

12   yes.

13       Q      Would those records have your name on

14   them?

15       A      The account would, yes.

16              MR. FOX:  I'm going to call for the

17       production of the additional records on the

18       Bittrex account that reflect the transaction

19       alleged in Paragraph 189 and include

20       Mr. Fabian's name.

21       Q      Would there be any records on your

22   Bittrex account that include BitGrail's name,

23   Mr. Fabian?

24       A      I don't know, to be honest.  Most of

25   the time it's just IDs like you see there

                                    Page 139

1      that -- a bunch of strings, that's how you

2      identify where it went.  I don't think it would

3      say an actual name.

4           Q     Okay.  Would you just double check

5      that for us?

6           A     Would I right now on this screenshot?

7           Q     No, after the deposition.

8           A     Oh, yes.

9           Q     Do you have any records reflecting the

10     fact that you opened a BitGrail account on

11     August 31st, 2017?

12          A     I don't believe so.

13          Q     Did you ever receive a confirmation

14     email from BitGrail after you opened that

15     account?

16          A     Gosh.  I believe -- I can't remember

17     100 percent, but there are might be.

18          Q     Would you still have access to that

19     email?

20          A     I should, yes.

21               MR. FOX:  I'm going to call for the

22          production of any emails from BitGrail to

23          Mr. Fabian.  I also want to note that this

24          was clearly called for in our Document

25          Request Number 3.

```
 1            MR. ENRIGHT:  I just want to say that
 2        there's no way of knowing that this existed
 3        at all at this time.  I believe Mr. Fabian
 4        searched for documents in his email relating
 5        to BitGrail.  If it turned up, it would have
 6        been produced.
 7            MR. FOX:  Okay.  Noted.
 8     Q    Let's go back to the complaint.
 9            Mr. Fabian, do you see the complaint
10  again?
11     A    I do.
12     Q    I'm going to Paragraph 191.  And I
13  apologize, again, that there's not a faster way
14  to move in this interface to the paragraphs that
15  we want to look at than just having me scroll
16  down.  On the other hand, I guess it's me who
17  has to deal with the carpal tunnel syndrome that
18  results from it.
19            Do you see in Paragraph 191 where it
20  says, "On September 1st, 2017, the .66971933 BTC
21  became available on BitGrail and Plaintiff
22  Fabian used the entire sum to purchase
23  approximately 21,143 XRB"?
24     A    I see that.
25     Q    Is that true?
```

1     A    I think the number of XRB might be off

2    because the 21,143, that's the total amount that

3    I had at its highest.  The initial purchase was

4    not for the full 21,143 because I did make -- I

5    believe if not one or another purchase.  Again,

6    like in December, maybe even before that.

7     Q    All right.  Is this something you

8    would have alerted your counsel to when you

9    reviewed the amended complaints?

10     A    Yes, I probably missed it thinking

11    that the whole thing was on that one

12    transaction.  I just probably thought it was the

13    whole amount I owned.

14     Q    Okay.  Do you have any records of this

15    transaction?

16     A    Not -- again, not from BitGrail, but

17    it should be on, you know, one of the other

18    exchanges, Bittrex or Coinbase sending it over.

19     Q    Right.  So do you remember from which

20    account you sent over that Bitcoin?

21     A    I think it was Bittrex.

22     Q    Okay.  Would you still have access to

23    those records on your Bittrex account reflecting

24    this transfer?

25     A    I would.

```
                                          Page 142

 1        Q     You know what, I apologize,
 2    Mr. Fabian, I think we already talked about that
 3    transfer.
 4              The question here is:  Do you have any
 5    records of your purchase of XRB on BitGrail?
 6        A     Again, I don't believe so since I
 7    don't have access to BitGrail any longer.
 8        Q     Okay.  Would you have received an
 9    email from BitGrail confirming that purchase?
10        A     I do not know.  I don't recall getting
11    one.
12              MR. FOX:  I'm going to call for the
13         production of any emails from BitGrail
14         reflecting the purchase of any XRB,
15         including on this date.
16        Q     Okay.  Let's go down to 192.
17              Do you see, Mr. Fabian, where it says,
18    "On December 12, 2017, Plaintiff Fabian
19    transferred $2,850 to BitGrail to purchase
20    another 2,000 XRB"?
21        A     I do.
22        Q     Okay.  Is that true?
23        A     I believe so.
24        Q     Do you have any records of this
25    transaction?
```

1      A      Again, it should be in the Bittrex if

2    it was transferred from there.

3      Q      Do you know if this $2,850 was

4    transferred from Bittrex?

5      A      I believe it was.

6      Q      Was that in U.S. dollars?

7      A      It was probably done in Bitcoin.

8      Q      Do you see any reference in this

9    allegation in Paragraph 192 to Bitcoin?

10      A      No.

11      Q      Do you think that Paragraph 192 might

12    not be fully accurate with respect to this

13    transaction?

14           MR. ENRIGHT:  Objection, misstates the

15        record and misrepresents the document.

16           THE WITNESS:  I believe it was meant

17        to show the value of the Bitcoin, I believe.

18    BY MR. FOX:

19      Q      So it's your testimony that you

20    transferred Bitcoin worth $2,850 to BitGrail on

21    December 12th; is that correct?

22           MR. ENRIGHT:  Objection, misstates the

23        prior testimony.  You can answer.

24           THE WITNESS:  It could have been

25        either to tell you from my memory.  I

                                              Page 144

1          believe -- I'm not 100 percent sure -- that
2          you can send the equivalent of cash as well
3          or Bitcoin.  But I don't remember which one
4          I did.  I would assume I did Bitcoin, but I
5          believe you have the option of doing cash as
6          well, which they call USD.
7     BY MR. FOX:
8          Q     Okay.  And if I told you that, in
9      fact, BitGrail did not accept Fiat currency,
10     would you have any reason to doubt that?
11         A     No.
12         Q     Any idea what account you might have
13     sent this $2,850 worth of Bitcoin to BitGrail
14     from?
15         A     It was going to be Coinbase or
16     Bittrex, I believe.
17              MR. FOX:  All right.  I'm going to
18         call for the production of any records in
19         Mr. Fabian's Coinbase or Bittrex account
20         reflecting any transfers of Bitcoin to
21         BitGrail, including any that happened on
22         December 12th, 2017.
23         Q     Let's go on to Paragraph 193.
24              Do you see where it says -- oh, excuse
25     me.  We were already there.  No, strike that.

Page 145

1    We were not.

2              Let's look at Paragraph 193.

3              Do you see where it says, "As of

4    December 12th, 2017, Plaintiff Fabian purchased

5    and held on BitGrail 23,143 XRB with a total

6    purchase price of $6,070"?

7        A    I see that.

8        Q    And is that true?

9        A    I believe so.

10       Q    And do you have any records reflecting

11   that this was your account balance as of

12   December 12th, 2017?

13       A    I do have screenshots that were

14   submitted of the BitGrail account showing that

15   amount.  I don't know if there was a time

16   anywhere in that, though.

17       Q    Okay.  I think we're going to take a

18   look at those in a minute.  I won't ask any

19   questions about it until the document is in

20   front of me.

21             But do you have any other documents

22   other than those screenshots reflecting what

23   your account balance was on December 12?

24       A    Not that I know of.

25       Q    Go ahead.

Page 146

1       A       No, I don't think there was anything
2    like that that I know of.
3       Q       Would you double check for us after
4    the deposition is over?
5       A       Absolutely.
6       Q       All right.  Let's take a look at
7    Paragraph 195.
8               And do you see where it says, "Shortly
9    before Plaintiff Fabian lost control of his
10   23,143 XRB on BitGrail, he transferred 110 XRB
11   to a separate XRB wallet off of BitGrail.
12   Therefore, he owned and held a total of 23,033
13   XRB in his BitGrail wallet"?
14      A       I see that.
15      Q       Okay.  Is that true?
16      A       I believe so, yes.
17      Q       To whom did you transfer the 110 XRB?
18      A       To the XRB wallet.
19      Q       What is the XRB wallet?
20      A       It's -- a wallet I guess is a
21   cryptocurrency bank almost where you can store
22   your coins and there was one made specifically
23   for XRB.
24      Q       And would you have an account within
25   that wallet?

1      A     Yes.  You set up your own -- well, you

2   have an ID, I believe.  It's been a long time

3   since I when into it, but I think there is an

4   ID.

5      Q     Do you know whether it's all one

6   wallet or whether it was a separate wallet just

7   for you?

8      A     No, I believe it's just a separate

9   wallet for myself.

10     Q     Do you have an address for that

11  wallet?

12     A     I should, yes.

13         MR. FOX:  All right.  I'm going to

14      call for production of documents reflecting

15      the address of that wallet.

16     Q     Do you have any records reflecting the

17  transfer of the 110 XRB from BitGrail to that

18  wallet?

19     A     I do not know what that wallet shows

20  to tell you the truth.  I don't -- it could

21  show -- I don't know if it shows a date or time

22  on that or not or if it just shows number of

23  coins there.

24     Q     And any other records, maybe records

25  from BitGrail?

Page 148

1        A      Not that I know of, no.

2        Q      Did you receive any email confirmation

3     of a withdrawal of XRB from BitGrail?

4        A      I don't recall them sending

5     confirmation emails like that.

6        Q      If I told you that they did, would you

7     have any reason to doubt that?

8        A      No.

9             MR. FOX:  I'm going to call for the

10        production of any emails from BitGrail

11        concerning the withdrawal of XRB including

12        any that -- any emails that were sent in

13        connection with the transaction that's

14        alleged in Paragraph 195.

15             MR. ENRIGHT:  Peter, just addressing

16        these BitGrail emails that you've been

17        asking about, I just want to ask this before

18        I forget.  If there are any search terms

19        that you believe would be helpful in

20        locating those that were not obvious in

21        terms of our efforts to locate responsive

22        documents, we'll be happy to follow up on

23        those search terms because I know that

24        Mr. Fabian searched his email for BitGrail

25        and this did not turn up.

```
 1              MR. FOX:  Okay.  We'll take a look and
 2         get back to you.  I believe the emails I've
 3         seen do say BitGrail on them, but I'll
 4         double check and see if there are any other
 5         search terms that can help.
 6         Q    Okay.  Where were we?
 7              Mr. Fabian, you testified a moment ago
 8    that you do have records that you had an account
 9    at BitGrail in the form of certain screenshots;
10    is that correct?
11         A    Correct.
12         Q    And did you produce those screenshots
13    in this litigation?
14         A    I did.
15         Q    And can you just describe them broadly
16    for us right now, please?
17         A    Yes.  I think there is a screenshot
18    that showed different coins in it and how much
19    you held in each one.  And then I think it had
20    BitGrail at the top of it and it showed any
21    coins.
22         Q    I'm going to introduce some documents
23    here.  So I'm going to stop the share and we'll
24    introduce documents and take a look at those.
25              MR. ENRIGHT:  Peter, we've been going
```

```
1        now for nearly four hours.  Do you think
2        this would be -- while you line up your
3        documents, do you think this would be a fair
4        time to take a short break?
5              MR. FOX:  We are getting pretty close
6        to the end of this line of questioning.  So
7        why don't we just run to that and then we'll
8        take a short break.  Is that okay?  If
9        somebody is in dire need --
10             MR. ENRIGHT:  If it's another ten
11       minutes, that's fine.  If it's going to be
12       longer than that, I think I need to use the
13       restroom.
14             MR. FOX:  We've all been in that boat.
15             All right.  Why don't we take a -- can
16       we do a five-minute break?  Is that
17       reasonable?  I'm just trying to accelerate
18       things as much as possible.
19             MR. ENRIGHT:  Sure.
20             MR. FOX:  Let's take a five-minute
21       break.  I have 4:56 Eastern time, which I
22       guess would be 1:56 Pacific time.  Let's
23       come back a minute or two after 2:00 p.m.
24       Pacific time.  Does that sound good to
25       everyone?
```

```
                                        Page 151
```

1              VIDEOGRAPHER:  We're going off the

2         record at 1:56 p.m.  This is the end of

3         Media 4.

4              (Recess taken.)

5              (Exhibits 9, 10 and 11 were marked.)

6              VIDEOGRAPHER:  We're on the record at

7         2:09 p.m.  This is the beginning of Media

8         Number 5 in the deposition of James Fabian.

9    BY MR. FOX:

10         Q    Okay.  We're back on the record,

11    Mr. Fabian.  And while we were off, I introduced

12    and labeled three new exhibits which we're going

13    to take a look at in a second.

14              Right before we broke, you were

15    talking about the screenshots of your BitGrail

16    account; is that correct?

17         A    Yes.

18         Q    Okay.  So let's take a look at one of

19    these.  This is a document that has been marked.

20    It's been marked Exhibit 9.  I'm pulling it up

21    right now and I'm about to share it with

22    everyone.

23              The document has a Bates stamp of

24    L&K_00712.

25              Mr. Fabian, have you seen this

                                                    Page 152

1     document before?

2          A     This one, I don't believe so.

3          Q     The fact that it has the Bates stamp

4     with the prefix L&K indicates that it was

5     produced in this litigation by your counsel.

6     And I will represent to you that that is indeed

7     the case.

8                Do you have any idea where they would

9     have gotten it if it wasn't from you?

10         A     I'm not sure.

11         Q     Is it still your testimony that you

12    don't recognize it?

13         A     Yes, I don't believe I recognize this

14    one.

15         Q     Okay.  Let's take a look at a

16    different one.  I'm going to stop the share and

17    pull up Exhibit Number 10.

18                Mr. Fabian, I'm showing you a document

19    that's been marked Exhibit Number 10.

20                This document bears the Bates stamp

21    zero -- strike that.

22                This document bears the Bates stamp

23    L&K_00673.  I'll scroll down so you can see

24    more of it.

25                Do you recognize this document?

```
 1        A      It looks like the one we just saw.  I
 2   believe it was the same document.
 3        Q      I'm going to represent to you that it
 4   does appear to be the same one, just maybe like
 5   zoomed in a little more so the other one has
 6   some more information from the screen visible.
 7               Fair to say this looks like a
 8   screenshot --
 9        A      Yes.
10        Q      -- on the website?
11        A      It does.
12        Q      Is it your testimony that just like
13   you didn't recognize the previous document
14   that's been marked as Exhibit 9, you don't
15   recognize this one?
16        A      Yes, I don't believe so.
17        Q      And I'm going to represent to you that
18   based on the Bates stamp, this is a document
19   that was -- I'm going to represent to you this
20   was produced by your counsel in this litigation
21   and point out for the record that it bears a
22   Bates stamp indicating the same.
23               Again, the same question, any idea
24   where your counsel would have gotten this if
25   wasn't from you?
```

Page 154

1        A      I'm not sure.

2        Q      Any idea why they would produce

3     something that wasn't from you?

4        A      I do not know.

5        Q      Looking at this number here and

6     toggling over, it looks like in a row entitled

7     XRB, it's got 523.009711483.

8               Does that look familiar to you as an

9     account balance you ever had at BitGrail?

10       A      Not that I recall.

11       Q      Okay.  Let's take a look at another

12    one.  We'll stop the share and pull up Exhibit

13    Number 11.

14   BY MR. FOX:

15       Q      All right, Mr. Fabian, I have a

16    document up on the screen, can you see it that

17    bears a sticker that says "Exhibit 11" on it?

18       A      Yes.

19       Q      And it's a little bit difficult to see

20    the Bates stamp.  I can see it here and I guess

21    if I can see it, you can probably see it.  The

22    Bates stamp on this document is L&K_00882

23    indicating this document also was produced by

24    your counsel in this litigation.

25               Have you seen this document before?

Page 155

1        A     I have.

2        Q     Okay.  What is it?

3        A     This is a screenshot of my account

4     balance.

5        Q     Do you see your name on it anywhere?

6        A     I do not see my name, but I do see

7     identifying marks like the Lincoln Financial

8     head, which is my company and also Citrixweb and

9     L4B which is also my company.

10        Q     Citrixweb is your company.  Is that

11     your testimony?

12        A     It's an app that we use on our

13     computers.

14        Q     Okay.  So Citrixweb is an application

15     that you use as part of your work?

16        A     Yes, and then the L4B next to it,

17     that's Lincoln for Benefits, correct.  And the

18     next one is my home page for Lincoln Financial.

19     And then MEW next to it is our marketing web

20     page.

21             MR. FOX:  All right.  Let the record

22         reflect that Mr. Fabian indeed was referring

23         to an icon that indeed appears to be the

24         white silhouette of Abraham Lincoln against

25         a red square background at the top of this

Page 156

1         page.

2         Q     All right.  Do you see any date on

3    this document?

4         A     Can you scroll up, please?

5         Q     Yes.

6         A     I do not think so.  No.

7         Q     If you look at the bottom, do you see

8    a copyright date?

9         A     2018.

10        Q     Okay.  Fair to say this statement is

11   from some time after December 31st, 2017?

12        A     I believe so, yes.

13        Q     And how many -- well, let me stop --

14   strike that.

15              Would you mind walking us through the

16   rows and columns reflected in this screenshot?

17        A     Yes, so the first one is BTC, which

18   stands for Bitcoin.  And then the second one is

19   XRB, which the RaiBlocks or Nano and the balance

20   of it.  And the rest are all various coins that

21   I have no stake in.

22        Q     What do you understand the column

23   "Reserved" to mean?

24        A     I do not know.

25        Q     And the column "Pending deposits,"

1    any --

2         A     Yes, usually if you transferred in

3    from another -- what do you call it, the

4    exchange and the funds weren't ready yet, it

5    would say "pending."

6         Q     And the "History" column, what's

7    reflected in that column to your understanding?

8         A     I'm not sure.

9         Q     Do you have any memory of when you

10   took the screenshot?

11        A     I do not remember exactly, no.  It was

12   some time after I transferred out the 110 to the

13   wallet, XRB wallet.  So that should help clarify

14   timeline.

15        Q     Do you remember about when you

16   transferred that 110 XRB out of the BitGrail

17   wallet?

18        A     It was a little -- I want to say early

19   2018.  It was a little bit before access was

20   shut off to the XRB.

21        Q     Okay.  And just to clarify, it's your

22   testimony that you yourself did take this

23   screenshot; correct?

24        A     I did.

25        Q     And is it your testimony that it was

Page 158

```
1      taken before the BitGrail exchange closed?
2           A     I don't know for sure.  It might have
3      even been taken after.  You couldn't get access
4      and at some point they did allow access for a
5      small portion of time and I did get in.  I think
6      that might have been when I took it.
7                 But again, it showed balances that
8      weren't available.
9           Q     Did you have -- strike that.
10                Do you have access to your BitGrail
11     account now?
12          A     I don't believe so.
13          Q     Have you tried to access your BitGrail
14     account?
15          A     I believe I tried a few months back
16     and there was -- I think it said no longer
17     existed or that the website in general.
18          Q     Do you think that would have been
19     before are or after May 29th, 2020?
20          A     Probably after.  I'm not exactly sure,
21     but --
22          Q     Why did you try to access it?
23          A     Just to see if I can see if anything
24     was in there.
25          Q     Did anybody ever ask you to try to
```

Page 159

```
 1    access your BitGrail account?
 2         A     I think we were just trying to go in
 3    there to see if we can verify any kind of funds
 4    or anything like that.  I don't know if anyone
 5    in particular asked me to do it, but in trying
 6    to get information.
 7         Q     Who's "we"?
 8         A     Legal counsel.
 9         Q     Okay.  Did you ever look at your email
10    from -- emails from BitGrail at any point over
11    the last couple of months?
12         A     Yes.
13         Q     Anybody ask you to do that?
14         A     Yes, counsel did.
15               MR. ENRIGHT:  I'll remind the witness
16         not to discuss communications between the
17         witness and his counsel.
18    BY MR. FOX:
19         Q     Okay.  Let's go -- I'm going to close
20    out of this, stop the share, let's go back to
21    the complaint.  Bear with me for a second.
22               Something happened with putting this
23    up that I didn't want to happen.  So just hold
24    on.
25               MR. FOX:  Should have it all
```

```
                                        Page 160
 1         straightened out here.  Let me share the

 2         screen.  Can everybody hear and see me okay?

 3              THE WITNESS:  Yes.

 4    BY MR. FOX:

 5         Q    Mr. Fabian, can you see the complaint

 6    here?

 7         A    Yes.

 8         Q    Okay.  Let's go back to Paragraph 195,

 9    which is a document that we talked about

10    before -- or, excuse me, a paragraph that we

11    talked about before which is in a document that

12    we talked about before.

13              All right.  We've reviewed the

14    language in this paragraph; correct, Mr. Fabian?

15         A    Correct.

16         Q    So when precisely did you own the

17    23,033 XRB?

18         A    I don't know the exact dates, but it

19    was somewhere between -- the full 23,000 I think

20    wasn't met until December of 2017 and so I held

21    on to that until it was -- until I transferred

22    out the 110.

23         Q    So do you have a date range between

24    when and when you had 23,033 XRB in your

25    account?
```

Page 161

```
 1        A     I would say probably from that
 2    December 2017 date.  I don't know the exact date
 3    when I withdrew the 110, but I would assume that
 4    to be early 2018.
 5        Q     Okay.  So it's your testimony that the
 6    23,033 reflects the amount that you had before
 7    you transferred out the 110 XRB; is that
 8    correct?
 9             MR. ENRIGHT:  Objection, misstates the
10         record.
11             THE WITNESS:  No, that was after I
12         transferred out the 110.
13    BY MR. FOX:
14        Q     Got it.  So it's your testimony that
15    you held 23,033 XRB in your account from the day
16    that you transferred the 110 out through the
17    close of BitGrail.  Is that your testimony?
18        A     Yes.
19        Q     And do you have any records to support
20    this contention other than the screenshot that
21    we just looked at?
22        A     Just a screenshot and the 110 XRB if
23    we can find the wallet.
24        Q     And fair to say that the screenshot
25    doesn't reflect precisely 23,033, but it's
```

Page 162

1       23,033 and some fraction.
2                I know we don't have that in front of
3       are us right now.  If I told you that, would you
4       have any reason to doubt it?
5            A     No.
6            Q     Any idea why there might be a
7       discrepancy between that and what's alleged in
8       the complaint?
9            A     I do not.
10           Q     Okay.  So let's go to 196.  Do you see
11      where it says the 23,033 XRB had a market value
12      of approximately $275,000 as of February 8th,
13      2018?
14               We talked earlier in the deposition
15      about how you arrived at this number.  It was
16      your testimony that you believe that as of
17      February 8th, there was some sort of price
18      report -- public price reporting about the value
19      of XRB that led you to calculate this
20      275,000-dollar figure; is that correct?
21           A     Correct.
22           Q     Do you have any records reflecting
23      that value on that date?
24           A     Personally, no.
25           Q     I want to introduce one more document

Page 163

```
 1      before we leave this line of questioning, so I'm
 2      going to stop the share and introduce another
 3      exhibit.
 4                (Exhibit 12 was marked.)
 5    BY MR. FOX:
 6         Q    I have a document up on the screen.
 7      It's been marked as Exhibit 12.  It bears the
 8      Bates stamp L&K_00885.
 9                Do you see this document, Mr. Fabian?
10         A    I do.
11         Q    All right.  Blow it up a little bit.
12                Do you recognize it?
13         A    I just want to let you know my
14      connection just broke and then automatically
15      reinitiated.  So apologies for me apparently
16      dropping out for a second.  That was not my
17      doing.
18         Q    Okay.  All right.  Can you see
19      everybody and --
20         A    Yes, I appear to be fully back.
21         Q    Okay.  Great.  Do you recognize this
22      document, Mr. Fabian?
23         A    Yes, it looks like a withdrawal
24      history from Bittrex.
25         Q    Okay.  When do you see withdrawals
```

1    reflected on this -- in this document?

2        A    This one looks like there's one on

3    April 19th, 2018, one on February 27th, 2018 and

4    then the bottom one is cut off.  There you go.

5    February 3rd, 2018.

6            MR. ENRIGHT:  I'm sorry.  Maybe I'm

7        reading this wrong, but the dates appear to

8        be 2018, if I'm looking at the right thing.

9            MR. FOX:  I think the witness said

10       these were all from 2018.

11           MR. ENRIGHT:  I'm sorry, I thought he

12       said 2019.

13           THE WITNESS:  I read it as 2018.

14           MR. ENRIGHT:  I'm sorry, I must have

15       misheard.

16   BY MR. FOX:

17       Q    Your testimony is that those were

18    withdrawals from Bittrex; correct?

19       A    It appears so.

20       Q    All right.  For the April 2018

21    withdrawal, what type of currency was being

22    withdrawn?

23       A    It looks like Bitcoin.

24       Q    And the February 27th withdrawal, what

25    currency was being withdrawn?

1      A      That one is ZCL.  I can't remember the

2    name off the top of my head for the actual coin.

3      Q      For February 3rd, 2018, what currency

4    was being withdrawn?

5      A      Bitcoin.

6      Q      Do you remember where you were

7    withdrawing these currencies to, Mr. Fabian?

8      A      I do not.

9      Q      Did you give this document to your

10   counsel to produce in this litigation?

11     A      I believe I did, yes.

12     Q      Why did you give it to your counsel to

13   produce in this litigation?

14     A      Upon request.

15     Q      Without -- strike that.

16            Does it seem at all relevant to any of

17   the allegations in the complaint?

18     A      I'm not sure.

19     Q      Does it relate to any of the

20   transactions that we just talked about?

21     A      I have no idea.

22     Q      So would it be fair to say that this

23   document is not related to any of your

24   allegations or claims in this case?

25     A      I can't be certain.

1        Q     I'm going to stop the share.  We don't

2     need to look at this anymore.  I want to review

3     your testimony about the transactions on

4     BitGrail.

5               I want to confirm that it's your

6     testimony that you do not have any records of

7     opening an account at BitGrail; correct?

8               MR. ENRIGHT:  Objection, asked and

9          answered.  You can answer.

10              THE WITNESS:  I don't believe so.

11    BY MR. FOX:

12        Q     With the exception of possibly emails

13    that you're going to look for; is that correct?

14        A     Correct.

15        Q     And it's your testimony that you don't

16    have any records of purchasing 21,143 XRB on

17    September 1st, 2017 on BitGrail; is that

18    correct?

19              MR. ENRIGHT:  Objection, misstates the

20         prior testimony and also asked and answered.

21              THE WITNESS:  Correct, I'd have to see

22         if there's emails on that or not.

23    BY MR. FOX:

24        Q     Will you look for those emails?

25        A     Yes, I will.

Page 167

1        Q     Can you confirm it's your testimony
2    that you don't have any records of purchasing
3    2,000 XRB on December 12, 2017 on BitGrail?
4        A     I don't believe I do -- what's that?
5        Q     Go ahead.
6        A     I don't believe I do, but again, I'll
7    check the emails.
8        Q     And can you confirm that it's your
9    testimony you don't have any records showing
10   your account balance at BitGrail on any specific
11   date?
12       A     Just the screenshot.
13       Q     Right.  And is it your testimony that
14   you don't know what day that screenshot was
15   taken?
16       A     I don't have the exact day, no.
17       Q     Mr. Fabian, when you sell employee
18   benefit products for Lincoln Financial, do you
19   advise your customers to keep records of the
20   transactions that you enter into with them?
21       A     I do not.
22       Q     If a customer told you that he or she
23   had no intention of recording the transaction
24   with you, would that cause you any concern?
25       A     It would not, no.

Page 168

1      Q      Would you say it's typical in your

2   business of sales of financial products for

3   people to not keep records of financial

4   transactions that they enter into?

5      A      They would probably keep copies of

6   contracts.

7      Q      Right.  So, for example, if you sold

8   an insurance policy, you would expect that the

9   customer would keep a copy of the contract and

10   the policy; is that correct?

11      A      Yes, correct.

12      Q      Mr. Fabian, did you ever purchase XRB

13   on any dates other than September 1st, 2017 and

14   December 12th, 2017?

15      A      It's possible.

16      Q      When do you think you might have

17   purchased XRB other than on those two dates?

18      A      I'm not sure if I did, if I made a

19   smaller transaction.  I know the two we talked

20   about before were the two large ones.  It would

21   be in between those two if there was any.

22      Q      And where would you have purchased the

23   XRB?

24      A      BitGrail as well.

25      Q      Did you ever purchase XRB on any other

Page 169

1    exchange?

2         A     I don't believe so, no.

3         Q     Did you ever receive XRB any other

4    way?

5         A     I believe I received some on the

6    faucet drip when they first did that.

7         Q     When would that have been?

8         A     That was probably -- I don't have an

9    exact date, but probably 2017 or something like

10   that, somewhere.

11        Q     Could it have been before April or May

12   of 2017?

13        A     It could have been, yes.  I don't know

14   the exact date.

15        Q     Why don't we switch gears and talk

16   about something completely different.

17               Mr. Fabian, are you aware that

18   BitGrail exchange is the respondent in a

19   bankruptcy proceeding in Italy right now?

20        A     I believe I heard about that, yes.

21        Q     Have you been contacted by anyone

22   connected to that proceeding?

23        A     There was some spam type emails but

24   nothing solid, no.

25        Q     What do you mean by "spam"?

1      A      I think there was either talk of it

2      like on Twitter, back and forth, things like

3      that.

4      Q      Did you ever receive an email about

5      the proceeding in Italy?

6      A      I don't know if it was regarding that

7      or not to be precise.  I don't know.

8      Q      If you told you that you did receive

9      an email from the trustees and that your counsel

10     produced it in this case, would you have any

11     reason to disagree with that?

12     A      No.

13     Q      Any recollection as to what you heard

14     from the trustees?

15     A      There was just some chatter.  I don't

16     remember exactly what it was.  I knew they were

17     going to go after BitGrail, but I can't remember

18     the exact details.

19     Q      Did you ever replying to anybody about

20     the -- strike that.

21            Did you ever communicate with anyone,

22     initiate communication with anyone about the

23     bankruptcy proceeding in Italy?

24     A      I think there was a few emails, yes.

25     Q      Who did you email?

```
 1        A     I do not know off the top of my head.
 2              MR. FOX:  All right.  I'm going to
 3        call for the production of all
 4        correspondence connected to the bankruptcy
 5        proceeding in Italy that Mr. Fabian has
 6        control over or possession of.
 7              MR. ENRIGHT:  I don't think there's
 8        anything that hasn't been produced.
 9              MR. FOX:  Well, he just testified that
10        he emailed someone.  We have one email
11        incoming from the trustees.
12              MR. ENRIGHT:  It's possible that what
13        he's talking about is an email to his own
14        counsel.  So if there is an outgoing email
15        that is not privileged that we can locate,
16        we'll produce it.
17              MR. FOX:  Great.
18        Q     Mr. Fabian, again -- strike that.
19              Have you filed a proof of claim in the
20     bankruptcy proceeding in Italy?
21        A     I don't believe so.
22        Q     Do you think it's possible that you
23     could have filed a proof of claim and you
24     wouldn't know about it or wouldn't remember it
25     today?
```

Page 172

1      A      Can you explain what a proof of claim

2    is?

3      Q      Sure, sure.  So a proof of claim as

4    I'm using the term is a claim in a liquidation

5    proceeding that you are entitled to money from

6    the debtor.

7      A      Okay.

8      Q      In this context, I'm going to

9    represent to you that the trustees of the

10   BitGrail estate were soliciting proofs of claim

11   from users of BitGrail whose cryptocurrency was

12   frozen when the exchange was shut down.

13            Does that make it clearer to you?

14     A      It does, yes.

15     Q      Did you file a proof of claim in the

16   Italian bankruptcy proceeding?

17     A      I may have.  I'm not 100 percent sure.

18     Q      So it's your testimony that you don't

19   know whether you have a pending claim in the

20   Italian bankruptcy proceeding?

21     A      I do not know if I do.

22     Q      And so I take it that you wouldn't

23   know whether your claim has been allowed or not?

24     A      Correct.  I would not know.

25     Q      Did you hire counsel to advise you in

Page 173

1    connection with the Italian bankruptcy

2    proceeding?

3         A     I did not.

4         Q     If you did file a claim in the Italian

5    bankruptcy claim, how much would you expect to

6    recover from the estate?

7              MR. ENRIGHT:  Objection, calls for

8         speculation, incomplete hypothetical.  The

9         witness can answer.

10             THE WITNESS:  I probably would have

11        requested the 23,033.

12   BY MR. FOX:

13        Q     So your testimony is that you would

14   have requested reimbursement for the full amount

15   that you claim you lost; is that correct?

16        A     Yes, correct.

17        Q     Do you ever any expectation as to what

18   percentage of that you would have expected to

19   receive?

20             MR. ENRIGHT:  Objection.  You can

21        answer.

22             THE WITNESS:  I do not.

23             MR. FOX:  All right.  Just to be

24        clear, calling for the production of any

25        documents whatsoever in Mr. Fabian's

```
                                          Page 174

 1          possession relating to the Italian

 2          bankruptcy proceeding.

 3                  MR. ENRIGHT:  If any exist.

 4                  MR. FOX:  If any exist.

 5                  MR. ENRIGHT:  Again, this was

 6          something that was searched for.  If

 7          something somehow escaped our notice or

 8          Mr. Fabian's notice in the course of the

 9          search, if after another search we find

10          anything, we will produce it.

11                  MR. FOX:  Okay.

12          Q     Mr. Fabian, do you use social media?

13          A     I do.

14          Q     What social media do you use?

15          A     Just Instagram.

16          Q     Do you use Twitter?

17          A     I'm sorry, there is a Twitter account

18     too, yes.

19          Q     Did you ever use Reddit?

20          A     Sometimes.

21          Q     Did you ever use Bitcointalk?

22          A     I believe so.

23          Q     Did you ever use Discord?

24          A     I did.

25          Q     Did you ever use Telegram?
```

Page 175

1        A     I did.

2        Q     Did you ever use Facebook?

3        A     I did, but I haven't had an account

4    for over five years probably.

5        Q     Fair to say you didn't conduct any

6    cryptocurrency-related communications over

7    Facebook?

8        A     I did not.

9        Q     Let's start with Twitter.  Do you have

10   any handles on Twitter other than

11   @HulksterCrypto?

12       A     I don't believe so, no.

13       Q     If you remembered one, would you let

14   your counsel know and ask him to advise us?

15       A     I would.

16       Q     Did you have a handle on Reddit?

17       A     I don't believe so.

18       Q     Is it possible to use Reddit without a

19   handle?

20       A     I would assume so.  I think so.

21       Q     How did you get on to Reddit?

22       A     Via website.

23       Q     And did you ever post anything on

24   Reddit?

25       A     I don't believe so.

```
                                              Page 176

 1        Q     If you decided to post something on

 2    Reddit, what do you think it would -- how would

 3    that post appear -- how would you be

 4    identified -- strike all that.

 5              How would you be identified in that

 6    post?

 7              MR. ENRIGHT:  Objection, incomplete

 8         hypothetical, assumes facts not in evidence,

 9         calls for speculation.

10              THE WITNESS:  I can't think off the

11         top of my head how Reddit allows you to post

12         or not.

13    BY MR. FOX:

14        Q     Okay.  Do you have an Instagram

15    handle?

16        A     I do.

17        Q     What is that?

18        A     I believe it's just my name, James

19    Fabian.

20        Q     Okay.  Did you ever post on

21    Bitcointalk?

22        A     I don't believe so.

23        Q     Did you have a handle on Bitcointalk?

24        A     I don't believe so.

25        Q     Did you ever post on Discord?
```

```
                                            Page 177

1          A     I can't think of anything.

2          Q     Did you have a handle on Discord?

3          A     I don't know.

4          Q     Did you ever post on Telegram?

5          A     I don't know.

6          Q     Did you have a handle on Telegram?

7          A     I believe I did.

8          Q     What was your handle on Telegram?

9          A     I don't know.  I haven't used it in

10    years.

11          Q     For those social media outlets that we

12    just talked about where you weren't sure whether

13    you made a post or had a handle, what would you

14    need to do to find out whether or not you had a

15    handle?

16          A     I would probably have to go to the

17    website to see if there was a way to see if I

18    had a handle.  It depends on the website.

19          Q     Okay.  All right.  Very good.

20                Have you deleted any of your posts on

21    any social media platform since this case was

22    filed?

23          A     I don't believe so, no.

24          Q     I just want to remind you that if you

25    delete social media posts that are related to
```

1    the facts at issue in this case while the case

2    is pending, that could lead to sanctions, so

3    don't do it.

4           Let's switch gears again.

5           Mr. Fabian, what is a class action?

6    A    So a class action is just a class of

7    people that all have the same commonality and

8    also a certain amount of people that are

9    involved as well to qualify.

10   Q    What do you mean by the same

11   commonality?

12   A    They all have the same issue, like in

13   this case they all have the same complaint of

14   having XRB taken.

15   Q    If the class is certified in this

16   case, will you continue to have a role in it?

17   A    I would.

18   Q    What would that role would be?

19   A    I believe I would be the lead in this

20   case.

21   Q    Okay.  And what does that entail?

22   A    So that would mean being involved

23   looking at pertinent documents, supervising my

24   counsel to make sure they prosecute.

25   Q    Can you provide examples of some of

1    those documents?

2        A    Yes.   Things that were presented by my

3    counsel like the claims, anything that comes,

4    you know, court related.

5        Q    Why did you want to be a class

6    representative, Mr. Fabian?

7        A    You know, I just felt there was a lot

8    of people who were hurt by this and so I thought

9    it was important that people were able to be

10   heard.

11       Q    If the class is certified and you lose

12   the case, what effect will certification have on

13   the class members?

14       A    I'm not sure.

15       Q    If a class is certified and you settle

16   the case, what effect will that settlement have

17   on the class members?

18       A    I would assume they would get part of

19   the settlement.

20       Q    Do you know if it would have any other

21   effect on them?

22       A    I'm not sure.

23       Q    Do you know if it would effect any of

24   their rights?

25       A    I'm not sure.

1       Q      Who would be in the class -- or strike
2    that.
3              Who is in the class that you seek to
4    certify?
5       A      Just other defendants who have lost
6    money through the BitGrail exchange.
7       Q      You mean other --
8       A      Plaintiffs, sorry, class members.
9       Q      Is there anything else about them that
10   distinguishes -- is there any -- strike that.
11             Are there any other factors that
12   distinguish someone who's in the class from
13   someone who is not allowed to be in the class?
14      A      Not that I know of other than, you
15   know, having XRB on BitGrail.  Other than that.
16      Q      Okay.  Have you spoken to anybody who
17   you believe would be included in the class?
18      A      I don't believe so.
19      Q      What do you understand to be the
20   interests of the members of the class?
21      A      I believe to get some of the proceeds
22   that were lost through BitGrail.
23      Q      Do you understand them to have any
24   other interests associated with their membership
25   in the class?

```
                                            Page 181
```

1        A      Not that I know of.

2        Q      What do you understand to be the

3    interest of your lawyers in this case?

4        A      To represent the -- all of the members

5    of the class.

6        Q      Do you understand them to have any

7    other interest beyond that?

8        A      I'm not sure what the other interests

9    are.

10       Q      Well, you testified earlier that you

11   understand that there is a contingency

12   arrangement in place; isn't that correct?

13       A      Correct, yes.

14       Q      Do you know if there is a mechanism

15   for your -- strike that.

16              Do you believe that the interests of

17   your lawyers and the class are aligned?

18       A      I do.

19       Q      We talked about your involvement with

20   respect to the amended complaint and we talked

21   about your involvement with respect to the

22   interrogatory responses.

23              How else have you been involved in

24   this litigation?

25       A      In general, speaking with my counsel

Page 182

1    on a regular basis.

2        Q     Who do you usually talk to when you

3    speak with your counsel?

4        A     Representatives from Silver Miller,

5    from Zelle and Levi & Korinsky.

6        Q     Specifically which lawyers do you

7    generally talk to?

8        A     Usually they're all on at the same

9    time, so it's kind of hard to differentiate who.

10   But, you know, some of the representatives that

11   are on this phone now.

12       Q     Okay.  Is there anybody else who --

13   who you've talked to frequently?

14       A     Just these people that I've had the

15   most contact with.

16       Q     Okay.  By "these people," you're

17   referring to Mr. Enright and Mr. Silver and

18   Mr. Carriel; is that correct?

19       A     Yes.

20       Q     How do you guys usually communicate?

21       A     It varies.  Either phone call, email.

22       Q     And how often do you normally talk

23   with them would you say?

24       A     It varies depending where we're at in

25   the litigation.  So I'm not sure how to answer

1     that.

2          Q     In the last 30 days, how many times

3     would you say you communicated with your

4     lawyers?

5          A     In the last 30 days, probably 40 times

6     or so.

7          Q     So it's your testimony that you talk

8     to your lawyers more than once a day?

9               MR. ENRIGHT:  Objection, misstates his

10          testimony.  Your first question asked for

11          how often he communicates and now you're

12          asking how often he's spoken.

13    BY MR. FOX:

14         Q     Okay.  How many separate instances --

15    strike that.

16               About how many conversations have you

17    had with your lawyers over the last 30 days?

18         A     I would say about 15 to 20.

19         Q     How about the 30 days before that?

20         A     I couldn't put a number on it.  I'm

21    not sure.

22         Q     Do you think it's more?

23         A     Probably less.

24         Q     You testified that you communicate by

25    email as well; correct?

Page 184

1        A      Correct.

2        Q      About how many emails would you say

3    you've exchanged with your lawyers over the last

4    30 days?

5        A      Again, estimate, I would say 25-ish,

6    somewhere around there.

7        Q      Do your lawyers get your approval

8    before they file or oppose a motion in this

9    case?

10       A      I believe they do, yes.

11       Q      What motions have been filed in this

12   case to your knowledge?

13       A      This motion to form the class.  I'm

14   not too sure about what was filed before off the

15   top of my head.

16       Q      Do you know of any motions that were

17   filed in the spring and summer of last year?

18       A      I'm not sure what was filed then.

19       Q      Did you ever talk about a motion to

20   dismiss?

21       A      I'm not sure if we spoke about that.

22       Q      Do you know whether your lawyers filed

23   another case against the same defendants raising

24   the same claims that you're raising in this

25   case?

Page 185

1          A      I'm not aware.  I'm not sure.

2          Q      So you haven't seen any other

3     complaint?

4          A      Other than the one I'm involved in, I

5     don't believe so.

6          Q      Do you know if your lawyers filed a

7     motion to consolidate that other case with this

8     case?

9          A      I don't remember.

10         Q      So you don't remember ever giving them

11    approval to file that motion?

12         A      There was a -- I believe -- I don't

13    know which is which, so I'm getting a little

14    confused.  I know there was the approval to

15    consolidate this class.  So I don't know --

16         Q      You mean to certify the class?

17         A      Certify the class.

18         Q      Right.  But you don't recall giving

19    approval to consolidate this case with a totally

20    different case?

21         A      I'm not sure.

22         Q      If there were 14 other lead plaintiffs

23    in this case, Mr. Fabian, how do you think your

24    role would change?

25         A      I don't know if it would change.

Page 186

```
 1        Q      Did you ever talk with your lawyers
 2    about the possibility that there might be 14
 3    other lead plaintiffs in this case?
 4        A      Yes.  I don't know if they are a lead,
 5    I just know there are other people.
 6        Q      What do you think about that?
 7        A      I have no issue with it.
 8        Q      Do you think what you might -- do you
 9    understand what you might receive if you win the
10    case could be different if there were 14 other
11    lead plaintiffs?
12              MR. ENRIGHT:  Objection, assumes facts
13         not in evidence, calls for speculation.
14              MR. FOX:  I just want to know if
15         that's his belief.
16        Q      Is that your belief?
17        A      I'm not sure.
18        Q      Mr. Fabian, how would you feel about
19    litigating this case in Italy?
20        A      I don't really have an opinion on
21    that.
22        Q      Did you ever talk about that
23    possibility with any lawyers?
24        A      I don't believe so.
25        Q      Did they ever tell you there was a
```

Page 187

1    motion to move this case to Italy?

2         A     I can't recall.

3         Q     Did they ever ask you about how to

4    oppose that motion?

5               MR. ENRIGHT:  Objection, this entire

6          line of questioning is entirely intrusive

7          into the attorney-client communications.

8          I've tried to give you some leeway here

9          because he is a class representative and

10         because he's representing other class --

11         absent class members.

12              But this is going on more than long

13         enough.  I'm going to direct the witness not

14         to answer.

15   BY MR. FOX:

16         Q     Mr. Fabian, how many claims did you

17   have at the beginning of this case?

18         A     I'm not sure.

19         Q     If I told you there were 11 claims at

20   the beginning of this case, would you have any

21   reason to doubt me?

22         A     I would not.

23         Q     How many claims remain in this case?

24         A     I'm not sure.

25         Q     You don't know how many claims you

Page 188

```
 1    have pending in this case?
 2         A     I do not.
 3         Q     If I told you that eight claims were
 4    dismissed, would that sound wrong to you?
 5         A     I would not know.
 6         Q     Do you know why those eight claims --
 7    I'm going to represent to you that eight claims
 8    were, in fact, dismissed.
 9               Do you know why those eight claims
10    were dismissed?
11         A     I do not.
12         Q     Did you ever talk about that with your
13    lawyers?
14         A     I don't believe so.
15         Q     What documents did you give your
16    lawyers to produce in discovery?
17         A     We did a search of my email for key
18    terms and those things that popped up were sent
19    over.
20         Q     Do you recall specifically which
21    documents you sent over?
22         A     There was the snapshots from Coinbase,
23    I believe Bittrex, I'm not sure, the snapshot of
24    my account balance in BitGrail, and I think -- I
25    believe a few emails.
```

1       Q       Okay.  Are there any documents that

2    were produced in this litigation by your counsel

3    that they didn't get from you?

4       A       I do not know.

5       Q       Did you review the production before

6    it was made?

7       A       I'm not sure.

8       Q       Is it possible that you reviewed the

9    production and forgot looking at 800 pages of

10   documents?  Is that likely?

11      A       It's not.

12      Q       So safe to say you did not review the

13   production?

14      A       I do not know what the production is,

15   so I can't answer that.

16      Q       Did you look at the documents that

17   your lawyers produced on your behalf to the

18   defendants before they were produced?

19      A       I reviewed documents that were sent to

20   me by my counsel, yes.

21      Q       Do you remember about how many there

22   were?

23      A       I do not.

24      Q       Did you see any documents they did not

25   get directly from you?

```
                                            Page 190

 1        A     I do not know.

 2        Q     Mr. Fabian, who decides whether to

 3   settle this case?

 4        A     I do not know who settles at the end

 5   of the day.

 6        Q     Okay.  Mr. Fabian, are your counsel

 7   authorized to legally bind you with respect to

 8   the matters in this case?

 9        A     I'm not sure.  I don't know what that

10   means.

11        Q     I'll rephrase the question.

12              Have you authorized them to take

13   positions that affect your rights in this case?

14        A     I believe so.  I hired them as my

15   representation.

16        Q     And it's your understanding that

17   lawyers serve as agents to their clients; is

18   that correct?

19        A     Correct.

20        Q     And is it your understanding that as

21   an agent, when the lawyer acts on the client's

22   behalf, the client is bound by that action?  Is

23   that correct?

24        A     Correct.

25        Q     Is that true for all of the lawyers
```

```
                                                    Page 191
 1      that you hired?
 2           A      I don't know.
 3           Q      Are there any lawyers that you hired
 4      that don't have authorization to bind you?
 5           A      I don't know the answer to that.
 6           Q      What don't you know about it?  You
 7      don't understand the question?
 8           A      I don't know the legal jargon on who
 9      exactly, but I assume all three firms would have
10      the same rights.
11           Q      Right.  All three firms are your
12      lawyers; is that correct?
13           A      Correct.
14           Q      And that's true with respect to David
15      Silver?
16           A      He's one of them, yes.
17           Q      David Silver has authority to bind you
18      with respect to matters in this case.  Is that
19      your testimony?
20           A      I believe so.
21                  MR. FOX:  Why don't we take a break.
22           We're getting pretty close to the end, so
23           you should be happy.  Can we come back in
24           ten minutes?  Does that work for people?
25                  THE REPORTER:  Sure.
```

Page 192

```
 1              MR. ENRIGHT:  Works for me.
 2              VIDEOGRAPHER:  We're going off the
 3         record at 3:05 p.m.  This is the end of
 4         Media 4.
 5              (Recess taken.)
 6              VIDEOGRAPHER:  We're on the record at
 7         3:20 p.m.  This is the beginning of Media 6
 8         in the deposition of James Fabian.
 9              MR. FOX:  Okay.  Mr. Fabian, we are
10         back on the record and I have what I believe
11         is going to be good news for you.  We have
12         no further questions in this deposition.
13              While we are on the record, I do want
14         to make clear, as was disclosed in our
15         notice of this deposition, this deposition
16         is for purposes of the motion for class
17         certification only.
18              So, Mr. Fabian, should the case
19         proceed so far, we will be having you back
20         for a second deposition on the merits of the
21         case.  And I want to reserve those rights
22         and also reserve rights to depose you on any
23         documents that should have been produced and
24         produced in response to your original
25         request.
```

Page 193

```
 1              Mr. Naunton, any questions from your
 2       end?
 3              MR. NAUNTON:  I have no question at
 4       this time.
 5              Thank you for your time today,
 6       Mr. Fabian.
 7              But I would just join in the
 8       reservation of rights on the record that
 9       Mr. Fox just made with respect to
10       questioning you at a later time with respect
11       to any additional documents that are
12       produced with respect to the merits if we
13       get that far.
14              THE WITNESS:  No problem.
15              MR. FOX:  Very good.
16              MR. ENRIGHT:  I'm going to have a
17       couple minutes of redirect, very briefly.
18              MR. FOX:  Go ahead.
19                     EXAMINATION
20   BY MR. ENRIGHT:
21       Q    Mr. Fabian, you testified earlier that
22    you were aware that counsel were working with
23    other plaintiffs that help represent the class;
24    correct?
25       A    Correct.
```

1      Q      Did you understand the exact mechanics
2    of how we were going to do that?
3      A      The exact mechanics, no.
4      Q      Do you recall if your counsel sent to
5    you any documents regarding doing that?
6      A      I believe there were, yes.
7      Q      And did you review those?
8      A      I did.  I just wasn't sure what the
9    title was of it, what it was called.
10     Q      Okay.  And did you ever specifically
11   authorize Mr. Silver or anyone else to release
12   or settle your claims in this case or in any
13   other case?
14     A      No, not on my behalf.
15          MR. ENRIGHT:  Okay.  I have nothing
16        further.
17          MR. FOX:  Okay.  I just want to say
18        for the record, although I think it's clear
19        already in the transcript, that this
20        redirect and the answers, which in some
21        cases are intentioned to the previous
22        testimony, follows a 15-minute break in the
23        deposition.
24          MR. ENRIGHT:  With that, we will
25        adjourn.

Page 195

1          MR. FOX:  Thank you very much,

2     Mr. Fabian.

3          VIDEOGRAPHER:  We're off the record at

4     3:23 p.m.  And this concludes today's

5     testimony given by James Fabian.  The total

6     number of media units used was six and will

7     be retained by Veritext.

8          (Proceedings concluded at 3:23 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 196

1           I, LYNNE M. LEDANOIS, a Certified

2      Shorthand Reporter of the State of

3      California, do hereby certify:

4           That the foregoing proceedings were

5      taken before me at the time and place herein set

6      forth; that a record of the proceedings was made

7      by me using machine shorthand which was

8      thereafter transcribed under my direction; that

9      the foregoing transcript is a true record of the

10     testimony given.

11          Further, that if the foregoing

12     pertains to the original transcript of a

13     deposition in a Federal Case, before completion

14     of the proceedings, review of the transcript [ ]

15     was [X] was not requested.

16          I further certify I am neither

17     financially interested in the action nor a

18     relative or employee of any attorney or party

19     to this action.

20          IN WITNESS WHEREOF, I have this date

21     subscribed my name.

22

23          _Lynne Marie Ledanois_

24     _____

       LYNNE MARIE LEDANOIS

25     CSR No. 6811

Page 197

1   NAME OF CASE: James Fabian v Nano, et al.,
2   DATE OF DEPOSITION: 8/7/20
3   NAME OF WITNESS: James Fabian
4   Reason codes:
5        1. To clarify the record.
         2. To conform to the facts.
6        3. To correct transcription errors.
7   Page _____ Line _____ Reason_____
    From _____ to_____
8
9   Page _____ Line _____ Reason_____
    From _____ to_____
10
11  Page _____ Line _____ Reason_____
    From _____ to_____
12
13  Page _____ Line _____ Reason_____
    From _____ to_____
14
15  Page _____ Line _____ Reason_____
    From _____ to_____
16
17  Page _____ Line _____ Reason_____
    From _____ to_____
18
19  Page _____ Line _____ Reason_____
    From _____ to_____
20
21
22
23
24                          _____
25                          Signature of Deponent

| & |
| --- |
| **&**   3:4 4:13 9:25 10:13,15 26:22 182:5 |

| 0 |
| --- |
| **00054**   1:7 2:7 9:13 |
| **00672**   8:7 |
| **00673**   8:11 152:23 |
| **00712**   151:24 |
| **00872**   7:22 132:14 |
| **00882**   154:22 |
| **00885**   8:17 163:8 |

| 1 |
| --- |
| **1**   7:3 9:7 45:9,23 46:5,10 47:4,7 54:21 58:10 60:11 60:17 61:21 64:14 65:1,20 72:15,23 73:6 77:10 78:1 78:15 79:5 80:15 87:11 97:7,13 102:14 105:20 113:13 117:12,20 197:5 |
| **1.62457112**   127:6 130:24 |
| **10**   8:8 151:5 152:17,19 |
| **10,000**   42:18 |
| **100**   133:6 134:8 136:22 139:17 144:1 172:17 |
| **10016**   4:19 |
| **10020**   5:9 |
| **109**   104:25 105:4 107:6,9 |
| **10:11**   2:17 9:2,5 |
| **10:54**   45:23 |
| **11**   6:4 8:12 151:5 154:13,17 187:19 |

**110**   146:10,17 147:17 157:12,16 160:22 161:3,7,12 161:16,22
**1101**   3:8
**112**   106:12,14
**113**   107:16
**114**   108:20,22
**115**   3:9
**11780**   4:7
**11:04**   46:1
**11:12**   52:6
**11:15**   52:10
**12**   8:15 102:5,21 142:18 145:23 163:4,7 167:3
**121**   109:19 110:22 111:3
**124**   111:12,14
**127**   7:18 111:21,24 112:8
**12:18**   96:1
**12:37**   96:5
**12th**   96:19 97:7 143:21 144:22 145:4,12 168:14
**13**   69:22,24
**131**   112:15
**132**   7:22
**137**   8:3
**138**   87:5,13,21
**139**   113:17,21
**14**   185:22 186:2,10
**141**   114:6,9
**144**   114:14
**15**   65:18 87:8 95:23 183:18 194:22
**151**   8:7,11,14
**154**   115:12,17,18

**163**   8:17
**164**   116:12 117:19
**16th**   127:5 129:23
**17**   96:9
**170**   37:20 38:8
**1775**   3:18
**183**   49:25 50:1 68:13 74:10,21 75:2
**184**   53:4 54:9
**185**   53:5,13
**186**   127:3 129:3 134:20 135:2
**187**   130:15,22 131:8 133:24 134:20 135:3 137:14
**188**   118:3
**189**   135:5,7,14 136:9 138:9,19
**19**   84:2 85:13
**191**   140:12,19
**192**   142:16 143:9 143:11
**193**   6:5 144:23 145:2
**194**   122:9
**195**   146:7 148:14 160:8
**196**   162:10
**19th**   4:18 83:20 85:5 164:3
**1:14**   10:21
**1:56**   150:22 151:2
**1st**   43:9 95:4 140:20 166:17 168:13

| 2 |
| --- |
| **2**   4:17 7:5 46:1 55:3,4,9 60:6 61:16 103:5,8 |

197:5
**2,000**   142:20 167:3
**2,850**   142:19 143:3 143:20 144:13
**20**   183:18
**200,000**   42:14
**20006**   3:20
**20007**   3:10
**2016**   43:9 68:7 73:22 76:19 81:8 81:12,20 82:1,4 83:20 84:2 85:5 85:13 86:21 87:3 88:16,23 96:24
**2017**   41:8 50:3,10 50:17,20 51:10 68:15,25 74:1,6,9 77:1,23 81:17 82:6 83:24 85:10 86:25 88:20 92:20 94:16 95:17 96:19 97:8 102:5,21 118:20 120:1 127:5 130:23 135:15 139:11 140:20 142:18 144:22 145:4,12 156:11 160:20 161:2 166:17 167:3 168:13,14 169:9,12
**2018**   8:16 27:7 36:22 41:10 114:22,24 156:9 157:19 161:4 162:13 164:3,3,5,8 164:10,13,20 165:3
**2019**   27:7 164:12
**202**   3:11,21

**2020** 1:17 2:17 9:1
9:6 158:19
**21,143** 140:23
141:2,4 166:16
**212** 4:20
**21st** 86:21 87:3
**22nd** 130:23 133:9
133:13,17
**23,000** 160:19
**23,033** 146:12
160:17,24 161:6
161:15,25 162:1
162:11 173:11
**23,143** 145:5
146:10
**25** 184:5
**26th** 92:20 95:17
**275** 36:8
**275,000** 35:23
36:13,20 37:1
162:12,20
**27th** 68:7 93:18
94:16 164:3,24
**28** 99:10,14
**29th** 158:19
**2:00** 150:23
**2:09** 151:7

**3**

**3** 7:8 52:7,10
59:16,19,24 63:8
63:17 69:4,15
78:4 79:13,15,25
96:2 139:25 197:6
**3,220** 135:20
**30** 183:2,5,17,19
184:4
**30th** 3:8 95:5
118:20
**31** 135:15
**31st** 139:11 156:11

**33** 31:3,24
**33065** 4:8
**352** 5:10
**375** 3:19
**3:05** 192:3
**3:20** 192:7
**3:23** 195:4,8
**3rd** 73:22 81:8,12
81:20 82:1,4
164:5 165:3

**4**

**4** 7:10 58:8 61:19
89:15,18,21 96:5
151:3 192:4
**4,308.83.** 127:10
**40** 183:5
**4205619** 1:25
**43** 49:22
**45** 7:4
**45,000** 42:11
**485** 5:8
**4:19** 1:7 2:7 9:13
**4:56** 150:21
**4th** 76:19

**5**

**5** 7:12 60:11 98:3
98:4,9 151:8
**516-6000** 4:9
**523.009711483.**
154:7
**524-4290** 3:11,21
**537-5411** 5:10
**55** 7:7
**57** 98:13
**58** 47:10
**59** 7:9

**6**

**6** 7:15 63:6,7
127:25 128:3
192:7

**6,070** 145:6
**6,720** 7:20
**6/25/19** 7:13
**66971933** 135:17
135:19 140:20
**6811** 1:24 2:19
196:25
**69** 65:3,6,13,22,23
70:11 71:5
**6954** 196:23

**7**

**7** 1:17 2:17 7:19
9:1 63:16 132:7,8
**7,000** 127:8
**7,104** 7:17
**7,104.30** 127:9
**72** 71:9,21
**729-7708** 4:20
**79** 103:17,17,25
**7th** 9:6 88:16,23

**8**

**8** 8:3 137:2,3
**8/16/17** 7:17
**8/31/17** 8:3
**8/7/20** 197:2
**800** 189:9
**86** 75:11,13 80:2
82:13,19
**89** 7:11 80:3,4,9
**8th** 162:12,17

**9**

**9** 8:4 151:5,20
153:14
**92** 104:11,21
**94** 82:10,11,18
**954** 4:9
**96** 82:21,23
**97** 84:5,6,11
**98** 7:14 85:15,17

**9th** 114:22

**a**

**a.m.** 2:17 9:2,5
45:23 46:1 52:6
52:10
**able** 11:25 16:8
75:15,20 84:13
179:9
**abraham** 155:24
**absent** 187:11
**absolutely** 146:5
**accelerate** 150:17
**accept** 144:9
**access** 29:1 43:15
128:13 134:13
137:11 139:18
141:22 142:7
157:19 158:3,4,10
158:13,22 159:1
**account** 8:4,8,12
109:11,17,23
110:9,17 119:4
122:11,25 123:11
124:1,19 126:1,4
127:18 129:1,18
130:9 131:13
134:5,11,16,25
135:16,18 137:12
138:11,15,18,22
139:10,15 141:20
141:23 144:12,19
145:11,14,23
146:24 149:8
151:16 154:9
155:3 158:11,14
159:1 160:25
161:15 166:7
167:10 174:17
175:3 188:24
**accounts** 35:25
53:23 54:6

**accurate** 49:5
143:12
**acquired** 100:14
100:15,24
**action** 7:3 33:6
47:22 57:17 61:7
62:3 99:18 178:5
178:6 190:22
196:17,19
**actionable** 101:7
**actions** 10:1
**activities** 64:6
**acts** 190:21
**actual** 49:6 75:19
86:5 90:21 94:7
138:11 139:3
165:2
**add** 11:8 14:19
48:15
**adding** 38:19
106:7
**additional** 97:12
122:3 138:17
193:11
**address** 12:6 21:7
130:6,12 147:10
147:15
**addresses** 80:24
**addressing** 148:15
**adjourn** 194:25
**advance** 97:23
**advertisement**
70:13
**advertising** 66:20
67:2
**advice** 21:11 33:22
34:22 38:20
**advise** 167:19
172:25 175:14
**advisement** 29:17

**affect** 190:13
**affiliated** 28:16
110:16
**agent** 190:21
**agents** 190:17
**ago** 43:8 59:5
60:20 64:17 68:4
70:18 81:6 90:8
109:8 122:4 149:7
**agree** 100:21
101:7,20
**agreeing** 101:17
**agreement** 31:15
31:18,22,25 32:8
32:12,16,24
**agreements** 32:9
32:19
**ahead** 22:2 26:10
38:1 53:3 67:25
145:25 167:5
193:18
**al** 7:9 9:10,11
197:1
**alcohol** 23:5
**alerted** 141:8
**alias** 23:21
**aligned** 181:17
**allegation** 74:4,10
75:1 131:8 136:9
143:9
**allegations** 34:17
49:1,6 50:22
62:19 96:15
165:17,24
**allege** 36:17 68:13
**alleged** 49:8 95:2
115:19 116:1,16
120:13 133:15,24
134:11,19 135:2
137:14 138:9,19
148:14 162:7

**allegedly** 100:22
**allergies** 97:20,25
**allow** 23:11 48:18
87:16 158:4
**allowed** 172:23
180:13
**allows** 176:11
**amend** 69:14
**amended** 7:3
47:21 50:7 54:21
62:19 141:9
181:20
**amount** 30:7
39:22 137:16
141:2,13 145:15
161:6 173:14
178:8
**amounts** 25:14
**annotate** 48:17
**announced** 37:4
115:24
**answer** 12:14
13:16 14:1,3 15:3
20:16 22:18 26:5
26:10 28:7,19
30:15 34:7 35:21
37:18 38:1,2,22,22
39:6,12,17,19 40:4
40:14 51:6,19
52:13,17 56:9,14
58:5 59:2 64:11
66:6,25 71:7 73:6
73:9 77:9 78:1,4
78:14 83:14 86:13
89:9 90:17 92:4,7
101:2,12,23
107:24 109:13,25
125:3,6,10 143:23
166:9 173:9,21
182:25 187:14
189:15 191:5

**answerable** 78:11
**answered** 28:7
57:10 70:7 125:17
166:9,20
**answering** 60:6
73:7
**answers** 56:22
57:6,12,19 60:21
61:14 63:6 71:11
77:25 194:20
**anybody** 158:25
159:13 170:19
180:16 182:12
**anymore** 166:2
**apologies** 163:15
**apologize** 57:15
97:20,22,23
112:21 140:13
142:1
**app** 155:12
**apparently** 163:15
**appear** 77:12 78:3
153:4 163:20
164:7 176:3
**appearances** 3:1
4:1 5:1
**appears** 20:5
82:11,12 83:15
101:16 155:23
164:19
**application** 19:4
155:14
**applications** 19:17
**apply** 15:7
**approval** 184:7
185:11,14,19
**approximately**
31:23 36:19 70:21
135:20 140:23
162:12

**april** 8:16 50:3,10 50:17,20 51:10 68:25 74:1,6,9 75:3 76:25 77:23 81:8,12,16,20 82:1 82:4,5 83:23 85:9 86:21,24 87:3 88:19 114:22 164:3,20 169:11

**area** 11:21

**arguable** 77:19

**argument** 99:3

**argumentative** 70:7 72:25

**arrangement** 16:10 181:12

**arrived** 38:12 39:22 162:15

**asked** 21:12 28:6 42:23 43:5 56:17 70:7 90:16 93:1 94:21 95:7 125:16 159:5 166:8,20 183:10

**asking** 13:25 21:4 43:4 56:24,25 57:2 87:15 101:19 148:17 183:12

**associated** 180:24

**assume** 13:6 25:20 81:13 105:23 116:2 124:12 131:4 144:4 161:3 175:20 179:18 191:9

**assumed** 69:19

**assumes** 37:23 51:4 92:5 176:8 186:12

**assuming** 15:21 94:7

**assuring** 99:23 116:20

**at'ing** 106:7

**attach** 135:11

**attached** 110:10

**attending** 17:16

**attests** 64:1,4

**attorney** 3:17 4:6 5:7 22:17 26:4 34:5 38:15 56:13 187:7 196:18

**attorneys** 3:7 4:16 14:21 35:5 49:4 55:21

**attribute** 64:22

**august** 1:17 2:17 9:1,6 52:24 92:20 93:18 94:16 95:5 95:17 118:20 120:1 123:2 127:5 129:23 130:23 133:9,13,17 135:15 139:11

**authority** 191:17

**authorization** 191:4

**authorize** 194:11

**authorized** 190:7 190:12

**automatically** 163:14

**available** 140:21 158:8

**avenue** 3:18 4:17 5:8

**award** 26:19,19 30:3

**aware** 48:22 62:6 102:2,6 169:17 185:1 193:22

**awhile** 59:5

**b**

**b** 7:1 8:1 58:12 130:25

**bachelor** 40:19

**back** 30:23 34:8 39:1 40:1 46:23 50:19 52:16 54:21 58:8 61:14,19 80:5 92:21 96:8,9 103:3,11 107:6 108:24 109:20 127:3 130:14 135:4 140:8 149:2 150:23 151:10 158:15 159:20 160:8 163:20 170:2 191:23 192:10,19

**backed** 87:24

**background** 155:25

**balance** 145:11,23 154:9 155:4 156:19 167:10 188:24

**balances** 8:5,9,13 158:7

**bank** 146:21

**bankruptcy** 169:19 170:23 171:4,20 172:16 172:20 173:1,5 174:2

**base** 61:9

**based** 30:2 33:22 34:22 35:5,9,13 37:2 38:3,4 57:18 62:6 75:8 78:19 94:25 153:18

**baseline** 42:10

**basic** 11:3

**basically** 24:3 35:1

**basics** 47:20

**basing** 86:10

**basis** 30:12 35:3,7 35:11 73:4 109:9 109:15,22 110:4,7 110:12,15,19 112:12 113:5 182:1

**basketball** 40:25

**bates** 128:19,21 132:13 151:23 152:3,20,22 153:18,22 154:20 154:22 163:8

**bathroom** 71:13 95:24

**bay** 2:16 41:5,11

**bear** 45:6 54:17 59:15 65:16 97:15 103:5 159:21

**bears** 47:7 128:21 132:13 152:20,22 153:21 154:17 163:7

**began** 53:16

**beginning** 46:1 52:10 96:5 151:7 187:17,20 192:7

**begins** 80:17 83:3

**behalf** 1:4 2:4 10:4 189:17 190:22 194:14

**belief** 49:11 56:23 57:20 74:22,24 118:1 186:15,16

**believe** 24:6 28:20 31:2 33:7 35:18 36:20,24 37:3,8,19

**[believe - break]**

38:8 39:21 40:8
47:13 48:1,5,16,25
51:12 52:23 55:19
56:4 57:18 60:2
60:23 62:23 67:24
69:16 71:25 76:11
78:16 82:16 89:24
90:11 94:18 95:19
96:25 97:9 98:16
101:13,14 102:9
102:19,22,23
105:14 107:13
108:5,8,16 109:9
109:15,22 110:4,7
110:12,15,19
112:8,12 113:1,5
113:16,22 114:24
115:3,11,20
118:19 119:2,25
120:4 127:1,14,21
128:9,12,25 129:4
131:10 132:18,24
133:1,22 134:2
135:24 136:21
137:6,10 139:12
139:16 140:3
141:5 142:6,23
143:5,16,17 144:1
144:5,16 145:9
146:16 147:2,8
148:19 149:2
152:2,13 153:2,16
156:12 158:12,15
162:16 165:11
166:10 167:4,6
169:2,5,20 171:21
174:22 175:12,17
175:25 176:18,22
176:24 177:7,23
178:19 180:17,18
180:21 181:16

184:10 185:5,12
186:24 188:14,23
188:25 190:14
191:20 192:10
194:6
**believed** 70:24
75:2
**believes** 62:12
**benefit** 167:18
**benefits** 41:19,24
155:17
**best** 13:2 56:22
57:10,20 74:18
118:1
**better** 12:7,9 88:5
104:7 106:17
114:2 130:16
**beyond** 181:7
**bg** 1:9 2:9
**big** 40:25
**bigger** 66:2,10,11
66:12,13 85:21,25
104:16
**bind** 190:7 191:4
191:17
**bit** 15:20,21,24
36:5 51:18 63:5
80:5 84:14,19
87:24 93:25 97:19
104:5 105:7
106:16 107:18
108:24 154:19
157:19 163:11
**bitcoin** 127:6,10
128:11 129:16,22
130:1 132:21
133:2,3,12,16
134:6 135:18
141:20 143:7,9,17
143:20 144:3,4,13
144:20 156:18

164:23 165:5
**bitcointalk** 174:21
176:21,23
**bitgrail** 1:10 2:10
8:4,8,12 24:7
50:13,17,24 51:15
52:25 64:6 79:2
93:4,7 96:12
99:24 100:2,25
101:9 102:4
114:23 115:2,7,23
115:23 116:1,21
118:10,11,18,23
119:3,8,16,17,21
119:21 120:9
121:1,5,15 122:11
122:17,18 123:1,4
123:16,20,21
124:1 125:12,25
126:18 129:7,11
130:3 133:7,12,16
135:16,18 136:7
136:11 138:2
139:10,14,22
140:5,21 141:16
142:5,7,9,13,19
143:20 144:9,13
144:21 145:5,14
146:10,11,13
147:17,25 148:3
148:10,16,24
149:3,9,20 151:15
154:9 157:16
158:1,10,13 159:1
159:10 161:17
166:4,7,17 167:3
167:10 168:24
169:18 170:17
172:10,11 180:6
180:15,22 188:24

**bitgrail's** 123:24
124:15 138:22
**bittrex** 8:3,15 86:1
130:25 131:6,13
131:17,21,25
134:4,7,11 135:17
136:3,6,7,10,14,17
137:12,17,24
138:18,22 141:18
141:21,23 143:1,4
144:16,19 163:24
164:18 188:23
**bleeds** 100:10
**blew** 108:12
**blocking** 113:24
**blow** 84:18 104:12
108:11 110:24
111:5,16,18
113:19,23 163:11
**boards** 27:15
**boat** 150:14
**body** 15:18
**bomber** 1:11 2:11
33:8
**bonus** 42:9
**bonuses** 42:15
**books** 23:20
**bottom** 61:20 63:7
75:24 89:24 99:10
99:14 108:9 156:7
164:4
**bought** 53:24
78:25 94:19 130:1
**bound** 190:22
**box** 68:5
**brand** 34:13
**break** 13:9,15,17
14:20 18:19 71:13
95:23 96:9 103:15
150:4,8,16,21
191:21 194:22

brentwood  41:9
briefly  193:17
bring  24:2 42:12
bringing  80:25
broadly  149:15
broccolex  93:2
broke  46:4,22 47:1
  51:18 74:7 151:14
  163:14
brought  27:22
  55:21 76:15
btc  7:17,21 127:6
  130:24 135:17,19
  140:20 156:17
built  43:18
bulk  80:23
bunch  139:1
busch  1:9 2:9 10:2
  33:11 34:9,21
  58:12
business  41:3
  168:2
buy  51:15 72:20
  79:2 80:12 86:17
  91:6 92:12,22
  94:17 95:8
buying  76:16
  128:11

**c**

c  4:5 58:12 86:1
calculate  36:25
  37:22 162:19
california  1:2 2:2
  9:17 40:22 41:5,9
  196:3
call  32:7 129:20
  130:10 131:24
  134:10,23 138:16
  139:21 142:12
  144:6,18 147:14
  148:9 157:3 171:3

182:21
called  44:11,12
  72:15 93:2 128:12
  139:24 194:9
calling  173:24
calls  22:15 28:18
  29:15 30:6,13
  34:4 35:20 37:16
  66:5 73:8 83:13
  86:12 101:1,11,22
  107:23 112:3
  116:5 173:7 176:9
  186:13
camera  11:12,18
  16:20 17:5 18:22
  46:24
caption  88:12
card  7:16 127:7
carpal  140:17
carriel  3:16 10:18
  10:18 21:24 99:14
  99:16,20 100:18
  100:21 101:6,16
  102:24 182:18
case  1:7 2:7 9:12
  25:7,12,16,19,22
  25:25 26:13,21
  31:9,13 33:10
  35:19 46:12 47:9
  48:9,19 54:12
  98:12 101:8
  132:15 133:25
  137:9 152:7
  165:24 170:10
  177:21 178:1,1,13
  178:16,20 179:12
  179:16 181:3
  184:9,12,23,25
  185:7,8,19,20,23
  186:3,10,19 187:1
  187:17,20,23

188:1 190:3,8,13
  191:18 192:18,21
  194:12,13 196:13
  197:1
cases  194:21
cash  144:2,5
cause  167:24
caution  26:5
caveat  75:6
cell  19:14
ceo  100:1
certain  73:16
  149:9 165:25
  178:8
certification  21:7
  96:18 179:12
  192:17
certified  2:18
  178:15 179:11,15
  196:1
certify  180:4
  185:16,17 196:3
  196:16
cex  86:1
challenge  61:7
challenged  58:11
  58:16,20,24 59:1,4
  59:9 61:4,8,12
  62:1,4,7,9,12
  63:11,21,24 64:12
  64:18,22 69:5
  70:17 71:10,23
  72:3,16 113:14
  117:5
chance  84:15 89:4
change  48:12
  79:13,25 98:23
  185:24,25
changed  73:13
changes  20:17

channels  122:15
  123:4,9
charger  135:11
chat  17:25
chatter  170:15
check  32:15 89:4
  139:4 146:3 149:4
  167:7
choose  27:10
chubbs  23:19
circumstances
  63:13
citrixweb  155:8,10
  155:14
claim  35:3,8,12
  40:10 47:17 50:23
  86:10 100:11,23
  171:19,23 172:1,3
  172:4,10,15,19,23
  173:4,5,15
claims  34:24 38:3
  38:4 61:10 100:11
  165:24 179:3
  184:24 187:16,19
  187:23,25 188:3,6
  188:7,9 194:12
clarification  58:25
clarify  13:3 32:22
  157:13,21 197:5
clarifying  94:8
class  7:3 21:7 24:4
  25:11,18,22 26:12
  26:18 37:15,19
  38:8 40:7,9,11,13
  40:13 47:22 96:18
  116:20 178:5,6,6
  178:15 179:5,11
  179:13,15,17
  180:1,3,8,12,13,17
  180:20,25 181:5
  181:17 184:13

185:15,16,17
187:9,10,11
192:16 193:23
**clear**  24:16 67:15
129:10 173:24
192:14 194:18
**clearer**  172:13
**clearly**  14:3,15
22:16 38:18
139:24
**click**  48:17
**clicks**  80:22
**client**  22:17 26:4
34:5 38:15 56:13
99:25 100:14,15
187:7 190:22
**client's**  190:21
**clients**  190:17
**close**  87:7 114:23
150:5 159:19
161:17 191:22
**closed**  115:7 158:1
**codes**  197:4
**coin**  79:1 80:12
86:17 88:13 92:17
94:7 165:2
**coinbase**  7:15,19
127:18 128:12
129:1 130:1,5,12
131:17 133:1
134:14,19,24
136:3,5,6 141:18
144:15,19 188:22
**coinbase's**  127:6
**coins**  82:8 94:5
146:22 147:23
149:18,21 156:20
**colin**  1:9 2:9 10:2
58:12 64:23
107:13

**colleagues**  17:18
**collect**  32:17
**college**  40:22
**column**  156:22,25
157:6,7
**columns**  156:16
**combination**  42:8
**come**  16:14 18:8
18:14,17,21 34:8
46:23 54:5 56:17
89:7 128:15
150:23 191:23
**comes**  23:21 179:3
**comfortable**  16:10
16:12 22:23
**coming**  87:16
97:21,24
**commencing**  2:16
50:2
**commission**  42:9
**commissions**
42:13
**commonality**  40:9
178:7,11
**communicate**
14:20 17:19,23
170:21 182:20
183:24
**communicated**
183:3
**communicates**
183:11
**communication**
14:6,10,14 19:3
22:17 34:6 61:6
66:19 170:22
**communications**
16:23 26:4,7
38:16 56:13
159:16 175:6
187:7

**company**  155:8,9
155:10
**compensated**  30:1
**complaint**  7:4
34:18 47:22 48:8
48:8 49:1,21 50:7
50:23 53:4 54:22
62:3,4,9,10,14,19
64:3 65:5 68:13
74:5,10 95:3
96:16 100:12
103:19,21,22
120:13 121:25
124:4 125:8,14
126:13,16,24
127:3 129:3
130:14,19 133:16
134:20 135:3,4
140:8,9 159:21
160:5 162:8
165:17 178:13
181:20 185:3
**complaints**  125:7
141:9
**completely**  169:16
**completion**  196:13
**compound**  78:8
**computer**  15:12
16:18 19:4,18
**computers**  155:13
**concern**  80:24
167:24
**concerning**  32:5
126:17 148:11
**concluded**  195:8
**concludes**  195:4
**conclusion**  30:7,13
35:21 37:17 66:6
73:9 83:14 86:13
101:2,11,22
107:23 112:4

116:6
**conduct**  15:10
175:5
**conducting**  11:6
**confirm**  20:7 49:4
105:18 166:5
167:1,8
**confirmation**  7:15
7:19 139:13 148:2
148:5
**confirmed**  79:17
**confirming**  142:9
**conform**  197:5
**confuse**  125:19
**confused**  94:6
185:14
**connected**  108:4
109:10,16,23
110:8 134:11
136:10 169:22
171:4
**connection**  20:3
20:14 31:9 96:17
110:2 148:13
163:14 173:1
**consecutively**
46:14
**consequences**
12:21
**consider**  79:23
**consolidate**  185:7
185:15,19
**construed**  86:15
**consumed**  23:5
**contact**  27:4
182:15
**contacted**  27:2
169:21
**contain**  62:19 63:2
77:12,19 78:3
79:5 111:25

**contained** 57:6
111:24
**containing** 71:22
113:13
**contains** 62:4
**contend** 62:20
63:2,11 66:3,17
67:10 70:10 72:10
75:13 80:8 82:23
83:6 84:11,23
85:17 88:3 103:12
104:3,21 105:2,21
106:14 107:20
108:22 111:3,15
111:25,25 112:17
114:9,17 115:14
**content** 67:3
**contention** 161:20
**context** 15:21
172:8
**contingency** 30:2
30:4 31:23 181:11
**continue** 178:16
**continued** 81:1
**continues** 33:17
53:12
**continuing** 71:15
**contract** 168:9
**contracts** 168:6
**control** 29:8,12
146:9 171:6
**convenient** 14:22
**convention** 46:9
**conversation**
58:19
**conversations**
22:10 56:15 86:6
86:7 183:16
**copies** 168:5
**copy** 168:9

**copyright** 156:8
**coral** 4:8
**corner** 68:6 108:9
**correct** 32:25 33:1
36:18 38:10 39:23
40:23 42:20,24
43:16 51:11 53:18
57:19,22 61:2
64:16 67:18 71:24
72:8 80:1 81:4
82:20 94:9,22
96:24 98:24 102:8
105:22,23 106:6
106:10 109:11
113:15 117:15,25
119:5,22 120:3
121:6,11,12,16,17
121:20,21,25
122:8 124:12,16
124:20,23,24
126:1,2,5,6,9,10
126:13,14 134:6
143:21 149:10,11
151:16 155:17
157:23 160:14,15
161:8 162:20,21
164:18 166:7,13
166:14,18,21
168:10,11 172:24
173:15,16 181:12
181:13 182:18
183:25 184:1
190:18,19,23,24
191:12,13 193:24
193:25 197:6
**correctly** 57:3
**correspondence**
171:4
**counsel** 9:9,19
10:10 14:24 19:25
21:18 26:8 33:22

34:23 46:6 54:20
56:16,17 63:19
99:17 124:25
132:15 137:9
141:8 152:5
153:20,24 154:24
159:8,14,17
165:10,12 170:9
171:14 172:25
175:14 178:24
179:3 181:25
182:3 189:2,20
190:6 193:22
194:4
**countless** 68:22
116:19
**couple** 11:3 22:1
42:16 50:18,20
51:20 159:11
193:17
**course** 14:20 17:2
18:19 22:7 32:3
38:23 174:8
**court** 1:1 2:1 9:12
9:17 13:20 14:4
16:8,13 20:20
30:3,22 38:25
39:25 42:22 45:14
47:9 52:15 99:3
100:8,22 101:7,17
101:20 103:1
179:4
**cover** 87:13
**covered** 63:25
**credentials** 43:25
**credit** 7:16 23:21
127:7
**criminal** 12:22
**criteria** 40:6
**cryptocurrency**
27:15 28:12 50:13

86:4 91:19 130:25
146:21 172:11
175:6
**cryptohulkster**
89:2
**cryptomacho** 89:8
90:15 91:5,10,18
92:21 93:3 94:20
95:8,18
**cryptomacho's**
91:16
**csr** 1:24 196:25
**culturecrypto**
93:3
**currencies** 165:7
**currency** 37:5,10
73:18 144:9
164:21,25 165:3
**current** 62:7 70:2
70:4 79:23
**currently** 41:13
42:7 44:15 62:5
**customer** 167:22
168:9
**customers** 167:19
**cut** 82:25 104:6
164:4
**cuts** 75:18,23
**cv** 1:7 2:7 9:13

**d**

**d** 6:1 7:1 8:1 58:13
**d.c.** 11:21
**daily** 80:23
**damages** 35:19
37:15
**date** 8:5,9,13 27:5
36:10,15,19,21
37:7 43:8,10
50:15,24 51:7,16
63:12 68:10 69:2
69:20 74:13,16

76:21 77:6 81:6
81:15,21,24 83:22
84:4 85:7 86:23
88:18 92:18 94:14
94:23,23,24 96:13
120:5 133:8
142:15 147:21
156:2,8 160:23
161:2,2 162:23
167:11 169:9,14
196:20 197:2
**dates** 69:17,17
74:14 79:21 129:9
160:18 164:7
168:13,17
**david** 4:5 10:16
21:24,25 191:14
191:17
**day** 11:21 37:3,10
93:6,17 100:3
161:15 167:14,16
183:8 190:5
**days** 22:1,8 94:18
94:20 95:7,10
183:2,5,17,19
184:4
**dc** 3:10,20
**deal** 38:23 140:17
**dealing** 64:6
**debtor** 172:6
**december** 96:19
97:7 102:5,21
141:6 142:18
143:21 144:22
145:4,12,23
156:11 160:20
161:2 167:3
168:14
**decide** 15:2 24:1
33:20 34:20
118:17 122:25

**decided** 176:1
**decides** 190:2
**deciding** 121:14
122:10 124:18
126:4
**decision** 64:5
115:1
**decisions** 78:19
**declaration** 96:16
**defendant** 4:12
5:3 10:8 53:9,10
54:11 62:15 100:1
118:6,6 119:6,7
**defendant's** 7:6
**defendants** 1:12
2:12 10:1,4,10
33:5,7 34:25
35:16 54:12 55:13
62:13 116:19
122:14,16 123:24
124:10 180:5
184:23 189:18
**defending** 11:15
14:25
**definition** 61:3
70:16,20
**definitions** 61:1
**degree** 40:20
**delete** 177:25
**deleted** 177:20
**denright** 3:12
**dental** 41:25
**depending** 42:17
182:24
**depends** 177:18
**depo** 44:5
**deponent** 197:25
**depose** 192:22
**deposition** 1:15
2:15 7:2 8:2 9:8
9:14 11:6 12:11

13:11,23 14:10
15:8,9 17:7,17,19
18:9,18 19:3,7,18
20:21 21:16 29:19
44:2 46:2,11,16
52:11 79:17 96:6
135:13 139:7
146:4 151:8
162:14 192:8,12
192:15,15,20
194:23 196:13
197:2
**depositions** 46:15
**deposits** 156:25
**describe** 58:15
63:12 149:15
**description** 7:2
8:2
**desktop** 15:13
**destroyed** 81:1
**detail** 58:15 62:2
63:12
**details** 170:18
**determine** 37:6
**determined** 37:12
**development**
33:15
**device** 19:3
**devon** 5:5 10:6
**dgalloway** 5:11
**different** 26:18
37:8 48:5 54:6
90:20 107:2,4,11
149:18 152:16
169:16 185:20
186:10
**differentiate** 182:9
**difficult** 154:19
**digits** 94:6
**diligence** 53:7

**dire** 150:9
**direct** 22:18 34:6
38:16 39:6,11
56:14 187:13
**directed** 90:18
106:7
**direction** 196:8
**directly** 189:25
**disability** 42:1
**disabled** 45:15
**disagree** 82:14
99:21 133:18
170:11
**disappearing** 65:9
**disclosed** 71:11
192:14
**disconnected**
135:12
**discord** 174:23
176:25 177:2
**discovery** 2:16
41:5,11 188:16
**discrepancy** 162:7
**discuss** 21:16
31:19 159:16
**discussion** 45:19
76:1
**discussions** 34:2
**dismiss** 98:19 99:4
184:20
**dismissed** 188:4,8
188:10
**disrupting** 67:2
**disseminated**
63:23
**dissemination**
62:11
**distance** 16:4
**distinguish** 180:12
**distinguishes**
180:10

**distorted** 52:14
**distorting** 51:23
**distribution** 81:1
**district** 1:1,2 2:1,2
  9:12
**division** 41:19
**divulge** 26:6
**docket** 47:9
**document** 16:18
  29:9 32:3 46:4
  47:3,7,8,10,11,24
  48:19 55:6,11,15
  56:1 59:5,18,19,23
  60:1,25 65:4
  69:22 89:13,18,20
  90:4,14 93:13
  98:2,8,12,13,14,25
  99:7 103:9 126:19
  128:3,7,15,21,24
  130:11,17 132:3,6
  132:10,13,16,22
  133:20 136:24
  137:1,5,8,25 138:5
  139:24 143:15
  145:19 151:19,23
  152:1,18,20,22,25
  153:2,13,18
  154:16,22,23,25
  156:3 160:9,11
  162:25 163:6,9,22
  164:1 165:9,23
**documents** 29:7
  32:17 38:4 129:21
  131:20 134:24
  140:4 145:21
  147:14 148:22
  149:22,24 150:3
  173:25 178:23
  179:1 188:15,21
  189:1,10,16,19,24
  192:23 193:11

194:5
**doing** 34:12 65:9
  74:19 76:16 83:16
  85:2 118:25 144:5
  163:17 194:5
**dollar** 35:23 42:18
  68:21 162:20
**dollars** 143:6
**don** 30:9 38:18
  75:20
**donald** 3:5 10:12
**door** 18:12
**double** 32:15
  44:13 139:4 146:3
  149:4
**doubt** 48:2,10
  96:20 99:5 117:21
  126:24 131:21
  144:10 148:7
  162:4 187:21
**dozen** 125:3
**dramatically** 36:4
**draw** 12:1
**drink** 87:17
**drip** 97:20 169:6
**drive** 86:7,7
**dropping** 163:16
**dsilver** 4:10
**due** 38:23 53:7
**duly** 10:25
**duties** 41:20

**e**

**e** 6:1,1 7:1,1 8:1,1
  58:13 130:25
**e.g.** 58:18
**earlier** 74:17 75:7
  119:2,25 162:14
  181:10 193:21
**early** 27:7 36:22
  115:22 157:18
  161:4

**easier** 66:2 80:6
  87:25 104:12
**easiest** 65:14
**eastern** 10:22
  150:21
**easy** 54:16
**economics** 41:3
**education** 40:18
**effect** 25:21 28:13
  34:17 179:12,16
  179:21,23
**efforts** 148:21
**eight** 188:3,6,7,9
**either** 28:10 35:16
  77:25 133:7
  143:25 170:1
  182:21
**electronic** 58:4
**elementary** 23:18
**eliciting** 22:16
**elicits** 34:5
**else's** 115:6
**email** 58:18
  139:14,19 140:4
  142:9 148:2,24
  159:9 170:4,9,25
  171:10,13,14
  182:21 183:25
  188:17
**emailed** 171:10
**emails** 43:24
  139:22 142:13
  148:5,10,12,16
  149:2 159:10
  166:12,22,24
  167:7 169:23
  170:24 184:2
  188:25
**employee** 41:19
  167:17 196:18

**employers** 41:25
**enabled** 47:1
**engage** 14:14
**engagement** 21:9
  29:1,3
**enlarge** 106:16
  114:11
**enright** 3:5 6:5
  10:9,12,12 11:15
  11:19 12:3,7
  14:23 17:10 21:25
  22:15 26:2,14
  28:6,18 29:5,14,20
  30:6,11 34:4
  35:20 37:16,23
  38:14,24 39:5,8,24
  43:20 46:13,19
  49:15 51:1,3
  56:11 66:5,24
  69:9 70:6 72:24
  73:8 75:17,23
  78:8 83:13 86:12
  87:6,14,19 92:5
  93:13 97:18 101:1
  101:10,21 107:22
  109:12,24 112:2
  116:5 120:18
  124:25 125:16
  126:19 136:13
  140:1 143:14,22
  148:15 149:25
  150:10,19 159:15
  161:9 164:6,11,14
  166:8,19 171:7,12
  173:7,20 174:3,5
  176:7 182:17
  183:9 186:12
  187:5 192:1
  193:16,20 194:15
  194:24

enright's   17:21
ensure   49:9
entail   178:21
enter   167:20 168:4
entire   130:24
  140:22 187:5
entirely   187:6
entitled   154:6
  172:5
environment   20:2
equivalent   144:2
errors   197:6
escaped   174:7
estate   172:10
  173:6
estimate   184:5
et   7:9 9:10,11
  197:1
eventually   79:2
everybody   10:20
  17:2 44:20 45:1
  46:24 95:23 160:2
  163:19
evidence   37:24
  51:4 92:6 176:8
  186:13
evident   47:8 98:11
exact   27:5 36:21
  43:8 51:7,16
  68:10 69:2,17,20
  74:13 76:21 77:6
  79:21 81:15,21
  83:22 84:4 85:7
  86:23 88:18 94:23
  94:24 96:2
  119:23 124:2
  129:8 160:18
  161:2 167:16
  169:9,14 170:18
  194:1,3

exactly   17:13
  27:13 73:24 94:4
  131:7 157:11
  158:20 170:16
  191:9
examination   6:3
  11:1 44:21 96:10
  193:19
examining   11:17
example   105:20
  117:13 168:7
examples   178:25
exception   166:12
exchange   24:8
  50:13 91:7 92:13
  92:19,23 93:19
  94:14 95:9 114:23
  116:22 118:10,11
  118:23 119:3,9,9
  119:16,17,21,22
  120:10 122:19
  123:5 124:15
  125:13,25 126:18
  131:1 133:7 157:4
  158:1 169:1,18
  172:12 180:6
exchanged   184:3
exchanges   85:21
  85:25 141:18
exclamation   44:13
excluding   63:24
excuse   16:2 76:24
  97:18 122:17
  144:24 160:10
exemplars   50:6
exhibit   7:3,5,8,10
  7:12,15,19 8:3,4,8
  8:12,15 43:12,16
  43:21 44:2,10,10
  44:24,25 45:7,9,11
  45:17 46:5,5 47:4

47:7 54:17,21,22
  54:24 55:2,3,4,8
  59:15,16,19,24
  60:6 61:16 65:20
  89:15,18,21 97:15
  98:2,4,9 103:5,8
  127:23,25 128:3
  128:18 132:7,8
  137:2,3 151:20
  152:17,19 153:14
  154:12,17 163:3,4
  163:7
exhibits   44:13,15
  44:22 46:11 151:5
  151:12
exist   174:3,4
existed   50:19
  119:22,24 120:1
  140:2 158:17
existence   51:10
  123:16,21
expand   24:20
expect   25:6,11,15
  25:18,24 26:17
  168:8 173:5
expectation   18:7
  173:17
expected   173:18
expecting   18:13
experiences   49:6
explain   33:24
  43:12 172:1
explore   27:16
extent   26:3 29:6
  39:12 133:4
eyes   16:20

**f**

f   1:8,8,10,10 2:8,8
  2:10,10 6:1 7:1
  8:1 9:10,11

fabian   1:4,16 2:4
  2:16 7:10 9:8,10
  10:13,15,17,19,24
  11:7,14,16 12:10
  15:14 16:7,11
  21:4 22:25 23:14
  23:16 24:1 26:10
  29:22 30:16 31:5
  33:5 37:14 39:20
  40:6,15 42:23
  43:4,11 44:19
  45:4,12 46:2,3,22
  47:12,25 48:15
  49:20 50:3 52:11
  52:12 53:8,16
  55:6,16 56:1,23
  57:17 59:23 61:17
  64:1 65:19 69:13
  70:9 73:20 76:6
  76:18 77:7 78:13
  80:4,7 82:15,22
  83:19 86:20 87:21
  88:25 89:17 91:5
  92:19 95:16 96:6
  96:8 98:8 112:9
  117:10 118:11
  119:17 122:13
  125:6 126:22
  127:5 128:2,23
  129:11,25 130:19
  130:23 132:6,17
  134:13 135:8,16
  136:25 138:23
  139:23 140:3,9,22
  142:2,17,18 145:4
  146:9 148:24
  149:7 151:8,11,25
  152:18 154:15
  155:22 160:5,14
  163:9,22 165:7
  167:17 168:12

169:17 171:5,18
174:12 176:19
178:5 179:6
185:23 186:18
187:16 190:2,6
192:8,9,18 193:6
193:21 195:2,5
197:1,3
**fabian's** 129:23
134:25 138:20
144:19 173:25
174:8
**face** 77:16
**facebook** 175:2,7
**fact** 49:8,10 77:17
128:20 139:10
144:9 152:3 188:8
**factors** 180:11
**facts** 21:13 37:23
38:18 51:4 92:5
176:8 178:1
186:12 197:5
**factual** 48:25
**fail** 12:20
**fair** 30:11 47:21
78:12 81:11,19
82:17 97:1,4
115:5,10,25 116:3
119:12,19 122:5
123:14 150:3
153:7 156:10
161:24 165:22
175:5
**false** 62:20 63:2
66:4,17 70:10,12
77:13 100:22
117:13
**falsely** 116:19
**familiar** 22:20
47:13,14 60:17
69:18 72:19 78:18

78:25 79:22 83:9
85:1 88:11 90:7
154:8
**far** 40:9 88:11
122:6 192:19
193:13
**faster** 140:13
**faucet** 80:21,22,25
85:2 88:12 169:6
**fault** 104:18
**february** 8:16
36:23 68:7 114:24
162:12,17 164:3,5
164:24 165:3
**federal** 196:13
**fee** 32:5
**feeds** 53:9 54:5
**feel** 22:23 186:18
**fees** 32:3
**felt** 179:7
**fiat** 144:9
**figure** 36:25 37:22
38:12 162:20
**file** 24:9,18,22,25
44:10 137:20
138:3 172:15
173:4 184:8
185:11
**filed** 9:11 47:9,17
48:9 98:12 171:19
171:23 177:22
184:11,14,17,18
184:22 185:6
**filing** 25:4
**final** 96:11,19
101:9 102:4,7,15
**finally** 20:20
**financial** 41:16,17
42:4 43:6 155:7
155:18 167:18
168:2,3

**financially** 196:17
**financing** 31:12
**find** 161:23 174:9
177:14
**finding** 36:6 74:16
**fine** 22:20 29:20
30:11 39:7 46:20
87:15 150:11
**finish** 13:13
**firano** 1:11 2:11
33:8 100:1,3
**firm** 9:15,18,24
10:4 26:22
**firms** 191:9,11
**first** 7:3,7,8 28:5
45:7 46:4 47:21
50:9,12 51:14
52:24 55:13 60:12
68:8,14 74:5,15,19
75:2 76:20 79:1
81:7 83:21 84:16
85:6 86:22 94:17
94:20 95:3,12
113:18 115:21
131:6 156:17
169:6 183:10
**five** 95:14 150:16
150:20 175:4
**fix** 20:25
**flip** 44:17
**floor** 4:18
**florida** 4:8
**flows** 89:25
**focused** 16:20
**folder** 54:23
**follow** 53:25 54:1
54:6 64:25 67:6
67:13 72:21 91:21
148:22
**followed** 53:8,22
54:2 73:17 76:15

**following** 44:20
53:13,25 57:1
64:2 70:15 74:19
75:9
**follows** 10:25
62:14 194:22
**foregoing** 57:19
57:22 61:25 63:20
196:4,9,11
**forget** 22:3 148:18
**forgot** 189:9
**form** 58:3,4 112:3
149:9 184:13
**format** 11:5
**forms** 14:5
**forth** 62:2 170:2
196:6
**forty** 40:16
**forum** 29:11
**forums** 28:12
**forward** 76:15
**found** 62:13 74:14
85:2
**founded** 50:24
51:8
**four** 42:5 43:7
122:3 150:1
**fourth** 17:15
**fox** 4:13,14 6:4
9:22,23,25 10:5,11
10:21 11:2,18
12:5,8 16:5,13,16
17:12,14 22:19
26:9,16 28:14,23
29:14,21 30:9,14
30:22 31:4 34:8
36:9 37:21,25
38:6,18 39:7,18
40:5 42:22 43:2,3
43:15,22 44:6,9
45:10,14,20 46:3

46:17,21 49:13,18
51:5,25 52:12
53:2 54:15 55:5
56:18 59:14,17,22
65:10,16 66:9
67:8 69:12 70:8
71:16,19 73:3,12
75:20,25 76:2
78:12 83:17 86:18
87:9,18,20 89:16
92:10 93:15,16
95:22 96:7 97:14
98:1,5 101:5,15
102:1 108:2
109:14 110:3
112:5 116:8
120:21 125:5,21
126:21 127:22
128:1,17 129:20
130:10 131:24
132:9 134:9,23
136:16 137:4
138:16 139:21
140:7 142:12
143:18 144:7,17
147:13 148:9
149:1 150:5,14,20
151:9 154:14
155:21 159:18,25
160:4 161:13
163:5 164:9,16
166:11,23 171:2,9
171:17 173:12,23
174:4,11 176:13
183:13 186:14
187:15 191:21
192:9 193:9,15,18
194:17 195:1

**fraction** 162:1

**francesco** 1:10
2:10

**fraud** 35:2,3 61:9
78:21 86:10
100:10

**fraudulent** 80:11

**free** 18:19 29:12

**freemium** 67:3

**freeze** 30:21

**frequently** 182:13

**friday** 1:17 2:17
9:1

**front** 12:19 65:23
103:22 130:20
145:20 162:2

**frozen** 30:17 35:25
172:12

**full** 23:15 42:19
141:4 160:19
173:14

**fully** 23:1,11
143:12 163:20

**function** 17:25
44:23 47:2 59:21

**functionality**
48:23

**funds** 99:23 100:4
116:21 157:4
159:3

**further** 15:20
61:23 63:5 93:25
118:4 192:12
194:16 196:11,16

---

**g**

**gaels** 40:23,24

**galloway** 5:5 10:7

**gears** 127:2
169:15 178:4

**gem** 89:9 90:16
92:4 94:21 95:18

**general** 28:21
66:19 91:20
158:17 181:25

**generally** 63:21
182:7

**getting** 20:6 45:15
85:25 87:6 125:3
142:10 150:5
185:13 191:22

**gift** 24:25

**give** 16:7 24:18,21
24:25 57:12 61:14
84:15 165:9,12
187:8 188:15

**given** 30:7 37:10
62:24 137:21
195:5 196:10

**giving** 185:10,18

**go** 11:8 18:20 22:2
24:10 26:10 38:1
45:20 46:9 48:16
49:3,13 51:25
53:3 56:19,20
58:8 60:10,24
61:14,19 63:5,15
65:22 66:14 67:25
77:14 79:11 82:10
84:5 85:15 86:4
103:3,11 107:6
109:19,19 113:17
114:6,14 127:2
129:8 130:13,14
130:15 135:4
140:8 142:16
144:23 145:25
159:2,19,20 160:8
162:10 164:4
167:5 170:17
177:16 193:18

**goes** 44:10

**going** 9:5 10:23
11:8 13:5 15:11
15:16 18:8 19:13
19:21 21:4 22:17

26:2 28:24 29:5
30:19 32:7 34:3
36:4 38:16,24
39:5,11 43:11,13
44:9,18,21,24,25
45:7,22 47:2
49:20,24 52:5,15
52:17 54:16,18
55:1 56:13 57:4
59:14 61:23 64:20
65:4,12,15 67:1
71:13,16,19 72:1
75:8 77:7,21
78:24 79:11 80:2
80:5 87:10,12,12
89:12,19,23 95:25
97:10,14,18 99:9
99:21 100:14
103:4,20 104:13
107:17,22 111:11
112:2 114:6 125:1
127:22,23 129:20
130:10,13 131:24
132:2,12 134:9,23
135:5 138:11,16
139:21 140:12
142:12 144:15,17
145:17 147:13
148:9 149:22,23
149:25 150:11
151:1,12 152:16
153:3,17,19
159:19 163:2
166:1,13 170:17
171:2 172:8
187:12,13 188:7
192:2,11 193:16
194:2

**good** 9:4 15:19
18:12 33:25 70:15
76:5 150:24

177:19 192:11
193:15
**gosh** 21:24 50:14
139:16
**gotten** 43:24 152:9
153:24
**graphic** 75:19
**great** 18:13 21:3
46:21 77:22 100:4
163:21 171:17
**ground** 11:4 15:7
125:2
**group** 41:16,17,19
41:24 97:17
**guess** 47:16 60:14
85:14 91:19 95:14
140:16 146:20
150:22 154:20
**guessing** 92:14
94:5
**guy** 100:4
**guys** 22:12 80:18
80:20 182:20

**h**

**h** 7:1 8:1
**hack** 37:5
**half** 27:6 42:6 43:7
125:2
**hand** 68:6 108:9
140:16
**handle** 89:1,8 90:9
105:16 106:24
107:2,8,14 108:6
175:16,19 176:15
176:23 177:2,6,8
177:13,15,18
**handles** 175:10
**happen** 28:24 86:2
86:3 159:23
**happened** 36:23
100:13 144:21

159:22
**happening** 35:24
**happy** 148:22
191:23
**hard** 182:9
**head** 14:5 15:18
32:6 79:7 117:16
130:9 155:8 165:2
171:1 176:11
184:15
**header** 47:8 98:11
**heading** 58:9
60:16 61:1,20
63:8,16
**hear** 14:23 16:3
28:5 30:18 97:21
97:24 160:2
**heard** 28:2 169:20
170:13 179:10
**hearing** 7:14 99:4
**held** 9:14 145:5
146:12 149:19
160:20 161:15
**help** 67:7 149:5
157:13 193:23
**helpful** 148:19
**hey** 80:18,20
**hieusys** 1:8 2:8 7:9
9:11 10:1 58:13
**high** 20:3,14
**highest** 40:17
141:3
**hire** 172:25
**hired** 190:14
191:1,3
**history** 8:15 157:6
163:24
**hmm** 77:11
**hold** 65:11 132:4
159:23

**holdings** 122:12
**home** 155:18
**honest** 77:2 82:2
91:12 138:24
**honestly** 77:5 92:8
**honor** 99:21
100:19 102:25
**hopefully** 25:8
55:2
**host** 45:15
**hosting** 20:21
**hour** 44:1,4 87:8
**hourly** 80:23
**hours** 13:12 68:22
150:1
**house** 18:4
**how's** 15:25
**hulkstercrypto**
89:1 90:10 91:4
175:11
**hundreds** 82:8
**hurt** 179:8
**hypothetical**
120:19 173:8
176:8

**i**

**i.e.** 53:8
**icon** 155:23
**idea** 24:9,10 25:23
26:1,11,15 33:25
92:9 108:19
144:12 152:8
153:23 154:2
162:6 165:21
**ideas** 91:22
**identification**
72:16
**identified** 35:17
70:11 71:22 176:4
176:5

**identify** 9:20
58:10,14 66:1,3,16
70:23 71:3 72:3,8
75:12 76:10 80:7
80:13 82:22 84:10
84:22 85:16 88:2
105:1 106:13
107:19 108:21
111:2,13,23
112:16 113:20
115:13 116:13,14
126:16 139:2
**identifying** 108:7
155:7
**ids** 138:25
**ihateaccounts90**
108:14,18 110:8
**image** 52:3 61:6
**immediately** 18:1
20:18
**impinges** 26:4
38:15
**important** 13:23
14:2 179:9
**impossible** 81:23
**inaccurate** 69:10
**include** 61:8 82:12
122:6 134:4,18,21
138:19,22
**included** 180:17
**including** 12:22
50:5 61:5 73:4
117:5,13 142:15
144:21 148:11
**incoming** 171:11
**incomplete** 69:9
69:10 120:18
173:8 176:7
**incorporated** 50:6
**independent** 39:15

**indicates** 152:4
**indicating** 106:2
  132:14 153:22
  154:23
**indicative** 60:15
**individual** 64:18
**individually** 1:4
  2:4
**individuals** 53:23
**influenced** 64:5
**inform** 20:17
**information** 26:6
  29:10 49:10 57:20
  62:7 74:22,24
  80:11 85:2,20
  91:21 135:1 153:6
  159:6
**initial** 67:2 96:14
  141:3
**initiate** 170:22
**innocuous** 100:13
**inquiry** 57:18
**instagram** 174:15
  176:14
**instances** 183:14
**instantly** 80:23
**instruct** 38:21,22
**instructed** 16:17
**instruction** 17:15
  39:9,20
**instructions** 19:1
**insurance** 41:25
  42:1,1,2 168:8
**intention** 167:23
**intentioned**
  194:21
**interaction** 35:15
**interactions** 21:6
**interest** 77:16 86:7
  181:3,7

**interested** 92:14
  92:16 196:17
**interests** 180:20
  180:24 181:8,16
**interface** 140:14
**internet** 20:3,6,14
  63:22
**interrogatories**
  7:7,8 55:14 60:4
  60:22 70:18 71:11
  77:25 103:8
**interrogatory**
  58:6,10,14 60:10
  60:17 61:21 63:8
  63:17 64:14 65:1
  69:4,15 72:15,23
  73:6,7 77:9 78:1,4
  78:15 79:5,12,25
  80:15 87:11 97:3
  97:6,13 102:14
  103:4 105:19
  113:13 117:6,11
  117:12,20,25
  181:22
**interrupt** 39:10
**introduce** 43:11
  44:9,24 45:7
  54:16,23 59:14
  89:13 97:15
  127:22 132:2
  149:22,24 162:25
  163:2
**introduced** 45:11
  46:4 47:3 59:17
  89:17 98:2 128:2
  132:5 137:1
  151:11
**intrusive** 187:6
**invest** 122:11
**investigation**
  33:23 34:23 35:6

  35:10,13
**investing** 53:17
**investment** 115:1
  122:12
**investments**
  124:19
**investors** 99:23,25
**involved** 178:9,22
  181:23 185:4
**involvement** 34:11
  181:19,21
**ish** 184:5
**issue** 178:1,12
  186:7
**issued** 40:21
  116:19
**issues** 21:8 44:3
**italian** 172:16,20
  173:1,4 174:1
**italy** 169:19 170:5
  170:23 171:5,20
  186:19 187:1
**items** 72:19

**j**

**j** 3:5 10:12
**james** 1:4,16 2:4
  2:15 9:8,9 10:13
  10:15,17,19,24
  23:16 46:2 52:11
  57:16 91:4 96:6
  151:8 176:18
  192:8 195:5 197:1
  197:3
**january** 36:23
**jargon** 191:8
**jcarriel** 3:22
**job** 1:25 42:19
**john** 3:16 10:18
  21:24
**join** 193:7

**judge** 12:19 15:2
**june** 68:14 82:5

**k**

**k** 1:8,8,10,10 2:8,8
  2:10,10 9:10,11
**keep** 16:20 65:15
  71:13,16,19 80:2
  167:19 168:3,5,9
**kevorkian** 5:16
  9:15
**key** 188:17
**kids** 18:11
**kind** 25:10,13
  27:21 82:25 104:6
  113:24 159:3
  182:9
**knees** 80:25
**knew** 35:25 56:8
  119:24 123:20
  170:16
**knock** 91:22
**know** 13:2,5,14
  20:24 23:2,10,13
  24:20 25:9 27:5
  27:12 30:4 31:5,7
  31:8,10,20 32:4,11
  32:13 33:9,12,13
  33:14,15 34:9,15
  34:18 35:1 36:21
  38:11 39:13 40:9
  40:12,14 46:7
  47:18,20 50:15,19
  50:23 51:7 54:2
  55:22 57:9 58:23
  59:2 60:3 66:20
  68:10,17 69:1,17
  70:12 72:12 74:12
  74:13 76:13,21
  78:20,21 79:3,21
  80:10 81:21 82:9
  83:9,22 84:3,24

85:8,19,24 86:1,2
86:5,8,15,23 87:25
88:9,18 89:10
91:1,11,12,13,23
94:24 95:17 96:13
98:24 100:9
102:11 104:9,15
104:23 105:4,8,17
106:19 107:15,25
108:14 109:2
110:1,10,18,23,24
111:8,16,19
112:10,19,21
113:3,19 114:4,19
115:9,16 120:5
121:7 122:2
123:12,17 126:12
131:16 137:13
138:24 141:17
142:1,10 143:3
145:15,24 146:2
147:5,19,21 148:1
148:23 154:4
156:24 158:2
159:4 160:18
161:2 162:2
163:13 167:14
168:19 169:13
170:6,7 171:1,24
172:19,21,23,24
175:14 177:3,5,9
179:4,7,20,23
180:14,15 181:1
181:14 182:10
184:16,22 185:6
185:13,14,15,25
186:4,5,14 187:25
188:5,6,9 189:4,14
190:1,4,9 191:2,5
191:6,8

**knowing** 140:2
**knowledge** 31:25
 39:15 56:23 57:11
 57:20 74:18
 184:12
**known** 52:25
**korinsky** 3:4
 10:13,15 26:23
 182:5

**l**

**l&k** 7:22 8:7,11,17
 132:14 151:24
 152:4,23 154:22
 163:8
**l&k00873** 7:18
 128:22
**l4b** 155:9,16
**labeled** 46:5 128:3
 151:12
**language** 110:23
 160:14
**laptop** 15:13,15,16
 15:17 16:21 19:14
 135:11
**large** 41:24 168:20
**larger** 75:15,18
**late** 27:7
**latest** 74:16
**law** 3:7,17 4:6,16
 5:7 9:24 10:4
 26:22
**lawnmower** 49:15
**lawsuit** 23:24 24:2
 24:9,19,23 25:1,4
**lawyer** 190:21
**lawyers** 14:13
 17:18 21:6 26:21
 26:24 29:23 31:6
 31:11,16 32:10,20
 32:23 35:10,14
 38:5,12 39:14,17

43:13 44:16 96:18
181:3,17 182:6
183:4,8,17 184:3,7
184:22 185:6
186:1,23 188:13
188:16 189:17
190:17,25 191:3
191:12
**lead** 33:18 55:11
 57:17 62:5,6,11
 178:2,19 185:22
 186:3,4,11
**learn** 50:12 51:14
**learned** 39:12 50:3
 50:9,17 68:14
 74:5,15 75:3,7
 82:5 95:12 119:3
 119:8,17,21 120:1
 123:15,20
**learning** 53:7
**leave** 54:18 71:17
 163:1
**led** 162:19
**ledanois** 1:24 2:18
 9:18 196:1,24
**leeway** 187:8
**left** 68:6
**legal** 21:10,11,18
 21:22 24:13,15
 30:7,13 35:21
 37:17 38:20 56:4
 57:13 66:6 73:9
 83:14 86:13 98:24
 99:17 101:2,11,22
 107:23 112:3
 116:6 159:8 191:8
**legally** 190:7
**legs** 87:17 95:24
**lemahieu** 1:9 2:9
 10:2 53:9 54:11
 58:12 64:23 71:23

103:12 105:15,21
107:13 108:17
109:10,16,22
110:16 113:14
116:4 117:6,14,21
118:6 119:7
**lemahieu's** 64:25
 105:10 106:21
 108:3 109:5 113:8
 116:9
**letter** 68:20
**level** 40:17
**levi** 3:4 10:13,15
 26:22 182:5
**life** 41:25
**light** 12:1
**limited** 39:8 50:5
 62:8
**lincoln** 41:16,17
 42:3 43:6 155:7
 155:17,18,24
 167:18
**line** 13:13 56:12
 67:2 81:7 150:2,6
 163:1 187:6 197:7
 197:9,11,13,15,17
 197:19
**link** 44:2 127:7
**liquidation** 172:4
**list** 64:7,24
**listed** 62:13,16
 132:6
**literally** 81:22
**litigating** 186:19
**litigation** 127:20
 131:15 136:20
 149:13 152:5
 153:20 154:24
 165:10,13 181:24
 182:25 189:2

**little** 15:20,24 18:11 51:18 52:3 63:5 66:2,12 72:5 80:5 84:13,19 87:24 93:24 97:19 104:5 105:7 106:16 107:17 108:24 153:5 154:19 157:18,19 163:11 185:13
**live** 14:15 15:9 17:6,24 19:22 41:4,8
**lived** 41:6
**llc** 1:9 2:9 7:9 9:11 10:1 58:13
**llp** 3:4,15 4:4 5:4 9:25 10:7,19
**load** 80:24
**loading** 45:8 136:25
**loaning** 31:8
**local** 46:8
**locate** 148:21 171:15
**located** 9:16
**locating** 148:20
**locked** 18:12
**log** 134:16
**logging** 137:12
**logs** 37:8
**long** 13:12 41:6 50:16 147:2 187:12
**longer** 11:4 36:7 94:25 142:7 150:12 158:16
**look** 16:18 19:6 37:9 44:22 47:13 47:14 48:19 49:24 53:3 56:21 57:14

60:17 63:6 64:18 65:5,22 76:2,4 80:3,4 81:7 87:5 88:8 89:12 90:1,7 91:15 99:10 103:15,18,19 104:11,25 106:12 107:7,16 108:20 110:22 111:12,21 112:15,24,25 113:18 115:12 116:12 118:3 122:9 124:10 126:15 135:10 136:23 140:15 145:2,18 146:6 149:1,24 151:13 151:18 152:15 154:8,11 156:7 159:9 166:2,13,24 189:16
**looked** 60:20 68:12 69:3,18 70:17 72:19 78:18 82:13 85:1 88:11 102:13,18 103:18 107:3 120:16 122:6 124:7 161:21
**looking** 60:7 61:16 65:19 69:21,24 96:23 103:7 109:4 115:21 154:5 164:8 178:23 189:9
**looks** 11:20 47:23 73:15 76:19 83:8 86:21 91:5 92:24 93:6,12 94:9,16 98:18 106:5,25 132:20 136:8

137:15 153:1,7 154:6 163:23 164:2,23
**lose** 25:16,19,22 179:11
**loss** 35:22
**losses** 24:3,5,7,17 25:8
**lost** 25:9,14 36:1 36:17 37:5 38:8 52:2 146:9 173:15 180:5,22
**lot** 32:2 34:12,13 34:14 41:18 68:19 78:11 85:24 121:6 179:7
**luck** 64:19 79:11
**lynne** 1:24 2:18 9:18 196:1,24

**m**

**m** 6:1 196:1
**machine** 196:7
**madam** 16:13 30:22 42:22 45:14
**madison** 5:8
**main** 22:1
**maintain** 117:24
**major** 41:2
**making** 27:18 64:5 100:2
**march** 73:22 76:19,23 77:23 83:20 84:2 85:5 85:13 87:10 88:16 88:23
**marie** 196:24
**mark** 108:7
**marked** 44:13 45:9 55:4,8 59:16 59:18,24 89:15,18 89:21 98:4,8

127:25 132:8 137:1,3 151:5,19 151:20 152:19 153:14 163:4,7
**market** 162:11
**marketing** 34:14 155:19
**marks** 155:7
**mary's** 40:22
**matter** 9:9 39:16 73:14
**matters** 190:8 191:18
**mean** 17:11,22 32:2 47:20 61:5 64:11 69:16 70:1 73:2 85:24 86:14 122:1 134:16 156:23 169:25 178:10,22 180:7 185:16
**means** 12:16 14:12 14:21 17:17 19:5 58:15 62:10 190:10
**meant** 12:15 58:23 59:4,8 61:12 94:2 102:24 103:2 143:16
**mechanics** 194:1,3
**mechanism** 181:14
**media** 9:7 45:23 46:1 50:4 52:7,10 53:23 58:17 96:2 96:5 118:5 122:14 123:4,9 151:3,7 174:12,14 177:11 177:21,25 192:4,7 195:6

medication  23:3
medium  58:16
mediums  123:7
members  24:4
  26:18 40:8 179:13
  179:17 180:8,20
  181:4 187:11
membership  40:7
  180:24
memorized  123:13
memory  75:9 95:1
  143:25 157:9
mention  30:16
mentioned  13:10
  63:25 64:17
mercatox  93:8
merit  15:2
merits  192:20
  193:12
message  17:25
  90:21,23
met  160:20
mew  155:19
mica  1:9 2:9 10:2
  33:11 34:9,20
  58:12
micropayments
  67:4
microphone  16:9
  17:6
middle  135:12
miller  4:4 10:17
  24:11 26:22 27:2
  27:11,24 28:2,17
  28:25 182:4
million  37:20 38:8
mind  15:20 70:14
  156:15
minute  65:8 71:12
  95:23 96:9 145:18
  150:16,20,23

194:22
minutes  87:8,18
  150:11 191:24
  193:17
misheard  164:15
misleading  62:21
  63:3 66:4,18
  70:10 77:13
  100:23 112:18
  113:2,4,6,22
  114:10,17 115:14
  117:14
misrepresentation
  35:2,8 61:7,10
  71:4 72:7,9,10,13
  75:14 76:11,14
  78:21 80:9 82:24
  83:7,10,11 84:12
  84:23,25 85:18,20
  85:23 88:3,10
  100:11 102:22
  104:4,10,22,24
  105:9,22 106:15
  106:20 108:1
  111:9 114:5,12
  115:17 122:7
misrepresentatio...
  70:25 72:17 77:20
  78:3 79:6 88:8
  102:3,17,19
  103:13 105:3
  107:21 108:23
  111:4,15 112:1
misrepresented
  109:3 111:20
  112:20
misrepresents
  143:15
missed  30:19
  53:19 141:10

misspoken  90:8
misstates  51:3
  92:6 101:10,21
  109:12,24 143:14
  143:22 161:9
  166:19 183:9
mm  77:11
moment  11:9 45:6
  52:1 54:18 57:5
  59:15 60:20 61:15
  64:17 65:17 70:18
  89:5 90:8 97:16
  109:8 149:7
momentarily
  54:25
monetary  24:7
  25:13
money  31:9 172:5
  180:6
months  50:18,21
  51:20 53:13,24
  69:22,24 95:11,14
  96:14 158:15
  159:11
morning  9:4 18:5
  21:17 23:6
motion  96:18
  98:18 99:4 184:8
  184:13,19 185:7
  185:11 187:1,4
  192:16
motions  184:11,16
mouse  91:1
move  17:5 36:1
  40:5 48:18 70:8
  71:9 75:10,20
  82:21 83:1 140:14
  187:1
moved  41:10
multiple  99:22

mute  11:13 49:14
  49:17 97:22

**n**

n  6:1,1,1 7:1 8:1
name  9:15,23 22:3
  23:15 33:8 64:25
  90:13 94:7 105:10
  105:25 106:21
  108:3 109:5 113:8
  116:9 129:13,16
  129:23 133:20
  134:14,25 137:20
  138:5,7,13,20,22
  139:3 155:5,6
  165:2 176:18
  196:21 197:1,3
named  93:6
names  23:17 33:12
nano  1:8 2:8 9:10
  33:7,9,15,19 34:13
  36:1,14,16 37:5
  38:9 54:4 64:6
  72:20 73:17 74:15
  75:3 76:16 92:17
  99:22 100:15
  105:13,16,23,24
  107:10 110:17
  116:18 118:9
  120:8 121:4,10
  122:14,15 125:11
  125:24 126:17
  156:19 197:1
nano's  124:14
nanocurrency
  106:25 109:5,10
  109:16
naunton  5:6 10:6
  10:6 193:1,3
nearly  150:1
necessarily  119:13

**necessary** 15:2
**need** 11:11 17:6,25
  18:22 20:23 44:14
  46:24 48:21 49:13
  51:23 54:20 58:25
  59:11 65:7 71:12
  104:15 105:4
  111:16 113:19
  150:9,12 166:2
  177:14
**needed** 119:11
  131:5
**negligence** 35:2,12
  78:22
**negligent** 35:7
  61:9
**negligently** 116:20
**neither** 196:16
**ness** 3:6 10:14,14
  22:4
**never** 32:23
**new** 4:19,19 5:9,9
  55:2 103:16 128:3
  151:12
**news** 192:11
**nice** 11:21
**nickname** 23:18
**night** 23:8
**nods** 14:4
**noise** 49:14
**non** 14:5 32:19
**normally** 182:22
**northern** 1:2 2:2
**note** 45:15 139:23
**noted** 140:7
**notice** 174:7,8
  192:15
**notices** 28:25 29:2
**number** 9:12
  47:10 55:3,9
  58:10 60:11,17

61:21 63:8,17
64:14 65:1,20
69:4,15 72:15,23
73:6 77:8,10,17,22
78:1,4,15 79:5,13
79:15,25 80:15
87:11 89:18,21
97:1,5,7,13 98:3,9
98:13 102:14
103:8,14,17
105:20 113:13
117:12,20 132:7
139:25 141:1
147:22 151:8
152:17,19 154:5
154:13 162:15
183:20 195:6
**numbered** 46:14
  46:15 64:24
**numbering** 46:9
**numbers** 38:19
  129:9
**nw** 3:8,18

**o**

**o** 6:1,1 7:1 8:1
**oath** 12:15 78:5
  79:16
**object** 26:3 29:5
  29:16 34:4 56:11
  107:22 112:2
**objection** 14:25
  15:1 22:15 26:2
  26:14 28:6,18
  30:6,12 35:20
  37:16,23 38:14
  51:1 66:5,24 69:9
  70:6 71:14 72:24
  73:8 78:8 83:13
  86:12 92:5 93:13
  101:1,10,21
  109:12,24 116:5

120:18 125:16
126:19 136:13
143:14,22 161:9
166:8,19 173:7,20
176:7 183:9
186:12 187:5
**objections** 7:6
  30:10 55:13 61:25
  63:20
**obtained** 40:18
**obvious** 148:20
**obviously** 13:14
  21:20 51:23
**occur** 94:14
**occurred** 92:19
**offered** 95:18
**offhand** 70:22
  102:11
**office** 12:1 49:16
**official** 34:15
**officially** 37:4
  53:25 54:2
**oh** 16:5 50:14 68:4
  75:25 139:8
  144:24
**okay** 13:9 14:9,19
  16:14 17:1 18:16
  19:1,21,23 20:18
  20:19 21:3,19,22
  23:23 29:4,14
  30:15 32:4 33:20
  36:10 41:8 42:22
  43:2 45:6 47:18
  48:23,24 49:23
  51:22,25 52:4,12
  52:19,20,23 54:9
  54:15 59:12,17
  60:24 64:17 67:9
  68:12 71:9,21
  72:14 75:25 76:8
  76:9,20 83:5 84:6

84:21 87:19 88:6
89:6,14,23 90:4,5
93:15 95:22 96:8
97:14 98:1,7,20,22
99:2,9,12 104:25
105:1,6,8 107:12
109:1 111:5
127:19 128:2,7,13
132:2,5,22 133:8
134:9,18 135:14
136:8,19,23
137:17,22 138:2
139:4 140:7
141:14,22 142:8
142:16,22 144:8
145:17 146:15
149:1,6 150:8
151:10,18 152:15
154:11 155:2,14
156:10 157:21
159:9,19 160:2,8
161:5 162:10
163:18,21,25
172:7 174:11
176:14,20 177:19
178:21 180:16
182:12,16 183:14
189:1 190:6 192:9
194:10,15,17
**old** 40:15 44:16
**once** 111:1 130:1
  183:8
**ones** 73:17 79:22
  102:18,20 103:16
  124:6 168:20
**ongoing** 17:7,20
  17:22 19:7 27:23
**online** 13:21 27:22
**open** 19:22 122:11
  122:25 124:18
  126:4

opened   119:4
123:10 125:25
135:16 139:10,14
opening   120:25
124:1 166:7
operative   48:8
62:2,4,8,10,14
64:2
opinion   186:20
opportunity   69:14
77:24 78:14
oppose   184:8
187:4
option   144:5
options   24:13,15
27:17
oral   61:5 99:3
order   80:12
original   192:24
196:12
originally   27:1
othes   2:4
outgoing   171:14
outlets   177:11
outside   49:16
91:25
owned   141:13
146:12

**p**

p.m.   10:21 96:1,5
150:23 151:2,7
192:3,7 195:4,8
pacific   150:22,24
page   6:3 7:2 8:2
19:19 48:19 49:22
56:19,20 58:8
60:11 61:19,20,24
63:6,7,16 99:10,14
155:18,20 156:1
197:7,9,11,13,15
197:17,19

pages   189:9
paid   25:10 42:7
paper   94:25
paragraph   49:3
49:25 50:1 53:3,4
53:5,13 54:9 63:1
65:3,6,22,23 66:17
68:13 70:11 71:5
71:9,21 72:4,11
73:5 74:10,21
75:2,11,11,13 80:4
80:9 81:8 82:10
82:11,13,18,19,21
82:23 83:3 84:9
84:11 85:17 87:11
87:21 102:13
103:17,20,25
104:3,10,11,21
105:4,9,19 106:12
106:14 107:3,6,8
107:16,20 111:3
111:10,14,24
112:8,20,23
113:12,13,21
114:9 115:19
116:10,13,17,24
117:2,4,12,13,19
118:3 122:9 127:3
129:3 130:15,22
131:8 133:24
135:5,7,14 136:9
137:14 138:9,19
140:12,19 143:9
143:11 144:23
145:2 146:7
148:14 160:8,10
160:14
paragraphs   62:16
62:18,22 64:7,25
71:22 77:8,18
78:2 79:4 97:5,12

134:20 135:2
140:14
paraphrased
105:3 117:2
park   4:17
part   53:7 54:7
55:25 61:24 63:18
83:3,4 99:17
117:17 155:15
179:18
participant   45:16
participating
11:10,11 43:13
particular   159:5
partner   9:23
party   196:18
pause   12:6
pay   24:22 80:22
paying   29:22 31:6
pen   58:3
penalty   57:21
pending   13:15,16
52:16 62:3 104:18
156:25 157:5
172:19 178:2
188:1
pennsylvania   3:18
people   18:19 22:1
40:10 53:10,14
86:17 87:16 90:20
91:21 118:7 168:3
178:7,8 179:8,9
182:14,16 186:5
191:24
people's   54:4
percent   31:3,24
133:6 134:8
136:22 139:17
144:1 172:17
percentage   173:18

perfect   12:8
perjury   12:22
57:21
person   18:8 33:18
34:11 67:21
personal   35:15
personalities
91:20
personally   162:24
pertaining   135:1
pertains   196:12
pertinent   178:23
peter   4:14,15 9:23
10:3 16:2,2,2 87:6
148:15 149:25
peters   4:13 9:24
pfox   4:21
phone   19:6,10,14
23:20 182:11,21
phrase   61:6
phrased   60:15
picture   90:12
place   79:1 181:12
196:5
plaintiff   1:6 2:6
3:3 4:3 10:13,15
10:17,19 23:23
50:3 53:8,16
57:17 62:1,5,11
63:20,22 116:20
118:10 122:13
127:5 130:23
135:15 140:21
142:18 145:4
146:9
plaintiff's   29:7
55:12 62:7
plaintiffs   14:24
180:8 185:22
186:3,11 193:23

plans  87:14
platform  177:21
please  9:20 23:14
  38:25 80:5,7
  112:24 149:16
  156:4
pled  49:10 74:22
  74:24
point  11:18,19
  17:4,21 44:13
  48:16 59:8 73:19
  76:22 78:12 79:23
  86:16 87:7,16
  90:24 92:15
  101:20 125:19
  153:21 158:4
  159:10
policy  168:8,10
poloniex  86:1
pop  113:24
popped  188:18
popular  93:4
portion  75:18
  158:5
position  15:11,17
positions  190:13
possession  29:8,12
  171:6 174:1
possibility  186:2
  186:23
possible  18:16
  79:8 82:7 83:23
  83:25 84:1,3 85:9
  85:11,12,14 86:24
  87:1,2,4 88:19,21
  88:22,24 95:16,20
  95:21 123:18
  124:3,5 150:18
  168:15 171:12,22
  175:18 189:8

possibly  133:7
  166:12
post  28:15 58:18
  100:12 105:11,12
  106:22,24 109:6
  113:9 175:23
  176:1,3,6,11,20,25
  177:4,13
posted  67:22
  85:21
posting  28:10
postnasal  97:19
posts  28:25 29:2
  50:4 81:23,25
  82:3 177:20,25
potentially  13:11
pouring  11:22
power  49:19
precise  170:7
precisely  44:12
  160:16 161:25
prefix  152:4
present  5:15 9:20
  22:9
presented  73:16
  74:14 78:17 179:2
preserve  15:1
preserving  29:15
pressure  71:20
pretty  15:19
  100:13 150:5
  191:22
previous  107:3
  109:20 153:13
  194:21
price  37:12,12
  86:4,8 127:8,9
  145:6 162:17,18
principal  41:20
print  113:24

prior  21:17 109:25
  143:23 166:20
private  20:2,6,11
privileged  171:15
probably  27:6,9
  42:18 50:18 68:11
  74:3 81:12,18
  141:10,12 143:7
  154:21 158:20
  161:1 168:5 169:8
  169:9 173:10
  175:4 177:16
  183:5,23
problem  18:25
  49:19 193:14
problems  20:23
  52:15
proceed  192:19
proceeding  169:19
  169:22 170:5,23
  171:5,20 172:5,16
  172:20 173:2
  174:2
proceedings  7:13
  15:10 30:10 98:21
  195:8 196:4,6,14
proceeds  180:21
process  43:19
produce  29:3
  127:19 131:14
  136:19 149:12
  154:2 165:10,13
  171:16 174:10
  188:16
produced  29:9
  38:5 132:14
  133:25 134:3
  137:9 140:6 152:5
  153:20 154:23
  170:10 171:8
  189:2,17,18

192:23,24 193:12
product  70:14,15
production  32:7
  32:18 129:21
  130:11 131:25
  134:10,24 138:17
  139:22 142:13
  144:18 147:14
  148:10 171:3
  173:24 189:5,9,13
  189:14
products  41:23
  167:18 168:2
programs  43:23
promise  25:3
promises  25:5
  32:23 33:2
promising  66:21
  67:5,13 99:24,25
promote  88:13
promotion  34:12
promotions
  122:14 123:3
promptly  63:22
pronoun  93:22
proof  75:5 171:19
  171:23 172:1,3,15
proofs  172:10
prosecute  178:24
protocol  118:10
  120:8 121:4,11
provide  20:1
  37:18 137:8
  178:25
providing  43:24
  60:20
pscoolidge  4:22
pst  2:17 9:2
public  29:11
  162:18

publication 27:22
published 50:5
53:14
pull 65:4 98:6
103:5,20 127:24
152:17 154:12
pulling 151:20
purchase 7:16
95:3 96:11,14,19
101:9,14,18 102:4
102:7,15 118:12
118:18 122:19
129:16,22 140:22
141:3,5 142:5,9,14
142:19 145:6
168:12,25
purchased 51:21
52:24 73:18
100:15 127:5
145:4 168:17,22
purchasing 132:21
166:16 167:2
purposes 44:19,20
192:16
pursuant 39:19
pursue 24:11,12
pushing 15:20
put 19:14 32:17
54:3,24 56:21
61:15 69:20 75:6
85:25 128:18
136:25 183:20
putting 159:22

**q**

qualified 37:18
qualify 75:1,4,5,6
178:9
question 12:25
13:1,3,6,16,17,25
14:3 15:3 16:6
22:16 26:3 30:20

30:23 34:5 38:14
38:25 39:21,25
40:1 43:5 52:16
56:15,24,25 60:12
60:13 65:12 66:15
72:6 78:9 91:16
92:25 101:4
104:17,19 109:14
109:20 111:13
112:3 116:14
117:9 125:22
142:4 153:23
183:10 190:11
191:7 193:3
questioning 13:13
56:12 150:6 163:1
187:6 193:10
questions 12:14
20:17 21:5,8,12
55:21,22 56:16
60:5,8 145:19
192:12 193:1
quiet 20:1,6,9
quite 12:21 36:5
quote 53:6 58:15
61:4 83:2 84:8
94:21 99:21
120:25 121:15
123:23
quoted 84:16
105:3 110:23
116:24
quoting 50:2
54:10

**r**

r 130:25
raiblocks 1:8 2:8
9:10 67:3,6
156:19
raising 184:23,24

ran 105:24
range 35:24 36:8
42:18 160:23
rate 31:23
reach 27:10
reachable 19:10
reached 27:2
read 30:23,25
38:25 39:3 40:1,2
47:24 48:2,5,13
52:16,21 62:24
64:12 68:8,16
69:5 73:23 74:8
74:13 76:7,9,20
78:5 79:9,18
81:14,19 83:5,21
84:16,21 85:6
86:22 88:17
104:13,14 118:6,8
118:23 119:7,14
119:20 120:8,24
121:4,9 123:5,9,18
123:25 124:13
125:23 128:20
164:13
reading 50:4
69:23 70:3 164:7
ready 157:4
really 11:23 66:7
89:25 125:19
186:20
reason 13:14 14:9
22:25 48:9 62:25
79:1 82:14 83:4
96:20 99:5 105:14
107:12 108:16
117:21 126:24
131:21 133:18
144:10 148:7
162:4 170:11
187:21 197:4,7,9

197:11,13,15,17
197:19
reasonable 57:18
150:17
reasons 78:25
recall 35:15 68:12
69:3 70:16 74:21
90:22,24 107:4
120:23 121:3
122:4 142:10
148:4 154:10
185:18 187:2
188:20 194:4
receipt 134:5
receive 25:6,12,15
25:19,24 26:13
139:13 148:2
169:3 170:4,8
173:19 186:9
received 26:7
63:13,21 64:12
142:8 169:5
receiving 16:22
recess 45:24 52:8
96:3 151:4 192:5
recitation 69:11
recognize 54:14
90:3,6 137:5
152:12,13,25
153:13,15 163:12
163:21
recollection 54:11
59:13 61:11 90:15
91:8 170:13
recommendation
35:6
record 9:5,21
10:23 11:11 13:11
14:4,12,16 15:1
16:23 17:4,11,12
17:20,22 19:5,15

19:22 20:4 24:16
29:15 45:19,20,22
45:25 46:7 51:3
52:1,6,9 67:15
69:11 76:1 92:6
96:1,4 101:11,22
106:1 109:13
113:11 128:17,20
132:13 143:15
151:2,6,10 153:21
155:21 161:10
192:3,6,10,13
193:8 194:18
195:3 196:6,9
197:5
**recorded**  9:8
**recording**  13:22
167:23
**records**  127:15,17
129:5,15,21
131:11,25 133:23
134:14 135:25
136:3,4,19 138:8
138:13,17,21
139:9 141:14,23
142:5,24 144:18
145:10 147:16,24
147:24 149:8
161:19 162:22
166:6,16 167:2,9
167:19 168:3
**recoup**  24:3,17
25:8
**recouping**  25:10
**recover**  173:6
**red**  155:25
**reddbytecoin**
93:25
**reddit**  174:19
175:16,18,21,24
176:2,11

**redirect**  193:17
194:20
**redundancy**  43:18
**refer**  44:14 54:20
72:14 78:2 105:18
113:11 117:12,19
**reference**  54:10
99:13 143:8
**referenced**  64:13
77:9,18 97:6,12
109:23
**referencing**  91:13
**referred**  63:1
77:18 79:4 117:4
**referring**  64:8
73:5 80:14 81:2
93:21 120:17
155:22 182:17
**reflect**  49:6 129:2
138:18 155:22
161:25
**reflected**  90:4
129:3 156:16
157:7 164:1
**reflecting**  129:22
130:11 131:20,25
139:9 141:23
142:14 144:20
145:10,22 147:14
147:16 162:22
**reflects**  137:13
161:6
**refresh**  54:11
59:12 61:11 90:14
91:8
**refresher**  59:11
**regard**  100:10
**regarding**  17:16
170:6 194:5
**regards**  64:5

**regular**  182:1
**reimbursement**
25:14 173:14
**reinitiated**  163:15
**reiterate**  134:10
**relate**  165:19
**related**  11:18
17:15 29:1,2
31:12 32:3 53:10
118:7 133:23
165:23 175:6
177:25 179:4
**relating**  140:4
174:1
**relative**  70:1
196:18
**relatively**  119:12
**release**  194:11
**relevant**  63:18
165:16
**reliable**  20:2,13
122:17,19 123:5
**reliance**  118:5,8
**relied**  79:18
118:24 119:15
120:24 121:4,13
122:2,13 123:6,10
123:25 124:17
126:3
**rely**  119:8 120:9
**relying**  53:15
**remain**  187:23
**remember**  27:13
27:18,20 28:9
36:10,15,19 59:9
74:16 75:8 82:2
90:18,19,20,21
94:4 117:17
121:19,23 124:8
124:22 125:10
126:8 131:7,16,17

133:5 139:16
141:19 144:3
157:11,15 165:1,6
170:16,17 171:24
185:9,10 189:21
**remembered**
175:13
**remind**  159:15
177:24
**remote**  1:15 2:15
3:1 4:1 5:1 15:8
20:21
**remotely**  11:6
**renders**  135:6
**repeat**  21:11 51:19
66:14 71:7 101:4
125:9
**rephrase**  13:3
109:14 112:6
125:1,22 190:11
**replied**  90:22 91:9
92:11 119:20
**replies**  93:7
**reply**  91:15 92:25
93:11,18
**replying**  91:5
170:19
**report**  23:21
162:18
**reported**  1:24
37:12
**reporter**  2:19 9:17
10:20 13:21 14:4
16:1,8,13,15 30:22
30:24 31:1 38:25
39:2,4,25 40:3
42:23,25 45:14,17
51:22 52:4,16,20
52:22 191:25
196:2

**reporter's** 7:12 98:21
**reporting** 20:20 162:18
**represent** 9:25 26:25 72:1 77:7 77:21 97:10 99:18 132:12 152:6 153:3,17,19 172:9 181:4 188:7 193:23
**representation** 190:15
**representations** 53:14,16 118:5,8
**representative** 179:6 187:9
**representatives** 182:4,10
**represented** 48:7 78:5,24 117:18 124:9 126:22 131:19
**representing** 122:16,18 123:4 187:10
**request** 29:9 54:1 139:25 165:14 192:25
**requested** 30:25 39:3 40:2 52:21 173:11,14 196:15
**required** 12:14,17 12:18 46:18
**research** 68:19 73:25 74:20 76:16 76:22 80:12 83:9 119:1
**researched** 81:22
**researching** 81:25 82:3

**reservation** 193:8
**reserve** 192:21,22
**reserved** 156:23
**respect** 79:12 90:9 102:13 115:2 143:12 181:20,21 190:7 191:14,18 193:9,10,12
**responded** 79:16
**respondent** 169:18
**response** 16:7 60:21 61:21,24 62:25 63:16 64:1 64:13 65:1 69:4 69:10,14 72:15 79:4,13,25 80:14 94:10 97:2,6,13 102:14,25 105:19 113:12 117:19 192:24
**responses** 7:5 55:12,20 57:7 103:4,7 117:11,25 181:22
**responsibility** 20:1
**responsive** 29:8 72:22 73:2 148:21
**rest** 97:17 156:20
**restroom** 150:13
**result** 97:25
**results** 140:18
**retained** 195:7
**return** 25:4
**retzer** 1:9 2:9 10:2 58:13
**review** 58:5 166:2 189:5,12 194:7 196:14
**reviewed** 19:25 38:5 122:13 141:9

160:13 189:8,19
**revise** 77:24 78:14
**right** 10:21 13:2 15:6,19 19:11,15 19:19 20:8,24 23:3 27:8 33:24 40:24 44:12 46:3 46:21,22 48:22 49:16,20 74:2 75:10,25 77:3 79:10 82:10 85:3 89:19 94:9 96:9 96:21 99:11 103:3 106:1,9 108:9 113:11,17 116:12 128:4,19 129:10 139:6 141:7,19 144:17 146:6 147:13 149:16 150:15 151:14,21 154:15 155:21 156:2 160:13 162:3 163:11,18 164:8,20 167:13 168:7 169:19 171:2 173:23 177:19 185:18 191:11
**rights** 25:22 179:24 190:13 191:10 192:21,22 193:8
**risk** 43:4
**road** 4:7
**role** 34:15 178:16 178:18 185:24
**room** 15:22 18:8 18:17,23 20:5,8
**roughly** 95:10
**route** 34:3

**row** 154:6
**rows** 156:16
**rule** 46:19
**rules** 11:4,9 15:7 46:8 97:23
**run** 71:18 150:7
**running** 19:4,17
**russotti** 4:13 9:25

**s**

**s** 7:1 8:1
**s.r.l.** 1:10,10 2:10 2:10
**safe** 99:24 100:5 116:2,21 122:17 122:18 123:5 189:12
**safety** 118:9,23 119:15 120:8 121:4,10 123:19 123:24 124:14 125:12,24 126:18
**saint** 40:22
**salary** 42:8,10
**sales** 41:22 168:2
**sample** 4:7
**sanctions** 178:2
**sat** 12:10
**saving** 77:16,16
**saw** 54:8 59:5 69:17,18,20 72:18 77:6 80:11 81:22 153:1
**saying** 116:18
**says** 31:22 45:15 50:2 53:6 55:19 57:16 58:10 61:4 61:25 63:10 67:4 68:4 80:19 83:20 91:4,4 99:20 100:9,18 105:13 115:20,22,23

118:4 120:5
122:10 127:4
130:23 133:9
135:15 140:20
142:17 144:24
145:3 146:8
154:17 162:11
**scale** 80:21
**school** 23:19 40:20
40:25 44:16
**science** 40:19
**scoolidge** 4:13,15
9:24 10:3,3
**screen** 16:18 44:23
45:1,13,16 47:1
48:17 54:19,24
55:1 59:20 60:9
75:17 98:7 113:24
128:4 153:6
154:16 160:2
163:6
**screenshot** 67:17
76:4,12 84:9
104:15 108:7
110:25 111:6,9,17
112:23,25 113:19
114:11 128:25
132:20,24,25
133:2 139:6
149:17 153:8
155:3 156:16
157:10,23 161:20
161:22,24 167:12
167:14
**screenshots**
145:13,22 149:9
149:12 151:15
**scroll** 84:13 89:25
90:2 93:5 104:5
105:5,6 114:2
130:17 140:15

152:23 156:4
**scrolling** 57:15
99:11
**search** 43:1 54:3
148:18,23 149:5
174:9,9 188:17
**searched** 140:4
148:24 174:6
**searches** 68:21,23
**searching** 68:19
**second** 7:5 16:1,17
45:21 52:18 54:23
55:12 65:11 83:3
103:6 132:4
151:13 156:18
159:21 163:16
192:20
**seconds** 30:17
65:18
**security** 118:9
119:16 123:19,25
124:15 125:12,24
126:18
**see** 11:23,24 12:3
12:9 13:20 15:17
24:13 45:1 47:5
50:1,8 53:6,20
55:2,6,8 57:1,16
57:23 58:9,22
59:12,23 60:8,11
60:13,13 61:1,3,20
61:24 62:15 63:10
63:14,18 64:9,24
65:23 66:2 67:19
68:3,5 71:4,18
72:5 73:20 75:22
79:9 80:6,10 81:6
81:9 82:25 84:6
85:19 87:21,25
88:7,14 89:10,20
89:21 90:25 91:1

91:3,7,11 92:12,18
92:23 93:9,17,20
93:24 94:1,12
95:8 98:7 99:13
99:20 100:6,8,16
100:18 102:12
103:9,22,25
104:14,19 105:10
106:2,21,24 107:8
108:3,6,13,25
109:5 111:22
112:7 113:1,8
114:7,8,12,15,16
116:9,16,23 117:17
118:4,13 122:10
122:21 126:16
127:4,11 128:5
129:13 130:19,22
132:10 135:7,14
135:21 137:24
138:2,25 140:9,19
140:24 142:17
143:8 144:24
145:3,7 146:8,14
149:4 152:23
154:16,19,20,21
154:21 155:5,6,6
156:2,7 158:23,23
159:3 160:2,5
162:10 163:9,18
163:25 166:21
177:17,17 189:24
**seeing** 62:22 90:19
113:25
**seek** 180:3
**seeking** 56:12
**seen** 27:12 34:13
47:11 55:15 60:1
68:24 69:19 78:19
79:23 98:14 99:7
128:7 132:16

149:3 151:25
154:25 185:2
**select** 26:24
**sell** 41:23,24 51:15
167:17
**send** 7:20 131:5
144:2
**sending** 132:21
133:2,3 136:6,7
141:18 148:4
**sense** 13:18 37:11
45:3 50:16
**sent** 130:2 131:6
133:12,16 141:20
144:13 148:12
188:18,21 189:19
194:4
**sentence** 16:7
115:21
**separate** 44:4
146:11 147:6,8
183:14
**separately** 46:15
78:10
**september** 95:4
140:20 166:17
168:13
**sequentially** 46:10
**serious** 12:21
**serve** 190:17
**service** 20:21,22
**serviced** 20:2,13
**services** 1:9 2:9
**set** 7:7,8 55:13
62:2,16 82:12
147:1 196:5
**settle** 25:25 179:15
190:3 194:12
**settled** 26:13
**settlement** 179:16
179:19

settles   190:4
shades   12:2
shapiro   1:9 2:9 5:3
    10:8 33:11,13
    53:10 54:14 58:12
    106:2,6 113:10
    118:7 119:7
shapiro's   105:25
share   43:16,21
    44:2,11,22,25,25
    45:12,18 54:17,18
    54:22 55:1 59:19
    59:20 89:19 97:16
    103:5,20 127:24
    128:18 130:14
    132:3 149:23
    151:21 152:16
    154:12 159:20
    160:1 163:2 166:1
sharing   16:19
    45:16 47:2 65:4
shawn   5:6 10:6
sheet   108:1
short   80:20 150:4
    150:8
shorthand   2:18
    196:2,7
shortly   119:3
    146:8
show   47:3 75:5
    143:17 147:21
showed   149:18,20
    158:7
showing   145:14
    152:18 167:9
shown   23:19 134:5
shows   147:19,21
    147:22
shrink   111:11
    114:6,14

shut   129:7 157:20
    172:12
sic   92:12,22
side   41:18 66:8
    75:21
sign   31:12 58:2
    68:21
signature   57:24
    58:3 196:23
    197:25
signed   57:2,3 58:6
    96:17
signing   43:20
silhouette   11:24
    155:24
silver   4:4,5 10:16
    10:16,16 21:25
    24:10 26:22 27:2
    27:11,24 28:2,17
    28:25 44:1,7,8
    46:23 65:7,10,14
    71:12,17 182:4,17
    191:15,17 194:11
silvermillerlaw....
    4:10
similar   89:3 94:5
similarly   1:4 2:4
simply   30:12
    31:22 32:16
single   87:10
    130:17
sitting   59:10 77:15
    83:12 120:23
    126:8
situated   1:4 2:4
six   195:6
size   76:5
sleep   23:8
slowly   90:1
small   66:7 119:12
    158:5

smaller   72:5
    104:13 111:22
    168:19
snapshot   188:23
snapshots   188:22
snaunton   5:12
social   50:4 53:23
    118:5 122:14
    123:3,9 174:12,14
    177:11,21,25
sold   168:7
solely   26:7
solicitation   67:12
    89:11
soliciting   172:10
solid   169:24
solutions   1:10
    2:10
somebody   49:13
    93:2 150:9
somewhat   52:14
sorry   68:1 71:7
    74:7 101:4 123:7
    125:9,18 127:8
    164:6,11,14
    174:17 180:8
sort   11:23 17:25
    108:6 162:17
soseh   5:16 9:15
sound   27:8 50:25
    70:25 71:2 72:22
    73:6 95:4 124:11
    150:24 188:4
sounds   33:18
    96:21 97:21
spaeder   5:4 10:7
spam   169:23,25
speak   14:2 100:2,3
    182:3
speaking   13:24
    14:15 30:9 32:25

181:25
speaks   93:14
    126:20
special   15:7
specific   11:4,8
    50:15 66:22 115:4
    115:6 116:23
    117:1 118:22
    120:7 121:3 123:3
    125:11 167:10
specifically   62:3
    63:23 78:20 121:7
    146:22 182:6
    188:20 194:10
speculation   28:19
    173:8 176:9
    186:13
speed   20:3,14
sphil   93:18 94:10
sphil1608   93:6,11
spoke   184:21
spoken   14:11
    180:16 183:12
spread   36:3
sprfllp.com   4:21
    4:22
spring   184:17
springs   4:8
square   155:25
stack   44:18
stake   118:12,18
    122:12,19 124:19
    156:21
stamp   128:19,21
    132:13 151:23
    152:3,20,22
    153:18,22 154:20
    154:22 163:8
stance   67:11
standard   10:22

standing 20:22
standpoint 67:21
stands 156:18
start 9:22 14:1
42:3 43:6 64:21
65:3 70:15 75:9
89:23 175:9
started 36:4 42:23
74:19 76:15
starting 21:17
125:18
state 23:14 30:12
58:16,19 196:2
stated 62:6
statement 14:25
58:11,16,17,20,24
59:1,4,9 60:14
61:4,5,12 63:2,11
63:24 64:15 66:3
66:16,22 67:14,19
68:9,16 69:23
70:3,17 71:10,23
72:4,9 73:5,21
74:9 75:4,12
76:10,17 77:4,13
80:8,13,17,19 81:2
81:5,11,14 82:23
83:6,8,16,18 84:10
84:16,22 85:3,16
86:11,19 88:2,14
88:17 103:1 104:2
104:20 105:1,20
106:13 107:19
108:21 111:2,14
111:23 112:16
113:14,21 114:16
114:21,25 115:8
115:18 116:3,13
116:15,16,23
117:1,5,8,14 122:5
123:19 124:10

125:20 156:10
statements 49:5
61:8,8 62:1,5,8,9
62:12,20 63:21
64:2,3,4,13,19,22
67:10,16,17 69:6
70:11,24 72:16
73:16 76:3 77:19
77:22 78:6 79:19
82:13 88:7 96:22
97:2,5 99:22
100:2,23 101:8
102:21 103:11
104:20 105:2
107:20 108:4,22
111:2,14,24 112:7
112:17,22 113:1
113:21 114:8
115:13,13,25
116:19 117:6
118:22 119:6,15
119:20 120:7,12
120:15,16,24
121:3,7,10,14,19
121:23,24 122:1
122:15 123:8,9,13
123:15,23 124:2,3
124:14,18,22
125:11,14,23
126:4,9,12,17,23
states 1:1 2:1 9:12
62:1 63:20
stayed 130:2
stefan 23:16
step 65:7
steps 125:1
sticker 128:19
154:17
stipulation 46:7
stop 65:4,8 103:4
103:20 127:23

130:13 132:3
149:23 152:16
154:12 156:13
159:20 163:2
166:1
stopping 87:7
store 129:25
146:21
story 80:20
straightened
160:1
street 3:8
stretch 87:17
95:24
strike 15:12 36:11
69:22 76:24 97:3
120:6 121:1 127:8
128:14 133:11
144:25 152:21
156:14 158:9
165:15 170:20
171:18 176:4
180:1,10 181:15
183:15
strings 139:1
structure 21:9
stuff 23:20 32:2
34:14 90:19
subheading
117:20
subject 30:8 39:16
61:25 63:19
submitted 127:18
145:14
subparts 78:10
subscribed 53:8
196:21
sue 33:20,25 34:20
sued 33:10
suffered 24:6

suite 3:9,19
sum 140:22
summer 184:17
sunlight 11:22
supervising
178:23
supplemental 7:5
55:12
support 40:11
161:19
suppose 123:22
sure 9:22 16:3,22
19:25 30:24 32:16
34:10,19 39:2
42:25 48:13 49:9
49:14 51:10,12,13
51:16 59:6 73:1
73:24 74:25 75:16
77:2 81:15 99:8
101:24 103:2
106:17 109:18
111:7 116:7 117:8
118:25 119:10,23
120:11 124:2
130:8,9 131:13
133:6 134:8
136:22 144:1
150:19 152:10
154:1 157:8 158:2
158:20 165:18
168:18 172:3,3,17
177:12 178:24
179:14,22,25
181:8 182:25
183:21 184:14,18
184:21 185:1,21
186:17 187:18,24
188:23 189:7
190:9 191:25
194:8

**switch** 127:2 132:4
169:15 178:4
**sworn** 10:25 12:13
**syndrome** 140:17

**t**

**t** 6:1 7:1 8:1
130:25,25
**tabletop** 15:18
**take** 13:9,15,17
19:13 29:17 49:21
57:14 65:5,22
67:11 80:3 87:5
89:12 95:22 99:9
103:18,19 104:11
104:25 106:12
107:7,16 108:20
110:22 111:12,21
112:15,24,24
113:18 115:12
116:12 118:3
122:9 135:5,10
136:23 145:17
146:6 149:1,24
150:4,8,15,20
151:13,18 152:15
154:11 157:22
172:22 190:12
191:21
**taken** 2:16 9:9
45:24 52:8 96:3
151:4 158:1,3
167:15 178:14
192:5 196:5
**takes** 11:16
**talk** 11:3 15:6
18:20 21:23 22:6
22:12 27:13,19
29:18 38:20 85:25
169:15 170:1
182:2,7,22 183:7
184:19 186:1,22

188:12
**talked** 11:7,10
17:1 21:24 91:25
103:14 134:1
142:2 160:9,11,12
162:14 165:20
168:19 177:12
181:19,20 182:13
**talking** 28:11,21
38:19 44:15 48:20
54:5,7 66:23
67:14,16 88:11
106:9,9 151:15
171:13
**team** 21:22 33:8,9
33:15 56:4 57:13
99:22 105:24
**technical** 20:23
48:16 52:14
**technicians** 20:22
20:24
**technology** 22:12
22:21
**telegram** 174:25
177:4,6,8
**telephone** 58:18
**tell** 12:17,18,20
18:1 21:10,13
44:12 70:22 77:5
90:2,3 112:25
143:25 147:20
186:25
**telling** 77:15
**tells** 137:23
**temporally** 89:25
**ten** 87:18 150:10
191:24
**tends** 86:4
**tense** 60:15
**term** 172:4

**terms** 26:18 31:18
32:4,5 46:8 54:3
98:24 148:18,21
148:23 149:5
188:18
**test** 16:8
**testified** 10:25
95:12 109:8 119:2
119:25 125:23
126:3,7,11 149:7
171:9 181:10
183:24 193:21
**testify** 23:1,11
53:19
**testimony** 30:25
31:21 32:1,22
36:16 38:7 39:3
40:2 48:12 51:9
52:21 59:7 67:9
70:5 79:24 82:17
82:18 94:19 98:23
109:21,25 119:14
120:22 121:2,9,13
121:18,22 124:13
124:17,21 125:15
143:19,23 152:11
153:12 155:11
157:22,25 161:5
161:14,17 162:16
164:17 166:3,6,15
166:20 167:1,9,13
172:18 173:13
183:7,10 191:19
194:22 195:5
196:10
**text** 14:13 17:24
60:16,19 76:3
84:8 104:14
110:23 113:18
**thank** 12:5 84:20
104:8 106:18

114:3 193:5 195:1
**thanks** 93:12
**theme** 19:2
**thing** 25:13 72:5
75:22 108:25
111:22 141:11
164:8
**things** 72:18 78:17
78:18 150:18
170:2 179:2
188:18
**think** 21:25 25:21
26:12 28:15,21
33:17 35:23 36:5
36:7,11,21,22
46:17 48:4,21
50:20 51:17 54:14
56:8 62:25 68:24
70:1,3 73:23
76:23,25 77:3
78:10 80:16,20
81:16 82:4,7 83:2
87:18 92:3,11
94:2 96:13 102:24
104:17 107:5
112:21 118:20
120:12 123:2
126:11 131:18
134:7 137:20,23
139:2 141:1,21
142:2 143:11
145:17 146:1
147:3 149:17,19
150:1,3,12 156:6
158:5,16,18 159:2
160:19 164:9
168:16 170:1,24
171:7,22 175:20
176:2,10 177:1
183:22 185:23
186:6,8 188:24

194:18
**thinking** 87:9
141:10
**third** 59:15 61:3
**thought** 27:23
33:25 43:20 73:10
78:18 89:2 90:11
95:5 141:12
164:11 179:8
**thoughts** 73:13
**thousands** 81:22
82:8
**thread** 7:10
**three** 22:1,7 68:4
68:20 81:6 95:10
122:3 151:12
191:9,11
**time** 9:19 10:22
13:24 35:22 36:6
42:19 45:2 46:25
51:17 52:18 53:1
59:6 64:3,14
66:20 68:11,17
69:6,25 71:20
73:11 77:17 78:6
79:19 81:18 84:1
89:7 95:1 118:24
123:6,10 130:18
135:19 138:25
140:3 145:15
147:2,21 150:4,21
150:22,24 156:11
157:12 158:5
182:9 193:4,5,10
196:5
**timeline** 157:14
**times** 11:12,14
16:21 17:6 124:25
125:3 183:2,5
**timing** 119:23
137:15

**title** 98:20 194:9
**titled** 55:11
**today** 13:21 15:7
15:14 21:5,7
22:13,21 23:1
43:13 59:10 83:12
120:23 122:6
126:8 171:25
193:5
**today's** 195:4
**toggling** 90:25
91:3 154:6
**told** 18:10 21:20
29:7 39:13,16
50:22 70:23 95:2
96:15 99:2 133:15
144:8 148:6 162:3
167:22 170:8
187:19 188:3
**top** 32:6 48:17
60:24 79:7 117:16
130:8 137:19
149:20 155:25
165:2 171:1
176:11 184:15
**topanga** 9:17
**total** 39:21 80:22
127:8,9 141:2
145:5 146:12
195:5
**totally** 185:19
**touch** 21:5,8
**tough** 122:4
**touting** 50:4
**traditionally** 11:5
15:9
**trail** 94:25
**transaction** 115:4
115:7 127:16
128:11 129:2,6,11
131:12,20 132:1

133:4,24 134:12
136:1 137:14
138:9,18 141:12
141:15 142:25
143:13 148:13
167:23 168:19
**transactions**
134:19,22 135:2
137:7 165:20
166:3 167:20
168:4
**transcribed** 14:12
196:8
**transcript** 7:12
98:21 99:3 194:19
196:9,12,14
**transcription**
17:16 197:6
**transfer** 8:3,15
136:10 141:24
142:3 146:17
147:17
**transferred**
130:24 135:17
142:19 143:2,4,20
146:10 157:2,12
157:16 160:21
161:7,12,16
**transfers** 144:20
**treated** 26:17
**tried** 66:10 158:13
158:15 187:8
**troubleshoot**
51:24
**troubleshoots** 52:2
**troy** 1:9 2:9 10:2
58:13
**true** 17:2 49:1
50:9 53:22 56:22
57:7,9,19,22 67:12
74:6,11 86:16

117:25 118:15
122:23 127:13
131:3,9 135:23
140:25 142:22
145:8 146:15
190:25 191:14
196:9
**trust** 100:1,4
**trustees** 170:9,14
171:11 172:9
**truth** 12:17,18,20
147:20
**truthful** 59:3
**truthfully** 23:1,12
**truthfulness** 53:15
**try** 16:19 17:23
158:22,25
**trying** 73:19
150:17 159:2,5
**tunnel** 140:17
**turn** 11:17 12:1
17:5 118:17
121:15 148:25
**turned** 118:11
119:9 120:9 140:5
**turning** 120:25
121:5
**tweet** 91:9 94:3
106:3,5,20 109:4
**tweeting** 107:1
**tweets** 7:11 34:14
54:8 90:3,6
**twitter** 7:10 27:14
27:21 28:10 33:16
34:12 50:6 53:9
54:1,6 58:18 67:6
89:1 90:9 91:20
92:1,18 170:2
174:16,17 175:9
175:10

two 18:11 33:12
35:16 41:7 43:24
44:4 71:12 78:9
150:23 168:17,19
168:20,21
type 34:14 41:23
68:20 164:21
169:23
types 24:5
typical 168:1
typically 42:12

**u**

u 108:14,18 110:8
u.s. 143:6
underneath 67:4
understand 11:15
12:23 13:1,4,6,7
14:7,17 15:4
16:24 17:8 18:2
18:24 19:8 21:1
21:14 37:14 52:13
59:3 156:22
180:19,23 181:2,6
181:11 186:9
191:7 194:1
understanding
29:25 157:7
190:16,20
understood 59:8
98:1
unfortunately
49:17 128:18
unique 11:4
unit 9:7
united 1:1 2:1 9:12
units 195:6
unknown 8:6,10
8:14
unpleasant 97:21
97:24

unquote 120:25
121:15 123:23
untrue 67:10,12
112:8,11,13,17
113:2,3,6,22 114:9
114:17,20 115:14
unusual 11:5
update 107:10
updates 105:13,16
105:23 110:17
upper 68:5
upwards 37:20
usd 144:6
use 19:2,6 88:25
95:23 150:12
155:12,15 174:12
174:14,16,19,21
174:23,25 175:2
175:18
user 8:4,5,8,9,12
8:13
users 172:11
usually 29:16
157:2 182:2,8,20

**v**

v 197:1
vague 136:13
vaguely 90:7
value 36:3,14
135:19 143:17
162:11,18,23
valued 36:5
variations 19:2
varies 182:21,24
various 156:20
verbal 14:5
verbally 14:3
verification 57:2
57:14,25
verify 57:21 159:3

veritext 9:16,18
20:22 43:23 195:7
versions 48:5
versus 9:10
video 9:8 71:17
videographer 5:16
9:4,16 45:22,25
52:1,5,9 95:25
96:4 151:1,6
192:2,6 195:3
videotaped 1:15
2:15
viewed 63:22
viewing 64:1
virtual 1:15
visible 153:6
vision 42:1
vocal 33:16
vocally 17:20
vouching 125:11
vs 1:7 2:7

**w**

wait 13:24 16:1
waiting 46:23
walk 97:11
walking 156:15
wallet 130:7,12
135:18 146:11,13
146:18,19,20,25
147:6,6,9,11,15,18
147:19 157:13,13
157:17 161:23
want 11:3,19 13:9
14:19 15:6 16:3
20:7,17 21:10,12
38:21 43:1,12
44:17 46:13 48:15
48:19,22 54:23
65:8 71:14 72:20
72:20 77:14,24
78:9 79:24 84:15

87:25 89:8 90:1,2
90:16 92:4 128:20
135:5 139:23
140:1,15 148:17
157:18 159:23
162:25 163:13
166:2,5 177:24
179:5 186:14
192:13,21 194:17
wanted 27:16
64:18 94:21
washington 3:10
3:20
way 11:25 12:17
13:3 15:9 23:22
44:21 49:21 75:4
80:21 89:24 90:12
94:9 110:16
130:16 140:2,13
169:4 177:17
we've 29:6 34:13
47:3 84:8,9
137:21 149:25
150:14 160:13
weaved 23:22
web 67:2 155:19
webcoin 1:10 2:10
website 52:25
122:16 123:24
124:11,14 125:11
125:24 126:17
127:6 129:7
153:10 158:17
175:22 177:17,18
websites 37:9
week 96:17
weird 49:18
welcome 13:10
29:16
went 27:1 59:6
79:2 139:2

**west** 4:7
**whatsoever**
  173:25
**whereof** 196:20
**white** 155:24
**wider** 107:17
**wife** 18:10 21:20
  21:20
**willing** 65:15
**win** 25:7,12 186:9
**window** 11:22
  119:12
**windows** 75:21
**wish** 130:15
**withdrawal** 148:3
  148:11 163:23
  164:21,24
**withdrawals**
  163:25 164:18
**withdrawing**
  165:7
**withdrawn** 164:22
  164:25 165:4
**withdrew** 161:3
**witness** 11:14,17
  16:4 22:18 26:5
  26:15 28:8,20
  31:2 35:22 37:17
  37:19 38:2,17
  39:6,11 40:4 51:2
  51:22 52:19,23
  56:14 66:6,7 67:1
  73:1,10 83:15
  86:14 92:8 101:3
  101:13,23,24
  107:24,25 110:1
  116:7 120:20
  125:18 136:14
  143:16,24 159:15
  159:17 160:3
  161:11 164:9,13

166:10,21 173:9
173:10,22 176:10
187:13 193:14
196:20 197:3
**wondering** 46:6
**word** 36:3 67:7
68:20 137:24
138:2
**work** 41:15,16,18
43:14 80:21
155:15 191:24
**worked** 27:24
**working** 31:22
41:13 42:3 193:22
**works** 192:1
**world** 43:17 86:4
**worth** 7:20 36:11
36:13,20 37:3,7,10
38:8 127:10
143:20 144:13
**write** 55:25 56:6
56:10 92:21 93:24
**writes** 93:7 94:10
**written** 31:15 32:9
32:19,24 33:3
61:6 63:19
**wrong** 50:25 70:25
71:2 95:4 100:21
101:6,6,19,25
124:11 164:7
188:4
**wrote** 56:3 89:8
90:15 92:3,22
106:2

| x |
|---|

**x** 1:3,13 2:3,13 6:1
6:1 7:1,1 8:1,1
130:25 196:15
**xr** 68:21
**xrb** 25:9 33:15,18
34:13 36:1,14,16

50:4,4,10 51:15
53:7,11,17,24 54:4
64:6 66:20 67:13
68:14,17,21 72:20
73:17 74:5,15
76:16 82:5 85:2
89:9 90:16 92:4
92:17 93:23 94:6
94:10,17,20 95:13
95:17 96:12
100:24 101:9
102:4 118:7,12,18
122:11,20 140:23
141:1 142:5,14,20
145:5 146:10,10
146:11,13,17,18
146:19,23 147:17
148:3,11 154:7
156:19 157:13,16
157:20 160:17,24
161:7,15,22
162:11,19 166:16
167:3 168:12,17
168:23,25 169:3
178:14 180:15
**xrbc** 91:7,11,13
92:13 93:25 94:6

| y |
|---|

**yeah** 16:5 120:6
**year** 27:6 36:23
42:17 70:4 184:17
**years** 33:17 41:7
42:6,16 43:7 68:4
81:6 122:4 175:4
177:10
**yep** 41:1
**yesterday** 44:3
**ygr** 1:7 2:7 9:13
**york** 4:19,19 5:9,9

| z |
|---|

**zach** 1:9 2:9 22:3
**zach's** 22:3
**zachary** 3:6 10:8
  10:14
**zack** 5:3 33:11,13
  54:14 58:12
  105:24 106:2,5
  113:10
**zcl** 165:1
**zelle** 3:15 10:18
  26:23 182:5
**zelle.com** 3:22
**zero** 152:21
**zlk.com** 3:12,13
**zness** 3:13
**zoom** 1:15 9:14
  19:18 22:14 44:23
  47:2 85:15 88:1,4
  107:17
**zoomed** 153:5
**zuckerman** 5:4
  10:7
**zuckerman.com**
  5:11,12

**EXHIBIT F**

Rosanne L. Mah (State Bar No. 242628)
Email: rmah@zlk.com
**LEVI & KORSINSKY, LLP**
388 Market Street, Suite 1300
San Francisco, California 94104
Telephone: (415) 373-1671
Facsimile: (415) 484-1294

Donald J. Enright (admitted *pro hac vice*)
Email: denright@zlk.com
**LEVI & KORSINSKY, LLP**
1101 30th St., NW, Ste. 115
Washington, DC 20007
Telephone: (202) 524-4292
Facsimile: (212) 363-7171

David C. Silver, Esq. (admitted *pro hac vice*)
E-mail: DSilver@SilverMillerLaw.com
**SILVER MILLER**
11780 W. Sample Road
Coral Springs, Florida 33065
Telephone: (954) 516-6000

John A. Carriel (admitted *pro hac vice*)
Email: jcarriel@zelle.com
**ZELLE LLP**
1775 Pennsylvania Ave, NW, Suite 375
Washington, DC 20006
Telephone: (202) 899-4111
Facsimile: (612) 336-9100

*Attorneys for Lead Plaintiff James Fabian*

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| JAMES FABIAN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>NANO F/K/A RAIBLOCKS F/K/A HIEUSYS, LLC; COLIN LEMAHIEU; MICA BUSCH; ZACH SHAPIRO; TROY RETZER; BG SERVICES, S.R.L. F/K/A BITGRAIL S.R.L. F/K/A WEBCOIN SOLUTIONS; and FRANCESCO "THE BOMBER" FIRANO,<br><br>Defendants. | Case No. 4:19-cv-00054-YGR (SK)<br><br>**LEAD PLAINTIFF'S SECOND SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANTS' FIRST SET OF INTERROGATORIES**<br><br>Judge:   Hon. Yvonne Gonzalez Rogers<br>         Magistrate Judge Sallie Kim |

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, and Local Rules 33 and 34 of the Northern District of California, Lead Plaintiff James Fabian ("Lead Plaintiff" or "Fabian"), by and through his undersigned counsel, hereby provide supplemental Responses and Objections to the First Set of Interrogatories propounded by Defendants Hieusys LLC, Colin LeMahieu, Mica Busch, Zack Shapiro, and Troy Retzer (collectively, the "Nano Defendants"). Lead Plaintiff served Responses and Objections to their Defendants' First Set of Interrogatories on June 29, 2020 (the "First R&Os"). On July 8, 2020, Lead Plaintiff served their first set of supplemental Responses and Objections to Defendants' First Set of Interrogatories (the "First Supplemental R&Os"). As with the First Supplemental R&Os, this Second Supplemental Response incorporates those in the First R&Os, while supplementing Responses to Interrogatories 4, 5, 6, 7, 8, 9, 12, and 13, with new language in bold. The same objections presented in the First R&Os and First Supplemental R&Os apply in full to these Second Supplemental Responses and Objections.  Lead Plaintiff waives no objections in providing these Second Supplemental Responses and reserves all rights.

## **PRELIMINARY STATEMENT**

1.        These responses are all disclosed for the purpose of this above-captioned Action only. Each response is subject to all appropriate objections (including but not limited to objections concerning competency, relevancy, materiality, propriety, and admissibility) that would require the exclusion of any requested information if the information were sought to be introduced into evidence at the time of trial. All such objections and grounds are reserved and will be imposed at the time of trial or other appropriate proceedings.

2.        Discovery is ongoing and Lead Plaintiff has not completed their investigations in this matter. The information set forth herein is true and correct to Lead Plaintiff's best knowledge at this time, and is subject to correction for inadvertent errors or omissions, if any errors or omissions shall be found to exist. Furthermore, Lead Plaintiff's responses are based upon the records and information presently available to Lead Plaintiff. The following responses are given without prejudice to the Lead Plaintiff's right to introduce, at the time of trial or other proceedings, subsequently discovered information relating to the proof of presently known material facts, and to introduce all information,

whenever discovered, relating to the proof of subsequently discovered material facts. However, Lead Plaintiff does not assume any duty of ongoing amendment to these responses.

3.  Except for the facts, if any, explicitly admitted by Lead Plaintiff, no admission of any nature whatsoever, incidental, inferred, or implied are intended by these responses or objections herein. Lead Plaintiff's responses and objections shall not be deemed an admission or concession of the existence of any facts set forth or assumed by these Interrogatories or that such objection or response constitutes admissible evidence of any fact set forth or assumed.

4.  If any information within the scope of the attorney-client privilege, the attorney work-product doctrine, the right to privacy, the privilege for confidential or proprietary information or trade secrets is inadvertently disclosed in these responses and/or the related document production, Lead Plaintiff has not done so intentionally and reserve their right assert those privileges at any time in these proceedings and further reserve the right to the return of all privileged information, including copies or abstracts of the information.

5.  This preliminary statement applies to each and every response or objections and is incorporated in each as though set forth in full therein.

### **GENERAL OBJECTIONS**

6.  Lead Plaintiff objects to the Nano Defendants' First Set of Interrogatories ("Interrogatories") to the extent that they seek information not relevant to the subject matter of this action and are not proportional to the needs of this case. Lead Plaintiff will not respond to irrelevant interrogatories.

7.  Lead Plaintiff objects to the Interrogatories to the extent they would require the answers containing confidential or proprietary information belonging to Lead Plaintiff or a third party. Lead Plaintiff will answer such interrogatories pursuant to the protective order and stipulation entered on February 24, 2020. [ECF Nos. 103-04].

8.  Lead Plaintiff objects to the Interrogatories to the extent they seek information or material prepared in anticipation of litigation or for trial of this or any other matter, to the extent that such information or material is protected by the work-product doctrine, the attorney-client privilege, or other applicable litigation privileges.

9. Lead Plaintiff bases the following responses herein on the assumption that the Nano Defendants do not seek information protected by the attorney-client privilege, information protected by the work-product doctrine, information protected by the Constitution or statutory rights of privacy or constitutional protection, information protected by the confidentiality of statements made or contact engaged in for settlement purposes, information protected by the confidential trade secrets privilege, or other proprietary information and information irrelevant to the subject matter of this proceedings. To the extent that the Nano Defendants' Interrogatories, or any part thereof, could be construed as seeking such information, Lead Plaintiff objects thereto and asserts the foregoing privileges to the greatest extent permitted by law.

10. Lead Plaintiff objects to the definitions and instructions of "Relating To" and "All" included in the Interrogatories as being overbroad, unduly burdensome, and harassing. Lead Plaintiff will respond to any Interrogatories incorporating these (or similar) terms based on a reasonable interpretation of the term as used in these particular Interrogatories.

11. Lead Plaintiff objects to answering any Interrogatories that would contain information equally available to the Nano Defendants, including, but not limited to, third-party information or information publically available.

12. Lead Plaintiff objects to each Interrogatory to the extent they are overly broad and thus unduly burdensome.

13. Lead Plaintiff objects to each Interrogatory to the extent they are vague and ambiguous. Lead Plaintiff similarly objects to the extent each interrogatory would require Lead Plaintiff to speculate as to the nature and/or scope of the information sought thereby. Lead Plaintiff has relied on the Nano Defendants' defined terms and have interpreted each Interrogatory in good faith.

14. Lead Plaintiff objects to each of the Interrogatories on the grounds they are unintelligible, incomplete, compound, oppressive, or intended to harass.

15. Lead Plaintiff objects to each Interrogatory to the extent it requires them to make legal conclusions.

16. Lead Plaintiff objects to each Interrogatory to the extent it compounds another Interrogatory.

17.     Lead Plaintiff objects to each Interrogatory to the extent they request information not in the Lead Plaintiff's possession, custody, or control. Lead Plaintiff has no obligation under the discovery rules to seek information from third parties.

18.     Lead Plaintiff objects to the Interrogatories on the basis that the Interrogatories and their subparts exceed the maximum number allowable under the Federal Rules of Civil Procedure and Local Rules.

## INCORPORATION OF GENERAL OBJECTIONS

19.     Each of the general objections is hereby incorporated by reference as though fully set forth in each of the specific responses made herein. Notwithstanding the specific response to any of the Nano Defendants' Interrogatories, Lead Plaintiff does not waive any of the general objections made herein, nor any other objection reasonably available. Each of the above general objections is asserted as to each of the Interrogatories propounded by the Nano Defendants.

## INTERROGATORIES AND RESPONSES THERETO

## INTERROGATORY NO. 1:

Identify each challenged statement, if any, made by:

a.) Colin LeMahieu,

b.) Mica Busch,

c.) Zack Shaprio,

d.) Troy Retzer, and

e.) Hieusys LLC

In this Interrogatory, "identify" means to quote or describe in detail the challenged statement, to state the medium or media through which the statement was made (e.g., email, Twitter post, telephone conversation), and to state where, when, by whom, and to whom the challenged statement was made.

## RESPONSE TO INTERROGATORY NO. 1:

Lead Plaintiff objects to this Interrogatory as overbroad and unduly burdensome because it seeks "each challenged statement" and is therefore not proportional to the needs of the case. This is particularly the case as the definitions in the Interrogatory construe "each" as inclusive rather than

LEAD PLAINTIFF'S SECOND SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANTS' FIRST SET OF INTERROGATORIES

exclusive. Nano Defendants will need to provide this Interrogatory more specifically so that Lead Plaintiff can properly respond to the Interrogatory. This Interrogatory does not differentiate which challenged statements, if all, are already available to the Nano Defendants on the basis of the Nano Defendants making these statements. Accordingly, Lead Plaintiff particularly objects on the basis that this information is already readily available to the Nano Defendants by reference to the Complaint.

Additionally, Lead Plaintiff objects on the basis that this Interrogatory seeks protected attorney work-product.

Lead Plaintiff also objects on the basis that this Interrogatory seeks legal conclusions.

Subject to the foregoing objections, Plaintiff states that the challenged statements are set forth in detail in the operative complaint pending in this Action. Specifically, the operative complaint contains all challenged statements of which Lead Plaintiff is currently aware. Stated otherwise, based on Lead Plaintiff's current information, the challenged statements are limited to those in the operative complaint. These challenged statements from the operative complaint, the means of their dissemination, and those to whom Lead Plaintiff believes those challenged statements were made, may be found as to each of the listed defendants in the operative complaint as follows:

a) Colin LeMahieu: ¶¶ 69, 72, 79, 86, 88, 89, 92, 94, 96, 97, 98, 109, 112, 113, 114, 121, 124, 127, 131, 138, 139, 141, 144, 154, 164, and 165.

b) Mica Busch: ¶¶ 91, 109, 112, 113, 114, 131, 133, 134, 144, 154, 164, and 165.

c) Zack Shapiro: ¶¶ 109, 112, 113, 114, 116, 117, 118, 119, 131, 144, 154, 164, 165, 166, 168, and 169.

d) Troy Retzer: ¶¶ 76, 78, 109, 112, 113, 114, 129, 131, 142, 143, 144, 154, 164, and 165.

e) Hieusys LLC: ¶¶ 109, 112, 113, 114, 131, 144, 154, 164, and 165.

Lead Plaintiff reserves the right to address and raise additional challenged statements not raised in the operative complaint should Lead Plaintiff become aware of those challenged statements.

**INTERROGATORY NO. 2:**

For any challenged statement that you contend was "made" by a person who did not write or speak such statement, describe in detail your basis for such attributing the statement to that person.

**RESPONSE TO INTERROGATORY NO. 2:**

1   Lead Plaintiff objects to this Interrogatory as overbroad and unduly burdensome because it

2   seeks "any challenged statement" and is therefore not proportional to the needs of the case. This is

3   particularly the case as the definitions in the Interrogatory construe "any" as inclusive rather than

4   exclusive. Nano Defendants will need to provide this Interrogatory more specifically so that Lead

5   Plaintiff can properly respond to the Interrogatory. This Interrogatory does not differentiate which

6   challenged statements, if all, are already available to the Nano Defendants on the basis of the Nano

7   Defendants making these statements. Accordingly, Lead Plaintiff particularly objects on the basis that

8   this information is already readily available to the Nano Defendants by reference to the Complaint.

9   Additionally, Lead Plaintiff objects on the basis that this Interrogatory seeks protected attorney

10   work-product.

11   Lead Plaintiff also objects on the basis that this Interrogatory seeks legal conclusions.

12   Subject to the foregoing objections, Plaintiff states that the challenged statements and the bases

13   for attribution are set forth in detail in the operative complaint pending in this Action. Specifically, the

14   specific allegations of the operative complaint in paragraphs 5, 22, 23, 71, 77, 78, 79, 80, 93, 96, 120,

15   125, 164, 165, 166, 167, 168, 169, 170, 204, 205, 228, 229, 230, 233, 234, 239, 240, and 241 contain

16   bases for attributing each challenged statement to the respective Defendant. The basis for attributing

17   any challenged statement to any particular Defendant is incorporated within the operative complaint

18   and within Lead Plaintiff's responses to Defendants' Motions to Dismiss (ECF Nos. 63, 91).

19   Additionally, and in specific regards to the Nano Twitter account, Defendant LeMahieu directly

20   conducted and supervised Nano's social media outreach, and that together the Nano Defendants

21   exercised control over Nano and BitGrail—including over Nano's social media accounts. *See*

22   Complaint, ¶¶ 69, 71-72, 78, 96, 114, 228-30; *see also* First Response to Defendants Motion to Dismiss

23   at 14, 19, 22, 24 (ECF No. 63).

24   Lead Plaintiff reserves the right to address and raise additional bases for attributing challenged

25   statements to Defendants in addition to those raised in the complaint should Lead Plaintiff become

26   aware of those bases.  Lead Plaintiff expects such information to be forthcoming in discovery.

27   **INTERROGATORY NO. 3**:

28   For any challenged statement that you contend was not made to you, describe in detail the date

LEAD PLAINTIFF'S SECOND SUPPLEMENTAL RESPONSES AND OBJECTIONS TO
DEFENDANTS' FIRST SET OF INTERROGATORIES

on which, and the circumstances in which, you received it.

**RESPONSE TO INTERROGATORY NO. 3:**

Lead Plaintiff objects to this Interrogatory as overbroad and unduly burdensome because it seeks "any challenged statement" and is therefore not proportional to the needs of the case. This is particularly the case as the definitions in the Interrogatory construe "any" as inclusive rather than exclusive. Nano Defendants will need to provide this Interrogatory more specifically so that Lead Plaintiff can properly respond to the Interrogatory. This Interrogatory does not differentiate which challenged statements, if all, are already available to the Nano Defendants on the basis of the Nano Defendants making these statements. Accordingly, Lead Plaintiff particularly objects on the basis that this information is already readily available to the Nano Defendants by reference to the Complaint.

Additionally, Lead Plaintiff objects on the basis that this Interrogatory seeks protected attorney work-product.

Lead Plaintiff also objects on the basis to the extent that the Interrogatory seeks legal conclusions.

Subject to the foregoing objections, Plaintiff states that the challenged statements were generally received and viewed by Plaintiff on the Internet promptly after they were disseminated. Specifically, and without excluding any challenged statement not mentioned or otherwise covered within this Response, Mr. Fabian attests to viewing the following statements from the operative complaint at or around the time those statements were made, and attests that these statements influenced his decision-making in regards to his activities dealing with Nano, XRB, and BitGrail: ¶¶ 70, 86, 88, 91, 92, 94, 97, 109, 112, 113, 114, 116, 117, 118, 121, 127, 131, 134, 139, 142, 143, 144, 154, 164, 165, 166, 168, and 169.

**INTERROGATORY NO. 4:**

Describe in detail each specific act or omission, if any, that you contend was negligent committed by:

a.) Colin LeMahieu,

b.) Mica Busch,

c.) Zack Shaprio,

d.)  Troy Retzer, and

e.)  Hieusys LLC

Such description must include the date that the act or omission occurred, the circumstances in which it occurred, and when you became aware of its occurrence. If the negligence involved an alleged omission, specify exactly what action you contend should have been, but was not, taken. Your description must also include the reasons why you contend such act or omission was negligent, including by describing in detail the facts that you contend created a duty toward you, and the facts you contend demonstrate how, if at all, the act or omission caused you damages.

**RESPONSE TO INTERROGATORY NO. 4:**

Lead Plaintiff objects to this Interrogatory as overbroad and unduly burdensome because it seeks "each act or omission" and is therefore not proportional to the needs of the case. This is particularly the case as the definitions in the Interrogatory construe "each" as inclusive rather than exclusive. Nano Defendants will need to provide this Interrogatory more specifically so that Lead Plaintiff can properly respond to the Interrogatory.  This Interrogatory does not differentiate which acts or omissions, if all, are already available to or known by the Nano Defendants on the basis of the Nano Defendants making these statements. Accordingly, Lead Plaintiff particularly objects on the basis that this information is already readily available to the Nano Defendants by reference to the Complaint.

Additionally, Lead Plaintiff objects on the basis that this Interrogatory seeks protected attorney work-product.

Lead Plaintiff also objects on the basis that this Interrogatory seeks legal conclusions.

Subject to the foregoing objections, Plaintiff states that the challenged acts and omissions are set forth in detail in the operative complaint pending in this Action, as well as how they caused harm to the Plaintiff.  **Specifically, the operative complaint contains all pertinent acts and omissions of which Lead Plaintiff is currently aware. These pertinent acts and omissions from the operative complaint, and their respective bases, may be found as to each of the listed defendants in the operative complaint as follows:**

**a) Colin LeMahieu: ¶¶ 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 21, 22, 23 69, 72, 74, 79, 86, 88, 89, 92, 94, 96, 97, 98, 109, 112, 113, 114, 121, 124, 127, 131, 138, 139, 141, 144, 145, 146, 147,**

148, 149, 150, 154, 160, 161, 162, 163, 164, 165, 167, 170, 171, 172, 173, 174, 228, 229, 230, 233, 234, 239, 240, and 241.

The acts and omissions set forth in these paragraphs of the operative complaint include Defendant LeMahieu's failure to adopt adequate safety precautions in the form of a lack of the Nano Protocol's idempotence and vulnerability to Double Withdrawal Transactions. As evidenced by the Italian Bankruptcy Proceedings obtained by Lead Plaintiff, this lack of protection resulted in exploitation and theft of XRB totaling over $170 million in loss. The Nano Defendants, including Defendant LeMahieu became aware of this issue before the exploit and theft took place, and still failed to safeguard the XRB, and misrepresented the safety of the Nano Protocol and the Bitgrail exchange.

b) <u>Mica Busch</u>: ¶¶ 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 21, 22, 23, 74, 91, 109, 112, 113, 114, 131, 133, 134, 144, 145, 146, 147, 148, 149, 150, 154, 160, 161, 162, 163,  164, 165, 167, 170, 171, 172, 173, 174, 228, 229, 230, 233, 234, 239, 240, and 241.

The acts and omissions set forth in these paragraphs of the operative complaint include Defendant Busch's failure to adopt adequate safety precautions in the form of a lack of the Nano Protocol's idempotence and vulnerability to Double Withdrawal Transactions. As evidenced by the Italian Bankruptcy Proceedings obtained by Lead Plaintiff, this lack of protection resulted in exploitation and theft of XRB totaling over $170 million in loss. The Nano Defendants, including Defendant Busch became aware of this issue before the exploit and theft took place, and still failed to safeguard the XRB, and misrepresented the safety of the Nano Protocol and the Bitgrail exchange.

c) <u>Zack Shapiro</u>: ¶¶ 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 21, 22, 23, 74, 109, 112, 113, 114, 116, 117, 118, 119, 131, 144, 145, 146, 147, 148, 149, 150, 154, 160, 161, 162, 163, 164, 165, 166, 167, 168, 169, 170, 171, 172, 173, 174, 228, 229, 230, 233, 234, 239, 240, and 241.

The acts and omissions set forth in these paragraphs of the operative complaint include Defendant Shapiro's failure to adopt adequate safety precautions in the form of a lack of the Nano Protocol's idempotence and vulnerability to Double Withdrawal Transactions. As evidenced by the Italian Bankruptcy Proceedings obtained by Lead Plaintiff, this lack of

protection resulted in exploitation and theft of XRB totaling over $170 million in loss. The Nano Defendants, including Defendant Shapiro, became aware of this issue before the exploit and theft took place, and still failed to safeguard the XRB, and misrepresented the safety of the Nano Protocol and the Bitgrail exchange.

d) <u>Troy Retzer</u>: ¶¶ 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 21, 22, 23, 74, 76, 78, 109, 112, 113, 114, 129, 131, 142, 143, 144, 145, 146, 147, 148, 149, 150, 154, 160, 161, 162, 163, 164, 165, 167, 170, 171, 172, 173, 174, 228, 229, 230, 233, 234, 239, 240, and 241.

The acts and omissions set forth in these paragraphs of the operative complaint include Defendant Retzer's failure to adopt adequate safety precautions in the form of a lack of the Nano Protocol's idempotence and vulnerability to Double Withdrawal Transactions. As evidenced by the Italian Bankruptcy Proceedings obtained by Lead Plaintiff, this lack of protection resulted in exploitation and theft of XRB totaling over $170 million in loss. The Nano Defendants, including Defendant Retzer, became aware of this issue before the exploit and theft took place, and still failed to safeguard the XRB, and misrepresented the safety of the Nano Protocol and the Bitgrail exchange.

e) <u>Hieusys LLC</u>: ¶¶ 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 21, 22, 23, 74, 109, 112, 113, 114, 131, 144, 145, 146, 147, 148, 149, 150, 154, 160, 161, 162, 163, 164, 165, 167, 170, 171, 172, 173, 174, 228, 229, 230, 233, 234, 239, 240, and 241.

The acts and omissions set forth in these paragraphs of the operative complaint include Defendant Hieusys LLC's failure to adopt adequate safety precautions in the form of a lack of the Nano Protocol's idempotence and vulnerability to Double Withdrawal Transactions. As evidenced by the Italian Bankruptcy Proceedings obtained by Lead Plaintiff, this lack of protection resulted in exploitation and theft of XRB totaling over $170 million in loss. The Nano Defendants, including Defendant Hieusys LLC, became aware of this issue before the exploit and theft took place, and still failed to safeguard the XRB, and misrepresented the safety of the Nano Protocol and the Bitgrail exchange.

Lead Plaintiff reserves the right to address and raise additional bases for attributing pertinent acts or omissions to Defendants as such are revealed in discovery.  Lead Plaintiff

LEAD PLAINTIFF'S SECOND SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANTS' FIRST SET OF INTERROGATORIES

**expects such information to be forthcoming.**

**INTERROGATORY NO. 5:**

Identify each specific negligent act or omission that you contend gives rise to vicarious liability – i.e., liability for the act or omission of another person. In this Interrogatory, "identify" means to describe in detail the act or omission that you content was negligent, to identify the person whom you contend is vicariously liable for the commission of the act or omission, and to describe in detail the facts that you contend make such person vicariously liable for the act or omission.

**RESPONSE TO INTERROGATORY NO. 5:**

Lead Plaintiff objects to this Interrogatory as overbroad and unduly burdensome because it seeks "each specific negligent act or omission" and is therefore not proportional to the needs of the case. This is particularly the case as the definitions in the Interrogatory construe "each" as inclusive rather than exclusive. This Interrogatory is also vague in that it does not specify between whom vicarious liability is being inquired. Nano Defendants will need to provide this Interrogatory more specifically so that Lead Plaintiff can properly respond to the Interrogatory. This Interrogatory does not differentiate which acts or omissions, if all, are already available to or known by the Nano Defendants on the basis of the Nano Defendants making these statements. Accordingly, Lead Plaintiff particularly objects on the basis that this information is already readily available to the Nano Defendants by reference to the Complaint.

Additionally, Lead Plaintiff objects on the basis that this Interrogatory seeks protected attorney work-product.

Lead Plaintiff also objects on the basis that this Interrogatory seeks legal conclusions, and objects that this Interrogatory is compound.

Subject to the foregoing objections, Lead Plaintiff states that some of the acts or omissions that give rise to vicarious liability include Defendant LeMahieu's and the Nano Defendant's promotion of XRB (including the offering of investment advice), Nano Defendants' partnership with Defendant Firano to develop a RaiBlocks dedicated exchange, the failure of disclosing material information relating to XRB Protocol, the shutdown of the BitGrail Exchange through Firano while knowingly concealing theft from XRB accountholders, disclosure of said theft, lacking proper security for XRB,

**LEAD PLAINTIFF'S SECOND SUPPLEMENTAL RESPONSES AND OBJECTIONS TO
DEFENDANTS' FIRST SET OF INTERROGATORIES**

1  improperly maintaining the security of the BitGrail Exchange, and misrepresenting the Exchange as

2  secure to the public. **The constant communication within the chat logs among the Nano Defendants**

3  **(and so within the Nano Defendants' possession) show how no decision was made independently,**

4  **as each decision regarding XRB was made in consultation among the Nano Defendants and all**

5  **aspects of XRB were managed jointly. Specifically, within the Complaint, Lead Plaintiff alleges**

6  **that the Nano Defendants worked as a collective unit in the promotion of Nano, XRB, and**

7  **BitGrail, the bases for which are contained within the operative complaint.** *See* **First Amended**

8  **Complaint, ¶¶ 32-38, 77, 78, 80, 109, 120, 123, 126, 127, 159, 167, 172, and 173. For example, in**

9  **these paragraphs, Lead Plaintiff relies upon Nano's own assertions that each Defendant was a**

10  **part of the "core" team at Nano, each handling a separate yet co-dependent and co-operating**

11  **aspect of Nano's operations. The Nano Core Team, as described in part by Defendant LeMahieu,**

12  **possess more than 50% of the total voting power within Nano. Defendant Firano was also**

13  **described by Nano as being a key member of Nano's operational team, together solving**

14  **operational challenges at BitGrail. Together, the Nano Core Team promoted XRB, including any**

15  **"challenged statements" or "acts and omissions." The Core Team, along with Defendant Firano,**

16  **repeatedly advertised publicly on social media the safety of Nano and BitGrail, and Defendant**

17  **Firano represented publicly that he and the Nano Defendants all worked together in**

18  **understanding and working with the safety concerns of BitGrail. The Nano Defendants all took**

19  **to social media in various capacities to promote the use of XRB and its safety.**

20      **Lead Plaintiff reserves the right to address and raise additional bases for vicarious**

21  **liability of acts or omissions to Defendants in addition to those raised in the complaint should**

22  **Lead Plaintiff become aware of those bases.  Lead Plaintiff expects such information to be**

23  **forthcoming in discovery.**

24  **INTERROGATORY NO. 6:**

25      Describe in detail all facts relating to any relationship you contend exists between any of the

26  Nano Defendants and Francesco Firano or any other person affiliated with the cryptocurrency exchange

27  known as BitGrail, including all facts relating to your contention that any of the Nano Defendants

28  "controlled" or were "involved" with BitGrail (*see* complaint ¶¶ 4, 18, 108, 172, 220, 221 and 246).

LEAD PLAINTIFF'S SECOND SUPPLEMENTAL RESPONSES AND OBJECTIONS TO
DEFENDANTS' FIRST SET OF INTERROGATORIES

**RESPONSE TO INTERROGATORY NO. 6:**

Lead Plaintiff objects on the basis that this Interrogatory is overbroad and unduly burdensome. Specifically, "any other person" is far too broad and vague to the point this Interrogatory is unanswerable, especially when "any" is defined by the Nano Defendants as inclusive rather than exclusive. This Interrogatory does not differentiate which facts pertaining to the relationship between Nano Defendants and Firano, if all, are already available to or known by the Nano Defendants on the basis of the Nano Defendants making these statements. Accordingly, Lead Plaintiff particularly objects on the basis that this information is already readily available to the Nano Defendants by reference to the Complaint.

Additionally, Lead Plaintiff objects on the basis that this Interrogatory seeks protected attorney work-product.

Lead Plaintiff also objects on the basis that this Interrogatory seeks legal conclusions.

Subject to the foregoing objections, Lead Plaintiff states that Defendant Firano and the Nano Defendants' relationship was such that both Firano and the Nano Defendants were partnered up to develop the BitGrail Exchange, following which the Nano Defendants began to exercise significant control over the development and operation of the BitGrail Exchange. The Nano Defendants, in other words, exercised executive control over the project, as compared to Firano who implemented the changes requested by the Nano Defendants. **Specifically, this is generally supported by the chat logs produced by the Nano Defendants (and so within the Nano Defendants' possession). Additionally this is supported by the paragraphs of the operative complaint which show all facts in Lead Plaintiff's possession that the Nano Defendants acted with control or were involved with BitGrail and/or with Firano, which include: ¶¶ 4, 5, 6, 9, 10, 11, 12, 16, 17, 18, 19, 20, 37, 38, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 118, 119, 150, 152, 153, 155, 156, 157, 160, 161, 164, 165, 166, 168, 169, 170, 171, and 172. More specifically, Defendant Firano has publicly represented multiple times that the Nano Defendants had a direct hand in the control over the BitGrail exchange and over the promotion of XRB on and for BitGrail.**

**In Defendant Firano's own words, he described being contacted by the Nano Defendants to build an exchange from the ground up that supported Nano natively, to work on the project**

LEAD PLAINTIFF'S SECOND SUPPLEMENTAL RESPONSES AND OBJECTIONS TO
DEFENDANTS' FIRST SET OF INTERROGATORIES

1   with the Nano Defendants directly, and that the Nano Defendants directed the changes they

2   wished to see on and for BitGrail. Defendant Firano, in his own words, warned the Nano

3   Defendants that their actions presented safety concerns, but according to Firano, the Nano

4   Defendants ignored those concerns. The "Nano Updates" Twitter Account confirms this account

5   insofar as it reveals that the Nano Defendants and Fabian worked closely together on BitGrail.

6       In addition to the above, the Nano Defendants had a specific focus on promoting XRB on

7   BitGrail. For example, the Nano Twitter account announced the launch of XRB on BitGrail, and

8   the Nano Defendants made a specific template for purchasing XRB on BitGrail. The Italian

9   Tribunal proceedings against Defendants Firano and BitGrail make clear that XRB was stolen

10  via the BitGrail platform due to deficiencies within the Nano Protocol, of which Defendant Firano

11  repeatedly warned the Nano Defendants. Finally, the Nano Defendants repeatedly assured Lead

12  Plaintiff and members of the Class that investment in XRB on BitGrail was safe.

13  **INTERROGATORY NO. 7:**

14      Describe in detail all monetary relief that you seek in this action, on your own behalf or on

15  behalf of anyone else, including any "compensatory damages, punitive damages, incidental damages,

16  and consequential damages" (*see* complaint, at 62), including any calculations, estimates, formulas,

17  spreadsheets, other documents, or other methods you contend should be used to determine such relief.

18  **RESPONSE TO INTERROGATORY NO. 7:**

19      Lead Plaintiff objects on the basis that this Interrogatory is overbroad and unduly burdensome.

20  Lead Plaintiff is not yet aware which specific monetary damages he will pursue, as such determinations

21  pend on the outcome of this litigation. Therefore, Lead Plaintiff also objects on the basis that such

22  Interrogatory is premature prior to any ruling on the merits of this Action, as a class or otherwise. To

23  the extent this question seeks Lead Plaintiff's current position, Lead Plaintiff particularly objects on

24  the basis that this information is already readily available to the Nano Defendants by reference to the

25  Complaint.

26      Additionally, Lead Plaintiff objects on the basis that this Interrogatory seeks protected attorney

27  work-product.

28      Lead Plaintiff also objects on the basis that this Interrogatory seeks legal conclusions.

LEAD PLAINTIFF'S SECOND SUPPLEMENTAL RESPONSES AND OBJECTIONS TO
DEFENDANTS' FIRST SET OF INTERROGATORIES

Subject to the foregoing objections, Lead Plaintiff states that they intend to seek equitable restitution including rescission of investments in XRB held in accounts at BitGrai, restoration of the status quo ante, return to Plaintiff and the Class all cryptocurrency or fiat currency paid as a result of Defendants' unlawful actions. Additionally, Lead Plaintiff will seek, jointly and severally, *inter alia*, compensatory damages, punitive damages, incidental damages, and consequential damages. Lead Plaintiff will also seek pre-and-post-judgment interest, and attorneys' fees and litigation expenses. These damages will be fully pursued pending the outcome of this Action, and will be based on findings of culpability of the Defendants in this Action. Lead Plaintiff will calculate these damages in manners traditional to these damages calculations per their respective claims alleged in the FAC, or as Ordered by the Court. Lead Plaintiff will based these calculations in part on publicly available trading information, as well as from the information retained by the Defendants in this Action through the regular course of business.

Based on the social media posts of the named Defendants, Lead Plaintiff, on or about August 16, 2017 purchased 1.62457112 BTC for $7,104.30. On August 31, 2017, Lead Plaintiff sent .66971933 BTC to BitGrail. On September 1, 2017, Plaintiff purchased approximately 21,143 XRB on BitGrail. On December 12, 2017, Lead Plaintiff, transferred $2,850.00 to BitGrail and purchased an additional 2,000 XRB. In total, Lead Plaintiff purchased 23,143 XRB. **These give rise to Mr. Fabian's individualized damages. As for class-wide damages, the figures provided in the operative complaint at ¶¶ 231, 237, and 244 are estimations of damages from the Class losing the entirety their reserves of XRB—a total worth of over $170 million.** *See* **First Amended Complaint, ¶¶ 10 ("the BitGrail Defendants announced that over 15 million XRB, bearing a market value of approximately $170 million, which were supposedly safely stored on BitGrail, were "lost."), 16, 17, 21 ("Plaintiff's claims for negligence against Defendants arise from the Nano Defendant's failure to adopt adequate idempotency measure in the XRB Protocol and the BitGrail Defendant's failure to safeguard the Class' XRB deposits, resulting in the theft of the Class' XRB—representing a $170 million loss."), 25 ("Plaintiff and the Class are among the members of the public who invested in tens of millions of dollars' worth of XRB to be held in, and exchanged from, their BitGrail accounts, and who, from July 2017 through January 2018,**

LEAD PLAINTIFF'S SECOND SUPPLEMENTAL RESPONSES AND OBJECTIONS TO
DEFENDANTS' FIRST SET OF INTERROGATORIES

through no fault of their own, suffered a loss of more than $170 million worth of XRB when their investment holdings were simply "lost."), 154 ("In early-February 2018, BitGrail announced that it had "lost" $170 Million worth of XRB from its exchange due to "unauthorized transactions." The "missing" XRB amounted to approximately eighty percent (80%) of the XRB that BitGrail customers held in their accounts and amounts to nearly fifteen percent (15%) of all XRB in existence."), 171.

Final damages figures will be elucidated through further discovery, and ultimately the use of experts in determining damages. *See* First Amended Complaint ¶ 64 ("As a result of the foregoing, Plaintiff and the Class have been damaged in an amount that will be proven at trial.").

**INTERROGATORY NO. 8:**

Describe in detail all non-monetary relief that you seek in this action, on your own behalf or on behalf of anyone else, including any "accounting" of funds or the imposition of a "constructive trust" (*see* complaint, at 62), including the facts you contend would justify such relief.

**RESPONSE TO INTERROGATORY NO. 8:**

Lead Plaintiff objects on the basis that this Interrogatory is overbroad and unduly burdensome. Lead Plaintiff is not yet aware which specific non-monetary damages he will pursue, as such determinations pend on the outcome of this litigation. Therefore, Lead Plaintiff also objects on the basis that such Interrogatory is premature prior to any ruling on the merits of this Action, as a class or otherwise To the extent this question seeks Lead Plaintiff's current position, Lead Plaintiff particularly objects on the basis that this information is already readily available to the Nano Defendants by reference to the Complaint.

Additionally, Lead Plaintiff objects on the basis that this Interrogatory seeks protected attorney work-product.

Lead Plaintiff also objects on the basis that this Interrogatory seeks legal conclusions.

Subject to the foregoing objections, Plaintiff states that currently, they intend to seek an order requiring an accounting of the remaining funds and assets raised from the Plaintiff and the Class in connection with XRB, and an order imposing a constructive trust over the funds and assets rightfully belonging to Plaintiff and the Class. **Lead Plaintiff seeks these forms of non-monetary relief to a)**

**determine the exact nature of the profits made and/or retained by the Defendants in this Action; and b) to ensure that these funds can be put into a trust to maximize full restitution for the class. The facts which would justify such relief are that, if Lead Plaintiff and the class are successful on their claims, securing the resources to pay any judgment would be crucial in maximizing the ultimate recovery.**

**INTERROGATORY NO. 9:**

Identify any communications with or by you, or on your behalf, relating to any challenged statement identified in response to Interrogatory No. 1, any act or omission described in your response to Interrogatory No. 4, or any other matters relevant to your claims and allegations in this action.

**RESPONSE TO INTERROGATORY NO. 9:**

Lead Plaintiff objects on the basis that this Interrogatory is overbroad and unduly burdensome. Specifically, "any communications" and "any other matters" are far too broad and vague to the point this Interrogatory is unanswerable and beyond the scope of this litigation, especially when "any" is defined by the Nano Defendants as inclusive rather than exclusive. Furthermore, this Interrogatory does not differentiate which facts pertaining to communications, challenged statements, and acts or omissions, if all, are already available to or known by the Nano Defendants on the basis of the Nano Defendants making these statements. Accordingly, Lead Plaintiff particularly objects on the basis that this information is already readily available to the Nano Defendants by reference to the Complaint.

Additionally, Lead Plaintiff objects on the basis that this Interrogatory seeks protected attorney work-product. Lead Plaintiff also objects that this Interrogatory is compound.

Lead Plaintiff also objects on the basis that this Interrogatory seeks legal conclusions.

Subject to the foregoing objections, Lead Plaintiff states that commencing in or around April 2017, Lead Plaintiff learned about XRB by reading social media posts touting XRB – including but not limited to those published on Twitter. Lead Plaintiff followed the Twitter feeds of Defendant LeMahieu, Defendant Shapiro, and other people related to XRB. Lead Plaintiff decided to invest in XRB, open an account at BitGrail, and stake his investment holdings there.  Lead Plaintiff reviewed and relied upon the Nano Defendants' promotions on social media channels and statements made on the Nano Defendant's own website representing that BitGrail was a safe and reliable exchange.

**Additionally, and without excluding any challenged statement or act or omission not mentioned or otherwise covered within this Response, Mr. Fabian attests to viewing the following statements from the operative complaint at or around the time those statements were made, and attests that these statements influenced his decision-making in regards to his activities dealing with Nano, XRB, and BitGrail: ¶¶ 70, 86, 88, 91, 92, 94, 97, 109, 112, 113, 114, 116, 117, 118, 121, 127, 131, 134, 139, 142, 143, 144, 154, 164, 165, 166, 168, and 169.**

**Lead Plaintiff has no other relevant communications to disclose at this time.**

**INTERROGATORY NO. 10:**

Identify each person with knowledge relating to your claims and allegations in the complaint and state the subject of that knowledge.

**RESPONSE TO INTERROGATORY NO. 10:**

Lead Plaintiff objects on the basis that this Interrogatory is overbroad and unduly burdensome. Specifically, "each person" is far too broad and vague to the point this Interrogatory is unanswerable and beyond the scope of this litigation, especially when "each" is defined by the Nano Defendants as inclusive rather than exclusive. It is impossible for Lead Plaintiff to arrive at a list of every person who has knowledge relating to the claims and allegations in the Complaint. Furthermore, what constitutes as "knowledge relating" and "subject of that knowledge" is also vague and ill-defined.

Subject to the foregoing objections, Plaintiff states in addition to counsel in this Action, those who certainly have knowledge relating to the claims and allegations in this Action include the Nano Defendants, the BitGrail Defendants, Counsels in this Action, and any investor in XRB who could belong to this Class. Lead Plaintiff states that commencing in or around April 2017, Lead Plaintiff learned about XRB by reading social media posts touting XRB – including but not limited to those published on Twitter. Lead Plaintiff followed the Twitter feeds of Defendant LeMahieu, Defendant Shapiro, and other people related to XRB. Lead Plaintiff decided to invest in XRB, open an account at BitGrail, and stake his investment holdings there.  Lead Plaintiff, reviewed and relied upon the Nano Defendants' promotions on social media channels and statements made on the Nano Defendant's own website representing that BitGrail was a safe and reliable exchange.

**INTERROGATORY NO. 11:**

1  Identify all litigation matters in which you have been a party. For purposes of this Interrogatory,

2  "identify" means to provide the case name, case number, court in which the litigation took place, and

3  a description of the subject of the litigation.

4  **RESPONSE TO INTERROGATORY NO. 11:**

5  Lead Plaintiff objects on the basis that this Interrogatory is overbroad and unduly burdensome.

6  Specifically, "all litigations matters" is far too broad and vague to the point this Interrogatory is

7  unanswerable, especially when "all" is defined by the Nano Defendants as inclusive rather than

8  exclusive. Furthermore, this Interrogatory does not differentiate which facts regarding Fabian's prior

9  litigation matters, if all, are already available to or known by the Nano Defendants. Accordingly, Lead

10  Plaintiff particularly objects on the basis that this information is already readily available to the Nano

11  Defendants by simple searches of Fabian's information.  Finally, Lead Plaintiff objects that this

12  Interrogatory is beyond the scope and relevancy of this litigation.

13  Subject to the foregoing objections, Lead Plaintiff states that he was involved in a personal

14  injury case in college – Fabian v. Equity Housing, but is unsure if this suit ever got filed. Lead Plaintiff

15  believes this case settled in pre-suit in 2012.

16  **INTERROGATORY NO. 12:**

17  Describe in detail all facts relating to your contention that a "class action is the proper form" to

18  bring this action (complaint ¶ 40).

19  **RESPONSE TO INTERROGATORY NO. 12:**

20  Lead Plaintiff objects on the basis that this Interrogatory is overbroad and unduly burdensome.

21  Specifically, "all" is far too broad and vague to the point this Interrogatory is unanswerable and beyond

22  the scope of this litigation. Furthermore, this Interrogatory does not differentiate which facts pertaining

23  propriety of a class action if all, are already available to or known by the Nano Defendants on the basis

24  of the Nano Defendants making these statements. Accordingly, Lead Plaintiff particularly objects on

25  the basis that this information is already readily available to the Nano Defendants by reference to the

26  Complaint, and legal principles ascertainable through review of applicable statues and case law.

27  Additionally, Lead Plaintiff objects on the basis that this Interrogatory seeks protected attorney

28  work-product. Lead Plaintiff also objects that the Interrogatory improperly seeks legal positions and

LEAD PLAINTIFF'S SECOND SUPPLEMENTAL RESPONSES AND OBJECTIONS TO
DEFENDANTS' FIRST SET OF INTERROGATORIES

contentions and conclusions related to class certification through the guise of factual discovery.

Additionally, Lead Plaintiff objects on the grounds that it is premature and imposes undue burden by demanding "all facts" in support of Lead Plaintiff's position while factual and expert discovery is still proceeding in this matter and before Lead Plaintiffs have revealed their full basis for seeking class certification. See FED. R. CIV. P. 33(a)(2) "[T]he court may order that the interrogatory [that asks for an opinion or contention that relates to the fact or the application of law to fact] need not be answered until discovery is complete, or until a pretrial conference or some other time."); *see also Yingling v. eBay, Inc.*, 2010 U.S. Dist. LEXIS 12800, *7-9 (N.D. Cal. Jan. 29, 2010) (citing *In re Priceline.com Inc. Sec Litig.*, 233 F.R.D. 83, 86-87 (D. Conn. Nov. 23, 2005)). Lead Plaintiff has not yet moved for class certification, at which point they will be required to carry the burden of Federal Rule of Civil Procedure 23. If Lead Plaintiff does make such a motion, Lead Plaintiff's positions with respect to class certification will be comprehensively set forth in its class certification motion. Lead Plaintiff reserve all rights to amend their responses to introduce legal and factual theories, including in reply to Nano Defendants' Response to Lead Plaintiff's Motion for Class Certification.

**Subject to the foregoing, and retaining all objections, Lead Plaintiff's basis for a class Action being the proper forum to maintain this Action is as follows: this action satisfies all of the requirements of Federal Rules of Civil Procedure, including numerosity, commonality, predominance, typicality, adequacy, and superiority. Members of the Class are so numerous and geographically dispersed that joinder of all members is impractical. Based on the immense scale of the XRB lost, class members are likely in the thousands (and shall be better ascertained when Defendants provide full and proper discovery). Because some XRB users' losses are relatively modest, it would be impracticable for each to bring a lawsuit individually. Even for those whose losses are large, a class action is still the most efficient method of litigating these claims. *See* First Amended Complaint ¶ 60. Rather, by bringing this action as a class action, claims for losses of XRB can be satisfied as swiftly and efficiently as possible. Because all Class members suffered in the same or similar manner (relying on the same representations by Defendants and suffering from the same acts and omissions of Defendants), common questions predominate as to liability. A fuller list of common questions can be found on paragraph ¶ 50 of the operative complaint.**

**Lead Plaintiff is advancing the same claims as any other prospective member of the Class, and in addition to their expertise, Lead Plaintiff and Lead Counsel will adequately represent the Class without conflict.**

**INTERROGATORY NO. 13:**

Identify all documents, whether or not within your possession, custody, or control, relating to the size and membership of the putative class alleged in paragraph 41 of the complaint. For any such document not within your possession, custody, or control, describe in detail the facts that cause you believe such document exists.

**RESPONSE TO INTERROGATORY NO. 13:**

Lead Plaintiff objects on the basis that this Interrogatory is overbroad and unduly burdensome. Specifically, "all" is far too broad and vague to the point this Interrogatory is unanswerable and beyond the scope of this litigation. Furthermore, this Interrogatory does not differentiate which facts pertaining to the size and membership of the punitive class if all, are already available to or known by the Nano Defendants. Accordingly, Lead Plaintiff particularly objects on the basis that this information is already readily available to the Nano Defendants by reference to the Complaint, and legal principles ascertainable through review of applicable statues and case law.

Additionally, Lead Plaintiff objects on the basis that this Interrogatory seeks protected attorney work-product. Lead Plaintiff also objects that the Interrogatory improperly seeks legal positions and contentions and conclusions related to class certification through the guise of factual discovery.

Additionally, Lead Plaintiff objects on the grounds that it is premature and imposes undue burden by demanding "all facts" in support of Lead Plaintiff's position while factual and expert discovery is still proceeding in this matter and before Lead Plaintiffs have revealed their full basis for seeking class certification. See FED. R. CIV. P. 33(a)(2) "[T]he court may order that the interrogatory [that asks for an opinion or contention that relates to the fact or the application of law to fact] need not be answered until discovery is complete, or until a pretrial conference or some other time."); *see also Yingling v. eBay, Inc.*, 2010 U.S. Dist. LEXIS 12800, *7-9 (N.D. Cal. Jan. 29, 2010) (citing *In re Priceline.com Inc. Sec Litig.*, 233 F.R.D. 83, 86-87 (D. Conn. Nov. 23, 2005)). Lead Plaintiff has not yet moved for class certification, at which point they will be required to carry the burden of Federal

LEAD PLAINTIFF'S SECOND SUPPLEMENTAL RESPONSES AND OBJECTIONS TO
DEFENDANTS' FIRST SET OF INTERROGATORIES

Rule of Civil Procedure 23. If Lead Plaintiff does make such a motion, Lead Plaintiff's positions with respect to class certification will be comprehensively set forth in its class certification motion. Lead Plaintiff resave all rights to amend their responses to introduce legal and factual theories, including in reply to Nano Defendants' Response to Lead Plaintiff's Motion for Class Certification.

Lead Plaintiff also objects that this Interrogatory is compound.

Subject to the foregoing objections, Plaintiff will rely on public reports about Nano, and particularly reports regarding how withdrawals of Nano were frozen for non-EU investors first, prior to U.S. investors. **Based on the immense scale of the XRB lost, class members are likely in the thousands (and shall be better ascertained when Defendants provide full and proper discovery).** *See* **First Amended Complaint at ¶ 154 ("In early-February 2018, BitGrail announced that it had "lost" $170 Million worth of XRB from its exchange due to "unauthorized transactions." The "missing" XRB amounted to approximately eighty percent (80%) of the XRB that BitGrail customers held in their accounts and amounts to nearly fifteen percent (15%) of all XRB in existence."). Such a loss, as revealed by BitGrail itself, must represent the losses of hundreds if not thousands of investors.** *See* **Lead Plaintiff's First Document Production, L&K_00302-L&K_00303; 305; 311; 319.**

Dated: July 14, 2020

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

By: _/s/ Donald J. Enright_
Donald J. Enright (admitted *pro hac vice*)
**LEVI & KORSINSKY, LLP**
1101 30th St., NW, Ste. 115
Washington, DC 20007
Telephone: (202) 524-4292
Facsimile: (202) 363-7171

Rosanne L. Mah
**LEVI & KORSINSKY, LLP**
388 Market Street, Suite 1300
San Francisco, CA 94104
Telephone: (415) 373-1671
Facsimile: (415) 484-1294

David C. Silver (admitted *pro hac vice*)
Jason S. Miller*
Todd R. Friedman (admitted *pro hac vice*)
**SILVER MILLER**

11780 W. Sample Road
Coral Springs, FL 33065
Telephone: (954) 516-6000
**\*** to be admitted *pro hac vice*

John A. Carriel (admitted *pro hac vice*)
**ZELLE LLP**
1775 Pennsylvania Ave, NW, Suite 375
Telephone: (202) 899-4111
Facsimile: (612) 336-9100
Email: jcarriel@zelle.com

## VERIFICATION OF INTERROGATORY ANSWERS

I, James Fabian, am Lead Plaintiff in this Action. I believe, based on reasonable inquiry, that the foregoing answers are true and correct to the best of my knowledge, information and belief. I verify under penalty of perjury that the foregoing is true and correct.

Executed on: _07/14/2020_____

*James Fabian*
_____
SignNow e-signature ID: 8a1a6d1c70...
07/14/2020 13:33:13 UTC
James Fabian
*Lead Plaintiff*

LEAD PLAINTIFF'S SECOND SUPPLEMENTAL RESPONSES AND OBJECTIONS TO
DEFENDANTS' FIRST SET OF INTERROGATORIES